# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10917 PBS

|  |  |
|---|---|
| THE HIPSAVER COMPANY, INC., <br>     Plaintiff / Counterclaim Defendant, <br><br> v <br><br> J.T. POSEY COMPANY, <br>     Defendant / Counterclaim Plaintiff. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## HIPSAVER'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF GARY REICH

Plaintiff, the HipSaver Company, Inc. ("HipSaver") respectfully submits this memorandum in support of its motion to exclude the testimony of Defendant J.T. Posey, Inc.'s ("Posey") expert Gary Reich. The testimony of Gary Reich fails to satisfy the requirements of the Federal Rules of Evidence and existing case law, which require that experts employ a reliable methodology. Mr. Reich failed to conduct a proper investigation and failed to apply principles reliably to the facts of the case. His conclusory opinions will fail to assist the jury in finding the facts and accordingly, should be excluded.

### FACTS

HipSaver challenges Posey's proffer of reports by Gary Reich as "expert" opinion. *See* **Exhibit A**, Expert Report of Gary Reich, submitted February 16, 2006, ¶ 5 ("Reich Report"); **Exhibit B**, Supplemental Report of Gary Reich, submitted October 17, 2006 ("Supplemental Reich report"). Mr. Reich claims experience in the "marketing of

1

health care products and with the impact of advertising of medical products on customers and potential customers", stating that he "acted as a marketing consultant for a variety of companies in the health care business." **Exh. A**, Reich report at ¶ 5. However, based on his resume, Mr. Reich's experience in the healthcare industry is limited to business development. Mr. Reich has little, if any, advertising experience and is not qualified to evaluate the impact of advertising on consumer opinion and purchaser decision-making. *See* **Exh. C**, resume of Gary Reich ("Reich resume"). Mr. Reich's resume plainly shows that Mr. Reich's experience is limited to business development and facility, services and contracting administration. For example, as an independent consultant, Mr. Reich planned sales strategy for MRI and PET centers, evaluated market opportunities for PET centers, outpatient surgery centers, and managed care facilities. Before his consulting work, Mr. Reich worked with a company that provided software used to manage patient discharge information, acted as director of business development of a regional hospital (increasing the business and profits of the hospital), and consulted on facilities, services and contracting projects. Mr. Reich is a businessman who works to increase overall business to hospitals and other healthcare providers. Mr. Reich has no qualifying experience in sales or advertising, consumer surveying or consumer opinion assessment with respect to preventative care products.[1]

---

[1] Mr. Reich states in his report that, as part of his consulting work, he evaluates "different manufacturer's products, including product features" and "talk[s] with customers and potential customers regarding benefits to them" and asserts that this experience increases his familiarity with the buying habits of healthcare-related products. He also states that he has developed advertisements for companies for products such as dose calibrators, thyroid up-take systems, work stations, injection chairs, and survey meters. **Exh. A**, Reich report at ¶ 6. In contrast, his resume is void of any mention of experience with advertising or consumer purchasing. *See* **Exh. C**, Reich resume**.** Based on his resume, Mr. Reich has no advertising experience and no experience with purchaser decision making. The inconsistency can only suggest that the experience that Mr. Reich cites to in his report is sparse. Furthermore, even the experience that Mr. Reich lists in his report is not related to long term care facilities, nursing homes, or rehabilitation facilities and is not related to preventative medical devices.

2

Despite his lack of expertise in advertising and consumer opinion assessment, Mr. Reich reviewed Posey and HipSaver advertisements and by his report, offers a statement of opinions regarding the following issues:

With regard to Posey advertisements, Mr. Reich purports to offer 'expert' opinion with regard to:

- The effect of specific terms and phrases used in Posey Hipster advertisements on consumers or potential consumers as well as the effect of the entire advertisement on the consumer. The specific terms and phrases addressed are:
    - "independent study", **Exh. A**, Reich report at ¶ 4;
    - "An independent Laboratories[sic] study was conducted to determine the most effective impact absorbing material", *Id.*;
    - "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" *Id.*;
    - "A weight was released in a guided drop to simulate a 120 lb subject falling from a height of 36"." *Id.* at ¶ 18;
    - "Posey Hipsters help protect against injury from falls." **Exh. B**, Supplemental Reich report at Section II;
    - "The Hipster's high energy-absorbing foam pads are positioned precisely over the hip bones, increasing the odds of surviving a fall uninjured." *Id.*;
- Sales patterns of medical products, **Exh. A**, Reich report at ¶ 20;
- Market for hip protector products, *Id.* at ¶¶ 21, 22, 26, 27;
- Effect of placement and format of advertising, *Id.* at ¶¶ 24, 25.

