UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE HIPSAVER COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> J.T. POSEY COMPANY, <br><br> Defendant. <br><br> AND RELATED COUNTERCLAIM. | Civil Action No. 05-10917 PBS |

**STATEMENT OF UNCONTROVERTED FACTS IN SUPPORT OF J.T. POSEY COMPANY'S (1) MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF THE HIPSAVER COMPANY, INC.; AND (2) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF POSEY'S COUNTERCLAIMS**

Defendant and Counterclaimant J.T. Posey Company Inc. ("Posey") submits the following statement of uncontroverted facts in support of (1) its motion for summary judgment on the claims of The HipSaver Company, Inc.; and (2) its motion for partial summary judgment on its counterclaims against Plaintiff and Counterdefendant The HipSaver Company, Inc. ("HipSaver") and Counterdefendant Edward Goodwin ("Goodwin"):

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. Posey is a California corporation that sells a variety of medical-related products. Posey sells hip protectors under the name "Hipsters". | Admitted. First Amended Complaint ("FAC"), ¶ 5; Lewis Decl., ¶ 3. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 2. HipSaver is a Massachusetts corporation that makes and sells hip protectors under the name "HipSaver." | Admitted. FAC, ¶ 1. |
| 3. Edward L. Goodwin is HipSaver's president. | Admitted. Goodwin Depo., Vol. 1, 15:12-16. |
| 4. Posey and HipSaver are competitors in the hip protector market. | Admitted. FAC, ¶ 6. |
| 5. A hip protector is generally a protective device that covers the hip and is intended to help prevent hip fractures in elderly persons caused by falls. | Lewis Decl., ¶ 3. |
| 6. Hip protectors may be entirely soft, entirely hard comprising a shield, or a combination of both hard and soft materials. | Lewis Decl., ¶ 4. |
| 7. Both HipSaver and Posey currently manufacture and sell entirely soft hip protectors. | Lewis Decl., ¶ 4; Goodwin Depo., Vol. 1, 15:17-20 and 22:9-11. |
| 8. In 2001, Posey hired Garwood Laboratories, Inc., an independent testing company, to conduct some impact testing on some foam materials. | Lewis Decl., ¶ 5. |
| 9. Posey picked one of the materials Garwood tested and began using it to make the pads that go into its hip protectors. | Lewis Decl., ¶ 5. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 10. In late-2001, Posey began disseminating advertising materials that made reference to the Garwood testing. | Lewis Decl., ¶ 6. |
| 11. These materials included product catalogs, product flyers and brochures that Posey distributed at trade shows and sent to people who requested information on its "Hipster" hip protectors. | Lewis Decl., ¶ 7. |
| 12. Posey's advertising materials that made reference to the Garwood testing were disseminated continually from late 2001 until 2005. | Lewis Decl., ¶ 8. |
| 13. HipSaver's president, Goodwin, learned at least as early as 2002 that Posey was using the results of the Garwood testing in its advertising. | Goodwin Depo., Vol. 1, at 43:5 |
| 14. Goodwin also wrote but apparently did not send a letter to Posey complaining about the Garwood testing. | Goodwin Depo., Vol. 2, at 135:19-136:5. |
| 15. In approximately late-2003 or early 2004, Posey disseminated some advertising that made reference to some testing results that were reported in a so-called "White Paper." | Morseburg Decl., ¶ 2; Posey Decl., ¶ 3. |
| 16. The white paper had been written by a UCLA graduate student named Bimal Gandhi regarding some | Morseburg Decl., ¶ 2; Posey Decl., ¶ 3. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| testing on hip protector materials he had preformed in connection with his master's thesis. | |
| 17. The gist of HipSaver's complaint in Posey I was that Posey was using false and misleading advertising in an effort to drive HipSaver from business. | Morseburg Decl., ¶ 4; Exh. 1. |
| 18. In connection with its claims in Posey I, HipSaver sought, among other things, damages and preliminary and permanent injunctive relief preventing Posey from publishing any statements that made reference to the superiority of its hip protection products over HipSaver's hip protection products. | Morseburg Decl., ¶ 4; Exh. 1. |
| 19. On or about July 19, 2004, Posey answered the complaint and counterclaimed against HipSaver for violations of the Lanham Act and unfair and deceptive business practices. | Morseburg Decl., ¶ 5; Exh. 2. |
| 20. As part of the settlement, the parties' claims and counterclaims were also dismissed with prejudice. | Morseburg Decl., ¶ 6. |
| 21. When the parties settled Posey I, they intended that, in the absence of any material changes in the facts or circumstances that existed at the time, the settlement would permit the continued publication and dissemination by each of them of advertisements and | Posey Decl., ¶ 4. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| commercial statements that had been published and disseminated in hard copy or electronically prior to the execution of the Settlement Agreement. They also intended that claims by either of them against the other based upon the re-publication or dissemination of advertisements or commercial statements that were the same as, or substantially similar to, any such earlier statements would be barred. | |
| 22. Within months after dismissing Posey I, HipSaver wrote to Posey and demanded that it stop disseminating advertising that made reference to the Garwood testing on the grounds that the advertising was false and misleading. | Morseburg Decl., ¶ 7; Exh. 4. |
