# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE HIPSAVER COMPANY, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>J.T. POSEY COMPANY, )<br><br>Defendant. ) | Civil Action No. 05-10917 PBS |

## APPENDIX OF EXHIBITS IN SUPPORT OF J.T. POSEY COMPANY'S (1) MOTION FOR SUMMARY JUDGMENT ON THE CLAIMS OF THE HIPSAVER COMPANY, INC.; AND (2) MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF POSEY'S COUNTERCLAIMS

| Exhibit No. | Description |
|:---:|:---|
| 1 | Complaint in the matter of *The HipSaver Company, Inc. v. J.T. Posey Company*, Civil Action No. 04-11294 PBS ("Posey I"), filed June 10, 2004. |
| 2 | Answer to Complaint and Counterclaim of Posey in the Posey I matter, dated July 19, 2004. |
| 3 | Settlement Agreement in the Posey I matter, dated September 22, 2004 |
| 4 | Letter from Edward J. Dailey, Esq. to Ernest M. Posey and Jeffrey G. Sheldon, Esq. dated May 3, 2005 |
| 5 | Letter from Jeffrey G. Sheldon, Esq. to Edward J. Dailey, Esq., dated May 9, 2005 |
| 6 | Letter from Edward J. Dailey, Esq. to Jeffrey G. Sheldon, Esq., dated May 18, 2005 |
| 7 | Statement of The HipSaver Company, Inc. Concerning the Defendant's Revised "Laboratory Test" Advertising, dated July 19. 2005 |
| 8 | Transcript of Hearing on Motion in the matter of *The HipSaver Company, Inc. v. J.T. Posey Company*, Civil Action No. 05-10917 PBS, dated October 11, 2005 |
| 9 | Excerpt from the Supplemental Response of The HipSaver Company, Inc. to J.T. Posey Company's First Set of Interrogatories, dated January 26, 2006 |
| 10 | Excerpts from the Deposition of Helen B. Brogna, taken March 2, 2006 |
| 11 | Excerpts from the Deposition of Jeffrey B. Burl, M.D., taken August 25, 2005 |
| 12 | Excerpts from the Deposition of Edward L. Goodwin, Volume 1, taken |

| Exhibit No. | Description |
|---|---|
|  | October 18, 2005 |
| 13 | Excerpts from the Deposition of Edward L. Goodwin, Volume 2, taken November 30, 2005 |
| 14 | Printout of Webpage with url of www.hipsaver.com/thelaundry.html, entitled "Hip Protectors & The Laundry" |
| 15 | Printout of link on Webpage with url of www.hipsaver.com/thelaundry.html, entitled "Hip Protectors & The Laundry" to a document entitled "Guidelines for Laundry in Health Care Facilities with url of www.cdc.gov/od/ohs/biosfty/laundry.htm |
| 16 | Printout of Webpage with url of www.hipsaver.com/validation.html, entitled "Validation & Testing" |
| 17 | Printout of link on Webpage with url of www.hipsaver.com/validation.html, entitled "Validation & Testing" to a document entitled "Hip Pads: Effective Fracture Prevention" by George Gross, PT, Tsan-Hui Chen, OTR/L, and Carolyn Flaherty |
| 18 | Printout of link on Webpage with url of www.hipsaver.com/validation.html, entitled "Validation & Testing" to a document entitled "Interpretation of Biomechanical Testing of HipSaver Dual-mechanism Shunting/Absorbing AirPad, August 2000" |
| 19 | Posey Hipsters Product Flyer regarding "New" Hipsters |
| 20 | Cover Page and Page 25 of the 2202 Catalog for Posey's Care Alternatives Division |

| Exhibit No. | Description |
|---|---|
| 21 | Posey EZ On Hipsters Product Instruction Sheet dated June 20, 2003 |
| 22 | Posey Hipsters Package Insert M6139 dated January 24, 2005 |
| 23 | Posey Flyer dated May 6, 2005 |
| 24 | Posey Flyer dated August 6, 2005 |
| 25 | Expert Report of Kevin Minissian, dated February 15, 2006 |
| 26 | Supplemental Expert Report of Kevin Minissian, dated October 16, 2006 |
| 27 | Expert Report of Gary Reich, dated February 12, 2006 |
| 28 | "Hip Protector Compliance" Study of Jeffrey B. Burl, et al., published in JAMDA September/October 2003 issue |
| 29 | Supplemental Expert Report of Gary Reich, dated October 17, 2006. |

Respectfully submitted,

Dated: December 11, 2006

J.T. POSEY COMPANY

By its attorneys,

/s/ Douglas H. Morseburg
Jeffrey G. Sheldon (CA Bar No. 67516)
Douglas H. Morseburg (CA Bar No. 26205)
SHELDON MAK ROSE & ANDERSON
225 South Lake Avenue, Suite 900
Pasadena, CA 91001
(626) 796-4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

## CERTIFICATE OF SERVICE

    I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electornic filing.

                        /s/ Donald K. Piper_____

December 11, 2006                  Donald K. Piper

**EXHIBIT 1**

COPY

FILED
IN CLERKS OFFICE

2004 JUN 10 P 3: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.

# 04-11294 PBS

The HipSaver Company, Inc.,
                                    Plaintiff,     )
                                                   )
                                                   )
v                                                  )
                                                   )
J.T Posey Company,                                 )
                                    Defendant      )
                                                   )
_____   )

## COMPLAINT

This action seeks preliminary and permanent injunctive relief, damages, costs, and attorney fees for intentional, fraudulent, and bad faith misrepresentation and literally false comparative advertising in violation of the Lanham Act, 15 U.S.C. §§1125, 1117, and the Massachusetts Business Practices Act, G.L. c.93A, §§ 2, 11. The Defendant, J.T. Posey Company ("Posey") is the dominant, nationwide distributor of patient safety and support equipment and devices. The relevant market includes some 17,000 nursing homes and 3,000 rehabilitation hospitals. For some time, Posey has been engaged in aggressive efforts to thwart its much smaller competitors, most of which, like Plaintiff, the HipSaver Company, Inc. ("HipSaver") invent, design, manufacture, distribute, and sell a limited number of products. Posey does not invent new products; rather, its standard operating procedure is to copy and "knock-off" competitor products. Then,

1

RECEIVED
JUN 11 2004
Acosta 9:45am

Posey uses its marketplace dominance and deceptive advertising to disparage competitor products and drive smaller companies from the marketplace. That is the core issue in this lawsuit.

In an intentional, deceptive, fraudulent, and bad faith effort to damage and destroy HipSaver, Posey has directly targeted the Plaintiff with an advertising and marketing campaign grounded in literally false product safety comparison claims. Posey's false claims cite an entirely unreliable, fundamentally flawed, and fraudulently presented product test conducted by a graduate student at the University of California Los Angeles ("UCLA"). Posey has intentionally misrepresented the test protocol and results as if they are the work of UCLA. More important, Posey has fraudulently misrepresented the products which were tested and the results. The test protocol and results claim to have tested HipSaver products and to have found HipSaver products to be inferior and less capable of preventing hip injury to older patients than Posey's product. However, *HipSaver products were not tested* under the protocol; and Posey's widely published claims that its products are more effective than HipSaver products are literally false, deceptive, and the product of fraudulent misrepresentation.

HipSaver has been damaged by Posey's advertising and faces immediate and irrevocable harm without injunctive relief to halt Posey's advertising, to compel withdrawal of all catalogs and advertising materials containing the false claims, and to require corrective advertising to counter those claims.

2

## Parties

1.      HipSaver is a small, closely held company incorporated in the Commonwealth and operating from offices in Canton, Massachusetts.  HipSaver has been in business since 1995.

2.      HipSaver's primary business is to invent, develop, manufacture, and sell soft hip protectors which reduce the potential for critical hip fractures in elder patients. HipSaver's soft hip protectors were invented by HipSaver's president, Edward Goodwin. The soft hip protectors incorporate an open cell foam pad enclosed in an expandable air pouch 1.   Together, the pad and pouch have a substantial capacity to absorb energy associated with a fall and provide fracture protection to the femur.   The device is washable and is sewn into clothing and positioned geometrically to cover the femur in the event of a fall or other impact.

3.      HipSaver protectors incorporate Mr. Goodwin's inventive technology for air-holding protective foam pad construction, including US Patent No. 6,519,789B2 and for a washable protective pad, including US patent pending pub .no. US2004/0078873 A1, before the United States Patent and Trademark Office.

4.      HipSaver protectors are marketed under the HIPSAVER® trademark.

5.      The Defendant, Posey, is a long established company and dominant supplier of patient safety and support products.   Posey operates from home offices in Arcadia, California.   As a consequence of increased regulation of patient restraint systems, Posey

3

has experienced a significant reduction in this product line and has sought to expand to other product lines such as patient alarms, bed enclosures, and hip protectors. However, Posey does not have an internal research, design, and development staff for products involving anything more sophisticated than simple cut and sewn fabric. And rather than develop and fund an internal expertise, Posey copies the work of other companies and then uses its market dominance to introduce "knock-off" products to the market.

### Jurisdiction and Venue

6.    Posey operates nationwide through catalogs, internet sales, and a national network of representatives and distributors. In the Commonwealth of Massachusetts, Posey is represented by Dennis Damato. Nationwide, Posey markets to 17,000 nursing homes and 3,000 rehabilitation hospitals. In Massachusetts, Posey markets routinely to more than 100 health care facilities. HipSaver markets to the same facilities.

7.    Posey is engaged in substantial business in and contact with the Commonwealth of Massachusetts. Further, Posey has and is carrying out the acts complained of here in Massachusetts; is therefore subject to the trial court's personal jurisdiction; and may be served and brought before the trial court under the Massachusetts Long-Arm Statute, G.L. c.223A, §3.

8.    Pursuant to 28 U.S.C. § 1331, the court has subject matter jurisdiction over HipSaver's federal claims for violation of the Lanham Act. Pursuant to 28 U.S.C. § 1332, the court has diversity jurisdiction over HipSaver's state law claims for violation of the Massachusetts Business Practices Act.

4

9.      Pursuant to L.R. 40.1 (C), venue is proper in the Eastern Division of the United

States District Court for the District of Massachusetts where the Plaintiff is domiciled.

**Statement of Factual Claims**

10.     In late 1998 or early 1999, three years after HipSaver introduced its soft hip

protectors, Posey introduced a hip protector product under the mark, HIPSTER.  This

product was a soft, removable pad but was poorly designed and not well accepted in the

marketplace.

11.     Beginning in early 2001, Posey secretively purchased samples of HIPSAVER hip

protectors from the Plaintiff.  Posey then copied much of the design and placement of the

HIPSAVER protector and introduced a knock-off marketed initially as the HIPSTER III.

12.     After introducing its knock off, Posey apparently recognized that its HIPSTER

product is vulnerable to quality and safety concerns.  In early 2003, Posey retained a

graduate engineering student at UCLA, Bimal Ghandi, to conduct sham, comparative

tests of hip protectors.  Mr. Ghandi was studying for a Master of Science degree in

biomedical engineering.  He was engaged by Posey to conduct tests of the "energy

absorbing characteristics of various industry produced hip protectors".

13.     Posey and Mr. Ghandi claim to have tested five "hip protectors".  In fact, the test

protocol, did _not_ include tests of hip protectors.  The hip protectors were stripped and

reduced to core materials only.  Expandable pouches, a critical energy dispersing

component in the HipSaver invention, were discarded and excluded from the tests.  This

material fact was secreted by Mr. Ghandi and Posey.  As a consequence and in direct

contradiction of representations by Posey and Mr. Ghandi, hip protectors were *not tested*. Only the core materials of certain hip protectors were tested.

14.     Posey and Mr. Ghandi intentionally misrepresented, distorted, and biased the tests to exclude critical energy dispersing components because Posey's HIPSTER product is a smaller product which cannot absorb and disperse fracture producing energy at the level of HipSaver.  By excluding a critical energy absorbing component of a competing product, Posey and Mr. Ghandi were able to distort test results.

15.     Posey and Mr. Ghandi falsely claim also to have included two HIPSAVER protectors among the five tested "hip protectors", one identified as HIPSAVER and another identified as "SLIMSAVER".  HipSaver does not have a product under the name, "SLIMSAVER".  The test protocol and Mr. Ghandi's faculty adviser have identified the so-called HIPSAVER protectors by color, "blue"; by substance, "rubber base"; and cross sectional dimension, "9mm".  In fact, HIPSAVER protectors are pink/orange in color, do not include a rubber base but incorporate homogeneous foam, and have a cross sectional dimension of 12.7 mm.

16.     Posey and Mr. Ghandi have intentionally and fraudulent misrepresented *what* was tested (stripped core materials rather than hip protectors); Posey has intentionally and fraudulent misrepresented the products tested (HipSaver protectors were not tested); Posey and Mr. Ghandi have intentionally, fraudulently, and falsely distorted and biased the tests; and Posey and Mr. Ghandi have intentionally, fraudulently, and falsely presented literally false test results.

6

17.    After completion of the deceptive testing process, Posey and Mr. Ghandi collaborated in writing a so-called "White Paper" which Posey distributes widely to customers and which is used also to justify Posey's false catalog advertising claims.

18.    The "White Paper" contains further deceptions, fraudulent misrepresentations, and literally false test comparisons.

