# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE HIPSAVER COMPANY, INC., | ) Civil Action No. 05-10917 PBS |
| Plaintiff, | ) |
| v. | ) ORAL HEARING REQUESTED |
| J.T. POSEY COMPANY, | ) |
| Defendant. | ) |
| AND RELATED COUNTERCLAIM. | ) |

## MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT AND COUNTERCLAIMANT J.T. POSEY COMPANY, INC. FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF POSEY'S COUNTERCLAIMS

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................- 1 -

II.  THE RELEVANT FACTS .......................................................................- 1 -

   A.   The Parties and The Products At Issue ...........................................- 1 -

   B.   The Facts Leading Up to This Case.................................................- 1 -

   C.   HipSaver's Internet Website ............................................................- 2 -

      1.   HipSaver's "Laundry" Page........................................................- 2 -

      2.   HipSaver's "Validation & Testing" Page ...................................- 3 -

         a.   The Compliance Study Reported in JAMDA .........................- 4 -

         b.   The Gross Study Reported in Advance for Physical Therapists...........- 5 -

         c.   The Alleged Testing At Harvard in 1996 ..............................- 6 -

         d.   The Tampere University Testing in 2000 ...............................- 6 -

III. THE APPLICABLE LEGAL STANDARDS ..........................................- 7 -

   A.   The Summary Judgment Standard ..................................................- 7 -

   B.   The Legal Standards Governing Posey's First Counterclaim For False
        Advertising Under Section 43(a) Of The Lanham Act....................- 8 -

      1.   The Elements of a Section 43(a) Claim ....................................- 8 -

      2.   Characterizing and Assessing False Advertising Statements .......- 9 -

IV.  THE "LAUNDRY" AND "VALIDATION & TESTING" CLAIMS ON
     HIPSAVER'S INTERNET WEBSITE VIOLATE SECTION 43(A)............- 10 -

   A.   First Element – HipSaver Has Made Literally False Statements About
        Its Own and Its Competitors' Products...........................................- 10 -

      1.   The Claims That "Only" HipSaver's Products Meet CDC Guidelines Are Literally
           False ...........................................................................................- 10 -

      2.   The Remaining Laundry Claims Are Literally False.................- 12 -

      3.   HipSaver's "Validation and Testing" Claims Are Literally False...........- 12 -

      a.    HipSaver Is Misrepresenting Both the Purpose and the Results of the
Study Which Is the Subject of the JAMDA Report ................................................- 13 -

      b.    The Gross Study Did Not Validate the Effectiveness of HipSaver's
Present Products ..................................................................................................- 14 -

      c.    The Alleged Testing At Harvard in 1996 Did Not Involve HipSaver's
Current Products ..................................................................................................- 14 -

      d.    The Tampere University Testing in 2000 Did Not Involve HipSaver's
Current Products; HipSaver Is also Misrepresenting the Results Of
That Testing ........................................................................................................- 15 -

  B.    Second Element - HipSaver's False Statements Are Material ......................................- 15 -

  C.    Third Element - HipSaver's Statements Have Presumably
Deceived Consumers ..................................................................................................- 16 -

  D.    Fourth Element – HipSaver's Statements Were in Made In Interstate
Commerce. ..................................................................................................................- 16 -

  E.    Fifth Element – Injury Or Likelihood Of Injury ..........................................................- 17 -

V.    GOODWIN IS LIABLE FOR FALSE ADVERTISING BECAUSE HE PERSONALLY
PARTICIPATED IN THE DECISION TO POST HIPSAVER'S LITERALLY FALSE
CLAIMS ON HIPSAVER'S INTERNET WEBSITE ....................................................- 18 -

VI.    CONCLUSION ..................................................................................................................- 18 -

TABLE OF AUTHORITIES

FEDERAL CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)......................................................10

*BASF Corp. v. Old World Trading Co.*,
   41 F.3d 1081 (7th Cir. 1994) ......................................................13

*Cashmere & Camel Hair Manufacturers Inst. v. Saks Fifth Avenue*,
   284 F.3d 302 (1st Cir. 2002)......................................................10, 17, 18

*Castrol, Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993)......................................................12

*Castrol, Inc. v. Quaker State Corp.*,
   977 F.2d 57 (2d Cir 1992) ......................................................12

*Clorox Company Puerto Rico v. Proctor & Gamble Comm. Co.*,
   228 F.3d 24 (1st Cir. 2000)......................................................12, 15

