# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)
THE HIPSAVER COMPANY, INC.,                    )
     Plaintiff / Counterclaim Defendant        )
)
v                                              )     Civil Action No. 05-10917 PBS
)
J.T. POSEY COMPANY,                            )
     Defendant / Counterclaim Plaintiff        )
)
_____)


## HIPSAVER'S OPPOSITION TO DEFENDANT J.T. POSEY COMPANY'S
## MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT

Having failed to learn from the 2004 Lanham Act lawsuit, Posey is now desperately attempting to get out of the corner it backed itself into by launching a revived false advertising campaign on the heels of the September 2004 settlement with HipSaver.  Posey's Motion for Summary Judgment on HipSaver's Complaint is groundless; it rests on revisionist, self-serving statements by Ernest Posey whose declaration conveniently sidesteps the substance of HipSaver's claims, whose statements and actions since the 2004 settlement contradict what is now declared, and whose Statement of Facts is materially disputed. *See* **Exh**. 1, a chart documenting all material facts disputed by HipSaver ("Disputed Facts Chart").  In short, Posey's Motion has no merit, is not a bar to trial on the merits or partial summary judgment for HipSaver, and should be rejected by this Court.

## FACTS

In 2001, J.T. Posey Company knocked off the soft hip protection garment, invented by HipSaver's principal, Edward L. Goodwin in 1995. *See* **Exh**. 2, Declaration of Edward L. Goodwin, January 8, 2007 ("Goodwin Decl.") at ¶2; **Exh**. 7, Excerpts of Deposition of Edward Goodwin ("Goodwin Depo."), November 30, 2005, p. 131.  Then, Posey embarked on relentless and largely successful campaigns of misrepresentation and false and deceptive advertising to supplant HipSaver in the U.S. health care market. Posey's advertising proclaimed the effectiveness, superiority, and launderability of its knock off product even though it was unquestionably aware early on that its product was so defective that it routinely failed in institutional laundering.  *See* **Exh**. 2, Goodwin Decl. at ¶¶11, 20, 22; **Exh**. 3, April 25, 2002, Posey's Meeting Minutes on Launderability ("Meeting Notes")(filed under seal) at PC 000917-000918.

In the beginning, Posey's false advertising was secretive and characterized by targeted correspondence with HipSaver's single largest customer, the Veterans Health Administration

("VHA"). *See* **Exh**. 4, July 27, 2001, email with attachment at PC 000852-000854; **Exh**. 2, Goodwin Decl. at ¶11. This was followed in 2002 by a public advertising campaign involving the first iteration of Posey's "Garwood" ads where Posey made false claims about the effectiveness and launderability of its Hipster product, suggesting that such claims were established by testing conducted by Garwood Laboratories. *See* **Exh**. 7, Goodwin Depo., Oct. 18, 2005, at 42. In the fall of 2003, Posey halted its initial Garwood ads and launched an eleven-month nationwide campaign against HipSaver with the literally false "UCLA" ads. *See* **Exh**. 5, Posey's 2004 "UCLA" ads ("Posey UCLA ads"); **Exh.** 2, Goodwin Decl. at ¶ 23; **Exh**. 1, Disputed Facts Chart at no. 12. HipSaver challenged the campaign in 2004, and Posey settled under an agreement for corrective advertising and payment of HipSaver's fees and costs. Less than a month after the settlement, Posey revived and updated its Garwood advertising and initiated a new false advertising campaign with no less than six literally false statements. *See* **Exh**. 6, Posey's Sept. 2004 Garwood ad ("Sept. 2004 Garwood ad") at PC 001744. *See also* HipSaver's Memorandum of Law in Support of Its Motion for Partial Summary Judgment [**D.N**. 156] at 7. Posey did not end that campaign until late Summer 2005.

### A.      The Parties

HipSaver is a small privately held company in Canton, Massachusetts; it has less than ten employees and has annual revenues of about $1.5 million. *See* **Exh**. 2, Goodwin Decl. at ¶2; **Exh**. 7, Goodwin Depo., Oct. 18, 2005 at 22-28. HipSaver has relied on its HipSaver® hip protector garment for its existence. Yet, in the face of Posey's false advertising, HipSaver's rate of growth has been declining, it has steadily lost its US market share, and it now has flat sales revenue. *See* **Exh**. 2, Goodwin Decl. at ¶2. This lawsuit is very much about HipSaver's survival.

Posey, with annual revenues in excess of $40 million, (**Exh**. 8, Posey 2005 Income Tax Return (filed under seal) at PC 005743) is the dominant nationwide distributor of patient safety

and support equipment devices; the Hipster knock off is only one of hundreds of items sold by Posey.  *See* Posey Statement of Facts [**D.N.** 163] at no. 1.

