# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
THE HIPSAVER COMPANY, INC.,                         )
     Plaintiff / Counterclaim Defendant           )
                                                    )
v                                                   )          Civil Action No. 05-10917 PBS
                                                    )
J.T. POSEY COMPANY,                                 )
     Defendant / Counterclaim Plaintiff           )
                                                    )
_____)


## HIPSAVER'S OPPOSITION TO DEFENDANT AND
## COUNTERCLAIMANT J.T. POSEY COMPANY'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT
## ON ITS COUNTERCLAIM

Posey's counterclaims are nothing more than a smoke and mirror attempt to evoke a "what's good for the goose is good for the gander" response. However, Posey's counterclaims and any suggestion of equality or balanced competition between these two parties fails outright. Posey embarked on relentless and largely successful campaigns of misrepresentation and false and deceptive advertising to supplant HipSaver in the U.S. health care market. When HipSaver sought relief through this court in 2004, Posey mustered these tit-for-tat counterclaims to divert the court's attention from its own wrongful acts. In this lawsuit, Posey has recycled and lifted its counterclaims directly from its 2004 counterclaims. Yet, the counterclaims were dismissed with prejudice in 2004 and are barred under the doctrine of *res judicata*. And notwithstanding this immovable bar, Posey's counterclaims fail on the merits because the challenged HipSaver statements are supported by the referenced authorities, as well as Posey's own product information and therefore, are not literally false. For these reasons and as set forth more fully below, Posey's counterclaims fail on both procedural grounds and on the merits and should be dismissed outright.

## FACTS

### A.    The Parties

Plaintiff HipSaver is a small privately held company; it has less than ten employees and has annual revenues of about $1.5 million. *See* **Exh**. 2, Goodwin Decl. at ¶1; **Exh**. 7, Goodwin Depo. Vol. 1 at 22-28. HipSaver has relied on its HipSaver® hip protector garment for its existence. Yet, in the face of Posey's false advertising, HipSaver has steadily lost its US market share. This lawsuit is very much about HipSaver's survival.

Posey, with annual revenues in excess of $40 million (**Exh**. 8, Posey 2005 Income Tax Return at PC 005743 (filed under seal)), is the dominant nationwide distributor of patient safety

and support equipment devices; the Hipster knock off is only one of hundreds of items sold by Posey.  *See* Posey Statement of Facts [**D.N.** 163] no. 1.

**B.    Posey's 2004 and 2005 Counterclaims**

Posey's Motion for Summary Judgment recycles counterclaims from previous litigation in 2004 between the parties ("the 2004 Litigation").  In response to HipSaver's false advertising claims against Posey in the 2004 Litigation, Posey filed a counterclaim for false advertising against statements made by HipSaver on its website, www.hipsaver.com ("Website"); J.T. Posey Company's Answer to Complaint and Counterclaim ("2004 Counterclaim"), *HipSaver v. J.T. Posey*, No. 04-11294-PBS, at ¶56 (D. Mass. July 19, 2004).  The 2004 Litigation was resolved by a settlement agreement (**Exh.** 11, Settlement Agreement at PC 000365-373) and was subsequently dismissed with prejudice.  *See* **Exh.** 27, Stipulation of Dismissal and Order entered granting same, *HipSaver v. J.T. Posey*, Case No. 04-11294-PBS (D. Mass. Sept. 22 & 24, 2004)("Dismissal").  While the resulting 2004 Settlement Agreement required that Posey stop publishing the so-called "UCLA White Paper" advertisement and publish a retraction to all of its customers, neither the settlement nor the court's final adjudication required that HipSaver alter or remove any statements from its Website.  *See* **Exh.** 11, Settlement Agreement at PC 000365-373; **Exh. 27,** Dismissal.

In 2005, HipSaver filed a new complaint challenging revived Posey advertising which was not related to the "UCLA White Paper" ads at issue in the 2004 Litigation.  Posey responded with this tit-for-tat counterclaim challenging precisely the same statements on the HipSaver Website that were challenged in 2004.  *See* Defendant's Answer, Counterclaim and Request for Jury Trial at ¶ 46, *HipSaver v. J.T. Posey*, 05-10917-PBS (D. Mass, July 26, 2005).  The

challenged statements have *not* been changed since the time of Posey's 2004 Counterclaim. *See* **Exh.** 28, Chart comparing 2004 and 2005 HipSaver Websites ("Website Comparison").

