**EXHIBIT 9**



# Posey® Hipsters™

...ey Hipsters feature impact absorbing, soft foam pads over the critical fracture area to help minimize potential damage, including hip fractures that can occur from a fall.

Hipsters are available in innerwear and outer-wear models. Innerwear garments are made of a polyester/cotton/Lycra® blend. Outerwear garments are made of a soft, preshrunk polyester/cotton blend and are available in a choice of navy blue or ash gray.



**INNERWEAR**




#6016 / #6016H          #6017 / #6017H




#6018 / #6018H          #6019 / #6019H




#6030                    #6031

## Hipsters are available in eight styles:

- Standard Unisex Brief easily fits over undergarments, or can be worn as underwear.
- Incontinent Brief features a snap front for easier application over adult diapers.
- Male Fly Brief easily fits over undergarments, or can be worn as underwear.
- EZ-On Brief features a crotchless design that allows patients to wear their own undergarments. The mesh material is water permeable, allowing the EZ-On Hipster to be worn during bathing.
- Women's Brief has the same look as regular day-to-day panties and is made of a soft cotton blend material.
- Men's Brief mirror men's regular briefs and are made of a soft gray cotton blend material.
- Sweatpants provide added comfort and warmth.
- Shorts provide added comfort.

Hipsters Sweatpants and Shorts feature high durability padding. All other models are available with original foam padding, or high durability padding designed to withstand laundering in large capacity machines at higher temperature hot washing cycles.

[REF] **6016 Hipsters, Standard Brief**
[REF] **6017 Hipsters, Incontinent Brief**
[REF] **6018 Hipsters, Male Fly Brief**
[REF] **6019 Hipsters, EZ-On**
[REF] **6008 Replacement Pads, 1 pair**
[REF] **6016H Hipsters, High Durability Pads, Standard Brief**
[REF] **6017H Hipsters, High Durability Pads, Incontinent Brief**
[REF] **6018H Hipsters, High Durability Pads, Male Fly Brief**
[REF] **6019H Hipsters, High Durability Pads, EZ-On**
[REF] **6008H Replacement High Durability Pads, 1 pair**
[REF] **6007A Hipsters Shorts, High Durability Pads, Ash Gray**
[REF] **6007N Hipsters Shorts, High Durability Pads, Navy**
[REF] **6009A Hipsters Sweatpants, High Durability Pads, Ash Gray**
[REF] **6009N Hipsters Sweatpants, High Durability Pads, Navy**
[REF] **6030 Hipsters Women's Brief**
[REF] **6031 Hipsters Men's Brief**

**PC 1051**

## Application Instructions:

*Standard, Male Fly, Incontinent Brief, Sweatpants and Shorts, Women's and Men's Briefs*
With the Posey label in the Back, step into the garment and gently slide it up over the hips. Adjust to assure that the foam pads are properly aligned with and cover the hip joint.

*EZ-On Model*
1. Unfasten the hook and loop at the waist and thighs.
2. Wrap the garment around your waist. The label should be at the back and on the inside of the waistband.

✠ **Posey®** | J.T. Posey Company • 5635 Peck Road • Arcadia, CA 91006-0020 USA
Phone 1- 800-447-6739 • Fax: 1-800-767-3933 • www.posey.com

[EC] [REP] MDSS
Burckhardtstr. 1,
D-30163, Hannover, Germany
© 2005 J.T. Posey Company. All rights reserved.          CE
M6139  083105

3. Fasten the hook and loop at the front of your waist. The waist-band should be securely fastened to allow minimal shifting of the garment, but should not feel tight or restrictive.
4. Pull the left panel taut over the left hip and thigh. The pad should be positioned directly over the hip joint.
5. Secure the leg band around the lower thigh using the hook and loop attachment. The elastic band should be tight enough to prevent the pad from sliding out of place, without restricting circulation.
6. Repeat steps 4 and 5 on the right side.

## Laundering Instructions

All Posey Hipsters can be washed according to CDC guide-lines for healthcare facilities. Hipsters with high durability pads are designed to withstand laundering in large capacity machines at higher temperature hot 180°F (82°C) washing and high temperature drying cycles. Standard Hipsters will wash at 120°F (50°C) and dry at medium temperatures. The complete Guidelines for Laundry in Health Care facilities are available at: www.cdc.gov/od/ohs/biosfty/laundry.htm. The CDC states that "the risk of actual disease transmission from soiled linen is negligible" and "recent studies have shown that a satisfactory reduction of microbial contamination can be achieved at lower water temperatures of 72°-122°F (22°-50°C) when the cycling of the washer, the wash formula, and the amount of chlorine bleach are carefully monitored and controlled." CDC offers the following advice for home care, "In the home, normal washing and drying cycles including 'hot' or 'cold' cycles are adequate to ensure patient safety. Manufacturers instructions for the machine and the detergent or wash additive should be followed closely."[1] Lower wash/dry temperatures will prolong garment life.

• Adhere hook and loop straps before laundering to prevent lint build-up on hook during laundry cycle. If hook and loop does not adhere due to lint, clean hook material with a stiff brush.

• If EZ-On pads are removed, wipe clean with mild, liquid disinfectant before replacing in the pants.

*Hipsters*
  

*High Durability Hipsters*
  

[1] www.cdc.gov/ncidod/hip/Sterile/laundry.htm

### OUTERWEAR


#6007A


#6007N


#6009A


#6009N

### SIZING CHART

| Size | Waist Measurement | Hip Measurement |
|------|-------------------|-----------------|
| XS | 26" - 28"  or  66 - 71cm | 33" - 35"  or  83 - 88cm |
| S | 28" - 30"  or  71 - 76cm | 35" - 37"  or  88 - 93cm |
| M | 30" - 34"  or  76 - 86cm | 37" - 41"  or  93 - 104cm |
| L | 34" - 38"  or  86 - 96cm | 41" - 45"  or  104 - 114cm |
| XL | 38" - 42"  or  96 - 106cm | 45" - 49"  or  114 - 124cm |
| XXL | 42" - 46"  or  106 - 116cm | 49" - 53"  or  124 - 134cm |

Note: Sweatpants and shorts are available in sizes XS - XL only.

