# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE HIPSAVER COMPANY, INC.,      )     Civil Action No. 05-10917 PBS
                         )
         Plaintiff,        )
                         )
     v.                )
                         )
J.T. POSEY COMPANY,       )
                         )
         Defendant.     )
                         )

## APPENDIX OF EXHIBITS IN SUPPORT OF J.T. POSEY COMPANY'S REPLY TO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNT I OF ITS COUNTERCLAIMS

| Exhibit No. | Description |
|---|---|
| 14 | Excerpt from Department of Veterans Affairs' Veterans Health Services and Research Administration Manual dated July 28, 1989 [PC5916-PC5926]. |
| 15 | Excerpts from the Deposition Transcript of Roy J. Epstein, taken November 7, 2006. |
| 16 | Additional Excerpts from the Deposition Transcript of Edward L. Goodwin, taken November 30, 2005. |

Respectfully submitted,

Dated: January 18, 2007

J.T. POSEY COMPANY

By its attorneys,


/s/ Douglas H. Morseburg
Jeffrey G. Sheldon (CA Bar No. 67516)
Douglas H. Morseburg (CA Bar No. 26205)
SHELDON MAK ROSE & ANDERSON PC
225 South Lake Avenue, Suite 900
Pasadena, CA  91001
(626) 796-4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

**EXHIBIT 14**

DEC 08,2006 18:14    From: unknown    Page: 11/21    Date: 12/8/2006 1:34:26 PM

Page 11

Department of Veterans Affairs                           M-1, Part VII
Veterans Health Services and                              Chapter 6
   Research Administration
Washington, DC 20420

*1 3 7*

July 28, 1989

1. Transmitted is a revision to Veterans Health Services and Research Administration Manual M-1, "Operations," Part VII, "Building Management Service," Chapter 6, "Textile Care Facility Operations." Brackets have not been used to indicate the changes.

2. The purpose of this manual revision is to outline current policy relative to state-of-the-art changes in laundry operations and infection control, plus outline specific guidance concerning A-76 initiatives. This manual change includes the proper technique of classifying and handling linen when universal precautions are exercised, plus changing the title of Laundry Plant Manager to Textile Care Manager. This change in title parallels the total responsibilities of the individuals, relative to plant operations, preventive maintenance, and textile control and security.

3. Filing Instructions:

| Remove pages | Insert pages |
|---|---|
| 6-i through 6-3 | 6-i through 6-8 |

4. RESCISSION: M-1, part VII, chapter 6, dated May 24, 1982.

*John A. Grondall, M.D.*
JOHN A. GRONDALL, M.D.
Chief Medical Director

Distribution: RPC: 1092
FD

Printing Date: 7/89

**PC 5916**

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

DEC 08, 2006 18:14        From: unknown      Page: 12/21      Date: 12/8/2006 1:34:26 PM                    Page 12

July 28, 1989

M-1, Part VII
Chapter 6

# CONTENTS

## CHAPTER 6. TEXTILE CARE FACILITY OPERATIONS

| PARAGRAPH | | PAGE |
|---|---|---|
| 6.01 | General | 6-1 |
| 6.02 | Policy | 6-1 |
| 6.03 | Scope of VA Textile Care Services | 6-2 |
| 6.04 | Operational Responsibility | 6-2 |
| 6.05 | Quality Assurance | 6-3 |
| 6.06 | Rates for Reimbursable Textile Care Services | 6-4 |
| 6.07 | Collecting for Reimbursable Services | 6-5 |
| 6.08 | Workload Data | 6-5 |
| 6.09 | Safety | 6-5 |
| 6.10 | Preventive Maintenance | 6-6 |
| 6.11 | Training | 6-6 |
| 6.12 | Field Laundry Advisory Group | 6-7 |
| 6.13 | Basic TCPF Staffing Methods | 6-7 |
| 6.14 | Basic Construction Program Methodology | 6-7 |
| 6.15 | TCPF Systems/Equipment Replacement | 6-8 |

## APPENDIXES

| | | |
|---|---|---|
| 6A | Laundry Consolidation Determination Procedure | 6A-1 |
| 6B | Performance Work Statement Quality Survey Evaluation for Laundry Operations | 6B-1 |

**PC 5917**

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

## CHAPTER 6.  TEXTILE CARE FACILITY OPERATIONS

### 6.01  GENERAL

The Chief, Building Management Service, is responsible for providing laundry, dry cleaning, and carpet care services, which assure bacteriologically clean textiles in ample supply to support patient treatment programs.

