# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                )
THE HIPSAVER COMPANY, INC.,                      )
                                                )
        Plaintiff / Counterclaim Defendant,    )
                                                )
v                                                )          Civil Action No. 05-10917 PBS
                                                )
J.T. POSEY COMPANY,                              )
                                                )
        Defendant / Counterclaim Plaintiff.   )
                                                )
_____)


## JOINT PRETRIAL MEMORANDUM


Lee Carl Bromberg, BBO No.:  058480
Edward J. Dailey, BBO No.:  112220
Courtney M. Quish, BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004  Fax

Jeffrey G. Sheldon (CA Bar No. 67516)
Douglas H. Morseburg (CA Bar No. 126205)
SHELDON MAK ROSE & ANDERSON PC
225 South Lake Avenue, Suite 900
Pasadena, CA 91001
(626) 796-4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200


*Attorneys for Plaintiff,*
*The HipSaver Company.*

*Attorneys for the Defendant,*
*J.T. Posey Company.*


Dated: May 1, 2007

# TABLE OF CONTENTS

1.      **CONCISE SUMMARY OF THE EVIDENCE**....................................................1

A.      **Summary Of Evidence To Be Offered By HipSaver** ..........................................1

    1.      **HipSaver's Claims of False Advertising; Unfair Competition under M.G. Ch. 93A; and Breach of Contract**......................................1

        a.      *General Background*.......................................................................1

        b.      *HipSaver's claim for false advertising under the Lanham Act and unfair competition under Chapter 93A*............................6

        c.      *HipSaver's claim for breach of settlement agreement* ................10

    2.      **Evidence relevant to Posey's Counterclaims for false advertising in violation of the Lanham Act and unfair competition under Ch. 93A, violation of Massachusetts common law for unfair competition; and, willful breach of the 2004 settlement agreement**..................................................................11

        a.      *Posey's Counterclaims for false advertising in violation of the Lanham Act and unfair competition under Ch. 93A and for violation of Massachusetts common law for unfair competition* ..................................................................................11

            1.      *HipSaver's Launderability Advertising Claims*................11

            2.      *HipSaver's Validation and Testing Advertising Claims*............................................................................13

                a.      *The JAMDA Report* ..............................................13

                b.      *The Gross Study*....................................................13

                c.      *The Tampere Test* ..................................................14

                d.      *The Harvard Study*.................................................14

            3.      *Breach of the 2004 Settlement Agreement*........................14

B.      **Summary Of Evidence To Be Offered By Posey**.............................................15

1.    **Posey's Counterclaims for False Advertising, Unfair Competition under Mass. G.L. Ch. 93A and Breach of Contract** .......................................................................... 15

    a.    **HipSaver's "Laundry" Page** ........................................ 15

    b.    **HipSaver's "Validation & Testing" Page** ................. 17

        (i)  **The Compliance Study Reported in JAMDA** .................. 18

        (ii)   **The Gross Study Reported in Advance for Physical Therapists** ....................................... 19

        (iii)  **The Alleged Testing At Harvard in 1996** ......... 19

        (iv)  **The Tampere University Testing in 2000** ......... 19

2.    **Posey's Counterclaim for Breach of Contract** ..................... 20

3.    **HipSaver's Claims and Posey's Defenses to HipSaver's Claims** ........ 21

2.    **THE FACTS ESTABLISHED BY PLEADINGS OR BY STIPULATIONS OR ADMISSIONS OF COUNSEL** ................................. 23

3.    CONTESTED ISSUES OF FACT ....................................................... 32

A.    **HipSaver's Statement Of Contested Issues Of Fact** ....................... 32

B.    **Posey's Statement Of Contested Issues Of Fact** ............................. 35

4.    **JURISDICTIONAL QUESTIONS** .................................................. 38

5.    **QUESTIONS RAISED BY PENDING MOTIONS** ......................... 38

6.    **ISSUES OF LAW** ............................................................................ 39

A.    **HipSaver's Statement Of Issues Of Law** ...................................... 40

    A.1.    **HipSaver Will Prevail on Its Complaint** ......................... 40

    1.    **HipSaver Will Prevail On Its Lanham Act Claim For False Advertising (Count II)** ...................................... 40

        a.    *Posey Made a False or Misleading Description of Fact in Thousands of Commercial Advertisements about its Products and/or HipSaver's Products* .............. 40

iii

        *i.     Posey's advertising claim showing Posey Hipster's performance in a test "simulating a fall causing direct impact to the greater trochanter" is literally false because the Garwood Test did not simulate a fall.* .................41

        *ii.    Posey's advertising claims that the Posey Hipster uses the "most effective impact absorbing material" and performs "best" are literally false because the Garwood Test shows that Posey Hipsters performed worse than HipSaver in the ASTM impact test* ...............42

        *iii.   Posey's advertising claim that Posey Hipsters are "proven effective in laboratory tests" and have "excellent impact absorption" cannot be supported by the Garwood Test and therefore, is literally false* .................42

        *iv.   Posey's advertising claim that "Posey Hipsters Help Protect Against Injury From a Fall" cannot be supported by the Garwood Test and therefore, is literally false* .....................43

        *v.    Posey's Advertisement is literally false in its entirety because the overall impression of the Garwood Advertisement strongly suggests, falsely, that the Garwood Test results prove that Posey Hipsters help protect against hip fractures from falls* ...............43

    *b.    Posey's Statement Actually Deceives or Has the Tendency to Deceive a Substantial Segment of its Audience* ....................44

    *c.    Posey's False Advertising Claims are Material* ...............44

    *d.    Posey Placed the Statement into Interstate Commerce* ....................45

    *e.    HipSaver Has Been or is Likely to be Injured as a Result of Posey's False Advertising Statements* ...............45

**2.    HipSaver Will Prevail On Its Claims For Violations of G.L Ch. 93A §§2, 11 (Count III)** ...............45

3.      **HipSaver Will Prevail On Its Breach of Contract Claim for Breach of the Settlement Agreement (Count I)** ................46

       a.      *The Settlement Agreement Between the Parties is Valid and Binding* ............................................................46

       b.      *HipSaver Complied with the Contract and Performed all Obligations under the Contract*................47

       c.      *Posey Breached the Notice Provision of the Settlement Agreement*......................................................48

       d.      *Posey's Breach of the Settlement Agreement Caused Damage to HipSaver*........................................49

**A.2.   Posey's Counterclaims are Procedurally Barred and Without Merit, and Posey's Counterclaims Must Fail.** ......................................50

     **1.      Posey's False Advertising Counterclaim is Precluded by Res Judicata or Claim Preclusion** ............................................50

     **2.      Posey's Counterclaims are Without Merit**..............................52

       a.      *Posey Cannot Show That It is Reasonably Likely to Suffer Injury As a Result of HipSaver's Claims*................52

       b.      *HipSaver's Website Claims Are Not Literally False (Counterclaims I and II)*....................................................53

           i.       *The CDC guidelines claims on HipSaver's Laundry webpage are not literally false and Posey will not prevail on its claims for false advertising under the Lanham Act and Ch. 93A* ...................................................................53

           ii.      *The laundry claims on HipSaver's Laundry webpage are not literally false* ............................55

           iii.     *The advertising claims on HipSaver's Validation and Testing webpage are not literally false*......................................................57

     a.      JAMDA Report ........................................................57

     b.      Gross Study ..............................................................58

       c.       Tampere Test.................................................................58

       d.       Harvard Study.............................................................59

              *c.*      *HipSaver Will Prevail On Posey's Common Law
                   Unfair Competition Claim (Counterclaim III)* ...............60*

              *d.*      *HipSaver Will Prevail On Posey's Breach of
                   Contract Claim for Breach of the Settlement
                   Agreement (Counterclaim IV)*..........................................61*

              *e.*      *Mr. Goodwin is Not Individually Liable On Posey's
                   Counterclaim* .................................................................62*

**B.**      **Posey's Statement Of Issues Of Law** ...................................63

**7.**      **ANY REQUESTED AMENDMENTS TO THE PLEADINGS** .....................68

**8.**      **ANY ADDITIONAL MATTERS TO AID IN THE DISPOSITION
       OF THE ACTION** ...........................................................68

**9.**      **THE PROBABLE LENGTH OF THE TRIAL** ...............................69

**10.**     **THE PROPOSED WITNESSES** .......................................69

**11.**     **THE PROPOSED EXHIBITS**..........................................69

**12.**     **THE PARTIES' RESPECTIVE POSITIONS ON ANY REMAINING
       OBJECTIONS TO THE EVIDENCE**.................................69

# JOINT PRETRIAL MEMORANDUM

The parties, The HipSaver Company ("HipSaver") and J.T. Posey Company ("Posey") hereby submit this Joint Pretrial Memorandum pursuant to Local Rule 16.5(D).

## 1.    CONCISE SUMMARY OF THE EVIDENCE

The parties intend to present the following evidence at trial:

### A.    Summary Of Evidence To Be Offered By HipSaver

#### 1.    HipSaver's Claims of False Advertising; Unfair Competition under M.G. Ch. 93A; and Breach of Contract

*a.    General Background*

This lawsuit follows a failed settlement of the HipSaver Company's 2004 false advertising litigation with the J.T. Posey Company.  Once for all, this lawsuit seeks relief which effectively bar what has been a concerted campaign of literally false advertising, unfair competition, and deceptive practice since early 2001.  HipSaver seeks disgorgement of Posey's profits, attorney fees and costs, and corrective advertising.

HipSaver, a Canton, Massachusetts based company with fewer than ten employees and annual revenues of about $1.5 million, manufactures and sells an innovative soft hip protector garment.  HipSaver's technology was designed and developed by the company's founder and president, Edward L. Goodwin who has also designed and developed the company's fabrication machinery and processes.  HipSavers are used in nursing homes, rehabilitation hospitals, and private residences to protect against hip fractures resulting from falls.

Beginning in the mid 1990's, HipSaver invented, designed, manufactured and marketed a soft hip protection garment which incorporates an encapsulated foam pad.  Through repeated testing of both raw materials and finished products, HipSaver has developed a unique, durable

product that attenuates force from a fall. The product is comprised of a 12.7 millimeter foam which is encapsulated in a sealed pouch. The foam is cut into an oval shape, cut to a size that will accurately cover the hip bone, and beveled at the edges to assure comfort. The encapsulated pads are sewn into a variety of garments, including spandex or cotton shorts and sweatpants so that the hip protectors are easily and comfortably worn. The hip protector garments are designed to withstand common institutional laundering at temperatures above 180ºF.

Throughout this development process, HipSaver's product has been tested internally as well as by third party laboratories and in field studies. In 1996, a study conducted by Harvard University measured the ability of HipSaver's first generation hip protectors to reduce the force of a fall by simulating a dynamic fall impacting the hip. HipSaver continued to test the product as it was further developed and tuned. In 2000, the Elder Service Plan of the East Boston Neighborhood Health Center conducted a study to determine the effectiveness of hip protectors in preventing hip fractures ("Elder Service Plan Study"). This Elder Service Plan Study reported zero fractures after 199 falls by participants wearing HipSavers. In 2000, the biomechanical properties of HipSaver pads were tested in a laboratory at Tampere University in Finland ("Tampere Test"). The Tampere Test used a mechanical hip to measure the ability of the leading hip protectors to reduce the force of a fall. The Tampere Test was conducted on HipSaver pads with the same foam used today in HipSavers and found that the pads reduced the impact force of a fall below the fracture threshold.

Of course, HipSaver garments can only protect against hip injury from falls when the garments are worn. Accordingly, HipSaver has also participated in a compliance study conducted by an independent third party researcher from the Fallon Clinic in Worcester. In 2003, the results of that thirteen-month-long compliance study were published in the Journal of

2

the American Medical Directors Association ("JAMDA Study").  All participants in this compliance study wore HipSavers.  The JAMDA study reported a 93-95% compliance rate among participants in the study.  The JAMDA study also reported a zero fracture rate after 126 falls by participants wearing HipSavers.

HipSaver has developed its product to be effective and comfortable for the user but also to be durable.  HipSaver's product has been designed and developed to withstand hot water institutional laundering.  The institutional laundering guidelines established by the Centers for Disease Control ("CDC Guidelines") recommend high temperature laundering of at least 160ºF.  The CDC Guidelines also allow for an alternative low temperature wash standard that relies on careful monitoring and control of the washing cycle and wash formula, and high levels of bleach.  However, use of the CDC Guideline's low temperature/high bleach recommendation is limited by its complexity.

J.T. Posey Company is a California based business which distributes over 600 healthcare/safety products for patient restraint, fall safety, wound prevention, and wheelchair seating, among others.  Posey has annual revenues in excess of $40 million and is the dominant nationwide distributor of patient safety and support equipment devices.  In 2000, Posey designed and sold its first hip protector product which consisted of a hard foam pad, much like football or hockey equipment.  In late 2001, Posey released a completely new hip protector garment, the Hipster which copies HipSaver's physical form and shape.  In fact, the Posey garment appears almost identical to HipSaver.

While the Posey Hipster garment looks like a HipSaver garment, the garment differs and is inferior in a number of key attributes:  The Posey product employs a different foam pad; the pad is generally of a smaller size; the pad was positioned differently in the garment and not

3

confirmed to cover the trochanter; the technology used to encapsulate the pad is different; the encapsulating material is different; the garment material itself is different; and the sewing of the pad into the product is different. These differences go to key characteristics of the product and directly impact effectiveness and durability/launderability.

In fact, Posey's product is inferior. Posey learned within a few months of introducing its new Hipster that the product failed, disintegrated, and broke apart at an alarming rate in the laundry. For example, one meeting memorandum from April 2002 states that, "we may loose [*sic*] large institutions if we do not find a solution [to the breaking pads caused by high heat]." After evaluation, the U.S. Veteran's Health Administration identified the same laundering problems with Posey's Hipster and published a warning in its 2004 Falls Toolkit that "Posey™ hip protectors should not be washed in the hospital laundry. They degrade more quickly and pads may crack or dissolve. Bleach appears to accelerate this degrading process." Posey Hipsters simply couldn't withstand high temperature washing employed by institutions. And, since bleach "accelerated" the degrading process, the low temperature solution is not a viable alternative.

Posey has never advised customers or users of its seriously flawed product. With an inferior product, Posey capitalized on its marketing power to compete with HipSaver.

