UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                           )
THE HIPSAVER COMPANY, INC., )
                           )
          Plaintiff,       )
                           )
     v.                    )    CIVIL ACTION NO. 05-10917-PBS
                           )
J.T. POSEY COMPANY,        )
                           )
          Defendant.       )
_____)
```

**MEMORANDUM AND ORDER**

May 15, 2007

Saris, U.S.D.J.

    This is the next contentious chapter of a long-running dispute between HipSaver, Inc. ("HipSaver") and J.T. Posey Company ("Posey") over the marketing of hip protectors, padded garments used to prevent hip and femur fractures in the elderly. The parties have each brought accusations of literally false advertising under the Lanham Act, 15 U.S.C. §§ 1117 & 1125, and deceptive business practices under state law. In the first iteration of this lawsuit, in 2004, the parties entered into a settlement agreement to dispose of similar claims. The parties now bring new allegations of falsehood and deceptive conduct, rehash geriatric claims, and assert breach of the prior settlement agreement. Both seek summary judgment. After hearing and review of the briefs, the Court:

- **ALLOWS IN PART** and **DENIES IN PART** HipSaver's motion for partial summary judgment on counts II and III of the

complaint;

- **ALLOWS** HipSaver's motion for summary judgment on Posey's cross-claims;

- **DENIES** Posey's motion for partial summary judgment on its cross-claims;

- **DENIES** Posey's motion for summary judgment on count I of the complaint;

- **ALLOWS** Posey's motion for summary judgment on count IV of the complaint;

- **ALLOWS IN PART** and **DENIES IN PART** Posey's motion for summary judgment on counts II and III of the complaint; and

- **ALLOWS** HipSaver's motion to dismiss Edward Goodwin.

## I.  Background

The record supports the following facts, which are undisputed, except where noted.

### A.  The First Litigation

Plaintiff HipSaver is a small, closely-held Massachusetts corporation that develops, manufactures and distributes hip protector garments ("HipSavers").  These garments consist of an open-cell foam pad enclosed in an expandable air pouch, which absorbs energy associated with the impact from a fall and provides fracture protection to the hip/femur in the elderly and disabled.  The device is washable, sewn into clothing, and positioned over the hip.  HipSaver's president, Edward Goodwin, invented the product in 1995.

Defendant and cross-claimant Posey is a family-owned California corporation and nationwide distributor of patient

2

safety and support services, including since 2001 a line of hip protectors ("Hipsters") which compete directly with HipSaver's garments. Together, HipSaver and Posey dominate the hip protector market in the United States.

In 2001, Posey hired Garwood Laboratories, an independent testing company, to perform impact-absorption testing on foam materials used in hip protector garments. The next year Posey began distributing advertising materials that referenced this testing ("the Garwood advertising") in support of its Hipster product line. These materials included catalogs, flyers, and brochures that Posey distributed at trade shows and sent to health care facilities requesting product information. The advertising claimed, among other things, that an independent laboratory had subjected various hip protectors to testing which simulated a fall and measured impact-absorption, and that Posey products proved not only effective at reducing fractures but showed "the best results of any hip protector available."

HipSaver alleges that Posey launched a large scale public advertising campaign in 2002 using the Garwood ads which made false representations about the effectiveness and launderability of the Hipster product as established by testing, and that in the fall of 2003, Posey halted its Garwood ads and replaced them with ads that referenced other testing. (See HipSaver's Opp. to Posey's Mot. for Summ. J. on the Compl., at 34, Docket No. 179). The president of HipSaver, Edward Goodwin, admits that he knew

about the Garwood advertisements in 2002 and 2003, but believed they had been discontinued. (<u>See</u> Goodwin Dep. Vol. I, at 43:5-9; Goodwin Decl. ¶¶ 23-24.) HipSaver offers no evidence in support of its assertion that the Garwood ads were withdrawn in 2003.

Posey contends that the Garwood ads were not abandoned. Posey's product manager, Victoria Gay Lewis, has submitted a declaration in which she states, from personal knowledge, that the Garwood testing results appeared in various forms, including a Posey promotional video, continuously from 2002 through 2005. (<u>See</u> Lewis Decl. ¶ 8.)

In late 2003 or early 2004, Posey began to distribute promotional materials that referenced the results of different hip protector testing reported in a so-called "White Paper" written by a UCLA graduate student. References to this White Paper testing also appeared on the company's website. Posey's White Paper advertisements claimed that the testing included both Posey and HipSaver products, among others, and demonstrated that Posey's products "outperformed all competitive hip protectors tested" with regard to their capacity to absorb energy associated with a fall. (<u>See</u> 2004 Complaint, Posey Exh. 1.)

In June 2004, in response to these White Paper ads, HipSaver filed suit against Posey for false advertising under the Lanham Act, 15 U.S.C. §§ 1117 & 1125, and violations of Mass. Gen. L. ch. 93A, §§ 2 & 11 ("Chapter 93A"). HipSaver claimed that the testing was flawed in several respects, including that the

4

student had not actually tested HipSaver products and had misrepresented questionable testing results, such that the White Paper could not support the claims in Posey's advertising.

