UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE HIPSAVER COMPANY, INC., <br><br> Plaintiff, <br><br> v. <br><br> J.T. POSEY COMPANY, <br><br> Defendant. <br><br> AND RELATED COUNTERCLAIM. | Civil Action No. 05-10917 PBS <br><br> ORAL HEARING REQUESTED |

### FIRST MOTION IN LIMINE OF J.T. POSEY COMPANY FOR ORDER PRECLUDING USE OF CERTAIN TERMS TO REFER TO POSEY, ITS PRESIDENT AND ITS PRODUCTS

By this first motion in limine, defendant and counterclaimant J.T. Posey Company seeks an order pursuant to Rules 402, 403 and 404(a) of the Federal Rules of Evidence precluding HipSaver and its counsel from (i) using the term "knockoff" or any similar term when referring to Posey's products, (ii) using the term "knock-off artist" or other pejorative terms when referring to J.T. Posey or it president, Ernest Posey, and (iii) engaging in other character assassination of Posey company or Mr. Posey.

Pursuant to Local Rule 7.1(A)(2), counsel for Posey has conferred with the plaintiff's counsel regarding this motion.

I.   FACTS

Prior to, and throughout the course of this litigation, The HipSaver Company, Inc. ("HipSaver") and HipSaver's counsel, Edward Dailey, have used a variety of pejorative terms to

refer to corporate defendant and counterclaimant J.T. Posey Company, Inc. ("Posey"), Posey's president Ernest Posey ("Mr. Posey"), and Posey's products.

For example, during the deposition of HipSaver's CEO Edward Goodwin, Mr. Goodwin repeatedly and gratuitously accused Posey, of unethical and unfair business practices. Mr. Goodwin stated, among other things: that it was commonly known in the industry that "Posey engages in knockoff practices and all types of unfair business practices"; that "Posey knocks off everything that is in the marketplace" and that Posey "steal[s] everybody else's product in the marketplace". Deposition of Edward Goodwin, taken October 18, 2005, at 75:18-20, 77:17-19 and 126:19-24, excerpts of which are attached as Exhibit "A" (hereafter, Goodwin Depo., 10/18/05, at ____.").

Mr. Goodwin's derogatory comments and his invective were not limited to Posey, the corporate entity. On the contrary, with respect to Mr. Posey personally, Mr. Goodwin stated at deposition, among other things: that anyone in the medical products industry who sells alarms, hip protectors, or restraint-free items "all have [had] a negative experience with [Mr.] Posey"; that Mr. Posey "uses bait and switch to get your intellectual property, try to suck you into an agreement that he never follows through on"; and that Mr. Posey is "an unethical business person". Goodwin Depo, 10/18/05, 129:3-7, 129:9-11, 156:15-16.

Before this litigation commenced, Mr. Goodwin had sent Mr. Posey numerous emails. In one particularly offensive message, Mr. Goodwin asked whether Mr. Posey had "screwed anyone today" and said that "there is not a single person on the trade side of the [medical products] industry that has one good word to say about you". In that same email, Mr. Goodwin also wrote that Mr. Posey was "a pathetic individual" whose mission was "to screw everyone out of their hard work".

While a bit more restrained, HipSaver's counsel has not been shy about slinging mud in Posey's direction. For example, in HipSaver's original Complaint and in its First Amended Complaint, HipSaver's counsel wrote (falsely) that Posey, the corporate entity, routinely uses false advertising to drive smaller competitors from the marketplace and that Posey introduced a "knock-off" of HipSaver's product to the market beginning in 2001. *See* Complaint (D.N. 1) and First Amended Complaint (D.N. 66), at introductory paragraph and paragraphs 11 and 12. In HipSaver's motion for summary adjudication on the issue of false advertising, HipSaver's counsel wrote that "Posey has been marketing a knock-off of HipSaver's product since 2001" and that "the Hipster knockoff is only one of hundreds of items sold by Posey." (D.N. 156-1, at p. 2). The list goes on and on, but the Court gets the point.

II.  **ARGUMENT**

   A.  **The Court Should Preclude HipSaver, Its Counsel and Its Witnesses From Referring to Posey's Hipster Product As a "Knock-Off", a "Copycat", a "Copy", an "Imitation", Or Any Other Similar Term.**

Black's Law Dictionary defines the term "knock-off" as "an unauthorized counterfeit" of another's product, especially "one protected by patent, trademark, trade dress or copyright, usu. [sic] passed off at a substantially lower price than the original." (8th ed. 2004). This is a case in which the parties are accusing one another of making false statements in their advertising. These claims do not involve the infringement of any patents, trademarks, copyrights or trade dress rights, the counterfeiting of any products or the "passing off" of one's products as those of another. Neither do these claims raise any issues regarding confusion or the likelihood of confusion as between the parties' products. Finally, these claims raise no issues as to whether Posey did anything illegal when it designed and introduced any of its products to the market.

