# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE HIPSAVER COMPANY, INC., | ) Civil Action No. 05-10917 PBS |
| Plaintiff, | ) |
| v. | ) ORAL HEARING REQUESTED |
| J.T. POSEY COMPANY, | ) |
| Defendant. | ) |
| AND RELATED COUNTERCLAIM. | ) |

## SECOND MOTION IN LIMINE OF J.T. POSEY COMPANY FOR ORDER PRECLUDING EVIDENCE THAT HIPSAVER HAS BEEN HARMED AS A CONSEQUENCE OF POSEY'S ACCUSED ADS.

By this second motion in limine, defendant and counterclaimant J.T. Posey Company ("Posey") seeks an order pursuant to Rules 26(a), 26(e)(1), 26(e)(2) and 37(c) of the Federal Rules of Civil Procedure precluding HipSaver from introducing at trial any evidence of harm purportedly caused by Posey's ads on the grounds that it failed to disclose the basis for that contention (i) in HipSaver's initial disclosures, (ii) in any supplemental disclosures, (iii) in response to Posey's written discovery requests, or (iv) in deposition testimony. Posey further seeks an order precluding such evidence pursuant to Rules 402 and 403 of the Federal Rules of Evidence on the grounds that the "evidence" of harm HipSaver has disclosed to date has nothing to do with the Garwood ads complained of in this action. Thus, that "evidence" is irrelevant and it would confuse the jury.

Pursuant to Local Rule 7.1(A)(2), counsel for Posey has conferred with the plaintiff's counsel regarding this motion.

## I.    FACTS

In the event this Court denies Posey's motion for summary judgment on HipSaver's claims, one of the issues in the case will be whether HipSaver suffered any actual harm as a consequence of Posey's accused ads.

As detailed below, Posey asked HipSaver during discovery in this case, to set forth the factual bases for its claim that it has been damaged as a consequence of those ads. However, HipSaver never identified anyone who purchased products from Posey or failed to purchase product from Hipsaver due to them. Nor did it identify any other information concerning the alleged damage it suffered as a consequence of them.

Considering the amount of time the accused ads ran (i.e., from late 2001 through August 2005), it is reasonable to expect that if Hipsaver had suffered any damage as a consequence of those ads – in the form of lost customers or otherwise – HipSaver would have known about it and provided details regarding it. However, it never did.

### A.    HipSaver Provided No Facts to Support Its Contention Supporting Its Claim of Damages From Posey's Accused Ads In Its Initial Rule 26 Disclosure

HipSaver commenced this action on May 5, 2005. HipSaver served its initial disclosures on July 5, 2005. In them, HipSaver stated that it would produce "information on damages, costs and attorney fees as this information becomes available" and that its "damages include lost business, lost business opportunities related to its business and damage to the marketplace, and

costs to investigate and counter Posey's false advertising." See attached Exhibit "A" (excerpt

from HipSaver's initial disclosure). HipSaver never supplemented its initial disclosures.

B.    **HipSaver Never Provided Any Relevant Information Regarding Its Damages**
      **Contentions In Its Initial Responses to Posey's Interrogatories**

Because HipSaver's initial disclosures lacked any meaningful information regarding

HipSaver's alleged damages, Posey sought that information through written discovery. On July

26, 2005, Posey served its first set of interrogatories on HipSaver which sought information

relevant to HipSaver's contention that it had suffered injury as a consequence of Posey's accused

ads. Specifically, Interrogatory No. 2 asked HipSaver to "[s]tate the basis for your contention

that 'HipSaver has been damaged by Posey's advertising', as stated on page 2 of the Complaint."

Under Local Rule 26.5(c)(8), when an interrogatory calls upon a party to "state the basis"

for a contention, the responding party is required to (i) identify each document that forms the

basis for that party's information regarding the contention referred to in the interrogatory,

(ii) identify each communication that forms part of the responding party's information regarding

the contention referred to in the interrogatory, (iii) identify each act or omission on the part of

any person (by stating their nature, time, place and the persons involved) which forms any part of

the responding party's information regarding the contention, and (iv) specify any other fact that

forms the basis for the responding party's contention referred to in the interrogatory.

On September 16, 2005, HipSaver served its responses to Posey's first set of

interrogatories. In response to Interrogatory No. 2, HipSaver vaguely responded, in essence: that

Posey had repeatedly misrepresented and disparaged HipSaver's products; that Posey had

knowingly misrepresented the protective capability, launderability and durability of its own

products; that, as a consequence of Posey's presence in the marketplace, it (Posey) had little difficulty in selling its products; that, when Posey's products fail, HipSaver loses the opportunity to replace Posey because buyers conclude that all hip protectors are flawed; that Posey's advertising campaigns "have a particularly damaging potential" because of the lack of knowledge among health care professionals and because of Posey's size; that, because it is a small company with only a single product offering, HipSaver has trouble competing with a large multi-line company such as Posey; that HipSaver does not have the "financial resources or the presence in the market to counter" Posey's repeated false advertising campaigns; that HipSaver "has also been unable to offer or to sell [its] products" to a number of health care facilities which simply will not consider [its] products; that Posey has depressed the entire market for soft hip protectors; and that Posey's strategy of offering inferior products and engaging in negative advertising contribute to the impression among health care buyers "that soft hip protection garments are of poor quality and of questionable effectiveness." See attached Exhibit "B" (excerpt from HipSaver's response to Posey's First Set of Interrogatories).

Notwithstanding the requirements of Local Rule 26.5(c)(8), in its response to Interrogatory No. 2, HipSaver failed to identify <u>any</u> documents, <u>any</u> communications, <u>any</u> facts or <u>any</u> people who were aware of any facts that would support HipSaver's contention that it had been damaged by Posey's accused ads. In sum, HipSaver's interrogatory answer as to the factual bases for its claim that it had been damaged by Posey's allegedly false advertising consisted of nothing but arguments and unsupported theories.

**C.** **<u>At Deposition, HipSaver Failed to Provide Any Facts Regarding the Alleged Harm It Suffered As a Consequence of Posey's Accused Ads</u>**

On October 18, 2005, Posey took the deposition of HipSaver's CEO, Edward Goodwin, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. During the deposition, Posey's attorney asked numerous questions regarding HipSaver's alleged damages in this case. However, Mr. Goodwin could not identify any actual sales that HipSaver lost or that Posey gained as a consequence of Posey's alleged false advertising statements. And he testified only in vague generalities regarding any other way HipSaver may have suffered damage as a consequence of Posey's ads. Specifically, he testified as follows:

> Q:    Are you aware of anyone who has purchased product from Posey on the strength of the statements that you object to in their 2005 advertising?
>
> A:    No one has mentioned that to me in particular.

Transcript of Goodwin Deposition, taken 10/18/05, at 86:21-87:1 (hereafter "Goodwin Depo., 10/18/05, at __."), excerpts of which are attached as Exhibit "C".

> Q:    . . . Has anybody made any comments to you about or along the lines of we're not going to buy your product, because we saw this Posey advertisement or a statement which is contained in the Posey advertisement, and we think that your products are not effective?
>
> A:    If anybody ever called me up and told me that, I think I'd fall on the floor. It just doesn't happen. People . . . don't have the time to call me and say, you know, I'm not buying your hip protector because I saw this [Posey advertisement]."

Goodwin Depo., 10/18/05, at 135:21-136:13.

> Q:    Have you had any instances in which existing customers have said, you know what, I'm not going to renew my order, because I got this Posey advertisement, and I think your products just aren't safe or just aren't reliable?
>
> A:    Our customers have generally I think been – no one has ever said that. No.

Goodwin Depo., 10/18/05, at 137:14-20.

Q:      . . . so how have you been damaged by the ad?  Have you lost any sales as a result of any of the statements in these, in the ads that you're complaining about?

A:      Sure.

Q:      Who have you lost sales to?

A:      I can't tell you, because they don't call me up and say I'm buying Posey's now because of the ad. . . .

Goodwin Depo., 10/18/05, at 139:4-11.

Q:      Are you aware of any sales that Posey made that they would not have made, but for some statement contained in the ads that you're complaining about?

A:      I'm not aware of any specific sale that they made.

Goodwin Depo., 10/18/05, at 140:19-141:12.

Q:      . . . As a result of any of the things you've alleged in the complaint, do you have in mind an amount of number, -- an amount by which HipSaver has been damaged?

A:      I believe we're going to hire, retain an expert, economist to work those numbers out.

Q:      As you sit here today, is it fair to say you don't have any idea what the number would be?

A:      There is a number, but that is to be determined.

Q:      Right.  There is a number.  You just don't know what it is.  Is that fair to say?

A:      That's right.

Goodwin Depo., 10/18/05, at 150:20-151:10.

Mr. Goodwin's deposition was taken again on November 30, 2005.  At that session,

Posey's counsel again asked Mr. Goodwin questions regarding HipSaver's contention that

HipSaver had been hurt by Posey's accused ads.  Specifically, Mr. Goodwin was asked the

following questions and he gave the following answers:

> Q.    Are you aware of any customer that's not purchased a HipSaver product
>       due to the Garwood ad?
>
> A.    No.
>
> Q.    Are you aware of any customer, who has purchased a Posey product as a
>       result of the Garwood ad?
>
> A.    No.  I'm not aware of any customer, but I'm sure there are some.

Transcript of Goodwin Deposition, taken 11/30/05, at 22:22-24:6 (hereafter, "Goodwin Depo.,

11/30/05, at ___."), excerpts of which are attached as Exhibit "D".

