# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE HIPSAVER COMPANY, INC., | ) Civil Action No. 05-10917 PBS |
| Plaintiff, | ) |
| v. | ) ORAL HEARING REQUESTED |
| J.T. POSEY COMPANY, | ) |
| Defendant. | ) |
| AND RELATED COUNTERCLAIM. | ) |

## FIFTH MOTION IN LIMINE OF J.T. POSEY COMPANY FOR ORDER PRECLUDING EXPERT TESTIMONY BY EDWARD GOODWIN

By this fifth motion in limine, defendant and counterclaimant J.T. Posey Company ("Posey") seeks an order pursuant to Rule 702 of the Federal Rules of Evidence precluding Edward Goodwin ("Goodwin") from providing any oral or written testimony regarding scientific, technical, or other specialized matters, and in particular, any oral or written testimony regarding the CDC washing guidelines or the mechanical specifications or properties of the materials from which the products at issue in this case are made.

Pursuant to Local Rule 7.1(A)(2), counsel for Posey has conferred with the plaintiff's counsel regarding this motion.

## I.     FACTS

HipSaver filed and served its Designation of Expert Witnesses on January 16, 2006, a copy of which is attached as Exhibit "A." In it, HipSaver designated three expert witnesses, i.e., Dr. Wilson Hayes, a technical expert; Roy Epstein, Ph.D., a damages expert; and Melvin Coons,

a chemist. HipSaver subsequently withdrew the designation of Mr. Coons, but it never sought leave to designate any additional experts.

One of the issues in this case is the truth or falsity of the statement on HipSaver's website that only its products can be washed in accordance with the so-called CDC Guidelines for Infection Control in the Laundry (the "CDC Guidelines"). The CDC Guidelines, which are available on HipSaver's website, set out two separate guidelines for the washing of laundry, i.e., a high-temperature washing guideline and a low-temperature washing guideline. In the Joint Pre-Trial Memorandum, HipSaver has asserted that the low-temperature washing guideline, which involves the use of low-temperature detergent, bleach, and "sour", is so complex and so involved that it is never used and that it is, consequently, irrelevant in the laundry industry.

During discovery, Posey designated as an expert, Kevin Minissian, who for many years has been designing and installing computer-controlled low temperature washing and chemical "dosing" systems for use in commercial, institutional and hospital laundries. Mr. Minissian is going to testify at trial that the low-temperature washing guideline is common in commercial, institutional and hospital laundries. Indeed, VA laundries, which HipSaver claims is its main customer, are <u>required</u> to follow the low-temperature guideline.

HipSaver has not designated an expert who has any experience with laundries or laundry issues. Therefore, Posey anticipates that HipSaver will attempt to introduce evidence regarding the prevalence of use of the CDC's high- or low-temperature washing guidelines through HipSaver's president, Edward Goodwin. In addition, in response to questions from his own attorney, Mr. Goodwin testified at deposition as to various technical issues surrounding the mechanical properties of Posey's Hipster product. Thus, at trial, Posey anticipates that HipSaver may attempt to elicit opinion testimony from Mr. Goodwin regarding various technical issues.

See Deposition of Edward Goodwin, taken 10/18/05, (hereafter, "Goodwin Depo., 10/18/05)"),

at 34:17-37:18, 94:11-95:22, 96:17-99:3, excerpts of which are attached as Exhibit "B."


II.    **ARGUMENT**

     A.    **The Court Should Preclude HipSaver From Offering Evidence Regarding Scientific, Technical, Or Other Matters Requiring Specialized Knowledge Through Mr. Goodwin Because Mr. Goodwin Was Never Identified As An Expert Pursuant to Fed. R. Civ. P. 26(a)(2)(a).**

Rule 26(a)(2)(A) provides, in pertinent part, that each party "shall disclose to other

parties the identity of any person who may be used at trial to present evidence under Rules 702,

703, or 705 of the Federal Rules of Evidence." Here, HipSaver did not disclose Mr. Goodwin as

an expert witness in its Designation of Expert Witnesses served on January 16, 2006. Neither

did it ever supplement its disclosures, or seek leave to designate Mr. Goodwin as an additional

expert, or serve an expert report for Mr. Goodwin. As a consequence, the Court should preclude

Mr. Goodwin from submitting testimony regarding scientific, technical, or other matters

requiring specialized knowledge because he was never identified as an expert pursuant to the

rules.