With regard to HipSaver advertisements, Mr. Reich purports to offer 'expert' opinion with regard to the effect of specific terms and phrases used in HipSaver's

3

advertisements on a consumer or potential consumer and the effect of the overall advertisement on consumers. **Exh. A**, Reich report at ¶¶ 29-37. The specific terms and phrases include:

- "Prevent devastating hip injury with the only scientifically validated soft hip protector", **Exh. A**, Reich report at ¶¶ 30-32;

- "only proven, all-soft hip protector", *Id.*;

- "only soft hip protector that has clinical validation", *Id.*;

- "Only HipSaver hip protectors clearly meets the CDC guidelines for infection control in the laundry", *Id.* at ¶¶ 33-34;

- "Only HipSaver can be laundered according to CDC (Center for Disease Control) Guidelines for laundry." *Id.*;

- "HipSaver machine wash/dry up to 250ºF"; "HipSaver's wash and dry up to 250ºF", *Id.* at ¶ 35;

- HipSaver's Industry Comparisons chart, *Id.* at ¶¶ 36, 37.

Throughout the two speculative memoranda of Mr. Reich's personal opinion, he does not offer a single basis for his conclusions. Mr. Reich did not conduct a survey, nor does he rely upon any other systematic or objective analysis or specialized knowledge.

**A.   Mr. Reich's Conclusions Regarding Posey Advertisements**

**1.   "Independent study"**

With respect to the phrase "independent study" placed in one of the challenged Posey ads, Mr. Reich states,

> A customer assumes that a manufacturer pays a laboratory or other facility to test its products, and payment for a study or testing does not suggest that the study or testing was biased towards the manufacturer's product. Typically, studies are funded. For example, Underwriters' Laboratories is paid to provide a 'UL' certification for a manufacturer's product…Thus, the words 'independent study' do not suggest that Posey did not pay Garwood for the study.

**Exh. A**, Reich Report at ¶ 15.  There is no survey data to show actual consumer's understandings of the phrase "independent study."  And, Mr. Reich offers no other support for his opinion of what an ordinary consumer would understand from the words "independent study."  Instead, Mr. Reich offers an analogy to an unrelated certification process.

> 2.  **"An independent Laboratories[sic] study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material"**

Mr. Reich states that a consumer would understand the phrases, "[a]n independent Laboratories[sic] study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" to indicate to a consumer that Garwood Laboratories tested materials for their effectiveness at reducing the force of impact but that a consumer would not understand this statement to mean that Posey tested the comfortability of the materials.  **Exh. A**, Reich Report at ¶ 16.  Again, Reich fails to offer any survey evidence of consumers' understandings of the phrases in question.  Moreover, whatever "comfortability" is, it is not even at issue in this lawsuit.

> 3.  **"A weight was released in a guided drop to simulate a 120 lb subject falling from a height of 36"."**

Mr. Reich states that a consumer would not assume that any other types of fall were included in the testing.  The statement is conclusory.  Mr. Reich does not offer any support for his statement nor rely on specialized knowledge to form his opinion. Further, Mr. Reich's point is irrelevant to this litigation.

5

4.  **"Posey Hipsters help protect against injury from falls" and "The Hipster's high energy-absorbing foam pads are positioned precisely over the hip bones, increasing the odds of surviving a fall uninjured."**

Mr. Reich doesn't offer any opinion as to how these statements would be understood by a consumer or potential consumer. Instead, Mr. Reich states that "it is difficult to estimate how much the buying decision might be influenced, if any, by this specific advertisement." Thus, Mr. Reich offers no opinion as to the effect of the advertising campaign on Posey or Hipster products. The formulation of his opinion that any conclusion would be speculative at best does not employ any specialized knowledge. His opinion should not be presented to a jury under the guise of "expert" testimony.