| 23. The gravamen of HipSaver's complaint in this case is exactly the same as it was in Posey I, which is that Posey is using false and misleading advertising in an effort to drive HipSaver from business. | Morseburg Decl., ¶ 8; *see generally* FAC, at p. 1 (Docket No. 66). |
| 24. In response to HipSaver's letter Posey subsequently revised the "Garwood language" in its advertisements in May 2005. | Lewis Decl., ¶ 9; *compare* Exhs. 19, 20, 21 and 22 *with* Exh. 23. |
| 25. When HipSaver objected to the revised "Garwood language," Posey stopped disseminating ads which | Lewis Decl., ¶ 9; Exh. 24. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| mentioned Garwood as of August 2005. In addition, it removed the product instructions which mentioned Garwood from its website. | |
| 26. The language in the ad to which HipSaver objected on May 3, 2005 which concerns the Garwood testing is virtually identical to the language concerning the Garwood testing that was contained in Posey advertisements that had been disseminated prior to the execution of the Settlement Agreement. | Lewis Decl., ¶ 6; *compare* Exhs. 19, 20 and 21 *with* Exh. 22. |
| 27. Posey made a request for summary judgment early on in this case on the grounds that since Posey has been making references to the Garwood testing in advertising continuously since at least 2002, any claims against Posey based upon that advertising were barred by the terms of the release. | Morseburg Decl., ¶ 8. |
| 28. On July 26, 2005, Posey answered the complaint and counterclaimed against HipSaver for false advertising under Section 43(a) of the Lanham Act, violations of G.L. ch.93A, § 11, common law unfair competition and breach of the settlement agreement. | Morseburg Decl., ¶ 9. |
| 29. HipSaver subsequently amended its complaint to state a claim for product disparagement. The claim is | Morseburg Decl., ¶ 10; Yates Decl., ¶¶ 2-8 and Exhibits "A" |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| based upon a single email communication from a former Posey employee to several individuals who worked at a VA hospital in Los Angeles and which may have been accompanied by a chart which made reference to the Garwood testing. | and "B" thereto. |
| 30. During discovery, HipSaver was unable to identify any damages it suffered as a consequence of any of the acts alleged in the Complaint. | *See* Goodwin Depo., Vol. 1, 60:7-62:24, 86:21-24, 140:19-23, 141:1-12, 148:12-152:12, 156:2-157:5; Goodwin Depo., Vol. 2, 23:2-24:6; Exh. 9 (Suppl. Response to Interrog. No. 2). |
| 31. HipSaver was also unable to identify anyone who has purchased Posey's products as a consequence of the Garwood advertising or any customers of its own who have ever ceased buying its products as a result of the Garwood advertising. | Goodwin Depo., Vol. 1, 86:21-24, 137:14-20; Goodwin Depo., Vol. 2, 22:22-24, 23:2-24:6. |
| 32. Posey's damages expert has concluded that HipSaver has suffered no damages as a consequence of the Garwood advertising. | Green Decl. & Exhs. "A" & "B" thereto (filed under seal). |
| 33. Posey's marketing expert, Gary Reich, has determined that the Garwood advertising at issue | Morseburg Decl., ¶ 11; Exh. 27 (Rule 26 Report of Reich). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| would not have affected Posey's sales. | |
| 34. HipSaver maintains an Internet website which it uses to advertise and promote its products and to educate the public about its products and its competitors' products. | Admitted.  Brogna Depo., 13:17-14:2. |
| 35. The url address of HipSaver's Internet website is http://www.hipsaver.com. | Piper Decl., ¶ 2. |
| 36. Goodwin approves the content of all of the statements that are posted on HipSaver's Internet website. | Admitted.  Goodwin Depo., Vol. 1, 91:8-10; Goodwin Depo., Vol. 2, 99:15-17; Brogna Depo., 19:20-22. |
| 37. The "Hip Protectors & the Laundry" page of HipSaver's Internet website contains a statement that "Only HipSaver hip protectors clearly meets [sic] the CDC Guidelines for infection control in the laundry". | Piper Decl., ¶ 3;  Exh. 14. |
| 38. The "Hip Protectors & the Laundry" page of HipSaver's Internet website also contains the statement that "Only HipSaver [hip protectors] can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry." | Piper Decl., ¶ 3; Exh. 14; Goodwin Depo., Vol. 1, 94:1-3. |
| 39. The "Hip Protectors & the Laundry" page of | Piper Decl., ¶ 3; Exh. 14. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| HipSaver's Internet website also contains a graphic representation that the CDC Guidelines recommend a "minimum" wash temperature of 160°F | |
| 40. The "Hip Protectors & the Laundry" page of HipSaver's Internet website also contains a graphic representation that the "wash temperature range" recommended by "CDC Guidelines" is between 160°F and a temperature "somewhere above that" | Piper Decl., ¶ 3; Exh. 14. |
| 41. The "Hip Protectors & the Laundry" page of HipSaver's Internet website also contains the statement that Posey Hipsters are machine washable at temperatures of up to 160° F the "CDC guideline suggested minimum" | Piper Decl., ¶ 3; Exh. 14. |
| 42. The "Hip Protectors & the Laundry" page of HipSaver's Internet website also contains the statement that the "average wash/dry temperature of institution laundries" is 180°F, | Piper Decl., ¶ 3; Exh. 14. |
| 43. The "Hip Protectors & the Laundry" page of HipSaver's Internet website also contains the statement that "HipSavers [products] wash and dry up to 250 [degrees F] – well above the CDC guidelines" | Piper Decl., ¶ 3; Exh. 14. |
| 44. HipSaver has never conducted any testing to | Brogna Depo, at 20:16-22:11. |