19.    The" White Paper" first makes the literally false statement that "hip protectors" were tested when, in fact, only stripped core materials were tested.

20.    The "White Paper" next makes the literally false statement that HIPSAVER protectors were tested when, in fact, none was tested.

21.    The "White Paper" makes the literally false statement that four "hip protectors" were tested when, in fact, the core materials from five hip protectors were tested.  Posey and Mr. Ghandi excluded the test results from the core material of the fifth protector because even in a rigged test it performed at a higher level than the Posey HIPSTER core material.

22.    The "White Paper" makes the literally false statement that "the Posey Hipsters have shown superiority when tested *in vitro* compared to those of other competitors".

23.    The "White Paper" makes the literally false statement that "Posey hipsters … outperformed all competitive hip protectors tested".

24.    Posey uses the literally false representations, statements, and comparisons from the "White Paper" to justify fraudulent, deceptive, and literally false comparative charts and statements in its 2004 product catalogs  Recently, the catalogs have been distributed

to some 50,000 customers in nursing and rehabilitation facilities across the United States, including more than 100 customers in Massachusetts. The catalogs have a shelf life of one year and are referred to routinely by health care workers who purchase patient safety and security products.

25,     Posey also employs a nationwide staff to distribute its "White Paper" and catalogs at trade conferences and exhibitions across the country.

26.     The catalogs state falsely, "In recent tests performed at UCLA, … Posey Hipsters outperformed all other hip protectors tested."

27.     The catalogs include a completely false bar chart purporting to demonstrate the relative safety performance of HIPSTER and competing products, including the two HipSaver products which were not tested.

28.     Posey's catalogs go on to proclaim falsely in large bold letters, " POSEY HIPSTERS PROVEN MOST EFFECTIVE IN ON-VITRO TESTING".

29.     The catalogs proclaim falsely, " In in-vitro laboratory testing performed at UCLA, Posey Hipsters were shown effective in reducing the force of impact in simulated falls to 36% below the average fracture threshold of the proximal femur, and Posey Hipsters outperformed all other energy-absorbing foam hip protectors tested.

30.     Each of the literally false advertising claims set out here is based on a fatally flawed and fraudulently manipulated test.

8

31.    Posey completes its deception by intentionally misrepresenting Mr. Ghandi's test protocol and results as if they are the work of UCLA. In fact, UCLA does not stand behind the test protocol or results and has not authorized Posey to refer to or use the UCLA Mark in advertising.

32.    Posey's misrepresentations, deception, and product disparagement are aimed at HipSaver, intended to undercut the integrity of Plaintiff's products, and directed to overwhelm HipSaver in the marketplace – all by unlawful means.

33.    Posey's misrepresentations, deception, and product disparagement are particularly damaging because of the relative lack of knowledge among health care buyers. Hip protection products are relatively new; neither the biomechanics nor the relative performance of competing products has been well understood in the marketplace. Lacking a strong understanding of performance and safety, buyers are susceptible to being misled by deceptive advertising masked as pseudo science, precisely the strategy pursued by Posey.

### Causes of Action

### Count I – Violation of the Lanham Act

34.    HipSaver restates and incorporates by reference all of the allegations in paragraphs 1 through 33 of the Complaint as if set for fully here.

35.    Posey's construct of an intentionally and fraudulent test protocol and its distorted misrepresentations, literally false representations, statements, and product comparisons in a nationwide advertising campaign violate the Lanham Act, 15 U.S.C. §§1125(a)(B).

9

36.    Posey's actions alleged here have been undertaken in bad faith and with the intent to misrepresent, harm, and damage HipSaver.

37.    Without intervention of the trial court, HipSaver cannot counter Posey's false advertising campaign and faces immediate loss of its business.

### Count II – Violation of the Unfair or Deceptive Business Practices Act

38.    HipSaver restates and incorporates by reference all of the allegations in paragraphs 1 through 37 of the Complaint as if set for fully here.

39.    Posey's construct of an intentionally and fraudulent test protocol and its distorted misrepresentations, literally false representations, statements, and product comparisons in an advertising campaign directed at more than 100 Massachusetts health care facilities violate the Massachusetts Unfair or Deceptive Business Practices Act, G.L. c.93A, §§2, 11.

40.    Posey's actions alleged here have been undertaken in bad faith and with the intent to misrepresent, harm, and damage HipSaver.

41.    Without intervention of the trial court, HipSaver cannot counter Posey's false advertising campaign and faces immediate loss of its business.

THEREFORE, pursuant to 15 U.S.C. §1117 and G.L. c.93A, §11, the Plaintiff, HipSaver Company, Inc., respectfully requests the trial court to grant the following relief:

- A preliminary injunction halting all further publication, distribution, or reference to the "White Paper" or the false testing conducted by Mr. Ghandi;
- A preliminary injunction halting all further publication, distribution, or reference to the alleged superiority of Posey hip protector products

10

- A preliminary injunction requiring Posey to publish and pay for distribution of a corrective statement to its entire customer and marketing lists

- A preliminary injunction requiring Posey to pay for publication of corrective advertising to Posey's entire customer and marketing list.

- Judgment for HipSaver on all claims before the court

- Damages, including three times Posey's Profits to be awarded to HipSaver

- Interest, costs and attorney fees

- A permanent injunction; and

- Such further relief as the trial court deems just and proper.

-

## JURY DEMAND

**Plaintiff HipSaver Company, Inc. requests a jury for all issues so triable.**

HIPSAVER COMPANY, INC.
By its Attorneys,

Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004 (fax)
Dated: 6.10.04
02820/00501  309384.4

AO 440 (Rev 1/90) Summons in a Civil Action

# United States District Court

―――――――――――――――― DISTRICT OF ――――――――――――――――
MASSACHUSETTS

THE HIPSAVER COMPANY

V.

J.T. POSEY COMPANY

## SUMMONS IN A CIVIL ACTION

CASE NUMBER:

# 04-11294 PBS

TO: (Name and Address of Defendant)

> J.T. Posey Company
> 5635 Pexk Road
> Arcadia, California  91006

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

> Edward J. Dailey
> BROMBERG SUNSTEIN LLP
> 125 Summer Street
> Boston, MA  02110

an answer to the complaint which is herewith served upon you, within _____20_____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

RECEIVED
JUN 1 1 2004
Acosta  9:45am

TONY ANASTAS

CLERK



BY DEPUTY CLERK

DATE  6-10-04

**EXHIBIT 2**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. No. 04-11294-PBS

|  |  |
|---|---|
| THE HIPSAVER COMPANY, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| J.T. POSEY COMPANY, | ) |
| Defendant. | ) |
| J.T. POSEY COMPANY, | ) |
| Counterclaimant, | ) |
| v. | ) |
| THE HIPSAVER COMPANY, INC., | ) |
| Counterdefendant | ) |

## ANSWER TO COMPLAINT AND COUNTERCLAIM

### ANSWER

Defendant J.T. Posey Company ("POSEY") in answer to the complaint herein, admits, denies and alleges as follows:

To the extent that any response is required to the three unnumbered introductory paragraphs of the complaint, POSEY admits that the action seeks relief as set forth in the first sentence of the first unnumbered paragraph. Except as expressly admitted, POSEY denies each and every allegation contained in the first three unnumbered paragraphs of the complaint.

1., 2., 3., 4.    POSEY lacks sufficient information to admit or deny the allegations contained in paragraphs 1, 2, 3, and 4 of the complaint and on that basis denies the same.

5.    In response to paragraph 5, POSEY admits the allegations contained in the first two sentences thereof, and admits that POSEY continually seeks to expand the nature and number of products that POSEY offers. Except as expressly admitted, POSEY denies each and every allegation contained in paragraph 5.

6.    POSEY admits the allegations in paragraph 6.

7.    In response to paragraph 7, POSEY admits that this court has personal jurisdiction over POSEY. POSEY denies that it is carrying out any of the acts complained of in the complaint within Massachusetts or anywhere in the world.

8.    In response to paragraph 8, POSEY admits that this court has subject matter jurisdiction.

9.    In response to paragraph 9, POSEY admits that, pursuant to Local Rule 40.1(D), this case is properly assigned to the Eastern Division of the District of Massachusetts because HIPSAVER resides within that division. Except as expressly admitted, POSEY denies the allegations of paragraph 9.

10.    In response to paragraph 10, POSEY admits that it introduced a hip protector product in the year 1999 under the name HIPSTER. Except as expressly admitted, POSEY denies each and every allegation contained in paragraph 10.

11., 12., 13., 14.    POSEY denies each and every allegation contained in paragraphs 11, 12, 13, and 14.

15.    In response to paragraph 15, POSEY admits that HIPSAVER does not have a product under the name "SLIMSAVER," and alleges that HIPSAVER has a product under the

name "SLIMFIT" and that the HIPSAVER product erroneously identified in the papers authored

by Mr. Gandhi as the "HIPSAVER SLIMSAVER" is correctly described as the "HIPSAVER

SLIMFIT" and further alleges that Plaintiff was fully aware of this misnomer long before the

complaint herein was filed. Except as expressly admitted, POSEY denies each and every

allegation contained in paragraph 15.

16., 17., 18., 19., 20., 21., 22., 23.    POSEY denies each and every allegation contained

in paragraphs 16, 17, 18, 19, 20, 21, 22, and 23.

24.    In response to paragraph 24, POSEY admits that it distributes catalogs throughout

the country. Except as expressly admitted, POSEY denies each and every allegation contained in

paragraph 24.

25.    POSEY admits the allegations of paragraph 25.

26., 27., 28., 29.    In response to paragraphs 26, 27, 28, and 29, POSEY denies that

the catalogs state anything falsely.

30.    POSEY denies each and every allegation contained in paragraph 30.

31.    In response to paragraph 31, POSEY admits that UCLA does not authorize the

use of the UCLA mark. Except as expressly admitted, POSEY denies each and every allegation

contained in paragraph 31.

32., 33.    POSEY denies each and every allegation contained in paragraphs 32 and

33.

## COUNT I

34.    In response to paragraph 34, POSEY refers to and incorporates herein by

reference its responses to each paragraph incorporated in paragraph 34 as though fully set forth

herein.

35., 36., 37.    POSEY denies each and every allegation contained in paragraphs 35, 36, and 37.

## COUNT II

38.    In response to paragraph 38, POSEY refers to and incorporates herein by reference its responses to each paragraph incorporated in paragraph 38 as though fully set forth herein.

39., 40., 41.    POSEY denies each and every allegation contained in paragraphs 39, 40, and 41.

## FIRST AFFIRMATIVE DEFENSE

42.    The complaint, and each purported claim for relief contained therein, fails to state facts sufficient to constitute a claim for relief against POSEY.

## SECOND AFFIRMATIVE DEFENSE

43.    Plaintiff is entitled to no recovery herein because POSEY at all times acted in good faith.

## THIRD AFFIRMATIVE DEFENSE

44.    Plaintiff is barred from recovery herein due to Plaintiff's unclean hands.

## COUNTERCLAIM

As and for its counterclaim against Plaintiff, POSEY alleges:

45.    Counterclaimant POSEY is a corporation organized under the laws of the State of California with its principal place of business located in Arcadia, California.

46.    Counterdefendant The HipSaver Company ("HIPSAVER") is a business entity the form of which is unknown to POSEY located in Canton, Massachusetts.

4

47.    POSEY is a family-run business, operated by members of the Posey family for three generations. POSEY was founded in 1937 by John T. Posey, is now run by his son Ernest M. Posey and his grandchildren are also involved in the business.

48.    POSEY is a well-respected supplier of various products used in the healthcare industry. POSEY currently manufactures and sells over 600 healthcare products. POSEY is an innovator, having designed numerous new products. POSEY has obtained several patents for products invented by employees of POSEY including U.S. Patent Numbers 4,685,454 and 5,076,288.

49.    POSEY has built a reputation for providing quality products at reasonable prices.

50.    Within the last five years POSEY has introduced a line of hip protectors, that is, products that are designed to help prevent fractured hips from falls by elderly persons.

51.    HIPSAVER offers a single line of healthcare products, namely hip protectors under the brand name HipSaver.

52.    HIPSAVER has embarked on a campaign to tarnish and damage the reputation of POSEY and POSEY's hip protector products. Among other things, HIPSAVER has wrongly accused POSEY of infringing United States Patent Number 6,519,780, although HIPSAVER subsequently acknowledged that POSEY does not infringe said patent.

53.    HIPSAVER has wrongly accused POSEY of selling "knock-off" products.

54.    HIPSAVER has wrongly and falsely accused POSEY of selling defective and dangerous products.

55.    HIPSAVER maintains an Internet website where HIPSAVER touts its products and denigrates products of its competitors, including POSEY.