*Committee for Idaho's High Desert v. Yost*,
   92 F.3d 814 (9th Cir. 1996) ......................................................20

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*,
   299 F.3d 1242 (11th Cir. 2002) ......................................................12

*LeBlanc v. Great Am. Ins. Co.*,
   6 F.3d 836 (1st Cir. 1993)......................................................10

*Minnesota Mining and Manufacturing Co. v. Dentsply Int'l, Inc.*,
   1994 WL 827735 (D. Del. 1994)......................................................16

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997)......................................................18

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*,
   290 F.3d 578 (3d Cir. 2002)......................................................13, 14

*Proctor & Gamble Co. v. Chesebrough-Pond's, Inc.*,
   747 F.2d 114 (2d Cir. 1984)......................................................12

*Rhone-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrill Dow, Inc.*,
   93 F.3d 511 (8th Cir. 1996) ......................................................11

*Rogers v. Fair*,
    902 F.2d 140 (1st Cir. 1990) ............................................................................10

*Royal Baking Powder Co. v. Federal Trade Commission*,
    281 F. 744 (2d Cir. 1922).................................................................................16

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
    768 F.2d 1001 (9th Cir. 1985) .........................................................................20

*United States v. Carroll*,
    105 F.3d 740 (1st Cir.), *cert. denied*, 520 U.S. 1258, 117 S. Ct. 2424, 138
    L.Ed.2d 187 (1997) .........................................................................................18

*Warner Lambert Co. v. Breathasure Inc.*,
    204 F.3d 87 (3d Cir. 2000)..............................................................................19

## FEDERAL STATUTES

Fed.R.Civ.P. 56(c) ..............................................................................................9

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).........................................10, 11

## STATE STATUTES

Mass. G.L. ch. 93A, §11 .....................................................................................2, 4

## I.    INTRODUCTION

This case proves the old adage that "people who live in glass houses shouldn't throw stones."  As the Court will see, although The HipSaver Company, Inc. ("HipSaver") has accused J.T. Posey Company, Inc. ("Posey") of false and misleading advertising, HipSaver's own advertising is riddled with literally false statements that tout its products and denigrate those of its competitors.  Based upon undisputed facts, Posey seeks partial summary judgment in its favor and against HipSaver and its president, Edward Goodwin, on Posey's counterclaim for false advertising under Section 43(a) of the Lanham Act.

## II.    THE RELEVANT FACTS

### A.    The Parties and The Products At Issue

Posey is a California corporation that sells a variety of medical-related products.  Fact 1.[1] HipSaver is a Massachusetts corporation that makes and sells hip protectors.  Fact 2.  Edward L. Goodwin ("Goodwin") is HipSaver's president.  Fact 3.  Posey and HipSaver are competitors in the hip protector market.  Fact 4.

A hip protector is generally a device that is designed to cover the hip and to help prevent hip fractures in elderly persons caused by falls.  Fact 5.  Hip protectors may be entirely soft, entirely hard comprising a shield, or a combination of both hard and soft materials.  Fact 6.  Both HipSaver and Posey currently manufacture and sell entirely soft hip protectors.  Fact 7.

### B.    The Facts Leading Up to This Case

The background fact leading up to this case are discussed in detail in Posey's companion motion for summary judgment on HipSaver's claims.  In the interests of brevity, they will not be repeated here.

---

[1]    All "Fact" references are to the Statement Of Uncontroverted Facts In Support Of J.T. Posey Company's (1) Motion For Summary Judgment On The Claims Of The Hipsaver Company, Inc.; And (2) Motion For Partial Summary Judgment On Count I Of Posey's Counterclaims

C.    **HipSaver's Internet Website**

HipSaver maintains an Internet website which it uses to advertise and promote its products and to educate the public about its products and its competitors' products. Fact 34. The "url" address of HipSaver's Internet website is http://www.hipsaver.com. Fact 35. Goodwin approves the content of all of the statements that are posted on HipSaver's Internet website. Fact 36.