**B.    The 2004 Litigation and Settlement**

In 2004, HipSaver sued Posey for false and deceptive advertising under the Lanham Act and chapter 93A ("2004 Litigation").  HipSaver challenged Posey's use of the so-called "UCLA White Paper" in its 2003-2004 advertising campaign. The UCLA White Paper was based on unreliable and invalid testing and research by a UCLA graduate student whose work was funded by Posey.  As a condition to settlement, Posey withdrew the challenged advertising and agreed to distribute the following corrective advertising:

> In the fall of 2003, Posey began distributing an article (also known as the "White Paper") entitled "A Solution to Hip Fractures Using Performance Tested Hip Protectors."  In its catalogs and newsletters, Posey included statements derived from the White Paper and bar charts comparing the relative effectiveness of Posey's Hipsters.
>
> The White Paper was written by a UCLA graduate student working on his Master's Thesis.  UCLA did not sponsor, authorize, or endorse the tests or the results reported in the White paper or the Master's Thesis.
>
> The HipSaver Company, Inc. challenged the accuracy of the White Paper and the statements and bar charts in Posey's catalogs and newsletters.  HipSaver's claims included: (a) a flawed testing methodology used by the graduate student; (b) testing of some products which were no longer offered in the marketplace; and (c) test conclusions which were subject to unreliable or false interpretation.
>
> The HipSaver Company retained Wilson C. Hayes, PhD, a recognized biomechanical engineering expert, to review the White Paper, the graduate student's thesis, and Posey's advertising.  Dr. Hayes determined that the research is not reliable and cannot sustain any of the claims in the White Paper and our advertising with reasonable certainty.

**Exh**. 10, Special Announcement ("Special Announcement") at PC 000373; **Exh.** 11, 2004 Settlement Agreement ("Settlement Agreement") at PC 000373.

Although Posey had counterclaimed in the 2004 Litigation with a false advertising challenge to HipSaver's web-site, Posey did not seek any changes to the

HipSaver web-site as part of the settlement. *See* **Exh**. 2, Goodwin Decl. at ¶25; **Exh**. 11, Settlement Agreement.

### C.    The Advertising Challenged by HipSaver

A description of the Garwood ads and numerous examples are included in HipSaver's Memorandum of Law in Support of its Motion for Partial Summary Judgment for Literally False Advertising [**D.N.** 156] at 3-6 and accompanying Exhibit 1, included here as **Exhibit** 14.

Posey's ads are based on testing first conducted by Garwood Laboratories in 2001. A description of this test procedure is included in HipSaver's Memorandum of Law [**D.N.** 156] at 7-8.  Garwood conducted subsequent tests in 2004 and 2005, using the same guided drop test procedure used in the July 2001 test.  *See* **Exh**. 15, Dec. 15, 2005, Deposition of Victoria Lewis at 72-73. The later tests included Posey's new "high durability" PORON® protector pad material.  *See* **Exh**. 16, Garwood 2004 and 2005 Test Results (filed under seal) at PC 001194-0001200, and PC 000420-000425.  Apparently, the 2004 and 2005 tests were intended to support or corroborate the claims made in the 2004/2005 Garwood ads for Posey's original material and for its new "high durability" material.

Posey's biomechanical expert agrees with HipSaver's expert, Wilson C. Hayes, PhD, that the Garwood test protocol was *not,* contrary to the ads, "a test that would simulate a fall causing direct impact to the greater trochanter." **Exh.** 17, Nov. 10, 2006, Deposition of Edward Ebramzadeh, PhD at 46-48.  Yet, Posey distributed this literally false advertising thousands upon thousands of times, aiming at its only significant competitor, HipSaver.

As noted above, Posey's first use of the Garwood ads was secretive and targeted HipSaver's most significant customer, the Veterans Health Administration ("VHA").  In 2002, Posey began large scale public distribution of advertisements based on the July 2001 Garwood

test results.  *See* **Exh**. 18, Examples of Garwood ads.  Posey also distributed an unknown number of video tapes containing a form of the ad making direct comparison and superiority claims. Posey halted distribution of these ads in late 2003 and replaced them with the UCLA "White Paper" ads.  *See generally* **Exh**. 5, Posey UCLA ads.  *The Garwood Ads were not in commerce at the time of the 2004 Litigation or Settlement Agreement.  See* **Exh.** 1, Disputed Facts Chart at nos. 12, 24.

Within weeks of the 2004 settlement, Posey revived Garwood.  *See* **Exh**. 6, Sept. 2004, Garwood ad at PC 001744. The new ads contained the same unsupported claims linked to Garwood Labs, but the ads referred to both the standard hip protector product and Posey's new "high durability" product, thus apparently incorporating Posey's 2004 and 2005 Garwood testing.