## C.     Posey's Lack of Injury

Posey's tit-for-tat counterclaims prove to be only smoke and mirror because Posey has not been harmed by HipSaver's Website. Posey's damages expert admits that "there is no evidence that Posey's sales have been measurably impacted by HipSaver's allegedly false advertisement." **Exh.** 29, February 12, 2006, Expert Report of Creighton Hoffman and Phillip Green ("Hoffman Report")(filed under seal). Between January 2004 and December 2005, during which time the HipSaver Website contained the same challenged statements, Posey's average monthly revenues increased by 8.8% from $110,000 to $120,000. *Id.* at 6.

## D.     HipSaver's Advertising Claims

Posey challenges two types of statements on the HipSaver Website: statements in 1) the "Hip Protectors and the Laundry" page and 2) the "Validation and Testing" page.

### 1.     HipSaver's Launderability Advertising Claims

HipSaver's Website comments on the launderability of the HipSaver hip protector and its competitors, Posey Hipster and Alimed HipShield. HipSaver's launderability claims do not purport to be based on its own testing; instead HipSaver's launderability claims are based on: 1) laundry guidelines published by the federal Centers for Disease Control, 2) third party laundry tests and published guidelines, 3) feedback received from customers about the failure of Posey hip protectors and 4) Posey's own wash recommendations. *See* **Exh.** 2 Goodwin Decl. at ¶¶ 22, 33.

HipSaver's laundering statements reference the Centers for Disease Control Guidelines ("CDC Guidelines") for Infection Control in the Laundry. *See* **Exh.** 30, Excepts from CDC Guidelines at PC 001483-1490; PC 001596-1598. The CDC Guidelines recommend high

temperature laundering of at least 160°F. *Id.* The CDC Guidelines also provide for an alternate low temperature wash standard that relies on careful monitoring and control of washer cycling, wash formula, and high levels of bleach. *Id.* Use of the CDC Guidelines low temperature/high bleach recommendation is limited by its complexity and limited validation. *See* **Exh.** 2, Goodwin Decl. at ¶33.

Posey recognizes that large health care institutions wash at high temperatures. *See* **Exh.** 3, Posey Meeting Notes, April 25, 2002, at PC 000917-000918 ("Meeting Notes")(filed under seal)("Large institutions want to launder multiple materials at high heat. We may loose [sic] large institutions if we do not find a solution."); From the introduction of its Hipster III product in late 2001 or early 2002, Posey labeled its Hipster III hip protector for washing at a maximum temperature of 160°F. *See* **Exh.** 21, Posey's wash label at HS2 000093.

Posey Hipster wash instructions state that Posey hip protectors cannot be laundered above 160°F. *See* **Exh.** 21, Posey wash label at HS2 000093. HipSaver relied on these published wash instructions to substantiate the launderability claims that Posey challenges. *See* **Exh.** 2, Goodwin Decl. at ¶33. It seems then that Posey is contesting its own laundry instructions as "literally false", certainly an odd challenge.

Notwithstanding its attempt to meet the CDC guidelines, Posey learned within a few months of introducing its Hipster that the product failed at an alarming rate. *See* **Exh.** 3, Posey's Meeting Notes at PC 000917-000918 ("Meeting Notes")(filed under seal)(describing how Posey hip protectors failed in high temperature institutional laundries and expresses concern about losing the market if Posey does not find a solution); *See* also **Exh.** 31, sample data of Posey Hipster Returns at PC 005736 (filed under seal).

An institutional test comparing the launderability of the HipSaver and Posey products was conducted at the United States Veteran's Health Administration in Mountain Home, Tennessee during 2002. In this study, hip protectors were laundered at wash temperatures of 160-170°F and drying temperatures of 180°F which are within the CDC guidelines. *See* **Exh.** 2, Goodwin Decl. at ¶ 22. HipSaver president Ed Goodwin and Posey product manager Victoria Lewis participated in the tests. *Id.* Ms. Lewis represented to the Veteran's Health Administration that Posey hip protectors could be laundered at the temperatures chosen for the test. *Id.* But, the Posey hip protectors fell apart during the high temperature laundering and failed the wash test. *Id.* As a result of this and similar Veterans Health Administration tests, the Veteran's Health Administration published a warning in its 2004 Falls Toolkit that "Posey™ hip protectors should not be washed in the hospital laundry. They degrade more quickly and pads may crack or dissolve. Bleach appears to accelerate this degrading process." *See* **Exh.** 20, Excerpts from 2004 National Center for Patient Safety Falls Toolkit ("Falls Toolkit") at HS2 002198-002201; HS2 002205-002206.