---

## ⚠ WARNING

Due to the random possibility of falls, the Posey Company makes no guarantee, express or implied, that the user is protected from hip trauma. The skin under the pants should be assessed regularly and Hipsters should be changed and washed after each incontinent episode to prevent skin breakdown.

Posey Hipsters contain foam pads that are sealed in a pouch to protect it from water. If the pouch is cut or the seal is broken during laundering, moisture will enter the pouch and may result in waterlogged foam. Waterlogged foam encased in the pouch may promote the growth of bacteria.
• Test the foam and pouch integrity by squeezing the pad in one fist, forcing the air to one end, resulting in an air bubble.
• If you hear or feel liquid or air escaping, the pouch is damaged.
• If the pouch is damaged, discontinue use and discard.

**PC 1052**

**EXHIBIT 10**

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 2

 3      THE HIPSAVER COMPANY, INC.,     )
                                        )
 4                      Plaintiff       )
                                        )
 5              -VS-                     )  CA No. 05-10917-PBS
                                        )  Pages 1 - 26
 6      J.T. POSEY COMPANY,             )
                                        )
 7                      Defendant       )

 8

 9                         MOTION HEARING

10             BEFORE THE HONORABLE PATTI B. SARIS
                   UNITED STATES DISTRICT JUDGE
11

12
        A P P E A R A N C E S:
13

14          EDWARD J. DAILEY, ESQ. and PETER J. KAROL, ESQ.,
        Bromberg & Sunstein, 125 Summer Street, Boston,
        Massachusetts, 02110-1618, for the Plaintiff.
15

16          ANTHONY J. FITZPATRICK, ESQ., Duane Morris,
        470 Atlantic Avenue, Suite 500, Boston, Massachusetts, 02210,
        for the Defendant.
17

18          JEFFREY G. SHELDON, ESQ., Sheldon & Mak,
        225 South Lake Avenue, 9th Floor, Pasadena, California,
        91101, for the Defendant.
19
                                United States District Court
20                              1 Courthouse Way, Courtroom 19
                                Boston, Massachusetts
21                              July 12, 2005, 3:30 p.m.

22

23                         LEE A. MARZILLI
                       CERTIFIED REALTIME REPORTER
                       United States District Court
24                     1 Courthouse Way, Room 3205
                          Boston, MA  02210
25                        (617)345-6787
```

2