### 6.02  POLICY

a.  Aseptically clean textiles and uniforms are an integral part of the medical facility operation.  To ensure an uninterrupted supply of clean textiles, the general policy is to operate TCPF (Textile Care Processing Facilities) in-house or in accordance with VA (Department of Veterans Affairs) regulations, contract for either GOCO (government-owned-commercially-operated), or commercially-owned-commercially-operated, or commercially-owned rental textile laundries in such a manner as to provide this service to all VHS&RA (Veterans Health Services and Research Administration) field facilities.  General policies for TCPF services are:

(1)  Prior to consolidating two or more VA TCPF operations, management will determine if delivery and pick-up of textiles can be accomplished with minimal impact on patient care.  Decisions to consolidate TCPF operations are determined after considering economical and other management advantages as prescribed in Appendix 6A, "Laundry Consolidation Determination Procedure."  Initial recommendations and studies concerning Textile Care consolidations will be managed by Building Management Service, VA Central Office.  The final decision concerning laundry consolidations will be made by the appropriate Regional Director.

(2)  Single TCPF operations designed to serve individual VA medical facilities may be operated where it is not economically and/or geographically advantageous to transport textiles to another VA TCPF for processing.

(3)  Providing all requirements are met, textile care service may be furnished by or to another agency or private medical institution, providing sufficient production capabilities exist and local policies are met.  There will be no diminution of services to veterans.

(4)  Medical facilities involved in a TCPF consolidation or sharing of these services will develop an initial support agreement that delineates pickup and delivery times, identifies common use textile items, establishes budgets for common use textiles, and addresses other appropriate operational matters.  **This agreement will be reviewed annually.**  Copies of these agreements will be provided to the Textile Care Division (137D), Building Management Service, VA Central Office.

(5)  TCPF production equipment, including ancillary support systems, will be designed for a minimum 30-year life cycle.

b.  In the interest of energy savings and producing hygienically clean textiles, all VA medical facilities TCPF's, unless they have a specific exemption from Building

6-1

**PC 5918**

M-1, Part VII                                              July 28, 1989
Chapter 6

Management Service, VA Central Office, will process textiles using low-temperature (*not to exceed 120 degree F*) washing formulas.  The following steps will be followed by each TCPF implementing low controlled temperature washing:

(1)  Temperature sensors and gauges capable of monitoring water temperatures at 90-120 degrees Fahrenheit will be installed at each medical facility TCPF.

(2)  All chemicals, e.g., bleach, detergent, softener, bacteriostat, etc., will be ordered only from approved GSA sources.  All chemicals must emulsify in 90-degree water or lower.

(3)  Each VA medical facility with TCPF operations will prepare low-temperature wash formula as for wash systems.

(4)  Each VA medical facility with TCPF operations will titrate and monitor chemical usage weekly for purposes of conforming with the supplier's instructions.

## 6.03  SCOPE OF VA TEXTILE CARE SERVICES

a.  Textile care services required to support treatment programs will be furnished at VA expense.  This includes the following categories:

(1)  Articles belonging to the VA, such as textiles, issue uniforms, and special purpose and protective clothing worn by employees while performing official duties.

(2)  Wearing apparel and/or special clothing worn by beneficiaries who are receiving care at a VA medical facility.

(3)  Articles used in the operation of the canteen, such as employee uniforms, aprons, barber, and beauty shop textiles.

b.  Textile care services furnished to other agencies will be on a reimbursement basis.  This includes hospital textiles and uniforms issued to employees of another agency while performing duties of caring for VA medical facility patients.