This dispute is the result of Posey's abuse of its marketing power and a long history of unfair competition through literally false advertising. This dispute is also the result of a failed settlement which was intended to resolve these issues and put an end to Posey's false advertising in 2004. In the 2004 litigation, HipSaver challenged Posey's deceptive advertising tactics in an action before this court, Docket Number 04-11294-PBS ("2004 Litigation"). Then, HipSaver challenged Posey's false advertising claims for its Hipster product which were keyed to a paper

written by a graduate student at UCLA, referred to as the "UCLA White Paper." Posey included statements derived from the UCLA White Paper and bar charts touting the relative effectiveness of Posey's Hipsters in its catalogs and newsletters. In fact, UCLA did not sponsor, authorize, or endorse the tests or the results reported in the White paper and demanded withdrawal of all Posey advertising references to UCLA.

HipSaver retained Wilson C. Hayes, PhD, a recognized biomechanical engineering expert, to review the UCLA White Paper, the graduate student's thesis on which it was based, and Posey's advertising. Dr. Hayes determined that the research was not reliable and could not sustain any of the claims in the White Paper or the advertising.

The parties attempted to resolve the issues by settlement. As a condition to settlement, Posey and HipSaver executed a settlement agreement. Posey agreed to pay HipSaver $360,000 to cover attorney fees, costs, and expenses, agreed to retract its false advertising, and agreed to distribute the following corrective advertising statement:

**Special Announcement:**

**HipSaver® and Posey Hipster® brand Hip Protectors**

In the fall of 2003, Posey began distributing an article (also known as the "White Paper") entitled "A Solution to Hip Fractures Using Performance Tested Hip Protectors." In its catalogs and newsletters, Posey included statements derived from the White Paper and bar charts comparing the relative effectiveness of Posey's Hipsters. The White Paper was written by a UCLA graduate student working on his Master's Thesis. UCLA did not sponsor, authorize, or endorse the tests or the results reported in the White paper or the Master's Thesis.

The HipSaver Company, Inc. challenged the accuracy of the White Paper and the statements and bar charts in Posey's catalogs and newsletters. HipSaver's claims included: (a) a flawed testing methodology used by the graduate student; (b) testing of some products which were no longer offered in the marketplace; and (c) test conclusions which were subject to unreliable or false interpretation.

The HipSaver Company retained Wilson C. Hayes, PhD, a recognized biomechanical engineering expert, to review the White Paper, the graduate student's thesis, and Posey's advertising. Dr. Hayes determined that the research is not reliable and cannot sustain any of the claims in the White Paper and our advertising with reasonable certainty.

5

> Posey values its hard-earned reputation and does not advocate the use of any material that may be inaccurate or out of date, and expressly regrets comparisons with HipSaver products and confusion this may have caused in the marketplace.
>
> Posey has eliminated the bar charts and all statements based on the White Paper from its catalogs.
>
> If by chance you have a copy of the White Paper or any advertising material referring to testing at UCLA, please do not use it or to rely on any statements in it.
>
> If you have any questions about anything in this announcement, please contact Posey at [telephone number]

While the settlement resolved the dispute over Posey's so-called "UCLA White Paper" advertisements, it failed to discourage Posey from its general marketplace strategy of competing with HipSaver through a false and deceptive advertising market strategy. So, shortly after the 2004 settlement, Posey revived an earlier false advertising campaign, referred to here as the "Garwood Ads" campaign.

b.     *HipSaver's claim for false advertising under the Lanham Act and unfair competition under Chapter 93A*

Posey distributed the Garwood Ads nationwide from the fall of 2004 through late summer of 2005 when they were halted in the face of this lawsuit. The Garwood Ads were distributed through catalogs, flyers, brochures, video and e-mail. In various forms of the Garwood Ads, Posey makes the following claims:

- "A test was created that would simulate a fall causing direct impact to the greater trochanter."
- "An independent laboratory study was conducted to determine the most effective impact absorbing material."
- "In an independent laboratory test designed to simulate a fall causing direct impact to the greater trochanter, the Posey Hipster III reduced the impact force by 90%, the best results of any hip protector available." [Emphasis added.]
- "Posey Hipsters Proven Effective in Laboratory Tests"
- "Posey Hipsters Help Protect Against Injury from Falls"

- "Posey Hipster … showed excellent impact energy absorption."

Using its marketplace power, Posey repeated these claims thousands upon thousands of times, blanketing the health care institutions, health care chains, and regional and national health care products distributors to misrepresent and mask its flawed product and to drive HipSaver from much of the marketplace.

The statements in the Garwood ads make literally false claims about and fundamentally misrepresent the Garwood testing and results. In fact, every claim Posey made is literally false and egregiously misrepresents the capacity of a product intended to safeguard patients at risk. Posey never tested the Posey product in a fall simulation; therefore, Posey cannot have made any claims regarding the Posey Hipster's ability to reduce the impact force during a fall. Indeed, Posey's own expert agrees that the Garwood Laboratory tests did not simulate a fall and failed completely to account for the biomechanical properties of the hip bone. Consequently, the Garwood tests are not capable of showing that the materials used in Posey Hipsters reduce the force below the fracture threshold. In addition, the Garwood test cannot be used as a proxy for a fall.

Furthermore, because the Garwood test did not test the Hipster garment, the Garwood test could not test the effectiveness of the hip protector garment, taking into account the size of the pad and the positioning of the pad in the garment. Indeed, Posey never confirmed that it has even positioned the pads in the garment to fit properly over the trochanter. Therefore, the Garwood test results could not prove any effectiveness of the garment itself.

Even if the Garwood tests had been designed and then advertised only as materials tests intended to rank and select from among several different candidate materials for padding in a hip protector device, the tests are not reliable or valid because the test protocol for testing raw

materials, known as the ASTM F355-95 standard, was not followed and did not, in any event, have the capacity to rank order materials for hip protector use.

And even if the Garwood tests were valid and reliable materials tests (they are not), the test results show that materials used in Posey Hipsters neither performed best nor proved most effective. The results of the tests show that the EAR ½" foam commonly used by Posey placed third in ability to shunt force and reduce impact. EAR ¾" Blue foam and the material used in SlimSaver (a HipSaver model) placed first and second respectively.

In addition to its false Garwood testing claims, Posey also makes repeated false claims about the launderability of the Hipster product. As part of the Garwood Ads Posey provides laundering instructions for Hipster products. For years, Posey advertised that its Hipster products can be washed in high temperature laundries at 160ºF. From Posey's internal documents and customer returns, however, it is clear that Posey knew early in 2002 that its Hipsters failed at high temperatures. Yet, Posey continued to market these flawed and defective products as able to withstand these temperatures. Customers were not notified of the defect; nor were they notified when, years after the fact, Posey simply changed its laundry instructions and reduced the wash temperature to 120ºF.

Beyond this, Posey also routinely advertised that its Hipster product "fits precisely over" the hip, a claim it never verified. This claim was routinely included in its Garwood ads, along with the false test and false launderability claims. In sum, every material claim made for the Hipster product was false or completely unverified.

Posey's false and unsupported claims were not insignificant misrepresentations made by a bit player; they are false claims, repeatedly made nationwide, by a 70-year-old company which is one of the largest and best known health care products distributors in the United States. These

misrepresentations of effectiveness and launderability distributed by the country's leading health care product manufacturer had a devastating effect on HipSaver's business. Where HipSaver's superior quality may have created opportunities for HipSaver to sell to health care institutions and distributors and where accurate information about testing, launderability, durability, and effectiveness would certainly have created opportunity for HipSaver, Posey's false claims of superior quality, effectiveness, and equivalent launderability quashed these opportunities. Nursing homes and rehabilitation centers purchased a hip protector product from its already existing supplier of other health care supplies (Posey) because customers believed the product was at least adequate. HipSaver was simply rejected and frozen out of the large institutional marketplace. By the end of 2005, HipSaver was unable to gain sales or distribution through any private sector distributor or health care facility chain in the United States, including but not limited to Alimed, Kindred Health Systems, McKesson, Cardinal Health, Medline, and Gulf South. Alimed, one the largest health care distributors in the United States, is based in Massachusetts, and Kindred Health Systems, McKesson, Cardinal Health, Medline, and Gulf South have distribution centers in Massachusetts. In most cases, HipSaver has been brushed aside with the suggestion that there is no difference between the Posey and HipSaver products.

Contrast this adverse impact to HipSaver experience with the Veterans Health Administration, the one institutional customer which is largely immune to advertising claims. The Veteran's Health Administration has conducted internal clinical studies of hip protector products for the past five years and informs VHA facilities of the results. So, for example, after the VHA's National Center for Patient Safety conducted independent launderability studies, it published a notice against use of Posey's product in institutional laundries. And because the VHA makes purchasing decisions on the basis of its internal evaluations rather than advertising,

HipSaver has been able to maintain its business with the VHA. In fact, HipSaver's institutional business has survived largely on the basis of sales to the VHA, which account for more than 40% of all HipSaver sales.

After Posey revived the Garwood advertising in the fall of 2004, its monthly sales increased an average of 8.8% while HipSaver's sales increased only 4.2%. In fact, coincident with Posey's false advertising, HipSaver's rate of growth in the private healthcare market declined annually through 2005. Posey's false advertising diverted opportunities and sales from HipSaver. So, as a result of Posey's false advertising campaign, HipSaver's growth slowed to a standstill while Posey, even with its flawed product, continued to grow its Hipster business.

c.     *HipSaver's claim for breach of settlement agreement*

In an effort to avoid further advertising disputes, paragraph 8 in the 2004 settlement agreement provided for 30 days advance notice "of the results and analysis" in the event of commercial advertising using the results of comparative testing. When, shortly after the settlement, Posey launched its revived Garwood Ads, no notice was given. Moreover, Posey presented the Garwood tests as if they were current, having removed all date references to completion of the tests in 2001.

Had Posey complied with the notice provision in the settlement agreement prior to reviving the Garwood Ads in the fall of 2004, this lawsuit would, in all likelihood, have been avoided. Posey's failure to give notice is a material breach of the settlement agreement.

>    **2.    Evidence relevant to Posey's Counterclaims for false advertising in violation of the Lanham Act and unfair competition under Ch. 93A, violation of Massachusetts common law for unfair competition; and, willful breach of the 2004 settlement agreement**

In response to HipSaver's 2005 Complaint, Posey counterclaimed with a breach of contract claim related to the settlement agreement and a false advertising challenge to Hipsaver's website– even though no changes has been made to any substantive information or any claims in the website since at least 2003.  In connection with is counterclaims under the Lanham Act, common law unfair competition, and G.L. Ch.93A, Posey acknowledges it has no damages.  Posey only claims that it will likely suffer future injury.  As such, Posey is not entitled to trial by jury on these claims.

Posey also offers a threadbare breach of contract claim related to the settlement agreement for which it seeks damages equal to its settlement payment in 2004.

a.    *Posey's Counterclaims for false advertising in violation of the Lanham Act and unfair competition under Ch. 93A and for violation of Massachusetts common law for unfair competition*

In its counterclaim, Posey challenges statements on HipSaver's web-site regarding the effectiveness and launderability of the HipSaver product.  This challenge is an almost *verbatim* recycling of the counterclaim Posey filed in the 2004 Litigation.  These counterclaims are barred by *res judicata*.

Posey challenges two types of statements on the HipSaver Website: statements in 1) the "Hip Protectors and the Laundry" page and 2) the "Validation and Testing" page.

1.    *HipSaver's Launderability Advertising Claims*

HipSaver's Website comments on the launderability of the HipSaver hip protector and its competitors, Posey Hipster and Alimed HipShield.  HipSaver's launderability claims do not

purport to be based on its own testing; instead HipSaver's launderability claims are based on: 1) laundry guidelines published by the federal Centers for Disease Control, 2) third party laundry tests and published guidelines, 3) feedback received from customers about the failure of Posey hip protectors and 4) Posey's own wash recommendations.

HipSaver's laundering statements reference the Centers for Disease Control Guidelines ("CDC Guidelines") for Infection Control in the Laundry. The CDC Guidelines recommend high temperature laundering of at least 160°F. The CDC Guidelines also provide for an alternate low temperature wash standard that relies on careful monitoring and control of washer cycling, wash formula, and high levels of bleach. Use of the CDC Guidelines low temperature/high bleach recommendation is limited by its complexity.

Posey's own documents show that Posey recognizes that large health care institutions wash at high temperatures. For this reason, from the introduction of its Hipster III product in late 2001 or early 2002, Posey labeled its Hipster III hip protector for washing at a maximum temperature of 160°F. HipSaver relied on these published wash instructions to substantiate the launderability claims that Posey challenges. It seems then that Posey is contesting its own laundry instructions as "literally false", certainly an odd challenge.

Notwithstanding its attempt to meet the CDC guidelines, Posey learned within a few months of introducing its Hipster that the product was materially defective and failed at an alarming rate. An institutional test comparing the launderability of the HipSaver and Posey products was conducted at the United States Veteran's Health Administration in Mountain Home, Tennessee during 2002. In this study, hip protectors were laundered at wash temperatures of 160-170°F and drying temperatures of 180°F which are within the CDC guidelines. HipSaver president Ed Goodwin and Posey product manager Victoria Lewis

participated in the tests.  Ms. Lewis represented to the Veteran's Health Administration that Posey hip protectors could be laundered at the temperatures chosen for the test – even though she was fully aware of the Hipster failure rate in institutional laundries.  Posey's hip protectors fell apart during the high temperature laundering and failed the wash test.  As a result of this and similar Veterans Health Administration tests, the Veteran's Health Administration published a warning in its 2004 Falls Toolkit that "Posey™ hip protectors should not be washed in the hospital laundry.  They degrade more quickly and pads may crack or dissolve.  Bleach appears to accelerate this degrading process."

### 2.    *HipSaver's Validation and Testing Advertising Claims*

HipSaver's validation and testing claims reference four tests: the JAMDA Report, the Gross study, the Tampere test, and the Harvard study.

### a.    *The JAMDA Report*

The JAMDA Study was a thirteen-month-long study that was published in 2003 by the Journal of the American Medical Directors Association.  The purpose of the study was to determine whether high compliance rates for hip protector wearers would be possible.  Participants in the study wore HipSaver hip protectors.  The JAMDA Study reported a 93-95% compliance rate among participants able to wear HipSavers.  The JAMDA Study also reported a zero fracture rate after 126 falls by participants wearing HipSavers.