Posey counterclaimed, alleging that HipSaver was engaged in a false and deceptive advertising campaign to tarnish Posey's reputation, also in violation of the Lanham Act's false advertising provisions and Chapter 93A.  Specifically, Posey identified certain representations regarding garment launderability and durability on HipSaver's website, as well as statements that HipSaver products had been tested and proven effective in various studies, as literally false and deceptive. Posey argued that the studies cited by HipSaver in support of these representations did not support the website's claims.

On August 24, 2004 the parties entered into a settlement agreement "to settle all disputes among them concerning or in any way related" to the lawsuit.  Posey agreed, among other things, to pay HipSaver $360,000; to stop distributing the White Paper and any advertisements referencing the results of that testing; and to issue a corrective "Special Announcement" disclaiming the reliability of the White Paper ads.  The parties also agreed to refrain from using the results of any further comparative testing of Posey and HipSaver products without giving the other advanced (30 days) written notice, and broadly released each other from liability for

all causes of action, <u>known or unknown</u>, fixed or

5

> contingent, which arise from or are related to the false
> advertising claims under [the Lanham Act or Chapter 93A]
> which were asserted or could have been asserted in the
> Action for conduct which occurred prior to the date of
> this Agreement.

(emphasis added.)  Neither the 2004 complaint nor the settlement agreement mention the Garwood advertising.

No reference is made in the agreement to any obligations with respect to the allegedly offending materials posted on HipSaver's website.  The agreement was drafted jointly by the parties, and includes an integration clause.  Both parties, in conjunction with the present lawsuit, admit that they understood the agreement to permit the continued publication of known promotional materials in existence during the dispute which the settlement agreement did not otherwise obligate them to alter or withdraw. (See, e.g, Tr. of Motion Hearing 5:3-6 (Oct. 11, 2005) (counsel for HipSaver stating: "So I think both parties move forward under the assumption that the advertisements as they existed at the time [of the agreement] were agreed to by both parties and were acceptable"); Posey's Statement of Uncontroverted Facts, ¶ 21 (admitting understanding "that claims by either of them against the other based upon the re-publication or dissemination of advertisements or commercial statements that were the same as, or substantially similar to, any such . . . statements [distributed before the settlement agreement] would be barred")).  However, HipSaver contends that it did not agree to the continued use of the Garwood ads post-settlement, because it

6

believed they had been discontinued prior to the litigation and were no longer at issue.

**B.   Round Two**

Following execution of the settlement agreement and withdrawal of the White Paper advertisements, Posey ran more Garwood ads.  The Garwood testing was supplemented in 2004-2005 to include new products, but used the same guided drop procedure employed in the 2001 tests.  Otherwise, the representations based on the testing were the same, or materially similar, to those contained in the first run of Garwood ads.  Posey did not provide HipSaver with advanced notice of its intent to disseminate these materials.  (The ads were withdrawn in May 2005 in response to HipSaver's complaint.)

HipSaver, in turn, did not remove or alter the challenged statements on its website following the settlement agreement. The representations as to durability and launderability remain the same, but for the addition of a single new HipSaver product and comparative references to a single new Posey product.

On May 4, 2005, only eight months after settlement of the first dispute, HipSaver again filed suit against Posey, bringing claims for breach of the settlement agreement, literally false advertising under the Lanham Act, violations of Chapter 93A, and common law product disparagement.  The false advertising and deceptive business practices claims are premised on the Garwood

ads.  HipSaver's product disparagement claim stems from an email sent by a former Posey marketing director to employees at a California Veterans Administration ("VA") which referenced the Garwood testing results in support of Posey products' superior impact-absorption properties.

In response, Posey raises numerous affirmative defenses, and has cross-claimed for literally false advertising under the Lanham Act, violations of Chapter 93A, common law unfair competition, and breach of the settlement agreement.  The basis for the majority of Posey's counterclaims are the same representations as to durability and launderability challenged in the first lawsuit.

HipSaver has moved for partial summary judgment on the issues of literal falsehood, materiality, consumer confusion, and distribution through interstate commerce with respect to the Lanham Act claims brought in the complaint.  Posey concedes distribution in interstate commerce, but disputes that the ads are literally false, material, or likely to confuse.  Posey opposes HipSaver's motion on numerous grounds.  HipSaver has also moved for summary judgment on Posey's counterclaims, asserting, among other things, that the 2004 settlement agreement bars all of its competitor's claims.  Posey, likewise, seeks summary judgment on its cross-claims and on HipSaver's complaint.

## II.  Discussion

## A.  Standard of Review

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Barbour v. Dynamics Research Corp., 63 F.3d 32, 36 (1st Cir. 1995) (quoting Fed. R. Civ. P. 56(c)), cert. denied, 516 U.S. 1113 (1996).  "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the non-moving party's position."  Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, 'who may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'"  Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  "There must be 'sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'"  Rogers, 902 F.2d at 143 (quoting Anderson, 477 U.S. at 249-50) (citations and footnote in Anderson omitted).

The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor."  Barbour, 63 F.3d at 36.

**B.  The Effect of the Settlement Agreement**

The parties vigorously dispute the effect of the 2004 settlement agreement's release provision, particularly with respect to its impact on claims rooted in the Garwood ads. Release interpretation turns on the expectations and intentions of the parties at the time of agreement with regard to the future effect of the release.  Atlas Tack Corp. v. Crosby, 671 N.E.2d 954, 957 (Mass. App. Ct. 1996) (citing Polaroid Corp. v. Rollins Envtl. Servs., 624 N.E.2d 959, 966 (Mass. 1993)).