Any evidence or any arguments relating to Posey's so-called "Hipster knock-off" are not relevant to any of the issues in the case. Thus, they should be excluded under Rule 402 of the Federal Rules of Evidence.

In addition, the term "knock-off" is a pejorative term. The use of that word or of any similar words, such as "copycat" or "imitation" in front of the jury would be unduly prejudicial, particularly in view of the fact that those terms are not relevant to any of the issues in the case. Finally, the use of words such as "knock-off", "copycat" or "imitation" would also be likely to confuse the jury or to mislead them into thinking that Posey did something wrong when it designed its products or when it introduced its products to the marketplace.

For the foregoing reasons, the Court should order that at the trial of the within matter, HipSaver, its counsel and its witnesses are precluded from referring to any Posey products as "knock-offs", "copycats", "copies", "imitations", or other similar terms. *See* Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible."); 403 (relevant evidence excludable on grounds of unfair prejudice, confusion of the issues or of misleading the jury).

### B. The Court Should Preclude HipSaver, Its Counsel and Its Witnesses From Assassinating the Character Of Posey, the Corporate Entity, Or Of Mr. Posey, Its President.

As is set out above, the attacks on Posey and on Mr. Posey personally during the course of this case over the past two years have been particularly vicious (not to mention false) and they amount to nothing more than character assassination. Given the tenor of the accusations and the invective of HipSaver's counsel and its president to date, it is reasonable to assume that at trial HipSaver will try to paint Posey and its president as big, bad, boogiemen who routinely steal the intellectual property of others and engage in other unethical conduct. However, theft of

intellectual property is not an issue in this case and character or evidence of other "bad acts" evidence is not admissible to prove conduct. Fed. R. Evid. 402, 404(a) and (b).

For the foregoing reasons, the Court should order that HipSaver, its counsel and its witnesses are precluded at trial from asking questions about, stating, suggesting, arguing or insinuating that Posey or its president, Ernest Posey, engage in unethical and unfair business practices or "knockoff practices", that people in the medical products industry "all have [had] a negative experience with [Mr.] Posey", that Mr. Posey "uses bait and switch to get [people's] intellectual property", or that Mr. Posey is unethical.

In addition, the Court should also order HipSaver's counsel to specifically instruct HipSaver's CEO, Mr. Goodwin – the main offender – to refrain from name calling or from making any ad hominem attacks on Posey and its president on the grounds that such conduct would be unduly prejudicial. Fed. R. Evid. 403 (unduly prejudicial evidence may be excluded).

### III.    CONCLUSION

For the forgoing reasons, Posey's first motion in limine should be granted.

Dated: May 15, 2007

J.T. POSEY COMPANY

By its attorneys,

/s/ Douglas H. Morseburg
Jeffrey G. Sheldon (CA Bar No. 67516)
Douglas H. Morseburg
    (CA Bar No. 126205)
SHELDON MAK ROSE & ANDERSON
100 E. Corson Street, 3d Floor
Pasadena, CA 91103-3842
626.796.4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
857.488.4200

## **CERTIFICATE OF SERVICE**

    I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.

May 15, 2007                                                                      /s/ Donald K. Piper
                                                                                          Donald K. Piper

**EXHIBIT "A"**

1

VOLUME 1

PAGES 1 - 273

EXHIBITS 1 - 52

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

No. CV-05-10917-PBS

- - - - - - - - - - - - - - - - - - - - - - - -

THE HIPSAVER COMPANY, INC.,

                Plaintiffs

    vs.

J.T. POSEY COMPANY,

                Defendants

- - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF EDWARD L. GOODWIN

Tuesday, October 18, 2005 9:20 a.m

Duane Morris, LLP

470 Atlantic Avenue, Boston, MA 02110

Reporter:  Janet M. Konarski, RMR, CRR

LegaLink Boston

320 Congress Street, Boston, MA 02210

(617)542-0039

Goodwin, Edward L. 101805

1  APPEARANCES:

2

3  SHELDON & MAK

4  (By Douglas H. Morseburg, Esquire)