> Q.    The advertisements relating to the Garwood study were in existence prior
>       to the settlement of the first lawsuit, were they not?
>
> A.    Yes.
>
> Q.    I'm sorry.  I didn't hear your answer.
>
> A.    There were Garwood advertisements.
>
> Q.    Did those ads have any effect on HipSaver's business?
>
> A.    They were devastating.
>
> Q.    The one[s] before [the settlement]?
>
> A.    Yes.
>
> Q.    How do you know that?
>
> A.    Well, I guess there are various ways to know things, and as a human
>       being, who has been in business and who has developed his company,
>       there are some things that I know through intuition, . . .
>
> Q.    Can you identify any Posey customer that purchased because of the
>       Garwood ad?
>
> A.    Just about every one of them.

Q.    How do you know that?

A.    Well, as I said before, . . . it's just a common sense thing. . . .

Q.    Has anyone ever said to you that they purchased a Posey product because of the Garwood ad?

A.    No.

                    *         *         *

Q.    Can you identify a customer that was stolen from HipSaver because of the use of the Garwood ad?

A.    I can't name a particular customer.

Goodwin Depo., 11/30/05, at 134:3-137:14.


**D.    In Its Supplemental Responses to Posey's Interrogatories, HipSaver Failed to Provide Any Facts to Support Its Contention That It Was Damaged By Posey's Ads.**

As a consequence of HipSaver's failure to provide specifics regarding its damage contentions in its initial interrogatory response, counsel for Posey requested that HipSaver supplement its response so as to comply with Local Rule 26.5(c)(8). Counsel for HipSaver agreed and, on January 26, 2006, HipSaver served a supplemental response to Posey's first set of interrogatories.

In that supplemental response, HipSaver did not add anything of substance to its answer to Interrogatory No. 2 (which asked HipSaver to "state the basis" for its contention that it had been damaged by Posey's allegedly false advertising). It did, however, specify that this contention was based upon (i) the deposition testimony of Mr. Goodwin, (ii) the opinion of its damages expert, (iii) unspecified HipSaver financial documents that were yet to be produced,

and (iv) unspecified Posey financial documents that were yet to be produced. See Exhibit "E" (HipSaver supplemental response to Interrogatory No. 2).

Although HipSaver reserved the right to further supplement its response to Interrogatory No. 2, it never did so.

E.    **Edward Goodwin's Declaration In Opposition to Posey's Motion for Summary Judgment**

Expert discovery closed on November 20, 2006 and on December 11, 2006 Posey moved for summary judgment on all of HipSaver's claims. The motion was based, in part, upon the grounds that HipSaver had no evidence of any damages to support its false advertising claims and no evidence that its purported damages were <u>caused</u> by Posey's allegedly false advertising. In opposition to the motion, HipSaver presented the declaration of its CEO, Mr. Goodwin. In that declaration, Mr. Goodwin, <u>for the very first time in this litigation</u>, set forth specific alleged facts and identified some of the people who were supposedly aware of the alleged facts supporting HipSaver's contention that it had been damaged as a consequence of Posey's accused advertising.

Specifically, Mr. Goodwin's declaration (see attached Exhibit "F") averred: that from 2002 through 2005, HipSaver had tried, but had failed, to sell its hip protectors to nursing and health care facilities, to national chains and to national distributors; that in 2002 it was working with an individual named John Bretz of Alimed, a medical products distributor, and that, in anticipation of a deal, HipSaver built up its inventory, only to be told at the last minute that Alimed decided to go with Posey hip protectors instead; that HipSaver has been "frozen out of all of the major catalog distributors and resellers . . . including McKesson, Cardinal Health,

Medline, and Gulf South"; that "one [unidentified] major chain and some [unidentified] facilities" have refused to purchase HipSaver products because of their negative experiences with Posey's hip protectors; that HipSaver had tried to secure a deal with a major nursing home chain named Manor Care, but was told by its buyer, Bill Cusack, that Manor Care had an exclusive arrangement with Posey; that HipSaver had worked to secure a deal with Life Care, another national nursing home chain, only to be told by its buyer that Life Care was going to deal with Posey; that in 2003 the corporate purchaser for another operator of health facilities, Kindred, told HipSaver that it (Kindred) had an exclusive deal with Posey; and that recently, Life Care had abandoned hip protectors altogether because of its poor experience with Posey's products. Goodwin Decl., ¶¶ 13-16.

In addition, Mr. Goodwin's declaration also claims that numerous individual health facilities have refused to purchase HipSaver products because of their negative experiences with Posey's products. Goodwin Decl., ¶ 17. Conspicuously absent from Mr. Goodwin's declaration is any indication that any of the people who have refused to deal with HipSaver have done so <u>as a consequence of Posey's accused ads</u>. (And even if Mr. Goodwin's declaration did say something to that effect, it would constitute inadmissible hearsay.).

## II.     <u>ARGUMENT</u>

### A.     <u>At Trial, the Court Should Preclude HipSaver From Offering Evidence It Was Damaged As a Consequence of Posey's Accused Ads.</u>

The Federal Rules of Civil Procedure[1] are designed to prevent trial by ambush and to weed out meritless claims by requiring all parties to fully and fairly disclose well in advance of trial the theories and, especially, the facts underlying their claims, counterclaims and defenses. For example, Rule 26(a)(1) provides that, shortly after the litigation commences, each party must, without awaiting a formal discovery request, provide to every other party in the litigation (i) the name address and telephone number of each person likely to have discoverable information that the disclosing party may use to support its claims or defenses, (ii) a copy of or a description of the documents and tangible things the disclosing party may use to support its claims or defenses, and (iii) a computation of each category of damages the disclosing party may claim.

Likewise, Rule 33 imposes an obligation upon a party who is validly served with interrogatories to respond to them fully and completely in writing and under oath.  Finally, subsections (1) and (2) of Rule 26(e) impose upon a party who has made an initial disclosure or who has responded to a written request for discovery to supplement those disclosures or responses, as the case may be, to complete or correct a prior incomplete or incorrect disclosure or response.

Rule 37(c)(1) sets out the consequences to a party who fails to disclose information required by Rules 26(a) or 26(e)(1), or who for fails to amend a prior incorrect or incomplete discovery response, as required by Rule 26(e)(2).  The rule provides, in plain and unambiguous language, that such a party "**is not** . . . permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed."  (Emphasis added.)

---

[1]     Unless otherwise specified, all further "Rules" references are to the Federal Rules of Civil Procedure.

Here, HipSaver provided no substantive information about its damages contentions in its initial disclosures. When Posey asked HipSaver at deposition to identify customers who had purchased from Posey or not purchased from HipSaver as a consequence of Posey's accused ads, HipSaver could not identify a single person or entity. When Posey asked HipSaver's president, Mr. Goodwin, at deposition how he knew Posey's ads had damaged HipSaver, he claimed it was simply a matter of "intuition" and "common sense". When Posey served an interrogatory asking HipSaver to "state the basis" for its contention that it had been damaged by Posey's allegedly false advertising, HipSaver initially responded with nothing but argument and supposition. When it supplemented its response, all it did was refer to Mr. Goodwin's deposition.

**After** Posey made a motion for summary judgment on HipSaver's complaint on the grounds that HipSaver had no damages, HipSaver offered the declaration of Mr. Goodwin which states, in essence, that in 2002 and 2003 HipSaver was (allegedly) working with specific people at specific companies who, ultimately, chose to deal with Posey instead of HipSaver. Given the timing of these alleged events, i.e. 2002 and 2003, HipSaver can have absolutely no excuse for not having disclosed this information in its interrogatory responses. And the most likely reason it did not disclose the information before discovery closed is that it wanted to deprive Posey of the opportunity to do discovery regarding the truth of these assertions.

The bottom line, however, is that during discovery HipSaver was unable to come forth with <u>any</u> evidence that it had been harmed as a consequence of Posey's accused ads. When Posey pressed HipSaver at deposition and via interrogatories, HipSaver gave Posey the run-around. And most tellingly, HipSaver did not even provide information regarding its alleged damages to its own expert. It was not until <u>after</u> discovery closed, <u>after</u> HipSaver had served its

expert reports, and <u>after</u> Posey moved for summary judgment, that HipSaver came forward with a declaration alleging that it was harmed in 2002 and 2003.

This Court has already recognized that HipSaver's tactic of failing to provide Posey with specifics regarding its damages contentions during discovery, of failing to provide that information even to its own expert, and then trying to sneak it in after Posey filed its motion for summary judgment was improper. Specifically, at the hearing on the parties' motions for summary judgment on February 14, 2007, the Court stated that if information regarding HipSaver's alleged damages was not in the record prior to the motions for summary judgment HipSaver "can't use it". See Transcript of Hearing on 02/14/07, at 26:5-6 (an excerpt of which is attached as Exhibit "G"). And, in connection with the fact that HipSaver's damages expert had not provided the information in his report, the Court remarked that "[i]t's a little unfair game to push it in after discovery." *Id.*, at 27:19-24.

As a consequence of its stonewalling, pursuant to Rule 37(a)(1), HipSaver should be precluded at trial from arguing or from offering (i) evidence of any of the facts contained in paragraphs 13 through 17 of the Goodwin declaration dated January 8, 2007, or (ii) any other evidence that it was damaged by Posey's accused ads. To permit HipSaver to introduce such evidence in the face of its stonewalling would be contrary to the dictates of Rule 37(a), as well as prejudicial and fundamentally unfair to Posey.