     B.    **The Court Should Preclude HipSaver From Offering Evidence Regarding Scientific, Technical, Or Other Matters Requiring Specialized Knowledge Through Mr. Goodwin Because Mr. Goodwin Is Not Qualified As An Expert Pursuant To Federal Rule Of Evidence 702.**

During deposition, Mr. Goodwin testified that he earned a bachelor's degree in Biology

with minors in education and chemistry from Bridgewater State College in 1973 and a master's

degree in psychology from Cambridge College in 1995.  Goodwin Depo., 10/18/05, at 14:11-15:11.  He also testified that he has taken some courses in business administration at Northeastern and that he has attended a couple of engineering seminars.  Goodwin Depo, 10/18/05, at 18:11-24.

Federal Rule of Evidence 702 provides that:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Under the Rules, "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Advisory Committee's Note on 2000 Amendment citing Bourjaily v. United States,* 483 U.S. 171 (1987).

Here, Mr. Goodwin's company makes and sells hip protectors.  While Mr. Goodwin may have experience in making hip protectors, he has no demonstrated knowledge, skill, experience, training or education that would qualify him as an expert with respect to the CDC washing guidelines or with respect to the chemical or physical properties of the raw materials from which the hip protection products at issue in this case are made.

Accordingly, this Court should preclude Mr. Goodwin from testifying as to any scientific, technical, or other matters requiring specialized knowledge that falls under the purview of Federal Rule of Evidence 702, and in particular, any evidence regarding the CDC washing guidelines, as well as the materials and performance of the products at issue.

III.    **CONCLUSION**

For the forgoing reasons, Posey's fifth motion <u>in limine</u> should be granted.


Dated: May 15, 2007

J.T. POSEY COMPANY

By its attorneys,

/s/ Douglas H. Morseburg
Jeffrey G. Sheldon (Admitted Pro Hac Vice)
Douglas H. Morseburg (Admitted Pro Hac Vice)
SHELDON MAK ROSE & ANDERSON
100 E. Corson Street, 3d Floor
Pasadena, CA  91103-3842
626.796.4000

Anthony J. Fitzpatrick (BBO # 564324)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
857.488.4200

**CERTIFICATE OF SERVICE**

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.

May 15, 2007

/s/ Donald K. Piper
Donald K. Piper

**EXHIBIT "A"**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10917 PBS

The HipSaver Company, Inc.,        )
                 Plaintiff,   )
                     )
v                       )
                     )
J.T. Posey Company,          )
              Defendant  )
                     )
_____)
                     )
J.T. Posey Company, Inc.,      )
           Counterclaim Plaintiff  )
                     )
v                       )
                     )
The HipSaver Company, Inc. and  )
Edward L. Goodwin,          )
          Counterclaim Defendants  )
                     )
                     )
_____)

## PLAINTIFF HIPSAVER'S DESIGNATION OF EXPERT WITNESSES

Plaintiff, HipSaver, designates the following proposed expert witnesses:

Wilson C. Hayes, Ph.D.
Corvallis, Oregon
      Mechanical engineering, biomechanical engineering, injury biomechanics,
      anatomy, orthopedics, exercise and sports science

Melvin S. Coons, B.S. Chemical Engineering
Columbus, Ohio
      Chemical engineering

Roy J. Epstein, Ph.D.
Belmont, Massachusetts
      Marketplace and business damages

THE HIPSAVER COMPANY, INC.
By its Attorneys,

/s/ Courtney M. Quish
Lee Carl Bromberg, BBO No.: 058480
Edward J. Dailey, BBO No.: 112220
Courtney M. Quish, BBO No.: 662288
BROMBERG SUNSTEIN LLP
125 Summer Street - 11th floor
Boston, Massachusetts  02110-1618
(617) 443-9292
(617) 443-0004  (fax)
cquish@bromsun.com

Dated:  January 16, 2006

02820/00502 460097.1

## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.

January 16, 2006

**EXHIBIT "B"**

1

1              VOLUME 1

2            PAGES 1 - 273

3           EXHIBITS 1 - 52

4       UNITED STATES DISTRICT COURT

5      FOR THE DISTRICT OF MASSACHUSETTS

6               No. CV-05-10917-PBS

7   - - - - - - - - - - - - - - - - - - - - - - -

8   THE HIPSAVER COMPANY, INC.,

9                 Plaintiffs

10        vs.