5.  **Sales patterns of medical products**

Mr. Reich states that both Posey and HipSaver's sales patterns reflect a "classic medical product sales trend." *Id.* at ¶ 20. He offers the observation that typically, the biggest increase in growth rate will be at the beginning of a product launch because there is the greatest number of potential customers. Mr. Reich offers no support for his characterization of "classic medical product trends."

6.  **Market for hip protector products**

Mr. Reich offers unsupported claims regarding the market for hip protectors. **Exh. A**, Reich report at ¶¶ 21, 22, 26, 27. Mr. Reich asserts that there is a finite number of elderly and suggests that the majority of this market has been reached. He offers no evidence to support the implicit assertion that the majority of the hip protector market has been reached. Mr. Reich asserts that nursing homes and care facilities often recycle hip protectors and suggests that, once the market is saturated, sales will decline because the number of replacement units would not equal those of new units. Again, Mr. Reich

6

offers no support for this assertion. Given the number of patients that pass through assisted living facilities and nursing homes and the baby boomer population that will be entering into these communities in the next thirty years, this assertion seems incredible. Furthermore, the assertion that the number of replacement units per person would be less than the number of new units is also unsupported.

### 7. Effect of placement and format of advertising

Finally, Mr. Reich states that the placement and format of Garwood advertisements is not very effective advertising. **Exh. A**, Reich report at ¶¶ 24, 25, 26. He states that it does not 'grab' the buyer's attention because it is in small print on second and third pages. Without any specialized knowledge or supporting evidence or survey data, this assertion will not assist the jury.

### B. Mr. Reich's Conclusions Regarding HipSaver Advertisements

#### 1. "Prevent devastating hip injury with the only scientifically validated soft hip protector"; "only proven, all-soft hip protector"; "only soft hip protector that has clinical validation"

With respect to these statements on the HipSaver web-site, Mr. Reich states that, "[w]hen a company touts the effectiveness and testing "validation" of its product, consumers likely believe that the company tested the product it is currently selling." **Exh. A**, Reich report at ¶ 31. With respect to HipSaver's statements about the soft hip protector, Reich states that "it would be too much for the buyer to know the details of construction and variety of hip protectors." *Id.* Mr. Reich offers no basis for his opinion and does not rely on supporting evidence or specialized knowledge for his opinion.

2.  **"Only HipSaver hip protectors clearly meets the CDC guidelines for infection control in the laundry"; "Only HipSaver can be laundered according to CDC (Center for Disease Control) Guidelines for laundry."**

Again, Mr. Reich comments on the overall impression of the statements, "Only HipSaver hip protectors clearly meets the CDC guidelines for infection control in the laundry" and "Only HipSaver can be laundered according to CDC (Center for Disease Control) Guidelines for laundry" without relying on any "expert" opinion. **Exh. A**, Reich report at ¶¶ 33-34. He merely comments that the term "only" suggests to a consumer that only HipSavers meet the CDC guidelines. *Id.* Mr. Reich offers no basis for his opinion and does not rely on supporting evidence or specialized knowledge for his opinion.

3.  **"HipSaver machine wash/dry up to 250ºF"; "HipSavers wash and dry up to 250ºF"**

Mr. Reich comments that the statements "HipSaver machine wash/dry up to 250ºF"; "HipSavers wash and dry up to 250ºF" suggests to a consumer that the HipSaver products can be wash and dried at 250º F." **Exh. A**, Reich report at ¶ 35. Mr. Reich offers no basis for his opinion and does not rely on supporting evidence or specialized knowledge for his opinion.

4.  **HipSaver's Industry Comparisons chart**

Mr. Reich offers opinion on a HipSaver chart on its web-site that states that HipSaver hip protectors have been on the market since 1995 and Posey "Hipster" hip protectors have been offered to the market since 2002. **Exh. A**, Reich report at ¶¶ 36, 37. Mr. Reich offers opinion that these statements could be understood to mean that both companies first offered hip protectors to the market in these years or that both companies first introduced the hip protectors that they are currently selling in these years. Again,

Mr. Reich offers no basis for his opinion and does not rely on supporting evidence or specialized knowledge for his opinion.