9

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| determine whether its products can be laundered according to the CDC Guidelines. | |
| 45. HipSaver has never conducted any testing to determine whether Posey's products or the products of any of its other competitors can be laundered in accordance with the CDC Guidelines. | Brogna Depo., at 23:6-16; Goodwin Depo., Vol. 1, 96:8-16, 99:18-100:18, 105:3-23. |
| 46. Kevin Minissian, an independent expert hired by Posey, has washed Posey's products according to the CDC's Guidelines. Even after 110 washings, those products are intact. | Morseburg Decl., ¶ 12; Exhs. 25 and 26. |
| 47. HipSaver's Internet website permits a person visiting the "Hip Protectors & the Laundry" page to "click here" to view the "CDC Guidelines for Laundry in Health Care Facilities". | Goodwin Depo, Vol. 1, 23:22-24:2, 27:19-38:8; Piper Decl., ¶ 3; Exh 15. |
| 48. A visitor to HipSaver's Internet website who clicks at the appropriate spot to view the "CDC Guidelines for Laundry in Health Care Facilities" is directed to a document entitled "Guidelines for Laundry in Health Care Facilities" which is posted at http://www.cdc.gov/od/ohs/biosfty/laundry.htm. | Goodwin Depo, Vol. 1, 33:22-24:2, 27:19-38:8; Piper Decl., ¶ 3; Exh. 15. |
| 49. HipSaver's statement that the average wash temperature of institution laundries is 180°F is literally | Morseburg Decl., ¶ 12; Exh. 25 (Minissian Rule 26 Report). |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| false. | |
| 50. With respect to the hot-water washing of soiled linen, the CDC Guidelines state that "[i]f hot water is used, linen should be washed with a detergent in water at least 71 C (160 F) for 25 minutes." | Piper Decl., ¶ 3; Exh. 15. |
| 51. The "Validation & Testing" page of HipSaver's Internet website claims that HipSaver's products "are the only all-soft hip protectors, proven effective – in both independent mechanical testing and clinical study." | Piper Decl., ¶ 4; Exh. 16. |
| 52. The "Validation & Testing" page of HipSaver's Internet website states that purchasers should choose HipSavers because they are the product of "proven testing, independent scientific validation and years of market success." | Piper Decl., ¶ 4; Exh. 16. |
| 53. RESERVED. | |
| 54. One of the clinical studies HipSaver claims proves the effectiveness of its products is a clinical study by Dr. Jeffrey Burl, and others (the "Compliance Study") that commenced in September 2001. | Piper Decl., ¶ 4; Exh. 16; *see also* Exh. 28. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| 55. The purpose of the Compliance Study was to determine if persons at risk for hip fractures could be induced to wear hip protectors consistently over a period of time. | Burl Depo., 14:1-10, 22:16-19; Exhs. 1 and 28. |
| 56. The individuals who participated in the Compliance Study wore HipSaver-brand hip protectors. | Burl Depo., 14:11-14; Exh. 28. |
| 57. On its Internet website, HipSaver cites the Compliance Study as evidence of the effectiveness of its products on the grounds that "there were 126 falls among the HipSaver wearers and no hip fractures" during the duration of the study. | Piper Decl., ¶ 4; Exh. 16. |
| 58. The HipSaver website further states that this fact is "equally[as] important" as the reported compliance rate and a "very significant" result of the study. | Piper Decl., ¶ 4; Exh. 16. |
| 59. The lead researcher on the study, Dr. Burl, testified that the fact there were falls but no fractures among HipSaver wearers during the Compliance Study was not "equally [as] important" as the reported compliance rate. He also testified that this was not even a statistically significant result of the study. | Burl Depo., 22:16-26:1. |