56.    Among other things, HIPSAVER advertises and represents on its website that:

A.    "In the event of a fall, the HipSaver airPad absorbs impact and inflates the pouch. Acting as a miniature automobile airbag, it shunts force away from the vulnerable hipbone to the soft tissue of the buttocks";

B.    HipSaver is the "only scientifically validated soft hip protector," and is "the only soft pad hip protector that has clinical validation";

C.    "HipSavers are the only all-soft hip protectors, proven effective - in both independent biomechanical testing and clinical study";

D.    HipSaver is "the Leader in Hip Protection";

E.    "HipSaver hip protectors won't fall apart or degrade like our competitors - we guarantee it!";

F.    "HipSaver is the first hip protector to encapsulate soft padding in an airtight, waterproof pouch. Beware of look-alike products that use inferior materials";

G.    "Only HipSaver can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry";

H.    Posey Hipsters wash care instructions state "Up to a maximum of 160° F";

I.    Posey has not proven effective in orthopedic biomechanical testing;

J.    Posey is not proven successful on the market; and

K.    Posey does not have adaptive models to meet varied patients' needs.

57.    POSEY is informed and believes and based thereon alleges that the representations described in the preceding paragraph are false and misleading.

58.    As a consequence of the wrongful conduct of HIPSAVER as alleged herein POSEY has been damaged in an amount according to proof.

## FIRST CLAIM

### Violation of the Lanham Act

59.    Posey repeats and realleges the allegations contained in paragraphs 45-58.

60.    The conduct of HIPSAVER as alleged herein constitutes a violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

## SECOND CLAIM

### Violation of the Unfair or Deceptive Business Practices Act

61.    Posey repeats and realleges the allegations contained in paragraphs 45-58.

62.    At all times relevant hereto, HIPSAVER has been engaged in trade or commerce within the Commonwealth of Massachusetts.

63.    The above-described acts by HIPSAVER occurred in the conduct of trade or commerce, and occurred primarily and substantially in the Commonwealth of Massachusetts.

64.    The above-described acts by HIPSAVER constitute unfair or deceptive acts or practices declared unlawful by G.L. c. 93A, §§1, et seq.

65.    HIPSAVER's use and employment of the above acts or practices constitute willful and knowing violations of G.L. c. 93A, §§1, et seq.

66.    As a result of said acts or practices, POSEY has suffered a loss of money and property and is, therefore, entitled to multiple damages and reasonable attorneys' fees.

WHEREFORE, POSEY prays for relief as follows:

1.    That Plaintiff take nothing by its complaint;

2.    That the complaint be dismissed and judgment be entered in favor of POSEY;

3.    For judgment for POSEY on the counterclaim;

4.    For preliminary and permanent injunctive relief requiring Plaintiff to correct its

false and misleading advertising claims;

5.    For damages according to proof;

6.    For multiple damages;

7.    For costs of suit;

8.    For reasonable attorney's fees;

9.    For such other and further relief as the court deems just and proper.

## REQUEST FOR JURY

POSEY hereby requests trial by jury of all issues triable to a jury.

J.T. POSEY COMPANY

By its attorneys,


  /s/ Anthony J. Fitzpatrick
Anthony J. Fitzpatrick (BBO No. 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

Jeffrey G. Sheldon
William J. Brutocao
Shannon S. Sheldon
SHELDON & MAK, PC
225 South Lake Avenue, 9th Floor
Pasadena, California 91101
(626) 796-4000

July 19, 2004

BOS\106749.1

**EXHIBIT 3**

# SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into between The HipSaver Company, Inc. ("HipSaver") and J.T. Posey Company, Inc. ("Posey") with reference to the following facts:

## RECITALS

A.    HipSaver has filed an action in the United States District Court for the District of Massachusetts entitled *The HipSaver Company, Inc. v. J.T. Posey Company, Inc.*, as Civil Action No. 04-11294 PBS (the "Action"), in which HipSaver accuses Posey among other things of having violated the Lanham Act and the Massachusetts Unfair or Deceptive Business Practices Act by disseminating certain materials, including a document entitled "A Solution to Hip Fractures Using Performance Tested Hip Protectors" (the "White Paper") and including in Posey catalogs and promotional materials certain bar charts comparing the relative effectiveness of hip protectors (the "Bar Charts") and statements derived from the White Paper.

B.    Posey denies the allegations asserted by HipSaver in the Action.

C.    Posey filed an answer and counterclaim in the Action in which Posey asserts among other things that HipSaver has made false representations about Posey products on HipSaver's website

D.    HipSaver denies the allegations asserted by Posey in the Counterclaim.

E.    The Parties desire to settle all disputes among them concerning or in any way related to the Action.

NOW, THEREFORE, in consideration of the promises, covenants and conditions set forth in this Agreement, the Parties hereto agree as follows:

1.    Posey shall pay to HipSaver the sum of $360,000.00 by check payable to The BROMBERG SUNSTEIN LLP Client Account to be delivered to BROMBERG SUNSTEIN within fourteen (14) days of the filing of the Stipulation for Dismissal of the Action as set forth in paragraph 12 below (the "Stipulation for Dismissal").

2.    Posey shall not distribute the White Paper or make any advertising claims based on or derived from the White Paper.

**PC 0365**

3. Posey shall permanently comply with the terms of the Undertaking filed in the Action by Posey on August 26, 2004, a copy of which is attached hereto as Exhibit "A".

4. In all future catalogs and other promotional materials Posey shall eliminate the Bar Charts and statements based on or derived from the White Paper and references to UCLA.

5. Within ten days from the filing of the Stipulation for Dismissal Posey shall provide all its sales representatives, distributors, and dealers who have purchased or sold Posey Hipster hip protectors at any time since January 1, 2001 a copy of the "Special Announcement: HipSaver® and Posey Hipster® brand Hip Protectors" a copy of which is attached hereto as Exhibit "B" (the "Special Announcement").

6. Within ten days from the filing of the Stipulation for Dismissal Posey shall post a link to a copy of the "Special Announcement: HipSaver and Posey Hipster brand Hip Protectors" on the first screen of the home page of the Posey web site immediately below the heading, "Resources for Healthcare Professionals". This posting shall continue until Posey has published and distributed its next editions of its Posey's "full line" catalogs and its "falls management and bed safety products" catalogs.

7. When Posey next distributes any of its annual catalogs advertising hip protectors, including Posey's "full line" catalogs and its "falls management and bed safety products" catalogs, it shall include therewith in the same envelope a copy of the Special Announcement: HipSaver and Posey Hipster brand Hip Protectors".

8. In the event of any further comparative testing of Posey and HipSaver products by either party, neither party shall make commercial advertising use of the results or analysis related to such testing without first giving the other party at least thirty (30) days advance written notice of the results or analysis.

9. This Agreement represents the compromise of disputed claims. Nothing contained here may be construed as an admission of wrongdoing or liability by any party.

10. Except for the obligations contained in this Agreement, Posey releases HipSaver, and all of its officers, directors, employees, agents, representatives, dealers, distributors, shareholders, attorneys, predecessors, successors, assigns, affiliates, related companies, or corporations connected with them from any and all claims, liabilities or

2

**PC 0366**

causes of action, known or unknown, fixed or contingent, which arise from or are related to the false advertising claims under 15 U.S.C. §§ 1125, 1117 and G.L. c.93A, §§ 2, 11 which were asserted or which could have been asserted in the Action for conduct which occurred prior to the date of this Agreement.

11.     Except for the obligations contained in this Agreement, HipSaver releases Posey, and all of its officers, directors, employees, agents, representatives, dealers, distributors, shareholders, attorneys, predecessors, successors, assigns, affiliates, related companies, or corporations connected with them from any and all claims, liabilities or causes of action, known or unknown, fixed or contingent, which arise from or are related to the false advertising claims under 15 U.S.C. §§ 1125, 1117 and G.L. c.93A, §§ 2, 11 which were asserted or which could have been asserted in the Action for conduct which occurred prior to the date of this Agreement.

12.     Concurrently with the counter-execution of this Agreement the Parties agree that their respective counsel will execute and file a Stipulation for Dismissal of the Action with prejudice substantially in the form of Exhibit "C" attached.

13.     HipSaver acknowledges and agrees that it will not initiate any legal action against Vijay Gupta, Bimal P. Gandhi, or the University of California for any claim related to the false advertising claims under 15 U.S.C. §§ 1125, 1117 and G.L. c.93A, §§ 2, 11 which were asserted or which could have been asserted in the Action for conduct which occurred prior to the date of this Agreement.

14.     The terms of this Agreement shall remain confidential except that they are binding and enforceable and are admissible for the purposes of enforcement. In addition, either party may truthfully report that the Action has been settled to the mutual satisfaction of the Parties. It is expressly understood and agreed that HipSaver may distribute and publish the "Special Announcement: HipSaver and Posey Hipster brand Hip Protectors" and may state that Posey will distribute that document in its new catalogs and to its sales representatives, distributors, and dealers. Except as provided in this paragraph, no Party shall, without notice to and the prior written consent of the other Party, disclose any of the terms and conditions of this Agreement to any person or entity, including, without limitation, to any customers or potential customers of a Party, provided, however, that any Party may disclose such information to the extent required

3

PC 0367

by law or order of a court or government agency; and the Parties may inform their attorneys and independent public accountants of the terms and conditions of this Agreement.

15.    Each party shall bear its own costs, expenses and attorneys' fees in connection with the Action and the negotiation, preparation, and execution of this Agreement.

16.    Any notices or other communications under this Agreement shall be in writing, and shall be sent by facsimile and/or by email attachment, with a copy by hand-delivery or overnight courier service, as follows:

Notice Addresses:

To HipSaver:
    The HipSaver Company, Inc.
    7 Hubbard Street
    Canton, Massachusetts  02021
    Attention: Edward L. Goodwin
    Fax: 1.781.821.6514
With a copy to:
    BROMBERG SUNSTEIN LLP
    125 Summer Street
    Boston, Massachusetts  02110-1618
    Attention: Edward J. Dailey, Esq.
    Fax: (617) 443-0004

To: Posey:
    J.T. Posey Company
    5635 Peck Road
    Arcadia, CA 91006
    Attention: Ernest Posey
    Fax: (626) 443-9886

With a copy to:
    SHELDON & MAK
    225 South Lake Avenue, 9th Floor
    Pasadena, California 91101
    Attention: Jeffrey G. Sheldon, Esq.
    Fax: (626) 795-6321

17.    The Parties, and each of them, acknowledge that they have completely read the terms of this Agreement, and fully understand the terms and consequences of this Agreement.  All Parties further acknowledge that they have been represented by

4

PC 0368

counsel with respect to the negotiation and execution of this Agreement and that their counsel has explained the terms and the significance of this Agreement.

18.    The failure of any party to insist upon the strict compliance by any other party to this Agreement of the performance of any covenant, condition or promise herein shall not invalidate this Agreement nor shall any such failure be construed as a waiver or relinquishment of the performance of any other covenant, condition or promise in this Agreement.

19.    This Agreement is the entire agreement between and among the Parties hereto with respect to the subject matter set forth herein.

20.    Each party has cooperated in the drafting and preparation of this Agreement. Hence, neither this Agreement nor any part of it shall be construed against either party merely because such party may have drafted all or part of it.

21.    The Parties to this Agreement, and each of them, agree to perform such further and other acts and to execute and deliver such further and other documents as may be reasonably necessary to carry out the provisions of this Agreement.

22.    Each party hereto represents and warrants that it has full power and authority to enter into this Agreement and to perform any and all transactions or other matters contemplated to be performed under this Agreement.

23.    This Agreement may be amended or modified only by a written instrument signed by all of the Parties.

24.    This Agreement shall be binding on and shall inure to the benefit of the Parties hereto, and their respective officers, directors, shareholders, legal representatives, assignees and successors-in-interest.

25.    This Agreement may be executed by facsimile and in counterparts all of which taken together shall constitute a single instrument.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth next to their respective signatures below.


THE HIPSAVER COMPANY, INC.          J.T. POSEY COMPANY, INC.

By: _Edward I. Goodwin_          By: _Ernst M Posey_


**PC 0369**

Edward L. Goodwin, President
Its: _President_

Dated: _9/22/04_ , 2004

Its: _President_

Dated: _9/21/2004_ , 2004

APPROVED AS TO FORM:

BROMBERG SUNSTEIN LLP

By: _____

Edward J. Dailey
Attorneys for HipSaver

Dated: _9.21.04_ , 2004

SHELDON & MAK PC

By: _____

Jeffrey G. Sheldon
Attorneys for Posey

Dated: _9/21_ , 2004

**PC 0370**

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11294-PBS

| | |
|---|---|
| HIPSAVER COMPANY, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| J.T. POSEY COMPANY, | ) |
| Defendant. | ) |

## UNDERTAKING BY DEFENDANT J.T. POSEY COMPANY

During the pendency of the above action Posey undertakes and agrees as follows:

1.    Posey has discontinued distribution of the White Paper authored by Bimal P. Gandhi ("White Paper");

2.    Posey has discontinued distribution of catalogs and all other materials containing information derived from the White Paper;

3.    Posey has instructed all its employees, sales representatives, and distributors who have purchased Hipsters since 2001, to discontinue all reference to the White Paper and information derived from the White Paper, nor represent that its hip protectors have been validated by scientific research at UCLA, in communications with

**EXHIBIT A**
(page 1 of 2)

7

**PC 0371**

customers or potential customers, including written correspondence, emails, telephonic or face-to-face conversations, sales pitches, and the like;

4.    Posey will not include the White Paper or information derived from the White Paper in any future catalogs, brochures, or other advertising materials.

5.    Posey will not represent that its hip protectors have been validated by scientific research at UCLA.

This undertaking is not made as any admission of liability or wrongdoing, but because Posey values its reputation, and does not engage in activities that are in any way questionable.