1.    **HipSaver's "Laundry" Page**

One of the pages of HipSaver's Internet website is entitled "Hip Protectors & the Laundry". This page contains the following unsubstantiated and false statements and graphic representations:

a)    The statement that "Only HipSaver hip protectors clearly meets [sic] the CDC Guidelines for infection control in the laundry", Fact 37;

b)    The statement that "Only HipSaver [hip protectors] can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry",  Fact 38;

c)    A graphic representation that the CDC Guidelines recommend a "minimum" wash temperature of 160ºF, Fact 39;

d)    A graphic representation that the "wash temperature range" recommended by "CDC Guidelines" is between 160ºF and a temperature "somewhere above that", Fact 40;

e)    The statement that Posey Hipsters are machine washable at temperatures of up to 160° F the "CDC guideline suggested minimum", Fact 41;

f)    The statement that the "average wash/dry temperature of institution laundries" is 180°F, Fact 42; and

g)     The statement that "HipSavers [products] wash and dry up to 250 [degrees F] – well above the CDC guidelines", Fact 43.

The undisputed evidence shows that each of these statements is literally false. As for statements a) and b), above, HipSaver admits that it never conducted any testing to determine whether its products or the products of any of its competitors meet the CDC Guidelines. Facts 44 and 45. Thus, it has absolutely **no** evidence that its products can, or that its competitors' products cannot, be laundered according to the pertinent CDC guidelines. Moreover, Kevin Minissian, an independent expert hired by Posey, has washed Posey's products according to the CDC's guidelines. Even after 110 washings, those products are doing just fine. Fact 46.

As for HipSaver's remaining laundry statements, HipSaver's Internet website contains a "link" to the "CDC Guidelines for Laundry in Health Care Facilities" which are mentioned on its website. Even a cursory review of those guidelines shows that HipSaver's graphic representation (see c), above) and its statement (see e), above) that the guidelines recommend a "minimum" wash temperature of 160° F and its graphic representation (see d), above) that the guidelines recommend a wash temperature range of between 160° F and "something more than that" are literally false. Facts 47 and 48.

Likewise, the accompanying declaration of Kevin Minissian establishes that HipSaver's statement (see f), above) that the average wash temperature of institution laundries is 180°F is literally false. Fact 49. Finally, HipSaver has admitted that it has absolutely no substantiation for the claim (in g), above) that one can "wash and dry [HipSavers' products] up to 250 [degrees F] – well above the CDC guidelines". Facts 44 & 45.

### 2.     HipSaver's "Validation & Testing" Page

Another one of the pages of HipSaver's Internet website is entitled "Validation & Testing". This page contains the statement that HipSaver's products "are the only all-soft hip

protectors, proven effective – in both independent mechanical testing and clinical study", Fact 51; and the statement that purchasers should choose HipSavers because they are the product of "proven testing, independent scientific validation and years of market success", Fact 52.

HipSaver's claims that its products have been independently tested and validated are based upon: a) the report of a study (the "Compliance Study") published in the September/October 2003 issue of the Journal of the American Medical Directors Association ("JAMDA"); b) the report of a study (the "Gross Study") published in the October 2000 issue of Advance for Physical Therapists; c) a biomechanical test purportedly performed at Harvard University in 1996; and d) a biomechanical test performed at Tampere University of Technology in Finland in 2000. HipSaver's claims that these studies and tests have "validated" their present products or proven them effective are literally false.

### a.     The Compliance Study Reported in JAMDA

The undisputed evidence shows that the Compliance Study reported in JAMDA was a clinical study that commenced in September 2001. Fact 54. It was designed to determine if persons at risk for hip fractures could be induced to wear hip protectors consistently over a period of time. Fact 55. The individuals who participated in the Compliance Study wore HipSaver-brand hip protectors. Fact 56.

On its Internet website, HipSaver cites the Compliance Study as evidence of the effectiveness of its products on the grounds that "there were 126 falls among the HipSaver wearers and no hip fractures" during the duration of the study. Fact 57. It further states that this fact is "equally [as] important" as the reported compliance rate and a "very significant" result of the study. Fact 58. However, the lead researcher on the study, Dr. Burl, testified that the fact that there were falls but no fractures among HipSaver wearers during the Compliance Study was not "equally [as] important" as the reported compliance rate. He also testified that this was not

- 4 -

even a statistically significant result of the study. Fact 59. Dr. Burl's testimony is uncontradicted.