## D.    Posey's Nationwide Distribution of the Garwood Advertisements Diverted Sales From HipSaver and Retarded HipSaver's Growth

Over the years of Posey's false advertising, HipSaver has lost contracts and sales opportunities with major distributors, large health facility chains, long-term care facility chains, and independent facilities.  *See* **Exh**. 2, Goodwin Decl. at ¶¶ 12-21.  At the same time, Posey's defective product led some customers to abandon hip protection products altogether.  *Id.* at ¶¶ 16, 20.  HipSaver has been virtually shut out of the large, private health care product distribution markets, as well as the health care, nursing home, and rehabilitation facility markets in the United States.  *Id.* at ¶19.  At the same time, Posey has acquired at least 50% of all sales in the United States; in 2001 Posey had no market share.  Posey's cumulative profits from sales of hip protectors over the past five years have exceeded $1.5 million.  *See* **Exh**. 19, Sept. 25, 2006, Expert Report of Roy Epstein, PhD ("Epstein Report") at 2.

Examples of HipSaver's lost opportunities illustrate HipSaver's injury. In 2002, HipSaver secured agreement for distribution by Alimed, a large, Dedham, Massachusetts based multi-line supplier with national distribution to some 600 nursing and rehab facilities in Massachusetts and 15,000 across the country. *See* **Exh.** 2, Goodwin Decl. at ¶14. Although Alimed had already reviewed the earlier form of the Posey Hipster, Alimed agreed to distribute HipSaver because of its design and testing validation. *Id.* at ¶14. This would have been HipSaver's first opportunity for widespread national distribution. Working with John Bretz, the marketing manager, HipSaver prepared artwork and photos in anticipation of a HipSaver catalog launch in 2002 and increased inventory in anticipation of a large sales increase. But, at the last minute, Alimed dropped HipSaver from its catalog and replaced it with Posey's knock off. *Id.* at ¶ 14.

Subsequently, HipSaver was rejected in favor of Posey by Manor Care, a major chain, and then by LifeCare and Kindred, two nationwide operators of nursing and rehabilitation facilities with a significant presence in Massachusetts. *See* **Exh.** 2, Goodwin Decl. at ¶¶15,16. HipSaver has not been able to obtain distribution by or sales to other Posey "authorized" national distributors with a presence in Massachusetts, including McKesson, Cardinal Health, Medline, and Gulf South. *Id.* at ¶16. And HipSaver has experienced similar rejection from numerous individual health care facilities across the country. *Id.* at ¶17. Additionally, HipSaver lost sales opportunities to many independent facilities and lost further opportunity with the LifeCare chain because these companies now largely refuse to use any hip protectors as a result of adverse experience with Posey's defective product. *Id.* at ¶¶ 16, 20.

By the end of 2005, HipSaver was unable to gain sales or distribution through any private sector distributor or health care facility chain in the United States. In most cases, HipSaver has been brushed aside with the suggestion that there is no difference between Posey and HipSaver.

*See* **Exh**. 2, Goodwin Decl. at ¶¶18,19.  Even after spending almost $200,000 for promotion and advertising from 2003 through 2005, HipSaver gained only 20 new customers, all individual nursing facilities.  *Id.* at ¶18.

After Posey revived the Garwood advertising in the fall of 2004, its monthly sales increased an average of 8.8% while HipSaver's sales increased only 4.2%.  *See* **Exh.** 19, Epstein Report at 6.  In fact, HipSaver's rate of growth in the private healthcare market has been declining annually and was flat in 2006.  *See* **Exh**. 2, Goodwin Decl. at ¶¶2,19. HipSaver's business survives largely on the basis of sales to the VHA, which account for more than 40% of HipSaver's sales.  *Id.*  Significantly, the VHA has some immunity to Posey's false advertising because it conducts its own clinical studies of hip protector products.  For example, the VHA's National Center for Patient Safety conducted launderability studies and published a notice against use of Posey's product in institutional laundries.  *Id.* at ¶¶19, 21-22; **Exh**. 20, NCPS Falls Toolkit at HS2 002198-002201 and HS2 002205-002206.

As a tiny company struggling against Posey, HipSaver does not have the resources or the record keeping capacity to calculate its actual damages.  Nevertheless, HipSaver's expert, Roy J. Epstein PhD, has stated unequivocally that there is evidence of lost sales and lost opportunity for HipSaver throughout the long period of Posey's false advertising campaign. *See* **Exh**. 19, Epstein Report at 6.