### 2. HipSaver's Validation and Testing Advertising Claims

HipSaver's validation and testing claims reference four tests: the JAMDA Report, the Gross study, the Tampere test, and the Harvard study.

### a. The JAMDA Report

The JAMDA Study was a thirteen-month-long study that was published in 2003 by the Journal of the American Medical Directors Association. *See* **Exh.** 24, JAMDA Study at PC 000414-000419. The purpose of the study was to determine whether high compliance rates for hip protector wearers would be possible. *See* **Exh.** 32, Deposition of Dr. Burl (August 25, 2005) at p. 14. Participants in the study wore HipSaver hip protectors. *See* **Exh.** 24, JAMDA Study at

PC 000415. The JAMDA Study reported a 93-95% compliance rate among participants able to wear HipSavers. *Id.* The JAMDA Study also reported a zero fracture rate after 126 falls by participants wearing HipSavers. *Id.*

      **b.**      **The Gross Study**

The Gross Study was conducted by the Elder Service Plan of the East Boston Neighborhood Health Center and published in 2000. *See* **Exh.** 25, George Gross, Tsan-Hui Chen and Carolyn Flaherty, Hip Pads: Effective Fracture Prevention, Advance for Physical Therapists, Oct. 30, 2000, v. 11, no. 22, pp. 45-46 ("Gross Study") at HS2 000043-000045. The purpose of the Gross Study was to determine the effectiveness of hip protectors in preventing hip fractures. *Id.* The Gross Study reported a zero fracture rate after 199 falls by participants wearing HipSavers. *Id.* Although the Gross Study tested a previous iteration of the HipSaver, the tested version was substantially a design equivalent of the current HipSaver, using the same basic encapsulated visco-elastic damping urethane pad technology. *See* **Exh.** 2, Goodwin Decl. at ¶35.

      **c.**      **The Tampere Test**

The Tampere Test was conducted in 2000 using a mechanical hip to measure the ability of hip protectors to reduce the force of a fall. *See* **Exh.** 33, Jari Parkarri, Trochanteric Pad Tests conducted at Tampere University of Technology, Finland, August 2000, and related summary ("Tampere test") at HS2 000046-000048. The Tampere test found that HipSavers reduced the impact force to 1790 Newtons and that the Safehip hard shell hip protector reduced the impact force to 2240 Newtons. *Id.*[1] The Tampere test was conducted on a HipSaver pad using the same foam as used in the current HipSaver product. *See* **Exh. 2,** Goodwin Decl. at ¶36. In fact, the current HipSaver pad employs an even thicker form of the foam than the pad used in the Tampere test. *Id.*

---

[1] The lower number recorded at Tampere represents better protection by HipSaver.

### d.     The Harvard Study

The Harvard Study was conducted in 1996 to measure the ability of hip protectors to reduce the force of a fall by simulating a dynamic fall impacting the hip.  *See* **Exh.** 2, Goodwin Decl. at ¶5.  The HipSaver Website explains that the Harvard Study was performed in 1996 on a pad made of different foam than the foam tested at Tampere and later incorporated into the current HipSaver model.  *See* **Exh.** 28, Website comparison.  The purpose of the Harvard test was to validate the technology.  The HipSaver Website does not claim that the Harvard Study validates the current version of HipSaver.  *Id.*

## ARGUMENT

## POSEY'S SMOKE AND MIRROR CLAIMS ARE BARRED BY THE FINAL ADJUDICATION OF THE FIRST LAW SUIT AND FAIL ON THE MERITS

Posey's recycled counterclaims are procedurally barred and without merit, and Posey's motion for summary judgment should be denied.  Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)).  The court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  *Barbour,* 63 F.3d at 36. As a matter of law, Posey's false advertising claim is barred by *res judicata* and should be dismissed. Furthermore, even if the court does not recognize the preclusive effect of the previous litigation and dismissal on Posey's current claims, there exists at the very least, a genuine issue of material fact with respect to the veracity of HipSaver's statements and the personal liability of Edward Goodwin.  Accordingly, these issues must be preserved for trial.