```
 1                    P R O C E E D I N G S
 2          THE CLERK:  The case of the HipSaver Company,
 3   Incorporated V. J.T. Posey Company, Civil Action
 4   No. 05-10917, will now be heard before this Court.  Will
 5   counsel please identify themselves for the record.
 6          MR. DAILEY:  Good afternoon, your Honor.  I'm Ed
 7   Dailey from Bromberg & Sunstein representing the plaintiff,
 8   HipSaver Company.  With me is Peter Karol.  Mr. Karol is
 9   going to argue for the plaintiffs this afternoon.  With me
10   also is Steve Ramsdell, and Mr. Goodwin, who is the president
11   of the plaintiff, is in the courtroom.
12          THE COURT:  Thank you.
13          MR. FITZPATRICK:  Good afternoon, your Honor.
14   Anthony Fitzpatrick from Duane Morris on behalf of the
15   defendant.  With me is lead counsel for J.T. Posey, Jeffrey
16   Sheldon from Sheldon & Mak in California.
17          THE COURT:  Let me start off by saying I am not
18   going to transfer the action.  This is my case.  I remember
19   it actually.  We had a motion for a preliminary injunction
20   hearing.  It was a settlement in this Court's jurisdiction,
21   and I don't see a good reason to transfer it at this point.
22   At some later point, if it becomes apparent to me that we
23   should transfer it, it would be one thing, but at least at
24   this point -- I remember the case actually, and if it weren't
25   for the settlement under my jurisdiction, you may well have
```

3

1    had a good point -- it's just I'm not going to transfer it.

2          But now let's get to the merits.  Let me turn to

3    HipSaver for a minute.  How can I grant summary judgment?  I

4    mean, I've read the stuff.

5          MR. KAROL:  Okay.

6          THE COURT:  And I don't know whether it's new

7    testing, old testing.  How could I grant summary judgment for

8    you?

9          MR. KAROL:  Your Honor, it's completely fine with

10   us if this Court decides not to grant summary judgment at all

11   at this stage.  We would certainly like the grant of summary

12   judgment going forward because we feel that, at least as

13   regards the exact provisions, it's clear from the face of the

14   agreement that it is a notice provision and that the only

15   issue here is whether or not there would be notice as to a

16   further advertisement.

17         THE COURT:  No, no, no.  No, no, not further

18   advertisement, as to additional testing, and I won't know

19   that.  "Further comparative testing," isn't that the word?

20         MR. KAROL:  Yes, it is, I believe.  So we're

21   comfortable with no grant of summary judgment in either way

22   at this point.  We don't know when the test was actually

23   done, your Honor.  Though it's cited in Posey's brief that

24   they feel that we've somehow consented to when the test was

25   done, that's a fact issue that we're not certain about.  We

4

1    just feel that it's relevant when the underlying impact study

2    was done, and that goes to when the actual advertisement was

3    put forward.  The advertisement that they dispute was January

4    of 2005.  Therefore we feel that it's clear from the face of

5    the agreement that there was notice that needed to be given

6    in order to keep us all out of this court.

7            THE COURT:  Why?  Why did notice have to be given

8    if there was no additional testing?  Does the contract say

9    notice has to be given for an additional advertisement based

10   on old testing?

11           MR. KAROL:  Well, your Honor, we feel that they

12   would be reading into the Court and that Posey would be

13   reading into the agreement an exception for old testing.  We

14   feel that that paragraph covers in addition to --

15           THE COURT:  Let me say, you may have a cause of

16   action based on new stuff that postdates the settlement

17   agreement.  You may.  I mean, if there's inaccurate

18   statements being made, I'm not sure it was covered by the old

19   agreement.  But if it's no new testing --

20           MR. KAROL:  Oh, your Honor, it's not the new

21   testing -- (Inaudible).

22           THE REPORTER:  I'm sorry.  I'm having trouble

23   hearing you.

24           MR. KAROL:  Your Honor, it would be only on the new

25   ads that we're talking about as a violation of the breach, a

5

1   breach of the notice provision, not the actual underlying

2   testing, as to the date of that.  It's the advertisement that

3   put forth the false claims about the testing and

4   misrepresented the testing, which is of a later date than the

5   settlement agreement.

6           THE COURT:  Well, read the paragraph you're

7   referring to.  I thought it said notice of any further

8   comparative testing.

9           MR. KAROL:  Your Honor, "In the event of any

10  further or comparative testing" is the first phrase, and we

11  just think that that's a phrase that's kind of an

12  introductory phrase into the notice provision and that the

13  notice provision is really intended to apply to all

14  advertisements.

15          THE COURT:  Read the whole paragraph.

16          MR. KAROL:  "In the event of any further

17  comparative testing of Posey and consumer products by either

18  party, neither party shall make commercial advertising use of

19  the results or analysis related to such testing without first

20  giving the other party at least 30 days' advanced written

21  notice of the results or analysis."  And we would contend

22  that the centerpiece of that is the use of the --

23          THE COURT:  I'm not sure you win on that.  Now,

24  assuming you don't win that, what happens?  Do you still have

25  a cause of action for false advertisement?

6

1          MR. KAROL:  Oh, we certainly do, we do, and that's

2     very much at the heart of our complaint is the false nature

3     of this advertisement.

4          THE COURT:  All right.  Now, let me just jump to

5     you for a minute.  Let's assume that you win your argument

6     that the notice doesn't go to any old testing, it only goes

7     to new testing, but you still have false advertisement.

8          MR. SHELDON:  No, I don't, your Honor.  The release

9     in the prior settlement agreement released all claims that

10    could have been brought.  I refer you to the declaration of

11    Victoria Lewis that we filed.  This testing was done in

12    2002.  The ads were first placed in 2002.  She attaches the

13    ads.  They have a copyright notice.  I'm dealing with ads

14    that existed in 2002, not 2005.

15         THE COURT:  Well, let me say this:  I agree that

16    anything up until the date of the settlement is precluded by

17    the release; but if there was a new advertisement that had

18    the exact same stuff, I don't think it's included in the

19    release.

20         MR. SHELDON:  Well, that's inconsistent with

21    plaintiff's position that there was stuff on the Internet

22    which existed prior to the release they can't be sued on and

23    they don't even have to give us the backup data.

24         THE COURT:  I don't know what their position is,

25    and they may lose that too.  I'm simply saying, I'm not

7

1    prepared to resolve that at this stage of the proceedings.

2    I'm definitely not transferring it.  I don't believe either

3    side is entitled to summary judgment or a dismissal, and I

4    think it needs to go forward with what the new ad is, what's

5    in it, and whether or not that falls afoul of the settlement

6    agreement or not.

7              MR. SHELDON:  May I argue the Rule 12 dismissal