## 6.04  OPERATIONAL RESPONSIBILITY

a.  TCPF's will be integrated organizationally within a textile distribution service, thus creating a textile service system which will permit the flow of textile articles in one continuous cycle, uninterrupted by organizational lines.  Operational responsibility for the textile service system will be delegated to the TCM (Textile Care Manager).

b.  The LPM (Laundry Plant Manager).  This responsibility will include preventive maintenance and transportation directly related to the Textile Care Program.

c.  At medical facilities receiving service from a TCPF, or from a commercial source, responsibility for directing the textile service system resides with the TCM, who will assure coordination between the using services.

d.  Where space permits, operation of the textile service system will be centralized.  For example, locating the textile distribution function in the TCPF and using exchange carts

6-2

**PC 5919**

July 28, 1989

which are delivered directly to the user will eliminate double handling of textiles, permit better supervision, and provide more flexibility in the use of TCPF staff.

e.  Management of textile care operations as well as programs involving TCPF renovations and new construction is the responsibility of the Chief, Textile Care Division (137D), Building Management Service, VA Central Office.

f.  Vehicle operators, as well as mechanics assigned to the TCPF should be directly supervised by the TCM.

g.  Assuring the timeliness and effective application of preventive maintenance procedures as they apply to TCPF systems is the responsibility of the TCM. A preventive maintenance plan will be developed and implemented that covers all aspects of TCPF system requirements.

h.  Depending on complexity, TCPF operations with consolidated activities may be designated a separate administrative service. This decision can be made by the appropriate Regional Director.

**6.05  QUALITY ASSURANCE**

a.  Quality control standards in accordance with appendix B, including textile handling procedures, will be formally established and systematically monitored. The quality of finished textiles shall be checked with sufficient frequency to assure that only aseptically clean linens are delivered to the user. As a minimum, the quality control standards will include:

(1)  For purposes of preventing the probable dissemination of contaminates, clean and soiled areas in the TCPF will be physically separated. Negative air pressure will be present in the soiled area and positive air pressure will be present in the clean area. Soiled textiles must enter the wash cavity of a wash system by impervious technique. Soiled textiles being disbursed from patient care areas are not allowed in the clean textile processing area of a TCPF.

(2)  Closed carts that will allow textiles to be transported to users with minimal handling after TCPF processing.

(3)  Commercial testing of tensile strength loss or whiteness retention. Testing will be used to determine the effectiveness of the cleaning process and to assure maximum useful life of textiles. The required textile processing standard is:

(a)  Tensile strength loss not more than 15 percent.

(b)  Whiteness retention not less than 90 percent.

b.  Quality control checks of finished textiles will be conducted at least semi-annually. When results do not meet the quality standards, the cause will be identified, corrective action will be taken, and follow-up tests will be conducted. A well-equipped washroom test kit will be kept on hand. This kit shall contain hardware and chemicals necessary to perform titrations, measurement of pH, temperature, and water levels.

6~

**PC 5920**

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

M-1, Part VII                                                              July 28, 1989
Chapter 6

c. Unannounced visual inspections of VA-operated and contract TCPF's will be conducted and documented weekly by the TCM or representative. Inspections will include examining the general cleanliness, appearance, and condition of the TCPF and equipment. TCPF processing techniques and safety practices will also be reviewed.

d. At health care facilities using commercial services, the TCM will participate with the contracting officer in conducting the pre-bid/award inspections of the commercial laundry plants and will act as the contracting officers technical representative during the term of the contract. Inspections of the contractor's facilities will be made weekly during the contract year.

e. A thorough and comprehensive PM (preventive maintenance) program will be implemented for all equipment associated with the TCPF operation. PM as well as repairs will be fully documented. TCPF system repair technicians will normally be organizationally assigned to the TCM or a representative of Engineering Service.

## 6.06 RATES FOR REIMBURSABLE TEXTILE CARE SERVICES

a. The reimbursement rate for other agencies, will be based upon the actual processing cost per pound or piece. This interagency reimbursement rate is to include:

(1) General operating cost expenses including labor, materials, supplies, and immediate overhead.

(2) Utilities costs.