### b.    *The Gross Study*

The Gross Study was conducted by the Elder Service Plan of the East Boston Neighborhood Health Center and published in 2000.  The purpose of the Gross Study was to determine the effectiveness of hip protectors in preventing hip fractures.  The Gross Study reported a zero fracture rate after 199 falls by participants wearing HipSavers.  Although the

Gross Study tested a previous iteration of the HipSaver, the tested version was substantially a design equivalent of the current HipSaver, using the same basic encapsulated visco-elastic damping urethane pad technology.

        *c.*      *The Tampere Test*

The Tampere Test was conducted in 2000 using a mechanical hip to measure the ability of hip protectors to reduce the force of a fall.  The Tampere test found that HipSavers reduced the impact force to 1790 Newtons and that the Safehip hard shell hip protector reduced the impact force to 2240 Newtons.  The Tampere test was conducted on a HipSaver pad using the same foam as used in the current HipSaver product.  In fact, the current HipSaver pad employs an even thicker form of the foam than the pad used in the Tampere test.

        *d.*      *The Harvard Study*

The Harvard Study was conducted in 1996 to measure and validate the ability of an early version of the HipSaver soft foam pad to reduce the force of a fall by simulating a dynamic fall impacting the hip.  The Tampere study validated the more advanced soft foam currently used.

        *3.*      *Breach of the 2004 Settlement Agreement*

In its counterclaim for breach of contract, Posey attempts to sidestep its 2004 release of all challenges to HipSaver's website with the assertion that HipSaver has made material changes to its web-site.  There have been no material changes to the website.  The sole change to the website is the addition of one new HipSaver garment style, the Open-Bottom 3-Snap model.  This embodiment uses the same elastic, lycra, and cotton materials and the same protective pads in the same positioning as previous HipSaver embodiments.

### B.    Summary Of Evidence To Be Offered By Posey

Generally, in connection with both HipSaver's claims against Posey and Posey's counterclaims against HipSaver, Posey intends to offer preliminary background information regarding the parties, the relationship between them, the nature of the products at issue in this case, the testing Garwood Laboratories, Inc. performed for Posey, Posey's advertising regarding the Garwood testing, the prior lawsuit between the parties concerning Posey's advertising regarding the so-called "White Paper" ("Posey I"), the Posey I settlement, the scope of the settlement and the Posey I settlement agreement.

### 1.    Posey's Counterclaims for False Advertising, Unfair Competition under Mass. G.L. Ch. 93A and Breach of Contract

In connection with its counterclaims against HipSaver and its president, Edward Goodwin, Posey will present further evidence at trial that HipSaver and Mr. Goodwin have made numerous literally false advertising statements on HipSaver's Internet website regarding the qualities and the characteristics of its own products and the products of its competitors, including Posey.  More specifically, Posey will show that HipSaver maintains an Internet website which it uses to advertise and promote its products and to denigrate the products of its competitors.  The "url" address of HipSaver's Internet website is http://www.hipsaver.com.  Goodwin approves the content of all of the statements that are posted on HipSaver's Internet website.

### a.    HipSaver's "Laundry" Page

One of the pages of HipSaver's Internet website is entitled "Hip Protectors & the Laundry".  The evidence will show that this page contains the following unsubstantiated and false statements and graphic representations:

a)    The statement that "Only HipSaver hip protectors clearly meets [sic] the CDC Guidelines for infection control in the laundry";

b)      The statement that "Only HipSaver [hip protectors] can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry";

c)      A graphic representation that the CDC Guidelines recommend a "minimum" wash temperature of 160°F;

d)      A graphic representation that the "wash temperature range" recommended by "CDC Guidelines" is between 160°F and a temperature somewhere above that;

e)      The statement that Posey Hipsters are machine washable at temperatures of up to 160° F the "CDC guideline suggested minimum";

f)      The statement that the "average wash/dry temperature of institution laundries" is 180°F; and

g)      The statement that "HipSavers [products] wash and dry up to 250 [degrees F] – well above the CDC guidelines".

The evidence will show that each of these statements is literally false, either as a matter of fact or as a matter of law.  As for statements a) and b), above, Posey will establish that HipSaver never conducted any testing to determine whether its products or the products of any of its competitors meet the CDC Guidelines.  Thus, it has absolutely no evidence that its products can, or that its competitors' products cannot, be laundered according to the pertinent CDC guidelines.  Since those statements are completely unsubstantiated, the trier of fact is entitled to find that they are false on their face.  Moreover, Kevin Minissian, an independent expert hired by Posey, has washed Posey's products according to the CDC's guidelines and he has concluded that Posey's products can, in fact, be laundered in accordance with the CDC guidelines.

As for HipSaver's remaining laundry statements, the "CDC Guidelines for Laundry in Health Care Facilities", which are available through HipSaver's own website, on their face show that HipSaver's graphic representation (see c), above) and its statement (see e), above) that the guidelines recommend a "minimum" wash temperature of 160° F,  as well as its graphic representation (see d), above) that the guidelines recommend a wash temperature range of between 160° F and something higher are literally false.

16

Likewise, Posey will present evidence by one of its expert witnesses to establish that the average wash temperature of institution laundries is 130°F. and that hospitals within the VA system (which HipSaver claims is its largest customer) are required to wash soiled linens and patient belongings, including underwear at temperatures below 120°F. Thus, HipSaver's statement (see f), above) that the average wash temperature of institution laundries is 180°F is literally false. Finally, Posey will establish that HipSaver has absolutely no substantiation for the claim (in g), above) that one can "wash and dry [HipSavers' products] up to 250 [degrees F] – well above the CDC guidelines". Thus, once again, the trier of fact will be entitled to conclude that this statement is false on its face.

### b.    HipSaver's "Validation & Testing" Page

Another one of the pages of HipSaver's Internet website is entitled "Validation & Testing". This page contains the statement that HipSaver's products "are the only all-soft hip protectors, proven effective – in both independent mechanical testing and clinical study" and the statement that purchasers should choose HipSavers because they are the product of "proven testing, independent scientific validation and years of market success".

The evidence to be adduced at trial will show that HipSaver's claims that its products have been independently tested and validated are based upon: a) the report of a study published in the September/October 2003 issue of the Journal of the American Medical Directors Association (the "Compliance Study"); b) the report of a study (the "Gross Study") published in the October 2000 issue of Advance for Physical Therapists; c) a biomechanical test purportedly performed at Harvard University in 1996; and d) a biomechanical test performed at Tampere University of Technology in Finland in 2000. HipSaver's claims that these studies and tests have "validated" their present products or proven them effective are literally false.

17

**(i)**    **The Compliance Study Reported in JAMDA**

The Compliance Study was a clinical study that commenced in September 2001. It was designed to determine if persons at risk for hip fractures could be induced to wear hip protectors consistently over a period of time. The individuals who participated in the Compliance Study wore HipSaver-brand hip protectors.

On its Internet website, HipSaver cites the Compliance Study as evidence of the effectiveness of its products on the grounds that "there were 126 falls among the HipSaver wearers and no hip fractures" during the duration of the study. It also claims that this fact is "equally [as] important" as the reported compliance rate and a "very significant" result of the study.

At trial, Posey will introduce evidence through the lead researcher on the study, Dr. Burl, who will testify that the fact that there were falls but no fractures among HipSaver wearers during the Compliance Study was not "equally [as] important" as the reported compliance rate. He will testify that this was not a significant result of the study or, even, a statistically significant result of the study.

HipSaver's Internet website also states that, according to the JAMDA report, the compliance rate for HipSaver wearers for the duration of the Compliance Study was 93%. At trial, Posey will show that the JAMDA report does not state that the compliance rate for HipSaver wearers during the Compliance Study was 93%. In fact, Dr. Burl will testify that it is not possible to determine from the report the exact compliance rate of HipSaver wearers who completed the Compliance Study. Posey will also show that, while the JAMDA report does mention a 93% compliance rate, that is the rate of compliance for people who died during the study.

### (ii)    The Gross Study Reported in Advance for Physical Therapists

On its Internet website, HipSaver also cites the Gross Study as evidence of the effectiveness of its products.  At trial, Posey will show that the product HipSaver was making in 1998 at the time the Gross Study was being conducted is completely different from the product HipSaver was selling in 2005 when this lawsuit commenced.  Since HipSaver's product as it existed in 1998 is so different from its present product, the trier of fact will have no trouble concluding that the results of the Gross Study cannot support HipSaver's claim that the effectiveness of its present product has been "clinically validated".

### (iii)    The Alleged Testing At Harvard in 1996

On its Internet website, HipSaver also claims that its products have been proven effective in testing at Harvard University and that the results of this test shows that HipSaver's "airPad technology" offers "more than 20% more force reduction" than the leading hard-shell hip protector.  At trial, Posey will show that HipSaver commissioned some testing on its then-product in 1996, that the product that was tested in 1996 is different from its present product and that the results of the Harvard test did not show that HipSaver's pads offered "more than 20% more force reduction" than the hard-shell hip protector to which HipSaver was referring on its website.

### (iv)    The Tampere University Testing in 2000

With respect to HipSaver's advertising claim that the Tampere University testing demonstrated the effectiveness of its product, Posey will establish that the testing occurred in August or September 2000 and that the pads tested were not the pads HipSaver was selling at the time the instant lawsuit commenced.

At trial, Posey will also demonstrate that HipSaver is affirmatively misrepresenting the results of the Tampere tests in its advertising. Specifically, HipSaver claims that the Tampere testing demonstrated that its pads offer "more than 20% more force reduction" than the leading hard-shell hip protector, i.e., Safehip. However, HipSaver's own documentary evidence shows that its former products were tested and that the results show that HipSaver's pads offered no more than 6% more force reduction than the Safehip, far less than the 20% difference HipSaver claims.

At trial, Posey will also establish that the false statements HipSaver is making on its Internet deceived or had the capacity to deceive consumers, that the statements were material in that they did or were likely to influence the purchasing decisions of consumers, that they were made in interstate commerce, that Posey is likely to be damaged by the continued publication of those false statements, and that Posey is entitled to an injunction requiring HipSaver and Goodwin to remove those statements from HipSaver's Internet website.

### 2. Posey's Counterclaim for Breach of Contract

Posey's breach of contract claim is asserted defensively in the event the Court determines that the Posey I settlement agreement should be interpreted so as to require the parties to give 30 days' advance notice to the other in the event they intended to conduct advertising regarding testing that the parties had completed prior to the settlement.

In connection with this claim, Posey intends to show that HipSaver added new products to its website and claimed that they had been tested and clinically validated in the same manner as were the products that were in existence as of the date of the settlement agreement, that it failed to give Posey the requisite 30 days' notice and that in doing so, it deprived Posey of the opportunity to counter HipSaver's claims.

### 3.    HipSaver's Claims and Posey's Defenses to HipSaver's Claims

Posey expects to prevail at trial on the claims that are the subject of HipSaver's complaint.  First, with respect to all of HipSaver's claims, Posey will present evidence showing that HipSaver has not suffered any losses or harm to its business as a consequence of any of the actions complained of in the FAC and that Posey withdrew its advertising relating to the Garwood testing nearly 2 years ago.  Thus, HipSaver's affirmative claims will all fail.

Second, with respect to HipSaver's claim for false advertising under the Lanham Act, Posey will present evidence that certain of the advertising statements to which HipSaver objects are not susceptible of objective proof.  Thus these statements are merely non-actionable "puffing".  It will also present evidence that certain of the other statements to which HipSaver objects are, in fact, true.  In the event HipSaver adduces any evidence that any of the statements Posey made regarding the Garwood ads are not accurate (e.g., the statements that the Garwood test "simulated" a fall or the statement that the force used in the Garwood test "simulated" the force of a 120 pound person falling from a height of 36 inches), Posey will show that these statements were not material in that they would not have influenced the buying decisions of consumers.  Since HipSaver has no evidence to the contrary, its false advertising claim will fail.

Third, with respect to HipSaver's claim for violations of Mass. G. L. Ch. 93A, Posey will present evidence to establish that the conduct of which HipSaver complains did not occur primarily and substantially within Massachusetts.

Fourth, with respect to HipSaver's complaint for product disparagement, Posey will present evidence that the allegedly "disparaging" statements of which HipSaver complains are simply not capable of being interpreted in a disparaging manner.

Fifth, with respect to HipSaver's breach of contract claim, Posey will show that the "notice" provision of the settlement agreement applies only to advertising regarding "further" comparative testing, that there was no such "further" comparative testing in this case and that, even if there were any such testing, HipSaver suffered no legally cognizable damage as a consequence of its failure to receive notice of Posey's intent to advertise the results of the testing.

Finally, with respect to its affirmative defenses to HipSaver's claims (viz., laches, estoppel, acquiescence, *res judicata*, unclean hands and release), Posey will show, among other things, that it began disseminating advertising that contained the accused statements regarding the Garwood tests in late-2001; that it has been disseminating advertising containing those statements continuously since that time; that HipSaver and its president, Goodwin, were aware of Posey's Garwood advertising since at least 2002; that neither HipSaver nor Goodwin ever complained to Posey about the Garwood ads prior to instituting this lawsuit; that HipSaver could have, but did not, complain to Posey about the Garwood ads prior to the time HipSaver brought the Posey I lawsuit; that HipSaver could have, but did not, seek the withdrawal of Posey's Garwood advertising at the time the parties settled Posey I; that Posey paid HipSaver a substantial sum to settle Posey I; that Posey would not have paid HipSaver to settle Posey I had it (Posey) thought that HipSaver could assert a claim against it based upon the Garwood ads following the date of the settlement; that Posey would not have exposed itself to potential legal liability for publishing the Garwood ads following 2001 or following the Posey I settlement had it known that HipSaver objected to those ads; that Posey and HipSaver executed a written settlement agreement in September 2004 pursuant to which the parties released each other from any and all claims that were related in any way to the matters that were asserted or that could

have been asserted in Posey I; that the release in the Posey I settlement agreement includes the Garwood ads; that HipSaver knew or should have known that Posey was disseminating ads that made reference to the Garwood testing in September 2004; that, when the parties settled Posey I, they intended that, in the absence of any material changes in the facts or circumstances that existed at the time, the settlement would permit both sides to continue publishing and disseminating advertisements and commercial statements that had been published and disseminated in hard copy or electronically prior to the execution of the settlement agreement and to re-publish and disseminate advertisements that were the same as, or substantially similar to, any earlier published statements; that Posey suffered evidentiary prejudice as a consequence of HipSaver's delay in complaining about Posey's Garwood ads; and that it would be inequitable for HipSaver to prevail on its claims against Posey as a consequence of the fact that HipSaver's own website is saturated with knowingly false advertising statements about its own and Posey's products.