> Questions of party intent are generally determined with reference to all the circumstances surrounding the making of the agreement, as well as the actual language of the agreement.  However, where the language of an integrated release agreement is unambiguous as applied to the question at hand and the intent of the parties is clear solely on the basis of that language, the parol evidence rule bars the use of extrinsic evidence to contradict that plain language.

Hermes Automation Technology, Inc. v. Hyundai Electronics Industries Co., 915 F.2d 739, 747 (1st Cir. 1990) (citations omitted).  Release is an affirmative defense, see Fed. R. Civ. P. 8(c), and ambiguity in a release should be resolved in favor of the claimant.  See Davignon v. Clemmey, 322 F.3d 1, 17  (1st Cir. 2003) (citing Cormier v. Cent. Mass. Chapter of the Nat'l Safety Council, 620 N.E.2d 784, 786 (Mass. 1993)).

Here, the plain language of the agreement exempts the parties from all liability for "known and unknown" claims which "arise from or are related to" the false advertising/deceptive business practices claims "which were asserted or could have been asserted" in the previous lawsuit for conduct occurring prior to August 2004. Massachusetts caselaw "instructs that the term 'arising out of' should be broadly construed." Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co., 220 F.3d 1, 7 (1st Cir. 2000) (construing insurance contract) (citation omitted). Courts have concluded that the execution of a "settlement agreement between two commercial entities releasing all claims 'arising out of' certain listed claims, clearly indicate[s] an intent that the release be broadly construed and not be strictly limited to the listed released claims." Trex Co. v. Exxonmobil Oil Corp., 234 F. Supp. 2d 572, 577 (D. Va. 2002) (citing Coakley & Williams Constr., Inc. v. Structural Concrete Equipment, Inc., 973 F.2d 349, 352-353 (4th Cir. 1992) (use of the words "arising out of" in a settlement agreement "suggests that the parties intended to release more than just the claims contained in the pleadings")). Where, as here, the phrase "arising from" is joined by the words "or related to," it is clear that the parties intended the release to sweep even more broadly. See, e.g., United States v. Alegria, 192 F.3d 179, 185 (1st Cir. 1999) (contracts generally "should be construed where possible to give effect to every term and phrase").

11

By releasing claims both "known and unknown" which "could have" been asserted in the previous complaint, the parties signaled their intent to broadly bar relitigation of the parties' pre-2004 marketing conduct.  A reading of the agreement that would limit the coverage of the release exclusively to claims factually rooted in the White Paper advertising campaign would render this language superfluous, since the release of "known and unknown" claims cannot be construed to bar only alternative legal theories of recovery for already-litigated conduct (which would be barred by res judicata in any event).  See United States v. Cunan, 156 F.3d 110, 114 (1st Cir. 1998) (explaining that "a voluntary dismissal with prejudice is ordinarily deemed a final judgment that satisfies the res judicata criterion" and precludes relitigation of previously-asserted claims).

The key issue is the scope of the release.  At the heart of the previous lawsuit were accusations by each party that the other had engaged in a false marketing campaign to misrepresent flawed testing results as to the superiority of certain product attributes (impact-absorption, launderability, durability) vis-a-vis direct competitors.[1]  Accordingly, a claim "relates" to the

---

[1]Compare, e.g., 2004 HipSaver Complaint ("In an intentional, deceptive, fraudulent and bad faith effort to damage and destroy HipSaver, Posey has directly targeted the Plaintiff with an advertising and marketing campaign grounded in literally false product safety comparison claims."), with 2004 Posey Answer and Counterclaim ¶ 52 (alleging that "HIPSAVER has embarked on a campaign to tarnish and damage the reputation of POSEY and POSEY's hip protector products" through various means).

previous lawsuit if it is rooted in allegations of such a campaign, provided that the conduct occurred prior to August 2004 and that the claims could have been brought in first lawsuit. This construction of the release is consistent with the recitation in the body of the agreement that signals the parties' intent "to settle all disputes among them concerning or <u>in any way related</u>" to the 2004 litigation.  (Settlement Agreement ¶ E (emphasis added).)  Therefore, with this construction in mind, I address the effect of the release on the claims brought by the parties.

### 1. HipSaver's Claims

#### a. False Advertising and Deceptive Business Practices

The broad language of the release as applied to "known and unknown" claims "related to" the previous false advertising allegations compels the conclusion that claims based on the Garwood ads are barred prior to August 2004.  The Garwood claims are "related to" the previously-asserted White Paper claims because both rest on allegations of a false marketing campaign to misrepresent flawed testing data as to impact-absorption and relative product superiority.  HipSaver knew about the ads as early as 2002 and chose not to pursue claims based on them although the claims were timely.  Even if HipSaver incorrectly believed the claims were abandoned, the release covers unknown claims.

The harder question is whether the post-2004 Garwood advertisements are barred by the settlement agreement. Generally, where an agreement is unambiguous and contains an integration clause, a court must give effect to its obvious meaning.  See, e.g., Bank v. IBM, 145 F.3d 420, 424 (1st Cir. 1998).  "That means, of course, that an inquiring court should construe the written document within its four corners, unfestooned with covenants the parties did not see fit to mention." United States v. Alegria, 192 F.3d 179, 185 (1st Cir. 1999) (citations and internal quotation marks omitted).  Here, however, the agreement is ambiguous with respect to its intended effect on advertisements in existence during the previous litigation but not otherwise addressed by the parties.  Both HipSaver and Posey concede that they understood the release to bar claims based on the continued publication of statements in existence during the first dispute which the parties knew about and were not obligated to alter or withdraw under the terms of the settlement.