5  225 South Lake Avenue

6  Pasadena, California 91101

7  (626)796-4000

8  Counsel for the Defendant

9

10 BROMBERG & SUNSTEIN LLP

11 (By Edward J. Dailey, Esquire, and

12 Courtney M. Quish, Esquire)

13 125 Summer Street

14 Boston, Massachusetts 02110

15 (617)443-9292

16 Counsel for the Plaintiff

17

18

19

20

21

22

23

24

1    Q.   After the meeting, Posey copied Gerri
2 Hip's Hip Protector.  Have I got it right so far?
3    A.   Right.
4    Q.   What else did the lady say?
5    A.   That was it.
6    Q.   Have you heard of Posey knocking off
7 anybody else?
8    A.   Yes.
9    Q.   Who?
10   A.   Me.
11   Q.   Okay.  Other than you?
12   A.   Vail Bed.  V-A-I-L B-E-D.
13   Q.   Who told you that Posey knocked off Vail
14 Bed?
15   A.   The representative that I met in Tampa in
16 2004, the Vail Bed representative that I met.
17   Q.   And who was the Vail Bed representative?
18   A.   I don't know her name.  It's common talk
19 at trade shows that Posey engages in knockoff practices
20 and all types of unfair business practices.  You just
21 have to walk around, and somebody will start a
22 conversation about it if he's there.
23   Q.   At these trade shows, do you tell people
24 Posey knocked you off?

1  thousands of dollars of inventory in alarms and then
2  telling him to take a walk.
3       Q.   Posey didn't knock him off, though?
4       A.   Well, I think Posey considers the
5  marketplace as his R&D garden, so to speak.  Obviously,
6  there is no original thought coming out of the company,
7  and everything that is offered on the market is a
8  variation of what somebody else has on the market.
9  Generally, for a person, for a company had a has been
10 in business for 75 years, whenever they come out with
11 something, they're always five to ten years after the
12 small, innovative companies come out with it.  So,
13 they're a sales and marketing oriented company, not an
14 R&D.
15      Q.   I appreciate all you have to say, but my
16 question was that Posey didn't knock UMB off?
17      A.   The essence of what I said was that Posey
18 essentially knocks off everything that is in the
19 marketplace.  When he goes to shows, that's part of
20 what his mission is, is to go around and survey what is
21 in the marketplace, and accept and incorporate those
22 aspects of a better product into his product, which is
23 okay to do so long as the person doesn't have patent
24 pending or patent granted status.  Not ethical, not

126

1      A.   Stole the Vail Bed's company's sales
2  force, that he lured them with promises and what not
3  to -- as you can understand, there is considerable
4  currency in getting some of the sales force to work for
5  you when they have contacts and methodology.
6      Q.   Have you told me everything you can
7  remember about the conversation with this lady --
8      A.   Mm-hmm.
9      Q.   -- at the Tampa conference?
10     A.   Yes.
11     Q.   Any other instances that you have heard
12 about or have any knowledge in which you say Posey
13 knocked off other peoples' products?
14     A.   He had a lawsuit going back four years ago
15 with Bed Check. There was a patent infringement
16 lawsuit, and I'm not sure what the outcome was, but
17 basically Posey was a late comer to all of these
18 markets, because Posey was just a simple cut and sew,
19 tie-down restraint company. Then when OBRA, OBRA of
20 '87 came in, the Restraint Reduction Act, it was
21 necessary in order for him to maintain a sales base to
22 steal everybody else's product in the marketplace,
23 because he had no R&D staff that would develop these
24 things.

have heard about in which Posey has knocked off other peoples' products?

    A.   I believe there was a situation with Tabs Alarms. I mean you can almost look at whoever is selling an alarm, a hip protector, any restraint-free item, and they all have a negative experience with Posey.

    Q.   Okay.

    A.   Because Posey uses a bait and switch, try to get your intellectual property, try to suck you into an agreement that he never follows through on.

    Q.   Did you have any conversations with anybody from Tab Alarms?

    A.   No. It was somebody else that told me about that.

    Q.   Who was that?

    A.   You know, I don't remember. It was a while ago.

    Q.   What year was it?

    A.   About three years ago. When you go to conferences, you talk to different people, and it's like, you know, sometimes you remember who they are.

    Q.   And what did the person say about Tab alarms. Is it T-A-B? Tab?

1  because he has something to hide.
2      Q.  So, if Posey had given you notice that it
3  was going to publish the ad which has been marked as
4  Exhibit 12, and you said, I want you to make changes to
5  it, and they said, We don't want to make changes to it,
6  and they published it, anyway, how would you be in any
7  different position than them not having given you
8  notice at all?
9          MR. DAILEY:  Objection.
10     A.  Well, see, the argument that you're
11 setting up does not take into consideration that you're
12 not dealing with a rational person, meaning Ernie
13 Posey.  This is all false advertising.  This is not
14 reality based.  This is somebody's fantasy, this whole
15 thing here.  So, when you say if Ernie Posey was an
16 ethical business person and we had a disagreement that
17 resulted in a settlement, and he sent me some -- you
18 never get anything from Ernie Posey in good faith.  Let
19 me tell you that right now.  If you sent something in
20 good faith, I would say, Okay, the guy has gone legal
21 and wants to bump along, that is fine.  That is not
22 Ernie Posey.
23     Q.  Are you finished with your answer?
24     A.  Yes.