B.    **The Court Should Preclude HipSaver From Offering Any Evidence Of Its Alleged Damages Because There Is No Nexus Between Posey's Allegedly False Ads and HipSaver's Alleged Damages.**

Without regard to how the Court rules on the first portion of this motion, the Court should note that there is nothing in any of the "evidence" that HipSaver plans to present at trial

that links its alleged damages to Posey's accused advertisements. Put another way, HipSaver is contending in this case that it has been shut out of portions of the hip protector market, that various customers have refused to consider buying its hip protectors because they have had bad experiences with Posey's hip protectors, and that some potential customers have given up on hip protectors altogether because of Posey's poorly performing products.

However, HipSaver's burden at trial is to show that it has been hurt <u>as a consequence of Posey's accused advertising</u>, not by people's alleged negative experiences with Posey's products. Thus, evidence that (i) HipSaver has been shut out of parts of the hip protector market, (ii) that various customers have refused to consider buying HipSaver's hip protectors because they have had bad experiences with Posey's hip protectors, and (iii) that some potential customers have given up on hip protectors altogether, is simply irrelevant to the issue of whether HipSaver has been damaged as a consequence of Posey's accused advertising. Moreover, the presentation of such evidence at trial would have a tendency to confuse the jury as to the issues in the case (which is false advertising and damages flowing from false advertising, not the quality of the parties' respective products).

Therefore, pursuant to Rules 402 and 403 of the Federal Rules of Evidence, the Court should order that Hipsaver is precluded at trial from offering any evidence of these facts, or from arguing that these facts show that HipSaver was damaged by Posey's advertising.

## III.    <u>CONCLUSION</u>

For the forgoing reasons, Posey's second motion <u>in limine</u> should be granted.

Dated: May 15, 2007                          J.T. POSEY COMPANY

By its attorneys,

/s/ Douglas H. Morseburg
Jeffrey G. Sheldon, Admitted Pro Hac Vice
Douglas H. Morseburg, Admitted Pro Hac Vice
SHELDON MAK ROSE & ANDERSON
100 E. Corson Street, 3d Floor
Pasadena, CA  91103-3842
626.796.4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
857.488.4200

## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.

May 15, 2007

/s/ Donald K. Piper
Donald K. Piper

**EXHIBIT "A"**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The HipSaver Company, Inc., | ) | Civil Action No. 05-10917 PBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v | ) | |
| | ) | |
| J.T. Posey Company, | ) | |
| Defendant | ) | |
| | ) | |

## PLAINTIFF'S INITIAL DISCLOSURES

Pursuant to Fed.R.Civ.P. 26, Plaintiff, The HipSaver Company, Inc. ("HipSaver"), makes the following initial disclosures:

1.    Plaintiff has reasonable grounds to assume that at least the following persons have discoverable information which may support HipSaver's claims and its defenses to the counterclaims:

Edward L. Goodwin, president, and Helen Brogna, vice president, The HipSaver Company, Inc., 7 Hubbard Street, Canton, Massachusetts 02021 1.718.828.3880. Mr. Goodwin and Ms. Brogna will provide testimony and evidence related to the matters set out in the Complaint and Mr. Goodwin's Declaration.

1

evaluation of the test and test results, and/or the development, approval and dissemination of Posey's ads that refer to the Impact Study and/or test results. Ms. Lewis may also have evidence related to the matters set out in her Declaration.

2.      HipSaver will produce samples of its HipSaver garments, HipSaver pads, foam inserts and encapsulation. It will also produce correspondence between Mr. Goodwin and Mr. Posey concerning false advertisements referring to the Impact Study. It will also produce copies of false advertisements referring to the Impact Study.

3.      HipSaver will produce further information on damages, costs, and attorney fees as this information becomes available. HipSaver damages include lost business, lost business opportunities related to its business and damage to the marketplace, and costs to investigate and counter Posey's false advertising.

4.      HipSaver is not aware of any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in the action or to reimburse or to indemnify or reimburse for payments made to satisfy the judgment.

3

THE HIPSAVER COMPANY, INC.
By its Attorneys,

Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts  02110-1618
617.443.9292
617.443.0004  (fax)
Dated:  July 20, 2005

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic mail and USPS First Class mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470 Atlantic Avenue, Boston, Massachusetts  02210, ajfitzpatrick@duanemorris.com, and by electronic mail and USPS First Class mail to Jeffrey G. Sheldon, Esq., SHELDON & MAK, 225 South Lake Avenue, 9th Floor, Pasadena, California  91101, jgsheldon@usip.com.

Dated: July 20, 2005

Edward J. Dailey

02820/00502  418024.1

4

**EXHIBIT "B"**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10917 PBS

The HipSaver Company, Inc.,                                )
                          Plaintiff,                       )
                                                           )
v                                                          )
                                                           )
J.T. Posey Company,                                        )
                          Defendant                        )
                                                           )
_____)
                                                           )
J.T. Posey Company, Inc.,                                  )
                 Counterclaim Plaintiff                    )
                                                           )
v                                                          )
                                                           )
The HipSaver Company, Inc. and                             )
Edward L. Goodwin,                                         )
                 Counterclaim Defendants                   )
                                                           )
                                                           )
_____)

## RESPONSE TO JT POSEY COMPANY'S
## FIRST SET OF INTERROGATORIES

**Plaintiff, the HipSaver Company, Inc. responds to the Defendant's First Set of**

**Interrogatories as follows:**

1. State the basis for your contention that "Posey uses its marketplace dominance and

deceptive advertising to drive smaller companies from the marketplace", as stated on pages

1-2 of the Complaint.

1

**Answer:** The Posey Company has, on a number of occasions, copied or knocked off products invented or developed by small competitors and has then used its dominant position as a health care supplier to overwhelm the competitors with inferior knock-offs. In other cases, including its unfair and deceptive actions towards our company, Posey has engaged also in false, deceptive, and fraudulent advertising to distort and misrepresent capabilities of its products and to disparage its competitors. Posey admitted to false, deceptive, and fraudulent advertising when it settled HipSaver's earlier lawsuit but then proceeded to launch a new campaign of deceptive advertising.

2. State the basis for your contention that HipSaver has been damaged by Posey's advertising", as stated on page 2 of the Complaint.

**Answer:** The Posey Company has engaged in repeated efforts to misrepresent, disparage, and deceive customers and potential customers about HipSaver's products. Posey's misrepresentations, deception, and product disparagement are aimed at HipSaver, intended to undercut the reputation and integrity of our products, and directed to unfairly compete and overwhelm HipSaver in the marketplace – all by fraudulent means.

In addition to false advertising aimed directly at HipSaver, the Posey Company has knowingly misrepresented the protective capability, launderability, and durability of its product when it knows that its products have been unable to withstand routine institutional laundering and when it knows that its products are not of proper size or positioning to protect the trochanter.

The Posey Company has an overwhelming presence in the rehabilitation and nursing facility segment of the healthcare marketplace, so it has little difficulty selling its

products. When those products have proven to be inferior, Posey may well lose business. At the same time, however, HipSaver loses the opportunity to replace Posey because buyers conclude that the product – whether from Posey or HipSaver is simply flawed.

Posey's advertising campaigns have a particularly damaging potential because of the lack of knowledge among health care buyers and Posey's marketplace dominance. Neither the biomechanics nor the relative performance of competing products has been well understood in the marketplace. Buyers are susceptible to being misled by deceptive advertising masked in pseudo scientific certainty, precisely the strategy which has been pursued repeatedly by Posey.

My company is a small, limited products line company competing against a dominant, multi-line company with annual revenues in excess of $40 million. HipSaver has competed with some success and on the basis of a demonstrated record of product safety and durability. Over the last several years, however, we have faced Posey's "UCLA White Paper" campaign and now its Garwood advertising which falsely and grossly misrepresent our product and Posey's Hipster.

HipSaver does not have the resources or the presence in the marketplace to counter Posey's fraudulent campaign. Our company has been forced to incur the costs and distractions of maintaining an ongoing defensive effort to counter Posey's deception. Our company has also been unable also to offer or sell our products to a number of health care facilities which simply will not consider our products. Additionally, the combination of Posey's inferior products and its disparagement of our products has depressed the marketplace opportunity to market and sell soft hip protection products more broadly. Posey's strategy of offering inferior products and its negative advertising

targeted against our company contributes to the impression by some buyers that soft hip

protection garments are of poor quality and questionable effectiveness.

3. State the basis for the allegations contained in paragraph 11 of the Complaint.

**Answer:**  In late 1998 or early 1999, three years after HipSaver introduced its soft hip

protectors, Posey introduced a hip protector product under the mark, HIPSTER.  This

product was a soft, removable hip protector but was poorly designed and not well

received in the marketplace.

Beginning in early 2001, Posey purchased samples of HIPSAVER hip protectors

from our company but did not identify itself as the purchaser.  Posey then copied much of

the design of the HIPSAVER protector and introduced a "knockoff" marketed initially as

the HIPSTER III.  Posey's product is now marketed simply as HIPSTER.  Posey's

HIPSTER copies HipSaver's design.  However, Posey's designed the HIPSTER with a

surface area about 30% smaller than HipSaver, and Posey positioned the surface area

improperly within the garment.  So, there is a substantial reduction in both the hip area

which can be protected and in the dispersion of energy associated with a fall.  The

Hipster product has been prone also to early failure because of its documented inability to

withstand normal institutional laundering.

4. With respect to each Posey advertisement that is the subject of the Complaint,

state the basis for your contention that each such ad is "false, misleading and

deceptive", as alleged in paragraph 14 of the Complaint.