11  J.T. POSEY COMPANY,

12                 Defendants

13  - - - - - - - - - - - - - - - - - - - - - - -

14       DEPOSITION OF EDWARD L. GOODWIN

15     Tuesday, October 18, 2005 9:20 a.m

16            Duane Morris, LLP

17    470 Atlantic Avenue, Boston, MA 02110

18

19

20    Reporter:  Janet M. Konarski, RMR, CRR

21            LegaLink Boston

22    320 Congress Street, Boston, MA 02210

23           (617)542-0039

24

2

```
 1        APPEARANCES:

 2


 3        SHELDON & MAK

 4        (By Douglas H. Morseburg, Esquire)

 5        225 South Lake Avenue

 6        Pasadena, California 91101

 7        (626)796-4000

 8        Counsel for the Defendant

 9


10        BROMBERG & SUNSTEIN LLP

11        (By Edward J. Dailey, Esquire, and

12        Courtney M. Quish, Esquire)

13        125 Summer Street

14        Boston, Massachusetts 02110

15        (617)443-9292

16        Counsel for the Plaintiff

17

18

19

20

21

22

23

24
```

14

1    with your ability to recall events or give your best

2    testimony here today that you're aware of?

3         A.   Nothing except for just the accumulation

4    of all the information that has transpired over the

5    last four years.

6         Q.   Is there any reason the deposition

7    shouldn't go forward today?

8         A.   No.

9         Q.   Have you ever been convicted of a felony?

10        A.   No.

11        Q.   Would you give me a description of your

12   post-high-school education, please?

13        A.   I have a Bachelor's Degree in Biology and

14   Chemistry from Bridgewater State College, 70 percent of

15   an MBA from Northeastern, and a Master's in Psychology

16   from Cambridge College.

17        Q.   I'm sorry, the Bachelor's was in Biology

18   and Chemistry?

19        A.   Biology with minors in Chemistry and

20   Education, actually.

21        Q.   From?

22        A.   Bridgewater State College.

23        Q.   You say you completed 70 percent of the

24   requirements for an MBA from?

15

1        A.   Northeastern.

2        Q.   And you have a Master's in?

3        A.   Psychology.

4        Q.   From?

5        A.   Cambridge College.

6        Q.   What year did you get your Bachelor's from

7  Bridgewater?

8        A.   '73.

9        Q.   And when did you get your Master's from

10  Cambridge?

11        A.   '95.

12        Q.   Are you presently employed?

13        A.   I'm president of the HipSaver Company.

14        Q.   How long have you been the president of

15  HipSaver Company?

16        A.   Ten years.

17        Q.   What are your responsibilities as the

18  president of the HipSaver Company?

19        A.   To design, develop, manufacture and market

20  encapsulated soft hip protectors.

21        Q.   Do you presently have any other

22  employment?

23        A.   No.

24        Q.   What year did you graduate from high

18

1    besides being the president of HipSaver?

2        A.    No.

3        Q.    During the last ten years, have you had

4    any other employment besides being the president of

5    HipSaver?

6        A.    In '97 through '98, I believe it was, I

7    worked on a consulting basis for a company called Coto

8    Technology.

9        Q.    How do you spell that?

10       A.    C-O-T-O.

11       Q.    What sorts of classes have you taken in

12   engineering?  For example, mechanical engineering?

13   Any?

14       A.    No.

15       Q.    Have you ever had any engineering types of

16   classes?

17       A.    Seminars I've went to and so forth.

18       Q.    How many seminars regarding engineering

19   have you taken?

20       A.    Oh, probably four.

21       Q.    What were they called?

22       A.    Most of them had to deal with production

23   and operations engineering, safety engineering,

24   industrial engineering.

1           A.    Yes.  We have a link to the CDC

2    guidelines.

3           Q.    Okay.  Is this the document that you link

4    to on your website?

5                 MR. DAILEY:  Objection.  He's already said

6    this is some kind of an excerpt, Mr. Morseburg.

7           A.    As I see here, some of the content is

8    similar, but I don't believe it's the exact same

9    document.

10          Q.    I want you to assume for the moment that

11   these are the CDC guidelines.

12                MR. DAILEY:  That is an unfair assumption.

13   We object.  He doesn't have to make any such

14   assumption, and he won't.  You can characterize them

15   any way you wish, but we won't.

16   BY MR. MORSEBURG:

17          Q.    Would you look through the document and

18   see if this document says that the minimum temperature

19   should be 160 degrees for 25 minutes for launderability

20   and infection control?

21          A.    Page 101, Paragraph 1, sentence -- I think

22   it's three -- contains what I believe to be what you

23   just said.

24          Q.    Would you read that, the part that you're

1    referring to?

2         A.    "Hot water provides an effective means of

3    destroying microorganisms.  A temperature of at least

4    160 degrees Fahrenheit for a minimum of 25 minutes is

5    commonly recommended for hot water washing."