## ARGUMENT

The reports and testimony proffered by Gary Reich as "expert" should be excluded because the evidence does not constitute expert evidence under the Federal Rules, is unnecessary, and will prejudice the jury. The admissibility of expert testimony is governed by Federal Rules of Evidence, Rules 702 and 703. Under F.R.E. 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed R. Evidence 702. Under the Rules, "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Advisory Committee's Note on 2000 Amendment citing Bourjaily v. United States,* 483 U.S. 171 (1987). Here, Mr. Reich does not qualify as an expert; his testimony is not based upon facts or data, it is not a product of reliable principles and methods, and Mr. Reich did not apply reliable principles and methods to the facts of the case.

### A.   Mr. Reich Does Not Qualify As An Expert

Gary Reich is improperly offered as an expert in marketing, qualified to testify to a consumer/potential consumer's interpretation of an advertisement. Mr. Reich is not a seasoned marketing or advertising surveyor, nor does he have specific experience in the marketing of preventative care devices for long term care and nursing home facilities.

9

Mr. Reich offers no support for his conclusions. Without any specific relevant experience and without survey evidence cataloging customers' opinions to support his analysis, Mr. Reich offers no "expert" opinion. *See e.g. IQ Products Co. v. Pennzoil Products Co.*, 305 F.3d 368 (5th Cir. 2002) (affirming exclusion of expert witnesses' opinions that consumers would have purchased plaintiff's tire inflators were it not for competitor's allegedly misleading statements about the explosiveness of its product because neither expert conducted reliable survey or market research, commonly employed by market analysts, to support their conclusions).

### B.  Mr. Reich's Opinions Are Based on Conclusory Speculation Rather Than Expert Analysis of the Evidence

#### 1.  The proffered testimony is not based upon sufficient facts or data

Mr. Reich's testimony is not based upon *any* facts or data relating to consumers' perception or understanding of the advertisements in question. There is no indication that Mr. Reich studied the group of consumers at issue, polled or surveyed consumers or potential consumers, or relied upon any specific marketing data compiled either by Mr. Reich or anyone else in the field. Accordingly, Mr. Reich's opinions are inapplicable to the purpose for which they are being offered and should not be considered. *See United States v. Fredette*, 315 F.3d 1235, 1239-40 (10th Cir. 2003) (marketing expert lacking personal knowledge in a particular program failed to explain how his experience and methods were sufficient bases for his opinion and was properly excluded), *cert. denied*, 538 U.S. 1045.

**2.     The proffered testimony is not the product of reliable principles and methods**

Mr. Reich's testimony is not based on any technique or theory, and his testimony cannot be objectively evaluated as required under Rule 702.[2]  There are no standards or controls in place for Mr. Reich's opinions.  Federal precedent prohibits the introduction of such unsupported, conclusory opinions by proffered experts.  *See Polaino v. Bayer Corp.,* 122 F.Supp.2d 63, 69 (D. Mass. 2000) (Stearns, J.) (expert opinion based on speculation rather than investigation properly excluded).  Because Mr. Reich's testimony is not based on a sufficiently reliable foundation, it should not be admitted.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("…under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

**C.     Mr. Reich's Report And Testimony Should Be Excluded Because It Is Not Necessary To Assist The Trier of Fact**

Expert testimony is improper when it will not assist the trier of fact.  "There is no more common certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently

---

[2] Rule 702 was amended in response to *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999).  The *Daubert* court provided a non-exclusive list used to assess reliability of scientific expert testimony.  The court in *Kumho* held that the same factors could be extended to non-scientific expert testimony. *Kumho* at 1175.  These factors include the following:

(1) whether the expert's technique or theory can be or has been tested—that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community.

11

and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Advisory Committee's Note citing* Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418 (1952).

Here, Mr. Reich's report and opinion testimony is offered to show the impression of the advertisement on consumers/potential consumers. Given that he offers nothing more than a speculative personal opinion, his report and testimony cannot qualify as necessary to assist the jury on any basis. The jury's common sense assessment of the challenged advertisements will be sufficient, without more, to analyze the advertisements and opine on the matter. Accordingly, Mr. Reich's testimony is unnecessary.

## CONCLUSION

Accordingly, for the reasons stated above, HipSaver respectfully requests that the Court grant its motion to exclude the reports and testimony of Mr. Gary Reich or alternatively, to selectively strike those portions of Mr. Reich's reports that the Court finds inadmissible under Rule 702 of the Federal Rules of Evidence.