| 60. The "Validation & Testing" page of HipSaver's | Piper Decl., ¶ 4; Exh. 16. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| Internet website states that, according to the JAMDA report, the compliance rate for HipSaver wearers for the duration of the Compliance Study was 93%. | |
| 61. The JAMDA report does not state that the compliance rate for HipSaver wearers during the Compliance Study was 93%. In fact, Dr. Burl testified that it is not even possible to determine from the report the exact compliance rate of HipSaver wearers who completed the Compliance Study. | Burl Depo., 15:21-17:19, 19:3-24; Exh. 28. |
| 62. The 93% compliance rate stated in the report is the rate of compliance for people who died during the study. | Burl Depo., 20:8-21. |
| 63. The report of the Gross Study, conducted by the Elder Service Plan of the East Boston Neighborhood Health Center, was purportedly published in October 2000 in Advance for Physical Therapists. | Piper Decl., ¶ 5; Exh. 17. |
| 64. A reprint of the Gross Study report is available on HipSaver's Internet website. | Piper Decl., ¶ 5; Exh. 17. |
| 65. On its face, the Gross Study report states that it was conducted over a period of 26 months. | Piper Decl., ¶ 5; Exh. 17. |
| 66. In 1998, the pads in HipSaver's hip protectors were constructed of two different foams laminated | Goodwin Depo., Vol. 1, 119:3-11. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| together. | |
| 67.  The pads were then encapsulated in a laminated envelope. | Goodwin Depo., Vol. 1, 119:3-11. |
| 68.  In 2000, HipSaver switched from a two-foam laminate pad to a single-layer pad which was made from different foam. | Goodwin Depo., Vol. 2, 79:21-80:9, 81:20-24. |
| 69.  In 2000, HipSaver also changed the overall thickness of its pads. | Goodwin Depo., Vol. 2, 79:21-80:4, 81:20-24. |
| 70.  In 2001, HipSaver changed the material encapsulating the pads and also began attaching the pads to the encapsulating material. | Goodwin Depo., Vol. 2, 75:14-25, 80:21-81:15. |
| 71.  HipSaver changed the thickness of its pads again in 2002. | Goodwin Depo., Vol. 2, 81:16-82:18. |
| 72.  HipSaver claims that its products have been proven effective in testing at Harvard University and that the results of this test shows that HipSaver's "airPad technology" offers "more than 20% more force reduction" than the leading hard-shell hip protector. | Piper Decl., ¶¶ 4, 6; Exh. 18. |
| 73.  The alleged testing at Harvard was performed in 1996. | Piper Decl., ¶ 6; Exh. 18. |
| 74.  However, HipSaver's products in their present | Piper Decl., ¶ 6; Exh. 18. |

| UNDISPUTED FACTS | SUPPORTING EVIDENCE |
|---|---|
| iteration did not even exist until 2002. | |
| 75. The Tampere University testing occurred in August or September 2000. | Piper Decl., ¶ 6; Exh. 18. |
| 76. HipSaver claims that the Tampere testing demonstrated that its pads offer "more than 20% more force reduction" than the leading hard-shell hip protector, i.e., Safehip. | Piper Decl., ¶ 6; Exh. 18. |
| 77. The documentation regarding the Tampere testing, which is available on HipSaver's Internet website, indicates that HipSaver's product offers no more than 6% more force reduction than the Safehip. | Morseburg Decl., ¶ 14. |

Respectfully submitted,

Dated: December 11, 2006

J.T. POSEY COMPANY

By its attorneys,

/s/ Douglas H. Morseburg
Jeffrey G. Sheldon (CA Bar No. 67516)
Douglas H. Morseburg (CA Bar No. 26205)
SHELDON MAK ROSE & ANDERSON PC
225 South Lake Avenue, Suite 900
Pasadena, CA 91001
(626) 796-4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.

December 11, 2006

/s/ Donald K. Piper
Donald K. Piper