Dated: August 26, 2004

J.T. POSEY COMPANY


By:   *s/Ernest M. Posey/*
Ernest M. Posey


**EXHIBIT A**
(page 2 of 2)

8

PC 0372

**EXHIBIT B**

## Special Announcement:
## HipSaver® and Posey Hipster® brand Hip Protectors

In the fall of 2003, Posey began distributing an article (also known as the "White Paper") entitled "A Solution to Hip Fractures Using Performance Tested Hip Protectors." In its catalogs and newsletters, Posey included statements derived from the White Paper and bar charts comparing the relative effectiveness of Posey's Hipsters.

The White Paper was written by a UCLA graduate student working on his Master's Thesis. UCLA did not sponsor, authorize, or endorse the tests or the results reported in the White paper or the Master's Thesis.

The HipSaver Company, Inc. challenged the accuracy of the White Paper and the statements and bar charts in Posey's catalogs and newsletters. HipSaver's claims included: (a) a flawed testing methodology used by the graduate student; (b) testing of some products which were no longer offered in the marketplace; and (c) test conclusions which were subject to unreliable or false interpretation.

The HipSaver Company retained Wilson C. Hayes, PhD, a recognized biomechanical engineering expert, to review the White Paper, the graduate student's thesis, and Posey's advertising. Dr. Hayes determined that the research is not reliable and cannot sustain any of the claims in the White Paper and our advertising with reasonable certainty.

Posey values its hard-earned reputation and does not advocate the use of any material that may be inaccurate or out of date, and expressly regrets comparisons with HipSaver products and confusion this may have caused in the marketplace.

Posey has eliminated the bar charts and all statements based on the White Paper from its catalogs.

If by chance you have a copy of the White Paper or any advertising material referring to testing at UCLA, please do not use it or to rely on any statements in it.

If you have any questions about anything in this announcement, please contact Posey at [telephone number]

**EXHIBIT B**
**(page 1 of 1)**

9

PC 0373

**EXHIBIT 4**

125 SUMMER STREET  BOSTON M.   )2110-1618

T 617 443 9292  F 617 443 0004  WWW.BROMSUN.COM

BROMBERG ⋆ SUNSTEIN LLP

EDWARD J DAILEY
T 617 443 9292 x233
EDAILEY@BROMSUN.COM

May 3, 2005

**By FedEx**

Ernest M. Posey, Chief Executive Officer
J.T. Posey Company
5635 Peck Road
Arcadia, California  91006

Jeffrey G. Sheldon, Esq.
SHELDON & MAK
225 South Lake Avenue
Pasadena, California  91101

Re      *The HipSaver Company, Inc. and the J.T. Posey Company*
        Our File    02820 / 00502

Gentlemen:

This letter is a formal demand on behalf of our client, the HipSaver Company, Inc. to cease, desist, and withdraw all advertising on the Posey Company website, in catalogs, in materials sent to customers, in materials distributed to or provided to customers by sales staff and sales representatives, and in materials and demonstrations at industry events which refer or are related in any manner to a so-called "independent laboratory study that was conducted to determine the most effective impact absorbing material". This letter is a formal demand also to cease, desist, and halt distribution of incomplete copies of certain impact tests conducted by Garwood Laboratories, Inc. and a demand to halt all materials stating, suggesting, or implying that the Garwood Laboratories impact tests constitute an

ATTORNEYS AT LAW

)                                    )

Page 2


"independent laboratory study ... to determine the most effective impact absorbing material".
Finally, this letter is a formal demand for a corrective advertising statement to be posted on
your website and to be made in writing to your sales staff and sales representatives and to
every person and entity on your customer and solicitation lists.

You must provide us with written assurance, acceptable to the HipSaver Company,
Inc. and its attorneys within the next ten days, of your compliance with this demand.  If you
fail to comply with this demand, the HipSaver Company, Inc. will proceed with a lawsuit for
violation of the Settlement Agreement executed with the J.T. Posey Company in September
2004, for willful violation of the Lanham Act, and for willful violation of the Massachusetts
business practices act, G.L. c.93A, §§ 2,11.  If litigation is required, the HipSaver Company
will seek damages, attorney fees and costs, and injunctive relief.


Please consider the following:

1.  Paragraph 8 of the Settlement Agreement expressly requires the J.T. Posey Company
    to provide 30 days advance written notice to the HipSaver Company before
    commercial advertising use of the results or analysis related to comparative testing.
    Your nationwide advertising with respect to the Garwood Laboratories testing is in
    direct and material violation of the Settlement Agreement.

2.  Your advertising claims that an "independent laboratory study was conducted to
    determine the most effective impact absorbing material".  No such study was
    conducted.  Indeed, the Garwood Laboratories report states expressly that Garwood
    tested and reported nothing more than impact absorption and that "all pass fail criteria
    to be determined by the Posey Company".

3.  It is false and deceptive advertising for your company to have misrepresented the
    purpose of the Garwood tests.  Moreover, it is willfully false and deceptive for the
    J.T. Posey Company to have misrepresented the fact that it was the J.T. Posey
    Company, *not* an independent laboratory, making the utterly biased determination and
    claim of what is the "most effective impact absorbing material" or even that the Posey
    Hipster product shows "excellent impact energy absorption".

)                              )

Page 3

4.  You biased the testing conducted by the Garwood Laboratories by misrepresenting to
    the testing lab that it was testing "hip protectors". In fact, Garwood tested foam only;
    and the results have no value as a measure of the characteristics of hip protectors.

5.  Your advertising misrepresents the results of the Garwood Laboratories testing by
    suggesting that the "low profile Posey Hipster" with its "excellent energy absorption"
    is "the most effective impact absorbing material".

6.  Your advertising is willfully deceptive and misleading and in direct violation of
    provisions of the Garwood Laboratories test protocol which bars partial or selective
    release of the test results. The J.T. Posey Company releases results for a Hipster
    product foam but fails routinely to release test results for competitive foams while, at
    the same time, suggesting that your company's product is superior.

7.  Your advertising is willfully deceptive and misleading in suggesting that the current
    Hipster products have the same superior impact absorbing capacity as the foam tested
    by Garwood Laboratories. Current products "with high durability pads" were not
    tested by Garwood.

Thank you for your immediate attention to this demand for relief.

Sincerely,

Edward J. Dailey

02828/00501  383424.1

**EXHIBIT 5**

SHELDON & MAK
A PROFESSIONAL CORPORATION
ATTORNEYS
CORPORATE CENTER
225 SOUTH LAKE AVENUE, 9TH FLOOR
PASADENA, CALIFORNIA 91101-3021
FACSIMILE: (626) 795-6321
HOME PAGE: www.uslp.com
(626) 796-4000

JEFFREY G. SHELDON
DANTON K. MAK
DENTON L. ANDERSON
DAVID A. FARAH, M.D.
DOUGLAS H. MORSEBURG
ROBERT J. ROSE
WILLIAM J. BRUTOCAO
DANIEL J. COPLAN
EDWARD C. SCHEWE
KRISTIN C. HIBNER, PH.D.
MARC KARISH
MICHAEL F. FEDRICK
SHANNON S. SHELDON
JULIO M. LOZA
A. ERIC BJORGUM



OTHER CALIFORNIA OFFICES:

RIVERSIDE
UPLAND

LES J. WEINSTEIN
SENIOR COUNSEL

May 9, 2005

VIA FACSIMILE 617.443.0004

Edward J. Dailey
Bromberg & Sunstein LLP
125 Summer Street
Boston, Massachusetts  02110-1618

> Re:  HipSaver Company and J.T. Posey Company
> Sheldon & Mak File No. 15994.52

Dear Mr. Dailey:

This is a follow up to my letter of May 5, 2005 in the above-identified matter and in further response to your letter of May 3, 2005.

We found it surprising that you are interpreting the Settlement Agreement to require thirty days' advance written notice with regard to advertising that was in place prior to the Settlement Agreement.  The objected to materials were used by Posey in 2003.  Accordingly, applying your interpretation of the agreement, we hereby demand that HipSaver Company cease all use of its commercial advertising that makes use of the results or analysis related to comparative testing since in no instance has HipSaver provided such advance notice, or any materials supporting its commercial advertising.  In fact, HipSaver has been repeatedly asked to provide the data supporting its claim that the HipSaver product can be machine washed and dried at 250° Fahrenheit. Since wash water boils at much less than 250° Fahrenheit at atmospheric pressure, that claim on its face appears impossible to support.

With regard to your criticisms of the materials, they are totally without merit.  Posey provided the data that supports exactly what is in the materials.  Your distorted view of the materials is totally unjustified and without merit.

Edward J. Dailey
May 9, 2005
Page 2


     However, the timing of your letter was fortuitous.  The materials have been used up, and they are in the process of being reprinted.  Thus, none of the existing materials will be distributed, and your views will be considered when reprints are prepared.

                    Sincerely yours,

                    SHELDON & MAK

By:
                    Jeffrey G. Sheldon

JGS/kpl
cc:    client

SHELDON & MAK          ID:626-7956321                              MAY 09'05   15:22

TRANSMIT CONFIRMATION REPORT

```
NO.            :  002
RECEIVER       :           6174280796
TRANSMITTER    :  SHELDON & MAK
DATE           :       MAY 09'05   15:22
DURATION       :  01'17
MODE           :           STD
PAGES          :  02
 RESULT        :  OK
```

**EXHIBIT 6**

125 SUMMER STREET  BOSTON MA 02110-1618

BROMBERG ★ SUNSTEIN LLP

T 617 443 9292  F 617 443 0004  WWW.BROMSUN.COM

EDWARD J DAILEY
T 617 443 9292 X233
EDAILEY@BROMSUN.COM

May 18, 2005

**By pdf and FedEx**

Jeffrey G. Sheldon, Esq.
SHELDON & MAK
225 South Lake Avenue
Pasadena, California  91101

      Re     *The HipSaver Company, Inc. and the J.T. Posey Company*
           Our File   02820 / 00502

Dear Jeff:

Thank you for your letters of May 5th and May 9th.  I wish to respond to both within the context of the demands made in our letter of May 3, 2005.

First, in having chastised us for sending a copy of the demand letter to Mr. Posey, you seem to have overlooked paragraph 16 in the Settlement Agreement which provides for notice to you and Mr. Posey.  Far from having engaged in some ethical lapse, I simply followed the notice terms of our Agreement.

Next, with respect to your "demand" concerning laundry advertising, I must alert you to the fact that the Posey Company challenged this same advertising in its Counterclaim in 2004.  *See, for example,* counterclaim paragraphs 55, 56E, and 56G.  Inasmuch as the Complaint and Counterclaim were dismissed *with prejudice*, Posey cannot challenge advertising which was subject to its earlier Counterclaim.  Consequently, we reject your demand as beyond the subject matter jurisdiction of a court.

ATTORNEYS AT LAW

Page 2

Finally, with respect to your response to our demand to withdraw all advertising related to the so-called" independent laboratory study, we must restate that demand and insist on immediate compliance with all remedial steps set out in my letter of May 3, 2005. Otherwise, we will proceed with our litigation in the United States District Court for the District of Massachusetts.

We would like to point out the following:

a) Contrary to your statement that the objectionable advertising materials "have been used up", the advertising continues to be posted prominently on the Posey Company website.  Indeed, the objectionable ads are linked to Hipster models displayed on the website.  A copy made from the Posey website at 9:23am this morning is enclosed for your information.

b) Contrary also to your statement that the objectionable advertising materials "have been used up", incomplete and deceptive Garwood test results continue to be packaged with Posey hip protector product sales to customers.

c) Contrary also to your statement that the objectionable advertising materials "have been used up", incomplete and Deceptive Garwood test results were distributed at a major safety conference in Florida just last week –after the date of your letter.

We must insist that you comply with the demand set out in our May 3d letter, and we must have your assurance of compliance by noon Pacific Time on Thursday, May 19th. Specifically, the Posey company must immediately cease, desist, and withdraw all advertising on the Posey Company website, in catalogs, in materials sent to customers, in materials distributed to or provided to customers by sales staff and sales representatives, and in materials and demonstrations at industry events which refers or is related in any manner to

Page 3

a so-called "independent laboratory study that was conducted to determine the most effective impact absorbing material". This is a formal demand also to cease, desist, and halt distribution of copies or excerpts of certain impact tests conducted by Garwood Laboratories, Inc. and a demand to halt all materials stating, suggesting, or implying that the Garwood Laboratories impact tests constitute an "independent laboratory study … to determine the most effective impact absorbing material". Finally, this is a formal demand for a corrective advertising statement to be posted on your website and to be made in writing to your sales staff and sales representatives and to every person and entity on your customer and solicitation lists.

Best regards,

Edward J. Dailey

02820/00501 . 386686.1



# Posey® Hipsters™

Posey Hipsters feature impact absorbing, soft foam pads over the critical fracture area to help minimize potential damage, including hip fractures that can occur from a fall.

## Hipsters are available in four styles:
- Standard Unisex Brief easily fits over undergarments, or can be worn as underwear.
- Incontinent Brief features a snap front for easier application over adult diapers.
- Male Fly Brief easily fits over undergarments, or can be worn as underwear.
- EZ-On Brief features a crotchless design that allows patients to wear their own undergarments. The mesh material is water permeable, allowing the EZ On Hipster to be worn during bathing.