HipSaver's Internet website also states that, according to the JAMDA report, the compliance rate for HipSaver wearers for the duration of the Compliance Study was 93%. Fact 60. This statement is complete fiction. The JAMDA report does not state that the compliance rate for HipSaver wearers during the Compliance Study was 93%. In fact, Dr. Burl testified that it is not even possible to determine from the report the exact compliance rate of HipSaver wearers who completed the Compliance Study. Fact 61. The JAMDA report does mention a 93% compliance rate. However, according to Dr. Burl, that is the rate of compliance for people **who died** during the study. Fact 62. Dr. Burl's testimony on these points is uncontradicted.

In sum, the Compliance Study was designed to test whether people would wear hip protectors, not whether they were effective in preventing injury. Thus, the results of the study do not support HipSaver's claim that the study constitutes "independent scientific validation" of the effectiveness of its products. The results of the study do not even support HipSaver's advertising claims regarding the rates of compliance.

        **b.**    **The Gross Study Reported in Advance for Physical Therapists**

As evidence of the effectiveness of its products, HipSaver also points to the Gross Study conducted by the Elder Service Plan of the East Boston Neighborhood Health Center. The report of the Gross Study was purportedly published in October 2000 in Advance for Physical Therapists. Fact 63. A reprint of that report is available on HipSaver's Internet website. Fact 64. It states on its face that the Gross Study was conducted over a period of 26 months. Fact 65.

Even assuming that the report was written and published on the day the study ended, the Gross Study could have commenced no later than August 1998. This is significant because the product HipSaver was making in 1998 (and, we must assume, was tested in the Gross Study) is

- 5 -

completely different from the product HipSaver was selling in 2005 when this lawsuit commenced.

For example, in 1998, the pads in HipSaver's hip protectors were constructed of two different foams laminated together. Fact 66. The pads were then encapsulated in a laminated envelope. Fact 67. In 2000, HipSaver switched from a two-foam laminate pad to a single-layer pad which was made from different foam. Fact 68. It also changed the overall thickness of its pads. Fact 69. Later, in 2001, it changed the material encapsulating the pads and also began attaching the pads to the encapsulating material. Fact 70. It changed the thickness of its pads again in 2002. Fact 71. Since HipSaver's product as it existed in 1998 is so different from its present product, as a matter of logic, the results of the Gross Study cannot support HipSaver's claim that the effectiveness of its present product has been "clinically validated".

### c.       The Alleged Testing At Harvard in 1996

HipSaver claims that its products have been proven effective in testing at Harvard University and that the results of this test shows that HipSaver's "airPad technology" offers "more than 20% more force reduction" than the leading hard-shell hip protector. Fact 72. This is not true. The alleged testing at Harvard was performed in 1996. Fact 73. However, as is set forth above, HipSaver's products in their present iteration did not even exist until 2002. Fact 74. Therefore, no matter what the results of the Harvard test were, as a matter of logic, without proof of the effectiveness of HipSaver's "improvements" to its earlier products, the results of that test simply cannot support HipSaver's claim that they show the effectiveness of its present products.

### d.       The Tampere University Testing in 2000

The Tampere University testing occurred in August or September 2000. Fact 75. Once again, however, it is undisputed that, in 2001, HipSaver changed the material encapsulating its pads and began attaching the pads to the encapsulating envelope and that, in 2002, it changed the

thickness of its pads. Facts 66-71. Without evidence of the effect of these changes to HipSaver's product, the results of the 2000 Tampere test cannot support any claim regarding HipSaver's present products.

In addition, HipSaver is affirmatively misrepresenting the results of the Tampere tests in its advertising. Specifically, HipSaver claims that the Tampere testing demonstrated that its pads offer "more than 20% more force reduction" than the leading hard-shell hip protector, i.e., Safehip. Fact 76. However, the documentation regarding the Tampere testing, which is available on HipSaver's Internet website, indicates that HipSaver's product offers no more than 6% more force reduction than the Safehip. Fact 77. This is far less than the 20% difference claimed by HipSaver in its advertising. Therefore, the Tampere test does not support HipSaver's claims regarding the effectiveness of its pads.

## III.    THE APPLICABLE LEGAL STANDARDS

### A.    The Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To succeed on a motion for summary judgment, the moving party may also show "that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990).

Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). To defeat the motion, "'the nonmoving party must establish a trial-worthy issue presenting enough

competent evidence to enable a finding favorable to the nonmoving party.'" *Cashmere & Camel Hair Manufacturers Inst. v. Saks Fifth Avenue*, 284 F.3d 302, 308 (1st Cir. 2002) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993)). "'If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249-50, 106 S.Ct. at 2511) (citations and footnote in *Anderson* omitted).