## ARGUMENT

## I.     HIPSAVER'S CLAIMS ARE NOT BARRED BY THE 2004 SETTLEMENT AGREEMENT OR *RES JUDICATA*, NOR BARRED BY POSEY'S GRAB BAG ARGUMENTS

In a frantic attempt to avoid trial, Posey has launched no less than eight trial balloons at dismissal: the Settlement Agreement in the first lawsuit, *res judicata* or claim preclusion, laches, unclean hands, materiality, injury, loss of money, and c. 93A jurisdiction. None of these will fly.

It should be noted at the outset that Posey's recitation of the standard for summary judgment is incomplete. Posey overlooks the rule that a court deciding a motion for summary judgment must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). Together with the remaining elements for summary judgment, this means the court should deny Posey's motion for summary judgment if a jury could reasonably find in HipSaver's favor based on HipSaver's evidence plus all reasonable inferences that can be drawn from HipSaver's evidence.

**A.     The 2004 Settlement Agreement is not a Bar to this Lawsuit**

In September 2004, Posey entered into settlement with HipSaver to resolve the issues raised in the first lawsuit. As clearly, unequivocally, and unambiguously stated in the Recitals to the 2004 Settlement Agreement, HipSaver contested the UCLA White Paper (Recital A), Posey contested claims in HipSaver's web-site (Recital C), and the parties desired to settle "all disputes among them concerning or in any way related to the Action" (Recital E). **Exh**. 11, Settlement Agreement at PC 000365. As part of the Settlement, the parties executed mutual releases for all claims:

> which *arise from or are related to* the false advertising claims … *which were asserted or could have been asserted* in the Action for conduct which occurred prior to the date of this Agreement.

*Id*. at PC 000366-000367, ¶¶ 10, 11, emphasis added.

A straightforward reading of the Settlement Agreement discloses a clear purpose and reach from the Recitals and the releases: 1) to settle the dispute about the UCLA White Paper and HipSaver's web-site and 2) to release all claims *arising from or related to* the UCLA White Paper and HipSaver's web-site *which were asserted or could have been asserted.* The Settlement Agreement is <u>not</u> and does <u>not</u> contain a global release of all claims for false advertising and

unfair or deceptive practices, and it is not a release of future claims. Rather, the release is limited to claims asserted or claims related to the asserted claims or which could have been asserted about the UCLA White Paper or the HipSaver web-site.

In the present lawsuit, HipSaver's claims relate to the Garwood ads, the launderability of the Posey hip protectors, and the capacity of the Posey hip protectors to cover and protect the hip bone. These claims are not barred because none is related to the UCLA White Paper ads, and none was raised or even suggested or implied in the first lawsuit. Moreover, nothing related to Garwood was in commerce during and for at least eight months prior to the 2004 Litigation. In fact, Mr. Goodwin thought that Posey had withdrawn Garwood "for good". **Exh**. 2, Goodwin Decl. at ¶24.

1. **The Parties Shared a Common Understanding of the Purpose and Reach of the Settlement Agreement and Release**

While Mr. Posey now declares that he would not have settled the first lawsuit and paid $360,000 to HipSaver for legal fees and costs had the Settlement Agreement been limited to the UCLA White Paper and HipSaver's web-site, his December 2006 declaration is an after the fact contrivance. **Exh.** 9, Declaration of Ernest Posey in Support of J.T. Posey Company for Summary Judgment on HipSaver's Claims and Partial Summary Judgment on Count 1 of Posey's Counterclaims (Dec. 12, 2006) [**D.N.** 164]. In fact, two weeks after the Settlement Agreement was executed in October 2004, Mr. Posey issued a marketing statement which is a far more accurate characterization of his purpose in settling. Mr. Posey noted *that HipSaver had challenged the UCLA ads*, that Posey had agreed to withdraw the UCLA ads, and that Posey settled this nuisance lawsuit "because it was cheaper to settle than to pay our expert to fight with their expert in court". **Exh**. 12, Oct. 14, 2004, email statement at HS2 000804-000805. In short, Mr. Posey just wanted to be rid of the UCLA White Paper dispute.

Mr. Posey's October 2004 statement is four square with Mr. Goodwin's understanding as he testified more than a year ago at deposition in this lawsuit. When asked his understanding of the Settlement Agreement, Mr. Goodwin testified repeatedly that his intention was nothing more than to obtain removal of the UCLA ads and that the Settlement Agreement accomplished that. *See* **Exh**. 7, Goodwin Depo., Oct. 18, 2005 at 47:14-48:11,51:24-54:3. In sum, the parties' unvarnished understanding of the Settlement Agreement was that it was limited to ending the UCLA ad dispute.