## I.    POSEY'S FALSE ADVERTISING COUNTERCLAIM IS PRECLUDED BY *RES JUDICATA OR CLAIM PRECLUSION*

Posey's tit-for-tat counterclaim recycles old claims that have already been adjudicated and dismissed with prejudice under Fed. R. Civ. P. 41 in the 2004 Litigation between these two parties.  When a stipulation is made with prejudice, the voluntary dismissal has the same claim preclusive *res judicata* effect as a final adjudication on the merits.  *See generally U.S. v Cunan,* 156 F.3d 110 (1st Cir. 1998).  Thus, the voluntary dismissal by the parties in 2004 bars a second suit raising claims dismissed in the 2004 Litigation between the same parties as well as claims based on transactions out of which the original action arose.

> To bring claim preclusion into play, …[t]he relevant test simply asks whether the same parties pursued a remedy that arose from the same "transaction" in an earlier proceeding…

*Cunan,* 156 F.3d at 116. All statements challenged by Posey in the current litigation were already challenged by Posey in the 2004 Litigation.  The claims are compared below:

| Statements Challenged in Posey's Counterclaim in 2004 and Dismissed with Prejudice | Statements Challenged in Posey's Counterclaim in 2005 |
|---|---|
| HipSaver is the "only proven, all-soft hip protector" | HipSaver is the "only proven, all-soft hip protector" |
| HipSaver is "the only soft pad hip protector that has clinical validation" | HipSaver is "the only soft pad hip protector that has clinical validation" |
| HipSavers are "the only all-soft hip protectors, proven effective – in both independent biomechanical testing and clinical study" | HipSavers are "the only all-soft hip protectors, proven effective – in both independent biomechanical testing and clinical study" |
| Only HipSaver products can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry. | Only HipSaver products can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry |
| HipSaver's competitor's products "fall apart" and "degrade," that competitors use "inferior materials," and that competitors sell "inferior look-alike" products. | HipSaver's competitor's products "fall apart" and "degrade," that competitors use "inferior materials," and that "big-name" competitors sell "inferior look-alike" products |
| Posey products can be washed up to a maximum of 160° Fahrenheit; | Posey products can be washed up to a maximum of 160° Fahrenheit |

| Posey products have not proven effective in orthopedic biomechanical testing | Posey products have not proven effective in orthopedic biomechanical testing |
|---|---|

*See* 2004 Counterclaim.

Unlike HipSaver's claims in the current action, which challenge revived claims arising out of advertising that was not in commerce at the time of the 2004 Litigation, Posey's claims were asserted and adjudicated in the first action. Posey challenges the *same* HipSaver advertising statements in the current suit that it challenged in the 2004 Litigation.  In fact, Posey's counterclaims are a virtual lift from its 2004 counterclaims—Posey's 2005 counterclaims assert the same claims, based on the same legal theories, and seek the same damages. *See* Defendant's Answer, Counterclaim and Request for Jury Trial [**D.N.** 28] ("2005 Counterclaim").

In fact, the claims *must* be the same as those asserted in the 2004 Litigation because the challenged web pages on the HipSaver Website have *not* changed since the dismissal of the 2004 Litigation.[2] Side-by-side comparisons of the challenged advertisements are attached at **Exhibit 28**.

Posey effectively agreed to HipSaver's use of the HipSaver Website as it currently exists. Posey's claims against the Website were dismissed with prejudice pursuant to the Settlement Agreement and Posey did not negotiate any changes to the HipSaver Website as part of that 2004 Settlement Agreement.  The Settlement Agreement did not require HipSaver to amend or remove any statements from its Website.  If Posey had any complaints about the HipSaver Website, the Settlement Agreement negotiations were the appropriate place to voice those complaints.