8    motion?

9              THE COURT:  Yes, you may.

10             MR. SHELDON:  And I'd like to go back and at least

11   give a shot on the transfer motion.

12             THE COURT:  I'm not doing it.  It's just not worth

13   your time.  I've read everything.  It's my settlement

14   agreement.  And I understand that, well, you know, absent the

15   existence of an agreement that happened in this court to

16   resolve a preliminary injunction here, which I actually even

17   remember, I might well say you're right, you know, if it was

18   just a sort of race-to-the-courthouse kind of thing for the

19   first-time round.  But it isn't, so don't waste your breath

20   on it.  But I will hear you on the motion to dismiss which I

21   haven't given you a chance to argue yet.

22             MR. SHELDON:  The problem with the complaint, it

23   doesn't make clear what advertisement they're complaining

24   to.  When you read all the papers, it does.  And I think this

25   was intentional.  All it says was, "In 2005, initiated an

8

1    enhanced advertising campaign." That's all we know. This

2    advertising campaign, as I said, started in 2002. So we

3    weren't clear what they're complaining about.

4         The other thing, on the breach of contract claim,

5    they never alleged they have performed under that contract,

6    and that's important because if they say that we had to give

7    notice on ads that continued, why don't they have to give

8    notice on their temperature ad? So that I think they should

9    be obliged to say that they have performed under the

10   contract. That's an element of a breach of contract claim,

11   and it doesn't appear in the complaint.

12        THE COURT: Well, let me ask you this: If it's

13   just a question of them not specifying that there were things

14   that happened in 2005, do you want me just to make them amend

15   it? Because that's really all it would involve.

16        MR. SHELDON: I do. When we filed our papers,

17   we're guessing what the complaint was directed to.

18        THE COURT: In the papers you refer to ads that

19   happened after the date of the settlement agreement. Maybe

20   I'm not remembering. Does the complaint specifically

21   reference those?

22        MR. KAROL: Yes, it does, your Honor. In the

23   demand for relief, it specifically references it. The actual

24   name of the impact study had references to it. It's not in

25   the actual -- (Inaudible).

9

1           THE REPORTER:  I'm sorry, I didn't hear you.  "It's

2     not in the actual. . ."

3           THE COURT:  Don't forget, she's got to write this

4     down.

5           MR. KAROL:  I'm sorry.  I know I mumble at times.

6     It was in the demand for relief.  It was part of the

7     complaint, and it's cited on the page of the complaint.  In

8     our memorandum we do cite to --

9           THE COURT:  Your memorandum, that's not good

10    enough.

11          MR. KAROL:  No, no, no, in the actual complaint,

12    it's in there, as in the demand for relief, we ask them to

13    specifically -- we ask the Court to specifically halt that

14    particular ad.  It's in the complaint itself.

15          THE COURT:  Is it?

16          MR. SHELDON:  It's in the prayer for relief, but

17    it's not in the body of the complaint.  And let me add, on

18    the --

19          THE COURT:  Well, as far as I'm concerned then,

20    that's the only ad at issue here.  Is that right?

21          MR. KAROL:  Yes.

22          THE COURT:  All right, so then we don't need to

23    have an amendment here.  And if you want to add any other

24    ads, you have to change the complaint because that's the only

25    ad we're talking about, the only ad postsettlement, so

10

1    they're on fair notice.

2          MR. SHELDON:  On the request that they specify 9(b)

3    with fraudulent conduct was -- the response was, well,

4    there's 43(a) cases that say a plain claim under 43(a) is not

5    a fraud claim, and therefore 9(b) doesn't apply, except in

6    the complaint on Line 2 alleges fraud.  So if they're going

7    to be alleging fraud and the remedies that you can get for

8    fraud, they should specify the --

9          THE COURT:  Well, now that you've got it specified

10   down with that one ad, that's what we're talking about, and

11   that's enough to meet 9(b).  That's all we're talking about.

12   Make it clear:  Their only fair notice is one advertisement,

13   all right?  That's the only one that's not covered by the

14   settlement agreement, since it's the only one that postdates

15   the settlement agreement, okay?

16          So just refresh me.  Let's get beyond all this.

17   What's the real issue here?  I'm trying to understand.  Are

18   we just back to square one?

19          MR. SHELDON:  No.  It's completely -- it has

20   nothing to do with the original case except they're alleging

21   breach in the settlement agreement.  It's a completely

22   different ad.  It has nothing to do with the UCLA study.

23          THE COURT:  I want to understand really what the

24   meat of what's going on here is.  It has to do with a

25   different study?

11

1          MR. SHELDON:  I wouldn't even call it a study.  In

2     2002 or 2001, I'm not sure when, Posey had some testing done

3     to try to select the material.  It selected the material and

4     released stuff in 2002 about it, and just has continued the

5     same ad in 2002, 2003, 2004, 2005.  That's it.  And what

6     they're complaining about --

7          THE COURT:  It's the exact same ad?

8          MR. SHELDON:  Yes.  Well, I mean, the surrounding

9     materials may be different, but the statement they're

10    complaining about has not changed one iota.

11         MR. KAROL:  Your Honor, may I be heard on that

12    point?

13         THE COURT:  Well, let him finish.  You sit down.

14    You're an eager beaver here.  Let him finish, and then I'll

15    give you your time in the sun, okay?

16         MR. KAROL:  Fair enough.

17         MR. SHELDON:  If I refer to the complaint, they

18    say, "An independent laboratory study that was conducted to

19    determine the most effective impact absorbing material."

20    That's what the prayer is complaining about.  That same

21    language has been used since 2002 based on the very same

22    study that was conducted by Garwood in either 2001 or 2002.

23         THE COURT:  And this is not the UCLA study that was

24    so bitterly contested last time?

25         MR. SHELDON:  It has absolutely nothing to do with

12

1    the UCLA study.

2          THE COURT: All right, thank you. Now, that's not

3    a motion to dismiss issue. But let me turn to you. Is that

4    what this is all about?

5          MR. KAROL: Your Honor, to begin with, they are

6    materially different ads, very much so, the January ad and

7    the one before it. In the first instance -- I have copies of

8    this if the Court needs it. This is from the Morseburg

9    declaration that just came out. It's Exhibit D from their

10    memorandum on Friday, and it's clear that this juxtaposes one

11    of the paragraphs from the ad. And keep in mind, this is in

12    the larger context of a greater ad with a lot of different

13    references in it. This actually has a specific date than the

14    earlier ad that they keep saying is the same, the July 1,

15    2001. That date is completely redacted from the current ad.

16          Now, this is extremely relevant because this is