(3) Fringe benefits cost of TCPF employees,

(4) Maintenance and repair costs,

(5) Incentive therapy payment costs allocated to TCPF services,

(6) Drycleaning services costs,

(7) Costs associated with transport of textiles when service is obtained from another health care facility (i.e., at consolidated TCPFs).

b. The intra-agency reimbursement rate for other agencies will include the applicable intra-agency reimbursement costs, stated above, plus an administrative overhead cost of 30 percent. This cost includes allocated expenses for building depreciation, equipment depreciation, and general administrative overhead. The VA may provide transportation for textile care services to another agency.

c. Rates for reimbursable services will be reviewed and adjusted annually, and at any other time when significant changes occur that effect these rates.

d. Computations and associated documents used to establish reimbursement rates for TCPF and uniform services will be retained during the period the rate is in effect.

6-4

**PC 5921**

e. Reimbursement rates for sharing of VA Textile Care Services with Department of Defense activities may be negotiated at less than actual cost prescribed. In no case should an estimated rate be below the incremental cost which would result in a subsidy to a sharing partner.

6.07  COLLECTING FOR REIMBURSABLE SERVICES

a.    Applicable interagency billing (SF 1080, Voucher for Transfers Between Appropriations and/or Funds, or 1081, Voucher and Schedule of Withdrawals and Credits) will be prepared for all TCPF services furnished to another agency.

b.  The VA is not financially responsible for loss or damage involving articles of reimbursable TCPF services.

6.08  WORKLOAD DATA

a.  Scales, weight carts and/or counting devices will be used for measuring TCPF workloads.  Actual soiled textiles received will be recorded by each TCPF.

b.  Facilities without mechanisms for weighing soiled textiles, but with a scale in the clean distribution area, may use clean weights plus a locally designated range of between seven and ten percent.  It is preferred that both the clean and soiled textile quantities be determined through the use of scales and/or counting devices.

c.  Accurate workload data, which can be used to measure equipment production and staff utilization will be maintained and established locally.

d.  All utilities serving VA TCPF's will be measured directly at the site of usage.  These measurements will record only those utilities used for the provision of TCPF administrative and production services, i.e., electrical, steam, air, gas, water usage, etc.

6.09  SAFETY

a.  The TCM is responsible for assuring that employees are trained to operate equipment in a safe manner, to use proper aseptic techniques in handling textiles, and to conduct daily inspections of equipment and methods to assure safe operations and practices.

b.  Inspections of the TCPF and systems for safety and fire hazards will be conducted as prescribed by local policy.

c.  All textiles collected from medical care areas will be classified as common universal. All soiled textiles utilized will be transported in bags that prevent leakage.  Textiles soiled with body fluids shall be handled as little as possible and with minimal agitation to prevent cross contamination of the persons handling soiled textiles.

d.  Although soiled textiles have been identified as a reservoir of large numbers of certain pathogenic microorganisms, the risk of actual disease transmission is negligible.  Rather than rigid procedures and specifications, hygienic and common sense storage and processing of clean and soiled textiles is required to preclude cross-contamination.  Soiled textiles will

6-5

PC 5922

M-1, Part VII                                                                July 28, 1989
Chapter 6

be pre-sorted with minimum agitation to prevent gross microbial contamination of the air and of persons handling the textiles. All soiled textiles will be placed into containers that prevent leakage at the location where it was used; it will not be sorted or rinsed in patient-care areas; however, gross contaminants should be contained by the judicious use of disposable wipes, etc. Chemicals suitable for low-temperature washing at proper use concentrations shall be used. All TCPF's will process by washing textiles at water temperatures that do not exceed 120 degrees Fahrenheit. Individuals pre-sorting soiled textiles will be gloved for prevention of sharps and other contaminants, gowned, masked, and be required to wear protective head covering and eye protective devices. Handwashing and shower facilities will be made available to all TCPF personnel.

e. The TCM shall:

(1) Provide employees safe working areas and conditions of employment;

(2) Maintain a written OSH (occupational safety and health) policy and program which contains issues pertaining to the specific hazards of the worksite;

(3) Conduct specialized training sessions to assure employees are adequately educated in specific job hazards and document the training;

(4) Authorize absence for treatment of job related injuries/illnesses sustained by employees;

(5) Investigate job related accidents and hazardous conditions reported by employees. The accident investigation report shall be forwarded to the FSO (Facility Safety Official) within 10 days of the accident;

(6) Assign light duty to employees injured on the job, and coordinate the assignment with the employee health physician, the FSO, and personnel specialist;

(7) Provide the FIH (Facility Industrial Hygienist) or FSO with a list of chemicals purchased.