### 2. THE FACTS ESTABLISHED BY PLEADINGS OR BY STIPULATIONS OR ADMISSIONS OF COUNSEL

The parties stipulate to the following facts and may supplement this list prior to trial:

1. HipSaver was founded in 1995. HipSaver is a company headquartered in Canton, Massachusetts. HipSaver had annual revenues in 2005 and 2006 of about $1.5 million. HipSaver is organized and registered as a Massachusetts corporation.

2. Mr. Edward Goodwin founded the HipSaver Company and is the co-owner and President of HipSaver. He developed the HipSaver® hip protector, a soft foam washable encapsulated protective pad sewn into a garment. Mr. Goodwin has sold HipSaver hip protectors since about 1997. His product is sold in the United States, Canada, Europe, and Australia.

23

3.  Ms. Helen Brogna is the majority owner and Executive Vice President of HipSaver.

4.  Until 2006, HipSaver was a single product company, designing, developing, and manufacturing the HipSaver hip protector product.

5.  HipSaver's hip protector garment is sold under the HipSaver trademark.  HipSavers are sold to nursing homes, long term care facilities, rehabilitation hospitals, and consumers.

6.  HipSaver maintains a web-site at www.hipsaver.com.

7.  Posey was founded in 1937. Posey is a California corporation headquartered in Arcadia, California.

8.  Mr. Ernest Posey is President of Posey.

9.  Ms. Victoria Lewis serves as a product manager for Posey.

10. Mr. Charles Nail serves as the Controller for Posey.

11. Posey is in the business of selling healthcare/safety products for patient restraint, fall safety, wound prevention, and wheelchair seating, among others. Posey sells its products to nursing homes, long term care facilities and hospitals.  Posey's annual revenue for 2005 was slightly more than $40 million dollars.   Posey maintains a website at www.posey.com.

12. A hip protector product is a product designed to protect at-risk individuals, primarily the elderly, against hip fractures caused by falls by reducing the force of the impact of the fall.

13. Hip protectors may be comprised of entirely soft materials, entirely hard materials consisting essentially of a shield, or a combination of both hard and soft materials.

14. Posey introduced its first soft hip protector into the market in the year 2000. It was sold under the name "Hipster". Posey later re-designed its soft hip protector. Its re-designed soft hip protector was introduced into the market in approximately October 2001.

15. HipSaver and Posey currently manufacture and sell entirely soft hip protectors.

16. HipSaver and Posey are direct competitors in the hip protector market.

17. This lawsuit challenges a series of advertisements published and distributed by J.T. Posey containing references to tests conducted by Garwood Laboratories. These advertisements are referred to as the "Garwood Advertisement/s" or the "Garwood Ad/s". Distribution of the ads in question commenced approximately in the latter part of 2001.

18. Garwood Laboratories, Inc. is a California corporation that conducts various types of testing.

19. In 2001, Posey paid Garwood to conduct some testing on some foam materials that Posey was considering using in the pads that are incorporated into its hip protectors. Since 2001, Posey contracted with and retained Garwood Laboratories on a number of occasions to conduct material or product testing, including impact tests on hip protector materials and products in 2005.

20. Garwood Laboratories conducted the "independent laboratory test" referred to in the Garwood ads. The tests conducted by Garwood Laboratories are referred to as the "Garwood Test/s."

21. Garwood performed two different types of tests for Posey. In one of the tests, Garwood tested samples of raw materials. Each material sample was placed under a 6" diameter weight weighing 72 lbs. The weight was then raised in a guide to the specified height of twenty-four (24) inches, and dropped on the sample. This drop was repeated on each

sample. Impact amplitudes, measuring the force attenuation properties of the samples, were recorded. This type of test is referred to as a "direct impact test." Upon completion of each test, the test samples were inspected by a Posey representative and returned to Posey.

22. Following the testing, Garwood produced reports to Posey detailing the results of the testing.

23. In late 2001, Posey began disseminating advertising materials that made reference to the Garwood Tests. In these early advertisements, Posey stated that the tests were conducted in 2001. These early advertisements contained the following statements:

    a) "A test was created that would simulate a fall causing direct impact to the greater trochanter."

    b) "An independent laboratory study was conducted to determine the most effective impact absorbing material."

    c) "In an independent laboratory test designed to simulate a fall causing direct impact to the greater trochanter, the Posey Hipster III reduced the impact force by 90%, the best results of any hip protector available."

    d) "Posey Hipsters Proven Effective in Laboratory Tests"

    e) "Posey Hipsters Help Protect Against Injury from Falls"

    f) "Posey Hipster … showed excellent impact energy absorption."

24. The Garwood Ads were contained in Posey product catalogs, product instruction sheets and brochures. These materials were mailed to customers and prospective customers, distributed at trade shows and sent to people who requested information on Posey's Hipster hip protectors.

25. Posey also distributed materials containing the Garwood Ads in late 2004. These materials repeated the same statements that were contained in the earlier Garwood Ads.

26. At some point, Posey deleted the reference to the 2001 date.

27. Beginning in 2004, the Garwood Ad was often placed on a flyer which included references to Posey's High Durability Hipster product.

28. Posey's Garwood Advertisements were withdrawn in the fall of 2005.

29. HipSaver's President, Mr. Goodwin, learned of Posey's Garwood Ads at least as early as 2002.

30. Late in 2003, Posey distributed advertising that made reference to a so-called "UCLA White Paper."

31. On June 10, 2004, HipSaver filed a lawsuit in the United States District Court for the District of Massachusetts, claiming, among other things, that the UCLA ads were false ("Posey I").

32. In connection with its claims in Posey I, HipSaver sought, among other things, damages and preliminary and permanent injunctive relief halting and preventing further publication, distribution, or reference to the challenged UCLA advertisement or so-called "UCLA White Paper" or the false testing conducted in support of the UCLA White Paper. HipSaver also sought an injunction halting all further publication or distribution of, or reference to, materials that claimed Posey's hip protector products were superior to HipSaver's.

33. In Posey I, Posey counterclaimed against HipSaver for, among other things, false advertising. Posey's counterclaims arose out of HipSaver's publication of various statements regarding the parties' respective products on HipSaver's internet web-site. On September 21, 2004, the parties settled the Posey I lawsuit. As part of the settlement, the parties dismissed with prejudice the claims and counterclaims asserted in Posey I and entered into a written settlement agreement.

34. After the Posey I settlement, HipSaver challenged Posey's Garwood advertising by way of a "cease and desist" letter dated May 3, 2005. HipSaver filed this lawsuit on May 4, 2005.

35. In May 2005, in response to HipSaver's letter objecting to Posey's advertising statements regarding the results of the Garwood Tests, Posey changed some of the language in its advertisements.

36. In August 2005, Posey eliminated any reference to the results of the Garwood advertising. In addition, it removed the product instructions which mentioned Garwood from its web-site.

37. Posey's Counterclaims arise out of HipSaver's publication of various statements regarding the parties' respective hip protector products that are contained on HipSaver's internet web-site, www.hipsaver.com.

38. These statements have been posted on HipSaver's web-site since before the 2004 litigation and the settlement agreement in Posey I.

39. Ed Goodwin approved the content of all of the statements that are posted on HipSaver's Internet web-site.

40. The "Hip Protectors & the Laundry" page of HipSaver's Internet website contains a statement that "Only HipSaver hip protectors clearly meets [sic] the CDC Guidelines for infection control in the laundry".

41. The "Hip Protectors & the Laundry" page of HipSaver's Internet website contains the statement that "Only HipSaver [hip protectors] can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry."

42. The "Hip Protectors & the Laundry" page of HipSaver's Internet website contains a graphic representation that the CDC Guidelines recommend a minimum wash temperature of 160ºF.

43. The "Hip Protectors & the Laundry" page of HipSaver's Internet website contains a graphic representation that the wash temperature range recommended by "CDC Guidelines" is between 160ºF and a temperature above 160ºF.

44. The "Hip Protectors & the Laundry" page of HipSaver's Internet website contains the statement that Posey Hipsters are machine washable at temperatures of up to 160º F the "CDC guideline suggested minimum".

45. HipSaver's Internet website permits a person visiting the "Hip Protectors & the Laundry" page to "click here" to view the "CDC Guidelines for Laundry in Health Care Facilities".

46. A visitor to HipSaver's Internet website who clicks at the appropriate spot to view the "CDC Guidelines for Laundry in Health Care Facilities" is directed to a document entitled "Guidelines for Laundry in Health Care Facilities" which is posted at http://www.cdc.gov/od/ohs/biosfty/laundry.htm.

47. The CDC Guidelines contain recommendations for the washing of soiled laundry at both high temperatures and low temperatures.

48. With respect to the washing of soiled linen at hot temperatures, the CDC Guidelines state that "[i]f hot water is used, linen should be washed with a detergent in water at least 71 C (160 F) for 25 minutes."

49. With respect to the washing of soiled linen at low temperatures, the CDC Guidelines state that "[i]f low temperature (<70 C) laundry cycles are used, chemicals suitable for low-temperature washing at proper use concentration should be used."

50. The "Hip Protectors & the Laundry" page of HipSaver's Internet website states that the "average wash/dry temperature of institution laundries" is 180°F.

51. The "Hip Protectors & the Laundry" page of HipSaver's Internet website also contains the statement that "HipSavers [products] wash and dry up to 250° [Fahrenheit] – well above the CDC guidelines."

52. The "Validation & Testing" page of HipSaver's Internet website claims that "HipSavers are the only all-soft hip protectors, proven effective – in both independent mechanical testing and clinical study."

53. The "Validation & Testing" page of HipSaver's Internet website states that HipSavers are the product of "proven testing, independent scientific validation and years of market success."

54. The "Validation and Testing" page of HipSaver's Internet website also states that its products have been "proven effective -- in both independent biomechanical testing and clinical study".

55. In 1996, HipSaver paid a researcher at Harvard University to test the ability of HipSaver hip protector pads to reduce the force of a fall. The results were reported to HipSaver.

56. HipSaver's products have been in their present version since 2002.

57. One of the clinical studies HipSaver claims proves the effectiveness of its products is a study conducted by the Elder Service Plan of the East Boston Neighborhood Health Center that was published in October 2000 in Advance for Physical Therapists (the "Elder Service Plan Study or Gross Study").

58. In 2000, the Elder Service Plan of the East Boston Neighborhood Health Center conducted a study to determine the effectiveness of hip protectors in preventing hip

fractures.  This Elder Service Plan Study reported zero fractures after 199 falls by participants wearing HipSavers.

59. The products that HipSaver presently manufactures incorporate the same type of foam but a different type of encapsulation as the products HipSaver manufactured and sold at the time that the Elder Service Plan Study was conducted.

60. HipSaver's Internet website states that its products have been proven effective in testing at Tampere University and that the results of this test show that HipSaver's protective pads offer "more than 20% more force reduction" than Safehip, the leading hard-shell hip protector.

61. In 2000, HipSaver paid a researcher at Tampere University in Finland to test the pads used in its HipSaver products.  The Tampere Test used a mechanical hip to measure the ability of HipSaver's pad to reduce the force of a fall.

62. The Tampere Test found that HipSavers reduced the force of an impact from 7200 Newtons to 1790 Newtons while the Safehip hard shell hip protector reduced the force of an impact from 7200 Newtons to 2240 Newtons.  Documentation regarding the Tampere testing is available through HipSaver's web-site.

63. In 2003, the results of a thirteen-month-long compliance study conducted by Jeffrey Burl, MD were published in the Journal of the American Medical Directors Association ("JAMDA Study" or "Compliance Study").  This study commenced in September 2001. The purpose of the study was to determine if persons at risk for hip fractures could be induced to wear hip protectors consistently over a period of time. All participants in the compliance study wore HipSavers.

64. On its Internet website, HipSaver cites the JAMDA Study or Compliance Study as evidence of the effectiveness of its products on the grounds that "there were 126 falls among the HipSaver wearers and no hip fractures" during the duration of the study. Specifically, HipSaver states on its web-site,

The results of a 13 month long study were published in the Sept/Oct. 2003 issue of the Journal of the American Medical Directors Association. HipSavers were written into the care plan of 38 at-risk residents. The study authors report an average 93% compliance rate for the duration of the study. Equally important, there were 126 falls among the HipSaver wearers and no hip fractures. The results are very significant since compliance is a major ingredient in the success of any hip protector program. Previous studies on hard-shell hip protectors have reported much lower compliance rates.

65. From 2001 through mid-2004, Posey marked all of its Hipster garments for high temperature laundering.

66. Since mid-2004, Posey has marked its Hipster garments for low temperature laundering with the exception of Posey's "high durability" Hipster which was introduced in mid-2004.

67. Following the dismissal of Posey I, HipSaver introduced a new product called the "Open-Bottom 3-Snap", which is presently included on its website.

68. Following the dismissal of Posey I, Posey introduced a new product known as the "High Durability Hipster".

3.  **CONTESTED ISSUES OF FACT**

    The parties identify the following contested issues of fact:

    A.    **HipSaver's Statement Of Contested Issues Of Fact**

1. Whether statements made by Posey and published in the Garwood Ads were literally false:

a)  "A test was created that would simulate a fall causing direct impact to the greater trochanter."

b)  "In an independent laboratory test designed to simulate a fall causing direct impact to the greater trochanter, the Posey Hipster III reduced the impact force by 90%, the best results of any hip protector available."

c)  "Posey Hipsters Proven Effective in Laboratory Tests"

d)  "Posey Hipsters Help Protect Against Injury from Falls"

e)  "Posey Hipster … showed excellent impact energy absorption."

2.  Whether Posey's literally false statements are material.

3.  Whether Posey's advertising and withholding of information with respect to launderability were unfair or deceptive.

4.  Whether Posey's advertising with respect to placement of the Hipster pads was unfair or deceptive.

5.  Whether Posey's literally false statements deceived or have the tendency to deceive consumers.

6.  Whether Posey's literally false statements have damaged HipSaver.

7.  Whether Posey's unfair or deceptive statements have damaged HipSaver.

8.  The extent of such damages.

9.  The extent of Posey's profits for its Hipster hip protector product.

10. Whether Posey's literally false and unfair or deceptive statements were made maliciously, fraudulently, deliberately, or willfully.

11. Whether the Garwood Ads were out of circulation during the 2004 Litigation.

12. Whether the parties intended the 2004 Settlement Agreement to release claims relating to the Garwood Ads.

13. Whether HipSaver's false advertising claims fall outside the scope of the Release provision of the 2004 Settlement Agreement.