The parties vigorously dispute whether the Garwood advertisements were in existence during the first dispute. Posey insists that the Garwood ads remained in circulation throughout the White Paper litigation, while HipSaver contends that the Garwood ads were withdrawn and abandoned prior to publication of the White Paper ads.  The dates listed on various

14

flyers and other promotional materials referencing the Garwood testing identify only dates of publication in 2003, but do not conclusively show whether the distribution continued into 2004. (See Exhs. 4-31, Docket No. 218.)  However, Posey employee Victoria Gay Lewis asserts in her declaration that the Garwood ads were in circulation during the previous litigation.  HipSaver contends that Lewis does not have sufficient knowledge regarding promotional activities to support this assertion, but HipSaver's evidence on this point -- deposition testimony in which Lewis professes a lack of knowledge regarding certain information the Posey's sales team provides to health care facilities -- is insufficient to create a disputed issue of material fact.  (See Lewis Depo. at 24-25.)  Moreover, HipSaver's position is undercut by other submissions by Lewis in which she demonstrates detailed knowledge about Posey's hip protector advertisements.  (See generally Lewis Decl., Docket No. 188.)  HipSaver, in turn, has failed to provide any evidence that the Garwood ads were not in circulation during the first litigation.

Nonetheless, HipSaver has averred that Mr. Goodwin was unaware of the circulation of the Garwood ads in 2004, and Posey has offered no evidence to rebut his lack of knowledge.  Posey distributes numerous advertisements in various forms across the country, and Goodwin could have reasonably believed, in good faith, that the Garwood ads had been discontinued when the White Paper ads came into existence.  Both sets of ads address similar

15

product attributes and served an identical function in the
advertising.  There is no evidence that the parties agreed to
release claims based on advertisements that the parties did not
know were in existence during the first lawsuit.  Because any
ambiguity in the release must be construed against Posey, the
settlement agreement cannot be read to bar claims based on post-
settlement distribution of the Garwood ads.  Posey's motion for
summary judgment on counts II and III of the complaint is **ALLOWED
IN PART** and **DENIED IN PART**.

### b.  Product Disparagement

Next, Posey argues that the settlement agreement also bars
HipSaver's product disparagement claim based on the 2001 email
sent by Jeffery Yates, a former marketing director for Posey, to
employees of a VA hospital in Los Angeles.  That email included
an attachment outlining the initial Garwood testing results which
were intended to demonstrate that an "independent testing
facility" had found Posey's Hipster III product "the best energy
absorbing external hip protector on the market."  (Exh. A to
Decl. of Jeffery Yates, Docket No. 164.)

The Yates email is "related" to the subject matter of the
previous lawsuit within the meaning of the release provision
because it involves an allegedly deceptive marketing effort which
references the results of "independent" testing to support claims
of impact-absorption efficacy vis-a-vis competitors.  Further,

16

the email was sent well before the settlement agreement was signed in 2004, and HipSaver "could have" brought a disparagement claim in the first lawsuit.  As such, HipSaver's claim based on the Yates missive is barred under the terms of the release. Posey's motion for summary judgment on Count IV of the complaint is **ALLOWED**.[2]

### 2. Posey's Claims

#### a. False Advertising and Deceptive Business Practices

HipSaver contends that Posey's false advertising and Chapter 93A claims based on allegedly false statements published on HipSaver's website are also precluded by the terms of the settlement agreement.  Posey concedes that the settlement agreement bars all claims related to representations on HipSaver's website which were posted prior to August 2004. Therefore, the representations which comprise the factual basis for Posey's Lanham Act and Chapter 93A claims include only those published after the execution of the settlement agreement.

---

[2]The parties contend that many of the claims in this dispute are barred by res judicata.  However, res judicata would not dispose of unknown claims.  See Porn v. National Grange Mut. Ins. Co., 93 F.3d 31, 34 (1st Cir. 1996).  Moreover, the First Circuit has stated that the "doctrine of res judicata, involving 'claim preclusion,' is a concept which we hesitate to apply" in situations involving a challenge to the republication of previously-litigated false advertisements "because of the ambiguities surrounding its applicability to situations of ongoing wrongful conduct."  Pignons S.A. de Mecanique v. Polaroid Corp., 701 F.2d 1, 2 (1st Cir. 1983).  Accordingly, I will limit discussion to the effect of the settlement agreement.

Claims based on these representations, HipSaver argues, are also barred by the agreement because the parties intended to allow the continued publication of challenged statements which they were not obligated to withdraw under the terms of the settlement.  The settlement agreement makes no mention of its intended effect on the website claims, does not specifically obligate HipSaver to withdraw or alter the statements, and contains an integration clause.  Here, as discussed above, the agreement is ambiguous with respect to its intended effect on promotional materials in existence at the time of the dispute and not otherwise addressed by the terms of the settlement.  Both parties have confirmed that the release was intended to permit the continued publication of materials not otherwise disposed of by the agreement.  Because the statements on the website existed during the prior litigation and were known to the parties, HipSaver's motion for summary judgment as to Counts I and II of Posey's counterclaim is **ALLOWED**.[3]

### b.  Unfair Competition

Posey also brings a claim for common law unfair competition

---

[3]A more difficult question involves the effect, if any, of certain modifications to the website post-settlement.  Since August 2004, HipSaver has added a single new product to its website, the "Open-Bottom 3-Snap", and has also included a reference to a single new Posey product, the "High Durability Hipster".  Whether the addition of these products exempts the challenged statements as to those products from the parties' understanding about continued use is not addressed in depth by the parties, and I do not rule on the issue.