4

Kennedy Park Medical & Rehab, Schofield WI

River Mede Health Care, Binghamton NY

Sacred Heart Home, Hyattsville, MD


These Interrogatories are answered in accordance with Fed.R.Civ. 33 and under penalty of perjury:

_____

Edward L. Goodwin


Objections to these Interrogatories are raised by counsel to the Plaintiff,

_____

Edward J. Dailey


THE HIPSAVER COMPANY, INC.
By its Attorneys,

Lee Carl Bromberg
BBO no: 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts  02110-1618
617.443.9292
617.443.0004  (fax)
Dated: 9.13.05

**CERTIFICATE OF SERVICE**

    I certify that a copy of this document has been forwarded by electronic mail and USPS First Class mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470 Atlantic Avenue, Boston, Massachusetts  02210, ajfitzpatrick@duanemorris.com, and by electronic mail and USPS First Class mail to Douglas H. Morseburg, Esq., SHELDON & MAK, 225 South Lake Avenue, 9th Floor, Pasadena, California  91101, jgsheldon@usip.com.

Edward J. Dailey
Dated:                                              02820/00502  427435.1

8

Kennedy Park Medical & Rehab, Schofield WI

River Mede Health Care, Binghamton NY

Sacred Heart Home, Hyattsville, MD

These Interrogatories are answered in accordance with Fed.R.Civ. 33 and under penalty
of perjury:

_Edw Good_    9/15/05

Edward L. Goodwin

Objections to these Interrogatories are raised by counsel to the Plaintiff.

_____

Edward J. Dailey

THE HIPSAVER COMPANY, INC.
By its Attorneys,

Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004 (fax)
Dated: 9.13.05

### CERTIFICATE OF SERVICE

     I certify that a copy of this document has been forwarded by electronic mail and USPS First Class
mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470
Atlantic Avenue, Boston, Massachusetts 02210, ajfitzpatrick@duanemorris.com, and by electronic mail
and USPS First Class mail to Douglas H. Morseburg, Esq., SHELDON & MAK, 225 South Lake Avenue,
9th Floor, Pasadena, California 91101, jgsheldon@usip.com.

Edward J. Dailey
Dated:                                 02820/00502 427435.1

**EXHIBIT "C"**

1

1              VOLUME 1

2             PAGES 1 - 273

3            EXHIBITS 1 - 52

4        UNITED STATES DISTRICT COURT

5     FOR THE DISTRICT OF MASSACHUSETTS

6                   No. CV-05-10917-PBS

7     - - - - - - - - - - - - - - - - - - - - - - -

8    THE HIPSAVER COMPANY, INC.,

9                  Plaintiffs

10          vs.

11   J.T. POSEY COMPANY,

12                 Defendants

13   - - - - - - - - - - - - - - - - - - - - - - -

14        DEPOSITION OF EDWARD L. GOODWIN

15      Tuesday, October 18, 2005 9:20 a.m

16            Duane Morris, LLP

17    470 Atlantic Avenue, Boston, MA 02110

18

19

20    Reporter:  Janet M. Konarski, RMR, CRR

21            LegaLink Boston

22    320 Congress Street, Boston, MA 02210

23            (617)542-0039

24

2

1        APPEARANCES:

2

3        SHELDON & MAK

4        (By Douglas H. Morseburg, Esquire)

5        225 South Lake Avenue

6        Pasadena, California 91101

7        (626)796-4000

8        Counsel for the Defendant

9

10       BROMBERG & SUNSTEIN LLP

11       (By Edward J. Dailey, Esquire, and

12       Courtney M. Quish, Esquire)

13       125 Summer Street

14       Boston, Massachusetts 02110

15       (617)443-9292

16       Counsel for the Plaintiff

17

18

19

20

21

22

23

24

1    also been tested or else who are you compare this to?

2              The second aspect of it is that when a

3    person requests the data on file at J.A. Posey Company,

4    which will be some of your most influential people,

5    medical directors and clinical directors of large

6    chains of nursing homes and hospitals, they're going to

7    get the Garwood test with the Posey curves and the list

8    of the also-ran hip protectors, which includes

9    HipSaver.  By implication, all of these on this list

10   are no good and only Posey does 90 percent.

11        Q.   Do you have any information at all that

12   directors of any facilities asked for information after

13   seeing this particular ad?

14             MR. DAILEY:  Objection.

15        A.   They always ask for the information on

16   HipSaver, so --

17        Q.   Okay.  Is there any other portion of this

18   advertisement which you think challenges the safety of

19   HipSaver products?

20        A.   Nothing occurs to me at the moment.

21        Q.   Has anyone said anything to you or do you

22   have any information -- let me ask them one at a time.

23   Has anybody made any comments to you about or along the

24   lines of we're not going to buy your product, because

136

1    we saw this Posey advertisement or a statement which is

2    contained in the Posey advertisement, and we think that

3    your products are not effective?

4         A.   If anybody ever called me up and told me

5    that, I think I'd fall on the floor.  It just doesn't

6    happen.  People buy what they want to buy, and they

7    don't tell anybody else, I'm not going to buy yours

8    because of this.  So, if somebody is influenced by

9    this, they're going to select the product and call up

10   the J.T. Posey Company and say I want to order some of

11   these, and that's it.  They don't have time to call me

12   and say, you know, I'm not buying your hip protector

13   because I saw this thing.

14        Q.   Well --

15        A.   It doesn't happen.

16        Q.   Do you have any salespeople?

17        A.   I'm sorry?

18        Q.   Do you have salespeople?

19        A.   No.

20        Q.   How do you sell your products?

21        A.   Direct mail.

22        Q.   How do you contact directors of or

23   purchasers or buyers of health care products, who would

24   buy your product?

Goodwin, Edward L.  101805

137

1           A.   We don't.

2           Q.   How is it you do your marketing?

3           A.   Direct mail.

4           Q.   So, you would send a direct mailing to the

5      director of a facility or the person who is in charge

6      of buying?

7           A.   Right.

8           Q.   You never call people up on the telephone

9      to follow up and say, Hey, we're interested in selling

10     you product?

11          A.   No.  HipSaver sells on durability, quality

12     and effectiveness, and we just do not have the money to

13     compete against Posey with a sales force.

14          Q.   Have you had any instances in which

15     existing customers have said, you know what, I am not

16     going to renew my order, because I got this Posey

17     advertisement, and I think that your products just

18     aren't safe or just aren't reliable?

19          A.   Our customers have generally I think

20     been -- no one has ever said that.  No.

21          Q.   After the litigation began, you learned

22     that Posey changed the statement that was in this flyer

23     to a different statement.  Right?

24               MR. DAILEY:  Objection.

139

1   absorbing material, leaving everybody to assume that

2   HipSaver, the other market leader, has a less effective

3   material by some degree.

4        Q.   Okay.  Well, so how have you been damaged

5   by the ad?  Have you lost any sales as a result of any

6   of the statements in these, in the ads that you're

7   complaining about?

8        A.   Sure.

9        Q.   Who have you lost sales to?

10       A.   I can't tell you, because they don't call

11  me up and say I'm buying Posey's now because of the ad.

12  The reason why companies advertise is to generate

13  revenue and influence people, and Posey doesn't do

14  these ads as an academic exercise.  He does it to steal

15  market share.  It's perfectly understandable to

16  anybody.

17       Q.   Do you have any knowledge as to the size

18  of the hip protector market in let's say the beginning

19  of 2005, in terms of either dollars or units?

20       A.   No.

21       Q.   Do you have any information as to what

22  HipSaver's relative share of the hip protector market

23  was at the beginning of 2005?

24       A.   The only country that I can tell you about

140

1    is Ireland, because we have a survey on that.  But,

2    United States, I would make the assumption that we'd

3    have somewhere around 40 percent of the market in the

4    U.S., but I really don't know for sure.  That's of the

5    current market.  Bear in mind this is an infant market

6    with a new product category.

7            Q.   What percentage of the market in your

8    estimation did HipSaver have in 2004?

9            MR. DAILEY:  Objection.

10           A.   I'm not sure.

11           Q.   Do you have more market share or less

12   market share than you had in 2004, presently, as we sit

13   here today?

14           MR. DAILEY:  Objection.

15           A.   Are we talking U.S. domestic market?

16           Q.   Yes.

17           A.   Okay.  About the same, I'd say.  This is

18   information I provide through my attorney.

19           Q.   Are you aware of any sales that Posey made

20   that they would not have made, but for some statement

21   contained in the ads that you're complaining about?

22           MR. DAILEY:  Objection.

23           A.   I'm not aware of any specific sale that

24   they made.

141

1        Q.   Are you aware of any out-of-pocket losses

2  that HipSaver has suffered as a consequence of the acts

3  complained of in the complaint?

4        A.   When you say "out-of-pocket," I don't

5  understand what you mean by that.

6        Q.   Anything that you can think of that you've

7  had to spend that you wouldn't have had to spend, but

8  for the fact that Posey did something bad?

9        A.   The cost of this lawsuit.

10        Q.   Anything else?

11        A.   Lost market share, lost opportunity,

12  wasted time.

13        Q.   If your market share is the same today as

14  it was a year ago, how could you have lost market

15  share?

16        MR. DAILEY:  Objection.

17        A.   Well, it's a growing market, although

18  slowly, so I can lose growth potential.  When I said

19  "about the same," please insert the caveat I said I'd

20  have to provide these numbers through my attorney,

21  because I wasn't sure exactly what.  It's not something

22  I have on the top of my head.

23        Q.   When you say "the numbers," are you

24  talking about gross sales numbers?