6         Q.    Okay.  Would you look down further on the

7    page, please, to the third paragraph.

8                    (Witness complies.)

9         Q.    Beginning on the third line, the words

10   "several studies."  Would you read that, the sentences

11   there?

12        A.    "Several studies have demonstrated that

13   lower water temperatures of 71 degrees Fahrenheit to

14   77 degrees Fahrenheit can reduce microbial

15   contamination when the cycling of the washer, the wash

16   detergent and the amount of laundry additive are

17   carefully monitored and controlled.  Low level laundry

18   temperatures, low level laundry cycles rely heavily on

19   the presence of chlorine or oxygen-activated bleach to

20   reduce the levels of microbial contamination."

21        Q.    Would you read the next two sentences,

22   please?

23        A.    "The selection of hot or cold water

24   laundry cycles may be dictated by the state health care

36

1   facility licensing standards or by other regulation.

2   Regardless of whether hot or cold water is used for

3   washing, the temperatures reached in drying and

4   especially during ironing provide additional

5   significant microbial action.  Dryer temperatures and

6   cycle times are dictated by the materials on the

7   fabrics.  Manmade fibers, polyester and polyester

8   blends require shorter times and lower temperatures."

9        Q.   Isn't it a fact that the CDC guidelines

10  for infection control in health care facilities with

11  respect to laundry instructions specify both hot and

12  cold water washing?

13            MR. DAILEY:  Objection.  That is not what

14  the document says.

15       A.   No.  They don't specify that at all.

16  These are guidelines here, and although they might say

17  "several studies have suggested," there is no facility

18  in this country that would be using this second

19  guideline.  They all use hot water.  And to lead

20  somebody to believe that they should buy a hip

21  protector, for example, based upon this obscure

22  guideline is misleading advertising.

23       Q.   Are these obscure guidelines?

24       A.   This one here is (indicating).

37

1      Q.   You make reference to these guidelines on

2   your website, right?

3      A.   I make reference to the guideline that

4   refers to the minimum of 160 degrees.

5      Q.   As if it's the only guideline?

6         MR. DAILEY:  Objection.

7      A.   It's the only guideline that an

8   institution uses.

9      Q.   And you know of this because?

10      A.   It's an accepted fact.

11      Q.   By you?

12      A.   Any person that does institutional

13   laundry.

14      Q.   And the basis for the statement is it's

15   just an accepted fact?

16      A.   I have never seen or talked to a laundry

17   person that uses low temperature washing on underwear

18   garments.  It does not happen.

19         MR. MORSEBURG:  Let's have marked as

20   exhibit next in order another multi-page document

21   called Guidelines for Laundry In Health Care

22   Facilities.

23         (Guidelines for Laundry In

24         Health Care Facilities marked Exhibit 5.)

94

1          Q.    HipSaver's website says that only its

2    products meet the CDC guidelines for laundering, right?

3          A.    Yes.

4          Q.    And by saying that, you're implying other

5    manufacturers' products don't meet that, those

6    guidelines, right?

7          A.    That's right.

8          Q.    That includes Posey's products, right?

9          A.    That's right.  His don't meet the

10   guidelines.

11         Q.    Posey has a new product out since the

12   settlement, doesn't he?  Posey High Durability?

13         A.    Yes.  But that is no good, either.

14         Q.    They don't meet, Posey's High Durability

15   products don't meet the CDC guidelines, either?

16         A.    I would say they're about the same as his

17   Confor base pad.  The thing you have to realize I've

18   been doing this since 1994, and I worked with both of

19   those pads, those foams he's working with.  I know

20   their thermal mechanical properties, and they're both

21   duds as a launderable hip protector, and Posey knows

22   this full well.  He's had that Confor pad out there for

23   three years.  The significance of it is when you

24   launder it and it degrades, the person thinks they have

1  a hip protector on, but when they fall, they have no

2  protection.  Posey knows this.  He knows it full well.

3  And now he's playing another slight of hand by saying

4  as a high durability poron pad, which he's trying to

5  associate with a test that didn't even -- assuming that

6  the 2001 test is the one that is being referred to, but

7  they're trying to make it look more contemporary by

8  taking the date off, I assume.