THE HIPSAVER COMPANY, INC.
By its Attorneys,


/s/  Courtney M. Quish
Lee Carl Bromberg
BBO No.:  058480
Edward J. Dailey
BBO No.:  112220
Courtney M. Quish
BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts  02110-1618
617.443.9292
cquish@bromsun.com

Dated:  October 26, 2006

## **CERTIFICATE OF SERVICE**

      I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.


/s/  Courtney M. Quish

October 26, 2006


02820/00502  558862.1

# EXHIBIT A
# FILE UNDER SEAL

# EXHIBIT B
# FILE UNDER SEAL

# EXHIBIT C

# GARY L. REICH

| | | |
|---|---|---|
| 151 North Nob Hill Road, #240 | | Residence: (954) 474-2273 |
| Plantation, Florida 33324 | | Office: (954) 683-0484 |
| E-Mail: g_reich@bellsouth.net | www.reichconsultingservices.com | Fax: (954) 424-8033 |

## BUSINESS DEVELOPMENT / MARKETING EXECUTIVE

Innovative, top performer with twenty year proven track record developing and marketing businesses, and managing people in both mature and growth industries. Strategic planner with solid experience in business-to-business applications and processes spanning Fortune 500 to mid-size companies. Landed and managed multi-million dollar contracts in diverse aspects of the Health Care industry. Credited with exceptional vision in developing new products and creating industry acceptance and demand. Designed and established new health care software solutions, pioneered and led teams in successful national and regional marketing programs, and directed business development for major corporations. Prominent customers include CIGNA, New York Presbyterian Health System, Prudential, and Tenet. Articulate, well-informed communicator with talent for building trust and alliances with top executives to support staff. High-ranking New York University graduate with MA. in Economics. Excellent writing skills. Spanish fluency.

---

**PRESIDENT**                                                                                             **REICH CONSULTING SERVICES**
  January 2001 to Present                                                                                              Ft. Lauderdale, FL

Successful health care consulting services, specializing in imaging, managed care, nuclear medicine, real estate, surgery, and wound care.
- Planned marketing and sales strategy for three MRI and Positron Emission Tomography (PET) centers, which increased revenue from zero to more than $3 million. Created and supervised sales programs.
- Completed a market research project that identified PET center development opportunities nationwide with hospitals and radiology groups. Developed presentations and facilitated meetings among top executives.
- Provided market research for a feasibility study regarding the development of a new outpatient surgery center.
- Developed and implemented a marketing plan for Lakeside Executive Suites which increased occupancy from 80% to 100% within six months.
- Created and supervised a new marketing plan for the Weston Outpatient Surgical Center which increased average net revenue $34,000 per month and increased average profit $13,000 per month.
- Negotiated three new managed care contracts for an ancillary service provider to the long-term care industry. Results are better customer service and increased revenue of more than $500,000.
- Recommended managed care opportunities for a long-term care provider.
- Designed, wrote, and implemented case reports and a clinical newsletter for a national provider of wound healing centers to promote better clinical education tools to physicians at a national clinical meeting.
- Provided HIPAA compliance-training programs to four medical offices.
- Integrate off-the-shelf nuclear medicine and PET laboratory equipment with custom stainless steel laboratory cabinets to achieve optimal levels of radiation safety at 35 hospitals and imaging centers.
- Raised $3.3 million for Weston Pavilion Partners, LLLP, in order to purchase the Weston Medical Surgical Pavilion, a two-story 30,000-square foot medical building in Weston, Florida.
- Completed an offering of units in the ParkCreek Surgery Center, LLLP, which raised $10 million to construct a 21,400 square foot ambulatory surgery center in Coconut Creek, Florida.

**GENERAL MANAGER**                                                                                                              **CAREVIEW**
  1998 – December 2000                                                                                                      Pompano Beach, FL

Managed a $1 million budget for CareView, a subsidiary of Visual Data Corporation, an Internet content provider company, with $6 million annual revenues. CareView is a health care software application that helps hospitals locate and communicate discharge information with long-term care facilities.
- Reported to the Vice President, promoted in two years to General Manager from Director of Business Development.
- Analyzed hospital needs across the country for a more efficient discharge planning process, and created and implemented application solutions across multiple hospital departments and long-term care affiliates.
- Catapulted the number of hospital installations from zero to 346. Won the trust of top health care executives for this innovative product, and within two years established a database of more than 2,800 professional health care users. Customers include Columbia Presbyterian, Jackson Memorial, and New York Hospital. Increased industry usage by 789% this year, representing over 28,200 page views versus 3,800 in 1999.