All Hipsters are available with original foam padding, or high durability padding designed to withstand laundering in large capacity machines at higher temperature hot washing cycles.

[REF] 6016 Hipsters, Standard Brief
[REF] 6017 Hipsters, Incontinent Brief
[REF] 6018 Hipsters, Male Fly Brief
[REF] 6019 Hipsters, EZ On
[REF] 6008 Replacement Pads, 1 pair
[REF] 6016H Hipsters, High Durability Pads, Standard Brief
[REF] 6017H Hipsters, High Durability Pads, Incontinent Brief
[REF] 6018H Hipsters, High Durability Pads, Male Fly Brief
[REF] 6019H Hipsters, High Durability Pads, EZ On
[REF] 6008H Replacement High Durability Pads, 1 pair

## Application Instructions:

*Standard, Male Fly and Incontinent Brief Models*
With the Posey label in the back, put the Hipsters on as you would a pair of shorts, sliding them gently over the hips. Adjust to assure that the foam pads are properly aligned with and cover the hip joint.

*EZ On Model*
1. Unfasten the hook and loop at the waist and thighs.
2. Wrap the garment around your waist. The labels should be at the back and on the inside of the waistband.
3. Fasten the hook and loop at the front of your waist. The waistband should be securely fastened to allow minimal shifting of the garment, but should not feel tight or restrictive.
4. Pull the left panel taut over the left hip and thigh. The pad should be positioned directly over the hip joint.
5. Secure the leg band around the lower thigh using the hook and loop attachment. The elastic band should be tight enough to prevent the pad from sliding out of place without restricting circulation.
6. Repeat steps 4 and 5 on the right side.

1 Center for Disease Control and Prevention, 27 Aug 2004, www.cdc.gov/ncidod/hip/Sterile/laundry.htm



#6016 / #6016H



#6017 / #6017H



#6018 / #6018H          #6019 / #6019H

## Laundering Instructions
Posey Hipster with High Durability pads are designed to withstand laundering in higher temperature hot washing cycles. Hipsters can be washed according to CDC guidelines for soiled linen. However, using the lower temperature washing and drying cycle for non-contaminated linen will prolong product life. "Studies have shown that a satisfactory reduction of microbial contamination can be achieved at water temperatures lower than 160°F if laundry chemicals suitable for lower-temperature washing are used at proper concentrations. In the home, normal washing and drying cycles including 'hot' or 'cold' cycles are adequate to ensure patient safety. Manufacturers instructions for the machine and the detergent or wash additive should be followed closely."[1]

- Adhere hook and loop straps before laundering to prevent lint build-up on hook during laundry cycle. If hook and loop does not adhere due to lint, clean hook material with a stiff brush.
- If EZ On pads are removed, wipe clean with mild, liquid disinfectant before replacing in the pants.

Hipsters    [120°F/50°C WASH HOT] [CL BLEACH AS DIRECTED ON CONTAINER] [DRY ON MEDIUM]

High Durability Hipsters    [180°F/82°C WASH HOT 25 MIN.] [CL BLEACH AS DIRECTED ON CONTAINER] [DRY ON HIGH]

| SIZING CHART | | |
|---|---|---|
| Size | Waist Measurement | Hip Measurement |
| S | 28" - 30"  or  71 - 76cm | 35" - 37"  or  88 - 93cm |
| M | 30" - 34"  or  76 - 86cm | 37" - 41"  or  93 - 104cm |
| L | 34" - 38"  or  86 - 96cm | 41" - 45"  or 104 - 114cm |
| XL | 38" - 42"  or  96 - 106cm | 45" - 49"  or 114 - 124cm |
| XXL | 42" - 46"  or  106 - 116cm | 49" - 53"  or 124 - 134cm |

J.T. Posey Company
5635 Peck Road • Arcadia, CA 91006-0020 USA • Tel: 800-447-6739 or 626-443-3143 • Fax: 800-767-3933 or 626-443-5014 • www.posey.com
© 2004 J.T. Posey Company. All rights reserved.

 MOSS
Burckhardtstr. 1,
30163, Hannover, Germany
M6139  012405

**⚠ WARNING**

Due to the random possibility of falls, the Posey Company makes no guarantee, express or implied, that the user is protected from hip trauma. The skin under the pants should be assessed regularly and Hipsters should be changed and washed after each incontinent episode to prevent skin breakdown.

Posey Hipsters contain foam pads that are sealed in a pouch to protect it from water. If the pouch is cut or the seal is broken during laundering, moisture will enter the pouch and may result in waterlogged foam. Waterlogged foam encased in the pouch may promote the growth of bacteria.
• Test the foam and pouch integrity by squeezing the pad in one fist, forcing the air to one end, resulting in an air bubble.
• If you hear or feel liquid or air escaping, the pouch is damaged.
• If the pouch is damaged, discontinue use and discard.

# Clinical References Supporting the Use of Hip Protectors

**Title:** *External Hip Protectors to Prevent Osteoporotic Hip Fractures*
**Author:** A. Ekman, H. Mallmin, K. Michaëlsson, S. Ljunghall
**Publication:** The Lancet, volume 350, August 23, 1997

*Study Objectives:* Ekman and colleagues conducted a controlled study on the use of hip protectors to prevent hip fractures. One expectation was to either confirm or disprove the 1993 reported findings of J.B. Lauritzen and colleagues in "*Effect of external hip protectors on hip fractures.*"

*Results:* The use of hip protectors as preventative treatment for hip fractures was validated. "Our study confirms a reduced risk for hip fractures of the same magnitude as the previous report ."

*Recommendations:* "With improved compliance external hip protectors should prove an effective prophylactic against hip fractures."

**Title:** *Prevention Of Hip Fracture in Elderly People*
**Author:** Pekka Kannus, M.D., Ph.D., et al
**Publication:** The New England Journal of Medicine, Vol. 343, No. 21, November 21, 2000

*Study Objectives:* The purpose of this study was "to determine whether an external hip protector would be effective in preventing hip fractures among elderly adults." The study population was comprised of elderly adults from 22 community based health-care centers in Finland; a treatment group of 653 and a control group of 1,148 participants.

*Results:* The degree of compliance with the hip protector was $48 \pm 29\%$. The hip protector group suffered 13 hip fractures, 9 of which occurred while not wearing the hip protector, compared to 67 hip fractures in the control group.

*Recommendations:* "We conclude that the risk of hip fractures can be reduced in frail elderly adults through the use of an anatomically designed external hip protector. Only 41 persons need to use the hip protector for one year or 8 persons for five years in order for one fracture to be prevented."

# Posey Hipsters Proven Effective in Laboratory Test

An independent laboratory study was conducted to determine the most effective impact absorbing material. A test was created that would simulate a fall causing direct impact to the greater trochanter. In this study, a weight was released in a guided drop to simulate a 120 lb. subject falling from a height of 36", or the estimated height of the hip above the floor for a typical nursing home resident. The baseline measurement of impact force was determined to be a fall directly onto concrete. The G-Force of a fall under this scenario was 2,660G's and, for purposes of comparison, is just slightly less impact force than that of a baseball being struck by a bat. In this extreme test, the low profile Posey Hipster reduced the impact force on average by 90% and showed excellent impact energy absorption.



Testing was conducted by Garwood Laboratories.
Data on file at J.T. Posey Company *Source: www.madsci.org

J.T. Posey Company, 5635 Peck Road, Arcadia, CA 91006-0020 • Phone 800-447-6739 • Fax 800-767-3933 • www.posey.com

**EXHIBIT 7**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The HipSaver Company, Inc., | ) | Civil Action No. 05-10917 PBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v | ) | |
| | ) | |
| J.T. Posey Company, | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |

### PLAINTIFF'S STATEMENT CONCERNING THE DEFENDANT'S REVISED "LABORATORY TEST" ADVERTISING

At the July 12, 2005 hearing on the Defendant, J.T. Posey Company's Motions to Transfer and Dismiss, counsel for Posey informed the trial court that a revised "Garwood Laboratories" advertisement has been published. The trial court asked the HipSaver Company to review the revised advertisement and to provide a statement of agreement with or objection to the revised advertisement. Following the hearing, counsel produced the revised advertisement, copy enclosed at Tab A.

The HipSaver Company objects to the revised advertisement as literally false and as simply the latest iteration in a chronic campaign of false and deceptive advertising. The HipSaver Company's Complaint stands against both the first of the Garwood Laboratories advertisements and against the revised advertisement.

1

The revised advertisement no longer suggests that Posey's HIPSTER contains the "most effective impact absorbing material" for preventing hip injury and no longer proclaims that the Garwood Laboratories test is as an "independent study". Nevertheless, the revised advertising continues the underlying theme of misrepresentation of the test, its purpose, the materials tested, and the results. The revised advertisement is little more than a restatement of the literally false claims of the first advertisement, all of which violate the Lanham Act, 15 U.S.C. §§1125, 1117; G.L. c.93A, §§2, 11; and the provisions of the earlier Settlement Agreement.

Specifically, the revised advertising is objectionable, false, and deceptive in at least the following respects:

1. The revised advertising presents the Garwood Laboratories testing as if some minimally credible, legitimate, and empirically valid testing of Hipster products was conducted. This is an outright deception. Garwood Laboratories set up the testing equipment but disclaimed everything else associated with testing. Indeed, Garwood Laboratories did not verify identity of the products tested, did not maintain independent custody of products tested, did not assess the results, and made no findings with respect to the recorded results. This was not a legitimate laboratory test by any measure. The laboratory was simply a backdrop, much as UCLA was for Posey's tests in 2004, for a deceptive and literally false advertising campaign crafted by Posey.

2

2. The revised advertising states that Posey has retained "Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material." Posey's statement is false. Garwood Laboratories has not conducted testing for any such purpose and had no role in selecting a "comfortable and effective impact absorbing material". The reference to Garwood is a deception intended solely to create the appearance of a credible test protocol and empirically valid tests where none exists.

3. The revised advertising clearly states and suggests that "Garwood Laboratories" conducted testing to "select a comfortable and effective impact absorbing material". The advertisement then proclaims that this testing has confirmed that the "low profile Hipster" is an "excellent" impact absorbing material. This is literally false. Posey has withheld and misrepresented the material fact that it alone, not Garwood Laboratories, declared that the testing demonstrates the alleged excellence of the Hipster products. Garwood Laboratories expressly disclaimed any such purpose in the testing and any such conclusion from the testing.

4. The revised advertising appears under the banners, "Posey Hipsters Help Protect Against Injury from Falls" and "Posey Hipsters Proven Effective In laboratory Test". As noted, the advertisement then presents the Garwood Laboratories test as one which demonstrates the effectiveness of the Posey Hipster to protect against hip injury and validates the Hipster product. This is literally false. The

test is not an empirically valid measure of effectiveness against hip injury and has not been presented by Garwood Laboratories as such.

5. The revised advertisement claims that "a test was created that would simulate a fall causing direct impact to the greater trochanter" [the hip joint]. This is literally false. The test is nothing more than a rudimentary, mechanical impact test. It is not a biomechanical test and has no empirically valid capacity to assess a "fall" or to demonstrate effectiveness against hip injury in humans.

6. The revised advertisement refers directly to "high durability" Hipsters, represents this product as if it has been tested in the Garwood Laboratories test, and then presents this product as having "excellent" impact absorption and demonstrated effectiveness against hip injury. This is false and a deceptive misrepresentation of what was tested.

7. The revised advertisement misrepresents the Hipster products as "washable to CDC standards for soiled linen". This is literally false. The CDC washable temperature standard is 160°F for 25 minutes. In fact, in the same advertisement Posey displays a wash label for most of its Hipster products with a wash temperature limit of only 120°F. Clearly, this fails the CDC standard, yet Posey maintains this outright misrepresentation of its failure to meet a significant safety standard. This is exacerbated by Posey's failure to notify nursing and rehabilitation facility purchasers and patients that its products do not meet the CDC standard.

8. The revised advertisement continues to note that test data is on file with Posey. From information provided by Posey, the HipSaver Company understands that the data includes alleged test results for HipSaver products. These test results are literally false, and Posey's specific references to and comparisons with HipSaver products irreparably harm the HipSaver Company.

The Garwood Laboratories advertising and the revised Garwood Laboratories advertising challenged in this lawsuit must be understood in the context of Posey's longstanding campaign of false advertising, including the "UCLA" advertising carried on in 2003 and 2004 which was contested last year in this court. Posey's false advertising is directed at its only real competitor in the soft hip protection garment marketplace, the HipSaver Company.

And while the target is the HipSaver Company, the method is to achieve "believability" through persistent claims put before a purchasing audience that is relatively unsophisticated and cannot readily distinguish a false claim or junk science. Nevertheless, the long term repetition of these false claims clothed in "laboratory testing" or an "independent laboratory study" or a "UCLA study" for that matter is deception as a matter of law. *See*, for example, *Schick manufacturing Inc. v The Gillette Company*, 372 F. Supp.2d 273 (D. Conn. 2005) And that deception violates the Lanham Act and c.93A.