**B.    The Legal Standards Governing Posey's Claim for False Advertising Under Section 43(a) Of The Lanham Act**

**1.    The Elements of a Section 43(a) Claim**

Count I of Posey's counterclaim is against HipSaver and Goodwin for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which prohibits false and misleading descriptions or representations of fact in connection with the advertising or promotion of goods and services in interstate commerce.  To prove a false advertising claim under this section, a plaintiff must demonstrate that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence purchasing decisions; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of the intended audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products." *Cashmere*, 284 F.3d at 310-311.

It is unnecessary for a plaintiff to present evidence to support each element of a Section 43(a) claim in every case.  For example, in a case such as this, where a defendant has made "literally false" representations, a plaintiff need not present evidence

concerning the third element, i.e., that the statements actually deceive or have a tendency to do so. *Id.*, at 311 ("A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or implicitly false-that is, the advertisement is true or ambiguous yet misleading. Where the advertisement is literally false, a violation may be established without evidence of consumer deception.") (Internal citation omitted.)

### 2.    <u>Characterizing and Assessing False Advertising Statements</u>

The HipSaver advertising statements at issue on this motion are characterized as "comparative advertising". There are two types of false comparative advertising claims - the plain vanilla "my product is better than yours" type and the "*tests prove* that my product is better than yours" type. *Rhone-Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrill Dow, Inc.*, 93 F.3d 511, 514 (8th Cir. 1996) (italics in original).

Where a defendant makes a garden variety "my product is better than yours" claim (i.e., a "superiority claim"), the plaintiff must prove that the defendant's claim of superiority is false. *Id.* But where the defendant has hyped the superiority of its product by attributing it to scientific testing (i.e., an "establishment claim"), the plaintiff need only demonstrate "'that the tests [relied upon] were not sufficiently reliable to permit one to conclude with reasonable certainty that they established the proposition for which they were cited.'" *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62-63 (2d Cir 1992) (quoting *Proctor & Gamble Co. v. Chesebrough-Pond's, Inc.*, 747 F.2d 114, 119 (2d Cir. 1984)).

In deciding the falsity of a superiority or an establishment claim, it is first necessary to determine what is the actual claim made by an advertisement and then to determine whether that claim is false. *Clorox Company Puerto Rico v. Proctor &*

*Gamble Comm. Co.*, 228 F.3d 24, 34 (1st Cir. 2000). A factual claim may either be express or made express by "necessary implication." For instance, a claim that one's motor oil provides "longer engine life and better engine protection" without mentioning competitors draws a comparison to them by necessary implication. *Clorox*, 228 F.3d at 35 (citing *Castrol, Inc. v. Pennzoil, Inc.*, 987 F.2d 939 (3d Cir. 1993)).

In addition, when assessing an advertisement, "'a court must view the message conveyed in full context.'" *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002) (quoting *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993)). Finally, "the court must view the face of the statement in its entirety, rather than examining the eyes, nose and mouth separately and in isolation from each other." *Johnson & Johnson*, 299 F.3d at 1248.

## IV.    THE "LAUNDRY" AND "VALIDATION & TESTING" CLAIMS ON HIPSAVER'S INTERNET WEBSITE VIOLATE SECTION 43(A)

As is set forth below, with respect to Count I of Posey's counterclaims, all of the elements of a Section 43(a) claim are satisfied.

### A.    First Element – HipSaver Has Made Literally False Statements About Its Own and Its Competitors' Products

#### 1.    The Claims That "Only" HipSaver's Products Meet CDC Guidelines Are Literally False

The statements on HipSaver's Internet website that "Only HipSaver hip protectors clearly meets [sic] the CDC Guidelines for infection control in the laundry" and the statement that "Only HipSaver [hip protectors] can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry" fall into the "tests prove" category. They implicitly say, "We have run tests to determine whether our products and our competitors' products can be laundered according to the CDC Guidelines and the results show that ours can and that our competitors' cannot."

- 10 -

*BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081 (7th Cir. 1994), illustrates the point. There, the defendant advertised that its antifreeze met certain manufacturers' specifications. The defendant contended that this statement was a superiority claim. The plaintiff contended, and the court found, that it was a "tests prove" claim because the defendant could not truthfully advertise that it met any specifications unless it had run tests to determine that fact. *BASF*, 41 F.3d at 1091. Because the statements HipSaver is making here are indistinguishable from the statements the defendant made in *BASF*, they are properly characterized as establishment, i.e., "tests prove", claims.