**2.    The First Version of Garwood was Not Alive at the Time of the 2004 Lawsuit**

In its Memorandum of Law, Posey makes the bald statement that the Garwood ads "were going on at the same time" as the UCLA ads challenged in the first lawsuit. Posey then argues that the Garwood ads are somehow *related to* the UCLA ads and thus barred by the Settlement Agreement. Beyond the fact that this is a reach far beyond any fair reading of the Settlement Agreement, Posey's argument fails on the facts. *The Garwood ads were not "going on" at the same time as the UCLA ads.*

As discussed above, Posey initiated its eleven-month-long UCLA ad campaign in or about October 2003 *and replaced* the first version of the Garwood ads with the UCLA ads. However Posey wishes to characterize the reach of the Settlement Agreement, the Garwood ads were not in circulation at the time of the 2004 lawsuit. Mr. Goodwin thought the Garwood ads had been permanently withdrawn. *See* **Exh.** 2, Goodwin Decl. at ¶24. The parties did not discuss the Garwood ads, did not plead the Garwood ads, did not conduct discovery related to the Garwood ads, and did not settle with any reference to the Garwood ads. These apparently extinct ads could not have been related to claims in the first lawsuit, could not have been barred by the lawsuit, and could not, as a matter of law, have been released as a related claim.

**3.      Claims Related to the Second Version of the Garwood Ads Are Not Barred by the Settlement Agreement**

Not content with its attempt to sweep the first version of the Garwood ads into the Settlement Agreement, Posey next argues that the Agreement releases all claims relating to subsequent advertising. Again, this argument is grounded in Mr. Posey's recent claims that there was an understanding that the Settlement Agreement – even though it is utterly silent – precludes future claims. The short response is that no reading of the Settlement Agreement could lead to this understanding. Indeed, Mr. Goodwin expressly disputed any such understanding in his deposition testimony and declaration. *See* **Exh.** 7, Goodwin Depo., Oct. 18, 2005 at 47:14-48:11, 51:24-54:3; **Exh**. 2, Goodwin Decl. at ¶¶24,26-27; **Exh**.1, Disputed Facts Chart at nos. 17,18,21.

Mr. Posey's own conduct shows that he saw no bar to future lawsuits. In March 2005, Posey retained an outside company to conduct tests in preparation for a lawsuit against HipSaver. *See* **Exh**. 1, Disputed Facts Chart at no. 5. If Mr. Posey understood that the Settlement Agreement barred all future claims, on what basis was he planning "legal claims" against HipSaver? *See* **Exh**. 13, March 23, 2005, email at PC 001022 (Posey email seeking to engage an outside company to conduct tests to shore up Posey's claims *"before [Posey] can make any legal claims against HipSaver…because Ernie [Mr. Posey] needs the results before he starts picking on Hipsaver."* [emphasis added]). Clearly, Mr. Posey's late 2006 reversal is only for purposes of summary judgment.

**B.      The Garwood Ad Claims are Not Barred by *Res Judicata* or Claim Preclusion**

Posey's *res judicata* or claim preclusion argument fails on two grounds: 1) claims which were not raised in the first lawsuit and not part of the transaction at issue are *not* subject to *res judicata*; and 2) *res judicata* does *not* bar a lawsuit based on future action by a defendant even if the future action is simply a revival of an earlier course of conduct.

*Res judicata* or claim preclusion is a function of voluntary dismissal with prejudice of the 2004 lawsuit under Fed. R. Civ. P. 41. It is independent of the Settlement Agreement. *See generally U.S. v Cunan,* 156 F.3d 110 (1st Cir. 1998). In September 2004, the parties dismissed all claims and counterclaims under Rule 41: HipSaver dismissed its UCLA White Paper claims while Posey dismissed its counterclaims against HipSaver's web-site.

*Res judicata* bars a second law suit based on claims already adjudicated in an earlier lawsuit as well as claims based in the same transaction as the original lawsuit.

> To bring claim preclusion into play, …[t]he relevant test simply asks whether the same parties pursued a remedy that arose from the same "transaction" in an earlier proceeding.

*Cunan,* 156 F.3d at 116. There can be no question that the UCLA White Paper advertising was the transaction at issue in the first lawsuit; indeed, Mr. Posey says so unequivocally in his corrective advertising statement in October 2004. *See* **Exh**. 10, Special Announcement at PC 000373 ("The HipSaver Company, Inc. challenged the accuracy of the White Paper and the statements and bar charts in Posey's catalogs and newsletters"). Nor is there any question about the Garwood ads; they were never addressed in any fashion by the parties in the first lawsuit and have nothing to do with the UCLA ads. To suggest that the Garwood ads were somehow part of the earlier transaction or dispute belies fact. The Garwood ads were not cited in any pleading, were never raised by any witness, were never produced by either party and were never referenced in a memorandum, court order, or the Settlement Agreement. Furthermore, as stated above, the Garwood Ads were not in commerce at the time of the 2004 litigation and could not have been raised in the 2004 litigation. Thus, HipSaver's claims are not precluded by the 2004 litigation.