---

[2]  Overall, the HipSaver Website changed only by the addition of a new embodiment of the same HipSaver product to the HipSaver product list.  Now, in addition to the HipSaver Softsweats, Interim, Nursing Home, QuickChange, Wrap&Snap, SlimFit and Open-Bottom hip protector garment models offered on the HipSaver Website at the time of the 2004 Settlement Agreement, the Website offers a new embodiment called the Open-Bottom 3-Snap.  This embodiment uses the same elastic, lycra, and cotton materials and the same protective pads in the same positioning as previous HipSaver embodiments. *The only change to the HipSaver Website since the 2004 Settlement Agreement is the addition of this new embodiment.*

Accordingly, because the challenged HipSaver web pages have not changed since 2004, any claim against the advertising statements now could have been made in 2004 and is therefore, precluded.

## II.    POSEY'S CLAIMS FAIL ON THE MERITS

### A.    Posey Cannot Show That It is Reasonably Likely to Suffer Injury As a Result of HipSaver's Claims

Posey fails to demonstrate any reasonable likelihood of injury from HipSaver's advertising.  Regardless of the accuracy of HipSaver's claims, Posey's Lanham Act claim fails because Posey is not likely to be injured by HipSaver's claims. Posey's own expert admits,

> [T]here is no evidence that Posey's sales have been measurably impacted by HipSaver's allegedly false advertisements.  As discussed above, Posey's average monthly sales were relatively consistent before and during the period of HipSaver's alleged improper actions.  Accordingly, Posey does not appear to have lost sales as a result of HipSaver's allegedly inappropriate actions.

**Exh.** 29, Hoffman Report at pp. 8, 9.  In fact, from January 2004 through December 2005 Posey's average monthly revenues increased by 8.8% from $110,000 to $120,000.  *Id.* at 7. Posey's own expert found that "Posey's average monthly sales were relatively consistent before and during the period of HipSaver's alleged improper actions.  Accordingly, Posey does not appear to have lost sales as a result of HipSaver's allegedly inappropriate actions." *Id.* at 8. There is simply no indication that HipSaver's advertising, posted on its Website since 2002, caused any injury to Posey.

Given that HipSaver's allegedly improper claims have never yet injured Posey after being posted on HipSaver's Website for four years, no evidence suggests that the claims could injure Posey in the future.  As the non-moving party on this summary judgment motion, HipSaver is entitled to the reasonable inference that after four years without injury, future injury is highly

unlikely. This reasonable inference raises a genuine issue of material fact, and Posey's motion for summary judgment on its counterclaim should be denied.

**B.     HipSaver's Website Claims Are Not Literally False**

       **1.     The CDC Guidelines Claims on HipSaver's Laundry Webpage are Not Literally False**

In its counterclaim against HipSaver's launderability page, Posey challenges the HipSaver claims relating to institutional laundering standards set by the Centers for Disease Control. To assess HipSaver's laundry statements, it is important to understand the CDC guidelines. The CDC guidelines provide for two separate laundering standards for the laundering of soiled linens and clothing: a high temperature recommendation and a low temperature/high bleach recommendation. The CDC high temperature recommendation states that,

> [h]ot water provides an effective means of destroying microorganisms, and a temperature of at least 71ºC (160ºF) for a minimum of 25 minutes is commonly recommended for hot-water washing. Chlorine bleach provides an extra margin of safety.

**Exh.** 30, CDC Guidelines at PC 001597. In addition to this hot water recommendation, the CDC also recognizes a low temperature/bleach standard:

> satisfactory reduction of microbial contamination can be achieved at lower water temperatures of 22-50ºC **when the cycling of the washer, the wash formula, and the amount of chlorine bleach are carefully monitored and controlled** (6,7). Instead of the microbicidal action of hot water, low-temperature laundry cycles **rely heavily on the presence of bleach to reduce levels of microbial contamination**.

*Id.*, emphasis added. This second, low temperature/high bleach wash requires "careful monitoring" and control of the "washer, the wash formula, and the amount of chlorine bleach" and is not widely used because of its complexity and limited validation.

In fact, Posey's own internal documents note that "large institutions want to launder multiple materials at high heat" and commented that Posey "may loose (sic) large institutions if

we [Posey] do not find a solution." **Exh. 3,** Posey Meeting Notes at PC 000917.  This admission followed an avalanche of returns and complaints by customers about Posey hip protectors. *See* **Exh.** 3, Posey Meeting Notes at PC 000918.   These returns and complaints and Posey's subsequent admission that Posey would lose large institutional customers all confirm that Posey's hip protectors did not meet the CDC Guidelines as they were practiced by consumers in the marketplace.  HipSaver's claim is accurate.