17    about the most effective impact absorbing material. This has

18    changed dramatically since July 1, 2001, and to make a

19    conscious decision to redact the date from the ad is

20    certainly part of a material issue here.

21          THE COURT: Help me. What's changed dramatically?

22    Is there different kinds of foam used today than -- I don't

23    know right word -- a different kind of pad used today than --

24          MR. KAROL: Yes. For example, in the Posey

25    advertisement they talk about a hydra-ability pad. This did

13

1    not exist at the time of 2001.  So the fact that that's

2    incorporated with the impact study is a very different

3    impression upon the viewer, saying that they have the most

4    effective impact absorbing material and then citing to these

5    hydra-ability pads which didn't exist at the time that they

6    claim the study was made.

7         THE COURT:  So basically -- you know, by the way, I

8    say you speak quickly.  That's an amazing thing because Lee

9    here accuses me of speaking quickly.  I win some awards in

10   the courthouse, so you must win some award for attorneys.  So

11   both of us need to learn to speak more slowly.

12        MR. KAROL:  I just wanted to get you home quicker,

13   your Honor.

14        THE COURT:  Thank you.  Good comeback.

15        So the gist of what's going on here is that there's

16   a dispute over this January, 2005 ad as to whether it's fair

17   advertising because it's referring to pads, and there's a

18   dispute about whether these are the current pads or the old

19   pads.  That the gist of it.

20        MR. KAROL:  That's part of it, yes.

21        THE COURT:  So that seems like a pretty narrow

22   issue; in other words, that we can get through quick

23   discovery and a quick either trial or motion for summary

24   judgment.

25        MR. SHELDON:  I think it's -- well, we think it's

14

1    ripe for summary judgment just because of the prior

2    settlement agreement because the claim could have been

3    brought.

4           THE COURT:  Well, okay, that's denied.  The motion

5    to dismiss is denied.  Both motions for summary judgment are

6    denied.  The motion to transfer is denied.  And now I want to

7    get you to the merits.

8           MR. SHELDON:  Can I argue one more portion of the

9    motion to dismiss?

10          THE COURT:  Sure.

11          MR. SHELDON:  This is Count 3, the Massachusetts

12    claim.  We cited the leading case interpreting that statute,

13    Kencorp.

14          THE COURT:  Which statute?

15          MR. SHELDON:  They have a claim under

16    Massachusetts --

17          THE COURT:  93A?

18          MR. SHELDON:  Yes, 93A.  Thank you.  I'm sure

19    you're more familiar with it than I am.  But at least

20    according to the Kencorp case, the acts had to principally be

21    directed to primarily and substantially within Massachusetts,

22    the acts complained of.  They didn't plead that, and they

23    can't.  The testing was done in California; the ads were

24    generated in California.  So maybe something happened in

25    Massachusetts, but they weren't primarily and substantially.

15

1          THE COURT:  Yes, we generally deal with those kinds

2     of issues on summary judgment.  So, you know, I need a

3     record, you may be right.  They claim that they were

4     distributed to what, a hundred people here?

5          MR. SHELDON:  Well, that's the problem.  In the

6     complaint they say a hundred, but they recognize that -- the

7     complaint itself says that may be .5 percent of Posey's total

8     customer base.  If you work out the numbers, it works out to

9     about that.  So the complaint on its face doesn't satisfy the

10    primary --

11         THE COURT:  I understand, you may have some really

12    good arguments, but I'm just not doing this on a motion to

13    dismiss.  And I think just the bitterness between the

14    parties -- I mean, I never say "never" on settlement, but

15    maybe it just makes sense to just reach the merits on this

16    and somebody go up on appeal, because I thought this was

17    settled last time, and obviously the parties aren't happy

18    with the settlement, so --

19         MR. SHELDON:  Well, your Honor, we're not the ones

20    who raced up to the courthouse.  We're not the ones who

21    started sending letters threatening and then sued before we

22    could even respond.  So we've got a problem over here.

23         THE COURT:  Yes, I think we should just at least do

24    a little discovery.  I don't think you should have to do very

25    much.  This seems relatively simple, one ad, one study.  How

16

1   many depositions apiece do you think you'd need?

2          MR. SHELDON:  Well, your Honor, we have at least --

3   that's the problem.  The people that did the testing, I'm not

4   arguing the motion, but the people that did the testing are

5   the Garwood people.  They're all in California.

6          THE COURT:  All right, all their depositions should

7   happen there.

8          MR. SHELDON:  Yes, I mean, so we've got at least

9   those --

10         THE COURT:  So they've got to schlepp out there

11  anyway, all right?

12         MR. SHELDON:  We have at least two ex-employees who

13  I understand aren't going to voluntarily come to

14  Massachusetts, so we're going to probably have at least six

15  trial depositions to take in California.

16         THE COURT:  Fine.  By the way, we may never even

17  get to that.  I mean, this sounds like something that's

18  possibly ripe for summary judgment, so let me -- is it bench,

19  or is it jury?  Do you know?  Was a demand made?

20         MR. KAROL:  A jury claim, yes.

21         THE COURT:  Let me say this for you:  I've had

22  other cases like this where I've denied a motion to transfer

23  and plaintiffs have lost because most of the case had to be

24  put in by deposition, and the jury fell asleep.  So you may

25  want to think about transferring it to California, if in fact

Court Hearing - 071205

17

1   the key percipient witnesses that you would have to prove

2   some sort of false ad with are going to be just the

3   deposition transcripts.  That's not a good place for you to

4   be in.  We don't have to make that ultimate decision now, but

5   if he's right that all we have is one person here and all the

6   test takers out there, what are you going to do?

7          MR. KAROL:  Your Honor, we feel that the case will

8   revolve around expert testimony more than anything else, and

9   our experts will certainly be here in court arguing in

10  person.

11         THE COURT:  Maybe.  So all the depositions should

12  be taken out there of Posey people, and all the HipSaver

13  people should be here.  I think that we're not talking about

14  very many, so why don't we say all fact discovery will be

15  done by October 31.  Then plaintiff's experts will be by

16  11/15, defendant's expert by 12/15, expert discovery deadline

17  by 1/15, motion for summary judgment by 1/30/06, opposition

18  by 2/15/06.  And obviously, if these things come on the

19  weekend, you'll just push it off to the following Monday.

20  Hearing on motion for summary judgment in March.

21         I'm highly unlikely to grant a motion for

22  preliminary injunction.  We've been down that route.

23         MR. KAROL:  Yes, your Honor, understood.

24         MR. SHELDON:  Let me add, your Honor, we think the

25  ad was fine to begin with.  We made minor modifications

18