(8) Implement labeling and posting requirements for toxic substances or harmful physical agents;

(9) Assure MSDS (Material Safety Data Sheets) are accessible to employees for all hazardous chemicals used, unless the FSO has granted an exception; and

(10) Assure that the purchase request for a hazardous chemical contains the words "HAZARDOUS: MSDS required" on the description line of the request. EXCEPTION: If the FSO or FIH grants a waiver for a hazardous chemical, the words "HAZARDOUS: MSDS not required" must be on the description line of the request.

6.10  PREVENTIVE MAINTENANCE

a. Definition. A preventive maintenance program is work performed on equipment without specific pre-knowledge of any defect in the system being serviced.

6-6                                                                **PC 5923**

Case 1:05-cv-10917-PBS    Document 203    Filed 01/18/2007    Page 12 of 28

DEC 08,2006 18:16    From: unknown    Page: 19/21    Date: 12/8/2006 1:34:28 PM

July 28, 1989
Page 19
M-1, Part 1.
Chapter

b.  Scope.  Preventive maintenance includes lubrication, running inspections, and minor adjustments under load conditions.  A preventive maintenance program excludes work performed on required shutdowns such as boiler inspections, ironer pad replacements, folder ribbon replacements, etc.  The preventive maintenance program also excludes breakdown repair, i.e., when equipment shuts itself down due to its inability to perform the intended function.

c.  Uses.  A TCPF preventive maintenance program provides detailed instructions to equipment mechanics on a scheduled basis.  An effective PM program helps discover incipient malfunctions, minimizes the number of equipment breakdowns, and lengthens the useful life of TCPF assets; i.e., buildings, utilities, production equipment, etc.

### 6.11  TRAINING

a.  A training and information program will be established for all TCPF employees.  All episodes of training/continuing education will be documented to reflect those employees in attendance as well as the subjects that were covered.

b.  The following subjects will be covered during orientation training as well as on a periodic basis, not less frequently than biannually:

(1)  Universal precautions and body substance isolation procedures,

(2)  System safety and operator technique,

(3)  Workplace practices which should include room cleaning, TCPF handling, and clean-up of body substance spills.

(4)  Needlestick exposure/management,

(5)  Hepatitis B vaccination.

(6)  Handwashing,

(7)  Precautions in using hazardous chemicals, and

(8)  The availability and use of material safety data sheets.

### 6.12  FLAG (FIELD LAUNDRY ADVISORY GROUP)

The Director, Building Management Service, VA Central Office, will utilize the services of a FLAG (Field Laundry Advisory Group) for purposes of providing operational support to the Textile Care Program, VA Central Office.  A representative TCM or Assistant Chief, Building Management Service, will be appointed by the Director, Building Management Service, for 3-year tours.  The Chief, Textile Care Division, VA Central Office, will be Chairperson of this group and will be responsible for nominating individuals to serve on this group.

### 6.13  BASIC TCPF BUDGET STAFFING METHODS

a.  TCPF may be staffed as follows:

(1)  Textile Care Manager                    1

6

**PC 5924**

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

M-1, Part VII
Chapter 6                                                                                                July 28, 1989

(2) Clerk/typist                                   1

(3) Assistant TCM                                  1
(at laundries processing five million pounds of textiles or more annually)

(4) Foreman (per each 25 employees)                1

(5) Textile/PAP supervisor:  one for the first eight employees

(6) Direct labor = Total annual production divided by 160,000

(a) Textile Care Clerks = Total Annual Production divided by 750,000

(b) Seamstress = One for the first 500 beds; one for each additional 650 beds.

(c) Uniform clerk = One for the first 2,000 employees; one for each additional 1000 employees.

(d) PAP Clerks = Bed capacity divided by 300.

(e) Vehicle Operators and Equipment Mechanics = As required.

b.  Non-recurring textile cost budget method = authorized beds x $75 x 5 (single TCPF); x 7 (consolidated).

c.  Recurring textile costs - non-recurring costs x 33% (est. textile life is 3 years).