14. Whether the following statements made by HipSaver on its website are accurate:

   a) "Only HipSaver hip protectors clearly meets [sic] the CDC Guidelines for infection control in the laundry"

   b) "Only HipSaver [hip protectors] can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry."

   c) A graphic representation that the CDC Guidelines recommend a minimum washing temperature of 160 [degrees F].

   d) A graphic representation that the "wash temperature range" recommended by "CDC guidelines" is between 160 degrees F and a temperature "somewhere above that"

   e) A statement that Posey Hipsters may be laundered up to 160 degrees F, the "CDC guideline suggested minimum."

   f) "Average wash/dry temperature of institutional laundries" is 180 degrees F.

   g) "HipSavers wash and dry up to 250 [degrees F] – well above the CDC guidelines."

   h) HipSaver's products "are the only all-soft hip protectors, proven effective – in both independent mechanical testing and clinical study."

   i) HipSavers are the product of "proven testing, independent scientific validation and years of market success."

   j) In connection with a study conducted by Dr. J. Burl and published in the Journal of American Medical Directors Association, in which compliance rates of patients wearing HipSavers were studied, HipSaver states that "[t]he study authors report an average 93% compliance rate for the duration of the study. Equally important, there were 126 falls among the HipSaver wearers and no hip fractures. The results are very significant since compliance is a major ingredient in the success of any hip protector program."

   k) HipSaver provides a summary of a study conducted by the Elder Service Plan of the East Boston Neighborhood Health Center, published in 2000. HipSaver states that the study was conducted to determine the effectiveness of hip protectors in preventing hip fractures ("Elder Service Plan Study") and reports the results of the study.

   l) HipSaver also provides a summary of a test conducted by an independent laboratory at Tampere University in Finland ("Tampere Test").

15. Whether HipSaver's website statements are likely to damage Posey in the future, despite not having caused any damage to Posey to date in the four years they have been published on the HipSaver website.

16. Whether HipSaver's website statements have remained the same since before the execution of the 2004 Settlement Agreement.

17. Whether HipSaver has performed its obligations under the 2004 Settlement Agreement.

18. Whether Posey has breached the Notice provision of the 2004 Settlement Agreement.

19. Whether Posey's breach of the Notice provision of the 2004 Settlement Agreement has damaged HipSaver.

20. The extent of such damages.

21. Whether Posey made false and disparaging statements regarding HipSaver hip protector products.

22. Whether Posey's false and disparaging statements have damaged HipSaver.

23. The extent of such damages.

24. Whether Posey's false advertising claims, which challenge the same HipSaver website statements challenged by Posey's false advertising claims in the 2004 Litigation, fall within the scope of the Release provision of the 2004 Settlement Agreement.

### B.    Posey's Statement Of Contested Issues Of Fact

As is set out above, the parties agree that numerous material facts in the case are undisputed.  Posey also contends that there are numerous additional material facts which, although not admitted or stipulated to, cannot genuinely be disputed.  Posey further contends that, taking into consideration (i) the facts which are admitted, and (ii) the facts which cannot genuinely be disputed, the case is ripe for a determination of Posey's motion for summary judgment on HipSaver's claims and of Posey's motion for partial summary judgment on its Posey's counterclaims.

In the event the Court disagrees, then Posey offers the following statement of contested factual issues to be determined at the trial:

1.  Whether the following statements and graphics published on HipSaver's Internet website by HipSaver and Goodwin are literally false:

    a)  The statement that "Only HipSaver hip protectors clearly meets [sic] the CDC Guidelines for infection control in the laundry";

    b)  The statement that "Only HipSaver [hip protectors] can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry";

    c)  The graphic representation that the CDC Guidelines recommend a "minimum" wash temperature of 160ºF;

    d)  The graphic representation that the "wash temperature range" recommended by "CDC Guidelines" is between 160ºF and a temperature somewhere above that;

    e)  The statement that Posey Hipsters are machine washable at temperatures of up to 160º F the "CDC guideline suggested minimum";

    f)  The statement that the "average wash/dry temperature of institution laundries" is 180°F; and

    g)  The statement that "HipSavers [products] wash and dry up to 250 [degrees F] – well above the CDC guidelines".

2.  Whether HipSaver and Goodwin's literally false statements are material.

3.  Whether HipSaver and Goodwin's literally false statements deceived or have the tendency to deceive consumers.

4.  Whether Posey is likely to be damaged by HipSaver and Goodwin's literally false statements.

5.  Whether HipSaver and Goodwin made their literally false statements maliciously, fraudulently, deliberately, or willfully.

6.  Whether HipSaver and Goodwin's publication of literally false statements on HipSaver's Internet website constitutes an unfair business practice.

7.  Whether HipSaver and Goodwin's publication of literally false statements on HipSaver's Internet website occurred primarily and substantially within Massachusetts.

8.  Whether HipSaver has not suffered any losses or harm to its business as a consequence of any of the actions complained of in the FAC.

9.  Whether each of the Posey advertising statements to which HipSaver objects is susceptible of objective proof.

10. Whether the Posey advertising statements to which HipSaver objects are literally false.

11. Whether each of the Posey advertising statements to which HipSaver objects is material in that it would have influenced the buying decisions of consumers.

12. Whether the conduct on the part of Posey of which HipSaver complains occurred primarily and substantially within Massachusetts.

13. Whether the allegedly disparaging statements of which HipSaver complains are capable of being interpreted in a disparaging manner.

14. Whether the notice provision in the Posey I settlement agreement applies to advertising regarding comparative testing that was completed prior to the execution of the Posey I settlement agreement.

15. Whether HipSaver suffered any legally cognizable damage as a consequence of its failure to receive notice of Posey's intent to advertise the results of the Garwood testing in 2005.

16. Whether Posey advertised the results of the Garwood test continuously from 2001 through 2005.

17. Whether HipSaver knew or should known that Posey was advertising the results of the Garwood test in 2003 and 2004.

18. Whether HipSaver unreasonably delayed in complaining about Posey's Garwood advertising.

19. Whether Posey suffered prejudice as a consequence of HipSaver's delay in complaining about Posey's Garwood advertising.

20. Whether HipSaver's claims in the instant matter are related in any way to the claims that were brought or could have been brought in Posey I.

21. Whether the release provision in the Posey I settlement agreement precludes any claim by HipSaver based upon Posey's pre-settlement publication or dissemination of advertising concerning the Garwood testing.

22. Whether the release provision in the Posey I settlement agreement precludes any claim by HipSaver based upon Posey's post-settlement publication or dissemination of advertising concerning the Garwood testing.

23. Whether, when the parties settled Posey I, they intended that, in the absence of any material changes in the facts or circumstances that existed at the time, the settlement would permit both sides to continue publishing and disseminating advertisements and commercial statements that had been published and disseminated in hard copy or electronically prior to the execution of the settlement agreement.

24. Whether, when the parties settled Posey I, they intended that, in the absence of any material changes in the facts or circumstances that existed at the time, the settlement would permit both sides to re-publish and disseminate advertisements that were the same as, or substantially similar to, any earlier published statements.

### 3.  JURISDICTIONAL QUESTIONS

None.

### 4.  QUESTIONS RAISED BY PENDING MOTIONS

On December 11, 2006, HipSaver filed (i) a motion for partial summary judgment on claims set forth in its First Amended Complaint ("FAC"), and (ii) a motion for summary judgment on Posey's counterclaims. That same day, Posey filed (i) a motion for summary

judgment on the claims set forth in the FAC, and (ii) a motion for partial summary judgment on its counterclaims.

On January 8, 2007, the parties filed their oppositions to the other's motions. As part of its opposition to Posey's motion for summary judgment on the FAC, HipSaver filed a Declaration of Edward Goodwin.

On January 18, 2007, at the time the parties filed their reply briefs in support of their motions, Posey filed objections to the Goodwin declaration. After HipSaver objected to Posey's objections to the Goodwin declaration, Posey moved for leave to exceed the reply brief page limits set by the court or, in the alternative, for an order striking the Goodwin declaration. On February 12, 2007, HipSaver filed a Motion to Strike Posey's Objections to Declaration of Edward L. Goodwin. Both of these motions are presently pending before the Court.

On February 14, 2007, this Court heard the parties' arguments in support of their motions for summary judgment. These motions are also presently pending before the Court.

In addition, at the hearing on the parties' motions for summary judgment, the Court requested additional briefing from the parties regarding the timing of Posey's accused advertising. After the parties filed the requested briefs, on March 9, 2007, Posey filed an Assented-to Motion of Defendant and Counterclaimant J.T. Posey Company, Inc. for Leave to File Response Clarifying [HipSaver's] New Exhibits or, Alternatively, For Order Striking [HipSaver's] New Exhibits. This motion is also still pending. While HipSaver assented to Posey's motion for leave, HipSaver will vigorously oppose Posey's underlying motion, should leave be granted.

### 5.    ISSUES OF LAW

The parties identify the following issues of law:

### A.    HipSaver's Statement Of Issues Of Law

### A.1.    HipSaver Will Prevail on Its Complaint

#### 1.    HipSaver Will Prevail On Its Lanham Act Claim For False Advertising (Count II)

Lanham Act §43(a) prohibits false advertising by prohibiting any "false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."   15 U.S.C. §1125(a)(1)(B).   HipSaver will prevail on this claim by showing that: (1) Posey made a false or misleading description of fact in thousands of commercial advertisement about its products and/or HipSaver's products; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material (*i.e.*, it is likely to influence the purchasing decision); (4) Posey placed the statement into interstate commerce; and (5) HipSaver has been or is likely to be injured as a result of the statement, either by direct diversion of sales to Posey or by a lessening of goodwill associated with HipSaver's products.   *Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 33 n.6 (1st Cir. 2000).

*a.    Posey Made a False or Misleading Description of Fact in Thousands of Commercial Advertisements about its Products and/or HipSaver's Products*

Posey's Garwood Advertisement is literally false because the Garwood Test results do not support the proposition for which they were cited.   A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or implicitly false.   *Cashmere*, 284 F.3d at 311.   Where the challenged ad explicitly or implicitly represents that tests or studies prove its claims, "plaintiff satisfies its burden of showing [literal falsehood] by showing that the tests did not establish the proposition for which they were cited."   *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 63 (2d Cir. 1991).   A plaintiff can meet this

burden by establishing either (a) that the tests were not sufficiently reliable to permit the conclusion for which it was cited; or (b) that the tests, even if reliable, do not establish the proposition for which they were asserted. *Castrol*, 977 F.2d at 63. Here, Posey's claims are literally false because the Garwood Test results can not and do not establish Posey's claims.

> i.   *Posey's advertising claim showing Posey Hipster's performance in a test "simulating a fall causing direct impact to the greater trochanter" is literally false because the Garwood Test did not simulate a fall.*

Of course, the very purpose of a hip protection garment is to protect a person, particularly elders and disabled persons, from hip fracture in the event of a fall. Keying directly to this purpose, the Garwood Advertisement states, "An independent laboratory study was conducted to determine the most effective impact absorbing material. A test was created that would *simulate a fall causing direct impact to the greater trochanter.*" Yet, the parties and Posey's expert agree that the Garwood Test did not simulate a fall causing direct impact to the greater trochanter. Posey's expert stated that the Garwood Tests "do not model the intricacies of the bone and soft tissue geometries and material properties" and accordingly that, "[the Garwood test] is not the proper way to simulate a fall." The statement in the Garwood Advertisement that "A test was created that would simulate a fall causing direct impact to the greater trochanter" is literally false.

Not only is the claim that the test simulated a fall literally false, all claims purportedly established by the Garwood Test must also be literally false because the Garwood Test does not permit any conclusions about the effectiveness or performance of any tested matter in a simulation of a fall. *Castrol*, 977 F.2d at 63. Therefore, all claims in the Garwood advertisement are literally false.

      ii.    *Posey's advertising claims that the Posey Hipster uses the "most effective impact absorbing material" and performs "best" are literally false because the Garwood Test shows that Posey Hipsters performed worse than HipSaver in the ASTM impact test*

The Garwood Advertisement states, "An independent laboratory study was conducted to determine the **most effective** impact absorbing material." *Emphasis added.* In the video version of the Garwood Advertisement, the narration states, "In an independent laboratory test designed to simulate a fall causing direct impact to the greater trochanter, the Posey Hipster III reduced the impact force by 90%, **the best results of any hip protector available**." *Emphasis added.* But, according to the Garwood Test results and Posey's expert, the Posey Hipster does not use the "most effective" impact absorbing material and did not perform "best" in the Garwood Test. In fact, the material eventually used for the Hipster pad placed third in the impact absorption testing and the Posey Hipster garment was <u>never</u> tested.

      Posey's expert agrees that the Posey product performed worse than the HipSaver material and another raw material in the Garwood Test. Thus, the statements in the Garwood Advertisement that the Posey Hipster uses the "most effective impact absorbing material" and performed "best" are literally false.

      iii.   *Posey's advertising claim that Posey Hipsters are "proven effective in laboratory tests" and have "excellent impact absorption" cannot be supported by the Garwood Test and therefore, is literally false*

The Garwood Advertisement claim that Posey Hipsters are "Proven Effective in Laboratory Tests" and have "Excellent Energy Absorption" cannot be supported by the Garwood Test results and is therefore literally false. The Garwood Test cannot prove that the Hipster is effective or has excellent impact absorption. Where an advertising claim makes implicit or explicit references to tests, the plaintiff may satisfy its burden by showing that *those* tests do not prove the proposition. *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1091 (7th Cir.

1994).  The Garwood Test cannot be used to draw any conclusions about the effectiveness of the hip protector because it did not test the garment and does not consider the size of the pad and/or the positioning of the pad in the garment, two significant factors in the ability of the Hipster to absorb impact.

Accordingly, the Garwood Advertisement's claims that Posey Hipsters are "proven effective in laboratory tests" and have "excellent impact absorption" cannot be supported by the Garwood Test results and are therefore, literally false.

> iv.    *Posey's advertising claim that "Posey Hipsters Help Protect Against Injury From a Fall" cannot be supported by the Garwood Test and therefore, is literally false*

One of the variations of the Garwood Advertisement is titled "Posey Hipsters Help Protect Against Injury from a Fall."  When the advertisement is considered in its entirety, the claim of protection against injury in a fall looks to be supported by the Garwood Test results. However, this claim is also literally false because the Garwood Test does not simulate a fall and cannot substantiate the claim that the Hipster garment protects against injury from a fall.