based on HipSaver's website representations.  The "unfair competition" identified in the cross-claims implicates the same core allegations that underpin the Lanham Act and Chapter 93A claims.  Accordingly, for all conduct preceding the settlement agreement, the claim is barred by the release.  For conduct postdating that agreement, the claim is foreclosed by the parties' understanding that existing materials not otherwise affected by the settlement would be permitted to continue. HipSaver's motion for summary judgment on count III of Posey's Counterclaim is **ALLOWED**.

## C.  Breach of the Settlement Agreement

### 1.  HipSaver's Claim

Posey also moves for summary judgment on HipSaver's breach of contract claims premised on publication of the 2005 Garwood advertisements without advanced written notice.  The agreement recites in relevant part:

> In the event of further comparative testing of Posey and HipSaver products by either party, neither party shall make commercial advertising use of the results or analysis of such testing without first giving the other party at least thirty (30) days advance written notice of the results or analysis.

(Settlement Agreement, ¶ 8.)  Posey contends that "further comparative testing" cannot include testing conducted in 2001, and that the dissemination of the Garwood materials therefore does not violate the terms of the agreement.

While this is true, HipSaver points to evidence that the

Garwood test results disseminated in 2005 were based, in part, on additional guided drop tests performed sometime in 2004 and 2005. (<u>See</u> Lewis Depo., at 72-73).  Some portion of that testing postdates the execution of the agreement.  Posey has not offered any evidence that it provided HipSaver with the 30 days notice required under the terms of the agreement, nor does it dispute that the 2005 Garwood testing data was put to "commercial advertising use."  Accordingly, because the new Garwood testing falls within the plain meaning of the term "further testing," Posey's motion for summary judgment on Count I is **DENIED**.

### 2.  **Posey's claim**

In tandem, HipSaver moves for summary judgment on Posey's breach of contract claim based on amendments to the format and content of HipSaver's website.  Posey characterizes these amendments, which consist of the addition of new products to the website, as an "advertisement that did not exist at the time of the settlement."  (<u>See</u> Answer and Counterclaim, ¶ 48.)  The merits of this issue, and the precise nature of the breach, are poorly briefed.  However, unlike the contract claim brought by HipSaver, Posey does not allege that the HipSaver website constitutes or otherwise incorporates "further comparative testing."  Without some allegation that the HipSaver website incorporates further comparative testing, as opposed to the inclusion of new product information, Posey cannot sustain its

20

burden of demonstrating the existence of a material issue of fact for trial on the breach of contract claim.  As such, HipSaver's motion for summary judgment on Count IV of Posey's counterclaim is **ALLOWED**.[4]

## C. False Advertising

To prove false advertising under the Lanham Act, a plaintiff must demonstrate that

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

Cashmere, 284 F.3d at 310-11 (citation omitted).  However, where the advertisement is literally false, as plaintiff alleges here, "a violation may be established without evidence of consumer deception."  Id. (citing, inter alia, Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 693 (6th Cir. 2000)).

### 1.  Literal Falsehood

"Whether an advertisement is literally false is typically an issue of fact."  Clorox Co. v. Proctor & Gamble Commer. Co., 228

---

[4]Because HipSaver's motion for summary judgment on Posey's cross-claims has been allowed, HipSaver president Edward Goodwin is dismissed from the lawsuit.

F.3d 24, 34 (1st Cir. 2000) (citation omitted).  To determine whether an ad is literally false, "[f]irst, a factfinder must determine the claim conveyed by the advertisement.  Once the claim made by the advertisement has been determined, the factfinder must then evaluate whether that claim is false."  Id. In undertaking this inquiry, a court "must analyze the message conveyed in full context" and "must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other."  Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1248 (11th Cir. 2002); see also S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001) ("In considering a false advertising claim, 'fundamental to any task of interpretation is the principle that text must yield to context.'" (citation omitted)).  At the same time, because consumers will not be exposed to every advertisement in a campaign, this inquiry focuses on individual advertisements, not marketing campaigns as a whole.  See Johnson & Johnson, 299 F.3d at 1248.

    "Where a defendant's ad explicitly or implicitly represents that tests or studies prove its product superior, a plaintiff satisfies its burden by showing that the tests did not establish the proposition for which they were cited."  Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 63 (2d Cir. 1992).  A plaintiff "can meet this burden by demonstrating that the tests were not

sufficiently reliable to permit a conclusion that the product is superior." Id. (citing, inter alia, McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544 (2d Cir. 1991)). However, the fact that "a study's design is imperfect" does not, on that basis alone, render an advertisement false within the meaning of the Lanham Act. Johnson & Johnson, 299 F.3d at 1249.