150

1    here (indicating) should be in the catalog, according

2    to FTC regulations.  These should not be on here

3    (indicating), according to FDA regulations.  You don't

4    take a clinical study from somebody else's product and

5    put it on your own.  You'll notice HipSaver doesn't do

6    that.

7              He said the pad covers critical hip

8    fracture area.  It doesn't.  These laundering

9    instructions are not right.  His lowest CDC standard,

10   which has very specific bleach instructions, it says

11   "bleach as directed on the container."  Does the CDC

12   put out containers with their instructions on it, or is

13   that the container that you get at Wal Mart?  So, it's

14   all wrong, and basically he's ruined the market.

15        Q.   Have you finished your answer?

16        A.   Yes.

17             MR. MORSEBURG:  I move to strike on the

18   basis it's nonresponsive.  My question was a little bit

19   different from the one you answered.

20        Q.   My question was:  As a result of any of

21   the things that you have alleged in the complaint, do

22   you have in mind an amount of number -- an amount by

23   which HipSaver has been damaged?

24             MR. DAILEY:  Objection.

151

1          A.    I believe we're going to hire, retain an

2     expert, economist to work those numbers out.

3          Q.    As you sit here today, is it fair to say

4     you don't have any idea what the number would be?

5               MR. DAILEY:  Objection.

6          A.    There is a number, but that is to be

7     determined.

8          Q.    Right.  There is a number.  You just don't

9     know what it is.  Is that fair to say?

10          A.    That's right.

11          Q.    Has your advertising expense increased

12     this year over last?

13          A.    No.

14               MR. DAILEY:  Objection.  Asked and

15     answered.

16          Q.    Has HipSaver's reputation been harmed by

17     any of the acts which are the basis of the complaint?

18               MR. DAILEY:  Objection.  Asked and

19     answered.

20          A.    Before Posey introduced his knockoff of

21     HipSaver, we would send a sample to a nursing home, and

22     generally they would show it around and start

23     purchasing.  Not always, but a lot of times.  After

24     Posey put his defective product on the market, we might

**EXHIBIT "D"**

1

1                        VOLUME 1

2                        PAGES 1 - 146

3                        EXHIBITS:  55 - 63

4              UNITED STATES DISTRICT COURT

5          FOR THE DISTRICT OF MASSACHUSETTS

6                        No. CV-05-10917-PBS

7    - - - - - - - - - - - - - - - - - - - - - - -

8    THE HIPSAVER COMPANY, INC.,

9                        Plaintiffs

10         vs.

11   J.T. POSEY COMPANY,

12                        Defendant

13   - - - - - - - - - - - - - - - - - - - - - - -

14   AND RELATED COUNTERCLAIM.

15   - - - - - - - - - - - - - - - - - - - - - - -

16       VIDEOTAPED DEPOSITION OF EDWARD L. GOODWIN

17       Wednesday, November 30, 2005 12:30 p.m

18              Duane Morris, LLP

19       470 Atlantic Avenue, Boston, MA 02110

20

21       Reporter:  Janet M. Konarski, RMR, CRR

22              LegaLink Boston

23       320 Congress Street, Boston, MA 02210

24                  (617)542-0039

2

```
 1        APPEARANCES:

 2

 3        BROMBERG & SUNSTEIN LLP

 4        (By Edward J. Dailey, Esquire)

 5        125 Summer Street

 6        Boston, Massachusetts 02110

 7        (617)443-9292

 8        Counsel for the Plaintiff

 9

10        SHELDON & MAK

11        (By Jeffrey G. Sheldon, Esquire)

12        225 South Lake Avenue

13        Pasadena, California 91101

14        (626)796-4000

15        Counsel for the Defendant

16

17        ALSO PRESENT:

18        Ernest Posey, Jr.

19        Jason LaChapelle, Videographer

20

21

22

23

24
```

22

1   high durability, he's attached some type of testing

2   done at Garwood laboratories.  And this is a direct

3   assault on HipSaver, because we've had a high

4   institution pad for a long time, from the get go,

5   actually, almost, and he has not.  And he broke down

6   and had to recognize this last year and downgraded the

7   washing instructions on that, which he previously said

8   was a high durability pad, and then this Garwood test

9   connected with his new false claim of a high durability

10  poron pad is a direct assault on HipSaver, because

11  that's our strength.  We have validation and ours

12  survives laundry.

13          MR. SHELDON:  I move to strike.  I'm going

14  to ask the court reporter to ask the question again.

15  I'm not sure it was answered.  Could you please do so.

16              (The pending question was read by the

17          reporter as requested.)

18          A.   The post-settlement publication of the

19  Garwood ad is direct at HipSaver.  So, I have lost

20  sales opportunity, and I have lost sales growth due to

21  his false advertising.

22          Q.   Are you aware of any customer that's not

23  purchased a HipSaver product due to the Garwood ad?

24          A.   No.

1          MR. DAILEY:  Objection.

2      Q.   Are you aware of any customer, who has

3  purchased a Posey product as a result of the Garwood

4  ad?

5      A.   Well, I think the answer to that is by

6  inference.  Posey doesn't advertise as an academic

7  exercise.  He advertises to get customers, so it's

8  pretty obvious to any intelligent person that is the

9  mechanism that's involved.

10          MR. SHELDON:  Move to strike.  Can you

11  read back the question, please.

12              (The pending question was read by the

13          reporter as requested.)

14          MR. DAILEY:  I'm sorry.  I didn't hear

15  your last --

16          MR. SHELDON:  I asked the court

17  reporter -- I moved to strike the answer as being

18  nonresponsive and asked the court reporter to repeat

19  the question.

20          MR. DAILEY:  How many times are we going

21  to get the question?  I think the witness has answered

22  the question.  Why don't we move on with a new

23  question.  Perhaps the problem is a better phrased

24  question might help us all.

24

1          MR. SHELDON:  Can you repeat the question,

2    please.

3              (The pending question was read by the

4          reporter as requested.)

5          A.    No.  I'm not aware of any customer, but

6    I'm sure there are some.

7          Q.    At the time you signed the settlement

8    agreement, did you intend to release Posey from any

9    claim that you could have brought against it up until

10   the time of the settlement agreement?

11         MR. DAILEY:  Objection.  Calls for a

12   conclusion of the law.

13         A.    This is one of the questions that we went

14   round and round the last time, and I believe you have a

15   sufficient answer in the first deposition.

16         Q.    No.  Actually, I don't.  Your response was

17   "I don't have an answer," so that is why I'm asking it

18   again.

19         A.    There is the answer.

20         MR. DAILEY:  Stand on that.

21         Q.    Your position remains "I don't have an

22   answer?"

23         A.    Right.

24         MR. DAILEY:  But, his attorneys do.

134

1    record.   The time is 3:50.

2    BY MR. SHELDON:

3         Q.   The advertisements relating to the Garwood

4    study were in existence prior to the settlement of the

5    first lawsuit, were they not?

6              MR. DAILEY:  Objection.

7         A.   Yes.

8         Q.   I'm sorry.  I didn't hear your answer.

9              MR. DAILEY:  Objection, I said.

10             MR. SHELDON:  I heard your objection.  I

11   didn't hear his answer over the objection.

12        A.   There were Garwood advertisements.

13        Q.   Did those ads have any effect on

14   HipSaver's business?

15        A.   They were devastating.

16        Q.   The one before?

17        A.   Yes.

18        Q.   How do you know that?

19        A.   Well, I guess there are various ways to

20   know things, and as a human being, who has been in

21   business and who has developed his company, there are

22   some things that I know through intuition, and

23   basically Posey used those as a door opener to get into

24   a lot of chains and a lot of hospitals and a lot of

135

1    nursing home chains, and that's how, whatever he has in

2    market share, first of all, he stole from HipSaver, and

3    I used the Garwood test as the ammunition to get in, to

4    say that he was better than HipSaver, to say that he

5    had validation like HipSaver had.

6         Q.    Can you identify any Posey customer that

7    purchased because of the Garwood ad?

8         A.    Just about every one of them.

9         Q.    How do you know that?

10        A.    Well, as I said before, if you're looking

11   for a legal standard of proof, you should ask your

12   client why he spent so much money developing and

13   advertising the Garwood ad, because it's just a

14   commonsense thing.  People advertise to get revenue.

15        Q.    Has anyone ever said to you that they

16   purchased a Posey product because of the Garwood ad?

17             MR. DAILEY:  Objection.

18        A.    No.

19        Q.    Prior to the first settlement, did you

20   ever object to Posey about the Garwood ad?

21             MR. DAILEY:  Objection.

22        A.    I wrote a letter to Tony Vella of your

23   firm explaining to him that I thought he was doing a

24   disservice to hip protectors and to the customers by

1    misleading them with a gimmick test.

2         Q.    Did you refer to the Garwood ad in that

3    letter?

4         A.    I believe if I didn't call it Garwood,

5    that is what was the intent of it.

6         Q.    What did you mean when you said that

7    "customers were stolen from HipSaver?"

8         A.    Customers were stolen?

9         Q.    I think that was the word you used

10   "stolen."

11        A.    I'm not sure that I said that.  What did I

12   say that in connection to?  I'm not sure.

13        Q.    Because of the Garwood ad, I believe you

14   said Posey stole customers from HipSaver?  What did you

15   mean by that?

16        A.    What I mean is that he copied my product,

17   which is totally legal for him to do, I understand,

18   contrary to the assertions of your firm in the

19   Complaint.  I never accused him of infringement.  He

20   stole my product, went out and conducted a test that is

21   not a biomechanical test at a time when the standard

22   was a biomechanical test.