9          We don't know, because we don't have

10  the test.  But, what he's trying to do now is go after

11  HipSaver again with a resurrected test, a test that is

12  probably bogus and manipulated data, associating it

13  with a new product that is going to go head to head

14  with HipSaver, in his mind, okay, bear in mind, in his

15  mind, in the laundry, and that pad is not a high

16  temperature pad.  You can -- I have what I institute,

17  what I call the sandwich test.  You can put that pad in

18  an oven, bend it in half, 185 degrees, the thing just

19  fractures right along.  So, every time it's going to

20  flex in the dryer, it's going to fracture this way

21  (indicating), fracture that way (indicating).  Before

22  you know it, you have a pile of dust in the pouch.

23          This is what I've been fighting Posey

24  on since 2001.  He stole my product, made it cheaper,

96

1    and ruined to a large extent the product category of

2    hip protectors.  So, his new high durability is not

3    highly durable.

4              MR. MORSEBURG:  Would you read my

5    question, please.

6                   (The pending question was read by the

7         reporter as requested.)

8         Q.    The short answer to my question is, no,

9    they don't.  Is that right?  I think that is what you

10   said in your long answer, but rather than move to

11   strike it -- I'll move to strike as nonresponsive.

12   But, do I take it from your last response, in your

13   estimation, Posey's high durability hip pads don't meet

14   the CDC laundry guidelines?

15             MR. DAILEY:  Objection.

16        A.    I don't know.

17        Q.    Your answer is you don't know whether

18   Posey's high durability product meets the CDC

19   guidelines?

20             MR. DAILEY:  Objection.

21        A.    It depends on which CDC guideline we're

22   going to be talking about here now.  The first CDC

23   guideline they always referred to was 160 degrees.

24   Okay.  Then in the lawsuit of Posey 1, they realized

1    after they got hit over the head with the fact that the

2    VA system said the things all fell apart in every

3    hospital, they had to downgrade the temperature from

4    160 to 120, so basically Posey took three years to face

5    up to the fact that his air Confor-based product was

6    not CDC launderable.  Now, what he does is say, okay,

7    we're going to go with the lower temperature CDC

8    standard, which requires higher bleach, which will

9    degrade the product just as fast as if you washed it in

10   a hot dryer.

11            Q.   So, the CDC laundry guidelines do have two

12   alternative wash?

13            A.   That is what we discussed earlier here

14   today.

15            Q.   Yes.

16            A.   Yes.  But, the second one is an obscure

17   study that nobody in the world uses.  It's just a

18   slight of hand by Posey to attach that CDC

19   launderability guideline on there.

20            Q.   Whether anybody uses them or not, the CDC

21   guidelines specify high temperature and low temperature

22   washing, right?

23            MR. DAILEY:  Objection.

24            A.   No, they don't.

98

1          Q.    They only specify high temperature

2     washing.   Is that what you're saying?

3                MR. DAILEY:   Objection.

4          A.    No.

5          Q.    The CDC guidelines allow for the

6     possibility of high temperature washing.   True?

7                MR. DAILEY:   Objection.

8          A.    That's correct.

9          Q.    They also allow for the low temperature

10    washing, true?

11               MR. DAILEY:   Objection.

12         A.    More information has to be added there.

13         Q.    What information needs to be added?

14         A.    What needs to be added there is that the

15    main standard 165 degrees -- 160 degrees for 25

16    minutes.   This one, he's now playing the shell game to

17    make reference to, refers to some studies suggest that

18    lower temperature microbial elimination can be achieved

19    with higher levels of breach and controlled

20    circumstances that nobody in the world is going to do.

21    So, he is suggesting in his advertisement -- he should

22    supply the whole standard, the concentrations of

23    detergents and bleaches required to every customer that

24    buys a Hipster, because nobody even knows what that is.

99

1           The only thing that people in nursing

2    homes and hospitals know is that hot is good, and

3    bleach and detergent facilitate the process.

4           Q.   The CDC guidelines that we're talking

5    about don't say recent studies suggest that low

6    temperature washing is okay.  The CDC guidelines in

7    fact say "Recent studies show..."  Isn't that true?

8                MR. DAILEY:  Objection.

9           A.   That's true.  Any of these questions about

10   the CDC have to be understood on the backdrop of Posey

11   changing his requirements for launderability of his

12   Hipsters going back to October, at about the settlement

13   date.

14               MR. MORSEBURG:  Would you read that last

15   part back.  Please.

16                    (Answer read by the reporter as

17               requested.)

18          Q.   Has HipSaver done any testing of Posey

19   products to see if they meet the CDC guidelines for

20   laundering since --

21               MR. DAILEY:  Objection.

22          Q.   -- since September of 2004?

23               MR. DAILEY:  Objection.  What guidelines

24   are you talking about?