- Recruited, hired, and managed four Business Development Managers. Coordinated website design and application enhancements and supervised HTML programming. Led long-term care sales in South Florida.

**DIRECTOR, BUSINESS DEVELOPMENT**                                    **PARKWAY REGIONAL HOSPITAL**
  1996 – 1998                                                                                                                  Miami, FL

Led strategic planning for all hospital product lines at a 382-bed hospital. Parkway Regional is part of the Tenet Healthcare system, a $9 billion provider of health care services, with 112 hospitals nationwide. Hospital met and exceeded its revenue and profitability goals.

- Authored and coordinated the hospital's annual strategic plan with department directors and achieved new income records totaling $13 million from breakeven the prior year. Working on key executive team with the CEO, Regional, and Corporate Directors, increased total patient days by 9%, and outpatient visits by 11%. Credited with exceptional ability to evaluate existing business, coordinate information, and achieve results.
- Spearheaded development and implementation of product line programs in collaboration with hospital departments. Wrote business plan for the Healthy Heart Center, a community education service developed to reduce the incidence of heart disease. Designed workflow, recruited staff, marketed the program in the community, and expedited software implementation. Directly credited with increasing cardiac outpatient revenues by $300,000 per year, and reducing losses from inpatient admissions by $100,000 per year.
- Reorganized the Wound Care Center after the departure of its management company. Identified a new location, improved community marketing, added new hyperbaric services, and initiated a clinical trial agreement for Apligraf, a living skin product. The result was over $2 million in increased revenue.
- Recruited five key specialty physicians to increase annual maternity revenues by $500,000.
- Supervised a highly effective department of seven professionals and support staff.

**PRESIDENT**                                                                                           **REICH CONSULTING SERVICES**
  1993 – 1995                                                                                                            Ft. Lauderdale, FL

Founded and managed a successful health care consulting service. Major national customers included HIP, OrNda, and Sterling Healthcare.

- Identified opportunities to enhance managed care revenue and negotiated a $300,000 primary care physician agreement with a 70,000-member HMO, which provided a new source of business for this private practice.
- Created a home care traveling staffing program, which resulted in over $500,000 in new revenue the first year.
- Marketed the expertise of a South Florida physician specialty, utilization review, and claims processing service to Managed Care Companies in three states, so that the company could obtain $5 million in new sales.
- Managed a North Miami Beach community health center, evaluated its turn-around potential, and recommended its closure to save its owner, Sterling Healthcare, $250,000 per year.

**MANAGED CARE ACCOUNT EXECUTIVE**                                              **MEDICAL CARE AMERICA**
  1986 – 1993                                                                                                                  Miami, FL

Promoted five times in seven years to Account Executive from Marketing Specialist, catapulting annual sales to $650 million from $11 million for this national provider of home infusion and ambulatory surgery. Medical Care America employed 5,000 people in twenty states at more than 100 health care centers. Survived three mergers and acquisitions of this company, which originated as CarePlus, and was merged into New England Critical Care, Critical Care America, and Medical Care International.

- Pioneered major account sales to managed care companies in 16 states on behalf of 25 profit centers. Negotiated 16 contracts covering 1 million members, resulting in annual revenue of $21 million.
- Increased infusion therapy revenues by $2,000,000, in South Florida, by negotiating new contracts with three managed care companies. During second quarter 1993, achieved 112% of sales plan.
- Driving force in formulating and implementing sales and marketing strategies for physicians and hospitals within multi-state regions. Worked closely with field, regional, and corporate management. Instituted managed care reporting programs. Analyzed potential expansion markets and acquisitions. Managed investor relations, advertising, collateral materials, and promotions.
- Assisted in growing the number of CarePlus offices from 4 to 20, with gross margins of more than 25%, making the company a desirable potential acquisition.

**Education**

**M.A., ECONOMICS**                                                                                           **NEW YORK UNIVERSITY**
  1985                                                                                                                              New York, NY
**B.A., ECONOMICS**                                                                       **GEORGE WASHINGTON UNIVERSITY**
  1983                                                                                                                              Washington, DC