The immediate consequence of this deception to HipSaver, a small focused product company, is, of course, the lost opportunity for sales. More important, there is the risk that Posey's campaign of chronically false advertising will continue to mislead

health care facility purchasers to believe that Posey's product has been proven to be effective against injury to humans and that it maintains a durable level of effectiveness after use and washing. Hip protection garments are not a casual consumer product where false and deceptive advertising is of no particular consequence. Here, the consequence is injury to often frail patients.

Finally, there is the risk that the consequences of Posey's false advertising of inferior products will retard, shrink, or even destroy the marketplace for soft hip protection garments. At some point, purchasers will recognize that Posey's claims for effectiveness and durability are indeed false. Yet, the HipSaver Company does not have the marketing and advertising resources to counter with a demonstration that its products are durable and effective. In the face of Posey's persistently false claims, purchasers may simply assume that no soft hip protector is durable or effective and turn to other products and strategies to safeguard patients from hip injury. That result will be devastating to the HipSaver Company but is of no particular consequence to Posey which can use its monopoly vendor status to turn to 600 other products it peddles to nursing and rehabilitation facilities.

## CONCLUSION

In the fall of 2004, the HipSaver Company halted Posey's "UCLA" advertising campaign which made much the same false claims at issue now. In the fall of 2004, Posey retracted its "UCLA" advertising, issued a public statement of regret, and

committed itself to accurate data and fair advertising. Within four months of the 2004 settlement, however, Posey returned with its false claims of Laboratory Testing at Garwood Laboratories, complete with a bar chart display similar to that used in the "UCLA" campaign, an "independent Laboratory study" reminiscent of its "laboratory testing at UCLA" claims from last year, and alleged comparative data for HipSaver products. This new campaign, including the revised advertising released last week, is no less objectionable, false, damaging, or unlawful.

Respectfully submitted,

THE HIPSAVER COMPANY, INC.
By its Attorneys,


/s/ Edward J. Dailey
Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004 (fax)
Dated: July 19, 2005

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic filing and USPS First Class mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470 Atlantic Avenue, Boston, Massachusetts 02210 and by USPS First Class mail to Jeffrey G. Sheldon, Esq., SHELDON & MAK, 225 South Lake Avenue, 9th Floor, Pasadena, California 91101

Dated: 7.19.05          /s/ Edward J. Dailey
                        Edward J. Dailey

02820/00502 418989.1

7

TAB A

PC 0401

## POSEY #6016 HIPSTERS STANDARD BRIEF

- Easily fits over undergarments, or can be worn as underwear.
- Unisex sizing.
- #6016H Standard Brief with high durability pads.

## POSEY #6017 INCONTINENT BRIEF

- Snap front for easier application over diaper. Unisex sizing.
- #6017H Incontinent Brief with high durability pads.

## POSEY #6018 MALE FLY BRIEF

- Easily fits over undergarments, or can be worn as underwear.
- Fly front for improved compliance in male residents.
- #6018H Male Fly Brief with high durability pads.

## POSEY #6019 EZ-ON BRIEF

- Residents can wear their own undergarments.
- Can be worn in the shower.
- Hip pads can be removed for laundering or replacement.
- #6019H EZ-ON Brief with high durability pad.

### SIZING CHART

| Size | Waist Measurement | Hip Measurement |
|------|-------------------|-----------------|
| S  | 28"-30" or 71-76cm | 35"-37" or 88-93cm |
| M  | 30"-34" or 76-86cm | 37"-41" or 93-104cm |
| L  | 34"-38" or 86-96cm | 41"-45" or 104-114cm |
| XL | 38"-42" or 96-106cm | 45"-48" or 114-124cm |
| XXL | 42"-46" or 106-116cm | 49"-53" or 124-133cm |

Posey High Durability Hipsters contain denser foam than the standard Hipsters. This increased density aids in its ability to withstand higher hot washing and drying cycles.

### LAUNDERING INSTRUCTIONS:

Hipsters

High Durability Hipsters

J.T. Posey Company
Arcadia, CA 91006 USA
Tel: 800-447-6739
www.posey.com











#6016/#6016H

#6017/#6017H

#6018/#6018H

#6019/#6019H

# POSEY HIPSTERS HELP PROTECT AGAINST INJURY FROM FALLS

It's a long way down for residents at risk of injury from falls. You can greatly reduce that risk with Posey Hipsters. The Hipsters' high energy-absorbing foam pads are positioned precisely over the hip bones, increasing the odds of surviving a fall uninjured. The Hipsters are comfortable and slim enough to be virtually undetectable under clothing. By offering increased protection, Hipsters relieve residents' anxiety about falling and enhance their quality of life.



Low Profile - All styles fit discreetly under men's and women's clothing

- High impact-absorbing viscoelastic pads protect hip bones against injury from falls
- Soft, comfortable pads improve compliance versus hard-shelled products
- Washable to CDC standards for soiled linen without removing the pads
- 100% latex-free
- Five sizes for correct fit
- Discreet, low-profile pads are virtually undetectable under clothing

### Posey Hipsters Proven Effective in Laboratory Test

Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material. A cost-conscious alternative would simulate a fall causing direct impact to the greater trochanter. In this study a weight was released in a guided drop to simulate a 120 lb. subject falling from a height of 56", or the estimated height of the hip above the floor for a typical nursing home resident. The baseline measurement of impact force was determined to be a fall directly onto concrete. The G-force of a fall under this condition was 2,000 G's and, for purposes of comparison, is just slightly less impact force than that of a baseball being struck by a bat. In this extreme test, the low profile Posey Hipster reduced the impact force on average by 90% and showed excellent impact energy absorption.

Testing was conducted by Garwood Laboratories.
Data on file at J.T. Posey Company. Source: www.nextec.org

**Special offer: 30-day no-risk free trial.**
Test the Posey Hipsters for yourself with no obligation to buy.

**EXHIBIT 8**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

THE HIPSAVER COMPANY, INC., )
                    )
      Plaintiff   )
                    )
   -VS-       ) CA No. 05-10917-PBS
             ) Pages 1 - 16
J.T. POSEY COMPANY,     )
                    )
     Defendant   )


MOTION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

   COURTNEY M. QUISH, ESQ. and EDWARD J. DAILEY, ESQ.,
Bromberg & Sunstein, 125 Summer Street, Boston,
Massachusetts, 02110-1618, for the Plaintiff.

   KATHERINE Y. FERGUS, ESQ. and DOUGLAS G. MORSEBURG, ESQ.,
Duane Morris, 470 Atlantic Avenue, Suite 500, Boston,
Massachusetts, 02210, for the Defendant.


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 11, 2005, 4:00 p.m.




LEE A. MARZILLI
CERTIFIED REALTIME REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

PROCEEDINGS

1

2     THE CLERK:  The case of The HipSaver Company,

3     Incorporated V. J.T. Posey Company, Civil Action

4     No. 05-10917, will now be heard before this Court.  Will

5     counsel please identify themselves for the record.

6     MS. QUISH:  Yes, Courtney Quish and Mr. Ed Dailey

7     for HipSaver Company.

8     MS. FERGUS:  Good afternoon.  Katherine Fergus from

9     the law firm of Duane Morris representing J.T. Posey.  With

10    me is Douglas Morseburg, who has been admitted pro hac in

11    this case.  And I am not on the docket, but I did file a

12    notice of appearance with Magistrate Judge Collings.

13    THE COURT:  All right, now, one thing that is clear

14    is that you are both going to have to speak up a whole lot

15    louder.  It is a huge courtroom, and I think the mikes are

16    on.  So whose motion to dismiss is it?

17    MS. QUISH:  It's our motion.  We submit this

18    motion, and it's a 12(b)(1) motion, to the Court for lack of

19    subject matter jurisdiction pursuant to this Court's 2004

20    dismissal with prejudice.  These are the exact same claims.

21    They are in fact identical in 2004 that were brought under

22    93A and the Lanham Act.  Again we see the same claims for the

23    same Web site for identical or almost identical Web pages.

24    THE COURT:  Let me ask you, did I deal with this

25    already in the previous motion hearing?

1    MS. QUISH:  No, I don't believe so.

2    THE COURT:  It was something very similar.  In

3    other words, I remember going around and around with counsel

4    before.  I'm not sure you were here.

5    MS. QUISH:  I wasn't, but I think I know what

6    you're referring to, and it was J.T. Posey's motion to

7    dismiss, and I believe their argument was fairly similar.

8    I'd like to distinguish the two arguments.  I think there's a

9    big difference between the claims against us and against --

10   and actually identifying things on the Web site and our

11   claims which you have already agreed to hear and are moving

12   forward.

13   The difference here is that these are the same.

14   There is no new comparative study done.  There is no new

15   comparative statement on the Web site.  They are virtually

16   identical.  And what that means is that they are bringing --

17   THE COURT:  But you continued after the release to

18   keep publishing them, right?

19   MS. QUISH:  We agreed in the release that these

20   were absolutely fine.  Both parties assented to the exact

21   comparative statements that are on the Web site.

22   THE COURT:  The release is only through the date of

23   the release, right?

24   MS. QUISH:  The release says that both parties

25   cannot bring any claims moving forward that they could have

4

1    brought before that date.

2         THE COURT:  Right, so that means that anything

3    through -- what's the date of the release?

4         MS. QUISH:  September of 2004, I believe.

5         THE COURT:  So they can't bring any claims through

6    September of 2004.

7         MS. QUISH:  Right, and they can't bring any claims

8    thereafter that they could have brought prior --

9         THE COURT:  Well, is it still on the Web site?

10        MS. QUISH:  It's still on the Web site.

11        THE COURT:  It just seems not clear -- in other

12   words, it wasn't worded --

13        MS. QUISH:  That's true, I understand what you're

14   saying.  But I should say the other part of the settlement

15   agreement is that the parties agreed that as the Web sites

16   existed at that time, that that was okay.

17        THE COURT:  Was that in the settlement agreement,

18   that they both agreed that the ads in the Web site are okay?

19   Read to me the part that says that.

20        MS. QUISH:  I don't know the answer to that.

21        (Pause.)

22        MS. QUISH:  I honestly don't see that, but I can

23   say that it seems that both parties, in our motion to dismiss

24   and in their response, make an assumption that the Web site

25   was fine as is because their argument is that those

5

1   advertisements have subsequently changed, and they argue that

2   the reason they can bring these counterclaims is because that

3   advertisement did subsequently change. So I think both

4   parties move forward under the assumption that the

5   advertisements as they existed at the time were agreed to by

6   both parties and were acceptable.

7        We've brought new claims because of a change in

8   their Web site following or subsequent to September of 2004,

9   and they are similarly now bringing claims against us arguing

10  that we have changed our Web site subsequent to what it

11  looked like in September of 2004 at the time of that

12  agreement.

13       THE COURT: I think I said this the last time: It

14  may just be that it was poor craftsmanship in how the

15  settlement agreement was written. It seems to only preclude

16  claims that preexisted it. So that if both sides continue to

17  use some sort of an offensive Web site to the other

18  afterwards, even if it's the same, it doesn't seem, unless

19  you can quote me language, to knock it out.

20       MS. QUISH: But isn't it the same claim prior to as

21  it is after?

22       THE COURT: No. Just they lose out on any damages

23  prior to the date of the settlement agreement. They lose

24  out, no damages prior to September, 2004.

25       MS. QUISH: Right, I understand what you're saying,

1    and I would agree with you that it's poor craftsmanship on

2    both of our parts, but I --

3            THE COURT:  I mean, what's sauce for the goose is

4    sauce for the gander.  I mean, I thought I held this whole

5    thing.

6            Now, I understand that if there's some language in

7    there that I'm not aware of -- let me just say this:  This is

8    essentially the flip side of what I did before, right?

9            MR. MORSEBURG:  Yes, your Honor.

10           THE COURT:  Well, let me ask you this:  Do you both

11   concede that the Web sites were okay that preexisted the

12   9/2004, that there was no problem with them?

13           MR. MORSEBURG:  No, your Honor, that is not what we

14   concede.  There was a release agreement.

15           THE COURT:  And it doesn't refer to anything after

16   September of 2004.  Why, I don't know.

17           MR. MORSEBURG:  It does not.  And, your Honor,

18   frankly, Jeff Sheldon when he was here several months ago

19   used this exact argument, and you basically said -- and he

20   said there's no liability for repeating stuff

21   post-settlement, and you looked at the release language and

22   you said -- and I have the transcript here, I'll give you the

23   transcript -- anything up to the date of the release is

24   released, but new ads with the same stuff are not covered by

25   the release.

1      So basically what we have now is counsel for

2   HipSaver making the argument we made last time. And if you

3   are consistent in your rulings, of course you should deny

4   their motion on the same grounds that you denied our motion,

5   because the motions are identical.

6      I might point out that we have more than one basis

7   for opposing the motion, and one basis for opposing the

8   motion is, they're continuing to make publications of

9   material which postdates the settlement agreement. Another

10   argument that we have -- and this is an argument that they

11   made the last time around against us, and it succeeded, so --

12   and, of course, we thought the case should go away, but we

13   obviously lost, so you liked their arguments. So the second

14   argument is: They have made material changes to their

15   Web site, such that the Web site that they have now in

16   existence is not the same Web site that they had at the time

17   we brought the action last time.