HipSaver has admitted that it has never conducted any testing to determine whether its products or the products of its competitors meet the CDC Guidelines. Facts 44 & 45. Since there are no tests showing that "only" HipSaver's products can be laundered according to the CDC's guidelines, these claims are literally false.

It should be noted, however, that it really makes no difference whether the foregoing statements are characterized as establishment claims as opposed to superiority claims. This is because they are completely unsubstantiated. Thus, even if they were superiority claims (and they are not), they would be *per se* false. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578 (3d Cir. 2002) ("[A] completely unsubstantiated advertising claim by the defendant is *per se* false without additional evidence from the plaintiff to that effect."). Moreover, even if these statements were not *per se* false, Posey's laundry expert has determined that Posey's products *can* be laundered in accordance with the CDC's guidelines. Fact 49. Thus, no matter how these statements are characterized, they are literally false.

2.       **The Remaining Laundry Claims Are Literally False**

As is set forth in the statement of facts, in addition to the two statements discussed immediately above, HipSaver's Internet website contains at least five other statements, all of which considered together constitute a claim of superiority of HipSaver products over Posey's products. These are: (i) a graphic display which represents that the CDC Guidelines recommend a "minimum" wash temperature of 160°F, Fact 39; (ii) a graphic display which also represents that the "wash temperature range" recommended by "CDC Guidelines" is between 160°F and a temperature "somewhere above that", Fact 40; (iii) the statement that Posey Hipsters are machine washable only up to the "CDC guideline suggested minimum" temperature of 160° F, Fact 41; (iv) the statement that the "average wash/dry temperature of institution laundries" is 180°F, Fact 42; and (v) the statement that "HipSavers wash and dry up to 250 [degrees F] – well above the CDC guidelines." Fact 43.

The undisputed evidence, including the CDL Guidelines which are available on HipSaver's website and the Minassian declaration show that i) through iv) are literally false. Fact 41. In addition, because the statement in v) above is totally unsubstantiated, it is *per se* false. *Novartis*, 290 F.3d 578.

3.       **HipSaver's "Validation and Testing" Claims Are Literally False**

HipSaver's website claims that its product is the "only proven, all-soft hip protector" that has been "independently validated" and "proven effective in both independent biomechanical testing and clinical study." It also exhorts its audience to choose a product "with proven testing, independent scientific validation and years of market success" over one that "looks similar but has no performance data or market history." Finally, HipSaver tells potential purchasers to

- 12 -

"[b]eware of imitators seeking to cash in on years of HipSaver research, development and testing . . ." Fact 52.

Because these claims make reference to testing, these are classic establishment claims. Moreover, even though these claims do not specifically mention Posey or any other competitor by name, the fact that HipSaver claims to have the "only proven" product and makes reference to "imitators", the claims necessarily implicate them. *Clorox*, 228 F. 3d at 35. **None** of the studies or tests HipSaver cites in support of the foregoing claims show that its current products have been "validated" or proven effective.

a.    <u>HipSaver Is Misrepresenting Both the Purpose and the Results of the Study Which Is the Subject of the JAMDA Report</u>

On its website, HipSaver cites the Compliance Study as evidence of the effectiveness of its products on the grounds that "there were 126 falls among the HipSaver wearers and no hip fractures" during the duration of the study. Fact 57. It further states that this fact is "equally [as] important" as the reported compliance rate and a "very significant" result of the study. Fact 58. However, the uncontradicted evidence is that the fact that there were falls but no fractures among HipSaver wearers during the Compliance Study was not "equally [as] important" as the reported compliance rate and that this was not even a statistically significant result of the study. Fact 59.

HipSaver's Internet website also states that the compliance rate for HipSaver wearers for the duration of the Compliance Study was 93%. Again, the uncontradicted evidence is that the JAMDA report does not state that the compliance rate for HipSaver wearers during the Compliance Study was 93% and that it is not possible to determine from the report the exact compliance rate of HipSaver wearers who completed the Compliance Study. Facts 60-62.