### C.    The Garwood Advertisement Claims Are Not Barred by Laches

Suggesting that it is somehow burdened and prejudiced, Posey pleads laches and petulantly asserts that "Goodwin's (*sic*) and HipSaver's actions don't smell quite right".  It is ironic indeed that a company with annual revenues in excess of $40 million, a penchant for knocking off the products of small competitors, a history of literally false advertising, and its own plan to sue HipSaver in 2005 would now baldly claim it has been prejudiced and sucker-punched by HipSaver.

In fact, Posey has no facts and no equitable grounds for an estoppel by laches plea.  HipSaver did not lie in wait for some opportune time to sue Posey.  Quite the contrary, as Mr. Goodwin states in his Declaration, he initially dismissed the first version of the Garwood ads in 2002 and 2003 as junk science.  *See* **Exh**. 2, Goodwin Decl. at ¶11.  Mr. Goodwin was not aware of the extent of Posey's national advertising, the secretive ads sent to the Veterans Health Administration, his largest customer, or ads circulated in video tape form claiming the outright superiority of the Posey knock off.

Then, in the fall of 2003, Posey halted the Garwood ads and launched its eleven-month UCLA White Paper campaign.  By the time of the 2004 Litigation, the Garwood ads were out of publication for at least eight months.  *See* **Exh**. 5, Posey UCLA ads; **Exh**. 1, Disputed Fact Chart at nos.12, 24.  HipSaver did not and could not have addressed ads that had been withdrawn and supplanted by the UCLA ads. Nor was there ever a suggestion by Posey that Garwood testing was ongoing and that the ads would be revived.  However, when it was clear by the Spring of 2005 that Posey was following withdrawal of the UCLA ad campaign with a revival of the Garwood ads, HipSaver promptly pursued this lawsuit.

Posey has not been misled and has not suffered any burden, prejudice, or damages at the hands of HipSaver. Rather, Posey invited this lawsuit with relentless false advertising.

**D.    HipSaver's Claims Are Not Barred by "Unclean Hands"**

Absent proof of false advertising *and* unconscionable conduct rising to the level of fraud, perjury or suppression of evidence or intentional concealment, Posey simply has no basis for summary judgment on an "unclean hands" claim. *Zeneca Limited v Pharmachemie B.V.*, 37 F. Supp. 2d 85, 93-94 (D. Mass. 1999). Posey's unclean hands defense amounts to nothing more than an assertion that its tit-for-tat counterclaim has merit.[1] To the extent, however, that the counterclaim does not fail on its own for admitted lack of damages or is not barred by *res judicata*, Posey must prove false advertising and an extraordinary level of unconscionable conduct at trial. Short of that, Posey's claim of unclean hands is groundless.

**II.    POSEY'S FALSE ADVERTISING CLAIMS ARE MATERIAL**

Posey's literally false advertising claims are material, and Posey's argument to the contrary is a studied misunderstanding of the law of this circuit. The materiality component of a false advertising claim requires HipSaver to prove that Posey's deception is "likely to influence the purchasing decision." *Clorox Co. v. Proctor & Gamble Comm. Co.,* 228 F.3d 24, 33, n. 6 (1st Cir. 2000). One may demonstrate that the deception is likely to influence the purchasing decision by showing that the false or misleading statement relates to an "inherent quality or characteristic" of the product. *Cashmere & Camel Hair Manufacturers Inst. v. Saks Fifth Ave.,* 284 F.3d 302, 311-312 (1st Cir. 2002). Here, Posey authored and distributed six literally false statements about the effectiveness of its hip protector garment in thousands upon thousands of ads. *See* HipSaver's Memorandum of Law In Support of Partial Summary Judgment for Literally

---

[1] *See also* HipSaver's concurrently filed Memorandum in Opposition to J.T. Posey Company's Motion for Summary Judgment on its Counterclaim.

False Advertising [**D.N**. 156] at 3-7.  And these literally false statements go to the very purpose of a hip protector—the prevention of fall related injury in elderly and disabled persons.  Posey's literally false statements are material.

## III.    POSEY'S LITERALLY FALSE ADVERTISING HAS INJURED HIPSAVER

HipSaver suffered injury as a result of Posey's false advertising.  HipSaver lost contracts and sales and marketing opportunities with major distributors, large health facility chains, long-term care facility chains, and independent facilities.  HipSaver's rate of sales growth has been declining and is less than half that of Pose.  Its revenues are flat.  HipSaver's sole source of historic sales growth is the VHA, the only customer which is largely immune to false advertising.  By contrast, Posey's falsely advertised knock off has acquired at least 50% of all sales in the United States since it starting selling the knock off in 2001 when it had no presence in the market.  And at the same time, Posey's defective product has led customers to abandon hip protection products altogether.  *See* **Exh**. 2, Goodwin Decl. at ¶¶2,14-21.