Furthermore, even for those rare laundries that may use the low temperature/bleach CDC guideline, hip protector products cannot be repeatedly washed according to the low temperature CDC guidelines because the required level of bleach erodes the spandex and urethane components of the hip protectors.  Hip protector laundering recommendations published by the Veterans Administration note that "Posey™ hip protectors should not be washed in the hospital laundry.  They degrade more quickly and pads may crack or dissolve. *Bleach appears to accelerate this degrading process.*  However, if necessary, small amounts of bleach should be used.  Hip protectors should be dried in low heat and removed promptly from the dryer." **Exh**. 20, Falls Toolkit at HS2 002205-002206, emphasis added. Because Posey's hip protectors are not suited to low temperature/high bleach washing, the CDC Guidelines high temperature recommendation is the only relevant CDC guideline for any customer with institutional laundering. Accordingly, graphic representations on the HipSaver Website accurately refer to only the high temperature CDC guideline and the graphics showing that the CDC guidelines recommend a minimum wash temperature of at least 160ºF is an accurate representation.

### 2.    The Laundry Claims on HipSaver's Laundry Webpage are Not Literally False

Posey also challenges HipSaver's Website representation relating to the launderability of HipSaver and Posey products. Graphic representations on the HipSaver laundry webpage

indicate that the HipSaver product may be washed at up to 250ºF and Posey may be washed up to 160ºF, just as stated in Posey's wash labels on its products, **Exh**. 21 at HS2 000093. These claims do not purport to be based on testing.[3]  Instead, the claims are based on information provided by the product manufacturers on the laundering instruction labels, the CDC guidelines, and a study conducted by the Veteran's Administration.

HipSaver's graphic representation of Posey's launderability indicates that Posey's Hipster can be washed only up to a maximum of 160ºF is supported by Posey's own laundering instructions.  The Posey Hipster instructs washing at a maximum of 160ºF, the CDC minimum high temperature.[4]  HipSaver's graphic representation that Posey may be washed up to 160ºF is consistent with Posey's own washing instructions and is accurate.

In reality, Posey's Hipsters could not be washed in the high temperature wash used by many institutions without falling apart, cracking, or completely disintegrating. In 2003, Mr. Goodwin and Posey product manager Victoria Lewis participated in a 160ºF wash test conducted by the Veteran's Health Administration in Mountain Home, Tennessee, and Ms. Lewis explicitly told the Veteran's Health Administration that Posey hip protectors could launder at 160ºF to 170°F.  Posey's hip protectors failed the wash test, and the Veteran's Health Administration published its conclusions that: "As a general rule, Posey™ hip protectors should not be washed in the hospital laundry.  They degrade more quickly and pads may crack or dissolve. Bleach appears to accelerate this degrading process.  However, if necessary, small amounts of bleach

---

[3]  HipSaver's claims that only HipSaver hip protectors meet the CDC Guidelines for launderability do not make any implied reference to testing to support the claims.  An advertising claim makes an implied reference to testing to support the claim when the advertising claim asserts that the advertised product meets a specification and when that specification is defined by a particular test.  *See BASF Corp v. Old World Trading Co.,* 41 F.3d 1081, 1084 (7th Cir. 1994).  Here, HipSaver's claims are based on Posey's wash instructions, CDC guidelines, personal experience and consumer feedback and do not reference any specification defined by a particular test.

[4]  Posey claims that its new "high durability" Hipster can be washed up to 180ºF.  However, Posey never notified HipSaver of the change in laundering instructions on the new product.

should be used. Hip protectors should be dried in low heat and removed promptly from the dryer." **Exh**. 20, Falls Toolkit at HS2 002205-002206.

In fact, Posey was well aware of these problems as early as 2002 when it was receiving returns of approximately 1% of its total volume because the foam used in the padding cracked and "completely fractured" when laundered in institutional laundries. **Exh.** 3, Posey Meeting Notes at PC 000918. Posey found that the foam "cracked inside the pouch", "[broke] into pieces", or appeared "disintegrated." **Exh.** 3, Posey Meeting Notes at PC 000917. Posey deduced that these problems resulted from high temperature laundering:

> Heat can weaken the foam, making it easy to break. We tried to address this problem in the packaging literature, but large institutions want to launder multiple materials in high heat. We may loose [sic] large institutions if we do not find a solution. We are also concerned about the effect of high heat on the adhesive if a laminated product is used.