1    almost immediately.

2           THE COURT:  Say it again.

3           MR. SHELDON:  We modified it almost immediately.

4    In our view, it wasn't worth fighting about.

5           THE COURT:  That's talking about the one 2005 ad?

6           MR. SHELDON:  Yes.

7           THE COURT:  Well, have you looked at their new ad?

8    Do you have problems with their new ad?  Is this even worth

9    the dime?

10          MR. KAROL:  Your Honor, are you talking about the

11   ad campaign from January, 2005, or are you talking about --

12   if we're talking about whether or not they pulled the ad, I'm

13   not sure.  I don't know.

14          THE COURT:  They didn't.

15          MR. KAROL:  If that's what they're suggesting --

16          THE COURT:  He didn't say they pulled it.  He said

17   they modified it.  Have you looked at the modification?

18          MR. KAROL:  I haven't seen the modification.

19          THE COURT:  What did it do?

20          MR. SHELDON:  It eliminated the word "independent."

21   They seemed to object to calling Garwood "independent," even

22   though they are.  And they objected to the language of the

23   "most effective," and I think we changed it to "determine an

24   effective and comfortable."  The most effective is a rigid

25   piece of steel that will keep your hips, but nobody's going

19

1      to wear it, so -- and that's what's currently using, and

2      nobody's complained about it.

3                  THE COURT:  Is that satisfactory?

4                  MR. KAROL:  Your Honor, I don't believe it does at

5      this point, at least that we haven't seen it, and we

6      certainly need to see it.  I mean, this has a history before

7      of coming back.

8                  THE COURT:  I denied the motion for PI the last

9      time, if I remember correctly.  If they took out that

10     offending language, what else from your point of view -- I'm

11     not saying it is offending -- but from your point of view,

12     what else is it that you'd be upset about?

13                 MR. KAROL:  Well, to begin with, attorneys' fees is

14     something we'd certainly be looking for under 93A.

15                 THE COURT:  What else in the ads?

16                 MR. KAROL:  General statements about effectiveness

17     is something we'd have to look into.

18                 THE COURT:  You know, they're allowed to advertise.

19                 MR. KAROL:  They are.

20                 THE COURT:  You know, of course they're going to

21     call their product effective.

22                 MR. KAROL:  We really ask the Court to be able to

23     at least be able to see the ad.

24                 THE COURT:  I know, but this is what I don't want

25     to do.  I don't want to spend a year ferrying back and forth

20

 1    across the United States -- you've got clients here, both

 2    sides, with the expense -- if in fact this is all going to

 3    turn on attorneys' fees.  I'm not going to do it.

 4            So let's do this.  I've just set a discovery

 5    schedule.  Did we already set a hearing on the motion for

 6    summary judgment?

 7            THE CLERK:  March 16 at 2:00 p.m.

 8            THE COURT:  All right, we're going to send you to

 9    mediation forthwith, immediately.  And I want you to look at

10    that ad and send a letter to me, the new one, immediately and

11    tell me two things:  One is whether or not it satisfies you,

12    and if it does, what are we talking about in terms of

13    attorneys' fees?  It isn't worth --

14            MR. KAROL:  Could we have that ad produced

15    immediately?

16            THE COURT:  Sure.

17            MR. SHELDON:  Sure.  I mean, it's out there.

18            THE COURT:  I know, but just give it to them.

19            MR. SHELDON:  I don't have it with me, but sure.

20            THE COURT:  What's your ballpark right now for

21    attorneys' fees?

22            MR. DAILEY:  Your Honor, with all due respect, we

23    certainly would like our attorneys' fees, but this is not the

24    issue.  This is a course of conduct that has gone on.  We

25    want this stopped.  We want the same relief we got the last

21

1    time, but we want a bulletproof settlement agreement that

2    doesn't have us before you a year hence.

3           This plaintiff has six employees.  He's the little

4    guy on the block.  He has inventive technology.  He cannot

5    continue to be hammered by the big guy on the block putting

6    out false ads and then us having to come to court once a

7    year.  We're not in that position.  We want this stopped.

8           THE COURT:  Well, you know, it's a nice speech.  I

9    understand your clients are sitting right here, and I

10    understand they want it stopped, but I can't stop all

11    advertising.

12           MR. DAILEY:  Of course.

13           THE COURT:  This is competition in the marketplace.

14           MR. DAILEY:  Of course.

15           THE COURT:  And of course people are going to say,

16    "My product's effective."  That's just what people say.

17           MR. DAILEY:  But if that is a literally false ad,

18    and it is further literally false because it refers to

19    testing of materials that didn't even exist at the time of

20    the testing --

21           THE COURT:  I remember you made that point the last

22    time, and it was hotly contested factually.  And we can spend

23    a fortune over the next year shuttling back and forth across

24    the United States taking everyone's depositions; but if in

25    fact their current ad is not offending, and if in fact, let

22

1   me guess, that your attorneys' fees are under at this point,

2   let's say $5,000 --

3          MR. DAILEY:  They are certainly not, but that's a

4   secondary matter, your Honor.  Your Honor, if I may --

5          THE COURT:  I'm not going to have a speech right

6   now.

7          MR. DAILEY:  Okay, fine.

8          THE COURT:  My point is, if their ad has changed

9   and the only damage that you've incurred is attorneys' fees,

10  whatever it is, then it is not -- I'm not going to have this

11  case litigated.

12         MR. DAILEY:  Absolutely.  Your Honor, I appreciate

13  that, and we would not bring a pointless lawsuit.  This is

14  not just vengeful litigation.  The complaint alleges damage

15  to the business.  This is not a game for attorneys' fees.

16  This is not an academic exercise.

17         THE COURT:  I never accused it of being a game for

18  attorneys' fees.

19         MR. DAILEY:  The point is, it's not saying:  "What

20  do you get out of this?  You get attorneys' fees."  Indeed,

21  in the earlier case, the settlement involved payment of

22  attorneys' fees, but that wasn't the genesis, that wasn't the

23  purpose.

24         With all due respect to the Court, Mr. Goodwin can

25  tell you that I did a risk analysis on that case before I

23

1   ever advised him to bring that case to court.  That risk

2   analysis was not premised on, what can Bromberg & Sunstein

3   recover?  It was, was there an opportunity to prevail on the

4   merits?

5           THE COURT:  I got it, but if this ad is fine --

6           MR. DAILEY:  Which we haven't even seen.

7           THE COURT:  Right.  I want some statement and a

8   review from you in a week what the offending piece of the

9   current ad is because there are two different issues.  If

10  we're battling over an ad and whether it's good or bad,

11  that's one thing.  But if we're only talking about an ad that