6.14  BASIC CONSTRUCTION PROGRAM METHODOLOGY

a.  Lighting - 80 foot candle power

b.  Sprinkler system

c.  2,000 AMP Service

d.  6 inch Concrete Floor - 200 lbs. per square foot capacity

e.  8 inch Open Water System

f.  10 inch Sewer Line/Local Codes apply

g.  150 lbs. per square foot Stress for Roof Support (Direct)

h.  50 lbs. per square foot Stress for Roof Support (Conveyors)

i.  16-18 Foot Clear Ceiling

j.  30-35 foot Grid

k.  Parking

l.  Uninterrupted Gas Service, if applicable

**PC 5925**

m.  $75-95 per gross square foot of construction required and $35-40 for TCPF equipment required per square foot.

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

### 6.15  TCPF SYSTEMS/EQUIPMENT REPLACEMENT

Building Management Service (137D), VA Central Office, manages funding control for the agency relative to textile care production systems and relative operational support for these projects. Prior to funding approval and/or final project approval, OMB Circular A-76, "Expansion" requirements must be met by medical facilities seeking project approval. VA Construction Standard H-08-9. chapter 408, outlines procedures and specific definitions and scope for various types of TCPF projects. All requests for centrally controlled TCPF equipment will be submitted through normal supply channels and will include A-76 verification, proper specifications in accordance with federal, military, or VA specifications and certifications by the Chief, Engineering Service, that utilities and space will be made available to accommodate the request. Request for funding of TCPF equipment or operational support will be submitted to the appropriate Regional Director (10BA__/137D).

**PC 5926**

This fax was received by GFI FAXmaker fax server. For more information, visit: http://www.gfi.com

**EXHIBIT 15**

1

1    Volume:    I

2    Pages:    1 - 96

3    Exhibits: 143 - 153

4    IN THE UNITED STATES DISTRICT COURT

5    FOR THE DISTRICT OF MASSACHUSETTS

6    -------------------------------------x

7    THE HIPSAVER COMPANY, INC.,

8    Plaintiff,    C.V. No. 05-10917 PBS

9    v.

10    J.T. POSEY COMPANY, INC.,

11    Defendant.

12    -------------------------------------x

13    -------------------------------------x

14    J.T. POSEY COMPANY, INC.,

15    Plaintiff,

16    v.

17    THE HIPSAVER COMPANY, INC.,

18    Defendant.

19    -------------------------------------x

20    VIDEOTAPED DEPOSITION of ROY J. EPSTEIN,

21    Ph.D., a witness called for examination by the

22    Defendant/Counter claimant, taken pursuant to

23    Rule 30 of the Massachusetts Rules of Civil

24    Procedure, before Laurie K. Langer, Registered

2

1    Professional Reporter and Notary Public in and

2    for the Commonwealth of Massachusetts, at the

3    offices of Duane Morris, 470 Atlantic Avenue,

4    Boston, Massachusetts, on Tuesday, November 7,

5    2006, commencing at 9:34 a.m.

6

7    APPEARANCES

8

9        BROMBERG & SUNSTEIN LLP

10       By Courtney M. Quish, Esq.

11       Edward J. Dailey, Esq.

12       125 Summer Street

13       Boston, Massachusetts 02110

14       (617) 443-9292

15       For the Plaintiff

16

17       SHELDON & MAK

18       By Douglas H. Morseburg, Esq.

19       225 South Lake Avenue, 9th Floor

20       Pasadena, California 91101

21       (626) 796-4000

22              and

23       HOFFMAN ALVARY & COMPANY LLC

24       By Joel Wacek, Esq.

3

1          Seven Wells Avenue

2          Newton, Massachusetts 02459

3          (617) 209-5117

4          For the Defendant

5

6          ALSO PRESENT

7          Paul Bosch, Videographer

8

9                        INDEX

10     ATTORNEY          EXAMINATION  CROSS     REDIRECT

11     Mr. Morseburg              5

12     EXHIBIT                                PAGE

13     143  Expert Report of Roy J. Epstein, Ph.D,

14     9/25/06                                41

15     144  Rule 26(a) Report Regarding Damages

16     Prepared by Creighton Hoffman and Philip

17     Green                                  56

18     145  Supplemental Report of Roy J.