> v.    *Posey's Advertisement is literally false in its entirety because the overall impression of the Garwood Advertisement strongly suggests, falsely, that the Garwood Test results prove that Posey Hipsters help protect against hip fractures from falls*

Posey's Garwood Advertisement is literally false in its entirety because the overall impression of the Garwood Advertisement suggests that the Posey Hipster was laboratory tested in a fall simulation and was proven to be not only an effective hip protector but, the *most* effective hip protector.  An advertisement conveys a claim by "necessary implication" under the Lanham Act when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated. Lanham Trade-Mark Act, § 43(a), 15 U.S.C.A. § 1125(a); *Clorox Co., P.R. v. Proctor & Gamble Commercial Co.,* 228 F.3d 24, 35

(1st Cir. 2000). Here, the Garwood Advertisement taken as a whole is literally false because (a) neither the garment nor the raw material was tested in a study simulating a fall; (b) the study did not test the Hipster garment and is therefore, incapable of making any assessment as to the effectiveness of the garment; (c) neither the garment nor the material was proven effective in preventing injury from a fall in the test; and (d) the pad was not the most effective at reducing force in a pure materials comparison. Accordingly, when considering the advertisement as a whole, the entire Garwood Advertisement is literally false.

b.    *Posey's Statement Actually Deceives or Has the Tendency to Deceive a Substantial Segment of its Audience*

To the extent HipSaver demonstrates Posey's literally false advertising, it is entitled to a "presumption of consumer deception, irrespective of the type of relief sought." *Cashmere*, 284 F.3d at 309.

c.    *Posey's False Advertising Claims are Material*

Posey's literally false advertising claims are material. The materiality component of a false advertising claim requires a plaintiff to prove that the defendant's deception is "likely to influence the purchasing decision." *Clorox,* 228 F.3d at 33, n. 6. One may demonstrate materiality by showing that the false or misleading statement relates to an "inherent quality or characteristic" of the product. *Cashmere*, 284 F.3d at 311-312 (finding that statement relating to the quality and characteristics of a cashmere garment would likely be found material by a rational fact finder) (internal citations omitted).

Here, Posey authored and distributed literally false statements about the effectiveness of its hip protector garment. The literally false statements go to the very purpose of a hip protector—the prevention of fall related injury and preservation of the health and wellbeing of elderly and disabled persons. Therefore, these literally false statements are material.

    *d.*    *Posey Placed the Statement into Interstate Commerce*

Posey admits that it placed the Garwood Advertisement into interstate commerce.

    *e.*    *HipSaver Has Been or is Likely to be Injured as a Result of Posey's False Advertising Statements*

In this case, HipSaver will prove that it has already suffered very serious harm and will continue to suffer additional harm due to Posey's wrongful conduct and is entitled to recover Posey's profits.

## 2. HipSaver Will Prevail On Its Claims For Violations of G.L Ch. 93A §§2, 11 (Count III)

Chapter 93A makes misleading or false advertising actionable by a competitor damaged by such advertising. *Skinder-Strauss Associates v. Massachusetts Continuing Legal Educ. Inc.*, 914 F.Supp. 665, 681-682 (D. Mass. 1995) (finding that using the word "official" where it did not have any endorsement supported a 93A claim because it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted"); 940 C.M.R. § 6.04(1) (1995) (providing that "[i]t is an unfair or deceptive act for a seller to make any material representations of fact in an advertisement if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading"). Posey's distribution of literally false claims in violation of the Lanham Act also constitutes a violation of G.L. c. 93A. §§2, 11. Similarly, Posey's claims, statements, and actions related to launderability, durability, and precise placement of the Hipster pads violate G.L. Ch. 93A, §§2, 11.

Furthermore, Posey's false advertising occurred primarily and substantially in Massachusetts. The center of gravity of HipSaver's false advertising claim is Massachusetts: HipSaver is a small Massachusetts business that invented, manufactures, markets, and sells its hip protector product from a facility in Canton. Posey's false advertising has targeted its

Massachusetts competitor. Injury occurred in Massachusetts every time Posey captured a sale and diverted revenue from HipSaver. Moreover, a material loss in sales occurred in Massachusetts where Alimed, one the largest health care distributors in the United States, is based and where almost all of Posey's "authorized" distributors have distribution centers, including Kindred Health Systems, McKesson, Cardinal Health, Medline, and Gulf South. In sum, damage has occurred in Massachusetts, and all of the injury to HipSaver's business has been in the Commonwealth.

The center of gravity of HipSaver's breach of settlement agreement is also Massachusetts. The settlement agreement between these parties resolved litigation filed in the District Court of Massachusetts. Massachusetts law governs the scope of the settlement agreement.

### 3.    HipSaver Will Prevail On Its Breach of Contract Claim for Breach of the Settlement Agreement (Count I)

To prevail on a breach of contract claim, a party must show (a) the existence of a valid and binding contract; (b) that the complaining party has complied with the contract and performed his own obligations under it; and (c) that the breach of contract caused damages. *Persson v. Scotia Prince Cruises, Ltd.,* 330 F.3d 28, 34 (1st Cir. 2003) (*citing* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1235, at 268-70 (2d ed. 2002)).

*a.    The Settlement Agreement Between the Parties is Valid and Binding*

In 2004, HipSaver filed suit against Posey in the District Court of Massachusetts, challenging Posey's distribution of the so-called "UCLA White Paper." Following mediation with Mazzone, J., HipSaver and Posey entered into a settlement agreement. Both parties signed the agreement and gave consideration for the agreement.

b.    *HipSaver Complied with the Contract and Performed all Obligations under the Contract*

Under the 2004 settlement agreement, HipSaver was obliged to comply with the notice and disclosure provision and the release provision.

The notice provision required that, "[i]n the event of any further comparative testing of Posey and HipSaver products by either party, neither party shall make commercial advertising use of the results or analysis related to such testing without first giving the other party at least thirty (30) days advance written notice of the results or analysis." HipSaver did not conduct further comparative testing and did not use the results or analysis related to such testing. In fact, HipSaver did not make any changes to its web-site but for adding a new model where the Velcro of the old model was substituted for snaps on the new model. Therefore, HipSaver had no obligation to provide Posey with notice.

HipSaver also complied with the release provisions. The first release provision states:

> Except for the obligations contained in this Agreement, HipSaver releases Posey, and all of its officers, directors, employees, agents, representatives, dealers, distributors, shareholders, attorneys, predecessors, successors, assigns, affiliates, related companies, or corporations connected with them from any and all claims, liabilities or causes of action, known or unknown, fixed or contingent, which arise from or are related to the false advertising claims under 15 U.S.C. §§ 1125, 1117 and G.L.c.93A, §§ 2, 11 which were asserted or which could have been asserted in the Action for conduct which occurred prior to the date of this Agreement.

HipSaver believes that it complied with this release provision because it released Posey from all claims relating to the false advertising claims raised in the 2004 litigation, the UCLA advertising claims. While the Court may ultimately interpret this provision differently, HipSaver's claims against Posey advertising from 2004 forward are expressly permitted under the agreement because claims are only released for conduct "which occurred prior to the date of this Agreement."

c.      *Posey Breached the Notice Provision of the Settlement Agreement*

The notice provision required that, "[i]n the event of any further comparative testing of Posey and HipSaver products by either party, neither party shall make commercial advertising use of the results or analysis related to such testing without first giving the other party at least thirty (30) days advance written notice of the results or analysis." These prophylactic measures were essential for a small, focused company like HipSaver, which can survive only so many attacks of false advertising, however much triage—in the form of corrective advertising— follows. The damage is done by the first assault, precisely the strategy pursued by Posey.

Shortly after the settlement agreement was executed, Posey began distributing the Garwood Ads in which Posey claims that the results are based on tests conducted by Garwood Laboratories. Posey removed all date references, thus suggesting that the Garwood tests have just been completed (although Posey now claims it was referring to the tests first conducted in 2001 and that it is not relying on more recent Garwood tests). In any case, no notice was given to HipSaver. Indeed, HipSaver was not even aware of the revived Garwood Ads for six months.

The clear purpose of the notice provision in the Settlement Agreement was to give HipSaver an advanced opportunity to review comparative studies (shown previously to be flawed, faulty and misrepresented) suddenly pulled out of thin air by Posey and asserted as fact. This works in tandem with provisions such as those of paragraphs 5-8 in the Settlement Agreement, requiring corrective advertising, and paragraph 4, preventing the future use of flawed studies.

Posey offers a crabbed reading of the opening phrase of paragraph 8 which would allow it to scuttle the Agreement by recycling old, flawed tests or by offering new comparisons from

old testing.  Posey's argument would contradict and undercut the very purpose of the Settlement Agreement.  An exception for a new advertising campaign grounded in "old testing" has no purpose and certainly was not contemplated or intended by the parties.  Indeed, the passive preamble to paragraph 8 and its reference to *further* testing could not have been and never was intended as a crippling limitation to be applied only to *new* testing.  Rather, the opening phrase should be construed, in light of its purpose, to mean:  "In the event of any further application of comparative testing of Posey and HipSaver products by either party . . .".  *Fay, Spofford & Thorndike, Inc. v. Massachusetts Port Authority*, 387 N.E.2d 206, 210 (Mass. App. Ct. 1979) (refusing to construe sentence in contract as limitation where a literal interpretation would undercut "the general purpose manifested by the entire contract, and by circumstances existing at the time of execution").

As is evident from the context of the Settlement Agreement (which settled a prior false advertising claim based on a different flawed study and which compelled corrective advertising) the point to paragraph 8 is notice of the further use of comparative tests in advertising, and Posey should not be allowed to evade its duties by finely parsing a provision with an otherwise obvious objective.  Had Posey complied with the notice provision, this lawsuit might well have been avoided.  Its failure to comply with the notice provision is material and a direct breach of the Settlement Agreement.

d.    *Posey's Breach of the Settlement Agreement Caused Damage to HipSaver*

Posey's failure to notify HipSaver of its new advertising appearing to be based on new testing deprived HipSaver of the opportunity to object to the advertisements before they were circulated to thousands of hip protector customers.  Furthermore, without knowledge of the advertisements, HipSaver was not even aware of the false statements and was unable to counter

the statements in the advertisements even after the advertisements were distributed. Accordingly, all harm to HipSaver caused by the false advertising was suffered as a result of Posey's breach of the notice provision of the settlement agreement.

### A.2.    Posey's Counterclaims are Procedurally Barred and Without Merit, and Posey's Counterclaims Must Fail.

#### 1.    Posey's False Advertising Counterclaim is Precluded by *Res Judicata* or Claim Preclusion

Posey's counterclaim recycles old claims that have already been adjudicated and dismissed with prejudice under Fed. R. Civ. P. 41 in the 2004 Litigation between these two parties. When a stipulation is made with prejudice, the voluntary dismissal has the same claim preclusive *res judicata* effect as a final adjudication on the merits. *See generally U.S. v Cunan,* 156 F.3d 110 (1st Cir. 1998). Thus, the voluntary dismissal by the parties in 2004 bars a second suit raising claims dismissed in the 2004 Litigation between the same parties as well as claims based on transactions out of which the original action arose.

> To bring claim preclusion into play, …[t]he relevant test simply asks whether the same parties pursued a remedy that arose from the same "transaction" in an earlier proceeding…

*Cunan,* 156 F.3d at 116. All statements challenged by Posey in the current litigation were already challenged by Posey in the 2004 Litigation. The claims are compared below:

| Statements Challenged in Posey's Counterclaim in 2004 and Dismissed with Prejudice | Statements Challenged in Posey's Counterclaim in 2005 |
|---|---|
| HipSaver is the "only proven, all-soft hip protector" | HipSaver is the "only proven, all-soft hip protector" |
| HipSaver is "the only soft pad hip protector that has clinical validation" | HipSaver is "the only soft pad hip protector that has clinical validation" |
| HipSavers are "the only all-soft hip protectors, proven effective – in both independent biomechanical testing and clinical study" | HipSavers are "the only all-soft hip protectors, proven effective – in both independent biomechanical testing and clinical study" |
| Only HipSaver products can be | Only HipSaver products can be |

| | |
|---|---|
| laundered according to the CDC (Center for Disease Control) Guidelines for laundry. | laundered according to the CDC (Center for Disease Control) Guidelines for laundry |
| HipSaver's competitor's products "fall apart" and "degrade," that competitors use "inferior materials," and that competitors sell "inferior look-alike" products. | HipSaver's competitor's products "fall apart" and "degrade," that competitors use "inferior materials," and that "big-name" competitors sell "inferior look-alike" products |
| Posey products can be washed up to a maximum of 160° Fahrenheit; | Posey products can be washed up to a maximum of 160° Fahrenheit |
| Posey products have not proven effective in orthopedic biomechanical testing | Posey products have not proven effective in orthopedic biomechanical testing |

Unlike HipSaver's claims in the current action, which challenge revived claims arising out of advertising that was not in commerce at the time of the 2004 Litigation, Posey's claims were asserted and adjudicated in the first action. Posey challenges the *same* HipSaver advertising statements in the current suit that it challenged in the 2004 Litigation. In fact, Posey's counterclaims are a virtual lift from its 2004 counterclaims—Posey's 2005 counterclaims assert the same claims, based on the same legal theories, and seek the same damages.

In fact, the claims *must* be the same as those asserted in the 2004 Litigation because the challenged web pages on the HipSaver Website have *not* changed since the dismissal of the 2004 Litigation.[1] Side-by-side comparisons of the challenged advertisements illustrate this point.

---

[1] Overall, the HipSaver Website changed only by the addition of a new embodiment of the same HipSaver product to the HipSaver product list. Now, in addition to the HipSaver Softsweats, Interim, Nursing Home, QuickChange, Wrap&Snap, SlimFit and Open-Bottom hip protector garment models offered on the HipSaver Website at the time of the 2004 Settlement Agreement, the Website offers a new embodiment called the Open-Bottom 3-Snap. This embodiment uses the same elastic, lycra, and cotton materials and the same protective pads in the same positioning as previous HipSaver embodiments. *The only change to the HipSaver Website since the 2004 Settlement Agreement is the addition of this new embodiment.*

Posey effectively agreed to HipSaver's use of the HipSaver Website as it currently exists. Posey's claims against the Website were dismissed with prejudice pursuant to the Settlement Agreement and Posey did not negotiate any changes to the HipSaver Website as part of that 2004 Settlement Agreement. The Settlement Agreement did not require HipSaver to amend or remove any statements from its Website. If Posey had any complaints about the HipSaver Website, the Settlement Agreement negotiations were the appropriate place to voice those complaints.