Alternatively, a plaintiff may "show that the tests, even if reliable, do not establish the proposition asserted by the defendant." Spalding Sports Worldwide, Inc. v. Wilson Sporting Goods Co., 198 F. Supp. 2d 59, 67 (D. Mass. 2002) (citing Castrol, Inc. v. Pennzoil Quaker State Co., 169 F. Supp. 2d 332, 336 (D.N.J. 2001)). Nonetheless, "[t]o ensure vigorous competition and to protect legitimate commercial speech, courts applying this standard should give advertisers a fair amount of leeway, at least in the absence of a clear intent to deceive or substantial consumer confusion." Rhone-Poulenc Rorer Pharms. v. Marion Merrell Dow, 93 F.3d 511, 515 (8th Cir. 1996).

### 2.  Materiality

"The materiality component of a false advertising claim requires a plaintiff to prove that the defendant's deception is likely to influence the purchasing decision. One method of establishing materiality involves showing that the false or misleading statement relates to an inherent quality or characteristic of the product." Cashmere, 284 F.3d at 311-12

(citations and internal quotation marks omitted).  "[E]ven when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers."  Id. at 312 n.10 (citing J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 27:35 (4th ed. 2001)).

### 3.  Actual Harm/Causation

Finally, in order for a plaintiff seeking money damages to prove causation, "the aggrieved party must demonstrate that the false advertisement actually harmed its business.  A precise showing is not required, and a diversion of sales, for example, would suffice."  Cashmere, 284 F.3d at 318 (citations and internal quotation marks omitted); see also 15 U.S.C. § 1117 (authorizing Lanham Act plaintiff "to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action").  A plaintiff satisfies this element if he puts forward evidence from which a fact-finder can draw a "reasonable inference" of a causal connection between the misrepresentations and the harm sustained.  Id. at 319.

### 4.  The Garwood Ads

HipSaver identifies six discrete representations conveyed in various advertisements as literally false.[5]  In turn, HipSaver

---

[5]The challenged statements include the following:
- "A test was created that would simulate a fall causing direct impact to the greater trochanter [i.e., part of the femur]"

24

contends that the advertisements containing those representations are literally false due to the overall impression they convey. The statements identified by HipSaver resolve into two broad claims or "messages": (1) one asserting that tests have demonstrated Posey's hipsters to be the "best" and "most effective" at absorbing impact-force associated with a fall; and (2) another representing that tests have proven the general effectiveness of Posey's hipsters, but which makes no implicit or explicit reference to other products.[6]  HipSaver launches two attacks on these claims.  First, HipSaver contends that the testing was not sufficiently reliable to support Posey's claims. Next, HipSaver argues that regardless of whether the tests were reliable, they do not support the representations in the

- "An independent laboratory study was conducted to determine the most effective impact absorbing material."
- "In an independent laboratory test designed to simulate a fall causing direct impact to the greater trochanter, the Posey Hipster III reduced the impact force by 90%, the best results of any hip protector available."
- "Posey Hipsters Proven Effective in Laboratory Tests"
- "Posey Hipsters Help Protect Against Injury from Falls"
- "Posey Hipster . . . showed excellent impact energy absorption."

[6] The Garwood advertising campaign consists of numerous advertisements, many of which differ slightly in their presentation of these messages.  Nonetheless, the context in which these claims are made is sufficiently similar across the campaign to address each "message" individually and without regard to minor variations in presentation.  Because many of the Garwood ads at issue convey both messages (i.e., relative and absolute product superiority), HipSaver can meet its burden by proving either literally false.  However, I note that not all of the Garwood ads assert claims of relative product superiority. (See, e.g., Docket No. 156 Exh. 1, Pt. 1.)

advertisements.

### a.  The Reliability of the Testing

HipSaver asserts that the Garwood testing was not a valid simulation of a fall and used materials that failed to account for the biochemical properties of bone.  As a result, HipSaver contends, all representations based on that testing are literally false.  Posey's expert, Edward Ebramzedah, concedes that the Garwood testing was not technically a valid simulation of a fall, (Dep. of Edward Ebramzedah at 47:13), and did not "model the intricacies of bone and soft tissue geometries and material properties."  (Ebramzedah Rebuttal Expert Report, at *8.) Nonetheless, Ebramzadeh maintains that the "test can be viewed as a materials test to rank and select from among several different candidate materials for padding in a hip protector device." (Id.)  Accordingly, a material issue of fact remains as to the capacity of the simulation to support the Garwood claims.

Other material facts remain for trial.  For example, the parties also agree that the testing did not follow the precise specifications of the ASTM F355-95 standard.  This is an industry standard laying down a protocol for testing a material's impact-absorption properties, and compliance with it (or not) would be strong evidence of the soundness of the Garwood testing methodology.  Questions remain as to whether the testing, despite variations from this standard, can support the assertions in the Garwood ads.  (See Dep. of Edward Ebramzedah at 53:6-25.)

26

Likewise, HipSaver contends that because Posey did not test
finished hip protector products -- and could not, for example,
take account of the size of the pad and its positioning over the
hip -- the Garwood testing could not prove the effectiveness of
the garments themselves.  However, Posey's expert concludes
otherwise.  (Ebramzedah Rebuttal Expert Report, at *8.)  The
testing may have been imperfect, but that is insufficient to
determine lack of reliability as a matter of law.  See Johnson &
Johnson, 299 F.3d at 1249.  HipSaver still must prove that the
testing, despite these flaws, cannot support the advertisements'
claims regarding impact-absorption and injury prevention.  Given
that the experts disagree, summary judgment is not appropriate.