23             When I started in 1995, there were no

24   biomechanical tests available.  The minute they became

137

1    available, I availed myself to get the test.  Posey, on

2    the other hand, starts up his own hip protector test,

3    tests everybody on the marketplace and trashes them all

4    and copies my product and then uses that test to go

5    around as a door opener to every hospital and nursing

6    home in this country.

7            MR. SHELDON:  I don't think that was

8    responsive, so I request to strike.

9        Q.   Can you --

10           MR. DAILEY:  Again, I object, Mr. Sheldon.

11       Q.   Can you identify a customer that was

12   stolen from HipSaver because of the use of the Garwood

13   ad?

14       A.   I can't name a particular customer.

15       Q.   Are you aware of any Posey customers that

16   prior to purchasing hip protectors from Posey had not

17   purchased hip protectors from anyone?

18       A.   Yes.

19       Q.   So, those customers weren't stolen from

20   HipSaver, were they?

21           MR. DAILEY:  Objection.

22       A.   Yes.  They were stolen as an opportunity.

23   If they had turned off on the concept of hip protection

24   because of his defective device, and I can't convince

**EXHIBIT "E"**

16117.74
JGS/DHM/SSS

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10917 PBS

The HipSaver Company, Inc.,        )
                   Plaintiff,   )
                          )
v                          )
                          )
J.T. Posey Company,                )
               Defendant   )
_____)
                          )
J.T. Posey Company, Inc.,        )
             Counterclaim Plaintiff )
                          )
v                          )
                          )
The HipSaver Company, Inc. and  )
Edward L. Goodwin,            )
             Counterclaim Defendants )
                          )
                          )
_____)

## SUPPLEMENTAL RESPONSE TO JT POSEY COMPANY'S
## FIRST SET OF INTERROGATORIES

**Plaintiff, the HipSaver Company, Inc. responds to the Defendant's First Set of**

**Interrogatories as follows:**

### Statement of Counsel:

The Defendant, JT Posey Company, through counsel has objected to the Plaintiff's

earlier response to the Defendant's First Set of Interrogatories, in large part, because the

1

2. State the basis for your contention that HipSaver has been damaged by Posey's
advertising", as stated on page 2 of the Complaint.

**Answer**: The Posey Company has engaged in repeated efforts to misrepresent,
disparage, and deceive customers and potential customers about HipSaver's products.
Posey's misrepresentations, deception, and product disparagement are aimed at HipSaver,
intended to undercut the reputation and integrity of our products, and directed to unfairly
compete and overwhelm HipSaver in the marketplace – all by fraudulent means.

In addition to false advertising aimed directly at HipSaver, the Posey Company
has knowingly misrepresented the protective capability, launderability, and durability of
its product when it knows that its products have been unable to withstand routine
institutional laundering and when it knows that its products are not of proper size or
positioning to protect the trochanter.

The Posey Company has an overwhelming presence in the rehabilitation and
nursing facility segment of the healthcare marketplace, so it has little difficulty selling its
products. When those products have proven to be inferior, Posey may well lose business.
At the same time, however, HipSaver loses the opportunity to replace Posey because
buyers conclude that the product – whether from Posey or HipSaver is simply flawed.

Posey's advertising campaigns have a particularly damaging potential because of
the lack of knowledge among health care buyers and Posey's marketplace dominance.
Neither the biomechanics nor the relative performance of competing products has been
well understood in the marketplace. Buyers are susceptible to being misled by deceptive
advertising masked in pseudo scientific certainty, precisely the strategy which has been
pursued repeatedly by Posey.

4

My company is a small, limited products line company competing against a dominant, multi-line company with annual revenues in excess of $40 million. HipSaver has competed with some success and on the basis of a demonstrated record of product safety and durability. Over the last several years, however, we have faced Posey's "UCLA White Paper" campaign and now its Garwood advertising which falsely and grossly misrepresent our product and Posey's Hipster.

HipSaver does not have the resources or the presence in the marketplace to counter Posey's fraudulent campaign. Our company has been forced to incur the costs and distractions of maintaining an ongoing defensive effort to counter Posey's deception. Our company has also been unable also to offer or sell our products to a number of health care facilities which simply will not consider our products. Additionally, the combination of Posey's inferior products and its disparagement of our products has depressed the marketplace opportunity to market and sell soft hip protection products more broadly. Posey's strategy of offering inferior products and its negative advertising targeted against our company contributes to the impression by some buyers that soft hip protection garments are of poor quality and questionable effectiveness.

**Basis:** *See* "Basis" response to Interrogatory no. 1 *See also* Mr. Goodwin's October 18, 2005 deposition at 139, 140-152. Further, HipSaver notes that its damages case will be more fully set out by its damages expert. Relevant financial documents will be provided to JT Posey Company's counsel on January 30, 2006 as agreed by counsel for the parties. These documents are incorporated by reference. HipSaver expects also to designate JT Posey Company's financial documents, when produced, in HipSaver's damages claim. HipSaver reserves its right to further supplement this response.

These Interrogatories are answered in accordance with Fed.R.Civ. 33 and under penalty of perjury:

_____

Edward L. Goodwin

With respect to the Statement of Counsel and Objection:

_____

Edward J. Dailey


THE HIPSAVER COMPANY, INC.
By its Attorneys,

Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts  02110-1618
617.443.9292
617.443.0004  (fax)
Dated: 1.25.06

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic mail and USPS First Class mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470 Atlantic Avenue, Boston, Massachusetts 02210, ajfitzpatrick@duanemorris.com, and by electronic mail and USPS First Class mail to Douglas H. Morseburg, Esq., SHELDON & MAK, 225 South Lake Avenue, 9th Floor, Pasadena, California 91101, jgsheldon@usip.com.

Edward J. Dailey
Dated: 1.26.06

02820/00502 427435.2

12

These Interrogatories are answered in accordance with Fed.R.Civ. 33 and under penalty of perjury:

*Edward L Goodin 1-25-06*

Edward L. Goodwin

With respect to the Statement of Counsel and Objection:

_____

Edward J. Dailey


THE HIPSAVER COMPANY, INC.
By its Attorneys,


Lee Carl Bromberg
BBO no. 058480
Edward J. Dailey
BBO no. 112220
Peter J. Karol
BBO no. 660338
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004 (fax)
Dated: 1.25.06

### CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic mail and USPS First Class mail today to Defendant's counsel of record, Anthony J. Fitzpatrick, Esq., DUANE MORRIS LLP, 470 Atlantic Avenue, Boston, Massachusetts 02210, ajfitzpatrick@duanemorris.com, and by electronic mail and USPS First Class mail to Douglas H. Morseburg, Esq., SHELDON & MAK, 225 South Lake Avenue, 9th Floor, Pasadena, California 91101, jgsheldon@usip.com.

Edward J. Dailey
Dated: 1.26.06                                    02820/00502 427435.2

12

**EXHIBIT "F"**

**Declaration of Edward L. Goodwin**
January 8, 2007

I, **Edward L. Goodwin**, make this Declaration on the basis of personal knowledge and under penalty of perjury.

1.    I am president of the HipSaver Company. In 1994, I informally surveyed a number of nursing homes and nursing home suppliers. I found that none offered a hip protector to help prevent the 60,000 hip fractures that occurred from falls in the 17,000 nursing homes each year.

2.    In 1995, I invented the HipSaver® hip protector, a soft foam washable encapsulated protective pad sewn into a garment. I hold a patent for technology related to soft hip protectors, and I have patents pending for related technology. My company has been based in Canton and employs less than 10 people. The HipSaver Company is a privately held company. Revenues from HipSaver were $1.5 million in 2005 and were flat for 2006.

3.    Prior to developing HipSaver, I worked as an engineer in the rubber and textile industry for 20 years and thus had the requisite technical background to develop such a product, and I understood and was familiar with equipment and machinery necessary for manufacture.

4.    Additionally I had worked on new product teams and new product launches and saw the organizational challenges inherent in developing, testing, improving, manufacturing, and selling innovative, high quality products.

5.    In 1995, I met with Harvard researchers about hip protectors and discussed a variety of topics relating to epidemiology, etiology, hip protector construction, proper pad positioning and biomechanics. Since hip protectors were a new product category, there

1

was no American Society of Testing and Materials (ASTM) standard to test a hip

protector. Therefore, university researchers were constructing a biomechanical test that

included all of the known factors in the dynamic fall to the hip.  These included soft

tissue modeling, trochanteric anatomy modeling, pelvic rebound compliance and

literature established fall forces to the hip bone. Such a test could then reveal if a given

protective pad could lower the simulated fall force sufficiently to protect

the osteoporatic trochanter of an older person.  Beginning with testing initiated at

Harvard in 1996 through the Tampere testing conducted in 2000 and internal testing

conducted since 2004, HipSaver has tested and confirmed the ability of our original and

improved hip protector pads to reduce impact forces of a fall.  All of HipSaver's testing is

verifiable and scientifically simulates a dynamic fall impacting the hip.

6.      HipSaver is also the subject of a published clinical study directed by a physician

at the Fallon Clinic in Worcester.  And HipSaver was the subject of one of the first

published clinical studies to statistically confirm effectiveness against hip injury which

was directed by George Gross, PT, and colleagues at the Elder Service Plan of East

Boston.  Since 2001, I have invested some $350,000 in sophisticated manufacturing and

test equipment for HipSaver.

7.      Prior to 2001, HipSaver was practically the only hip protector in substantial

distribution to the United States nursing home and rehabilitation hospital market,

including the Veterans Administration.

8.      In 1999, the Posey Company introduced a hip protector product with removable

(non-washable) pads.  This product did not receive a significant response in the

marketplace and was not a competitive threat to HipSaver.