18      THE COURT: You know, I was expecting people to

19   give me copies of these Web sites and to show me. As far as

20   I know, I have an additional affidavit. Technically, I

21   suppose, I could consider an affidavit on a subject matter

22   jurisdiction kind of basis. I don't view this as subject

23   matter. I sort of view it as more a motion to dismiss or a

24   motion for summary judgment, and it sort of morphs from one

25   to the other if I look outside the four corners of the

1    complaint.  But regardless of how I style it, no one gave me

2    the Web sites.

3        MR. MORSEBURG:  Your Honor, if it would help, if I

4    can approach, I have a copy of some of the new material.

5        THE COURT:  You know, it's too late.  I'm going to

6    deny this.  It's not in the release.  What's sauce for the

7    goose is sauce for the gander.  Now, I wish we could move

8    beyond this.  Where are we in this case?

9        MS. QUISH:  I believe we're stuck in discovery, and

10   we're just awaiting documents from the other side, and

11   discovery is still ongoing.  But I'd like to bring out that

12   from my understanding, the Court didn't just rule because of

13   this, what you are referring to as "What's sauce for the

14   goose is sauce for the gander."  And I do think it's poorly

15   crafted, but I think the intention is fairly clear from

16   here.  But my understanding of the Court's ruling --

17       THE COURT:  Where?  Tell me where the intention is

18   clear.

19       MS. QUISH:  If we look at No. 11 in the settlement

20   agreement, I think the intention is there:  "Except for the

21   obligations contained in this agreement, HipSaver releases

22   Posey --" and, of course, there's a mirror image paragraph

23   elsewhere -- "of all of its officers, directors, employees,"

24   et cetera.

25       THE COURT:  Which occurred prior to the date of

1    this agreement.

2          MS. QUISH:  " -- which arise from or are related to

3    the false advertising claims under the following statutes."

4          It seems that these are absolutely arising from and

5    related to the claims that existed beforehand.

6          THE COURT:  Well, let me put it this way:  If you

7    both want to agree to this, I can knock both sets of claims

8    out.  But as far as I'm concerned, I read it both people

9    signed this; it relates to both equally.  If you both want to

10   go for a reformation, you both agree that it just knocked out

11   the Web sites altogether --

12         MS. QUISH:  No, I think there's a difference

13   there.  I think, if you could assume for a moment that the

14   parties agree that anything that's related to those --

15         THE COURT:  I can't assume that.  I won't assume

16   that.

17         MS. QUISH:  There is another ground for why our

18   motion was kept in, and the ground is that there's a

19   substantive difference.  This claim isn't arising out of or

20   related from the same things.  They have made material

21   changes to the Web site, and that brings up a brand-new cause

22   of action because they are new claims and new

23   advertisements.  On the other hand, we have it.  The motions

24   are different for that reason.

25         THE COURT:  Well, you have different products,

1  right?

2       MS. QUISH:  No.  This is actually about very much

3  the same products.

4       THE COURT:  Well, they claim it isn't, and there I

5  am.  And I don't have your Web site, and you keep saying this

6  counterclaim and this are identical, but no one's ever given

7  me the Web sites before and after.

8       MS. QUISH:  That's true, but I'd like to point out

9  that in a 12(b)(1) motion, the burden is on their party to do

10 that.  And, to me, if they can't identify where this

11 fundamental material change is in this new Web site, then

12 they have failed to explain how this is any different from

13 what you dismissed with prejudice before.

14      THE COURT:  Thank you.  I deny the motion without

15 prejudice to both sides coming in on summary judgment.  I'm a

16 little bit suspicious, I'll be honest, that there's some

17 truth to what you have both said and that it was just poor

18 craftsmanship in the way that both sides drafted this

19 agreement.  Maybe it was done in a hurry and under pressure

20 of court.  I mean, I understand all the issues that come up.

21 But maybe you'll both agree that this precludes -- I mean,

22 you both have seemed to make the exact same argument from

23 your own point of view, and then you all say, "But the ad

24 here is different."

25      If you both agree this is meant to immunize the

1   preexisting ads and the only issue is whether the new ads are

2   new, if you both agree to that, that may be a basis for a

3   reformation or some sort of -- I don't even know, is there an

4   integration clause in here?  I mean, that may have created

5   some ambiguity.

6          Now, I'm just watching both of your courses of

7   action or courses of conduct as they've played out during the

8   course of this litigation, and both sides seem to have taken

9   the same legal position as to what this meant.  And maybe

10  that's something I can play out in a motion for summary

11  judgment, and then the only issue would be whether or not the

12  ads materially changed; in other words, any ad that

13  preexisted 2004 was intended to be released, but any ad that

14  substantially changed is not.  So therefore the continuing

15  course of conduct that preexisted would be knocked out by the

16  settlement.  That makes some sense to me.  You both seem to

17  say it, and I understand; why would you have signed a

18  settlement agreement if you were still going to have to fight

19  about the same Web site?

20         I understand that you might both agree with that,

21  and then the only battle on summary judgment is whether the

22  Web site is actually changed at all.  But I don't feel as if,

23  A, I have a record for doing that here.  I don't have the

24  Web sites.  I have nothing.  I just have a battle: "Yes, I

25  did, no, I didn't."  But, more importantly, the contract

1    doesn't say that, it just doesn't say it.  And so I'm

2    wondering whether this piece of it can be resolved.

3          MR. MORSEBURG:  Your Honor, we'll talk about it.

4          THE COURT:  I think you must -- can I say

5    something?  I wouldn't be surprised at all if you end up

6    doing a lot of discovery, and you're going to come back to me

7    and both sides thought that's what they did.  And I hate to

8    have you spend the money on discovery if that's where we're

9    going to end up at the end of the day.  So does it make any

10   sense to sort of -- I know there's a lot more to this case

11   than this -- does it make sense to spend time on discovery,

12   or do you both want to talk about it and at least resolve

13   this claim?

14         MR. MORSEBURG:  Your Honor, I think the fundamental

15   problem is that we view these motions as "What's good for the

16   goose is good for the gander," and they think that there is a

17   distinction to be made as between their position and our

18   position.  I mean, it's a fundamental difference as between

19   us.

20         THE COURT:  But one thing you could agree on is

21   that you both plan to release each other from the preexisting

22   Web site, even to the extent it continued into the future;

23   and then the only issue would be whether or not a material

24   change in that Web site occurred or not.  That's very

25   different from the black-and-white language I have here.

1    MR. MORSEBURG:  Right.  Keep in mind, your Honor,

2  that's not the only issue that involves the settlement

3  agreement.

4    THE COURT:  I fully understand that, but I would

5  suggest that you're going to be back here, and I forget what

6  time period it is, with a motion for summary judgment.  And

7  it's at that point that I'm going to decide whether or not

8  that was the meaning that the people who crafted this

9  intended.

10    MS. QUISH:  Yes, we're absolutely amenable to

11  having a conversation.  I think it's a nice preliminary step.

12    THE COURT:  Do you want to try and get together and

13  talk about that?  And then in the summary judgment, I can

14  focus on, is there any material change in them?

15    MS. QUISH:  Right.

16    MR. MORSEBURG:  Your Honor, it might be possible to

17  do it at the mediation that you ordered, but we're having

18  difficulty scheduling the mediation.

19    THE COURT:  Well, what's the difficulty?

20    MR. MORSEBURG:  Mr. Dailey has said that he can't

21  go until he gets some documents, and it's been quite some

22  time now since you ordered the mediation.  We're hopeful of

23  getting a resolution to the issue of certain documents soon,

24  but in the meantime, we won't go to mediation.

25    MS. QUISH:  My understanding is that a mediator

1    hasn't been identified yet, and in fact --

2         THE COURT:  Well, why don't I send you to a

3    magistrate judge, and then if you come up with another

4    mediator by then --

5         MR. MORSEBURG:  Your Honor, we agreed on a mediator

6    who has IP experience, intellectual property experience.

7         THE COURT:  Who?

8         MR. DAILEY:  We did agree.  I think going to a

9    magistrate judge would be perfect.

10        THE COURT:  Well, this is what I'm going to do.

11        MR. DAILEY:  We had been sent to the court's

12   mediation process, your Honor, and in fact Mr. Fitzpatrick,

13   local counsel at Duane Morris, said that Posey was not

14   comfortable with the mediator who was proposed, who was

15   another lawyer, and they proposed a third person which we

16   never reached agreement on.  It's that simple.  I think, if

17   we were referred to a magistrate judge, that would be most

18   appropriate.

19        THE COURT:  All right, we're going to refer you

20   forthwith to a magistrate judge.

21        MR. DAILEY:  Thank you.

22        THE COURT:  And as far as I'm concerned, at this

23   point, if you haven't had any resolution because of whatever

24   the document issue, file a motion to compel.

25        MR. MORSEBURG:  Your Honor, we've filed motions for

1    protective orders, and I think there's a -- it's not -- they

2    are third-party documents, and I think there's supposed to be

3    a motion to compel filed today in California with respect to

4    those documents.

5            THE COURT:  Well, who's the third party?

6            MR. MORSEBURG:  Garwood Laboratories, the people

7    that did the testing.

8            THE COURT:  And what's the issue for the protective

9    order?  Is it confidential?

10           MR. MORSEBURG:  Yes.  Yes, your Honor.

11           THE COURT:  Proprietary information?

12           MR. MORSEBURG:  Yes.  And Magistrate Judge Collings

13   just heard the motion today.

14           THE COURT:  Oh, all right, then I won't get

15   involved.  All right, so good, it's in good hands.  I think

16   why don't I do this:  You can discuss it during the

17   mediation, but if that isn't settled at the mediation, within

18   a week after the mediation, why don't you both try and write

19   me a joint letter resolving this particular issue about the

20   intent of the parties.  If not, I'll just address it at

21   summary judgment.

22           I think you do both seem to be saying the same

23   thing, and then you disagree on whether there were material

24   changes that took it out from under the agreement.  But you

25   both basically have argued to me that the release was for

1  anything that was in the preexisting Web site; and since I

2  hear it from both sides, it may just have been the writing

3  needs to be reformed to reflect the mutual agreement.

4      MR. MORSEBURG:  Again, your Honor, we lost on the

5  issue, so, you know, that was our position initially.

6      THE COURT:  Right, you both have taken the same

7  one.  That's the only thing that hits me.  I'm going to rule

8  the same on both.  And then it's clearly tweaked as far as,

9  all right, well have there been material changes?  I don't

10  have the record to do that right now, but I sure will do it

11  during summary judgment, okay?

12      So we're going to refer you to a magistrate judge

13  right away, and then I look forward to seeing you on the

14  serious stuff.  Thank you.

15      MR. DAILEY:  Thank you, your Honor.

16      MR. MORSEBURG:  Thank you, your Honor.

17      THE CLERK:  Court is in recess.

18      (Adjourned, 4:35 p.m.)

19

20

21

22

23

24

25

1          C E R T I F I C A T E

2

3     UNITED STATES DISTRICT COURT )

4     DISTRICT OF MASSACHUSETTS    ) ss.

5     CITY OF BOSTON               )

6

7

8          I, Lee A. Marzilli, Official Federal Court

9     Reporter, do hereby certify that the foregoing transcript,

10    Pages 1 through 16 inclusive, was recorded by me

11    stenographically at the time and place aforesaid in Civil

12    Action No. 05-10917-PBS, The HipSaver Company, Inc. Vs. J.T.

13    Posey Company, and thereafter by me reduced to typewriting

14    and is a true and accurate record of the proceedings.

15          In witness whereof I have hereunto set my hand this

16    3rd day of November, 2005.

17

18

19

20

21

22    _____

23    LEE A. MARZILLI, CRR
      OFFICIAL FEDERAL COURT REPORTER

24

25

**EXHIBIT 9**

16117.24
JGS/DHM/SSS

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10917 PBS

The HipSaver Company, Inc.,                  )
              Plaintiff,          )
                                )
v                                            )
                                )
J.T. Posey Company,                          )
              Defendant            )
                                )
_____)
                                )
J.T. Posey Company, Inc.,                    )
              Counterclaim Plaintiff )
                                )
v                                            )
                                )
The HipSaver Company, Inc. and               )
Edward L. Goodwin,                           )
              Counterclaim Defendants )
                                )
                                )
_____)

## SUPPLEMENTAL RESPONSE TO JT POSEY COMPANY'S
## FIRST SET OF INTERROGATORIES

**Plaintiff, the HipSaver Company, Inc. responds to the Defendant's First Set of**

**Interrogatories as follows:**

### Statement of Counsel:

The Defendant, JT Posey Company, through counsel has objected to the Plaintiff's

earlier response to the Defendant's First Set of Interrogatories, in large part, because the

2. State the basis for your contention that HipSaver has been damaged by Posey's advertising", as stated on page 2 of the Complaint.

**Answer**: The Posey Company has engaged in repeated efforts to misrepresent, disparage, and deceive customers and potential customers about HipSaver's products. Posey's misrepresentations, deception, and product disparagement are aimed at HipSaver, intended to undercut the reputation and integrity of our products, and directed to unfairly compete and overwhelm HipSaver in the marketplace – all by fraudulent means.

In addition to false advertising aimed directly at HipSaver, the Posey Company has knowingly misrepresented the protective capability, launderability, and durability of its product when it knows that its products have been unable to withstand routine institutional laundering and when it knows that its products are not of proper size or positioning to protect the trochanter.