In sum, the Compliance Study was designed to test whether people would wear hip protectors, not whether they were effective in preventing injury. Thus, the results of the study do not support HipSaver's claim that the study constitutes "independent scientific validation" of the

effectiveness of its products.  The results of the study do not even support HipSaver's advertising

claims regarding the rates of compliance.

### b.    The Gross Study Did Not Validate the Effectiveness of HipSaver's Present Products

HipSaver points to the Gross Study as evidence of the effectiveness of its products.

However, as is set out above, the Gross Study commenced in 1998 at the latest and HipSaver's

products went through substantial changes in 2000, 2001 and 2002.  Facts 63-65.  The Gross

Study may or may not have "clinically validated" the 1998 version of HipSaver's product.  It

matters not, however, because the product HipSaver was making in 1998 is not the same as the

product it is making now.  Therefore, the results of the Gross Study cannot support HipSaver's

claim that the effectiveness of its present product has been "clinically validated".  *See, e.g.,*

*Royal Baking Powder Co. v. Federal Trade Commission,* 281 F. 744, 753 (2d Cir. 1922)

(advertising stating that product was well-known for over 60 years without disclosing that

product's formula had recently been changed was false and misleading); *Minnesota Mining and*

*Manufacturing Co. v. Dentsply Int'l, Inc.,* 1994 WL 827735 (D. Del. 1994) (where the defendant

chemically improved its dental bonding system and had no evidence regarding the performance

of the improved elements, advertising claims making reference to the clinical history of the

initial bonding system were literally false).

### c.    The Alleged Testing At Harvard in 1996 Did Not Involve HipSaver's Current Products

HipSaver's claim that its products have been proven effective in "independent

biomechanical testing" at Harvard University is literally false.  The alleged Harvard testing was

performed in 1996.  However, the undisputed evidence is that HipSaver's products in their

present iteration did not even exist until 2002.  Facts 72-74.  Therefore, no matter what the

results of the Harvard test were, as a matter of logic, without proof of the effectiveness of

- 14 -

HipSaver's changes to its 1996 products, the results of that test simply cannot support

HipSaver's claim that they show the effectiveness of its present products.

> **d.      The Tampere University Testing in 2000 Did Not Involve HipSaver's Current Products; HipSaver Is Also Misrepresenting the Results Of That Testing**

The Tampere University testing occurred in August or September 2000.  Once again,

however, it is undisputed that, in 2001, HipSaver changed the material encapsulating its pads and

began attaching the pads to the encapsulating envelope and that, in 2002, it changed the

thickness of its pads.  Facts 75-77.  Without evidence of the effect of these changes to

HipSaver's product, the results of the 2000 Tampere test cannot support any claim regarding

HipSaver's present products.

Moreover, HipSaver is affirmatively misrepresenting the results of the Tampere tests in

its advertising.  Specifically, HipSaver claims that the Tampere testing demonstrated that its pads

offer "more than 20% more force reduction" than the leading hard-shell hip protector, i.e.,

Safehip.  However, the documentation regarding the Tampere testing indicates that HipSaver's

product offers no more than 6% more force reduction than the Safehip.  This is far less than the

20% difference claimed by HipSaver in its advertising.  Therefore, the Tampere test does not

support HipSaver's claims regarding the effectiveness of its pads.

> **B.      Second Element - HipSaver's False Statements Are Material**

Representations are material if they are "likely to influence the purchasing decision."

*Cashmere*, 284 F.3d at 311 (citing *Clorox*, 228 F.3d at 33 n.6)).  One method of establishing

materiality involves showing that the false or misleading statement relates to an "inherent quality

or characteristic" of the product.  *Cashmere*, 284 F.3d at 311-12 (citing *Nat'l Basketball Ass'n v.

Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997)).  In essence, if the statement relates to an

inherent quality or characteristic, it is automatically "material.

In the instant case, HipSaver's "Validation & Testing Claims" and its "Laundry Claims" all relate to inherent qualities or characteristics of its hip protectors. Specifically, the statements regarding the Gross Study, the alleged Harvard testing and the Tampare testing all relate to the effectiveness of HipSaver's products in reducing fractures, which is the key reason people would buy them. The statements pertaining to the Compliance Study relate to comfort, one of the most desirable characteristics, and (according to HipSaver, anyway) effectiveness. The "Laundry Claims" all relate to the durability of the products and, inasmuch as they are basically underwear, the ability to launder them to achieve an acceptable level of cleanliness. Thus, this element of Posey's claim is satisfied.