HipSaver has been shut out of the *entire* large, private health care distribution market and has lost significant positioning and sales in the health care, nursing home, and rehabilitation facility market in the United States.  Not a single national distributor or health care facility chain will distribute or purchase the product Mr. Goodwin invented.  Clearly, HipSaver is losing its market opportunity; and for this near ruinous injury, it seeks an accounting of the Defendant's profits as a proxy for its own lost profits.  15 U.S.C. § 1117(a); *Tamko Roofing Products, Inc. v. Ideal Roofing Co*., 282 F.3d 23, 37 (1st Cir. 2002); *Vermont Pure Holdings, Ltd. v. Nestle Waters North America, Inc.*, No. 03-11465 DPW, 2006 WL 839486 at 12-13 (D. Mass. March 28, 2006).

### A.    HipSaver Suffered Actual Harm

In order to prevail on a claim under the Lanham Act seeking an accounting of defendant's profits, a plaintiff must show actual harm and direct competition.  *Vermont Pure*

*Holdings, Ltd.*, 2006 WL 839486 at 15-17.   While a common sense inference of harm is sufficient at the summary judgment stage, *Cashmere and Camel Hair Manufacturer's Institute v. Saks Fifth Avenue*, 284 F.3d 302, 319 (1st Cir. 2002), HipSaver has significant evidence of marketplace harm and damage.   For a showing of actual harm, "[a] precise showing is not required, and a diversion of sales, for example, would suffice." *Cashmere,* 284 F.2d at 318 (internal quotation omitted).   A plaintiff must prove the fact of damage with reasonable certainty, which can be satisfied by "proof of some damage flowing from defendant's unlawful act." *Ricky Smith Pontiac, Inc. v. Subaru of New England, Inc.*, 14 Mass.App.Ct. 396, 422-423 (1982). Proof of damages does not necessarily require a showing of a decrease in sales; in fact, courts have allowed for a finding of harm where a plaintiff's rate of growth decreased as a result of defendant's actions.   *Id.* (awarding lost profits for loss of additional sales even though plaintiff's sales increased to some extent over time); s*ee also Rebel Oil Co. v. Atlantic Richfield Co.*, 957 F.Supp. 1184, 1197 (D. Nev. 1997)(finding that a material issue of fact existed with respect to lost profits even where there was steady growth in the plaintiff's profit margins throughout the period in question).

Here, Posey's false advertising diverted sales, retarded growth, poisoned the hip protector market, and drove HipSaver out of the large, private distribution market.   HipSaver has lost opportunities for distribution with every major distributor and national chain and many independent long-term facilities.   HipSaver is left with a declining growth rate, flat revenue, and a single major customer.   Indeed, it cannot even pursue opportunities where Posey has lost customers because those dissatisfied with Posey's defective product simply refuse to purchase any hip protector product.

In addition to HipSaver's illustrations of actual harm, Posey's false advertising of the quality, effectiveness, and launderability of its hip protection product creates a common sense inference of lost sales. *Cashmere,* 284 F.3d at 318-19 (1st Cir. 2002).

HipSaver has been harmed seriously, perhaps fatally in this case. And there can be no doubt that Posey is the source - the single competitor with an *admitted* history of false advertising. (**Exh**. 10, Special Announcement at PC 000373), the competitor with a history of marketing a defective product (**Exh**. 3, Meeting Notes at PC 000917-000918), and the competitor which set out in 2001 to knock off HipSaver's product and capture the market by any means available.

### B.    HipSaver and Posey are Direct Competitors

The parties agree that HipSaver and Posey are direct competitors. *See* Posey Statement of Facts [**D.N.** 163], no. 4; **Exh.** 2, Goodwin Decl. at ¶¶7-10,14-16. In fact, they are the *only* two significant market participants. Given that HipSaver has been injured by its direct competitor, a material issue of disputed fact exists with respect to damages. The issue of injury and damage should be preserved for trial.

### IV.    HIPSAVER'S EVIDENCE OF A LOSS OF MONEY IS SUFFICIENT TO SUSTAIN ITS CLAIMS UNDER G.L. c. 93A

To establish harm, a Chapter 93A plaintiff must show a "loss of money." *Schwanbeck v. Federal-Mogul Corp.*, 31 Mass.App.Ct. 390, 415-16 (1991). A plaintiff can succeed if it proves that a loss of money occurred, even if the amount of the loss cannot be proven. *Jet Lines Servs., Inc. v. American Employers Ins. Co.*, 404 Mass. 706, 718 (1989) ("Under [c. 93A] § 11, that unfair or deceptive conduct must have had some adverse effect upon the plaintiff, even if it is not quantifiable in dollars."); *see also Hanover Ins. Co. v. Sutton*, 46 Mass.App.Ct. 153, 175-76

(1999) (affirming an award of nominal damages, injunctive relief and attorney's fees for a c. 93A plaintiff who proved the existence of damages but could not quantify the amount).