*Id.* Accordingly, HipSaver Website statements that, "[o]nly HipSaver hip protectors clearly meet the CDC guidelines for infection control in the laundry" and "[o]nly HipSaver [hip protectors] can be laundered according to the CDC Guidelines for laundry" is accurate.

### 3.    The Advertising Claims on HipSaver's Validation and Testing Webpage are Not Literally False

HipSaver's advertising claims on the Validation and Testing page of the HipSaver Website are not literally false; the claims are accurate, and the cited tests support the claims. The relevant tests are reported in the JAMDA Report, the Gross Study, the Harvard study and the 2001 Tampere test.

### a.    JAMDA Report

HipSaver's description of the JAMDA Report is accurate, and the claims are supported by the JAMDA Report. HipSaver claims that there were 126 falls and no fractures among participants in the JAMDA test. *See* **Exh.** 28, Website Comparison. This claim is cited directly

from the JAMDA Report.  *See* **Exh.** 24, JAMDA Report at PC 000416.  Although the JAMDA study set out to measure compliance, the study recorded the incidence of falls and fractures and found that no fractures were suffered by the study participants, all of whom wore hip protectors. In its discussion of the JAMDA report, HipSaver offers its opinion about the importance of this secondary finding that none of the study participants, all wearing hip protectors, suffered a hip fracture during the study.  HipSaver highlights this point because it believes that this "no fracture" finding is as important as the very high rate of patient compliance in the JAMDA study. *See* **Exh.** 2, Goodwin Decl. at ¶34.

The HipSaver webpage also claims that "[t]he results [of the JAMDA Report] are very significant since compliance is a major ingredient in the success of any hip protector program." See **Exh.** 28, Website comparison.  Posey misreads this significance claim as referring to the fact that there were 126 falls but no fractures, but the reference to compliance in this claim shows that it actually refers to the significance of the very high compliance rate among patients in the study. To this end, HipSaver states that the JAMDA Report records a 93-95% compliance rate. *See* **Exh.** 24, JAMDA Report at PC 000416-000417.

**b.**     **Gross Study**

HipSaver's statements concerning the Gross study are also accurate.  The purpose of the Gross Study was to evaluate the effectiveness of hip protectors when worn by high risk, elders. And while the study tested a previous iteration of the HipSaver hip protector, it was a substantial design equivalent of the current HipSaver product.  *See* **Exh.** 2, Goodwin Decl. at ¶35.  The basic HipSaver technology is the same in both hip protector iterations: an encapsulated visco-elastic damping urethane pad.  *Id.*

The Gross study found that after 199 falls none of the test participants suffered fractures, a significant finding in view of a substantial fracture rate among patients who did not wear hip protectors. *See* **Exh.** 25, Gross study at HS2 000043-000045. Any doubt after the Gross study about the effectiveness of the current HipSaver iteration (as compared to the previous iteration) is resolved by the secondary findings of the JAMDA Report which confirms for the current HipSaver iteration what Gross proved for the previous iteration: the current HipSaver pad is effective in preventing fractures from falls. This is further confirmed by the fact that the physical therapists who performed the Gross Study moved to the current iteration HipSaver when it was released, and these physical therapists have informally noted that after an additional 200 falls by patients with the current iteration HipSavers, there have still been no fractures. *See* **Exh**. 2, Goodwin Decl. at ¶35.

### c.    **Tampere Test**

HipSaver's claims relating to the Tampere test are accurate and supported by the test. The Tampere test evaluated the force reduction of HipSaver pads that use the same foam as the current iteration of the HipSaver pad, and foam is the determinant of the force absorption of the pad. *See* **Exh.** 2, Goodwin Decl. at ¶36. The Tampere test evaluated two thicknesses of HipSaver pads (12.7mm and 8.4mm) and found that the thicker 12.7mm pad offered better force reduction. The Tampere test results show that the HipSaver hip protector reduced a 7200N impact to a 1790N impact and that the Safehip hard shell hip protector only reduced a 7200N impact to a 2240N impact. Thus the HipSaver reduced the impact force by 550N more than Safehip reduced impact force. This confirms HipSaver's claim that a HipSaver wearer receives 20% less force from a fall than a Safehip wearer.[5]