12  was out from January, 2005, until today, which is July of

13  2005, and whatever damage to reputation, if you can even

14  prove it, that's a different kind of dispute.

15          MR. DAILEY:  We certainly appreciate that, your

16  Honor.  And all I want to say is that the first time I

17  heard -- and I pay attention to this on a daily basis -- the

18  first time I heard that there was a revised ad was this

19  afternoon.

20          THE COURT:  Okay, I'm not blaming you.  That may

21  well be, but here we are.  So I've set a discovery schedule.

22  I'm going to hear from you in a week what your position is

23  with respect to the new ad.  If you think something is still

24  offensive, you need to tell me what it is.  What form should

25  it be in?

24

1          MR. DAILEY:  We can file a memorandum, that's fine.

2          THE COURT:  Okay.  And if in fact it makes sense to

3     then -- I will send you to mediation forthwith, and if in

4     fact that doesn't work, we'll go forward with this whole

5     thing.  In the meantime, the depositions of the Posey people

6     and the Garwood people will be in California, and the

7     depositions of the HipSaver people will be here.  The Posey

8     expert will be -- do you have an expert here, or do you have

9     an in-house person?  Do you know?  Are you going to have an

10    independent expert?

11         MR. SHELDON:  We'll have to contemplate that.

12         THE COURT:  Do you already have an expert?

13         MR. DAILEY:  Yes, we do.

14         THE COURT:  Who is it?

15         MR. DAILEY:  Dr. Hayes, the same expert we had in

16    the earlier case.

17         THE COURT:  Where is he from?

18         MR. DAILEY:  He's from Oregon, and he will be

19    deposed on the West Coast.  We made him available for

20    deposition on the West Coast the last time.

21         THE COURT:  Great.  And this will be about the new

22    study, right?

23         MR. DAILEY:  Correct, correct.

24         THE COURT:  Are you the only two people in the

25    market?

25

1          MR. SHELDON:  No.

2          THE COURT:  There are other people?

3          MR. SHELDON:  Yes.

4          THE COURT:  Okay.  There it goes.

5          MR. SHELDON:  I want to correct something.  I don't

6    want to -- let's say that plaintiff may have forgotten.

7    Early on, even before we knew they had sued us, we advised

8    them that we had changed the ad.  So even before we knew a

9    complaint was filed, we had agreed to make the change.

10          THE COURT:  Well, thank you.

11          MR. SHELDON:  And I don't recall whether they were

12   sent it or not, but they were certainly advised that the

13   change was made.  In fact, we got back a complaint that the

14   revised one got distributed in Florida after we said we

15   changed it, pointed out that the guy had a heart attack, and

16   that's why he didn't come with the new stuff.  But be that as

17   it may, even before Posey knew it was sued, it voluntarily

18   made a change in what it considered perfectly okay to begin

19   with, and that has been brought to the attention of

20   plaintiff.

21          THE COURT:  Well, I thank you for doing that.  All

22   right.  Is that accurate, by the way?

23          MR. DAILEY:  Thank you, your Honor.

24          THE COURT:  Do you remember getting that?

25          MR. DAILEY:  Oh, no, I did not.  I'm sorry.  I

26

1    apologize.  I did not see that.  I am not aware of a revised

2    ad.  There was certainly back-and-forth colloquy or dialogue

3    between me and Mr. Sheldon, but I do not understand that

4    there was a revised ad.

5         MR. SHELDON:  I have the letter right here, your

6    Honor.

7         THE COURT:  You might want to confer afterwards.

8    We don't need to resolve that right now.  I hope you have a

9    nice rest of the summer.  I hope you resolve this, but if you

10   don't, I definitely remember this contest, and so I will

11   resolve it this time.  Okay, thank you.

12        MR. DAILEY:  Thank you, your Honor.

13        THE CLERK:  All rise.  Court is in recess.

14        (Adjourned, 4:00 p.m.)

15

16

17

18

19

20

21

22

23

24

25

27

1                          C E R T I F I C A T E

2

3

   UNITED STATES DISTRICT COURT )
4  DISTRICT OF MASSACHUSETTS     ) ss.
   CITY OF BOSTON                )

5

6

7

8            I, Lee A. Marzilli, Official Federal Court

9  Reporter, do hereby certify that the foregoing transcript,

10 Pages 1 through 26 inclusive, was recorded by me

11 stenographically at the time and place aforesaid in Civil

12 Action No. 05-10917-PBS, The HipSaver Company, Inc. Vs. J.T.

13 Posey Company, and thereafter by me reduced to typewriting

14 and is a true and accurate record of the proceedings.

15            In witness whereof I have hereunto set my hand this

16 18th day of July, 2005.

17

18

19

20

21

22    _____
      LEE A. MARZILLI, CRR
23    OFFICIAL FEDERAL COURT REPORTER

24

25

**EXHIBIT 11**

# EXHIBIT 11

# CONFIDENTIAL - ATTORNEY'S EYES ONLY

# FILED UNDER SEAL PURSUANT TO

# ASSENTED-TO MOTION

**EXHIBIT 12**

1

1           UNITED STATES DISTRICT COURT
          FOR THE STATE OF MASSACHUSETTS
2

3 THE HIP SAVER COMPANY, INC.,      )
                                )
4             PLAINTIFF,       )
                                )
5     VS.                   )
                                ) NO. 05-10917 PBS
6 J.T. POSEY COMPANY,         )
                                )
7             DEFENDANT.       )
                                )
8 J.T. POSEY COMPANY, INC.,     )
                                )
9            COUNTERCLAIM PLAINTIFF, )
                                )
10     VS.                   )
                                )
11 THE HIP SAVER COMPANY, INC.; AND )
   EDWARD L. GOODWIN,        )
12                                )
           COUNTERCLAIM DEFENDANTS. )
13

14

15           DEPOSITION OF VICTORIA LEWIS

16             CERRITOS, CALIFORNIA

17        THURSDAY, DECEMBER 15, 2005

18

19

20

21 REPORTED BY:

22 DENISE HERFT
   CSR NO. 12983
23

   JOB NO.:
24 A0413NCV

25

1                    UNITED STATES DISTRICT COURT

2                    FOR THE STATE OF MASSACHUSETTS

3

4     THE HIP SAVER COMPANY, INC.,            )
                                              )
5                    PLAINTIFF,               )
                                              )
6          VS.                                )
                                              )  NO. 05-10917 PBS
7     J.T. POSEY COMPANY,                     )
                                              )
8                    DEFENDANT.               )
      _____)
9     J.T. POSEY COMPANY, INC.,               )
                                              )
10                   COUNTERCLAIM PLAINTIFF,  )
                                              )
11         VS.                                )
                                              )
12    THE HIP SAVER COMPANY, INC.; AND        )
      EDWARD L. GOODWIN,                      )
13                                            )
                     COUNTERCLAIM DEFENDANTS. )
14    _____)

15

16                    DEPOSITION OF VICTORIA LEWIS,

17            TAKEN ON BEHALF OF THE PLAINTIFF, AT,

18            17871 PARK PLAZA DRIVE, SUITE 200,

19            CERRITOS, CALIFORNIA, COMMENCING AT

20            2:06 P.M., ON THURSDAY, DECEMBER 15, 2005,

21            REPORTED BY DENISE HERFT, CSR NO. 12983, A

22            CERTIFIED SHORTHAND REPORTER IN AND FOR

23            THE STATE OF CALIFORNIA, PURSUANT TO NOTICE.

24

25

3