19     Epstein, Ph.D, 10/31/06                71

20     146  Defendant J.T. Posey Company's

21     Amended Notice of Deposition of

22     Roy J. Epstein                         77

23     147  10/20/06 E-mail                   80

24     148  Document COR 000023 to COR 000024  82

75

1       remaining SG&A expenses have any relation to

2       Hipster sales.

3  Q.  Have you reviewed any financial information

4      produced by HipSaver since your initial report?

5  A.  No.

6  Q.  You understand I've switched gears on you now, I

7      didn't do it intentionally without warning you,

8      I'm talking about HipSaver now as opposed to

9      Posey?

10  A.  Yes, I heard you.

11  Q.  I just wanted to be sure.

12  A.  Yeah.  Thank you.

13  Q.  What information would you need -- let me

14      withdraw that.

15         In your initial report you said that you

16      can't determine whether HipSaver suffered any

17      lost profits because you didn't have sufficient

18      information; is that your opinion?

19  A.  I don't know if I said those exact words, but

20      that I didn't, I don't think there was enough

21      data, that's right.

22  Q.  What additional information would you need in

23      order to determine whether HipSaver suffered any

24      lost profits?

76

1    A.    Well, I don't know that I could give a list of

2          information that would be sufficient.  A

3          determination of lost profits requires, in my

4          mind, a comparison between an actual world and a

5          but for world; where there's profits in the

6          actual world and profits in the but for world.

7          And the difference in profits would be a measure

8          of lost profits.  In this instance, one of the

9          liability theories, as I understand it, is that

10         Posey would be liable for certain conduct

11         commencing in 2001, and under that theory the

12         entire period for which we have data would be

13         tainted by the conduct, so there wouldn't be any

14         data in a purely untainted period.  So to come

15         up with a benchmark for lost sales I think would

16         be a difficult problem.  As I indicated in my

17         report one possible way, although there is

18         certainly no guarantee that it would be useful,

19         is to basically interview potential customers

20         and try to assess the reasons for their

21         purchasing decisions or lack of purchasing

22         decisions, but in this case I gather that type

23         of information was never gathered and I think it

24         would be, it's in my experience difficult to

77

```
 1            frame those inquiries so that the responses are

 2            reliable also, but that is at least one possible

 3            avenue.  So it's....

 4      Q.    Is it fair to say that you're not aware of any

 5            information that HipSaver has in its possession

 6            at present which would permit you to conclude

 7            whether they had lost profits or not?

 8      A.    Yeah, I'm not prepared to offer an opinion on

 9            lost profits at all, because I think it wasn't

10            really proper, it wasn't really possible to do a

11            proper study, so I just can't go there.

12      Q.    Okay.  Let's mark as Exhibit 146 a multi-page

13            document purporting to be an Amended Notice of

14            Deposition.  Well, it is an Amended Notice of

15            Deposition.  It's not purporting to be one.

16               (Deposition Exhibit 146 marked for

17            identification.)

18      Q.    Have you had a chance to look at the document

19            that's been marked as Exhibit 146?

20      A.    Yes.

21      Q.    Have you seen it before?

22      A.    Yes, I have.

23      Q.    When you -- did you see it sometime around

24            October 20th?
```

**EXHIBIT 16**

1

1        VOLUME 1

2        PAGES 1 - 146

3       EXHIBITS:  55 - 63

4    UNITED STATES DISTRICT COURT

5   FOR THE DISTRICT OF MASSACHUSETTS

6       No. CV-05-10917-PBS

7 - - - - - - - - - - - - - - - - - - - - - - -

8 THE HIPSAVER COMPANY, INC.,

9       Plaintiffs

10   vs.