Accordingly, because the challenged HipSaver web pages have not changed since 2004, any claim against the advertising statements now could have been made in 2004 and is therefore, precluded.

### 2.    Posey's Counterclaims are Without Merit

a.    *Posey Cannot Show That It is Reasonably Likely to Suffer Injury As a Result of HipSaver's Claims*

Posey fails to demonstrate any reasonable likelihood of injury from HipSaver's advertising. Regardless of the accuracy of HipSaver's claims, Posey's Lanham Act claim fails because Posey is not likely to be injured by HipSaver's claims. Posey's own expert admits,

> [T]here is no evidence that Posey's sales have been measurably impacted by HipSaver's allegedly false advertisements. As discussed above, Posey's average monthly sales were relatively consistent before and during the period of HipSaver's alleged improper actions. Accordingly, Posey does not appear to have lost sales as a result of HipSaver's allegedly inappropriate actions.

In fact, from January 2004 through December 2005 Posey's average monthly revenues increased by 8.8% from $110,000 to $120,000. Posey's own expert found that "Posey's average monthly sales were relatively consistent before and during the period of HipSaver's alleged improper actions. Accordingly, Posey does not appear to have lost sales as a result of HipSaver's allegedly inappropriate actions." There is simply no indication that HipSaver's advertising, posted on its Website since 2002, caused any injury to Posey.

Given that HipSaver's allegedly improper claims have never yet injured Posey after being posted on HipSaver's Website for four years, no evidence suggests that the claims could injure Posey in the future.  As the non-moving party on this summary judgment motion, HipSaver is entitled to the reasonable inference that after four years without injury, future injury is highly unlikely.  This reasonable inference raises a genuine issue of material fact, and Posey's motion for summary judgment on its counterclaim should be denied.

b.     *HipSaver's Website Claims Are Not Literally False (Counterclaims I and II)*

    i.    *The CDC guidelines claims on HipSaver's Laundry webpage are not literally false and Posey will not prevail on its claims for false advertising under the Lanham Act and Ch. 93A*

In its counterclaim against HipSaver's launderability page, Posey challenges the HipSaver claims relating to institutional laundering standards set by the Centers for Disease Control.  The evidence will show that HipSaver's statements are not literally false.

To assess HipSaver's laundry statements, it is important to understand the CDC guidelines. The CDC guidelines provide for two separate laundering standards for the laundering of soiled linens and clothing: a high temperature recommendation and a low temperature/high bleach recommendation.  The CDC high temperature recommendation states that,

> [h]ot water provides an effective means of destroying microorganisms, and a temperature of at least 71°C (160ºF) for a minimum of 25 minutes is commonly recommended for hot-water washing. Chlorine bleach provides an extra margin of safety.

In addition to this hot water recommendation, the CDC also recognizes a low temperature/bleach standard:

> satisfactory reduction of microbial contamination can be achieved at lower water temperatures of 22-50ºC **when the cycling of the washer, the wash formula, and the amount of chlorine bleach are carefully monitored and controlled** (6,7).  Instead of the microbicidal action of hot water, low-temperature laundry

cycles **rely heavily on the presence of bleach to reduce levels of microbial contamination**.

*Emphasis added.* This second, low temperature/high bleach wash requires "careful monitoring" and control of the "washer, the wash formula, and the amount of chlorine bleach" and is not widely used because of its complexity and limited validation.

In fact, Posey's own internal documents note that "large institutions want to launder multiple materials at high heat" and commented that Posey "may loose (sic) large institutions if we [Posey] do not find a solution." This admission followed an avalanche of returns and complaints by customers about Posey hip protectors. These returns and complaints and Posey's subsequent admission that Posey would lose large institutional customers all confirm that Posey's hip protectors did not meet the CDC Guidelines as they were practiced by consumers in the marketplace. HipSaver's claim is accurate.

Furthermore, even for those rare laundries that may use the low temperature/bleach CDC guideline, hip protector products cannot be repeatedly washed according to the low temperature CDC guidelines because the required level of bleach erodes the spandex and urethane components of the hip protectors. Hip protector laundering recommendations published by the Veterans Administration note that "Posey™ hip protectors should not be washed in the hospital laundry. They degrade more quickly and pads may crack or dissolve. *Bleach appears to accelerate this degrading process.* However, if necessary, small amounts of bleach should be used. Hip protectors should be dried in low heat and removed promptly from the dryer." Because Posey's hip protectors are not suited to low temperature/high bleach washing, the CDC Guidelines high temperature recommendation is the only relevant CDC guideline for any customer with institutional laundering. Accordingly, graphic representations on the HipSaver Website accurately refer to only the high temperature CDC guideline and the graphics showing

that the CDC guidelines recommend a minimum wash temperature of at least 160°F is an accurate representation.

     *ii.*     *The laundry claims on HipSaver's Laundry webpage are not literally false*

Posey also challenges HipSaver's Website representation relating to the launderability of HipSaver and Posey hip protector products. Graphic representations on the HipSaver laundry webpage indicate that the HipSaver product may be washed at up to 250°F and Posey may be washed up to 160°F, just as stated in Posey's wash labels on its products. These claims do not purport to be based on testing.[2] Instead, the claims are based on information provided by the product manufacturers on the laundering instruction labels, the CDC guidelines, and a study conducted by the Veteran's Administration.

HipSaver's graphic representation of Posey's launderability indicates that Posey's Hipster can be washed only up to a maximum of 160°F is supported by Posey's own laundering instructions. The Posey Hipster instructs washing at a maximum of 160°F, the CDC minimum high temperature.[3] HipSaver's graphic representation that Posey may be washed up to 160°F is consistent with Posey's own washing instructions and is accurate.

In reality, Posey's Hipsters could not be washed in the high temperature wash used by many institutions without falling apart, cracking, or completely disintegrating. In 2003, Mr.

---

    [2] HipSaver's claims that only HipSaver hip protectors meet the CDC Guidelines for launderability do not make any implied reference to testing to support the claims. An advertising claim makes an implied reference to testing to support the claim when the advertising claim asserts that the advertised product meets a specification and when that specification is defined by a particular test. *See BASF Corp v. Old World Trading Co.,* 41 F.3d 1081, 1084 (7th Cir. 1994). Here, HipSaver's claims are based on Posey's wash instructions, CDC guidelines, personal experience and consumer feedback and do not reference any specification defined by a particular test.

Goodwin and Posey product manager Victoria Lewis participated in a 160°F wash test conducted by the Veteran's Health Administration in Mountain Home, Tennessee, and Ms. Lewis explicitly told the Veteran's Health Administration that Posey hip protectors could launder at 160°F to 170°F.  In direct contrast to these assertions, Posey's hip protectors failed the wash test, and the Veteran's Health Administration published its conclusions that: "As a general rule, Posey™ hip protectors should not be washed in the hospital laundry.  They degrade more quickly and pads may crack or dissolve.  Bleach appears to accelerate this degrading process.  However, if necessary, small amounts of bleach should be used.  Hip protectors should be dried in low heat and removed promptly from the dryer."

In fact, Posey was well aware of these problems as early as 2002 when it was receiving returns of approximately 1% of its total volume because the foam used in the padding cracked and "completely fractured" when laundered in institutional laundries.  Posey found that the foam "cracked inside the pouch", "[broke] into pieces", or appeared "disintegrated."  Posey deduced that these problems resulted from high temperature laundering:

> Heat can weaken the foam, making it easy to break.  We tried to address this problem in the packaging literature, but large institutions want to launder multiple materials in high heat.  We may loose [sic] large institutions if we do not find a solution.  We are also concerned about the effect of high heat on the adhesive if a laminated product is used.

Accordingly, HipSaver Website statements that, "[o]nly HipSaver hip protectors clearly meet the CDC guidelines for infection control in the laundry" and "[o]nly HipSaver [hip protectors] can be laundered according to the CDC Guidelines for laundry" is accurate.

---

[3]  Posey claims that its new "high durability" Hipster can be washed up to 180°F. However, Posey never notified HipSaver of the change in laundering instructions on the new product.

iii.    *The advertising claims on HipSaver's Validation and Testing webpage are not literally false*

HipSaver's advertising claims on the Validation and Testing page of the HipSaver Website are not literally false; the claims are accurate, and the cited tests support the claims. The relevant tests are reported in the JAMDA Report, the Gross Study, the Harvard study and the 2001 Tampere test.

a.    JAMDA Report

HipSaver's description of the JAMDA Report is accurate, and the claims are supported by the JAMDA Report. HipSaver claims that there were 126 falls and no fractures among participants in the JAMDA test. This claim is cited directly from the JAMDA Report. Although the JAMDA study set out to measure compliance, the study recorded the incidence of falls and fractures and found that no fractures were suffered by the study participants, all of whom wore hip protectors. In its discussion of the JAMDA report, HipSaver offers its opinion about the importance of this secondary finding that none of the study participants, all wearing hip protectors, suffered a hip fracture during the study. HipSaver highlights this point because it believes that this "no fracture" finding is as important as the very high rate of patient compliance in the JAMDA study.

The HipSaver webpage also claims that "[t]he results [of the JAMDA Report] are very significant since compliance is a major ingredient in the success of any hip protector program." Posey misreads this significance claim as referring to the fact that there were 126 falls but no fractures, but the reference to compliance in this claim shows that it actually refers to the significance of the very high compliance rate among patients in the study. To this end, HipSaver states that the JAMDA Report records a 93-95% compliance rate.

b.    Gross Study

HipSaver's statements concerning the Gross study are also accurate. The purpose of the Gross Study was to evaluate the effectiveness of hip protectors when worn by high risk, elders. And while the study tested a previous iteration of the HipSaver hip protector, it was a substantial design equivalent of the current HipSaver product. The basic HipSaver technology is the same in both hip protector iterations: an encapsulated visco-elastic damping urethane pad.

The Gross study found that after 199 falls none of the test participants suffered fractures, a significant finding in view of a substantial fracture rate among patients who did not wear hip protectors. Any doubt after the Gross study about the effectiveness of the current HipSaver iteration (as compared to the previous iteration) is resolved by the secondary findings of the JAMDA Report which confirms for the current HipSaver iteration what Gross proved for the previous iteration: the current HipSaver pad is effective in preventing fractures from falls. This is further confirmed by the fact that the physical therapists who performed the Gross Study moved to the current iteration HipSaver when it was released, and these physical therapists have informally noted that after an additional 200 falls by patients with the current iteration HipSavers, there have still been no fractures.

c.    Tampere Test

HipSaver's claims relating to the Tampere test are accurate and supported by the test. The Tampere test evaluated the force reduction of HipSaver pads that use the same foam as the current iteration of the HipSaver pad, and foam is the determinant of the force absorption of the pad. The Tampere test evaluated two thicknesses of HipSaver pads (12.7mm and 8.4mm) and found that the thicker 12.7mm pad offered better force reduction. The Tampere test results show that the HipSaver hip protector reduced a 7200N impact to a 1790N impact and that the Safehip

hard shell hip protector only reduced a 7200N impact to a 2240N impact. Thus the HipSaver reduced the impact force by 550N more than Safehip reduced impact force. This confirms HipSaver's claim that a HipSaver wearer receives 20% less force from a fall than a Safehip wearer.[4]

Posey complains that the Tampere test tested a previous iteration of the padding and claims that such results cannot be applied to HipSaver's current model. Posey's hairsplitting is without merit. In fact, the current HipSaver iteration uses an even thicker pad to improve force reduction even further. There simply is no support for Posey's contention that HipSaver mischaracterizes the Tampere test results.

d.    Harvard Study

HipSaver's claims regarding the Harvard Study are also accurate and supported by the Harvard Study results. Again, Posey complains that HipSaver's statements regarding this test are false because the test does not relate to HipSaver's current product. However, the HipSaver webpage makes no such claim and explicitly states that the Harvard testing which was conducted in 1996 related to a soft foam pad in use in 1996 and confirmed 10% better force reduction than SafeHip, the first widely used hip protector. There is no suggestion in the report on the Harvard study that it refers to HipSaver's current product. Simply stated, the Harvard Study was conducted in 1996 to measure and validate the ability of an early version of the HipSaver soft foam pad to reduce the force of a fall by simulating a dynamic fall impacting the hip. The later

---

[4]    Although Dr. Ebramzadeh quibbles with the wording of the HipSaver web-site, he agrees that, under HipSaver's method of calculation, a comparison of the HipSaver and Safehip force reduction would show that, when compared to Safehip's performance, HipSaver reduced the impact force by an additional 20% of Safehip's performance.

Tampere study validated the more advanced soft foam pad currently used. In sum, HipSaver's statements are accurate and Posey's accusations fail.

c.  *HipSaver Will Prevail On Posey's Common Law Unfair Competition Claim (Counterclaim III)*

Posey's common law unfair competition counterclaim will fail because Posey makes no claim that HipSaver advertisements resulted in consumer confusion as to source as required under Massachusetts Common Law Unfair Competition. Posey failed to plead this element in its counterclaim. And Posey has not asserted nor offered any evidence of consumer confusion as to source. Under Massachusetts law, the "gravamen of an unfair competition claim is the likelihood of consumer confusion as to the source of the goods or services." *American Telephone & Telegraph Co. v. IMR Capital Corp.*, 888 F.Supp. 221, 246-247 (D. Mass. 1995) (stating that "[Unfair competition under Massachusetts Law] addresses the same concerns as does a claim for trademark violation, preventing one firm from unfairly capitalizing on the consumer goodwill of another" and finding no facts suggesting unfair competition where party complained of competitor's disparaging remarks) (citing *Datacomm Interface v. Computerworld, Inc.,* 396 Mass. 760, 769 (1986) (Lynch, J.) (affirming judgment against unfair competition claim where claimant did not prove consumer confusion as to source or origin)); *see also Cytologix,* 2006 WL 2042331 at *1. The required consumer confusion must be caused by either 'palming off' or by copying features of a product or service. *Datacomm Interface*, 396 Mass. at 768-69. As Judge Zobel summarized in *Cytologix*, "[a party] alleging unfair competition must demonstrate either 'palming off,' defined as 'an attempt by one person to induce customers to believe that his products are actually those of another,' or the plaintiff must demonstrate 'that the features of the product in question have acquired a secondary meaning such that confusion as to its source is

likely to arise if defendant is allowed to copy them." *Cytologix Corp.*, *2006 WL 204331* at *1 (D. Mass. July 20, 2006) (Zobel, J.).