### b. Relative Product Qualities

HipSaver also challenges the statement that the testing
demonstrated that Posey products were proven "most effective" and
"reduced the impact force by 90%, the best results of any hip
protector available."  (emphasis added.)  HipSaver contends that
regardless of the validity of the testing, the materials used in
Posey's garments placed third, after HipSaver's SlimSaver.  Posey
responds that the term "best" refers not just to a garment's
impact-absorption potential, but also to other considerations
such as comfort and price.  Posey also argues that the
description "most effective" is "entirely subjective and a matter
of opinion," and therefore not actionable under the Lanham Act.

True, for a statement to be actionable under the Lanham Act,

27

it must be "specific and measurable," as opposed to "mere puffery." Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1999). However, the term "best" as used in the advertisements follows on and modifies the claim that Posey garments "reduced the impact force by 90%." The plain meaning of this term as used in the ad was that the Garwood testing demonstrated that Posey's product performed "best" at reducing impact force. Likewise, the phrase "most effective" modifies "impact absorbing material" and is tied to the Garwood testing results. Accordingly, the claims are specific enough to be actionable under the Lanham Act. See id. (distinguishing claims of "puffery" from claims that quantify alleged product superiority (citing Cook, Perkiss & Liehe, Inc. v. Northern Cal. Collection Serv., Inc., 911 F.2d 242, 245 (9th Cir. 1990))).

Because the materials used in Posey's product placed third, HipSaver has produced evidence that the statements that the product proved "best" or that it was "most effective" at impact-absorption are literally false. Further, because impact absorption is an "inherent quality or characteristic" of hip protector garments -- reducing the impact from a fall is, after all, the point -- HipSaver has met its burden of producing evidence that the representations are material. See Cashmere, 284 F.3d at 311-312.

**c. Absolute Product qualities**

HipSaver challenges a series of representations that make

the claim that Posey's hip protectors were "proven effective in laboratory tests," "help protect against injury from falls," and "showed excellent impact energy absorption."  HipSaver has failed to produce evidence that the Garwood testing does not support such claims.  These representations do not attempt to quantify product efficacy and Posey is entitled to some latitude. Accordingly, for those ads that do not assert relative product superiority, HipSaver has fallen short of its burden.

### d.  Injury

Posey contends that HipSaver has been unable to identify a single lost customer or other sales opportunity attributable to the Garwood ads and that summary judgment in its favor is required.  Both parties have submitted expert reports.

Posey's experts assert that HipSaver has suffered no injury as a result of the Garwood advertising.  They conclude that (1) the Garwood ads had no measurable impact on HipSaver's sales because HipSaver's average sales grew at a rate consistent with that of Posey during the period of circulation, and were unaffected by the withdrawal of the ads; (2) Posey's sales did not increase as a result of the ads, because they were ineffective; and (3) Posey earned only $32,000 in profits on its hip protector sales during the period subject to this lawsuit, which was not gained as a result of the Garwood ads.  (See id.; see also Supplemental Report of Green and Hoffman, at 5.)  Posey has also submitted a report from an expert in the marketing of

29

health care products who concludes, among other things, that the Garwood ads had no effect on HipSaver or Posey sales.  (See Expert Report of Gary Reich, at 9. But see Order, Nov. 11, 2006.)[7]

HipSaver has also provided an expert report on damages, but in calculating the loss attributable to Posey's false advertisements Posey's experts shoot from the hip.  The report vastly overstates the potential recovery available to HipSaver by, among other things, padding its damage claim with all profits earned by Posey from 2001 through December 2005. (Expert Report of Roy J. Epstein, at 3.)  This analysis also fails to meaningfully address causality.  HipSaver points to lost contracts with several health care facilities before 2004, but does not identify specific lost customers or other opportunities which postdate the settlement agreement.  (See, e.g., Goodwin Deposition 22-23.)

At the same time, HipSaver argues that Posey is a head-to-head competitor in a developing market that has disseminated literally false advertisements touting its products' superiority to that of the only other significant market player.  Cf. Ortho Pharmaceutical Corp. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Cir. 1994) (recognizing, in a discussion of standing under the

_____

[7]As indicated in this Court's order on Nov. 11, 2006, many of Mr. Reich's opinions are conclusory on matters on which no expert testimony is needed or appropriate.  His conclusions as to causality are weighed accordingly.

Lanham Act, that where a plaintiff's products are in direct competition with a defendant's products, or where a defendant's advertisements draw a direct comparison between the two, a less definite showing of injury is required); see also Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 691 (6th Cir. 2000) (noting that consumer confusion, which is presumed in claims for literally false advertising, tends to show that "hard-to-prove" marketplace damages, like lost profits or lost sales, "probably exist").  It also points out that after the settlement, Posey's monthly sales increased an average of 8.8% while HipSaver's sales increased only 4.2%.