9.      Based on what I have learned in the present lawsuit with the Posey Company, it

appears that the Posey Company embarked on an effort to develop a lower cost but

inferior copy of our HipSaver product early in 2001. Unknown to us at the time, this

development effort included comparative testing of materials, secretive purchase of our

products, false claims to our largest customer, the Veterans Administration about the

superiority of Posey's new hip protector pad, and development of the 2001 version of the

Garwood ads.

10.     Late in 2001, the Posey Company launched its new hip protector product, known

as Hipster III. In essence, Posey created in 5 months the "appearance" of a hip protector

offering the same benefits that HipSaver had worked on for the previous seven years.

It was markedly distinct in appearance from Posey's earlier product, contained what was

represented as a washable pad, and looked remarkably like our HipSaver. If you place

the two products side by side, it is difficult to distinguish the Posey copy from our

HipSaver. In fact, after Posey Hipsters began to fail routinely in health care facility

laundries during 2002 and 2003, Posey's products were, on a number of occasions,

mistakenly returned to our company – with complaints and demands for refunds.

11.     Although we learned that Posey had blatantly copied our product and were aware

also of its initial Garwood advertising in 2002 and 2003, I dismissed the advertising as

junk science. I was not aware of the national scope of this advertising. I was not aware

that Posey had made comparison claims of superiority to the Veterans Administration in

July 2001, and I was not aware of similar claims made in a Posey advertising video. I

was not alarmed by Posey's advertising until its "UCLA" advertising appeared in 2004.

3

12.     During 2002 and 2003, I was working to counter Posey's aggressive marketing to

the Veterans Administration and its false claims to the VA about the durability and

launderability of its hip protector product. Our company was also working very hard to

expand sales of HipSaver to nursing and rehab facilities and to obtain agreements with

major heath care product distributors and health care chains.

13.     From 2002 through 2005, our company made numerous efforts to advertise and

sell HipSaver to individual nursing and health care facilities, to national chains, and to

national distributors.

14.     HipSaver secured an agreement to be sold by Alimed, a large, Massachusetts

based multi-line supplier with national distribution to some 600 nursing and rehab

facilities in Massachusetts and about 15,000 across the country. This would have been

HipSaver's first opportunity to obtain a vehicle for widespread national distribution.

Working with John Bretz, the marketing manager, and his staff we supplied artwork and

photos in anticipation of a HipSaver catalog launch during 2002. Mr. Bretz told me that

although Alimed had reviewed an earlier Posey hip protector, they wanted to try

HipSaver because of its design and testing validation. We built inventory in anticipation

the large sales increase, only to be told at the last minute that HipSaver was dropped from

Alimed's catalog and replaced by the Posey copy.

15.     Since then, although we have tried repeatedly, we have been frozen out of all of

the major catalog distributors and resellers of hip protectors, including McKesson,

Cardinal Health, Medline, and Gulf South which have operations in Massachusetts.

Posey is sold by these distributors and resellers. In other cases, one major chain and

some facilities have refused to purchase HipSaver because of their experience with

4

Posey's product. The Posey Hipster failed at high rate in the laundry, customers believed

that Posey's advertising misrepresented launderability, and we could not overcome the

perception that all hip protector products would fail in the laundry. But, we still pursued

the large chains.

16.    We tried to secure an agreement to supply Manor Care, a major nursing home

chain, only to be told by its senior buyer, Bill Cusack, that he would not buy HipSaver

because his company had entered into an exclusive arrangement with Posey. Similarly,

we worked with Life Care, another national nursing home chain with facilities in

Massachusetts, but were rejected by the company's corporate buyer for Posey. And

again, in 2003 the corporate purchaser for Kindred, which has a number of health care

facilities in Massachusetts, informed us that the company was under exclusive contract

with Posey for hip protectors. Recently, we learned that LifeCare Corporation has

largely abandoned hip protectors because of the poor quality of Posey's product.

LifeCare refused to consider HipSaver as an alternative.

17.    Numerous individual facilities have also refused to purchase HipSaver. In a

number of cases, these facilities have refused to purchase HipSaver hip protectors

because of their experience with Posey's product and its repeated failures in the laundry.

Included are Bangor Mental Health Institute, Bangor, ME; Truman Medical Center at

Lakewood, Kansas City MO; Peaks Care Center, Longmont CO; Dunn County Health

Care Center, Menomonie WI; VA Medical Center Bedford, Bedford MA; Resthaven

York, York PA; Pleasant Meadows Christian Village, Chrisman IL; Friendship Village,

Schaumburg IL; Pisgah Manor, Candler NC; Golden View, Meredith NH; Seneca Place,

Verona PA; Phoebe Ministries, Allentown PA; Dow Rummel Village, Sioux Falls SD;

Eaglewood Care Center, Springfield OH; Baptist medical Center, Little Rock AR; Cedar

Wood Health Care, Colorado Springs CO; Park River States Care Center, Coon Rapids

MN; Regency at the Park, College Place WA; Kennedy Park Medical & Rehab,

Schofield WI; River Mede Health Care, Binghamton NY; and Sacred Heart Home,

Hyattsville MD.

18.     Between 2002 and the end of 2005, HipSaver spent almost $200,000 on

advertising primarily to the private market and yielded a total of only 20 nursing homes

as customers.  We have realized we don't have the capacity to counter Posey's false

advertising.  By the end of 2005 Posey had captured at least one half of the hip protector

market in the United States.

19.     By the end of 2005, it was clear also that HipSaver has been completely frozen

out of every private sector nursing and health care facility chain and every private

distribution chain.  Our rate of growth in the private marketplace has declined every year

since 2002, and we maintain our business largely on the basis of sales to the Veterans

Administration which accounts for more than 40% of our U.S. sales and almost all of our

growth offsetting other losses in the United States.

20.     Some of our lost business is due to the fact that the Posey Company's advertising

and sale of a defective product has led a number of health care facilities to abandon hip

protection products altogether.  Since at least the early spring of 2002, less than six

months from introduction of the Hipster III product, Posey has been aware that its

product is defective and has a high rate of failure.  In fact, notes from an internal Posey

meeting to evaluate its defective product in April 2003 indicate that Posey was concerned

that it "could lose the market" if it failed to resolve this issue.  Posey knew early on that

6

its hip protector failed in institutional laundries but continued to advertise that it could be laundered at high temperature. Some health care facilities have not distinguished between Posey's defective product and our sound product. So, a number of facilities have simply refused to buy any hip protection products.

21.    When Posey misrepresented the effectiveness and durability and launderability of its product in national campaigns year in and year out, our company simply didn't have the resources or ability to mount a counter campaign. We have been able to maintain most of our business with the Veterans Administration because it is not as susceptible to Posey's advertising. The VA system purchases independently, seeks the best value products, is open to new sources, and conducts its own product evaluation and testing – unlike the private sector. Since at least late 2003, our company has spent most of its marketing resources dealing with the VA and fending off Posey's false claims about the superiority, launderability, and effectiveness of its hip protector copy in protecting patients from hip injury.

22.    HipSaver and Posey jointly participated in laundry testing conducted independently by the Veterans Health Administration. Testing was initiated in September 2002 at the Mountain Home Veterans Medical Center. Helen Brogna and I represented HipSaver. Posey was represented by Victoria Lewis. The Medical Center was represented by Randall Nentrup, its Risk Manager and the laundry manager. The study coordinator was Eric Stalhanske, National Safety Center Manager. Mr. Stalhanske outlined the study procedures which included laundering in accordance with the high temperature CDC Guideline with washing at 160-170°F, extraction cycle, and drying at 180°F. Ms. Lewis stated that Posey's hip protector product would tolerate the study

7

procedures. HipSaver completed the study without failure. Posey's product had a high rate of failure. Subsequently, the Veterans Health Administration's National Center for Patient Safety issued guidelines for use of hip protectors in which it stated: "As a general rule, Posey™ hip protectors should not be washed in the hospital laundry. They degrade quickly and pads may crack or dissolve. Bleach appears to accelerate the degrading process". In the same guidelines, the Veterans Health Administration notes that HipSaver hip protectors can be washed in hospital laundry facilities without restriction.

23.    The Posey Company withdrew its first version of the Garwood advertising in the fall of 2003 and blanketed distributors, chains, and facilities with a new campaign, the false UCLA advertising which was distributed in catalogs, newsletters, and mailers, and on the Internet. The UCLA ads were based on a flawed testing protocol conducted by a UCLA graduate student and a white paper which was written or edited by Posey and misrepresented as a "UCLA" study. In this advertising, Posey claimed that its "UCLA" tests demonstrated the superiority of the Posey hip protector over HipSaver. In fact, even though the UCLA tests were flawed, they showed that HipSaver was superior. Nevertheless, Posey utterly misrepresented the tests and embarked on an 11 month campaign against HipSaver.

24.    In the spring of 2004, HipSaver filed a lawsuit in the federal court in Boston, seeking to halt Posey's false "UCLA" advertising. At the time, the false advertising consisted only of the UCLA ads; there was no Garwood advertising. So, of course, we challenged only what was being advertised at the time. When our company challenged the UCLA ads, we thought Posey had abandoned the Garwood ads for good and, instead, was trying to use the UCLA brand name to attack us.

8

25.     Posey filed a "tit for tat" countersuit to our lawsuit in 2004, challenging claims made by HipSaver in our website. After mediation, Posey agreed to a settlement which included withdrawal of all UCLA ads, a corrective advertising statement repudiating the false advertising, payment of attorney fees and associated costs, and dismissal of all claims with prejudice. In conjunction with the settlement, Posey did not request any changes to our website.