The Posey Company has an overwhelming presence in the rehabilitation and nursing facility segment of the healthcare marketplace, so it has little difficulty selling its products. When those products have proven to be inferior, Posey may well lose business. At the same time, however, HipSaver loses the opportunity to replace Posey because buyers conclude that the product – whether from Posey or HipSaver is simply flawed.

Posey's advertising campaigns have a particularly damaging potential because of the lack of knowledge among health care buyers and Posey's marketplace dominance. Neither the biomechanics nor the relative performance of competing products has been well understood in the marketplace. Buyers are susceptible to being misled by deceptive advertising masked in pseudo scientific certainty, precisely the strategy which has been pursued repeatedly by Posey.

4

My company is a small, limited products line company competing against a dominant, multi-line company with annual revenues in excess of $40 million. HipSaver has competed with some success and on the basis of a demonstrated record of product safety and durability. Over the last several years, however, we have faced Posey's "UCLA White Paper" campaign and now its Garwood advertising which falsely and grossly misrepresent our product and Posey's Hipster.

HipSaver does not have the resources or the presence in the marketplace to counter Posey's fraudulent campaign. Our company has been forced to incur the costs and distractions of maintaining an ongoing defensive effort to counter Posey's deception. Our company has also been unable also to offer or sell our products to a number of health care facilities which simply will not consider our products. Additionally, the combination of Posey's inferior products and its disparagement of our products has depressed the marketplace opportunity to market and sell soft hip protection products more broadly. Posey's strategy of offering inferior products and its negative advertising targeted against our company contributes to the impression by some buyers that soft hip protection garments are of poor quality and questionable effectiveness.

**Basis:** *See* "Basis" response to Interrogatory no. 1 *See also* Mr. Goodwin's October 18, 2005 deposition at 139, 140-152. Further, HipSaver notes that its damages case will be more fully set out by its damages expert. Relevant financial documents will be provided to JT Posey Company's counsel on January 30, 2006 as agreed by counsel for the parties. These documents are incorporated by reference. HipSaver expects also to designate JT Posey Company's financial documents, when produced, in HipSaver's damages claim. HipSaver reserves its right to further supplement this response.

These Interrogatories are answered in accordance with Fed.R.Civ. 33 and under penalty of perjury:

_____

Edward L. Goodwin


With respect to the Statement of Counsel and Objection:

_____

Edward J. Dailey


THE HIPSAVER COMPANY, INC.
By its Attorneys,

Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004 (fax)
Dated: 1.25.06

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic mail and USPS First Class mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470 Atlantic Avenue, Boston, Massachusetts 02210, ajfitzpatrick@duanemorris.com, and by electronic mail and USPS First Class mail to Douglas H. Morseburg, Esq., SHELDON & MAK, 225 South Lake Avenue, 9th Floor, Pasadena, California 91101, jgsheldon@usip.com.

Edward J. Dailey
Dated: 1.26.06

02820/00502 427435.2

12

These Interrogatories are answered in accordance with Fed.R.Civ. 33 and under penalty
of perjury:

*Edward L Goodwin: 1-25-06*

Edward L. Goodwin


With respect to the Statement of Counsel and Objection:


_____

Edward J. Dailey


THE HIPSAVER COMPANY, INC.
By its Attorneys,


Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004 (fax)
Dated: 1.25.06

### CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic mail and USPS First Class
mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470
Atlantic Avenue, Boston, Massachusetts 02210, ajfitzpatrick@duanemorris.com, and by electronic mail
and USPS First Class mail to Douglas H. Morseburg, Esq., SHELDON & MAK, 225 South Lake Avenue,
9th Floor, Pasadena, California 91101, jgsheldon@usip.com.

Edward J. Dailey
Dated: 1.26.06

02820/00502 427435.2

12

**EXHIBIT 10**

1

1                 VOL. I, PAGES 1 - 78

2            UNITED STATES DISTRICT COURT

3       FOR THE DISTRICT OF MASSACHUSETTS

4         CASE NO. CV-05-10917 PBS

5

6  THE HipSaver Company

7                 Plaintiff

8  V.

9  J.T. POSEY COMPANY

10                Defendant

11  AND RELATED COUNTERCLAIM

12          - - - - - - - -

13

14     Videotaped Deposition of Helen B. Brogna

15        Thursday, March 2, 2006

16           1:30 p.m.

17          Duane Morris

18        470 Atlantic Avenue

19      Boston, Massachusetts

20         - - - - - - - -

21     Reporter:  Deborah Roth, RPR/CSR

22

23

24

2

1    PRESENT:

2

3    Courtney M. Quish, Esq.

4    Edward J. Dailey, Esq.

5    Bromberg Sunstein, LLP

6    125 Summer Street

7    Boston, Massachusetts  02110

8    For the Plaintiff

9

10    Douglas H. Morseburg, Esq.

11    Sheldon & Mak, P.C.

12    225 South Lake Avenue, Suite 900

13    Pasadena, California  91001

14    626 796 4000

15    For the Defendant

16

17    ALSO PRESENT:    Edward Goodwin

18                    Richard Mendes, Videographer

19

20

21

22

23

24

13

1      A.   No.

2      Q.   Is that the only degree that you have?

3      A.   Yes.

4      Q.   Did you, after you graduated from -- let me

5  ask it this way, we will start presently and go

6  backwards.

7           Are you presently employed?

8      A.   Yes.

9      Q.   What is your present employment?

10     A.   The HipSaver.

11     Q.   And what is your position with HipSaver?

12     A.   I am a co-owner and executive vice

13  president.

14     Q.   What do you do as the executive vice

15  president of HipSaver?

16     A.   I didn't hear you.

17     Q.   What do you do as executive vice president

18  of HipSaver?

19     A.   My primary functions -- functions are

20  customer service and some administrative work and

21  the graphic material, marketing materials.

22     Q.   When you say the graphic materials and

23  marketing materials, would that include the

24  material that appears on HipSaver's Internet

14

1    Website?

2        A.  Yes.

3        Q.  How long have you been the executive vice

4    president of HipSaver?

5        A.  Since 1995.

6        Q.  Prior to becoming a co-owner and the

7    executive vice president of HipSaver, what did you

8    do?

9        A.  I was a co-owner of a graphic design direct

10   marketing agency.

11       Q.  And what was the name of that agency?

12       A.  Exhibit A Communications.

13       Q.  Did it have anything to do with lawyers or

14   law firms?

15       A.  Part of what we did was courtroom graphics.

16       Q.  And how long were you the co-owner of

17   Exhibit A Communications?

18       A.  13 years.

19       Q.  Is it fair to say that you became the

20   co-owner of Exhibit A Communications when you

21   graduated from University of Massachusetts Boston?

22       A.  No.

23       Q.  Before you became a co-owner of Exhibit A

24   Communications, what did you do?

19

1    is a document that has previously been identified

2    as Exhibit 61, and it is still marked as Exhibit

3    61, so we don't need to re-mark it.

4              Have you had a chance to look at the

5    exhibit that has been marked as Exhibit 61?

6        A.   Yes.

7        Q.   Have you ever seen it before?

8        A.   Yes.

9        Q.   What is it?

10       A.   It's a page from the HipSaver Website.

11       Q.   Take a look at the middle of the page

12   there, where it says "hip protectors and the

13   laundry," and below that there is a statement that

14   says, "Only HipSaver hip protectors clearly meets

15   the CDC guidelines for infection control in the

16   laundry."

17       A.   Yes.

18       Q.   Did I read that portion right?

19       A.   Yes, you did.

20       Q.   Did you approve this statement for

21   inclusion on HipSaver's Website?

22       A.   Ed and I make the final approvals together.

23              I am not sure if I approved this

24   particular line or if Ed did.

Brogna, Helen 030206

25

1       A.   I personally do not.

2       Q.   Look at over there in the right-hand side,

3    where you have that big arrow above the line that

4    says, "160 degrees," and then it goes up to the

5    line that is "250 degrees."

6            Do you see that?

7       A.   Yes.

8       Q.   You see the statement that says, "CDC

9    guidelines recommended wash temperature range."

10           What's the --

11           MS. QUISH:  Objection.  I don't think

12   it was read correctly.

13      Q.   Okay.  I will withdraw the question, and I

14   will start over.

15           Do you see the line that says, "CDC

16   guidelines recommended wash temperature range"?

17      A.   Yes.

18      Q.   According to this advertisement, what is

19   the wash temperature range recommended by the CDC

20   guidelines?

21      A.   A minimum of 160 degrees.  So if it is a

22   minimum of 160, it has to go somewhere above that.

23      Q.   Does this indicate that it is -- the

24   recommended minimum wash temperature range -- I'm

1    sorry -- the CDC guidelines recommended wash

2    temperature range is 180 degrees to 250 degrees?

3        A.   No, it does not.

4        Q.   Then does it say that the CDC guidelines

5    recommended wash temperature range is 160 degrees

6    to 250 degrees?

7        A.   What you can't see there, on this copy, is

8    that there are multiple arrows, and the implication

9    is that it could be -- that it is above 160, and

10   that the range is somewhere -- again, I think if

11   you saw it in color, it would be more -- it would

12   be clearer.

13       Q.   Are you saying that there are arrows which

14   appear on the Website that are not shown on this --

15       A.   You can barely see them here, if you look.

16   There are -- in color, this goes from -- I think it

17   goes from a blue up to a red, and you can see there

18   are multiple little arrows in there.

19       Q.   When you say that -- okay.  You know what,

20   let's do it this way.  I will get a color copy of

21   it.

22       A.   Okay.

23       Q.   We will make it so -- I see a faint -- what

24   could be an arrow -- you're saying that there is an

27

1    arrow superimposed on an arrow in another color?

2        A.   It's a gradation.   The color of that big

3    arrow comes from, like I said, I think it's blue up

4    to red.

5            There are -- there is an arrow just --

6    I think there are three more arrowheads, is what I

7    should say.

8            Well, actually, they do have -- there

9    are, like, three arrows, yes, sort of superimposed,

10   with a gradation going up.

11       Q.   The purpose of this statement and the

12   graphic, though, is to tell people that the CDC

13   guidelines recommended wash temperature range is

14   160 to something above 160, right?

15       A.   The arrow that is next to the 180 kind of

16   goes with that thing, average wash temperature of

17   institutional laundries, 180.

18            So, the implication is that, yes, it

19   can be washed -- that the recommended guidelines,

20   wash temperature, are going to be from that 160 to

21   something above, and I think that's saying that the

22   180 is the average temperature of the laundries.

23   That's going to imply that that is -- that's the

24   range.   That's my feeling.

47

1    about Posey and the false advertising HipSaver

2    contends as being alleged -- as being waged against

3    it by Posey?

4        A.  Yes.

5        Q.  And, in your view, as executive vice

6    president of HipSaver, is the false advertising

7    campaign you allege that is going on now part of

8    the same false advertising campaign that Posey was

9    waging against HipSaver back in 2004?

10       A.  Is it part of it?  It's false advertising.

11   It's a different test.

12       Q.  It's a different test, yes, but is it part

13   of the same campaign?

14       A.  The same ad campaign or the same campaign

15   against -- to advertise against HipSaver?

16       Q.  Yes, the latter.

17       A.  It's part of it -- it is to advertise

18   against HipSaver.

19       Q.  It's just a continuation of the stuff that

20   was going on in 2004, in your view; is that right?

21       A.  To some degree.

22            Again, I also rely, you know, on Ed's

23   opinion, on our counsel's opinion, in terms of

24   going forward.

52

1    Posey when the parties settled Posey 1?

2        A.  No.

3        Q.  Are you aware of any customers who stopped

4    buying HipSaver products as a consequence of any

5    statements Posey made in its advertising regarding

6    the Garwood testing?

7        A.  They don't usually call us and tell us that

8    they stopped buying from us.

9            They would just stop.  So I wouldn't --

10   so my answer is no.

11       Q.  Are you aware that HipSaver recently

12   amended its complaint in the case to add a claim

13   for product disparagement?

14       A.  Yes.

15       Q.  We are talking about the present case

16   instead of Posey 1.

17       A.  Yes.

18       Q.  Are you aware of any customers who stopped

19   buying from HipSaver as a consequence of any

20   disparaging statements Posey ever made about

21   HipSaver products?

22       A.  Again, no.

23       Q.  Are you aware of any other kinds of losses

24   that HipSaver may have suffered as a consequence of

53

1    any disparagement of HipSaver products by Posey?

2    　　A.　My awareness is that there are -- I believe

3    it's more lost opportunity, that there are

4    customers that we may have gotten that we are not

5    getting because of things that Posey said in its

6    advertisement.

7    　　Q.　And can you point to any individual

8    customer that that is true of?

9    　　A.　Not necessarily individual customers.

10   　　　　I would say the -- probably the large

11   chains:　Life Care, Manor Care.

12   　　Q.　Have you ever had any discussions with

13   anybody at Life Care and asked them whether they

14   are not buying HipSaver products because of

15   anything Posey said that disparaged HipSaver

16   products?

17   　　A.　I have not asked.

18   　　Q.　How about Manor Care, have you had any

19   discussion with anybody from Manor Care asking them

20   whether they are not buying HipSaver products

21   because, for example, Posey said something

22   disparaging about HipSaver products?

23   　　A.　No, I have not.

24   　　Q.　Do you have any responsibilities at