### C.    Third Element - HipSaver's Statements Have Presumably Deceived Consumers

Ordinarily, a false advertising claimant must demonstrate that the defendant's misrepresentations deceived or had a tendency to deceive a substantial portion of the consuming public. Where the defendant's advertising claims are literally false, however, consumer deception is presumed. *Cashmere*, 284 F.3d at 314-315. Because HipSaver's claims that are the subject of this motion are all literally false, the presumption applies. Therefore, this element is also satisfied.

### D.    Fourth Element – HipSaver's Statements Were Made In Interstate Commerce.

The fourth element of a false advertising claim under the Lanham Act requires the plaintiff to show that the defendant placed the false or misleading statements in interstate commerce. Since HipSaver's statements were made via the Internet, they were made in interstate commerce. *See United States v. Carroll*, 105 F.3d 740, 742 (1st Cir.), *cert. denied*, 520 U.S. 1258, 117 S. Ct. 2424, 138 L.Ed.2d 187 (1997) (transmission of material by means of the

Internet is tantamount to moving material across state lines and thus constitutes transportation in interstate commerce).

### E.    Fifth Element – Injury Or Likelihood Of Injury

The quantum of proof required to satisfy the final element of a Section 43(a) false advertising claim, i.e., injury or the likelihood of injury as a consequence of the defendant's misrepresentations, varies depending upon whether the plaintiff is seeking damages or merely an injunction.  Where, as here, the plaintiff is seeking an injunction, this element is satisfied if the plaintiff demonstrates a reasonable likelihood of injury from the defendant's continued publication or dissemination of its false ads.  *Warner Lambert Co. v. Breathasure Inc.*, 204 F.3d 87, 97 (3d Cir. 2000).

In the instant case, Posey and HipSaver directly compete in the market for hip protectors. HipSaver's laundry claims and its validation and testing claims are literally false and the laundry claims make direct, but false, comparisons between HipSaver's products and Posey's products. Under these circumstances, there is a reasonable likelihood that HipSaver's false claims will injure Posey either through a diversion of sales from Posey to HipSaver or through a lessening of the goodwill associated with Posey's products. *See Warner Lambert*, 204 F.3d at 97 (where plaintiff and defendant were competitors, defendants' "Breathasure" name was literally false and defendant's ads made direct comparisons to plaintiff's product, trial court's refusal to enjoin use of name was an abuse of discretion).

All of the elements of a Section 43(a) false advertising claim are satisfied.  Therefore, Posey is entitled to partial summary judgment on Count I of its counterclaim.

V.   **GOODWIN IS LIABLE FOR FALSE ADVERTISING BECAUSE HE PERSONALLY PARTICIPATED IN THE DECISION TO POST HIPSAVER'S LITERALLY FALSE CLAIMS ON HIPSAVER'S INTERNET WEBSITE**

The law is settled that corporate officers or directors who take part in tortious activities are personally liable, even though they do so for the benefit of the corporation. *Committee for Idaho's High Desert v. Yost*, 92 F.3d 814 (9th Cir. 1996) (corporate officer or director is personally liable for acts of trademark infringement which he authorizes or directs or participates in); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985) (same). Here, Mr. Goodwin is the president of HipSaver and he participated in the decision to disseminate HipSaver's literally false advertising. Moreover, it is he who decided to leave the offending materials on HipSaver's website even though they are demonstrably false. Thus, he is personally liable on Posey's claim for false advertising.

VI.   **CONCLUSION**

For the foregoing reasons, Posey respectfully requests that the Court grant the instant motion and enter partial summary judgment in Posey's favor and against HipSaver and Goodwin on Count I of Posey's counterclaim.

Dated: December 11, 2006                    J.T. POSEY COMPANY

                                            By its attorneys,


                                            /s/ Douglas H. Morseburg
                                            Jeffrey G. Sheldon (CA Bar No. 67516)
                                            Douglas H. Morseburg (CA Bar No. 26205)
                                            SHELDON MAK ROSE & ANDERSON PC
                                            225 South Lake Avenue, Suite 900
                                            Pasadena, CA  91001
                                            (626) 796-4000

                                            Anthony J. Fitzpatrick (BBO # 564324)

DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

## <u>CERTIFICATE OF SERVICE</u>

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electornic filing.

December 11, 2006

/s/ Donald K. Piper
Donald K. Piper