As set out above, HipSaver has been injured and has suffered a loss of money as it has been systematically frozen out of the private healthcare marketplace. Indeed, HipSaver's damages expert, Dr. Epstein, notes that, with a growth rate that is more than double HipSaver's rate through 2005, "there are indications of an effect of the challenged conduct on HipSaver's sales." **Exh.** 19, Epstein Report at 6. And, of course, as this court has ruled, common sense suggests that a false advertising campaign about the effectiveness of Posey's hip protector would harm the sales of HipSaver's hip protectors, causing a loss of money to HipSaver. *See Skinder-Strauss Assocs. v. Mass. Continuing Legal Educ., Inc.*, 914 F. Supp. 665, 682 (D. Mass. 1995) (Saris, J.)(denying summary judgment against plaintiff's c. 93A false advertising claim where plaintiff did not have evidence of a loss of money or property, but where plaintiff and defendant were direct competitors both selling legal directories).

Further, where, as here, Posey has falsely advertised the quality, effectiveness, and launderability of its hip protection product, there is a common sense inference of lost sales. *Cashmere*, 284 F.3d at 318-19 (1st Cir. 2002).

Accordingly, because HipSaver's evidence and reasonable inferences raise a genuine issue of material fact that Posey's false advertising has caused a loss of money, HipSaver has a sufficient basis for its deceptive business practices claims under c.93A, §§2,11.

## V.   HIPSAVER'S c. 93A CLAIMS ARE BASED ON PRACTICES OCCURRING "PRIMARILY AND SUBSTANTIALLY" IN MASSACHUSETTS

A Chapter 93A claim meets the statutory requirement of being based on unfair business practices "primarily and substantially" in Massachusetts when Massachusetts is the "center of gravity" of the circumstances giving rise to the claim. *Kuwaiti Danish Computer Co. v. Digital*

*Equipment Corp.*, 438 Mass. 459, 473 (2003). Here, the center of gravity is Massachusetts: HipSaver is a small Massachusetts business that invented, manufactures, markets, and sells its hip protector product from a facility in Canton. Posey's false advertising has targeted its Massachusetts competitor.

Injury occurred in Massachusetts every time Posey captured a sale and diverted revenue from HipSaver. Moreover, a material loss in sales occurred in Massachusetts where Alimed, one the largest health care distributors in the United States, is based and where almost all of Posey's "authorized" distributors have distribution centers, including Kindred Health Systems, McKesson, Cardinal Health, Medline, and Gulf South. *See* **Ex.** 2, Goodwin Decl. at ¶16. In sum, damage has occurred in Massachusetts, and all of the injury to HipSaver's business has been in the Commonwealth.

Furthermore, HipSaver's prayer for relief under c. 93A advances the purpose and scope of c. 93A. *Kuwaiti Danish Computer Co.,* 438 Mass. at 472 (concluding that the purpose and scope of 93A provides an independent basis for determination of whether unfair business practices occurred primarily and substantially in Massachusetts); *see also RGJ Assocs. Inc. v. Stainsafe, Inc.*, 338 F.Supp. 2d 215, 233 (D. Mass. 2004). The purpose of c. 93A is to encourage more equitable behavior in the marketplace and impose liability on persons seeking to profit from unfair practices in Massachusetts. *Arthur D. Little v. Dooyang Corp.*, 147 F.3d 47, 55 (1st Cir. 1998)(internal quotations omitted). This is precisely the circumstance for which a court should confirm HipSaver's c. 93A claim: a Massachusetts-based business plaintiff seeking the protection of the Massachusetts unfair business practices act to end an unfair business practice aimed directly at the Massachusetts plaintiff.

## CONCLUSION

For the reasons stated here, HipSaver opposes Defendant Posey's motion for summary judgment because disputed issues of material fact exist with respect to HipSaver's claims and accordingly, these issues are appropriately preserved for trial.

THE HIPSAVER COMPANY, INC.
By its Attorneys,


/s/  Courtney M. Quish
Lee Carl Bromberg, BBO No.:  058480
Edward J. Dailey, BBO No.:  112220
Courtney M. Quish, BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
cquish@bromsun.com

Dated: January 8, 2007


## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.


/s/  Courtney M. Quish
January 8, 2007


02820/00502 591182.1