---

[5]  Although Dr. Ebramzadeh quibbles with the wording of the HipSaver web-site, he agrees that, under HipSaver's method of calculation, a comparison of the HipSaver and Safehip force reduction would show that, when compared

Posey complains that the Tampere test tested a previous iteration of the padding and claims that such results cannot be applied to HipSaver's current model. Posey's hairsplitting is without merit. In fact, the current HipSaver iteration uses an even thicker pad to improve force reduction even further. *See* **Exh.** 2, Goodwin Decl. at ¶36. There simply is no support for Posey's contention that HipSaver mischaracterizes the Tampere test results.

### d.    Harvard Study

HipSaver's claims regarding the Harvard Study are also accurate and supported by the Harvard Study results. Again, Posey complains that HipSaver's statements regarding this test are false because the test does not relate to HipSaver's current product. However, the HipSaver webpage states that the Harvard testing which was conducted in 1996 related to a pad foam in use in 1996 and confirmed 10% better force reduction than SafeHip, the first widely used hip protector. *See* **Exh**. 33, Tampere test at HS2 000046. There is no suggestion in the report on the Harvard study that it refers to HipSaver's current product. In fact, the website goes on to state explicitly that HipSaver researched other materials after 1996 and identified and tested its current pad foam at Tampere in 2000. HipSaver's statements are accurate and Posey's accusations fail.

## C.    Ed Goodwin is Not Individually Liable On Posey's Counterclaim

Posey's claims against Ed Goodwin as an individual are just piling on. The claims are an attempt by Posey to intimidate its way out of HipSaver's claims. The facts of this case do not support individual liability for Ed Goodwin on Posey's counterclaim even if HipSaver were liable on Posey's counterclaim.

In practice, courts apply this doctrine of individual liability for corporate officers in cases with extreme facts such as fraud or blatant misconduct by the individual, or where the

---

to Safehip's performance, HipSaver reduced the impact force by an additional 20% of Safehip's performance. **Exh.** 17, Ebramzadeh Depo. at pp. 71-75.

individual's conduct left the claimant without a remedy because the corporation itself was judgment proof. *Frontier Mgmt. Co., Inc. v. Balboa Ins. Co.,* 658 F.Supp. 987, 993 (D. Mass. 1986)(finding personal liability where the officers participated in fraudulent misrepresentations); *Frito-Lay of Puerto Rico, Inc. v. Canas*, 92 F.R.D. 384, 393 (D. P. R. 1981)(finding liability under circumstances of "pervasive fraud" and where the corporation was nothing more than an alter ego for the individual); *Petland, Inc. v. Arbelo,* No. 05-2115(ADC), 2006 WL 2583758, slip op. at 2-4 (D. P.R. Sept. 7, 2006)(finding individual liability for trademark infringement where the individual secretly transferred ownership of the corporation and continued to use the trademark and operate as a franchise without making royalty payments to the trademark owner); *LaClair v. Silberline Mfg. Co., Inc*., 379 Mass. 21, 24, 28-29 (1979)(finding individual liability for negligence where the corporate officer neglected to secure fire insurance or workers compensation insurance for a corporation engaged in high risk manufacturing where an explosion eventually killed an employee and put the uninsured corporation out of business, leaving the employee's family without a worker's compensation insurance payment and without any remedy against the corporation).

Posey has offered no such evidence of exceptional circumstances or extreme misconduct that would warrant a finding of individual liability for Ed Goodwin.  Accordingly, the Court should deny Posey's motion for summary judgment for individual liability for Ed Goodwin

## CONCLUSION

For the reasons stated here, HipSaver opposes Defendant Posey's motion for partial summary judgment because Posey's claims are procedurally barred by *res* judicata or alternatively, disputed issues of material fact exist with respect to HipSaver's claims and these issues are appropriately preserved for trial.

THE HIPSAVER COMPANY, INC.
By its Attorneys,


/s/  Courtney M. Quish
Lee Carl Bromberg
BBO No.:  058480
Edward J. Dailey
BBO No.:  112220
Courtney M. Quish
BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
cquish@bromsun.com

Dated: January 8, 2007


## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.


/s/  Courtney M. Quish
January 8, 2007


02820/00502 593994.1