```
 1     APPEARANCES:

 2          FOR THE PLAINTIFF/           LAW OFFICES OF
            COUNTERCLAIM DEFENDANT:      BROMBERG & SUNSTEIN
 3                                       BY:  EDWARD J. DAILEY
                                         125 SUMMER STREET
 4                                       BOSTON, MASSACHUSETTS
                                                   02210-1618
 5
            FOR THE DEFENDANT/           LAW OFFICES OF
 6          COUNTERCLAIM PLAINTIFF:      SHELDON & MAK
                                         BY:  DOUGLAS H. MORSEBURG
 7                                       225 SOUTH LAKE AVENUE
                                         SUITE 900
 8                                       PASADENA, CALIFORNIA
                                                   91101
 9

10          THE VIDEOGRAPHER:            NANCY HOTALING

11
            ALSO PRESENT:                ERNEST POSEY
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

34

1    A    YES, HE IS.

2    Q    WHAT WERE YOUR COMPANY'S GOALS WITH RESPECT TO

3    THIS TEST, AT LEAST AS YOU KNOW THEM?

4    A    WITH RESPECT TO THE AUGUST 7TH, 2001 TEST?

5    Q    RIGHT.

6    A    TO DETERMINE THE BEST MATERIAL FOR POSEY TO

7    USE IN THEIR HIP PROTECTOR DEVICE.

8    Q    OKAY.  AND HOW DID YOU EXPECT GARWOOD WOULD

9    HELP YOU DETERMINE THAT?

10    A    TO HELP US DETERMINE THE IMPACT CAPABILITY OR

11    IMPACT PROPERTIES OF DIFFERENT MATERIALS THAT WE WERE

12    CONSIDERING USING.

13    Q    OKAY.  CAN YOU TELL ME WHY YOU ALSO TESTED

14    COMPETITOR MATERIALS?

15    A    THAT'S STANDARD PRACTICE IN MARKETING WHEN YOU

16    ARE DEVELOPING A PRODUCT OR MAINTAINING YOUR PRODUCT LINE.

17    IT'S COMMON PRACTICE TO KNOW WHAT COMPETITION IS DOING.

18    Q    OKAY.  COULD YOU LOOK AT EXHIBIT 89 ON

19    PAGE G 000188?  DO YOU SEE WHERE IT SAYS "TABLE 1,

20    SAMPLE"?

21    A    YES.

22    Q    AND IT LISTS A NUMBER OF MATERIALS, I ASSUME

23    SOME OF WHICH ARE BRAND NAMES; IS THAT CORRECT?

24    A    YES.

25    Q    WHICH OF THOSE IN THIS LIST OF "TABLE 1" ARE

**EXHIBIT 13**

1

<pre>
 1                           VOLUME 1

 2                         PAGES 1 - 273

 3                        EXHIBITS 1 - 52

 4             UNITED STATES DISTRICT COURT

 5          FOR THE DISTRICT OF MASSACHUSETTS

 6                         No. CV-05-10917-PBS

 7    - - - - - - - - - - - - - - - - - - - - - - - - -

 8  THE HIPSAVER COMPANY, INC.,

 9                         Plaintiffs

10         vs.

11  J.T. POSEY COMPANY,

12                         Defendants

13    - - - - - - - - - - - - - - - - - - - - - - - - -

14           DEPOSITION OF EDWARD L. GOODWIN

15         Tuesday, October 18, 2005 9:20 a.m

16               Duane Morris, LLP

17       470 Atlantic Avenue, Boston, MA 02110

18

19

20       Reporter:   Janet M. Konarski, RMR, CRR

21                 LegaLink Boston

22       320 Congress Street, Boston, MA 02210

23                  (617)542-0039

24
</pre>

2

```
 1       APPEARANCES:

 2

 3       SHELDON & MAK

 4       (By Douglas H. Morseburg, Esquire)

 5       225 South Lake Avenue

 6       Pasadena, California 91101

 7       (626)796-4000

 8       Counsel for the Defendant

 9

10       BROMBERG & SUNSTEIN LLP

11       (By Edward J. Dailey, Esquire, and

12       Courtney M. Quish, Esquire)

13       125 Summer Street

14       Boston, Massachusetts 02110

15       (617)443-9292

16       Counsel for the Plaintiff

17

18

19

20

21

22

23

24
```

1    was in no means a positive statement of my wanting to

2    do business with Posey, because I really didn't.  But,

3    by the same token, what I realized at this time is that

4    Posey was going to ruin the market for hip protectors

5    and possibly put me out of business, so as a small guy

6    at this time, who was selling $300,000 worth of hip

7    protectors a year, the question is do I jump on the

8    steam roller or get steam rolled over, and Ernie Posey

9    was not smart enough to construct a good contracted

10   business deal, and he went forward with his defective

11   Hipsters for the next four years.

12        Q.    What you're saying is he would have been

13   smarter by entering into a business relationship with

14   you?

15              MR. DAILEY:   Objection.

16        A.    He would have been smarter if he adopted a

17   hip protector that doesn't fall apart in the laundry.

18        Q.    Basically, what you were after is you

19   wanted him to stop selling Hipsters and to let the

20   market, let the HipSaver product be the only product in

21   the market or at least not the only product in the

22   market, but be in the market without competition from

23   the Hipster.  That is what you wanted, right?

24        A.    Right.

1

1   VOL. III, PAGES 1- 136

2   UNITED STATES DISTRICT COURT

3   FOR THE DISTRICT OF MASSACHUSETTS

4   CASE NO. CV-05-10917 PBS

5

6   THE HIPSAVER COMPANY

7   Plaintiff

8   V.

9   J.T. POSEY COMPANY

10   Defendant

11   AND RELATED COUNTERCLAIM

12

13   Confidential - Attorneys' Eyes Only

14   - - - - - - - -

15   Videotaped Deposition of Edward L. Goodwin

16   Friday, March 3, 2006

17   10:00 a.m.

18   Duane Morris

19   470 Atlantic Avenue

20   Boston, Massachusetts

21   - - - - - - - -

22   Reporter:  Deborah Roth, RPR/CSR

23

24

2

1   PRESENT:

2

3   Edward J. Dailey, Esq.

4   Bromberg Sunstein, LLP

5   125 Summer Street

6   Boston, Massachusetts  02110

7   For the Plaintiff

8

9   Douglas H. Morseburg, Esq.

10  Sheldon & Mak, P.C.

11  225 South Lake Avenue, Suite 900

12  Pasadena, California  91001

13  626 796 4000

14  For the Defendant

15

16

17

18  ALSO PRESENT:  Wesley Hicks, Videographer

19

20

21

22

23

24

1      A.   The basis of that statement is that we are

2   comparing the three products which are on this

3   page, which -- HipSaver is a leading brand of hip

4   protectors in this country.  Posey is one of the

5   leading suppliers of the geriatric industry and

6   Alimed is also one of the leading supplies of the

7   rehabilitation industry.

8           So these are the three people that have

9   hip protectors that are in any way on the market,

10   and the Posey hip protector had a maximum

11   instruction of up to 160 degrees, whereas the CDC

12   minimum is 160 degrees.

13           So you could not wash the previous

14   Posey Hipster above 160, and you can't wash the one

15   that's 120 at 160; and Alimed is washed on warm,

16   not hot, which is not consistent with the CDC

17   standard.

18           HipSaver, on the other hand, can be

19   washed at whatever the highest temperature an

20   institutional laundry can have, and it can be dried

21   up to 250 degrees.

22      Q.   Let me ask you this:  Now, you remember

23   yesterday Mr. Morseburg referred to Posey 1, that

24   is, the earlier lawsuit between HipSaver and the