11 J.T. POSEY COMPANY,

12       Defendant

13 - - - - - - - - - - - - - - - - - - - - - - -

14 AND RELATED COUNTERCLAIM.

15 - - - - - - - - - - - - - - - - - - - - - - -

16  VIDEOTAPED DEPOSITION OF EDWARD L. GOODWIN

17  Wednesday, November 30, 2005 12:30 p.m

18    Duane Morris, LLP

19  470 Atlantic Avenue, Boston, MA 02110

20

21  Reporter:  Janet M. Konarski, RMR, CRR

22    LegaLink Boston

23  320 Congress Street, Boston, MA 02210

24    (617)542-0039

2

1    APPEARANCES:

2

3    BROMBERG & SUNSTEIN LLP

4    (By Edward J. Dailey, Esquire)

5    125 Summer Street

6    Boston, Massachusetts 02110

7    (617)443-9292

8    Counsel for the Plaintiff

9

10   SHELDON & MAK

11   (By Jeffrey G. Sheldon, Esquire)

12   225 South Lake Avenue

13   Pasadena, California 91101

14   (626)796-4000

15   Counsel for the Defendant

16

17   ALSO PRESENT:

18   Ernest Posey, Jr.

19   Jason LaChapelle, Videographer

20

21

22

23

24

135

1    nursing home chains, and that's how, whatever he has in

2    market share, first of all, he stole from HipSaver, and

3    I used the Garwood test as the ammunition to get in, to

4    say that he was better than HipSaver, to say that he

5    had validation like HipSaver had.

6           Q.    Can you identify any Posey customer that

7    purchased because of the Garwood ad?

8           A.    Just about every one of them.

9           Q.    How do you know that?

10          A.    Well, as I said before, if you're looking

11   for a legal standard of proof, you should ask your

12   client why he spent so much money developing and

13   advertising the Garwood ad, because it's just a

14   commonsense thing.  People advertise to get revenue.

15          Q.    Has anyone ever said to you that they

16   purchased a Posey product because of the Garwood ad?

17               MR. DAILEY:  Objection.

18          A.    No.

19          Q.    Prior to the first settlement, did you

20   ever object to Posey about the Garwood ad?

21               MR. DAILEY:  Objection.

22          A.    I wrote a letter to Tony Vella of your

23   firm explaining to him that I thought he was doing a

24   disservice to hip protectors and to the customers by

137

1    available, I availed myself to get the test.  Posey, on

2    the other hand, starts up his own hip protector test,

3    tests everybody on the marketplace and trashes them all

4    and copies my product and then uses that test to go

5    around as a door opener to every hospital and nursing

6    home in this country.

7              MR. SHELDON:  I don't think that was

8    responsive, so I request to strike.

9         Q.   Can you --

10              MR. DAILEY:  Again, I object, Mr. Sheldon.

11         Q.   Can you identify a customer that was

12    stolen from HipSaver because of the use of the Garwood

13    ad?

14         A.   I can't name a particular customer.

15         Q.   Are you aware of any Posey customers that

16    prior to purchasing hip protectors from Posey had not

17    purchased hip protectors from anyone?

18         A.   Yes.

19         Q.   So, those customers weren't stolen from

20    HipSaver, were they?

21              MR. DAILEY:  Objection.

22         A.   Yes.  They were stolen as an opportunity.

23    If they had turned off on the concept of hip protection

24    because of his defective device, and I can't convince

138

1    them that they ought to take a look at another hip

2    protector, whereas previously obviously they were

3    interested in hip protection, because they bought his

4    device that fell apart in the laundry, now they said we

5    don't want anything to do with it.

6         Q.    Can you identify any such customer that

7    purchased from Posey because of the Garwood ad, who

8    refuses to purchase from any hip protectors?

9              MR. DAILEY:  Objection.

10        A.    Who refuses to purchase from what?

11        Q.    Purchase any hip protectors from anyone?

12        A.    I don't understand the question.

13        Q.    Let me rephrase it for you.  Are you aware

14   of any ex-customer of Posey, "ex" meaning they no

15   longer purchase from Posey, that refuses to purchase

16   hip protectors from anyone?

17        A.    That is what I just said.  Yes.  There is

18   a lot of them.

19        Q.    Can you identify them?  Who?

20        A.    We have some notes on them.

21        Q.    Do you know their names?

22        A.    I don't know them off the top of my head,

23   but I have them on a list.

24             MR. DAILEY:  We responded to that in

## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.

/s/ Donald K. Piper_____

January 18, 2007                    Donald K. Piper

3