Accordingly, because Posey does not allege customer confusion as to source and does not offer any evidence of such consumer confusion, Posey's common law unfair competition counterclaim fails as a matter of law.

d.    *HipSaver Will Prevail On Posey's Breach of Contract Claim for Breach of the Settlement Agreement (Counterclaim IV)*

Under Massachusetts law, Posey's breach of contract claims should be dismissed because Posey did not suffer any damages as a result of any alleged breach by HipSaver.  To prevail on a breach of contract claim, a party must show (1) the existence of a valid and binding contract; (2) that the complaining party has complied with the contract and performed his own obligations under it; and (3) breach of contract causing injury or damages. *Persson v. Scotia Prince Cruises, Ltd.,* 330 F.3d 28, 34 (1st Cir. 2003) (*citing* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1235, at 268-70 (2d ed. 2002)).  Defendant Posey's counterclaim fails because Posey admitted that it suffered no injury or damages from this alleged breach. While it is true that a plaintiff need not prove damages with mathematical certainty, "damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty." *Pierce v. Clark,* 66 Mass. App.Ct. 912 (2006)(internal citations omitted)(refusing to award monetary damages because plaintiff's estimation of damages was only speculative).

Here, Posey admits that it suffered 'no measurable damages' as a result of any alleged breach by HipSaver ("there is no evidence that Posey's sales have been measurably impacted by HipSaver's allegedly false advertisements. … Posey's average monthly sales were relatively consistent before and during the period of HipSaver's alleged improper actions.  Accordingly,

Posey does not appear to have lost sales as a result of HipSaver's allegedly inappropriate actions"). Because Posey does not claim to have suffered any injury or actual damages, there is no issue in dispute as to whether Posey is entitled to actual damages. Thus, the Court should dismiss Posey's breach of contract claim in its entirety or alternatively, dismiss the claim as it relates to a prayer for actual damages.[5]

*e.    Mr. Goodwin is Not Individually Liable On Posey's Counterclaim*

The facts of this case do not support individual liability for Ed Goodwin on Posey's counterclaim even if HipSaver were liable on Posey's counterclaim. In practice, courts apply this doctrine of individual liability for corporate officers in cases with extreme facts such as fraud or blatant misconduct by the individual, or where the individual's conduct left the claimant without a remedy because the corporation itself was judgment proof. *Frontier Mgmt. Co., Inc. v. Balboa Ins. Co.,* 658 F.Supp. 987, 993 (D. Mass. 1986)(finding personal liability where the officers participated in fraudulent misrepresentations); *Frito-Lay of Puerto Rico, Inc. v. Canas*, 92 F.R.D. 384, 393 (D. P. R. 1981)(finding liability under circumstances of "pervasive fraud" and where the corporation was nothing more than an alter ego for the individual); *Petland, Inc. v. Arbelo,* No. 05-2115(ADC), 2006 WL 2583758, slip op. at 2-4 (D. P.R. Sept. 7, 2006)(finding individual liability for trademark infringement where the individual secretly transferred ownership of the corporation and continued to use the trademark and operate as a franchise without making royalty payments to the trademark owner); *LaClair v. Silberline Mfg. Co., Inc.*,

---

[5]   All that remains is the possibility that, in the event that this Court finds a breach by HipSaver, Posey may be entitled to symbolic nominal damages. *St. Charles v. Kender,* 38 Mass. App.Ct. 155, 161 (1995); *Lord's & Lady's Enterprises, Inc. v. John Paul Mitchell Sys.,* 46 Mass. App.Ct. 262 (1999). But, in the case of possible entitlement to only nominal damages, it does not make sense for the parties to continue this expensive litigation. "It would be an imposition

379 Mass. 21, 24, 28-29 (1979)(finding individual liability for negligence where the corporate officer neglected to secure fire insurance or workers compensation insurance for a corporation engaged in high risk manufacturing where an explosion eventually killed an employee and put the uninsured corporation out of business, leaving the employee's family without a worker's compensation insurance payment and without any remedy against the corporation).

Posey has offered no such evidence of exceptional circumstances or extreme misconduct that would warrant a finding of individual liability for Ed Goodwin. Accordingly, the Court should deny Posey's motion for summary judgment for individual liability for Ed Goodwin

### B.    Posey's Statement Of Issues Of Law

Posey contends that the following issues of law remain to be determined either on the parties' respective motions for summary judgment or partial summary judgment or at trial:

1.      In the interests of economy, Posey will not repeat the arguments it advanced in support of or in opposition to the parties' motions for summary judgment, partial summary judgment and/or summary adjudication of issues. However, the legal issues remaining to be determined in connection with the parties' pending motions are:

a)      Whether all of HipSaver's claims fail because it has suffered no damages as a consequence of any of the acts which are the subject of its First Amended Complaint?

b)      Whether HipSaver's claims for false advertising under the Lanham Act, unfair business practices under Mass. G.L. Ch. 93A and product disparagement are barred by the terms of the release provision contained in the written agreement signed by the parties at the time they settled the prior litigation between them?

---

on the parties to consign them to further exertions of [this Court] from which [the plaintiff] could expect to recover no more than one dollar in damages." *St. Charles,* 38 Mass.App.Ct. at 161.

c)    Whether HipSaver's claims for false advertising under the Lanham Act and unfair business practices under Mass. G.L. Ch. 93A are barred by the doctrine of res judicata?

d)    Whether HipSaver's claims for false advertising under the Lanham Act and unfair business practices under Mass. G.L. Ch. 93A are barred by the doctrine of laches?

e)    Whether HipSaver's claims for false advertising under the Lanham Act and unfair business practices under Mass. G.L. Ch. 93A are barred by the doctrine of estoppel?

f)    Whether HipSaver's claim for breach of contract fails because Posey did not undertake any "further" testing in connection with its advertising regarding the Garwood testing?

g)    Whether HipSaver's claim for false advertising under the Lanham Act fails because HipSaver has failed to present evidence that the allegedly false advertising statements of which it complains had a material effect on consumers' purchasing decisions?

h)    Whether HipSaver's claim for violations of Mass. G. L. Ch. 93A fails as a matter of law because the acts which are the subject of its First Amended Complaint did not occur primarily and substantially within the Commonwealth of Massachusetts?

i)    Whether HipSaver's claims for false advertising under the Lanham Act, unfair business practices under Mass. G.L. Ch. 93A and product disparagement are barred under the doctrine of unclean hands as a consequence of HipSaver's own false advertising?

j)    Whether Posey is entitled to summary adjudication of its first claim against HipSaver and Goodwin for false advertising under the Lanham Act?

2.    Depending upon the Court's ruling on Posey's motion for summary judgment on HipSaver's claims and HipSaver's motion for summary adjudication of issues on its claims, the

legal issues remaining to be determined at trial in connection with the claims set forth in the FAC will include:

a)     Whether HipSaver should be precluded from introducing any evidence that the acts which are the subject of its First Amended Complaint caused any actual damage to HipSaver on the grounds that it failed to disclose the factual basis for its claim of actual harm?

b)     Whether all of HipSaver's claims fail as a matter of law because it is precluded from introducing any evidence that the acts which are the subject of the FAC caused any actual damage to HipSaver?

c)     Whether HipSaver's claim for false advertising under the Lanham Act fails because the Posey advertising statements of which it complains are not false or misleading?

d)     Whether HipSaver's claim for false advertising under the Lanham Act fails because the Posey advertising statements of which HipSaver complains did not deceive or have the capacity to deceive consumers?

e)     Whether HipSaver's claim for false advertising under the Lanham Act fails because the Posey advertising statements of which HipSaver complains did not have a material effect on consumers' purchasing decisions?

f)     Whether HipSaver's claim for false advertising under the Lanham Act fails as a matter of law because it did not suffer any actual damages as a result of the Posey advertising statements of which HipSaver complains?

g)     Whether HipSaver's claim for false advertising under the Lanham Act fails as a matter of law because it is not likely to be injured by the Posey advertising statements of which are the subject of its complaint?

h)      Whether HipSaver's claim for violations of Mass. G. L. Ch. 93A fails as a matter of law because the acts which are the subject of its First Amended Complaint did not occur primarily and substantially within the Commonwealth of Massachusetts?

i)      Whether HipSaver's claim for product disparagement fails as a matter of law because the statements which form the basis for that claim cannot reasonably be interpreted in a disparaging manner?

j)      Whether HipSaver's claim for product disparagement fails because HipSaver did not suffer any special damages as a direct result of the statements which form the basis for that claim?

k)      Whether HipSaver's claim for breach of contract for Posey's failure to give HipSaver notice of its intention to publish ads making reference to the Garwood fails as a matter of law because Posey never conducted "further" comparative testing?

l)      Whether HipSaver's claims for (i) false advertising under the Lanham Act, (ii) unfair business practices under Mass. G. L. Ch. 93A, and (iii) product disparagement are barred by the doctrine of res judicata?

m)      Whether HipSaver's claims for (i) false advertising under the Lanham Act, (ii) unfair business practices under Mass. G. L. Ch. 93A, and (iii) product disparagement are barred by the terms of the release contained in the Posey I settlement agreement?

n)      Whether HipSaver's claims for (i) false advertising under the Lanham Act, (ii) unfair business practices under Mass. G. L. Ch. 93A, and (iii) product disparagement are barred by the doctrine of laches?

o)     Whether HipSaver's claims for (i) false advertising under the Lanham Act, (ii) unfair business practices under Mass. G. L. Ch. 93A, and (iii) product disparagement are barred by the doctrine of estoppel?

p)     Whether HipSaver's claims for (i) false advertising under the Lanham Act, (ii) unfair business practices under Mass. G. L. Ch. 93A, and (iii) product disparagement are barred by the doctrine of acquiescence?

q)     Whether HipSaver's claims for false advertising under the Lanham Act, unfair business practices under Mass. G.L. Ch. 93A and product disparagement are barred under the doctrine of unclean hands as a consequence of HipSaver's own false advertising?

r)     If HipSaver prevails on its claims for (i) false advertising under the Lanham Act or (ii) unfair business practices under Mass. G. L. Ch. 93A, whether it would be inequitable for the Court to award HipSaver any portion of the profits Posey earned on its sales of Posey Hipsters?

s)     If HipSaver prevails on its claims for (i) false advertising under the Lanham Act or (ii) unfair business practices under Mass. G. L. Ch. 93A and it would not be inequitable to award HipSaver any portion of the profits Posey earned on its sales of Posey Hipsters, what portion of Posey's profits should HipSaver recover and for what period of time?

t)     If HipSaver prevails on its claims for (i) false advertising under the Lanham Act, (ii) unfair business practices under Mass. G. L. Ch. 93A, or (iii) product disparagement, whether the Court should enter an injunction in favor of HipSaver and, if so, what the injunction should provide?

3.     Depending upon the Court's ruling on Posey's motion for partial summary judgment on its first counterclaim against HipSaver for false advertising under the Lanham Act

and on HipSaver's motion for summary judgment on Posey's counterclaims, the legal issues remaining to be determined at trial in connection with the counterclaims set forth in Posey's counterclaim will include:

a)    Whether HipSaver and/or Goodwin are liable for false advertising under the Lanham Act as a consequence of the publication of the false and misleading "laundry" and "testing and validation" statements posted on HipSaver's Internet website?

b)    Whether HipSaver and/or Goodwin are liable for violating Mass. G. L. Ch. 93A as a consequence of the publication of the false and misleading "laundry" and "testing and validation" statements posted on HipSaver's Internet website?

c)    Whether Posey is likely to be injured as a consequence of the publication of the false and misleading "laundry" and "testing and validation" statements posted on HipSaver's Internet website?

d)    If Posey prevails on its claims for (i) false advertising under the Lanham Act and/or (ii) unfair business practices under Mass. G. L. Ch. 93A, whether the Court should enter an injunction in favor of Posey and, if so, what the injunction should provide?

e)    Whether HipSaver is liable for breach of contract for failing to give Posey notice that it was going to make advertising claims regarding the product it introduced following the effective date of the settlement agreement in Posey I?

## 7.    ANY REQUESTED AMENDMENTS TO THE PLEADINGS

None.

## 8.    ANY ADDITIONAL MATTERS TO AID IN THE DISPOSITION OF THE ACTION

None.

**9.      THE PROBABLE LENGTH OF THE TRIAL**

Assuming that the trial will be conducted in consecutive half-days, the parties anticipate that the trial will take approximately 1-2 weeks.

**10.     THE PROPOSED WITNESSES**

HipSaver's Rule 26(a)(3) witness list has been filed separately.  A final witness list will be submitted by May 15, 2007, and may be amended or supplemented prior to trial.  Posey's Rule 26(a)(3) witness list has been filed separately.  A final witness list will be submitted by May 15, 2007, and may be amended or supplemented prior to trial.

**11.     THE PROPOSED EXHIBITS**

HipSaver's Rule 26(a)(3) exhibit list has been filed separately.  A final exhibit list will be submitted by May 15, 2007, and may be amended or supplemented prior to trial.  Posey's Rule 26(a)(3) exhibit list has also been filed separately.  A final exhibit list will be submitted by May 15, 2007, and may be amended or supplemented prior to trial.

**12.     THE PARTIES' RESPECTIVE POSITIONS ON ANY REMAINING OBJECTIONS TO THE EVIDENCE**

Notwithstanding that certain facts are established by the pleadings, by admissions or by stipulation, the parties each reserve their rights to object to the admissibility at trial of any facts or other evidence on any grounds permitted by the Federal Rules of Evidence or by the Federal Rules of Civil Procedure and to seek to limit the issues or the purpose for which any evidence may be used at trial by appropriate motions in limine.

/s/  Courtney M. Quish

Lee Carl Bromberg, BBO No.:  058480
Edward J. Dailey, BBO No.:  112220
Courtney M. Quish, BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
(617) 443.9292
(617) 443.0004  Fax

*Attorneys for Plaintiff,*
*The HipSaver Company.*

/s/ Doug H. Morseburg

Jeffrey G. Sheldon (CA Bar No. 67516)
Douglas H. Morseburg (CA Bar No. 126205)
SHELDON MAK ROSE & ANDERSON PC
225 South Lake Avenue, Suite 900
Pasadena, CA 91001
(626) 796-4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
(617) 289-9200

*Attorneys for the Defendant,*
*J.T. Posey Company.*

Dated:  Boston, Massachusetts
        May 1, 2007