HipSaver's inability to identify specific lost opportunities or sales following August 2004 is not necessarily fatal at this point because it did not know the Court's ruling on this summary judgment motion.  It contends it does not have the resources or record-keeping capacity to calculate its actual damages. HipSaver, however, must present admissible evidence of post-settlement damages and cannot invite jury speculation.  Thus, HipSaver must supplement its pre-trial memorandum within two weeks to make a proffer of evidence supporting causation and a theory of damages consistent with this ruling.  HipSaver will not be permitted to grab a pocketful of Posey's profits without some evidence linking the false advertisements to HipSaver's allegations of injury.

**F.  Chapter 93A**

    **1.  HipSaver's Claims**

    Posey also moves for summary judgment on Count III of HipSaver's complaint, alleging violations of Massachusetts Unfair or Deceptive Business Practices Act, Mass Gen. Laws. ch. 93A, §§ 2, 11, on the ground that the allegedly deceptive conduct (<u>i.e.</u>, dissemination of the false advertisements) did not occur "primarily and substantially" in the Commonwealth.  HipSaver responds that its Chapter 93A claim is viable because Posey targeted numerous Massachusetts health care facilities with its allegedly deceptive advertisements and because "[i]njury occurred in Massachusetts every time Posey captured a sale and diverted revenue from HipSaver."  It is unclear whether these Massachusetts facilities were targeted before or after the settlement agreement.

    To sustain a claim under Chapter 93A, the allegedly wrongful conduct must have taken place "primarily and substantially" in Massachusetts.  <u>E.g.</u>, <u>Zyla v. Wadsworth</u>, 360 F.3d 243, 255 (1st Cir. 2004) (citing Mass. Gen. Laws Ann. ch. 93A, § 11).  To defeat a claim, the defendant bears the burden of demonstrating that the relevant conduct took place elsewhere.  <u>Garshman Co. v. GE</u>, 176 F.3d 1, 7 (1st Cir. 1999).  "Courts applying this requirement 'determine whether the center of gravity of the circumstances that give rise to the claim is primarily and

substantially within the Commonwealth.'" <u>Storage Tech. Corp. v.</u>
<u>Custom Hardware Eng'g & Consulting, Ltd.</u>, 2006 U.S. Dist. LEXIS
43690, at *38-39 (D. Mass. June 28, 2006) (quoting <u>Kuwaiti Danish</u>
<u>Computer Co. v. Digital Equip. Corp.</u>, 781 N.E.2d 787, 800 (Mass.
2003)).

   To determine a claim's center of gravity, the "First Circuit
has adopted a three-prong balancing test that looks to (1) where
the defendant commits the unfair or deceptive act or practice;
(2) where the plaintiff receives or acts on the wrongful conduct;
and (3) where the plaintiff sustained losses caused by the
wrongful conduct." <u>Kuwaiti Danish Computer</u>, 781 N.E.2d at 798
(citing <u>Clinton Hosp. Ass'n v. Corson Group, Inc.</u>, 907 F.2d 1260,
1265-66 (1st Cir. 1990)).  However, where the relevant deceptive
conduct involves communications between a defendant and third
parties, courts have said that the "center of gravity" lies in
the state in which the communications occurred (<u>i.e.</u>, were
"published").  <u>See</u> <u>Korpacz v. Women's Prof'l Football League</u>,
2006 U.S. Dist. LEXIS 3154, at *21-22 (D. Mass. Jan. 27, 2006)
(noting that "[t]o the extent that plaintiffs' 93A claim is based
on communications among [other out-of-state] parties, such
communications occurred outside of Massachusetts").

   Moreover, in undertaking this inquiry, courts have focused
more on the location of the wrongful conduct than on the location
where the plaintiff suffered injury.  <u>See</u> <u>Garshman</u>, 176 F.3d at 7
(conduct did not occur "primarily and substantially in

Massachusetts" under Chapter 93A where the plaintiff resided in Massachusetts and thus suffered the loss there, but most of the defendants' conduct occurred out-of-state; "the place of injury is not determinative"); <u>see also</u> <u>Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.</u>, 518 N.E.2d 519, 523 (Mass. App. Ct. 1988) ("[I]f the place of injury were the only test, practically no case involving a Massachusetts plaintiff would be exempt from c. 93A status, no matter how negligible the defendants' business activity in this State. Such a result would effectively nullify the words 'primarily and substantially within the commonwealth,' which imply some process of measuring and weighing.").

Here, HipSaver claims injury under the statute as a result of Posey's distribution of allegedly false advertising materials to 98 health care facilities in Massachusetts from September 2004 through the end of 2005.  (HipSaver Amended Complaint, ¶ 27.) Because the distribution of these materials occurred in-state, HipSaver has produced sufficient evidence that the "center of gravity" of the claim occurred "primarily and substantially" inside of the Commonwealth.

## ORDER

For the reasons stated, HipSaver's motion for partial summary judgment (Docket No. 154) on counts II and III of the complaint is **DENIED IN PART** and **ALLOWED IN PART**. HipSaver's motion for summary judgment on Posey's cross-claims (Docket No. 158) is **ALLOWED** and Posey's motion for partial summary judgment on it cross-claims (Docket No. 168) is **DENIED**. HipSaver's motion to dismiss Edward Goodwin from the lawsuit is **ALLOWED**. Posey's motion for summary judgment (Docket No. 161) HipSaver's complaint is **DENIED** as to count I; **DENIED IN PART** and **ALLOWED IN PART** as to count II and III; and **ALLOWED** as to count IV.


                                    S/PATTI B. SARIS
                                    United States District Judge

35