26.     Posey's corrective advertising statement explicitly admitted that UCLA did not sponsor, authorize, or endorse Posey's advertising, that our expert, Wilson C. Hayes, PhD is a recognized biomechanical engineering expert, and that he found that the "UCLA" tests were not reliable and could not sustain "any of the claims" in Posey's advertising. The corrective advertising statement noted Posey's regret at "comparisons with HipSaver products and confusion this may have caused in the marketplace".

27.     I agreed to the settlement because I thought that corrective advertising would put an end to Posey's false advertising. I understood that the settlement agreement barred any further claims by us against the UCLA ads in return for withdrawal of those ads and corrective advertising, and I understood also that Posey could not challenge our website – unless we made material new statements or claims in the website.

28.     Since the settlement in September 2004, HipSaver has not made any changes to the claims and statements in its website. We have updated several color product photos and added one garment to our HipSaver line, but not so much as a comma has changed in the statements and claims in our website.

29.     The Posey Company's regret for its false UCLA ads was short lived. I understand that less than a month after the settlement, Posey's president issued a marketing statement

9

to Manor Care, a 300 facility nursing home chain in which he undercut the corrective advertising settlement by suggesting that the "UCLA" testing was valid and that he had settled only because our lawsuit was a nuisance. More important, however, Mr. Posey revived the Garwood test advertising with a new version which included additional testing done on Posey's new PORON® based pad. This new advertising began sometime late in 2004.

30.      I became aware of the new Garwood ads in the late winter of 2005 after some correspondence with Mr. Posey. I was unaware until recently that in March 2005, Mr. Posey had ordered further testing of Posey's hip protector products in an effort to prepare for filing a lawsuit against HipSaver.

31.      In any case, once we reviewed the new Garwood ads, we instructed our lawyer to demand an immediate retraction. This lawsuit followed.

32.      While Posey finally withdrew the new Garwood advertising in the late summer of 2005, four years of false advertising by a company with the means to repeat its false claims again and again to customers has left HipSaver with little opportunity beyond the Veterans Administration. Our rate of growth is less than half Posey's. We are losing market share. Our revenue for 2006 was flat. We have no ability to access the private health care distribution and facility chains. The corrective advertising of 2004 might have reversed the trend against us, but it was undercut by Mr. Posey's marketing statement and the new Garwood ads. Posey's regret is meaningless. We remain frozen out, and we even face skeptical buyers who will no longer purchase from Posey because its product proved defective but will no longer consider us either.

33.     Since I began my work with soft hip protection garments, I have routinely
conducted laundry and drying tests of numerous materials. I have tested all of the pads
used by HipSaver and all of the pads used by Posey. And as noted above, I have
participated in a large scale test by the Veterans Administration. Based on my experience
with institutional laundries operated by the VA and a number of private health care
facilities and based on temperature readings I have taken at commercial laundries, the
average wash temperature is 180°F and is frequently higher. I understand that the
American Institute of Architects industry standard for health care facility construction
calls for laundry temperatures at 160°F. The CDC high temperature wash guideline is for
a minimum temperature of 160°F. HipSaver hip protectors are labeled to be washed at
200°F while Posey labeled its product at a minimum temperature of 160°F until 2005.
And while I am aware of a low temperature CDC guideline, this guideline cannot be
competently recommended for institutional settings because it requires use of bleach to
offset the lower temperature. The hip protectors which are the subject of this lawsuit
contain Lycra/Spandex stretch fibers and a urethane pad pouch covering. Bleach
manufacturers recommend against bleach use on these components since routine use of
bleach rapidly degrades the molecular structure of the base polymers.

34.     As noted above in paragraph 6, HipSaver has participated in two clinical studies.
The purpose of the study conducted by Jeffry B. Burl, MD, a physician at the Fallon
Clinic, was to determine the extent to which a high compliance rate can be achieved
among an elder group at high risk of hip injury. The compliance rate for patients who
completed the study exceeded 93%. Moreover, it is significant as a matter of fact that not
a single high risk patient was injured while wearing a HipSaver hip protector – even

11

Jan 08 07 02:31p    HipSaver

Case 1:05-cv-10917-PBS    Document 232-3    Filed 05/15/2007    Page 19 of 24
Case 1:05-cv-10917-PBS    Document 183-3    Filed 01/08/2007    Page 13 of 14

though patients experienced 126 falls during the course of the study. While the Fallon study did not evaluate the statistical significance of zero injury, this was demonstrated and confirmed in a related study by George Gross and his colleagues in the Elder Service Plan study. Gross' study of frail elders over the course of 26 months determined that a zero hip injury rate among HipSaver wearers was statistically significant.

35.    The HipSaver pad used in the Gross Study was substantially a design equivalent of the current HipSaver pad. Both pads use the same basic technology of an encapsulated visco-elastic damping urethane pad which I invented. In 2002, two years after the study ended, the physical therapists who ran the Gross Study informed us that they now used HipSavers that use the current HipSaver pad and that they had an additional 200 falls on the current HipSavers with no fractures.

36.    HipSavers were also tested at Tampere University in 2000. The pads in the hip protectors tested at Tampere use the same foam as the current HipSaver pad. The foam material is the determinant of the force absorption of a hip protector pad. To add an extra margin of safety, current hip protector pads are even thicker than the pads tested at Tampere.


_Edward L. Goodwin_
**Edward L. Goodwin**

Dated:1/8/07

12

02820/00502  596287.1

**EXHIBIT "G"**

1

1       IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

3    THE HIPSAVER COMPANY, INC.,   )
                                   )
4                    Plaintiff     )
                                   )
5            -VS-                  ) CA No. 05-10917-PBS
                                   ) Pages 1 - 36
6    J.T. POSEY COMPANY,           )
                                   )
7                    Defendant     )

8

9                      MOTION HEARING

10         BEFORE THE HONORABLE PATTI B. SARIS
                 UNITED STATES DISTRICT JUDGE
11

12

     A P P E A R A N C E S :
13

         EDWARD J. DAILEY, ESQ. and COURTNEY M. QUISH, ESQ.,
14   Bromberg & Sunstein, 125 Summer Street, Boston,
     Massachusetts, 02110-1618, for the Plaintiff.
15

         DANIEL B. WINSLOW, ESQ., Duane Morris,
16   470 Atlantic Avenue, Suite 500, Boston, Massachusetts,
     02210, for the Defendant.
17

         JEFFREY G. SHELDON, ESQ. and DOUGLAS H. MORSEBURG, ESQ.,
18   Sheldon, Mak, Rose & Anderson, P.C., 225 South Lake Avenue,
     9th Floor, Pasadena, California, 91101, for the Defendant.
19
                             United States District Court
20                           1 Courthouse Way, Courtroom 19
                             Boston, Massachusetts
21                           February 14, 2007, 2:45 p.m.

22
                         LEE A. MARZILLI
23               CERTIFIED REALTIME REPORTER
                 United States District Court
24                1 Courthouse Way, Room 3205
                    Boston, MA  02210
25                    (617)345-6787

1          MR. SHELDON:  No, your Honor, we don't, and that's

2     the problem we have.  The first time these names were even

3     mentioned was in this declaration after discovery closed.

4     That's why it's so unfair to allow it if it --

5          THE COURT:  Well, if it's not in the record, she

6     can't use it.  So what's in the record, only Alamed?

7          MR. SHELDON:  No, no, the others are mentioned, but

8     we don't know when -- well, first of all, it's not like he

9     lost them.  He never had them, as far as we can tell.

10     They're sort of lost opportunities.  There's, again, no

11     evidence that him not getting it had anything to do with the

12     Garwood ad.  It could be -- and put yourself in the position

13     of a nursing home.  If a patient falls and breaks their hip,

14     who would you rather have standing behind you for product

15     liability, HipSaver or Posey?  I mean, there's myriad of

16     reasons why these people --

17          THE COURT:  Most of them have dementia anyway --

18          MS. QUISH:  -- as effective, I would honestly pick

19     HipSaver, so I think that's a rough argument when they have

20     the VA standing behind HipSaver.

21          THE COURT:  Is there any other arguments you want

22     to make?

23          MS. QUISH:  I just want to make the point that at

24     this point, to survive summary judgment on an issue of

25     causation, we need enough evidence of injury to enable a

1    rational fact-finder to make a reasonable inference that the

2    Garwood ads caused the injury.  Under Cashmere, it's very

3    clear that that is what we need.  We think we have more than

4    enough evidence to support and satisfy that burden.

5              MR. SHELDON:  Your Honor, that's a misreading of

6    Cashmere.  Cashmere stated uncontroverted evidence of

7    diverted sales caused by the falsehood.  Even if you let that

8    declaration in with all its hearsay and with the fact that

9    it's late, and it's unfair to us that we can't now go depose

10   those people to prove Garwood had nothing to do --

11             THE COURT:  This is a recently filed declaration?

12             MR. SHELDON:  It was filed in opposition to our

13   summary judgment motion.

14             MS. QUISH:  Cashmere relied on a declaration of the

15   complaining party with opposing summary judgment that was

16   also pulling in comments and, quote, "hearsay" stating that

17   it had heard from its buyers that it was affected by this

18   price issue.

19             THE COURT:  Why didn't you provide this information

20   in the expert report?

21             MS. QUISH:  As I said, the expert report says that

22   there are indications of harm.  That's there.

23             THE COURT:  It's a little unfair game to push it in

24   after discovery.

25             MS. QUISH:  The problem is, discovery was closed