# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-10917 PBS

|  |  |
|---|---|
| THE HIPSAVER COMPANY, INC., | ) |
|     Plaintiff / Counterclaim Defendant, | ) |
|  | ) |
| v | ) |
|  | ) |
| J.T. POSEY COMPANY, | ) |
|     Defendant / Counterclaim Plaintiff. | ) |
|  | ) |
|  | ) |

## HIPSAVER'S MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE EXPERT REPORTS AND TESTIMONY OF KEVIN MINISSIAN

Plaintiff, the HipSaver Company, Inc. ("HipSaver") respectfully submits this memorandum in support of its motion to exclude the expert reports and testimony of Defendant J.T. Posey, Inc.'s ("Posey") expert Kevin Minissian. The expert reports and testimony of Mr. Minissian fail to satisfy the requirements of the Federal Rules of Evidence and existing case law, which require that experts employ a reliable methodology. Mr. Minissian failed to personally conduct or adequately supervise the tests upon which his conclusions are based, and his qualifications as an expert are similarly inadequate. His conclusory opinions will fail to assist the jury in finding the facts and accordingly, should be excluded.

## FACTS

HipSaver challenges Posey's proffer of reports and testimony by Kevin Minissian as "expert" opinion. *See* Ex. A, Expert Report of Kevin Minissian, submitted February 16, 2006 ("Minissian Report") and Ex. B., Supplemental Expert Report of Kevin

Minissian, submitted October 16, 2006. Mr. Minissian claims experience in the laundry and laundry chemical industry.

Mr. Minissian reviewed various statements regarding the laundering capability of hip protectors on HipSaver's website, and claims to have conducted a series of laundering tests on Posey's hip protector to determine the accuracy of these statements as compared to Posey's products. Ex. A, ¶ 4. Throughout the two speculative reports of Mr. Minissian's personal opinion, he does not testify to any personal knowledge for his conclusions. Mr. Minissian's report is devoid of any information as to the chain of custody of the garments his company tested, and indeed, his deposition testimony confirms that he has no first-hand knowledge of the testing or of the results because <u>he was not even present at the facility during the testing.</u> *See* Ex. C, Deposition of Kevin G. Minissian ("Minissian deposition"), ¶ 39, 79, 97-98. Specifically, Mr. Minissian's deposition testimony revealed the following information regarding his involvement in the testing on which he based his conclusions:

1) he did not personally inspect the hip protectors when they were delivered to his office for testing (Ex. C, Minissian deposition, p. 91);

2) he did not perform tests on his own machines, but instead rented machines and failed to review any documentation concerning the rental machines (Ex. C, Minissian deposition, p. 39);

3) he did not personally perform the tests, nor was he present at the facility while the tests were being performed (Ex. C, Minissian deposition, p. 39, 88);

4) he did not know what material the pads in the protectors consisted of, and did not consider this material in determining the protocol for the tests (Ex. C, Minissian deposition, p. 61-62) ;

5) he did not review whether the technician who performed the tests actually followed the protocol he was given, nor did he visit the facility to obtain a copy of the protocol which was entered into the testing machines to verify the actual time and temperature under which the garments were washed and dried (Ex. C, Minissian deposition, p. 40-41);

7)  he did not place his signature on the garments that had been tested until approximately six months after the tests were performed, and had no first hand knowledge of the information regarding the testing conditions about which he signed (Ex. C, Minissian deposition, p. 78).

Moreover, Mr. Minissian's qualifications as an expert are also inadequate.  Mr. Minissian claims to have a master's degree in chemistry from University of California Los Angeles ("UCLA"), but this degree does not appear on the resume attached to his expert report.  *See* Ex. A, Appendix A.  Mr. Minissian testified that he would provide a transcript from UCLA, but despite HipSaver's continued attempts to obtain this transcript, Mr. Minissian has failed to produce it.  *See* Ex. C, Minissian deposition, p. 28.  Thus, it is questionable whether Mr. Minissian holds any sort of advanced degree.  Tellingly, Mr. Minissian refused to identify himself as an "expert" in his deposition, and no where in his report does he identify himself as such.  *See* Ex. C, Minissian deposition, p. 47, 99. Further, Mr. Minissian claims to have served as an expert in a previous

litigation, but this reference is also missing from his resume.  *See* Ex. C, Minissian deposition, p. 33.

## ARGUMENT

At each stage of the testing upon which Mr. Minissian's conclusions are based, Mr. Minissian lacks personal knowledge as to the make-up of the products being tested, the machines utilized in the tests, and the conditions under which the tests were run.  Yet, over six months after the tests had been completed, Mr. Minissian placed his signature on each garment that had been tested, presumably indicating that he had personally approved of the test and the results.

Mr. Minissian's opinions are not based on first-hand knowledge, his testimony is not a product of reliable principles and methods, and he is not qualified as an expert. Thus, the reports and testimony proffered by Kevin Minissian as "expert" should be excluded because the evidence does not constitute expert evidence under the Federal Rules, is unnecessary, and will prejudice the jury.  The admissibility of expert testimony is governed by Federal Rules of Evidence, Rules 702 and 703.  Under F.R.E. 702,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed R. Evidence 702.  Under the Rules, "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the

evidence." *Advisory Committee's Note on 2000 Amendment citing Bourjaily v. United States,* 483 U.S. 171 (1987).

A.     **Mr. Minissian's Conclusions Are Based On Tests Of Which He Has No Personal Knowledge, For Which There is No Chain Of Custody, and Which Are Not the Product of Reliable Principles and Methods.**

Mr. Minissian was not personally involved in the testing upon which his conclusions are based, and thus his opinions are not based on first-hand knowledge. Moreover, the expert reports do not provide any explanation for the chain of custody of the materials used in the tests upon which Mr. Minissian's conclusions are based, and Mr. Minissian's deposition testimony similarly fails to establish a chain of custody. Thus, Mr. Minissian's reports and testimony are not the product of reliable principles and methods.

Federal precedent prohibits the introduction of such unsupported, conclusory opinions by proffered experts. *See Polaino v. Bayer Corp.,* 122 F. Supp.2d 63, 69 (D. Mass. 2000) (Stearns, J.) (expert opinion based on speculation rather than investigation properly excluded); *see also Goodwin v. MTD Products, Inc.,* 232 F.3d 600 (7th Cir. 2000) (defense expert could not give his opinion concerning lawn mower accident when that opinion was merely based on speculation and not on admissible scientific evidence). Because Mr. Minissian's testimony is not based on a sufficiently reliable foundation of first-hand knowledge, it should not be admitted. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("…under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").

In paragraph 4 of his expert report, Mr. Minissian opines on the accuracy of the statement on HipSaver's website, "Only HipSaver hip protectors clearly meets the CDC Guidelines for infection control in the laundry" and the statement "Only HipSaver can be laundered according to the CDC Center for Disease Control Guidelines for laundry." Ex. A, ¶ 4. In formulating his opinion that this statement is false, Mr. Minissian claims to have run laundry tests on Posey's hip protector to determine whether it can be laundered according to the CDC Guidelines. *See* Ex. A, ¶ 4. Mr. Minissian's involvement in the tests upon which his conclusions are based is detailed in his deposition testimony, as follows.

**1.  Mr. Minissian did not personally inspect the hip protectors when they were delivered to his office for testing.**

Mr. Minissian's testimony reveals that he has no first hand knowledge of the condition of the hip protectors when his company first obtained them, nor does he even know the person or party from whom he obtained the garments. Mr. Minissian's opinion on the state of garments after testing can not be reliable if he had no pre-wash inspection with which to compare the results.

> Q: Did—When you received the Posey hip protectors from – Did you receive them from Posey or from Mr. Morseburg?
> A: They were dropped off to us
> Q: By whom? Someone at Posey?
> A: No . .
> * * *
> I don't know who dropped off, but somebody brought to our office . . .
> * * *
> I can't tell you.
> Q:  Did you – Did you inspect the – the garments and the packaging at that point in time?
> A:  I think Doug [Posey's counsel] came over and opened up and told me what – what they were   because first time I've seen them . . .

Ex. C, Minissian deposition, p. 91.

**2.  Mr. Minissian did not perform tests on his own machines, but instead rented machines and failed to review any documentation concerning the rental machines.**

Mr. Minissian's deposition testimony reveals that he had no knowledge of the conditions of the washing and drying machines which were utilized in the laundry tests. He testified that he rented machines at an independent commercial laundry facility, and even more incredibly, that he did not review any documentation of the facility regarding these machines.  Thus, there are no standards or controls in place for Mr. Minissian's methods, and his conclusions based on these methods are unsupported.

> Q:  Where is the laundry located?
> A:  El Monte. El Monte.
>
> ***
>
> Q:  Is that a Norchem facility?
> A:  No, it's an independent laundry
>
> ***
>
> It's a commercial laundry.
> Q:  What do you mean by 'commercial laundry'?
> A.  Commercial laundry that washes sheets and towels.  They have washing machines.
>
> ***
>
> Q.  So, for example, a hotel might send their laundry to them?
> A:  That's correct.
> Q:  Does it—Does it do institutional laundry for healthcare facilities?
> A:  No.  We use the facility to – to – We took one of their washers to do the test.
> Q:  You rented time on one of their machines –
> A:  Yes.
>
> ***
>
> Q:  Have you reviewed the documentation that is kept at this laundry facility in El Monte?
> A:  No, I have not.

Ex. C, Minissian deposition, p. 39.

**3.  Mr. Minissian did not personally perform the tests, nor was he present at the facility while the tests were being performed.**

Perhaps the most egregious aspect of Mr. Minissian's proffering of an expert opinion is that he did not personally perform the tests upon which his opinion is based,

and indeed, was not even present at the facility while the tests were being performed. This fact is a strong indication of the inherent unreliability of Mr. Minissian's report and testimony.

> Q:  Do you know whether or not the 100 cycles or any of the 100 cycles was, in fact, conducted in accordance with your protocol?
> A:  It's in the – The washer has a washer controller.  It's a computer.
> ***
> All the formulas are in that processor.
> ***
> Q:  . . . But have you reviewed it to see that it actually did what you thought it was going to do?
> A:  I provided the information for my technician to do the test.  <u>I did not personally wash them.</u>

Ex. C, Minissian deposition, p. 39 (emphasis added).

> Q:  Now, you testified earlier that <u>you weren't present at any of the washer and dryer testings</u>, is that correct?
> A:  Yes.
> ***
> Q:  And is it your understanding that Mr. Gastelum [the technician] . . . that he was present for all of the washings?
> A:  I'm sure he was because he got paid for it.

Ex. C, Minissian deposition, p. 88 (emphasis added).

> **4.  Mr. Minissian did not know what material the pads in the protectors consisted of, and did not consider this material in determining the protocol for the tests.**

Although Mr. Minissian is offered as an expert in the laundry industry, and admits that the formulas that the industry uses for laundering is dependent on the materials washed and dried, Mr. Minissian does not know what material the pad in the hip protector is made of.  This lack of knowledge is especially relevant because the pad is the key element of the hip protector being tested.  If the pad were to disintegrate in the laundry tests, the entire garment would be rendered ineffective.  Thus, Mr. Minissian's

lack of knowledge about the material involved in his tests is yet another indication of inherent unreliability.

> Q: And what was the pad made out of that is incorporated in the product?
> A: I do not know.
>
> ***
>
> Q: Did anybody tell you what it's made of?
> A: I have no idea.
> Q: Did you consider that when you set up the formula for washing and drying?
> A: No.
> Q: Aren't the formulas that the textile industry use based on the materials that are to be washed and dried?
> A: The wash and dry materials are – if there's a tag on the – on the product says what the recommended wash cycles are, we follow that. If it's not, we basically do, just from our experience, what – how long it takes to dry and follow the soil characteristic of the fabric and wash according to that. It's basically from our experience in the industry to generate the formulas to wash.

Ex. C, Minissian deposition, p. 61-62.

> Q: Do you know where those pads are in the garments that you tested?
> A: I guess they're sealed. They're sewed inside the fabric.
> Q: And you don't – You don't know what the material is –
> A: No, I don't.
> Q: . . . of what the foam is, is that correct?
> A: No.
> Q: And you don't know what the sealing material is either, do you?
> A: No.

Ex. C, Minissian deposition, p. 92.

## 5. Mr. Minissian did not review whether the technician who performed the tests actually followed the protocol he was given.

As Mr. Minissian did not personally perform the tests, he passed the protocol for washing and drying on to his technician, Mr. Gastelum, to input into the machines and conduct the tests. Yet, there is no written record of the protocol that Mr. Minissian gave to his technician, or the of the protocol that his technician actually used, and Mr. Minissian failed to verify that the tests were done according to his verbal protocol.

> Q:   . . . was there a formula guide that you produced that set out all the specifications for washing the Posey products?
> A: I get the formula guide verbally to Jaime Gastelum.
> Q: Did you write it down?
> A: No.

Ex. C, Minissian deposition, p. 57.

> Q: Did you go and review whether, in fact, your technician . . . had done the washing and drying in accordance with your protocol?
> A: No, I did not.

Ex. C, Minissian deposition, p. 40.

> Q: How did you know or how were you able to verify that a setting of 145 or 150 was, in fact, the actual temperature on the dryer?
> A: My technicians carry a laser temperature probe.
>                                   ***
> Q:  And did Mr. Gastelum maintain a record of the temperatures that he was able to record?
> A: I don't know if he kept a record or not.

Ex. C, Minissian deposition, p. 55-56.

Moreover, Mr. Minissian did not visit the facility to obtain a copy of the protocol which was entered into the testing machines to verify the actual time and temperature under which the garments were washed and dried.   The information regarding the conditions under which the tests were conducted is only available in the microprocessor on the machines, and Mr. Minissian neither personally inspected this microprocessor nor made a hard copy record of this information.  As the testimony below indicates, there is no contemporaneous record of the protocol for the tests upon which Mr. Minissian based his conclusions.  This lack of personal knowledge and supervision is indicative of the unreliability of the methods used in the testing which are the basis for Mr. Minissian's opinions.

> Q: Did you – did you verify that the computer code included your protocol?
> A: It's not a protocol.  It's basically—washer's a microprocessor.

Q:  Okay.  But does the microprocessor . . . incorporate the wash formula guide used to wash  . . . Posey products which you gave to Mr. Morseburg?
A:  Yes.
Q:  How do you know that?
A:  Because it's in there.
Q:  How do you know it's in there?
A:  Well, what I'm saying is when I go visit, I can get the copy of it.

Ex. C, Minissian deposition, p. 40-41.

Q:  Somebody told you they were washed 100 times and you signed your name, is that correct?
A:  That's correct.
Q:  So you don't know whether they –
A:  My employees.
Q:  You don't know whether they were washed 10 times, one time, 100 times, 1000 times, do you?
A:  My employees were instructed to do exactly what I told them.
Q:  Okay. And how did you confirm?
A:  I have the controller at the plant which tells me how many times the – this formula was washed.
                                        ***
Q:  So where are the formulas written down? That's what –
A:  I don't have it with me.
Q:  Are they in your head?
A:  Yes.
Q:  Are they someplace else?
A:  No they're – they're in the computer. He's got them – he's got them in the washer controllers.
Q:  Are they - - Are they in a textbook or a reference someplace?
A:  Again in – it's in the microprocessor.

Ex. C, Minissian deposition, p. 44-45.

**6.  Mr. Minissian did not place his signature on the garments that had been tested until over six months after the tests were performed, and had no first hand knowledge of the information regarding the testing conditions about which he signed.**

Mr. Minissian conducted the laundry tests in February 2006, but did not sign the garments that had been tested until approximately September 2006, over six months after the tests were performed.  Further, his deposition testimony reveals that his signature does not confirm the conditions under which the tests were conducted.  Mr. Minissian

mistakenly thought that all of the garments had been washed at 120 and 160 degrees at the time he had signed them, and only during the deposition, when he placed a call to the technician who ran the tests, did he determine that only some of the garments had been washed at each temperature. Thus, there is no indicia of reliability in these tests and Mr. Minissian's opinion is unsupported by personal observation.

> Q:  . . . When did you physically inspect . . . the products?
> A:  When they came back from the laundry, I – I looked at is as soon as they returned.
> ***
> Q: And—And is that the point at which you signed the garments?
> A: No.  I was – The items were sitting in our office awhile back.  I mean all this time actually they were sitting . . .
> ***
> Q: When did you put your signature on the garments?
> A: Two months ago, a month and a half ago.  I don't remember exact date, but it was not too long ago.
> Q: So you didn't sign them at the time you inspected them, is that correct?
> A: No, I did not.

Ex. C, Minissian deposition, p. 79.

> Q:  . . . But your signature does—is not a representation of personal knowledge that a particular garment was washed in a particular temperature, dried at a particular temperature or washed a certain number of times, is it?
> A: To my knowledge they were washed.
> Q: That's all you know.
> A: That's all I know.

Ex. C, Minissian deposition, p. 79.

> Q: Earlier this morning you testified twice that all of the pads were – were washed at both 120 and 160 degrees, correct?
> A: That's correct.
> Q:  You then this morning – You then a few moments ago called Mr. Gastelum during the break, correct?
> A: That's correct.
> Q: And Mr. Gastelum informed you, no, the pads had been washed, some at 120 and some at 160, correct?
> A: Yes.
> Q: Did you know that when you signed each one of those pads that you brought with you today?

12

A: I only signed – I signed the pads based on what they said on them.

Q: You signed – So you didn't know whether what they said had been done or not, is that correct?

A: That's not what I said. I said I signed what they were indicated on the pad as far as what they were washed at.

Q: Right. And you had no personal knowledge of what they were washed at, is that correct?

A: As far as temperatures?

Q: As far as temperature, as far as chemical, as far as time, as far as drying, as far as washing, as far as what was washed at 160 and what was washed at 120. You have no personal knowledge whatsoever, do you?

A: He was told to wash according to the CDC Guidelines based upon the temperatures, but I don't – I didn't remember whether they were washed together or separately. I guess they were heavy-duty and the light-duty items, but they were washed separately so I cannot –

Q: And – And when you signed them, you didn't know that, did you? You didn't know what you were signing, did you?

A: I signed what they said on there.

Ex. C, Minissian deposition, p. 97-98.

As the above passages indicate, Mr. Minissian's conclusions are not supported by any first hand knowledge. Moreover, neither his report nor his testimony establish a chain of custody of the garments tested. Thus, the methods and principles upon which Mr. Minissian's conclusions are based are inherently unreliable, and his opinions would not be helpful to the jury.

**B.     Mr. Minissian Does Not Qualify As An Expert.**

Kevin Minissian is improperly offered as an expert in hospital and/or institutional laundry and laundry products. Mr. Minissian has no experience in the actual laundering practices of hospital laundries. Due to infection control concerns, hospital laundry standards are particularly stringent. HipSaver's statements regarding the laundering capabilities of its product relate to the actual practices of its customers (i.e., the hospital industry) rather than simply to the CDC Guidelines alone. As such, Mr. Minissian is unqualified to opine on the average temperature in hospital and long-term care facilities,

as well as the practices of these facilities in following the CDC guidelines. *See* Ex. A, ¶¶1-3.

In particular, Mr. Minissian has little to no experience with CDC guidelines, and has not done any research on the impact of water temperature or heat or bleach on materials that are used in healthcare facilities. *See* Ex. C, Minissian deposition, p. 65. He also has never conducted any research on infections, infectious control or decontamination of materials laundered in healthcare facilities. *See* Ex. C, Minissian deposition, p. 72. Mr. Minissian had never even heard of or seen a hip protector product until he was retained in connection with this litigation. *See id.* In short, Mr. Minissian has no qualifications as an expert in laundering materials used in healthcare facilities, in the CDC guidelines, or in hip protectors generally.

Moreover, Mr. Minissian's qualifications are not sufficient. First, Mr. Minissian has offered no proof of an alleged degree in chemistry from UCLA, which is missing from the resume attached to his expert report. *See* Ex. A, Appendix A; *see also* Ex. C, Minissian deposition, p. 28. Thus, it is questionable whether Mr. Minissian holds any sort of advanced degree.

Additionally, the only expert experience listed on his resume is a reference to a lawsuit filed against his own company, in which he did not serve as an independent expert. *See* Ex. C, Minissian deposition, p. 32. While Mr. Minissian claims to have served as an expert in a previous litigation, this reference is also missing from his resume. *See* Ex. C, Minissian deposition, p. 29-31, 33. Thus, Mr. Minissian's qualifications as an expert in the laundry industry are virtually unknown.

Tellingly, Mr. Minissian refused to identify himself as an "expert" in his deposition, and no where in his report does he identify himself as such. *See* Ex. A.

> Q:  . . . But you were doing [the tests] as an expert witness, correct?
> A: I was asked to wash the items.
> Q: Were you – Were you asked to do [the tests] as an expert witness?
> A: I'm not – I don't know what you want to call expert witness, but I was asked to wash and see if the product will handle the wash formulas according to CDC Guidelines.

Ex. C, Minissian deposition, p. 47.

> Q:  . . . But – but you're being asked to testify to the facts as an expert witness, aren't you?
> A: I'm asked to – We were asked to wash these items, which we did.

Ex. C, Minissian deposition, p. 99.

Thus, Mr. Minissian is not qualified to serve as an expert in this case and his opinions will not be helpful to a jury.  His expert reports and testimony should therefore be excluded.

### C.    Mr. Minissian's Reports And Testimony Should Be Excluded Because They Are Not Necessary To Assist The Trier of Fact.

Expert testimony is improper when it will not assist the trier of fact.  "There is no more common certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *Advisory Committee's Note citing* Ladd, Expert Testimony, 5 Vand. L. Rev. 414, 418 (1952).

Here, Mr. Minissian's report and opinion testimony is offered to show the falsity of statements on Hipsaver's website regarding the durability of its garments in light of the CDC laundering standards.   Given that Mr. Minissian offers nothing more than a

speculative personal opinion which is unsupported by first hand knowledge, his report and testimony cannot qualify as necessary to assist the jury on any basis. The jury's common sense assessment of the challenged advertisements will be sufficient, without more, to analyze the advertisements and opine on the matter. Accordingly, Mr. Minissian's testimony is unnecessary.

## CONCLUSION

Accordingly, for the reasons stated above, HipSaver respectfully requests that the Court grant its motion to exclude the reports and testimony of Mr. Kevin Minissian or alternatively, to selectively strike those portions of Mr. Minissian's reports that the Court finds inadmissible under Rule 702 of the Federal Rules of Evidence.

THE HIPSAVER COMPANY, INC.
By its Attorneys,


/s/  Courtney M. Quish
Lee Carl Bromberg
BBO No.:  058480
Edward J. Dailey
BBO No.:  112220
Courtney M. Quish
BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts  02110-1618
617.443.9292
cquish@bromsun.com

Dated:  May 15, 2007

## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.

/s/  Courtney M. Quish

May 15, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THE HIPSAVER COMPANY, INC., | ) | Civil Action No. 05-10917 PBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| J.T. POSEY COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| AND RELATED COUNTERCLAIM. | ) | |
| | ) | |

# EXPERT REPORT OF KEVIN MINISSIAN

**WITNESS STATEMENT OF KEVIN MINISSIAN PURSUANT TO
RULE 26(a)(2)(B) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

## I.      MY QUALIFICATIONS

Attached as Appendix "A" is a copy of my resume which identifies my qualifications and

a list of publications authored by me during the preceding ten years and the cases in which I have

testified as an expert at trial or deposition during the past four years.

I am presently employed as the Vice President of Operations at Norchem Corporation

("Norchem").  Briefly, Norchem is in the business of manufacturing and supplying laundry

chemicals to the health care, linen, industrial and commercial laundry industry . As the Vice

President of Operations and Technical Support of Norchem,   I have had leadership roles in the

areas of developing new laundry cleaning products, chemical injection systems and water and

energy recycling equipment and systems..  I am the inventor of a single pump chemical injection

system for commercial and institutional laundries.  The invention is the subject of U.S. Patent

No. 5,564,595.  I am also the author of two articles related to wastewater recycling and the

treatment of laundry wastewater. I am also a member of the TRSA and UTSA laundry trade

association special project committees that evaluate new, innovative products, such as

detergents, bleaching agents, energy and water conservation programs utilizing more effective

washing formulas.

I have been actively involved in the TRSA, UTSA, IFI, NAILM and AATCC trade

associations.

I am being compensated for my work in connection with this case and any testimony at

the rate of $ 125.00 per hour.  This is my normal hourly rate for consulting work.  In addition,

Norchem is presently conducting some wash testing of some products in connection with this

matter for which it is being compensated at the rate of $ 85.00 per hour per technician plus use of

laundry facility.  Neither my compensation nor the compensation of Norchem is dependent upon the content of my report, the nature of my opinions or the outcome of this litigation.


## II.    DATA AND OTHER INFORMATION RELIED UPON

The data and other information I relied upon in forming my opinions are listed in the attached Appendix "B".

## III.    MY OPINIONS

I have been asked to express an opinion regarding the accuracy of various statements that appear on the Internet website of The HipSaver Company, Inc.  Specifically, I have been asked:

**1.    Whether the statement "Average Wash/Dry Temperature of Institution Laundries (180∘)" is accurate?**

In my opinion, this statement is false. Based on my experience, wash temperature range of institutional laundries currently is between 100 F – 160F.   Therefore the average temperature is around 130 F and drying temperature for geriatric pads which is similar to hip protector is around 140-150 F. The CDC guideline does not specify such high wash temperatures.


**2.    Whether the representation "CDC Recommended Wash Temperature Range" of between 180 to 250 degrees is accurate?**

In my opinion, this statement is false. As published, CDC guidelines provide two options: a) high temperature wash at least 160 F for Minimum of 25 minutes and b) low temperature wash 71-77 F.  In both cases, CDC requires effective use of alkali, detergent, bleach and sour, but in low temperature wash it requires careful monitoring and proof of

proper use of laundry chemicals. In addition, effective drying of 140-150 F and ironing shall provide effective disinfection of common microorganism found in health care environment. CDC guidelines DO NOT recommend wash temperature range of 180 -250 F as advertised in HipSavers website.

3.    **Whether the representation that "CDC Guidelines Minimum Recommended Wash Temperature (160)" is accurate?**

In my opinion, this statement is false. As published, CDC guidelines provide two options: a) high temperature wash at least 160 F for Minimum of 25 minutes and b) low temperature wash 71-77 F.  In both cases, CDC requires effective use of alkali, detergent, bleach and sour, but in low temperature wash it requires careful monitoring and proof of proper use of laundry chemicals. In addition, it is well documented in Textile Laundering Technology textbook, which is widely used by laundry industry as guide to proper laundering, that effective use of chlorine bleach at lower temperatures ranging between 120-130 F and pH range between 9.0-10.0 provides an effective laundry disinfection method. Such lower temperature washing allows the industry to conserve energy and minimizes fabric degradation impacted by high temperature, alkali and chlorine bleach. Several studies have concluded that lower temperature washing protects the fabric color and drastically reduces fabric lint in the dryers.

4. Whether the statement that "Only HipSaver hip protectors clearly meets the CDC
   Guidelines for infection control in the laundry" and the statement "Only HipSaver can be
   laundered according to the CDC Center for Disease Control) Guidleines for laundry" are
   accurate?

   In my opinion, this statement is false. Norchem has received 80 samples of hip
   protectors from Posey Company for purpose of evaluating to see whether or not Posey
   hip protectors meets the CDC wash guidelines for high and low temperature wash cycle.
   Posey provided 40 pieces of high durability (HD) and 40 pieces of standard (ST) hip
   protectors. According to Posey specification HD hip protectors are designed for high
   temperature wash cycle and ST for low temperature wash cycle. We were asked to wash
   these hip protectors in commercial laundry environment. We chose Valet Laundry
   Services facility located in El Monte California to wash Posey hip protectors under my
   supervision. We elected to use 100 lb. commercial laundry machine manufactured by
   Milnor Corporation equipped with hot and cold water inlet water valves, computer
   controlled washer microprocessor for accurate temperature control and Norchem's
   NORFLOW-WIN precision chemical injection system for dosing laundry chemicals such
   as alkali, detergent, bleach and sour. We divided 80 pieces of Posey hip protector into
   two separate batches, one batch consist of HD type and second batch ST type. For control
   purposes, we kept one sample from each batch in a plastic bag. Remaining hip protectors
   were then washed according to CDC guidelines to high and low temperature wash and
   dry. After each wash and dry cycle, each batch was examined and compared to control

sample. Each batch were washed 10 times and dried 10 times. The HD hip protector

designed for high temperature washed according to CDC guideline showed slight color

loss but no physical deformation or degradation. The ST hip protector washed at lower

temperatures according to CDC guidelines for low temperature wash showed no sign of

color loss or physical change. Both products maintained their integrity and shape after

washing and drying at 150 F.

IV.    POSSIBLE ADDITIONAL ANALYSIS AND INVESTIGATION

In support of my opinions, at trial, I may rely on visual aids and other demonstrative

exhibits which may include, among other things, excerpts from deposition or trial testimony,

documents and exhibits relied upon by other witnesses, additional information from the materials

listed in Appendix "B", or other types of materials.

In addition, I may supplement this report in the event that additional information is

provided to me. I may also rely on testimony given by, or to be given by, other witnesses and on

other reports and/or documents supplied to me in the future.

My investigation is ongoing, and I may perform the following additional investigation:

1. We propose to further wash each HD and ST batches for additional 120 times and dry

120 times according to CDC guidelines. This shall provide further evidence whether or not the

Posey hip protectors can withstand CDC's high temperature and low temperatures guidelines.

2. If necessary, we may also submit samples of Posey products to independent textile

testing institute for independent evaluation.

DATED: February __15_, 2006

Kevin Minissian

# APPENDIX "A"

# PROFESSIONAL RESUME

Kevin Minissian,
VP of Operations and Technical Support
Norchem Corporation
5649 Alhambra Ave.
Los Angeles, CA 90032

Phone: 323-221-0221
Fax. 323-227-8733
e-mail: Kevin@norchemcorp.com

---

## Professional Experience

**1978-1989**  Founded Hychem Co. in 1978 to serve the hotel and commercial laundry industry with liquid chemical dispensing systems and laundry products.

**1989 to Present**  In 1989 Hychem was incorporated into Norchem Corporation where I am currently Vice President of Operations and Technical Support. I am responsible for overall product development, design and manufacturing of laundry products, such as computerized chemical injection systems with proof of delivery to washers, water and energy recycling systems and washer controllers. I also supervise Norchem's field technicians to develop effective wash formulas and low energy wash processes to conserve water and energy for the hospital, linen and uniform laundry market. I frequently visit laundries to evaluate Norchem's product performance, the effectiveness of low temperature wash chemistry and wash quality, to conduct bacteriological testing of cleaned fabric with 3M bacterial plate count to insure that linen is hygienically clean and to conduct customer satisfaction survey.

Four years ago I worked with the U.S. Environmental Protection Agency (EPA) to develop laundry products Designed for Environment (dfe). The purpose of "dfe" is to introduce "green" chemistry to protect our environment, waterways and sewer systems. EPA has recognized NUpHASE and MAXIMIZE products in their "dfe" program. These two products were developed and formulated by me over a 10 year period. Following fours years of R & D, I was able to develop a

"new generation" laundry detergent named NORBRITE designed for "dfe" and lower wash temperatures (100-120 degrees F). I was instrumental in persuading Norchem Corporation's laundry customers to convert to NORBRITE in support of lowering energy costs.

Currently I hold one patent for delivery and injection of laundry chemicals to commercial laundry machines.

## Education

| | |
|---|---|
| 1970 | University of Yerevan, Armenia (former Soviet Union<br>Engineering Degree in Electrical Engineering and Instrumentation |
| 1975 | University of California, Los Angeles,<br>Biochemistry, B.S. |

## Affiliations and Memberships

Textile Rental Supply Association (TRSA), Uniform Textile Rental Association (UTSA), National Association of Institutional Laundry Managers (NAILM), International Fabric Institute (IFI), American Association of Textile Chemist and Colorist (AATCC).

## Articles/Publications

"Water Recovery and Recycling: Ceramic Membrane Filtration Benefits", Kevin Minissian, *Textile Rental*, March 2004

"Reduce Your Sludge Volume Through Centrifugation", Kevin G. Minissian, *Textile Rental*, April, 2002

## Deposition Testimony

10/07/05 - <u>Bryant v. Norchem Corp.</u>, Orange County Sup. Ct Case No. 04 CC 08663

APPENDIX "B"

**Documents Reviewed**

| Document Description | Beginning Bates No. | Ending Bates No. | Date |
|---|---|---|---|
| Jaska and Fredell, *Impact of Detergent Systems on Bacterial Survival on Laundered Fabrics*, Applied and Environmental Microbiology 39(4):743-748 | PC1958 | PC1963 | April 1980 |
| Mallison, *Is low temperature washing safe and effective?*, Textile Rental 46-54 | PC2050 | PC2053 | April 1981 |
| Battles and Vesley, *Wash Water Temperature and Sanitation In the Hospital Laundry*, Journal of Environmental Health, 43(5), 244-250 | PC1964 | PC1970 | 1981 |
| Erkenbrecher and Paradee, *Low-temp washing for hospital linen*, Textile Rental 65(9):64-5, 67-8, 70 passim. | PC2041 | PC2049 | May 1982 |
| Christian, Manchester and Mellor, *Bacteriological Quality of Fabrics Washed at Lower-Than-Standard Temperatures in a Hospital laundry Facility*, Applied and Environmental Microbiology 45(2):591-597 | PC1951 | PC1957 | February 1983 |
| Blaser, et al., *Killing of Fabric-Associated Bacteria in Hospital Laundry by Low-Temperature Washing*, Journal of Infectious Diseases 149(1):48-57 | PC1933 | PC1942 | January 1984 |
| Baker, *The V.A. and Low Temp Washing – An Update*, Textile Rental 58, 60, 62 | PC2033 | PC2035 | August 1985 |
| Smith, et al., *Effect of Water | PC1927 | PC1932 | August 1987 |

| Document Description | Beginning Bates No. | Ending Bates No. | Date |
|---|---|---|---|
| *Temperature on Bacterial Killing in Laundry*, Infect. Control (8):294-09 | | | |
| Tompkins, Johnson and Fittall, *Low-temperature washing of patients' clothing; effects of detergent with disinfectant and a tunnel drier on bacterial survival*, Journal of Hospital Infection 12:51-58 | PC1943 | PC1950 | December 1988 |
| TRSA Healthcare Service Operations Manual | PC2113 | PC2155 | 1995 |
| TRSA Guidelines For Healthcare Linen Service-1999 – By Joint Committee on Healthcare Laundry Guidelines | PC2101 | PC2112 | 1999 |
| HipSaver Web Page entitled "Hip Protectors & The Laundry" | PC0338 | PC0339 | 2005 |
| CDC Guidelines for Environmental Infection Control in Health-Care Facilities | PC0377 | PC0389 | 2003 |
| CDC Guidelines for Laundry in Health Care Facilities, document linked from HipSaver Web Page (Reference:  Garner and Favero, *Guideline for Handwashing and Hospital Environmental Control*, in Guidelines for Protecting the Safety and Health of Health Care Workers) | PC0375 | PC0376 | 1985 |
| Riggs and Klipper, *Textile Laundering Technology*, Textile Rental Services of America | | | 2005 |

| | | | |
|---|---|---|---|
| Wash formula guide used to wash Posey product samples met CDC guidelines. Washing guide record chemical titration levels for alkali, bleach and sour. Kevin Minissian | PC | PC | February 14, 2006 |
| Each wash and dry cycle has been documented and recorded on a log sheet to track product performance. Kevin Minissian | PC | PC | February 14,2006 |
| Posey samples have been inspected after each wash to monitor product performance in low and high temperature wash according to CDC guideline. Kevin Minissian. | PC | PC | February 14, 2006 |
| Included a Genie wash test piece in the wash cycle with Posey samples to determine chlorine bleach intensity and effective stain removal. Kevin Minissian | PC | PC | February 14, 2006 |

## <u>CERTIFICATE OF SERVICE</u>

    I certify that a copy of this document has been forwarded by electronic filing and USPS First Class mail today to Plaintiff's counsel of record, Edward J. Dailey, Esq., BROMBERG & SUNSTEIN, LLP, 125 Summer Street, 11th Floor, Boston, Massachusetts 02110-1618.

Dated:  February 16, 2006

                                                  Donald K. Piper

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE HIPSAVER COMPANY, INC., | ) | Civil Action No. 05-10917 PBS |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| J.T. POSEY COMPANY, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
| AND RELATED COUNTERCLAIM. | ) |  |
|  | ) |  |

## SUPPLEMENTAL EXPERT REPORT OF KEVIN MINISSIAN

### *CONFIDENTIAL – ATTORNEYS' EYES ONLY*

### SUPPLEMENTAL WITNESS STATEMENT OF KEVIN MINISSIAN

**I.     ACTIVITIES SUBSEQUENT TO INITIAL REPORT**

AFTER 10 SUBSEQUENT WASH, ONE SAMPLE OF POSEY HIP PROTECTOR

WAS REMOVED FROM THE WASH LOAD AND PLACED IN A PLASTIC BAG. FOUR

SEPARATE BATCHES WERE USED TO SEGGRIAGTE HIGH AND LOW

TEMPERATURE WASH CYCLES THAT MET CDC GUIDELINES. AFTER 100 WASH

CYCLE, THERE WERE 10 SAMPLES LEFT FROM EACH BATCH.

**Deleted: XXX**

**II.     MY OPINIONS**

Following 100 wash cycles and further examination of final condition of Posey hip

protectors, I concluded that this product performed very well and did not indicate any chemical

and physical deterioration from chemical, high and low wash water temperature as stated in CDC

guidelines.

**Deleted: XXX**

**III.     POSSIBLE ADDITIONAL ANALYSIS AND INVESTIGATION**

In support of my opinions, at trial, I may rely on visual aids and other demonstrative

exhibits which may include, among other things, excerpts from deposition or trial testimony,

documents and exhibits relied upon by other witnesses, additional information from the materials

listed in Appendix "B" of my original report or other types of materials.

DATED: October 16, 2006

Kevin Minissian

0001
1                    CERTIFIED COPY

2          UNITES STATES DISTRICT COURT

3          DISTRICT OF MASSACHUSETTS

4
   THE HIPSAVER COMPANY, INC.,        )
5                                      )
           Plaintiff,        )
6                                      )
     vs.                      )  No. 05-10917PBS
7                                      )
   J.T. POSEY COMPANY,              )
8                                      )
           Defendant.          )
9  _____)
   AND RELATED COUNTERCLAIM           )
10 _____)

11

12

13          DEPOSITION OF KEVIN G. MINISSIAN, a witness

14          herein, noticed by BROMBERG SUNSTEIN LLP, at

15          17871 Park Plaza Drive, Suite 200, Cerritos,

16          California, at 9:14 a.m., Friday, November 10,

17          2006, before Diane M. Lytle, CSR 8606.

18

19          Hutchings Number 142014-NO

20

21

22

23

24

25

0002

1    APPEARANCES OF COUNSEL:

2

3    For Plaintiff:

4    BROMBERG SUNSTEIN LLP

5    BY EDWARD J. DAILEY

6    125 Summer Street

7    Boston, Massachusetts 02110-1618

8

9    For Defendant and Counterclaimant:

10   SHELDON & MAK

11   BY DOUGLAS H. MORSEBURG

12   225 South Lake Avenue, 9th Floor

13   Pasadena, California 91101

14

15   Also Present:

16   Roger Jordan, Videographer

17

18

19

20

21

22

23

24

25

0003

1                    I N D E X

2    WITNESS:  KEVIN G. MINISSIAN

3    EXAMINATION BY:              PAGE

4    Mr. Dailey              6

5

6                    E X H I B I T S

7    Exhibit identification within the transcript is flagged
     with "[EXH]" as an identifier.

8

9    PLAINTIFF  DESCRIPTION          IDENTIFIED  MARKED

10   154      Document entitled      15      15
             "Expert Report of Kevin
11           Minissian," Bates
             numbered HS2 002210
12           through HS2 002221
             [EXH-154]

13

     155      Document entitled      20      20
14           "Supplemental Expert
             Report of Kevin
15           Minissian," Bates
             numbered HS2 002222
16           and HS2 002223
             [EXH-155]

17

     156      Document entitled      90      90
18           "Warning" Bates number
             HS2 002209
19           [EXH-156]

20   157      Document entitled      94      95
             "Guidelines for Laundry
21           in Health Care
             Facilities" Bates number
22           PC 0375
             [EXH-157]

23

     158      HipSaver article from   122     122
24           the Internet, Bates
             number HS2 002287
25           [EXH-158]

**Minissian, Kevin 11/10/2006**                    **Page 3**

0004

1                E X H I B I T S  (Continued)

2     Exhibit identification within the transcript is flagged
      with "[EXH]" as an identifier.

3

4     PLAINTIFF   DESCRIPTION            IDENTIFIED   MARKED

5     159       Document entitled    127        127
              "Video 2 NCPS" Bates
6              numbers HS2 002198
              through HS1 002207
7               [EXH-159]

8     160       Document entitled    130        130
              "Bacterial Quality of
9               Fabrics Washed at
              Lower-Than-Standard
10              Temperatures in a
              Hospital Laundry
11              Facility" Bates number
              PC 1951 through PC 1957
12               [EXH-160]

13    161       Document entitled    131        131
              "Killing of
14              Fabric-Associated
              Bacteria in Hospital
15              Laundry by
              Low-Temperature Washing"
16              Bates numbered PC 1933
              through PC 1942
17               [EXH-161]

18

19

20

21

22

23

24

25

**Minissian, Kevin 11/10/2006**                    **Page 4**

0005

1      THE VIDEOGRAPHER:  We are on the record.  My name

2   is Roger Jordon.  I'm a video technician contracted by

3   Hutchings Management Corporation, located at

4   6055 East Washington Boulevard, 8th Floor, Los Angeles,

5   California.

6      This is the videotaped deposition of Kevin

7   Minissian, beginning at 9:14 a.m. on November 10, 2006,

8   in the matter of The HipSaver Company, Inc. versus

9   J.T. Posey Company, et al. and related counterclaim,

10   Case Number 05-10917PBS, taken at 17871 Park Plaza

11   Drive, Suite 200.

12      May we have introductions beginning with counsel.

13      MR. DAILEY:  Good morning.  My name is Ed Dailey.

14   I am counsel for the plaintiff, HipSaver.

15      MR. MORSEBURG:  And I'm Doug Morseburg, counsel for

16   the defendant and counterclaimant J.T. Posey Company,

17   Inc.

18      (Continued on the following page.)

19

20

21

22

23

24

25

0006

1                     KEVIN G. MINISSIAN,

2     a witness herein, having been sworn, testifies as

3     follows:

4

5                     -EXAMINATION-

6

7          BY MR. DAILEY:

8          Q.  Good morning, Mr. Minissian.  Am -- Am I

9     pronouncing your name correctly?

10         A.  Very correctly.

11         Q.  Thank you.

12             As -- As you heard, I'm Ed Dailey, and I'm a lawyer

13     from Boston representing the plaintiff in this case, a

14     company named as HipSaver.  And I'm going to ask you a

15     number of questions this morning.

16             If you don't understand the question, you have

17     every right to say, "I don't understand it," and I'll

18     try again.  I'm not -- I'm not intent on trick

19     questions.  They may just be garbled questions.  So if

20     you need a question broken up or it just doesn't make

21     sense, let me know, and I'll try again.

22             So is that -- Is that fair?

23         A.  Fair.

24         Q.  Let me -- Let me ask you this morning, also,

25     when you answer questions to answer with a word.  A

0007

1    shake of the head cannot be readily captured by the

2    stenographer.

3        So if you say "yes" or "no" rather than "uh-huh" or

4    just nodding your head, that -- that will be helpful.

5    And if you -- if you lapse, I'll try to remember you --

6    I'll try to remind you, but it will be helpful.

7        Can I ask you to begin and just give us for the

8    record your full name and your business address?

9        A.  Kevin G. Minissian.  I work for Norchem

10   Corporation, located at 5649 Alhambra Avenue,

11   Los Angeles, zip code 90032.

12       Q.  And Mr. Minissian, can you tell me generally

13   what Norchem Company does?

14       A.  Norchem is -- manufactures laundry chemical for

15   textile and commercial laundry industry.

16       Q.  And for how long have you been associated with

17   the Norchem Company?

18       A.  Over 30 years.

19       Q.  Okay.

20       And can you briefly tell me about your education

21   beginning with post high school?

22       A.  I grew up in Soviet Armenia, graduated high

23   school in Soviet Armenia.  Have got Poly Technique

24   Institute in Armenia for four years.  Graduated in

25   electrical engineering.

**Minissian, Kevin 11/10/2006**                    **Page 7**

0008

1      Q.  And that's equivalent of an undergraduate

2   degree --

3      A.  Yes.

4      Q.  -- in the United States?

5      A.  That's correct.

6      Q.  Sure.  Okay.

7      A.  Came to United States in 1970.  Continued my

8   education in Cal State L.A. in biochemistry.  From there

9   continued at UCLA for postgraduate.

10     Q.  And you have a master's degree in?

11     A.  In chemistry.

12     Q.  In chemistry.

13     A.  And Bachelor of Science in biochemistry.

14     Q.  And the master's degree is from Cal State?  Is

15   that what you said?

16     A.  No, UCLA.

17     Q.  I'm sorry, UCLA.

18     Now, I understand that you were retained to prepare

19   an expert report and a supplemental report in this case;

20   is that correct?

21     A.  Correct.

22     Q.  And can you tell me who retained you?

23     A.  Sheldon & Mak.

24     Q.  And who at Sheldon & Mak?

25     A.  Doug Morseburg.

0009

1    Q.  Mr. Morseburg, who's sitting here today?

2    A.  Yes.

3    Q.  Have you had any previous association with

4    Sheldon & Mak?

5    A.  Yes.

6    Q.  What has been your association?

7    A.  I contact them several years ago.  They did a

8    patent for us on a chemical injection system for

9    laundry.

10    Q.  And was that a patent that has your name on it

11    as an inventor --

12    A.  Yes.

13    Q.  -- or someone else?

14    A.  Yes.

15    Q.  Okay.

16    And when did you first speak with Mr. Morseburg

17    about being a potential expert in this case?

18    A.  I would say over almost a year maybe.  I don't

19    remember exactly the month, but it's been a while.

20    Q.  And what was the nature of your contact with

21    Mr. Morseburg at that time?

22    A.  I was contacted to -- because of Sheldon & Mak

23    was aware that we were involved -- involved in the

24    laundry and that Jeff Sheldon was involved in our

25    patents, and I was contacted to see I'll -- I'll be

0010

1   willing to get involved with this case.

2       Q.  When did you do first -- When did you first do

3   work on this case, Mr. Minissian?

4       A.  When?

5       Q.  Yes.

6       A.  I think it was last -- the end of last year.

7       Q.  And what was the nature of the work you did at

8   the end of last year?

9       A.  What kind of work?

10      Q.  You said you did some work at the end of last

11  year on this case.  What was the nature of the work you

12  did?

13      A.  Oh, we were -- we were supplied with Posey Hip

14  Protectors for us to do washing.

15      Q.  Okay.

16          And you did that washing when?

17      A.  We did the -- We did the washing sometimes, as

18  I recall, January and December somewhere.

19      Q.  So the end of 19- -- of 19- -- 2005 --

20      A.  Somewhere in there.

21      Q.  -- and early 2006 you did washing.

22          Was this when you washed the pads and -- and dried

23  them 10 times each?

24      A.  Yes.

25      Q.  Did you wash and dry all of the pads 10 times

0011

1   each?

2       A.  No.  We divided into categories.  There were

3   two batches of HipSavers --

4       Q.  Uh-huh.

5       A.  -- and we were supplied 40 pieces, as I recall.

6   They were washed 10 times and a sample was taken out and

7   it continued washing for subsequently several times

8   more.

9       Q.  So, of the initial sample of 40, were all 40

10  washed and dried 10 times?

11      A.  Yes.  And a sample was taken out after each 10

12  wash.

13      Q.  So, for example -- So you started with 40?

14      A.  Right.

15      Q.  And you took one sample out that you didn't

16  wash; is that correct?

17      A.  We had one original sample that we kept as a --

18  as a -- as a reference.

19      Q.  As a reference.

20      A.  And then after 10 washes, remove one sample.

21      Q.  Okay.

22      A.  And --

23      Q.  So then you would be down to 38 at that point;

24  is that correct?

25      A.  Well, there were two samples.  One was what we

0012

1   call a heavy, and the other was light stitch, I guess.

2      Q.  Uh-huh.

3      A.  So there were two samples were taken out every

4   time we washed it.

5      Q.  Okay.

6      A.  So --

7      Q.  Did you wash them separately or did you wash

8   them all together?

9      A.  There was one for high temperature wash, one

10  for low temperature wash, so there were two separate

11  batches.

12     Q.  Okay.

13        When you washed -- When you washed for low

14  temperature, did you the first time around wash 39

15  samples --

16     A.  Yes.

17     Q.  -- in one -- in one load?

18     A.  Right.

19     Q.  Okay.

20        And did you dry 39 samples in one load?

21     A.  Yes.

22     Q.  And you did the same for the high temperature?

23     A.  Uh-huh.  Yes.

24     Q.  Okay.

25        And then when you got to the second iteration, you

**Minissian, Kevin 11/10/2006**                    **Page 12**

0013

1    now had 38 samples for low temperature and 38 for high

2    temperature; is that correct?

3        A.  Yes.

4        Q.  And you washed 38 of each at correspondingly

5    low or high temperature; is that correct?

6        A.  That's correct.

7        Q.  Okay.

8        So the -- So the -- So the routine was that for

9    each iteration of the number of washings --

10       And it was 10 washings each cycle; is that correct?

11       A.  That's correct.

12       Q.  -- you took one sample out at the completion of

13   the -- of the wash; is that correct?

14       A.  Two samples.  Again, one heavy, one light.

15       Q.  Right.  Okay.  Fair enough.  Fair enough.

16       So at the end of your tests, when you had washed

17   some samples 100 times, how many had been washed 100

18   times?

19       A.  Well, if you take out two and two and two, 20

20   samples were removed at the end, plus -- plus one out,

21   so that makes it 21, I guess.

22       Q.  21 had been washed 100 times?

23       A.  21 was taken out.

24       Q.  Okay.

25       A.  So there were 19.

0014

1     Q.  19.  Okay.

2     A.  Yeah.

3     Q.  Thank you.

4     So 19 were washed 100 times at low temperature and

5     19 washed 100 times at high; right?

6     A.  Right.

7     Q.  Okay.

8     And in each cycle did you dry the samples between

9     laundry cycles?

10     A.  After each wash the samples were dried in the

11     dryers.  Full dry and then rewashed again.

12     Q.  Okay.

13     And what was the temperature setting you used to

14     dry the samples?

15     A.  145 to 150, average about 145, plus a cooldown.

16     Q.  Okay.

17     And that was regardless of whether it was a low

18     temperature wash sample or a high temperature wash

19     sample?

20     A.  That's correct.

21     Q.  Okay.

22     When did you complete your washing of the 100

23     cycles?

24     A.  Sometime in January.

25     Q.  Okay.

**Minissian, Kevin 11/10/2006**                    **Page 14**

0015

1     So is it fair to say that you had completed the

2   100-cycle washing prior to the time you wrote your first

3   expert report?

4     A.  Yes.

5     Q.  Why did you not reference the 100-cycle washing

6   in your first report?

7     A.  I'm not -- I'm not understanding what you mean

8   by that.

9     Q.  When you -- In your first report, as I read it,

10   you can correct me if I'm wrong, but as I read your

11   first report, you reported on only a 10-wash cycle; is

12   that correct?

13     A.  I don't recall.

14     Q.  All right.  Let me -- Let me -- Fine.  And it's

15   not a trick.

16     So let me -- Let me ask the stenographer to mark as

17   the next exhibit in order, which would be 154, a

18   document which is captioned "Expert Report of Kevin

19   Minissian," and has on the first page a Bates number

20   HS2 002210. [EXH-154]

21     (Whereupon the document referred to is marked by

22   the reporter as Plaintiff Exhibit 154 for

23   identification.)

24     MR. DAILEY:

25     Q.  All right.

0016

1       Take -- take a moment to review that document which

2    has been marked as Exhibit 154, if you will,

3    Mr. Minissian.

4       A.  What am I looking at?

5       Q.  I'm asking you, do you recognize that document?

6       A.  Yes, I do.

7       Q.  Okay.

8       What is it?

9       A.  Expert -- Expert Report by Kevin Minissian.

10      Q.  Okay.

11      And is this the report that you drafted?

12      A.  Yes.

13      Q.  Okay.

14      And this is your first report; is that correct?

15      A.  Yes.

16      Q.  Okay.

17      And let me ask you to refer to the unnumbered page

18   that has a Bates number in the bottom right-hand corner,

19   HS2 002214.  Do you see that?

20      A.  Okay.

21      Q.  Do you see that?  I'm going to ask you to look

22   at the last line.  And do you see the sentence beginning

23   "After each wash"?

24      A.  That's correct.

25      Q.  Okay.

0017

1      It says, "After each wash and dry cycle, each batch

2    was examined and compared to the control sample.

3    Each --"

4      A.  That's correct.

5      Q.  "Each" -- And the next sentence says, "Each

6    batch was washed 10 times and dried 10 times."  Period.

7      Did I read that correctly?

8      A.  That's correct.

9      Q.  Okay.

10      Is this a report on only the first 10 washings and

11   dryings or on all 100?

12      A.  That indicates the process we were doing.

13      Q.  I see.

14      At the time you wrote the report, had you finished

15   100 cycles of washing and drying?

16      A.  My understanding, yes.

17      Q.  What do you mean your understanding?

18      A.  We were done with the report -- We were done

19   with the washing, and once I got the samples back, then

20   I finished my report.

21      Q.  And was it your intent in this first report to

22   report only on 10 washings or 100 washings?

23      A.  All of them.

24      Q.  All of them.  Okay.  Okay.

25      Can you -- Can you show me where in this first

0018

1    report you state that you are reporting on all 100?

2        A.  It's not -- doesn't say that, but that's what

3    we were instructed to do.

4        Q.  Okay.

5        You were instructed by whom?

6        A.  By Doug Morseburg to wash 100 times.

7        Q.  Were you instructed by Mr. Morseburg to report

8    on the results of 100 times or 10 times?

9        A.  No.  We were instructed to wash them 100 times,

10    10 times, and take samples out.

11        Q.  Okay.  I -- I think we're having a problem

12    here.

13        Were you instructed by Mr. Morseburg for this first

14    report to report on the results of 100 washings and 100

15    dryings for both low temperature and high temperature?

16        A.  What do you mean by results because I was not

17    instructed to -- We were instructed to basically wash

18    and -- and bring the samples back to them.

19        Q.  Were you asked to provide an opinion on the

20    results of 100 washings?

21        A.  I was -- I was requested to respond to the --

22    the questions that were -- were provided to us and get

23    a -- regarding the CDC and do 100 washes and then return

24    the samples back to Sheldon & Mak.

25        Q.  Okay.

0019

1       So you washed --

2       A.  And then -- And then he asked me about the --

3   my comment, what I felt about the -- the condition of

4   the samples, and I explained to him that basically I did

5   not see any physical damage to the fabric with the

6   exception of color loss.

7       Q.  Okay.

8       And is that an opinion based on 100 or on 10?

9       A.  On 100.

10      Q.  And I'm going to ask you to return to the page

11  that I just referenced to you HS2 002214.

12      A.  Okay.

13      Q.  And at the top of that page, do you see the

14  number "4"?

15      A.  Yes.

16      Q.  And this is one of the questions you were asked

17  to provide an opinion on; is that correct?

18      A.  That's correct.

19      Q.  Okay.

20      And the question is, "Whether the statement that,

21  quote, 'Only HipSaver hip protectors clearly meets the

22  CDC Guidelines for infection control in the laundry,'

23  closed quote, and the statement, quote, 'Only HipSaver

24  can be laundered according to the CDC Center for Disease

25  Control Guidelines for laundry,' quote, are accurate,"

0020

1   question mark.

2       Did I read that correctly?

3       A.  That's correct.

4       Q.  And is this your opinion below where you state,

5   "In my opinion, this statement is false"?

6       A.  Yes.

7       Q.  And did you render that opinion based on the

8   100 washings you did?

9       A.  No.  That opinion is based on my professional

10   opinion.

11      Q.  Okay.

12          I'm going to ask you to look at another exhibit.

13   And I'm going to ask that this be marked as the next in

14   order Exhibit 155, and this is a document that is --

15   Excuse me -- has a Bates number on the first page HS2

16   002222.  And it's captioned "Supplemental Expert Report

17   of Kevin Minissian." [EXH-155]

18          (Whereupon the document referred to is marked by

19   the reporter as Plaintiff Exhibit 155 for

20   identification.)

21      MR. DAILEY:

22      Q.  Take a moment to look at that.

23          Do you know what that document is?

24      A.  Yes.

25      Q.  And what is that document, if you know?

0021

1      A.  Following 100 washes, that's -- that's exactly

2   what it says.

3      Q.  Okay.

4      Do you see where it says -- I'm going to ask you to

5   look at the second page of this document that is

6   captioned HS2 002223.  Do you see that?  I'm going to

7   ask you to look at the top of the page.

8      Do you see where it says "Supplemental Witness

9   Statement of Kevin Minissian"?

10     A.  Right.

11     Q.  Do you see that?

12     A.  Yes.

13     Q.  And I -- And Roman Numeral I says "Activities

14  subsequent to initial report."

15     And then you go on to state, "After 10 subsequent

16  wash, one sample of Posey Hip Protector was removed from

17  the wash load and placed in a plastic bag.  Four

18  separate batches were used to segregate high and low

19  temperature wash cycles that met CDC guidelines.  After

20  100 wash cycles there were 10 samples left from each

21  batch."

22     Did I read that correctly?

23     A.  That's correct.

24     Q.  And let me ask you first.  Why did you submit

25  this as a draft word processing document?  Did you have

0022

1   a reason for doing that?

2      A.  I was asked to do that, I mean.

3      Q.  You were asked to -- to -- to submit it in this

4   form?

5      A.  I don't remember.  It was sent to me to respond

6   to my final conclusion and that's what I did.

7      Q.  What was sent to you?

8      A.  I was asked to do my final conclusion as far

9   as -- the -- following to the 100 washes what my final

10   conclusion was.

11      Q.  Okay.  That's not what I asked you.

12      I asked you -- You said something was sent to you.

13   What was sent to you?

14      A.  There were -- I was e-mailed to me to respond

15   to a report and this is my report.

16      Q.  What report were you responding to?

17      A.  To the final -- my final -- My understanding is

18   this is my final report of the 100 washes.

19      Q.  Okay.  Let's -- Let's step back a second.

20      You received an e-mail from whom?

21      A.  Doug Morseburg.

22      Q.  And what did -- As you remember it, what did

23   Mr. Morseburg ask you to do?

24      A.  My final summary to summarize my report.

25      Q.  Okay.

0023

1       So he was ask- -- He -- He sent you an e-mail and

2    said, "Would you please summarize your earlier report?"

3       A.  My -- my -- my professional opinion of -- of

4    100 washes.

5       Q.  Okay.

6       And where you say on this Exhibit 155, "Activities

7    subsequent to the initial report," what activities are

8    you referring to?

9       A.  Where is activity?  I'm not --

10      Q.  It's right next -- If you look at Roman

11   Numeral I at the top, you'll see it says, "Activities

12   subsequent to initial report."

13      A.  The report I have here, I guess, the following

14   to -- to this report, that's what I'm understanding.

15      Q.  Okay.  Okay.

16      So it was subsequent to that.  But what did you do

17   that was subsequent to the first report?

18      A.  Just to summarize my final report.

19      Q.  Okay.

20      You did no -- You did no further launderings or

21   dryings?

22      A.  No, nothing.

23      Q.  You looked at no expert data?

24      A.  No.

25      Q.  You didn't do any further observation of the

0024

1    materials; is that correct?

2        A.  I -- I looked at the bags as -- I put all the

3    bags in a -- in the plastic bags and placed them and

4    shipped them back to them prior.

5        Q.  Okay.  Okay.

6        Did you write this document that's been marked as

7    Exhibit 155?

8        A.  Yes.

9        Q.  Okay.

10       And what did you do with it when you finished it?

11       A.  I mailed it to Sheldon & Mak to Doug Morseburg.

12       Q.  Okay.  Fair enough.

13       Did you write the first report which has been

14   marked as Exhibit 154?

15       A.  Yes.

16       Q.  Did you review a draft with Mr. Morseburg?

17       A.  I don't recall.  It's been awhile.

18       Q.  Okay.

19       Did you review the draft of the second report, 155?

20       A.  I wrote that report.

21       Q.  Did you review it with Mr. Morseburg?

22       A.  I e-mailed it to him.

23       Q.  Did you e-mail it to him in final form or did

24   you make any corrections?

25       A.  No.  I e-mailed it just the way it was.

**Minissian, Kevin 11/10/2006**                    **Page 24**

0025

1    Q. Just the way it is. Okay. Fair enough.

2    Now, you told me that you have a master's of

3  science degree in chemistry? Is that it?

4    A. Uh-huh.

5    Q. Subsequent to obtaining that degree -- And when

6  did you obtain that degree?

7    A. '78.

8    Q. 1978?

9    A. I think so.

10    Q. Okay.

11    Subsequent to obtaining that degree -- Let me go

12  back a second. I want you to look at your resume in

13  Exhibit 154. Would you mind looking at -- I'll tell you

14  what page it is. It begins with -- It's Appendix "A"

15  and it begins with the Bates numbers HS2 002216.

16    A. Oh, this --

17    Q. It says "Professional Experience" --

18    A. No, this is wrong. That's supposed to be State

19  of -- California State University.

20    Q. Well, let's -- Wait a minute. Let's --

21  let's -- let's go for a second.

22    A. Okay.

23    Q. Let's move to the -- to the first page of the

24  rev- -- of the resume.

25    A. Okay.

**Minissian, Kevin 11/10/2006**        **Page 25**

0026

1    Q.  And it says "Appendix 'A' Professional Resume."

2    Do you see that?

3    A.  Yes.

4    Q.  Did you prepare this document?

5    A.  Yes.

6    Q.  When did you prepare this document?

7    A.  Summer -- Let's see.  I was asked to --

8    Generally I -- I have been self-employed since the

9    beginning.  I found the Nor- -- I found Norchem, the

10   company that I found is -- which currently Norchem,

11   right at college level.

12    Q.  I don't think that was the question I asked

13  you.

14    MR. DAILEY:  Could you read the question back.

15    (The record is read by the reporter.)

16    THE WITNESS:  This document was prepared sometime

17  summertime.

18    Q.  Last year?

19    A.  No, this year.

20    Q.  This year?  Okay.

21    A.  What I'm saying is I do not have a resume.  I

22  was asked to prepare a resume.

23    Q.  Okay.  Fine.  All right.  Fair enough.

24    A.  That's what I'm saying.

25    Q.  But -- But this is a -- This is an accurate

0027

1   statement of your resume, and it was prepared by you; is

2   that correct?

3     A.  Yes.

4     Q.  Okay.  All right.

5     Let me look -- ask you to go to the second page of

6   your resume.  And you say that in 1970 you completed an

7   "Engineering Degree in Electrical Engineering and

8   Instrumentation" at the University of Yerevan in

9   Armenia --

10     A.  Uh-huh.

11     Q.  -- is that correct?

12     A.  Right.  That's correct.

13     Q.  Okay.

14     And in 1975 you state that you received a

15   bachelor's degree in biochemistry; is that correct?

16     A.  Yeah, that should be Cal State L.A., actually,

17   I think but --

18     Q.  Okay.

19     Where did you receive the master's degree?

20     A.  UCLA.

21     Q.  Okay.

22     And why isn't that on your resume?

23     A.  I forgot to put it on there.

24     Q.  And when did you receive the master's degree?

25     A.  '78.

0028

1    Q.  And what did -- What did you receive the

2    master's degree in?

3    A.  Chemistry.

4    Q.  Chemistry.  I'm puzzled why you didn't list it

5    on your resume.

6    A.  I was -- I was asked very quickly to make a

7    resume because I don't have a regular resume.

8    Q.  Did you write a thesis at UCLA?

9    A.  I -- I did some thesis, not too much, no.

10    Q.  Okay.

11    I'm going to ask you to get me a certified

12    statement of your -- of your transcript, not your

13    grades, but I want to see a trans- -- a certified

14    statement of your transcript from UCLA.

15    All right?

16    MR. MORSEBURG:  All right.

17    MR. DAILEY:

18    Q.  I'll make that request --

19    MR. MORSEBURG:  Requests for production are

20    directed to me.

21    MR. DAILEY:  Okay.  Well, that's what I'm going to

22    ask for.

23    Q.  So I would like you to get that for me one way

24    or another.

25    All right.  So you have a master's degree that you

0029

1    didn't report in your expert report.

2        Let me ask you this:  What fields of study have you

3    been involved in since you got this master's degree?

4        A.  I -- I started my own company.

5        Q.  And have you -- Have you been involved in any

6    fields of study?

7        A.  No.

8        Q.  Okay.  That's fine.

9        A.  Specifically in chemistry or --

10       Q.  Chemistry, engineering, anything.

11       A.  Not in -- not in scientific level, no.

12       Q.  Okay.

13       A.  In a business level.

14       Q.  Okay.  Fine.

15           Mr. Minissian, have you ever been qualified by a

16   court to testify as an expert witness?

17       A.  Yes.

18       Q.  And can you tell me what the subject was?

19       A.  Had to do laundry waste water.

20       Q.  And when was that?

21       A.  Six months ago.

22       Q.  And what was the name of that case?

23       A.  It was a case against American Maintenance

24   Textile versus New Century.

25       Q.  Versus who?

0030

1    A.  New Century.

2    Q.  New Century.

3    And what court was that in?

4    A.  Norwalk Superior Court.

5    Q.  In what state?

6    A.  California.

7    Q.  California.

8    You said Norwalk.  I thought Connecticut.

9    A.  No, Norwalk.

10   Q.  Sorry.  I'm kind of parochial.

11   A.  Down the street from here.

12   Q.  All right.

13   And you said that was the superior court?

14   A.  Yes.

15   Q.  Okay.

16   What was the outcome of that case?

17   A.  I'm not too sure.

18   Q.  Okay.

19   For -- On behalf of which party did you testify?

20   A.  American Maintenance Textile.

21   Q.  And what was the nature of your testimony?

22   A.  Nature of my testimony to verify the amount of

23   volume of laundry generates washing fabric textile.

24   Q.  Can you tell me some more about that?

25   A.  There was American Maintenance Textile --

**Minissian, Kevin 11/10/2006**                    **Page 30**

0031
1    Textile Maintenance purchased New Century laundry

2    facility in Long Beach.

3       Q.  Yes.

4       A.  There was a water discharge issue that was not

5    applied to the purchase, and there was discrepancy on

6    the permits.  So I was asked to offer my services to

7    state how much water the laundries use annual basis and

8    the cost that it required to discharge that water to the

9    sewer.

10      Q.  Thank you.

11          And how were you qualified as an expert witness in

12   that case?

13      A.  I -- I been dealing with laundries for a long

14   time and we set up the wash formulas for them, and per

15   wash formula basis, you know how much water is consumed

16   washing fabric.

17      Q.  Okay.

18      A.  And so I offered our services to determine

19   exactly how much water was required to discharge.

20      Q.  Did you testify at a deposition or at trial or

21   both?

22      A.  Oh, I had a deposition and -- and also trial.

23      Q.  Okay.

24          And did the judge declare that you were an expert

25   witness at that trial?

0032

1      A.  I couldn't tell you that.

2      Q.  Did the judge allow you to testify?

3      A.  Yes.

4      Q.  Okay.

5      Besides this testimony six months ago, have you

6   otherwise ever been qualified as an expert witness?

7      A.  We had a bleach case.

8      Q.  What was the bleach case?

9      A.  That was a lawsuit filed against us.  Someone

10   claiming that they got hurt from a bleach -- chlorine

11   bleach.

12     Q.  Oh, so you weren't an ex- -- You were -- You

13   were a witness for the defendant in that case; is that

14   correct?

15     A.  Defendant was Norchem.

16     Q.  Yes.  Your company was sued?

17     A.  That's right.

18     Q.  So you weren't an independent expert in that

19   case; correct?

20     A.  Right, not independent.

21     Q.  All right.

22     I'm going to ask you to look at Exhibit 154 again,

23   which is your first report, and go back to your resume,

24   the Appendix "A."

25     A.  Uh-huh.

**Minissian, Kevin 11/10/2006**                    **Page 32**

0033

1    Q.  And I'm going to ask you to look at page

2  HS2 002217, which is one of the -- It's the last page of

3  your resume.  The last page of your resume, not --

4    A.  22?

5    Q.  2217.  That page (indicating).

6    A.  Okay.

7    Q.  Do you see where it says "Deposition

8  Testimony"?  Do you see that?

9    A.  Yes.

10    Q.  And it lists the Norchem case; correct?

11    A.  That's -- That's right.

12    Q.  But it doesn't list any other case.  Can you

13  tell me why you didn't list the Norwalk, California

14  American Maintenance case?

15    A.  Like I said, this was a -- I did it very

16  quickly so I don't -- I didn't remember putting

17  everything down.

18    Q.  Is there anything else you forgot to put in

19  Exhibit 154?

20    A.  Can't remember right now.

21    Q.  How much did you bill to provide your services

22  under exhibits for both this report and the supplemental

23  report?

24    A.  How much I got paid?

25    Q.  Yeah or how much you billed.

**Minissian, Kevin 11/10/2006**        **Page 33**

0034

1       A.  How much I billed.  I don't remember.  My

2   office knows.

3       Q.  Okay.

4       I'm going to ask you now to turn to the next page

5   of your report, Exhibit Number 154.

6       A.  Okay.

7       Q.  And that's listed as "Appendix 'B'" or it's

8   captioned as "Appendix 'B'" at the top; is that correct?

9       A.  Exhibit 154?

10      Q.  154.  And I'm going to ask you to look at --

11      A.  Oh, okay.

12      Q.  -- page 0 -- HS2 002218.

13      A.  Oh, okay.

14      Q.  It's captioned "Appendix 'B'" at the top.

15      Do you see that?

16      A.  Yes.

17      Q.  Okay.

18      Did you prepare Appendix "B"?

19      A.  Yes.

20      Q.  When did you prepare it?

21      A.  Can't remember.

22      Q.  Okay.

23      I'm going to ask you to go to the next page of

24  Appendix "B" which has the Bates numbers HS2 002219.

25      A.  HS2?

0035

1    Q.  Yes.  It's the next page of Appendix "B."

2    A.  Okay.

3    Q.  And look at the bottom, and it says "Riggs and

4  Klipper, Textile Laundering" Tex- -- "Technology."

5    A.  Uh-huh

6    Q.  Do you see that?

7    A.  Yeah.

8    Q.  And you list that as a document that you

9  reviewed.  Can you tell me what that is?

10    A.  That's the Textile Rental laundry textbook that

11  is widely used in the laundry industry.

12    Q.  Okay.

13    A.  It was published in 2005.

14    Q.  Is it a -- Published by the Textile Rental

15  Services of America or some other public -- publisher?

16    A.  No, it's published by TRSA, called Textile

17  Rental Association --

18    THE REPORTER:  Sorry, "published by"?

19    THE WITNESS:  TRSA, which is Textile Rental

20  Association of America.

21    MR. DAILEY:

22    Q.  Can you tell me what in that textbook you

23  referenced -- or you reviewed, excuse me?

24    A.  Their textbook includes numerous wash formulas

25  for healthcare, commercial linen and industrial.

0036

1    There's -- It's a full -- full guideline for laundry,

2    people involved in the laundry industry.

3        Q.  And what in particular with respect to the wash

4    formulas did you review?

5        A.  They have a geri- -- geriatric -- geriatric

6    pads that also healthcare laundry facilities that

7    utilize formulas from the textbook which every company

8    involved in the industry utilizes these formulas.

9        Q.  Okay.

10        And what did you do with those formulas?

11        A.  Nothing.  I just -- I was asked to provide

12    information so I --

13        Q.  To whom?

14        A.  -- so I generated a document to Doug Morseburg.

15        Q.  What document did you generate to Doug

16    Morseburg?

17        A.  The textbook and the other ones involved.

18        Q.  Okay.

19        I think we'll come back to that in a few minutes,

20    but why don't we press ahead.  Would you go to the next

21    page, which is -- has the Bates number HS2 02220.

22        Do you see that?  Do you see that page?

23        A.  HS2, yeah.

24        Q.  Okay.

25        The first document listed at the top is something

**Minissian, Kevin 11/10/2006**                    **Page 36**

0037

1   called, in part, a "Wash formula guide used to" watch --

2   "wash Posey product samples met CDC guidelines."

3        Do you see that?

4        A.  Yes.

5        Q.  Did you provide this document to --

6        A.  Yes.

7        Q.  -- Mr. Morseburg?  You did.

8        A.  Uh-huh.

9        Q.  When did you provide it?

10       A.  It says February 14.

11       Q.  Okay.

12       And the next document says "Each wash and dry cycle

13  has been documented and recorded on a log sheet to track

14  product performance."

15       Do you see that?

16       A.  Yes.

17       Q.  Did you provide this document to Mr. Morseburg?

18       A.  No, I have not provided it.

19       Q.  Why is that?

20       A.  I wasn't asked.

21       Q.  Did -- Did Mr. Morseburg instruct you to

22  provide copies of every document that you had produced

23  during the course of your study?

24       A.  They are recorded there at the laundry.

25       Q.  Do you have --

0038

1        A.  I don't have it on hand.

2        Q.  Do you -- And -- And Mr. Morseburg didn't ask

3    you to produce them at this deposition this morning?

4        A.  He asked me last night and I was out of town.

5    So when I got in late, I didn't get to the laundry.

6        Q.  How far is your laundry from here?

7        A.  Oh, quite a way.

8        Q.  Uh-huh.

9        A.  At least an hour drive.

10       Q.  Where is the laundry located?

11       A.  El Monte.  El Monte.

12       Q.  El Monte?

13       A.  Yeah.

14       Q.  Is that a Norchem facility?

15       A.  No, it's an independent laundry.

16       Q.  What kind of independent laundry?

17       A.  It's a commercial laundry.

18       Q.  What do you mean by "commercial laundry"?

19       A.  Commercial laundry that washes sheets and

20    towels.  They have washing machines.

21       Q.  For paying customers?

22       A.  For paying customers.

23       Q.  So, for example, a hotel might send their

24    laundry to them?

25       A.  That's correct.

0039

1      Q.  Does it -- Does it do institutional laundry for

2   healthcare facilities?

3      A.  No.  We use the facility to -- to -- We took

4   one of their washers to do the test.

5      Q.  You rented time on one of their machines --

6      A.  Yes.

7      Q.  -- is that fair to say?

8      So a -- a washing machine and a drying machine?

9      A.  Yes.

10     Q.  Okay.

11     Have you reviewed the documentation that is kept at

12   this laundry facility in El Monte?

13     A.  No, I have not.

14     Q.  Do you know whether or not the 100 cycles or

15   any of the 100 cycles was, in fact, conducted in

16   accordance with your protocol?

17     A.  It's in the -- The washer has a washer

18   controller.  It's a computer.

19     Q.  Yes.

20     A.  All the formulas are in that processor.

21     Q.  All right.

22     But have you reviewed it to see that it actually

23   did what you thought it was going to do?

24     A.  I provided the information for my technician to

25   do the test.  I did not personally wash them.

0040

1    Q.  Did you go and review whether, in fact, your

2    technician had done the --

3    A.  I'd given the written copy for them to follow.

4    THE REPORTER:  I'm sorry.  I need you to wait for

5    the question to finish.  I didn't get the last couple of

6    words.

7    THE WITNESS:  Sorry.

8    THE REPORTER:  I have "Did you go and review

9    whether, in fact, your technician" --

10   MR. DAILEY:

11   Q.  -- had done the washing and drying in

12   accordance with your protocol?

13   A.  No, I did not.

14   Q.  Okay.

15   Did you give him a computer code?

16   A.  He has the computer code.

17   Q.  He has.  Did you -- Did you verify that the

18   computer code included your protocol?

19   A.  It's not a protocol.  It's basically --

20   washer's a microprocessor.

21   Q.  Okay.

22   But does the microprocessor, whatever you want to

23   call it, incorporate the wash formula guide used to wash

24   Podey -- Posey products which you gave to Mr. Morseburg?

25   A.  Yes.

0041

1    Q.  How do you know that?

2    A.  Because it's in there.

3    Q.  How do you know it's in there?

4    A.  Well, what I'm saying is when I go visit, I can

5    get the copy of it.

6    Q.  All right.

7    You should have visited -- You knew you were going

8    to be deposed today; is that correct?

9    A.  Well, I've been -- I've been real busy.

10   Q.  So -- So you would -- You can just blow off

11   this deposition?  Is that your testimony?

12   A.  I'm not --

13   MR. MORSEBURG:  Object.

14   THE WITNESS:  I'm not saying --

15   MR. MORSEBURG:  Don't answer that question.  It's

16   argumentative.

17   MR. DAILEY:

18   Q.  Well, I'd like to know --

19   MR. MORSEBURG:  And harassing.

20   MR. DAILEY:

21   Q.  -- Mr. Minissian why you didn't produce

22   documents that we specifically asked you to produce.

23   And when you didn't produce them, we asked you to

24   produce them today.

25   A.  I was asked late and I was out of town.

**Minissian, Kevin 11/10/2006**                    **Page 41**

0042

1      Q.  Do you have anybody who works with you?  You're

2   a vice president.

3      A.  I have people work, but they're all busy, too,

4   so --

5      Q.  They're all busy.  Okay.  All right.

6      The next document down listed on your list of

7   documents that you reviewed is something called "Posey

8   samples have been inspected after each wash to monitor

9   product performance in low and high temperature wash

10   according to CDC guideline."

11      Did you produce that document to Mr. Morseburg?

12      A.  Yes, I did.

13      Q.  And where is that document?

14      A.  What document?  I physically -- visually

15   inspected.

16      Q.  Did you pro- -- produce a report?

17      A.  No.

18      Q.  What did you produce?

19      A.  My report is which is the one right here

20   (indicating) says "physically we did not see any damage

21   to the Posey Hip Protectors."

22      Q.  Did you keep any notes at -- at the time you

23   inspected after each wash and dry cycle?

24      A.  It's -- You have the samples, I mean, you look

25   at the samples.

0043

1      Q. But Mr. Minissian, I'm asking you what you did.

2      A. What I did what?

3      Q. You're the -- You're the -- You are the

4  supposed expert here.  I want your opinion.  And I want

5  to know if after each cycle you personally reviewed the

6  samples that had been washed or not?

7      A. No, I did not, not after the wash.  I -- I saw

8  the final result when it came back.

9      Q. Okay.

10     So the only time you saw the documents is after

11  they had supposedly been washed -- I'm sorry, the

12  products -- was after they had been supposedly --

13     A. That's correct.

14     Q. -- washed 100 times?

15     A. That's correct.  I saw the product, final

16  product.

17     Q. Okay.

18     And what inspection documents did you provide to

19  Mr. Morseburg?

20     A. There's no inspection document.  Again, it's a

21  physical observation.

22     Q. Okay.  Okay.

23     And the only observation is what you state in your

24  report; is that correct?

25     A. That's correct.

**Minissian, Kevin 11/10/2006**                    **Page 43**

0044

1      Q.  So there's no inspection log; is that correct?

2      A.  The inspection logs are the facts what's in the

3  bag -- in the box.

4      Q.  There -- there are logs in the bag?

5      A.  No.  There's signature of -- my signature on

6  the -- on the bags, what they are, and what -- how many

7  times they were washed, that's it.

8      Q.  Somebody told you they were washed 100 times

9  and you signed your name; is that correct?

10     A.  That's correct.

11     Q.  So you don't know whether they --

12     A.  My employees.

13     Q.  You don't know whether they were washed 10

14  times, one time, 100 time, 1,000 times, do you?

15     A.  My employees were instructed to do exactly what

16  I told them.

17     Q.  Okay.

18     And how did you confirm?

19     A.  I have the controller at the plant which tells

20  me how many times the -- this formula was washed.

21     Q.  And what is the controller you're referring to?

22     A.  Microprocessor washer.

23     Q.  Okay.

24     And tell me how that works.

25     A.  We have a specific formula that was made for

0045

1    Posey to wash these items.

2         Q.  Okay.

3         And is that -- Let's stop right there.  That

4    specific formula.  Is that written down someplace?

5         A.  It's in the controller.

6         Q.  Okay.

7         How did it get in the controller?

8         A.  My technician programmed it.

9         Q.  Okay.

10        So you must have given your technician -- You must

11   have given him or her some instruction; correct?

12        A.  That's correct.

13        Q.  What instruction did you give the technician?

14        A.  I give him the samples.  I told him what they

15   need to be done.  I told him that they -- These are the

16   formulas that he needs to put in the washer controllers.

17        Q.  So where are the formulas written down?  That's

18   what --

19        A.  I don't have it with me.

20        Q.  Are they in your head?

21        A.  Yes.

22        Q.  Are they someplace else?

23        A.  No, they're -- they're in the computer.  He's

24   got them -- he's got them in the washer controllers.

25        Q.  Are they -- Are they in a textbook or a

**Minissian, Kevin 11/10/2006**                    **Page 45**

0046

1  reference someplace?

2      A.  Again, in -- it's in the microprocessor.  It

3  has to be put on the paper.

4      Q.  You -- They've been inputted into the

5  microprocessor --

6      A.  Right.

7      Q.  -- correct?

8      A.  That's correct.

9      Q.  And apparently the microprocessor can somehow

10  print them out; is that correct?

11      A.  No.  We just go through it and handwrite it and

12  put them in a -- in a laptop and print it.

13      Q.  So there's a microprocessor someplace.  What is

14  this microprocessor?  Are we talking about a laptop or

15  what?

16      A.  No, no.  It's a -- It's a little microprocessor

17  that controls the cycle -- wash cycle of the washing

18  machine.  So you physically go there, enter the steps of

19  wash cycle.

20      Q.  Okay.

21      A.  Temperatures, steam, drains, whatever.  And

22  that microprocessor writes the formula the way you want

23  to wash things.  You put the product name, load size,

24  how many pounds you're going to wash, and then you put

25  the steps and temperatures and then -- then when you put

**Minissian, Kevin 11/10/2006**                    **Page 46**

0047

1  the item inside the washer, close the door, you press

2  the formula number, you start running until it finishes

3  and extracts.

4      When it's finished, then you take it out, put them

5  in the dryer and dry it.  Well, once you dry, bring it

6  back and wash it again.  That's the way it was done.

7      Q.  All right.

8      And where is there a record of what was entered

9  into that microprocessor?

10     A.  The technician has a copy that I told him to

11  enter into the microprocessor.

12     Q.  Okay.

13     A.  Again, for us it's a -- it's a very common

14  thing.  We do this all the time.  It's --

15     Q.  Right.

16     But you were doing this as an expert witness;

17  correct?

18     A.  I was asked to wash the items.

19     Q.  Were you -- Were you asked to do that as an

20  expert witness?

21     A.  I'm not -- I don't know what you want to call

22  expert witness, but I was asked to wash and see if the

23  product will handle the wash formulas according to CDC

24  Guidelines.

25     Q.  Okay.

0048

1      So I need -- I need you to tell me what the formula

2   is --

3      A.  Uh-huh.

4      Q.  -- or where it was recorded.  And then I need

5   you to tell me how that formula got into the computer

6   and that -- that was on the microprocessor on the

7   washing and drying machine, and then I need you to tell

8   me how that was recorded so we know that, in fact, 100

9   cycles were done according to your formula.

10      Okay.  Is there any record of that?

11      A.  The controller keeps track of how many times

12   the formula was selected.

13      Q.  Okay.

14      The controller is on the machine?

15      A.  Yes, on the -- on the machine.

16      Q.  And can that be printed out?

17      A.  You cannot print it out, but you can physically

18   see it.

19      Q.  You can physically see it.

20      After the 100 washings were done of the Posey

21   equipment, was that -- of the Posey product, excuse

22   me -- was that laundry equipment shut down so no more

23   formulas were entered into the machine?

24      A.  No, no.  They -- they use the washer every day.

25      Q.  So how do we know -- Well, so how do we find

0049

1    what was done when your 100 cycles were done?

2        A.  Formula has 31 formulas.

3        Q.  Yes.

4        A.  Which they wash sheets, towels, pillow cases.

5    There's extra formulas that are not being used.  So

6    he -- he took one of the formulas, made a Posey hip

7    protector wash formula, so that formula was used to wash

8    these items.

9        Q.  Okay.

10       And how do we know that -- what formula of those 31

11   he chose?

12       A.  What do you mean how -- how do you know?

13       Q.  Is there --

14       A.  A formula 5, formula 10, whatever he selected.

15       Q.  But I'm asking you how do we know what he

16   selected?  That's what I need to know.

17       A.  Well, you're asking the question how do you

18   know that things are washed right.

19       Q.  No, no.  I'm on --

20       A.  No.

21       Q.  No.  I'm not even yet -- there yet.  We got a

22   long way to go before we get there.

23       A.  Yeah.

24       Q.  I'm asking how do we know what the formula is

25   you gave to the technician, what formula he entered into

0050

1    the computer, and what record there is to show that the

2    formula he entered into the computer --

3        A.  Uh-huh

4        Q.  -- is the formula you gave him?

5        A.  Well, we can go verify.

6        Q.  And I'm asking you how do we verify that?

7        A.  Just go look at the microprocessor.

8        Q.  Okay.

9            And does the microprocessor have --

10       A.  It retains memory.

11           THE REPORTER:  One at a time please.

12           MR. DAILEY:

13       Q.  Does the microprocessor say on, for

14   example, "February 13th, Posey load 1, 2, 3, 4, Formula

15   X"?

16       A.  It does not give you a date.  It gives you a

17   number -- the formula number and a formula procedures.

18       Q.  Does it identify what was laundered?

19       A.  No, it just says "Posey item."

20       Q.  It says "Posey item"?

21       A.  Yeah.

22       Q.  Okay.

23           And does it list the formula?

24       A.  Yes.

25       Q.  Okay.

**Minissian, Kevin 11/10/2006**                    **Page 50**

0051

1     And it's -- It has the chemical and wash settings

2    and heat settings and so on and cycle --

3     A.  That's --

4     Q.  -- times?

5     A.  That's correct.

6     Q.  Okay.

7     So it will -- We can get that, we can extract that

8    by looking into that record; is that correct?

9     A.  That's correct.

10     Q.  Okay.

11     What's the technician's name?

12     A.  Jaime Gastelum.

13     Q.  Would you spell that?

14     A.  Gastelum, G-A-S-T-E-L-U-M.

15     Q.  And first name?

16     A.  Jaime.

17     Q.  How do we spell that?

18     A.  J-A- -- J-A-I-M-E.

19     Q.  And for whom does he work?

20     A.  He works for Norchem.

21     MR. DAILEY:  Can we take a break for a few minutes?

22     MR. MORSEBURG:  Sure.

23     THE VIDEOGRAPHER:  We're going off the record.  The

24    time is 10:06.

25     THE VIDEOGRAPHER:  We are on the record.  The time

0052

1   is 10:14.

2        MR. DAILEY:

3        Q.  Mr. Minissian, I'm going to still refer you to

4   the last page of the -- of Appendix "B" to your first

5   report, and I'm -- I want to return just for

6   clarification to the first item on that page, which is

7   HS2 002220.  And it says, "Wash formula guide used to

8   wash Posey product."

9        Do you see that?

10       A.  Uh-huh.

11       Q.  Now, you said you gave that guide to

12   Mr. Morseburg; correct?

13       A.  Guide?

14       Q.  Yes.  That's what you described it as, a wash

15   formula guide.  And you said you gave it --

16       A.  Yes.  It's wash formula.  Basically it's a

17   formula that's in the controller.

18       Q.  Okay.

19       A.  In the microprocessor.

20       Q.  Okay.

21       And -- And if you remember what items are

22   included -- I'm not asking you for the specific

23   formula -- but what items would have been included in

24   that document you gave to Mr. Morseburg?

25       A.  What item -- do you mean items?

0053

1       Q.  Well, does it say what the laundry detergent

2    is, how much water is used, what the cycle time is, what

3    the heat is, what the bleaches are, et cetera?

4       A.  Yeah.  Wash for- -- Excuse me.  Wash formula

5    guide basically says the item.

6       Q.  Yes.

7       A.  Formula time for each step, the temperature and

8    the chemicals and the titration levels.

9       Q.  Okay.

10      And the "titration levels."  What do you mean by

11   that?

12      A.  PH, alkalinity -- alkalinity, parts per million

13   on the bleach.

14      Q.  Okay.

15      A.  The basic standard thing that we always do, you

16   know, at the laundry.

17      Q.  And does it also have associated with it the

18   guide for drying?

19      A.  Not the wash.

20      Q.  Not the drying?

21      A.  Not the wash.

22      Q.  Oh, is there a separate guide for drying?

23      A.  Drying is basically you put them in the dryer.

24   When it's dry, you take it out.

25      Q.  Okay.

0054

1      But is there something that said dry it at a

2   certain temperature for so many minutes?

3      A.  No.  It's -- There's a dial on the dryer that

4   you set to dry.

5      Q.  Okay.

6      And -- And is there a temperature setting on the

7   dryer?

8      A.  Yes.

9      Q.  What's the temperature setting you used?

10      A.  We -- We tried at 145.  We dried effectively

11   so -- That's what I was told.

12      Q.  You were told that it dried effectively at 145

13   degrees; is that correct?

14      A.  That's correct.

15      Q.  And does the dryer have a temperature gauge on

16   it or is it just sort of a dial?

17      A.  It's a dial.

18      Q.  Okay.

19      A.  You set whatever temperature you want to dry

20   it.

21      Q.  Okay.

22      And the dial is dialed in at 150, 140, whatever you

23   want?

24      A.  You can select whatever temperature you want.

25      Q.  Okay.

0055

1       So is that a digital statement and it says this is

2    the temperature it's heating?

3       A.  No.  It's a circular thing and you set the

4    temperature that you want to dry it.

5       Q.  Okay.

6       And -- And did you calibrate the dryer?

7       A.  The dryer's being used every day, 20 hours a

8    day.  So they're not -- They're not only drying the

9    Posey item, but they also dried everything else with it

10   every day.  It's a running operation so it's --

11      Q.  Were the Posey products dried with other items?

12      A.  No.  They dried in a dryer that they were

13   using.

14      Q.  But just the Posey items were in the dryer at

15   the time?

16      A.  That's correct.

17      Q.  Okay.

18      How did you know or how were you able to verify

19   that a setting of 145 or 150 was, in fact, the actual

20   temperature on the dryer?

21      A.  My technicians carry a laser temperature probe.

22      Q.  Yes.

23      A.  They can -- They check the temperature on the

24   washing machines.  That's -- That's common practice for

25   them, to evaluate the temperature of the wash.

**Minissian, Kevin 11/10/2006**                    **Page 55**

0056

1    Q.  Uh-huh.

2    A.  Also they use a laser temperature probe to

3  measure the temperature on the dryers.

4    Q.  And did Mr. Gastelum maintain a record of the

5  temperatures that he was able to record?

6    A.  I don't know if he kept a record or not.

7    Q.  How do you know that he set the machine for 145

8  degrees?

9    A.  I told him to try at 145 drying time because in

10  our experience with the hospital diapers, because

11  they're plastic material, they don't dry very high

12  temperatures.

13    Q.  Okay.  All right.

14      So you gave Mr. Morseburg a wash formula guide for

15  washing; correct?

16    A.  I have not given him anything yet.

17    Q.  Oh, you told me you gave him some- -- You gave

18  him a copy of the guide on February 14th, 2006.

19    A.  He asked me yesterday to give him a copy.  I

20  say, "I don't" -- "I came late in town."

21    Q.  Yes.

22    A.  But I don't remember if I gave him prior

23  that -- to that or not.

24    Q.  Okay.

25      Oh, you don't remember?

**Minissian, Kevin 11/10/2006**            **Page 56**

0057

1    A.  I don't remember if I gave him a copy of it.

2    Q.  All right.

3    Regardless of whether you gave it to him or not,

4  was there a formula guide that you produced that set out

5  all the specifications for washing the Posey products?

6    A.  I get the formula guide verbally to Jaime

7  Gastelum.

8    Q.  Did you write it down?

9    A.  No.

10    Q.  Okay.

11    Did you give him a guide for both low temperature

12  and high temperature?

13    A.  Yes.

14    Q.  Okay.  Was --

15    (Interruption in proceedings.)

16    MR. DAILEY:

17    Q.  Okay.

18    Now, next it says -- and staying on the same page,

19  just so we can get everything straight here -- it says

20  "Each wash and dry cycle has been documented and

21  recorded on a log sheet"; is that correct?

22    A.  That's correct.

23    Q.  Is that what it says?

24    A.  Yes.

25    Q.  Okay.

0058

1      And there is a log sheet someplace?

2      A.  I think Jaime has the log sheet.  I called him

3   earlier this morning.  He says he has the log sheet.  He

4   has to look for it.

5      Q.  And next it says, "Posey samples have been

6   inspected after each wash."  And was it your technician

7   who did the inspection?

8      A.  I asked him after each wash to look at the

9   samples and make sure they were not damaged or any kind

10   of deterioration of the fabric before he -- he went on

11   to the next load.

12      Q.  And as far as you know, there's no log of his

13   inspection; is that correct?

14      A.  I can't tell you.

15      Q.  Have you asked him?

16      A.  No.

17      Q.  The last item says, "Included a Genie wash test

18   piece in the wash cycle with Posey samples to determine

19   chlorine bleach intensity and effective stain removal."

20      Did I read that correctly?

21      A.  That's correct.

22      Q.  First, would you tell me what a Genie wash test

23   piece is?

24      A.  It came out of the bottle.  Genie wash test

25   piece is a -- is a sample, a little cloth has different

0059

1    type of -- there's swatches that you -- As a common

2    practice for us to do any new item, to see intensity to

3    chlorine and alkalinity and temperature, to verify that

4    you're not overinjecting product and the formula is --

5    being washed properly, Genie test piece is manufactured

6    by a company called Artex.  It's an independent company.

7        Q.  Did you retain these samples?

8        A.  I don't know.  I asked him to do one.  I don't

9    know if he retained it or not.

10       Q.  Okay.

11       A.  It's basically for our application, to make

12   sure that the chemistry is right.

13       Q.  Uh-huh.

14           Is it your practice to retain these samples?

15       A.  Not necessarily.

16       Q.  Okay.

17           So do you have any way of verifying that, in fact,

18   the formula you thought was being punched into the

19   machine was, in fact, punched into the machine?

20       A.  Like I -- Like I said, the formula is still in

21   the controller, so you can go verify it.

22       Q.  Right.  We can -- We can verify what was

23   punched in perhaps, but can we verify that that actually

24   was loaded into the machine without the Genie?

25       A.  I don't understand the question.

**Minissian, Kevin 11/10/2006**                    **Page 59**

0060

1    Q.  Okay.

2    Well, you told me that the -- the Genie is used to

3  verify the -- at least the bleach and temperature

4  levels --

5    A.  Uh-huh.

6    Q.  -- in the washing machine; correct?

7    A.  Yes.

8    Q.  Is there any other way to verify that if

9  they're missing?

10    A.  The Genie, again, is a chemical test, one-time

11  wash.

12    Q.  Right.

13    A.  In the beginning you throw them in the washer.

14  It's a one-time test.

15    Q.  Right.

16    A.  Not 100 time.

17    So when it comes out of the washer, you look at the

18  sample and see if the intensity -- There's a guideline

19  for that to compare.  See, Artex provides that who

20  commonly use in every laundry when you wash it.

21    Q.  So you did the Genie test only once; is that

22  correct?

23    A.  Only one wash only.

24    Q.  Okay.

25    So did you do one high-temperature wash and one

**Minissian, Kevin 11/10/2006**        **Page 60**

0061

1    low-temper- -- and one standard wash or low-temperature

2    wash?

3        A.  I -- I cannot tell you if he did multiple or

4    not.  I know he did one of them but --

5        Q.  Is there any other way to verify that, in fact,

6    the machine operated in accordance -- in accordance with

7    the formula that was punched in?

8        A.  We also do titrations --

9        Q.  Okay.

10       A.  -- to verify the -- the chemical.

11       Q.  All right.

12           Were titrations done in this case?

13       A.  I don't remember if he did or not.

14       Q.  Okay.

15       A.  I can verify with him.

16       Q.  Okay.

17           Do you know what materials the Posey hip protectors

18   that you washed and dried were made of?

19       A.  I think it's a polyester cotton blend.  I don't

20   know the exact details, but I think it's a blended

21   product.

22       Q.  Okay.

23           And what was the pad made out of that is

24   incorporated in the product?

25       A.  I do not know.

0062

1       Q.  Okay.

2       Did anybody tell you what it's made out of?

3       A.  I have no idea.

4       Q.  Did you consider that when you set up the

5   formula for washing and drying?

6       A.  No.

7       Q.  Aren't the formulas that the textile industry

8   use based on the materials that are to be washed and

9   dried?

10      A.  The wash and dry material are -- if there's a

11  tag on the -- on the product says what the recommended

12  wash cycles are, we follow that.  If it's not, we

13  basically do, just from our experience, what -- how long

14  it takes to dry and follow the soil characteristic of

15  the fabric and wash according to that.  It's basically

16  from our experience in the industry to generate the

17  formulas to wash.

18      Q.  So are you telling me that you washed and dried

19  the Posey product in accordance with the label on the

20  products?

21      A.  No.  We followed the CDC Guidelines.

22      Q.  Okay.  Well, we're not there yet.

23      Did you develop your formula guide that

24  Mr. Gastelum was to put into the machine on the basis

25  of --

0063

1      A.  CDC Guideline.

2      Q.  -- the product label or the CDC Guideline?

3      A.  CDC.  I was told to do by the CDC Guidelines.

4      Q.  Okay.

5      And what CDC Guidelines did you use?

6      A.  We use the CDC Guidelines for high temperature

7  160 minimum, 25 minutes --

8      THE REPORTER:  I'm sorry.  "We use the CDC

9  Guidelines for"?

10      THE WITNESS:  High temperature wash for 25 minutes

11  and low temperature wash at average of 120.

12      MR. DAILEY:

13      Q.  Okay.

14      So that's all that formula guide has in it, just

15  says run this machine for 25 minutes at a certain

16  temperature?

17      A.  Yeah.  And that wash temperature -- Again, I

18  explained to Mr. -- Mr. Morseburg that the wash time

19  indicates not only the chemistry but also drains time,

20  bleach time.  That's part of the whole wash time of

21  25 -- 25 minutes.

22      Q.  The entire?

23      A.  Formula time.

24      Q.  The entire -- When you say "formula time," is

25  that the en- -- from the time you switch the machine on

**Minissian, Kevin 11/10/2006**                    **Page 63**

0064

1   until the time it stops spinning, that's 25 minutes?  Is

2   that what you're telling me?

3       A.  The temperature -- The 25 minutes that 160

4   degrees is maintained, whether it's a bleach cycle,

5   drain cycle, you know, alkaline cycle, detergent cycle,

6   once you stop dropping the temperature down, then you're

7   out of the -- out of the wash cycle.

8       Q.  Okay.

9       So the formula guide you used would have had a wash

10  temperature time for 25 minutes of 160 degrees; is that

11  correct?

12      A.  That's correct.

13      Q.  Okay.

14      And what about for the low temperature?

15      A.  Low temperature was 120.  And there's no --

16  There's no time guide on that.

17      Q.  Okay.

18      And what -- what -- what guide did you program into

19  the machine?

20      A.  We had eight minutes wash, eight minutes

21  bleach, and one minute drain, one minute drain, and two

22  rinses and extract.

23      Q.  Okay.

24      And that -- and the 120 degree temperature was

25  maintained throughout?

0065

1     A.  Until the final cool rinses.

2     Q.  Okay.  Okay.

3     A.  And they were extracted eight minutes --

4     Q.  Okay.

5     A.  -- or six minutes, I think.

6     Q.  Mr. Minissian, have you ever conducted any

7     research on the impact of water temperature or heat or

8     bleach on materials that are used in healthcare

9     facilities?

10     A.  I was involved with the California Title 22

11     over, I guess, 16-some years ago when we had an energy

12     crunch again, California Title 22 is very similar to CDC

13     Guideline of 160 degree for 24 minutes, not 25.

14         When we had energy crunch, we went to State of

15     California, whole association of Textile Rental --

16     California Laundry Association went to State of

17     California and reduce the temperature down to 140 for

18     healthcare.

19     Q.  Right.

20         Did you do any research in association with that

21     Title 22 work?

22     A.  I was involved with the committee.

23     Q.  Okay.

24         But you didn't do any research; is that correct?

25     A.  No, we didn't do research, but I was -- I was

**Minissian, Kevin 11/10/2006**                    **Page 65**

0066

1    getting a lot of the reports from VA hospitals on low

2    temperature hospitals, which VA went down to 120 after

3    their research at Colorado State -- Colorado Univers- --

4    University.

5        Q.  How do you know they went down to 120?

6        A.  Because there was a public report.  I think you

7    have copies of the -- some of the low-temperature

8    washing reports.

9        Q.  Is this the Blaser report you're talking about?

10       A.  I think so.  That's one of them.

11       Q.  That's just a test, that's not adoption of 120

12   degrees, isn't it?

13       A.  There's a VA hospital report that was done at

14   the VA hospital.

15       Q.  It was a -- It was a research project; is that

16   correct?

17       A.  It was research project, yes.

18       Q.  Okay.

19       The hospital didn't adopt 120 degrees, did it?

20       A.  The VA Hospitals did.

21       Q.  What VA Hospitals?

22       A.  VA hospital, Vet- -- Veteran Administration.

23       Q.  How -- How do you know that?

24       A.  Because they have a report.

25       Q.  All right.

0067

1      I'm going to ask you to tell me the name of that

2   report.

3      A.  I don't know if there's a copy of the reports

4   or not.

5      Q.  Is it -- Is it something that you reviewed for

6   purposes of this case?

7      A.  No.  They were copies that I provided to them,

8   to Doug Morseburg, what I had in my file --

9      Q.  Okay.

10     A.  -- regarding low-temperature washing.

11     Q.  Okay.

12     And you say there's a report someplace that says VA

13   Hospitals adopted 120 degree?

14     A.  And they are continuing doing it.

15     Q.  And they are continuing it.  It's even better.

16     A.  They continue washing at 120.

17     Q.  That's terrific.  I want to know where that

18   document is because that's going to be a surprise to me.

19   So tell me where that document is.

20     A.  I don't -- I give what I have.

21     Q.  Okay.

22     What -- Describe the document.

23     A.  Based on the research that VA hospital did on

24   low-temperature washing which claim that with

25   chemical -- with chemistry they can disinfect and

**Minissian, Kevin 11/10/2006**              **Page 67**

0068

1   provide hygienically-clean linen, that high temperature

2   was not required.

3        So throughout the country all the VA hospital

4   dropped their wash temperatures to 120.

5        Q.  Okay.

6        And I want you to tell me -- You know that for a

7   fact?

8        A.  That's a fact.

9        Q.  Okay.

10        And what's the source of that information, that

11   fact?

12        A.  You can -- You can ask the VA hospital, not --

13        Q.  No, no.  I know what the answer is.  I want to

14   know where you got your answer.

15        A.  Where I got my answer?

16        Q.  Yeah.

17        Where did you find out that VA Hospitals across the

18   country --

19        A.  VA hospital --

20        THE REPORTER:  One at a time.

21        MR. DAILEY:

22        Q.  Stop, stop, stop.

23        Where did you -- Where did you get your information

24   and where is the information that leads you to believe

25   that not only have VA Hospitals adopted a laundry

0069

1    temperature of 120 degrees, but they're continuing to

2    use a laundry temperature of 120 degrees?

3        A.  Where is the document for that?

4        Q.  Yes.

5        A.  I don't have it on hand.

6        Q.  Okay.

7        That's fine.  There are a lot of documents that you

8    don't have on hand today, but where is the document?

9        A.  Well, I can contact VA hospital, get it --

10       Q.  Okay.

11       A.  -- or you can contact also.

12       Q.  What's --

13       A.  It's a public infor- -- it's a public

14   information.

15       Q.  Okay.

16       And -- And when was that document published, if you

17   know?

18       A.  Several years ago.

19       Q.  Okay.

20       A.  At least 15 years ago.

21       Q.  At least 15 years ago.

22       What's the author's name?

23       A.  I don't remember.

24       Q.  Okay.

25       All right.  That's a document -- That's a document

0070

1   that was done some 15 -- Do you have that document?

2       A.  I don't -- I had what I give them.  I don't

3   know if it was one of them or not.  I don't remember

4   now.

5       Q.  Okay.

6           Now, you said this document was produced some 15

7   years ago; correct?

8       A.  The research was done at one of the VA

9   Hospitals, I remember --

10      Q.  Okay.

11      A.  -- and based on that report, they decided to

12  drop the temperature down.

13      Q.  Okay.

14          Now, that's what I'm after.  Where is the document

15  that says the VA Hospitals, based on that report that

16  was done 15 years ago --

17      A.  I don't --

18      Q.  -- says -- wait, wait, wait, wait -- says VA

19  Hospitals adopted 120 degrees as the wash temperature

20  and not only that, continue to use 120 degrees.  That's

21  what I'm after.

22      A.  I don't have it, but I can try to find out --

23      Q.  Okay.

24          When did you last see that document?

25      A.  That's been a while.

**Minissian, Kevin 11/10/2006**            **Page 70**

0071

1     Q.  Okay.

2          When you say it's been awhile, what's awhile?

3     A.  12, 13 years ago.

4     Q.  Okay.

5          Well, how do you know what you saw 12 or 13 years

6     ago is what they do now?

7     A.  I spoke with another chemical vendor.  He has a

8     contract with the VA hospital.

9     Q.  What's his name?

10    A.  Company's name is Gurtler.  Gurtler.

11    Q.  G-E-R-T-L-E-R?

12    A.  G-U-R-T-E- -- G-U-R-T-L-E-R.

13         They're one of our competitor.

14    Q.  Okay.

15         And what's the person's name at Gurtler?

16    A.  I don't have it.  Their -- their rep you mean?

17    Q.  The person who told you that all the VA

18    Hospitals are continuing to use 120-degree wash

19    temperature.

20    A.  I -- I -- I heard that.  I'm not saying I spoke

21    with someone.  I heard that Gurtler is washing down at

22    120.

23    Q.  Okay.  Okay.

24         Well, if you can find a document from Gurtler or

25    the VA that states that the VA has adopted or is, I

0072

1    would like you to produce that document that says the VA

2    has adopted 120-degree wash cycle temperature and is

3    continuing to use that.  That will be helpful.

4        Mr. Minissian, can I ask you, have you ever

5    conducted any research on infections, infectious control

6    or decontamination of materials laundered in healthcare

7    facilities?

8        A.  No.

9        Q.  Now, let me take you back, and I apologize.

10   I'm not trying to beat a dead horse, although it

11   probably seems like that to you, but -- but let me take

12   you back again to the last -- to HS2 002220, part of

13   Appendix "B."

14       A.  Uh-huh.

15       Q.  I think you still have it there.  And again,

16   I'm -- I'm going to ask a couple more questions about

17   this wash formula guide.  And -- and this was the --

18   this is the specification for temperature and time

19   and -- and cycles and bleach that you used for the 100

20   cycles; is that correct?

21       A.  That's correct.

22       Q.  Did you develop that from any source, the

23   formula itself?

24       A.  Yes.  The -- Basically the source is CDC

25   Guideline.

0073

1      Q.  Did you use anything else?

2      A.  I -- I looked at the laundry textile book as

3   a -- because we use that as our Bible.

4      Q.  Okay.

5      And what did you --

6      A.  To compare that.

7      Q.  Was there a formula in the laundry textile book

8   that you used?

9      A.  No, because none of the laundry textile book

10   formulas comply with the CDC Guidelines.

11      Q.  Okay.  Okay.

12      The formula you used for these launderings, has

13   that been peer reviewed by any people who have similar

14   training to you or people who have training in

15   infectious disease control or in laundering materials

16   that are used in hospitals and other healthcare

17   facilities?

18      A.  Someone by independent you mean?

19      Q.  Yes.

20      A.  No.

21      Q.  Have you asked the CDC or anyone associated

22   with the CDC to review the formula you used for these

23   100 washings for compliance or verification of

24   compliance with the so-called CDC Guidelines?

25      A.  No.

0074

1    Q.  Okay.

2        Do you know of any healthcare facilities that

3    actually wash hip protector and similar garments

4    according to the formula you washed these Posey hip

5    protectors with?

6        A.  Frankly, I've not seen them out there.  It's

7    the first time I've been exposed to this -- this item.

8        Q.  Okay.  Fair enough.

9        You brought with you this morning all of the hip

10   protectors that were washed and dried during your test;

11   is that correct?

12       A.  That's correct.

13       Q.  And where have those garments been since

14   February of 2006?

15       A.  They were sitting in our office in a box.

16       Q.  Okay.

17       When did you physically inspect the documents?  I'm

18   sorry, the products, I apologize.

19       A.  When they came back from the laundry, I -- I

20   looked at it as soon as they returned.

21       Q.  Okay.

22       Tell me what you did.

23       A.  I individually looked at with my rep, went

24   through the items, looked at each item.

25       Q.  And -- And is that the point at which you

0075

1   signed the garments?

2       A.  No.  I was -- The items were sitting in our

3   office awhile back.  I mean, all this time actually they

4   were sitting.  Recently, only a week ago, they were

5   returned back to the Sheldon & Mak because someone

6   requested that they wanted -- Someone from your com- --

7   your -- your firm wanted to take a look at it.

8       Q.  That's correct.

9       A.  So --

10      Q.  But -- But what I'm asking you is you

11  apparently saw the garments that had been washed for the

12  first -- You saw them for the first time --

13      A.  Right.

14      Q.  -- after at least some of them were washed 100

15  times in February; is that correct?

16      A.  Yes.

17      Q.  Is that when you put your signature on the

18  garments?

19      A.  No.

20      Q.  When did you put your signature on the

21  garments?

22      A.  Two months ago, a month and a half ago.  I

23  don't remember exact date, but it was not too long ago.

24      Q.  So -- So you didn't sign them at the time you

25  inspected them; is that correct?

0076

1    A.  No, I did not.

2    Q.  Who told you to sign them?

3    A.  I was asked to sign -- sign each one of them

4  individually.

5    Q.  Okay.

6    Who asked you to do that?

7    A.  Sheldon & Mak.

8    Q.  Okay.

9    Where did you sign them?

10    A.  On the plastic bags.

11    Q.  Yeah, I know that.  Sorry.  Where physically

12  were the garments when you signed them?

13    A.  At our office at Norchem.

14    Q.  At your office.

15    And had they been at your office all that time?

16    A.  All that time.

17    Q.  And you signed -- Did you sign the garments or

18  the plastic bags?

19    A.  No.  We signed the -- I think we signed the

20  material itself.

21    Q.  Okay.

22    And when you signed the material, did you also sign

23  off a temperature on the material?

24    A.  Yes.

25    Q.  Okay.

0077

1      How did you know that when you wrote 160 degrees on

2  a garment that it had been washed and dried at 160

3  degrees?

4      A.  Because they were brought and separated with --

5  with that temperature.  They were -- they were

6  identified what temperature they were washed.

7      Q.  Okay.

8      And how were they identified?

9      A.  They were identified by the -- in the plastic

10  bag, piece of paper.

11      Q.  Okay.

12      It was a piece of paper.  Did it have the

13  technician's name on it?

14      A.  No.  I know who did it so --

15      Q.  Did you recognize the handwriting?

16      A.  Well, only one person was in charge of doing

17  this so --

18      Q.  Okay.

19      Well, did you recognize Mr. Gastelum's --

20      A.  I didn't pay attention to his handwriting, but

21  there were temperatures.

22      Q.  Okay.

23      Were there dates?

24      A.  Don't recall.

25      Q.  Did it have number of cycles?

0078

1      A.  Yes.

2      Q.  Okay.

3      What did it say?

4      A.  Says 10 wash, 20 wash, 30 wash, 40 wash, 50

5  wash, 100 wash, so --

6      Q.  Okay.

7      So for a given hip protector garment, it was inside

8  a plastic bag; is that correct?

9      A.  That's correct.

10     Q.  Okay.

11     So there was one bag and one garment; correct?

12     A.  No, there were two.

13     Q.  Two what?

14     A.  There were two of them.  One was -- again, one

15  heavy-duty, one light-duty.  Remember?

16     Q.  Right.  I got that.

17     A.  So there were two of them.

18     Q.  Okay.

19     So there were two in the bag -- in a bag?

20     A.  Yes.

21     Q.  Are they still in the bags here today?

22     A.  I'm -- I hope so.

23     Q.  Okay.  We're going to have to look at them, but

24  we'll maybe come back to that in a few minutes.

25     When you signed your name to the garment --

0079

1       A.  Uh-huh

2       Q.  -- you were signing not on your personal

3    observation; is that correct?

4       A.  I was -- When I signed, I already -- already

5    observed when they came back from the laundry.

6       Q.  Right.

7       A.  I was asked basically to put my signature on

8    there, on each one of them.

9       Q.  Right.  But your signature does -- is not a

10   representation of personal knowledge that a particular

11   garment was washed in a particular temperature, dried at

12   a particular temperature or washed a certain number of

13   times, is it?

14      A.  To my knowledge they were washed.

15      Q.  That's all you know.

16      A.  That's all I know.

17      Q.  Okay.  Fine.

18      Is it -- Do -- Do you know what the practice of

19   healthcare institutions is with respect to laundering

20   hip protectors?  Let me -- Let me just ask you to hold

21   that for a second and see if I can be a bit more

22   specific.

23      For example, do you know if hip protectors are

24   washed all by themselves by healthcare institutions or

25   washed in 100- or 300- or 400-pound loads with whatever

**Minissian, Kevin 11/10/2006**                    **Page 79**

0080

1   else is being laundered?

2       A.  I have no idea.

3       Q.  Okay.

4           Now, in your reports you talk about hip protectors

5   which you identify as ST hip protectors and hip

6   protectors that you identify as HD hip protectors.

7       Do you remember that?

8       A.  Yes, that's the one I'm calling light and

9   heavy.

10      Q.  Okay.

11          When you say "light and heavy," what do you mean?

12      A.  I was told there -- one was light stitch, I

13  guess, and heavy stitch.

14      Q.  Okay.

15      A.  I mean I don't know.

16      Q.  Okay.

17      A.  That's what I was explained so --

18      Q.  Okay.

19          Do you know how to identify from the garments you

20  brought here today what is a light stitch and what is a

21  heavy stitch, or what is an ST or what is an HD?

22      A.  As I recall, there's a tag on the -- on the hip

23  protector that has an ID number that tells you what they

24  are.

25      Q.  Okay.  Fair enough.

**Minissian, Kevin 11/10/2006**                    **Page 80**

0081

1    So that's what -- that's -- that's the way you

2    identified them?

3    A. Uh-huh.

4    Q. Okay.  Fine.

5    A. I was also told that there was a single --

6    maybe single stitch, like you just brought up, single

7    stitch or double stitch.

8    Q. Okay.  That's fine.

9    A. So --

10   Q. Okay.

11   So there's a -- there's a physical characteristic,

12   in other words?

13   A. Possibly.

14   Q. Okay.  Fine.  All right.

15   Now, let's just keep our attention to the standard

16   Posey hip protector garment.  Was that washed at high

17   temperature or low temperature?

18   A. They both.

19   Q. I'm sorry?

20   A. Washed both temperatures.

21   Q. You washed -- you washed both the standard

22   Posey hip protectors at 120 degrees and at 160 degrees?

23   A. That's what I recall, yes.

24   Q. Okay.

25   And the drying temperature was 145 to 150; correct?

0082

1       A.  Yes.

2       Q.  And what kind of bleach was used for washing

3    these garments?

4       A.  Chlorine bleach.

5       Q.  Okay.

6       And when you say "chlorine bleach," is that

7    something as simple as Clorox or is it something more

8    sophisticated?

9       A.  No, same as sodium hyperchloride.

10      Q.  Okay.  Okay.

11      Will there be -- In the wash formula information

12   that you're going to get for me, will there be a record

13   showing what the bleach concentration or volume was?

14      A.  All the bleach that was -- supplies 12-1/2

15   percent, standard for all launderings.

16      Q.  12-1/2 --

17      A.  Percent.

18      Q.  -- percent.  What's that a percent of?  Is that

19   a dilution percentage?

20      A.  No, it's a chlorine -- concentration chlorine

21   by volume.

22      Q.  And -- And what's the other component, what's

23   the other?

24      A.  Water.

25      Q.  Okay.

**Minissian, Kevin 11/10/2006**                    **Page 82**

0083

1       So it's -- so it's 12 percent --

2       A.  Active chlorine concentration.

3       Q.  In the -- in the --

4       A.  In the product.

5       Q.  That's what's injected, but then it gets

6   diluted when it goes into the machine; correct?

7       A.  Yes.

8       Q.  Do you have a dilution standard also?

9       A.  You -- It's not a dilution standard.  It's --

10  It's, let's say, if it's 100-pound load, you put six

11  ounce of product to so many gallons of water based on

12  water level.

13      Q.  So you put so many ounces of the diluted

14  concentrate into a machine based on the volume of water

15  that's in the machine?

16      A.  Volume of water and volume of load.

17      Q.  So if it's a small load, you put less or more

18  or what?

19      A.  If it's a small load, you put less and you put

20  less water.

21      Q.  All right.

22      Now, will your information tell me how much -- what

23  the water volume was, as well as what the load was, as

24  well as what the dilution was?

25      A.  The formula will give you the water level.

**Minissian, Kevin 11/10/2006**                    **Page 83**

0084

1      Q.  In -- in gallons, something like that?

2      A.  Not gallons, inches.

3      Q.  Inches?

4      A.  How many inches, it's in the drum.

5      Q.  Okay.

6      Is there a way we can use that to determine the

7      dilution level though?

8      A.  Yeah.  The inches from the manufacturer, you

9      know how many gallons per inch.

10     Q.  All right.  Fine.  Fair enough.

11     That's what I'm looking for.

12     A.  So each inch equals, let's say, so many

13     gallons.  At a six-inch level it would be equal, let's

14     say, 20 gallons of water.

15     Q.  Okay.

16     A.  If -- if the load is bigger, you know, there's

17     a formula.  That's what laundry guideline will tell you.

18     If you look at the laundry textbook, it will tell you

19     different manufacturer, different washers, what the

20     levels are for each formula -- for each washer.

21     Q.  Okay.

22     And the information you're going to be able to give

23     me is going to tell me what that is; is that correct?

24     A.  Yes.

25     Q.  Okay.

0085

1     And that would have varied by the number of hip

2  protectors that were being washed or just the wash

3  level -- I mean or just the -- the capacity of the

4  machine?

5    A.  The capacity that you use in this case was

6  100-pound washer.

7    Q.  Right.

8    A.  And they put the hip protectors so I -- and

9  then he basically look at the water levels and

10  mechanical action.  Whenever you set up the water level,

11  you have to look at the mechanical action of the wash

12  cycle.

13    Q.  So, in -- in other words, you're saying that

14  your technician somehow adjusted the amount of water

15  that came into that 100-pound machine because these

16  loads were much smaller; is that correct?

17    A.  Yes.  It -- It's a programmable level --

18    Q.  Okay.

19    A.  -- on the micro- -- again on the

20  microprocessor.  You can program the one-inch level,

21  two-inch level, three-inch level, four-inch level.

22    Q.  Okay.

23    And the information you're going to get me is going

24  to be able to show what Mr. Gastelum programmed?

25    A.  Yes.

**Minissian, Kevin 11/10/2006**                    **Page 85**

0086

1      Q.  Okay.

2           And from that I'll be able to determine what the

3      dilution was of the chlorine breach -- Excuse me, bleach

4      for each load; is that correct?

5      A.  Yes.

6      Q.  Okay.

7      A.  He also have a -- strips that measures ppm,

8      chlorine ppm.

9      Q.  Did he maintain those?

10     A.  Yeah.  He has a titration saying how many ppm

11     chlorine.

12     Q.  And you think he maintained those?

13     A.  It's a standard procedure for us to do, every

14     laundry he does.

15     Q.  Right.

16     A.  So --

17     Q.  Standard procedure, but is it also standard

18     procedure for him to have retained those titration --

19     titra- -- titration slips?

20     A.  I don't know if he's got the paperwork, but, I

21     mean -- But I can ask him.

22     Q.  Okay.

23          I'd like you to ask him.

24     A.  Okay.

25     Q.  Bear with me for a second.  I just want to make

0087

1   a note.

2       A.  Sure.

3       Q.  And I -- I have a question and I'm not sure

4   you -- I'm not sure I understand your answer, so let me

5   go back to the question and see if I can --

6       For all of the standard Posey hip protectors that

7   were washed in your test, what was the temperature or

8   temperatures used to wash them?

9       A.   As I said earlier, 160 for 25 minutes for one

10  batch and 120 for the other batch.

11      Q.  Okay.

12      So for what batch was -- was washed at 120?

13      A.  They were -- They were, again, single-stitch,

14  as you mentioned, plus the heavy-duty.  They were

15  identical loads, one 120-wash, one 160-wash.

16      Q.  Okay.

17      And did you also wash some of the HD hip protectors

18  at both 120 degrees and 160 degrees?

19      A.  Yes.

20      Q.  Okay.

21      Did you use a different bleach dilution when you

22  washed at 120 degrees relative to when you washed at 160

23  degrees?

24      A.  Used the same amount.

25      Q.  Okay.

0088

1    Sorry.  My typing leaves something to be desired

2  today.  That's what happens on Fridays.

3    Now, you testified earlier that you weren't present

4  at any of the washer and dryer testings; is that

5  correct?

6    A.  Yes.

7    Q.  Okay.

8    And is it your understanding that Mr. Gastelum --

9  Would you pronounce his name for me?

10    A.  Gastelum.

11    Q.  Gastelum.  That he was present for all of the

12  washings?

13    A.  I'm sure he was because he got paid for it.

14    Q.  Okay.  That's a good incentive.

15    What -- Tell me about him.  What does he do for

16  your company or with your company?

17    A.  He's our field technical manager.  He's been

18  with us for almost 28 years.  He worked in the

19  laundry -- in the healthcare laundry since he was 18

20  years old.  He knows healthcare laundry and then he

21  joined us after he left the company.

22    Q.  Okay.

23    A.  He -- He sets up wash formulas, titrates the

24  load, make sure quality control is there.  He starts up

25  new accounts for us.

0089

1    Q.  When you say he "starts up new accounts," he

2    sets up the machines?

3    A.  When you -- When you sign a new contract with a

4    new laundry facility --

5    Q.  Yes.

6    A.  -- he goes in and programs all the washers,

7    sets up the formulas, titrations, injection quantities,

8    water levels, temperatures in the washer controllers.

9    Q.  Does your company do dry-cleaning as well as --

10    A.  We do not do dry-cleaning.

11    Q.  Okay.

12    Did you conduct any contamination or

13    decontamination tests associated with laundering of

14    these Posey hip protectors?

15    A.  What do you mean by decontam- --

16    Q.  In other words, did you -- Were -- Were these

17    brand-new products when you tested them?

18    A.  Yes, they were brand-new given to us.

19    Q.  And you didn't -- There were no -- There were

20    no -- No contamination was entered into the test; is

21    that correct?  In other words, they weren't soiled, they

22    weren't subject to some infections or anything like --

23    infectious materials or anything like that?

24    A.  No, they were not.

25    Q.  Okay.

0090

1    So you weren't able to determine the extent to

2    which your washing and drying protocol could or would

3    remove infectious materials from the products; is that

4    correct?

5    A.  No, I couldn't tell you because they were not

6    contaminated.

7    Q.  Okay.

8    Did you or did your technician conduct any tests to

9    determine the extent to which the pads in the Posey hip

10    protectors were subject to moisture or cracking after

11    the washing?

12    A.  He has no clue.  He just does washing.

13    Q.  Okay.  Fine.

14    A.  He was instructed basically to do wash and dry

15    and return.

16    Q.  Okay.

17    I'm going to ask that this document be marked

18    as the next exhibit in order, which I believe is

19    156, and this is a document that is captioned on

20    the top "Warning" and it has the Bates number

21    HS2 002209. [EXH-156]

22    (Whereupon the document referred to is marked by

23    the reporter as Plaintiff Exhibit 156 for

24    identification.)

25    MR. DAILEY:

0091

1      Q.  Have you seen that document before?

2      A.  I don't recall, no.

3      Q.  Did -- When you received the Posey hip

4   protectors from -- Did you receive them from Posey or

5   from Mr. Morseburg?

6      A.  They were dropped off to us.

7      Q.  By whom?  Someone at Posey?

8      A.  No.

9      Q.  No.  Someone at Sheldon?

10      A.  I don't know who dropped off, but somebody

11   brought to our office.

12      Q.  Okay.  Fine.  Fair enough.

13      A.  I can't tell you.

14      Q.  Did you -- Did you inspect the -- the garments

15   and the packaging at that point in time?

16      A.  I think Doug came over and opened up and told

17   me what -- what they were because first time I've seen

18   them.

19      Q.  Okay.

20      A.  So -- and he basically -- I was told that there

21   was heavy-duty and light-duty and so we divided what --

22   what they asked us to do as far as washing, you know, 40

23   pieces of each and 100 washes and whatever instruction

24   they give us and that's what we did.

25      Q.  Okay.

**Minissian, Kevin 11/10/2006**                    **Page 91**

0092

1      Did you see this warning label on any of the

2    garments?

3      A.  I don't recall.

4      Q.  Okay.

5      I'm going to ask you to look at the second

6    paragraph that begins "Posey hipsters contain foam" --

7    Do you see that?

8      A.  Yes.

9      Q.  And it says, "Posey hipsters contain foam pads

10   that are sealed in a pouch to protect the foam."

11      Did I read that correctly?

12      A.  Yes.

13      Q.  Do you know where those pads are in the

14   garments that you tested?

15      A.  I guess they're sealed.  They're sewed inside

16   the fabric.

17      Q.  And you don't -- You don't know what the

18   material is --

19      A.  No, I don't.

20      Q.  -- of what the foam is; is that correct?

21      A.  No.

22      Q.  And you don't know what the sealing material is

23   either, do you?

24      A.  No.

25      Q.  It then goes on to say "If the pouch is cut or

0093

1    the seal is broken in laundering, moisture will enter

2    the pouch and compromise the impact absorption quality

3    of the foam."

4         Did I read that correctly?

5         A.  Yes.

6         Q.  It then says, "Test pouch and foam integrity by

7    squeezing the pad in one fist, forcing the air to one

8    end, resulting in an air bubble."

9         Do you see that?

10        A.  Yes.

11        Q.  Did I read that correctly?  Did I read that

12   correctly?

13        A.  Yes.

14        Q.  And then it goes on to say, "If you hear or

15   feel air or liquid escaping, or the foam feels soft and

16   spongy, the pouch is damaged."

17        Do you see that?

18        A.  Yes.

19        Q.  And then it says, "If the pouch is damaged

20   discontinue use immediately."

21        Did I read all of that correctly?

22        A.  Yes.

23        Q.  Did you or Mr. Gastelum conduct any of these

24   squeeze testing between washings?

25        A.  Not to my knowledge.

**Minissian, Kevin 11/10/2006**                    **Page 93**

0094

1      MR. DAILEY:  Okay.

2         We can take a break now.  You want to take a break

3   for five minutes?

4      THE VIDEOGRAPHER:  We're going off the record.  The

5   time is 11:05.  This is end of Tape 1, Volume I of the

6   deposition of Kevin Minissian.

7      (A recess is taken.)

8      THE VIDEOGRAPHER:  We are on the record.  The time

9   is 11:23.  This is beginning of Tape 2, Volume I of the

10   deposition of Kevin Minissian.

11      MR. DAILEY:

12      Q.  I'm going to ask the stenographer to mark as

13   the next exhibit in order, which will be 157, a document

14   that is entitled at the top --

15      A.  Before we go forward, can I make a comment?  I

16   need to correct something.

17      Q.  You know, I knew you were going to do that.  I

18   gave you two chances already.  Hang on for just a

19   second.  Let me get this document in, and then I'll be

20   happy to let you do that.

21      This document that will be marked as Exhibit

22   Number 157, is marked "Guidelines for Laundry in Health

23   Care Facilities" and it has on the first page a Bates

24   number PC 0375. [EXH-157]

25      Let's get that marked and then you can make your

**Minissian, Kevin 11/10/2006**                    **Page 94**

0095

1   statement.

2       (Whereupon the document referred to is marked by

3   the reporter as Plaintiff Exhibit 157 for

4   identification.)

5       MR. DAILEY:  Whoa, whoa, whoa, whoa, whoa.  Well --

6       THE WITNESS:  Sorry.

7       MR. DAILEY:  Things happen.  You shouldn't be

8   laughing.  You've done that.

9       MR. MORSEBURG:  I have.  It's nice to know someone

10  else has done it, and I'm not alone.

11      THE VIDEOGRAPHER:  You want to go off the record?

12      MR. DAILEY:  Yeah.

13      THE VIDEOGRAPHER:  We're going off the record.  The

14  time is 11:24.

15      (A recess is taken.)

16      THE VIDEOGRAPHER:  We are on the record.  The time

17  is 11:26.

18      MR. DAILEY:

19      Q.  Okay.

20      Mr. Minissian, you wanted to correct a statement or

21  amend a statement; is that correct?

22      A.  Yeah.  I just contacted Mr. Jaime Gastelum.

23  The way the procedure went, we were given the Posey

24  material to wash.  It was washed 10 times when -- first

25  time they were given, and then they were -- We stopped.

**Minissian, Kevin 11/10/2006**                    **Page 95**

0096

1    I did -- I did a report based on the samples that I

2    received from a 10-wash.  And then they were -- they

3    came back and we were asked to do 100 times wash and

4    they were washed 100 times, sometimes in April and May.

5        Q.  Okay.

6        A.  And the samples that were given, they were

7    heavy-duty, and the -- and the light-duty -- the

8    heavy-duty was washed 160 and the light-duty was washed

9    on 120, so they were not mixed together.

10        Q.  That's the information you received from?

11        A.  Jaime Gastelum.

12        Q.  So when you signed your name to all of these

13    garments, did you know what you were signing before you

14    just asked Mr. Gastelum what had been done to the

15    products?

16        A.  The boxes were separated 10 by 10 by 10.  And

17    they were identified as high-temperature wash and

18    low-temperature wash.

19        Q.  Right.

20        But prior to -- My question is prior to speaking to

21    Mr. Gastelum about 10 minutes ago, did you think that

22    the process that had been used by him was as you

23    testified earlier this morning?

24        A.  Say that again?

25        Q.  Earlier this morning you testified twice that

**Minissian, Kevin 11/10/2006**                    **Page 96**

0097

1    all of the pads were -- were washed at both 120 and 160

2    degrees; correct?

3        A.  That's correct.

4        Q.  You then this morning -- You then a few moments

5    ago called Mr. Gastelum during the break; correct?

6        A.  That's correct.

7        Q.  And Mr. Gastelum informed you no, the pads had

8    been washed, some at 120 and some at 160; correct?

9        A.  Yes.

10       Q.  Did you know that when you signed each one of

11   those pads that you brought with you today?

12       A.  I only signed -- I signed the pads based on

13   what they said on them.

14       Q.  You signed -- So you didn't know whether what

15   they said had been done or not; is that correct?

16       A.  That's not what I said.  I said I signed what

17   they were indicated on the pad as far as what they were

18   washed at.

19       Q.  Right.

20       And you had no personal knowledge of what they were

21   washed at; is that correct?

22       A.  As far as temperatures?

23       Q.  As far as temperature, as far as chemical, as

24   far as time, as far as drying, as far as washing, as far

25   as what was washed at 160 and what was washed at 120.

**Minissian, Kevin 11/10/2006**                    **Page 97**

0098

1      You have no personal knowledge whatsoever, do you?

2      A.  He was told to wash according to the CDC

3   Guidelines based upon the temperatures, but I don't -- I

4   didn't remember whether they were washed together or

5   separately.  I guess they were heavy-duty and the

6   light-duty items, but they were washed separately so I

7   cannot --

8      Q.  And -- And when you signed them, you didn't

9   know that, did you?  You didn't know what you were

10  signing, did you?

11     A.  I signed what they said on there.

12     Q.  Okay.

13     But you thought they said something different than

14  what you testified to just this few minutes ago because

15  you testified two different ways this morning, haven't

16  you?  In fact, I asked you the question twice, didn't I?

17     A.  I know you did but --

18     Q.  Okay.

19     And you answered differently than what you've

20  answered now after consulting outside the room with your

21  lawyer --

22     A.  Well, 10 months ago --

23     Q.  -- and your -- and Mr. Gastelum; correct?

24     A.  Well, this was done 10 months ago, and I've got

25  other things to do than just remember every facts that

0099

1   you're asking me.

2       Q.  Okay.

3       But -- But you're being asked to testify to the

4   facts as an expert witness, aren't you?

5       A.  I'm asked to -- We were asked to wash these

6   items, which we did.

7       Q.  Okay.

8       A.  What the outcome is, is what you got in the

9   boxes.  That's all I can tell you.

10      Q.  Okay.  Fine.  We'll leave it at that.

11      A.  Okay.

12      Q.  Let me ask you to look at Exhibit 157.  Do you

13  recognize that document?

14      A.  This looks like the CDC Guidelines of the --

15      Q.  When you say it "looks like," do you know for a

16  fact that it is?

17      A.  I can't tell you, but they're very similar to

18  the CDC Guidelines.

19      Q.  Okay.

20      When you -- when you referenced or used the CDC

21  Guidelines, where did you get them, Mr. Minissian?

22      A.  I got a copy of the CDC -- I mean, you can get

23  on the website and see it.

24      Q.  Is that how you got them?

25      A.  No, I had a copy from -- from Doug.

**Minissian, Kevin 11/10/2006**                    **Page 99**

0100

1    Q.  Mr. Morseburg gave you --

2    A.  Yes.

3    Q.  Did he give you this copy, which has a -- the

4  Bates number PC 0375?

5    A.  I don't remember the number but --

6    Q.  Okay.  Okay.  Well, let's move on.

7    On the first page of this document, can you point

8  to me where the CDC Guideline is for the higher

9  temperature laundering and drying?

10    A.  It's under one, two -- under "Control

11  Measures."

12    Q.  Yes.

13    A.  Paragraph three.

14    Q.  The -- The paragraph that begins the

15  "microbial" action of normal laundering process --

16    A.  Yes.

17    Q.  -- that paragraph?

18    Okay.  That's the -- That's the guideline you used

19  for your high temperature laundering; is that correct?

20    A.  Yes.

21    Q.  And it says -- If you count down in that

22  paragraph, I'm going to count lines, one, two, three,

23  four -- four lines down, the -- the word on the left is

24  "have"?  Do you see that, "have some micro-" --

25  "microbicidal" products -- "properties."

**Minissian, Kevin 11/10/2006**        **Page 100**

0101

1        Do you see that?

2        A.  Yes.

3        Q.  And the next sentence says, hot water provides

4   an effective means of destroying microorganism, and a

5   temperature of at least 71 degrees centigrade, paren,

6   (160 Fahrenheit) for a minimum of 25 minutes is commonly

7   recommended for hot water washing.

8        Did I read that correctly?

9        A.  Yes.

10       Q.  Now, did the formula you gave to Mr. Gastelum

11  include for -- for the high temperature laundry, was

12  that at 71 degrees centigrade or 160 degrees Fahrenheit

13  for a minimum of 25 minutes?

14       A.  Yes.

15       Q.  Okay.

16       And when you produce that formula to me, it will

17  show that; is that correct?

18       A.  Yes.

19       Q.  And it will show that on the log; is that

20  correct?

21       A.  On the log?

22       Q.  Microprocessor log?

23       A.  On the log sheet that he did it only shows the

24  times.

25       Q.  Where -- Where can we determine the temperature

**Minissian, Kevin 11/10/2006**                          **Page 101**

0102

1   since you don't have --

2       A.  It will be on -- It will be on the wash guide.

3       Q.  It will be on a --

4       A.  On a wash formula guide.

5       Q.  Okay.

6       But how -- Where do we have information that it

7   actually was washed at that?

8       A.  It's in the microprocessor.

9       Q.  So the microprocessor will show that on such

10  and such a date in January or February of this year, you

11  washed for 25 minutes at 71 degrees centigrade; is that

12  correct?

13      A.  There's no date in the microprocessor, only

14  formula.

15      Q.  Okay.

16      But does it show 71 degrees centigrade at least?

17      A.  Yes.

18      Q.  Okay.

19      And you say you believe that Mr. Gastelum could

20  actually do a laser test to confirm that temperature; is

21  that correct?

22      A.  That's correct.

23      Q.  Okay.

24      MR. MORSEBURG:  Object.  That misstates his prior

25  testimony.  You mean washing temperature or drying

**Minissian, Kevin 11/10/2006**                    **Page 102**

0103

1   temperature?

2       MR. DAILEY:  Both.  But I asked him about washing.

3       MR. MORSEBURG:  Okay.

4       THE WITNESS:  What I said is he has a physical

5   temperature probe with a laser gun --

6       MR. DAILEY:

7       Q.  Right.

8       A.  -- that he has ability to measure the

9   temperatures to verify that's what it is.

10      Q.  Right.

11          And you're going to ask him if he has a log showing

12  that, in fact, he verified the temperature.

13      A.  I'm going to ask him if he used the gun.

14      Q.  That's fine.

15      A.  So --

16      Q.  That's fine.

17          But the formula that you wrote down and told him to

18  program says 71 degrees centigrade for 25 minutes; is

19  that correct?

20      A.  I told him 160 Fahrenheit.

21      Q.  That's fine.  That's fine.  Okay.   Fair

22  enough.  For 25 minutes.  Okay.

23      A.  Yes.

24      Q.  And then this higher-temperature laundry

25  standard goes on to state, "Chlorine bleach provides an

**Minissian, Kevin 11/10/2006**                    **Page 103**

0104

1    extra margin of safety.  A total of available chlorine

2    residual of 50-150 parts per million is usually achieved

3    during the bleach cycle."

4        Did I read that correctly?

5        A.  Yes.

6        Q.  Is that the level of bleach that you specified?

7        A.  We specify between 50 and 175.

8        Q.  50 and 175 parts per million --

9        A.  Yeah.

10       Q.  -- and that's in the document that you gave

11   to --

12       A.  That's common what you use.

13       Q.  Okay.

14       And that will show in the record in the -- from the

15   microprocessor?

16       A.  His test results will indicate what the ppm was

17   on the --

18       Q.  Okay.

19       And that will be from the titration; is that

20   correct?

21       A.  Yes.

22       Q.  Okay.

23       It then goes on to state, "The last action

24   performed during the washing process is the addition of

25   a mild acid to neutralize any alkalinity in the water

0105
1    supply, soap, or detergent."

2        Did I read that correctly?

3        A.  Yes.

4        Q.  Was some type of acid applied in --

5        A.  It's laundry soap with the softeners.

6        Q.  So the answer is "yes"?

7        A.  Yes.

8        Q.  Okay.

9        So you used this process for all of the Posey hip

10   protectors that were washed at 160 degrees; is that

11   correct?

12       A.  Yes.

13       Q.  Okay.

14       And you believe, although you don't know, that

15   Mr. Gastelum carried out the 100 washings in that

16   fashion; is that correct?

17       A.  He was initially paid to do this for us, so I

18   assume he did.

19       Q.  Okay.

20       If you look at the next paragraph of Exhibit 157,

21   it says, "Recent studies have shown that a satisfactory

22   reduction of microbi-" -- cro- -- "microbial," excuse

23   me, "contamination can be achieved at lower water

24   temperatures of 22" -- "22-50 degrees centigrade when

25   the cycling of the washer, the wash formula and the

**Minissian, Kevin 11/10/2006**                    **Page 105**

0106

1    amount of chlorine bleach are carefully monitored and

2    controlled."

3        Did I read that correctly?

4        A.  Yes.

5        Q.  It then references two footnoted documents.  Do

6    you see that?  It says exhibit footnotes 6 and 7.

7        A.  Well, where are you looking at, 6 and 7?

8        Q.  All right.

9        Just bear with me.  We're in this paragraph that

10    talks about lower water temperatures.

11        Do you see that?

12        A.  Yes.

13        Q.  And then in the next line down, there are two

14    footnotes talking -- That they say 6 and 7.

15        Do you see them?

16        A.  Yes.

17        Q.  And then you go over to the next page and you

18    look at footnote 6 and 7.  Do you see those?

19        A.  Yes.

20        Q.  Footnote 6 references a research article by

21    RR Christian, the lead author.

22        Do you see that?

23        A.  Yes.

24        Q.  And that's one of the documents, in fact, you

25    cited in your report, isn't it?

0107

1    A.  Yes.

2    Q.  Okay.

3    And the second one, number 7, is a -- is a document

4    authored by MJ Blaser.

5    Do you see that?

6    A.  Yes.

7    Q.  And you also referenced that in your report; is

8    that correct?

9    A.  Yes.

10    Q.  Does that mean that you used a formula for the

11    low-temperature laundry that was -- that included a wash

12    formula and chlorine levels that were both carefully

13    monitored and controlled that were in accordance with

14    either Christian or Blaser or both?

15    A.  You went with the guidelines of maintaining 50

16    to 175 ppm.

17    Q.  Okay.

18    50 to 175 ppm and the guideline is actually 50 to

19    150.

20    A.  Uh-huh.

21    Q.  That -- that guideline is for high-temperature

22    laundry; is that correct?

23    A.  Yes.

24    Q.  And, in fact, for the low-temperature

25    monitoring, Christian specifies a different chlorine

0108

1    level; isn't that correct?

2        A.  He probably does.  I don't remember what the

3    number is.

4        Q.  In fact, he specifies a higher chlorine level.

5        A.  Then I'm sure he does.

6        Q.  You did not -- You did not increase the

7    chlorine level when you used low-temperature laundering,

8    did you?

9        A.  We did not because it was not contaminated.

10       Q.  Okay.

11           But the answer is you used the same chlorine bleach

12    level for your low-temperature laundry as for your

13    high-temperature laundry; is that correct?

14       A.  I said we use the same amount of product in

15    both cases.

16       Q.  Right.

17           So same product, same dilution, same parts per

18    million; is that correct?

19       A.  That's correct.

20       Q.  Okay.  Fine.

21           Now, with respect to both low-temperature laundry

22    and high-temperature laundry, did you dry the products

23    at the same dryer temperature and for the same duration?

24       A.  Yes.

25       Q.  Okay.

**Minissian, Kevin 11/10/2006**                    **Page 108**

0109

1       And that was approximately 150 degrees?

2       A.  That's what he was -- I was told, yes.

3       Q.  Okay.

4       You read both the Christian and Blaser articles; is

5   that correct?

6       A.  It's been a while.

7       Q.  Did you read them in preparing your report?

8       A.  No.

9       Q.  Okay.

10      Did you read them in preparing the formula that you

11  gave to Mr. Gastelum before washing and drying?

12      A.  Not based on their report.

13      Q.  Okay.  Fine.

14      Are you aware that both Christian and Blaser report

15  that higher temperature is to be used for -- is to be

16  used for drying when you're using low-temperature

17  laundering?

18      A.  They -- they may.

19      Q.  Okay.

20      A.  They also universally talk about all kinds of

21  fabric, not just the one.  You have cotton fabric, you

22  have polyester fabrics.

23      Q.  Well, you had cotton polyester and other

24  urethanes in this product; is that correct?

25      A.  That's correct.

**Minissian, Kevin 11/10/2006**                    **Page 109**

0110

1    Q. Okay.

2    A. My -- My experience with the polyester or

3  synthetic material you do not like to expose to high

4  temperatures --

5    Q. Okay.

6    A. -- because of melting issue.

7    Q. Okay. Fine.

8    Would that suggest that if you have to use lower

9  drying temperature, that you have to use a higher

10  laundering temperature to obtain the necessary

11  decami- -- decontamination?

12    A. Not necessarily.

13    Q. Why?

14    A. Because most of the disinfection is done by the

15  chlorine bleach and washing in water.

16    Q. But you didn't increase the chlorine bleach

17  level, did you?

18    A. Doesn't matter.

19    Q. Does that mean you're rejecting Christian and

20  Blaser?

21    A. Their test was done on a very soiled

22  contaminated water soil. We did not do that here.

23    Q. But you tested products that had never been

24  worn, I understand that.

25    A. Right.

0111

1      Q.  But how do you think these products are going

2   to be used in the real world?

3      A.  Don't know.

4      Q.  Would you expect them to be soiled, like any

5   underwear, for example?

6      A.  It could.

7      Q.  Would that suggest that you should follow

8   Christian and Blaser and increase the bleach levels?

9      A.  You can.  I don't know what it will do to the

10   polyester fabric.

11      Q.  Okay.

12      A.  I don't think it will impact anything to the

13   fabric at all.

14      Q.  But is it fair to say that the CDC Guideline

15   specifies when it references Christian and Blaser that

16   you should increase the bleach level if you use

17   low-temperature laundering?

18      A.  For purpose of disinfecting.

19      Q.  Okay.  Okay.

20      Do you consider that to be an important purpose for

21   a product that is used in healthcare facilities?

22      A.  Again, it's a controversial -- very

23   controversial because the bacterial side effect of

24   chlorine on the -- on the fabric, you can get the same

25   results at 50 ppm.  Primarily chlorine bleach is not

**Minissian, Kevin 11/10/2006**                    **Page 111**

0112

1    only used for disinfecting but also used for stain

2    removal.

3        One thing that they -- they did not include in that

4    when you drop the temperature, effectiveness of chlorine

5    bleach decreases as far as remove -- removing stain.

6        Q.  So are you telling me that you disagree with

7    Christian and Blaser that bleach -- that chlorine bleach

8    levels should be increased when you use low-temperature

9    laundering?

10       A.  They increase for sake of removing stain

11   because the activity of the chlorine drops at 120.

12       Q.  Do you remember them saying stain or -- or --

13   or contamination?

14       A.  I don't remember what they say, but my 30 years

15   of experience I know for a fact at 120 degrees, stain

16   removal from chlorine bleach is -- is not as effective

17   as higher temperature.

18       Q.  So is it your opinion that you -- That when you

19   use low-temperature laundering, that you should not

20   change the bleach level?

21       A.  It has to do how effectively the chlorine can

22   remove the stain.

23       Q.  Okay.

24       What about contamination?

25       A.  I think 150 ppm with chlorine is plenty enough

0113

1    to disinfect if that's what it is.

2    Q.  Okay.

3    And is it your position then that you should

4    deviate from the CDC standard which references a higher

5    bleach level when you use lower temperature laundering?

6    MR. MORSEBURG:  Object --

7    THE WITNESS:  I'm not --

8    MR. MORSEBURG:  -- there's no foundation for any of

9    this.

10    THE WITNESS:  I'm not deviating anything.  I'm

11    saying from my opinion throughout the 30 years, because

12    of ironing and drying temperatures and amount of

13    chlorine that's used -- Again, it's a -- it's a

14    temperature versus chlorine concentration, and if

15    there's a stain on the fabric, then the wash quality is

16    not adequate.

17    MR. DAILEY:

18    Q.  Right, but -- but the CDC Guidelines are not

19    about stain, they're about contamination, aren't they?

20    A.  CDC Guidelines for infection control.

21    Q.  Right.

22    And what -- What does your experience tell you

23    about chlorine bleach levels to remove contamination?

24    A.  Chlorine bleach level you can kill bacteria

25    at -- at low ppms as 10.

0114

1      Q.  So why didn't you use 10?

2      A.  Because you can't clean at 10 ppm

3      Q.  Can you remove contamination at a low water

4   temperature?

5      A.  You can -- You can destroy bacteria, yes.

6      Q.  How do you know that?

7      A.  Well, you can do -- We can do a test to find

8   out.

9      Q.  Have you ever done any test?

10     A.  We've done some culture tests, yes.

11     Q.  Yes.  Who has?

12     A.  At the hospitals I have -- I have customers

13  that do the preadded culture test.

14     Q.  And did you do any culture test here?

15     A.  Culture?  No, we did not do them.  It's not

16  contaminated.

17     Q.  It's not contaminated.

18     So is your testimony that you did not use the

19  higher bleach levels set out in the Christian arti- --

20  Christian and Blaser articles?

21     A.  We did not because it's not contaminated.

22     Q.  Now, you referenced both Christian and Blaser

23  as authorities in your report, didn't you?

24     A.  Yes.

25     Q.  What are you recogni- -- what are you citing

0115

1   them as authorities for?

2       A.  As far as that the fabric can be washed at low

3   temperature effectively.

4       Q.  Okay.

5       But at the same -- but not for the bleach levels.

6   Is that it?

7       A.  I mean, we can argue about this all day.

8       Q.  No, I'm -- I'm asking you what you cited it

9   for.

10      A.  I just don't know what impact chlorine is going

11  to do here.

12      Q.  So you didn't follow the statements about the

13  chlorine -- increased chlorine bleach levels that are in

14  the Christian and Blaser articles; is that correct?

15      A.  Because it was not contaminated, I didn't think

16  it was an impact.

17      Q.  Okay.

18      In your experience what is a low-drying

19  temperature?

20      A.  Most common drying temperatures are 180 for

21  cotton items, 180 degrees or closer to 200.  Low-drying

22  temperatures are 130 to 160.

23      Q.  What about hot?

24      A.  180 to 200.

25      Q.  What about medium?

0116

1      A.  There's no -- It's 160, I would say.

2      Q.  I'm sorry --

3      A.  160.

4      Q.  -- I -- I -- When I said "hot" I meant high.

5      A.  High?

6      Q.  Yes.

7      A.  I gave you 180 to 200.

8      Q.  Okay.

9          And is there -- And you said 180 is the most common

10   drying temperature?

11     A.  On cotton items, 180 to 200 is the most common.

12     Q.  Okay.  Fine.

13         And for high you said it was 180; is that it?  Am I

14   correct?

15     A.  Yes.

16     Q.  Okay.

17         Did you conduct any test to determine the extent to

18   which the Posey hip protectors could be washed and dried

19   according to the instructions that Posey prints on the

20   labels on the -- on the wash tag of -- of each of the

21   garments?

22     A.  No.

23     Q.  Okay.

24         So do you know whether the products can survive

25   without degradation 10 washings, 50 washings, 100

0117

1   washings, if they're washed according to the

2   instructions on the products?

3       A.  I -- I think their -- the -- the single-stitch,

4   as I recall, was designed for low temperature and heavy

5   duty was designed for high.

6       Q.  Right.

7       A.  So --

8       Q.  But you washed the low temperature products at

9   a different bleach level than is set out in the CDC

10   Guideline, didn't you?

11      A.  We put whatever ppm it was in there.  I'm not

12   too sure.  I have to look at the data, what ppm was

13   washed at.  I don't have the exact titration numbers for

14   me to tell you.

15      Q.  Did you -- When you washed the -- some of the

16   garments at the higher temperature, did you also dry

17   them on medium or high?

18      A.  No.  All the drying were the same.

19      Q.  Okay.

20      Were you asked -- and I apologize if I asked you

21   this question -- were you asked to conduct any test at

22   any level of washing and drying the products in

23   accordance with the labels that are printed on them by

24   the manufacturer?

25      A.  We dried based on the time it took to dry

**Minissian, Kevin 11/10/2006**                    **Page 117**

0118

1   effectively.

2       Q.  So you didn't follow the instruction on the

3   labels.  Is that what your answer is?

4       A.  No, I -- I told them to dry based from my

5   experience what the fabric, you know, the material was

6   that polyester blend.

7       Q.  Okay.  I got that.

8       But did you consult the labels and wash and dry in

9   accordance with them?

10      A.  I don't remember.

11      Q.  Okay.  Fair enough.

12      I'm going to ask you to look again at Exhibit 154,

13  if you wouldn't mind.

14      A.  Okay.  Fine.

15      Q.  That should be the first document I gave you

16  this morning, and, in particular, I'd like you to look

17  at -- Bear with me.  I have to find what I'm trying to

18  cite here.

19      If you look at your opinions beginning on page

20  HS2 002212.  Do you see that --

21      A.  Uh-huh.

22      Q.  -- it says "My Opinions"?

23      A.  Yes.

24      Q.  And then -- And then under the numeral 1, you

25  cite a statement from the web site of the HipSaver

**Minissian, Kevin 11/10/2006**                 **Page 118**

0119

1   company.  Do you see that?

2       A.  Uh-huh.

3       Q.  And then you state, in my opinion, this

4   statement is false.  Based on my experience, wash

5   temperature range of institutional laundries is

6   currently between 100 degrees Fahrenheit and 160 degrees

7   Fahrenheit; is that correct?

8       A.  Yes.

9       Q.  And the first thing -- And then you say,

10  therefore the average temperature is around 130 degrees

11  Fahrenheit and drying temperature for geriatric pads

12  which is similar to hip protector is around 140 to 150

13  degrees Fahrenheit.

14      Did I read that correctly?

15      A.  Yes.

16      Q.  Now, how did you determine that there is some

17  kind of average wash temperature of 130 degrees?

18      A.  That's what I -- That's what currently I see at

19  the healthcare facilities.

20      Q.  Okay.

21      And what healthcare facilities are those?

22      A.  Angelica, Clothold --

23      THE REPORTER:  I'm sorry, "Angelica"?

24      THE WITNESS:  Clothold, Sedexco, which these are

25  major health -- healthcare facilities in the country.

**Minissian, Kevin 11/10/2006**                    **Page 119**

0120

1    MR. DAILEY:

2        Q.  They are major healthcare facilities?  Where

3    are they located?

4        A.  All over the country.

5        Q.  All over the country.

6        And how do you determine that their average wash

7    temperature is 130 degrees Fahrenheit?

8        A.  Because we supply the chemicals to set up their

9    formulas.

10       Q.  And -- and what information do they give you

11   that says we wash at 130 degrees Fahrenheit?

12       A.  You look at the washing machine and look at the

13   formula setup, the wash guide, and you look at the

14   temperature gauges.

15       Q.  I asked you what information you receive from

16   these institutions, or did you go out and look at --

17       A.  No, we're at the -- We're at the facilities

18   every week.

19       Q.  Okay.  Fine.

20       When we say "we," who are we talking about?

21       A.  Our technician.

22       Q.  Okay.  Fine.

23       And what kind of -- Is that the same Mr. Gastelum?

24       A.  Mr. Gastelum and others we have in the field

25   that service accounts.

**Minissian, Kevin 11/10/2006**                    **Page 120**

0121

1       Q.  Okay.  Fine.

2       And -- And they report to you that healthcare

3    facilities in their institutional laundries wash at 130

4    degrees Fahrenheit; is that correct?

5       A.  That's correct.

6       Q.  Okay.  Fine.

7       Do you have any personal knowledge of any

8    healthcare facilities that wash at 130 degrees?

9       A.  Quite a few.

10      Q.  Other than all the VA facilities that --

11      A.  Yeah.

12      Q.  -- you think wash?  Okay.

13      A.  I've been -- I've been personally

14    knowledgeable.  We had Angelica contract for 10 years.

15      Q.  Okay.

16      And when you say the drying temperature for

17    geriatric pads, which is similar to hip protector is

18    around 140 to 150 degrees, what type of geriatric pads?

19      A.  These are --

20      Q.  Say again?

21      A.  These are pads, diapers.

22      Q.  I'm sorry?

23      A.  Diapers.

24      Q.  Diapers.

25      What are they made out of?

**Minissian, Kevin 11/10/2006**                    **Page 121**

0122

1      A.  They have a padding inside and they're --

2   they're large.

3      Q.  Yes, but what are they made out of?

4      A.  Polyester.

5      Q.  Polyester.

6      A.  Polyester and cotton blend.

7      Q.  Okay.  Fine.

8      Is it the same material that's used in the hip

9   protector?

10     A.  I can't tell you that.  There could be

11  similarities but not exactly what.

12     Q.  Okay.

13     I'll ask the stenographer to mark as the next

14  exhibit in order, which will be --

15     MR. MORSEBURG:  157?

16     THE REPORTER:  158.

17     MR. DAILEY:

18     Q.  -- 158.

19     A document which is -- has the Bates number

20  HS2 002287, and has at the bottom a web address

21  www.hipsaver.com/thelaundry.html. [EXH-158]

22     (Whereupon the document referred to is marked by

23  the reporter as Plaintiff Exhibit 158 for

24  identification.)

25     MR. DAILEY:  Sorry, Doug.

**Minissian, Kevin 11/10/2006**                    **Page 122**

0123

1    Q.  Ask you to take a moment to review that.

2    A.  Okay.

3    Q.  Do you recognize this document?

4    A.  Vaguely, yeah, I think so.  I'm not -- I'm not

5  too sure but --

6    Q.  Where did you get the information that certain

7  statements were made by the HipSaver Company on its web

8  site?

9    A.  I'm saying what -- what's in the report.

10    Q.  Right.

11    A.  I never -- I did not refer to the web site.  I

12  was given the report to respond.

13    Q.  You were given what report?

14    A.  This -- this form (indicating) was given to me

15  for me to comment.

16    Q.  What form was given to you?

17    A.  This report (indicating).

18    Q.  That report was given to you?

19    A.  Well, I -- I'm commenting on this average

20  temperature.

21    Q.  Oh, you were given a statement that said

22  number 1, whether --

23    A.  Right.

24    Q.  -- the statement, quote, "Average wash/dry

25  temperature" --

0124

1       A.  Right.

2       Q.  -- is accurate; is that correct?

3       A.  Right.

4       Q.  So someone gave you just that statement and you

5   were asked to provide an opinion --

6       A.  Right.

7       Q.  -- is that correct?

8       A.  I think I went on the web site one time.  I'm

9   not -- I'm not too sure but I think that's correct.

10      Q.  Okay.

11          So you say in your opinion that first statement is

12   false because you think institutional wash/dry laundries

13   average 130 degrees; is that correct?

14      A.  That's correct.

15      Q.  Okay.  Okay.

16          And then the next one you say whether the

17   representation, quote, "CDC recommended wash temperature

18   range," closed quote, of between 180 to 250 degrees is

19   accurate; is -- is that correct?  You were asked to

20   provide an opinion on that?

21      A.  I think the CDC Guideline -- oh, within the CDC

22   Guideline.  I don't think the CDC Guideline recommends

23   that high of a temperatures wash/drying.

24      Q.  Do you know for a fact that HipSaver has made

25   any such statement that the CDC recommends a wash

**Minissian, Kevin 11/10/2006**                    **Page 124**

0125

1    temperature range of 180 to 250 degrees?

2        A.  I have no idea.  I'm just responding what it

3    says.

4        Q.  Okay.

5        And you would agree with me, wouldn't you, that if

6    anybody said the CDC recommended a wash temperature

7    range of 180 to 250 degrees that that would be

8    absolutely false, wouldn't you?

9        A.  Would I agree with you?

10       Q.  Yes.

11       A.  Well, I'm saying it's false so --

12       Q.  So you and I agree; correct?

13       A.  If you agree with me, yes.

14       Q.  We do.

15       And if you go over to the next page which has your

16   third opinion and it states whether the representation

17   that, quote, "CDC Guidelines minimum recommended wash

18   temperature 160" is accurate.

19       Do you see that?

20       A.  Yes.

21       Q.  And you say that statement is false, and can

22   you tell me why you think that's a false statement?

23       A.  Because it gives two options, not only one.

24       Q.  Okay.  Fine.

25       But, in fact, if you washed at the -- at the higher

**Minissian, Kevin 11/10/2006**                    **Page 125**

0126

1    temperature, 160 is the minimum; isn't that correct?

2        A.  That's one of them.

3        Q.  Okay.

4        In fact, you washed at 160, didn't you?

5        A.  I was asked to wash.

6        Q.  Okay.

7        Well, did you think that was in compliance with the

8    CDC Guideline?

9        A.  It is in compliance.

10       Q.  Okay.  Fine.

11       A.  But that's not the only item, if you look at my

12   report.

13       Q.  Well, you're -- There's another option, and the

14   other option, I agree, is a lower temperature; correct?

15       A.  Right.

16       Q.  But I'm asking you if this is an accurate

17   statement, in fact; you said it is --

18       MR. MORSEBURG:  Object --

19       MR. DAILEY:

20       Q.  -- because you washed --

21       MR. MORSEBURG:  -- misstates his testimony.

22       MR. DAILEY:

23       Q.  -- you washed at 160 degrees; correct?

24       A.  To -- to basically comply what your people want

25   us to do.

**Minissian, Kevin 11/10/2006**                    **Page 126**

0127

1     Q.  I'll ask you to look at -- Ask you to look at a

2   document that on the cover page says "Video 2 NCPS" and

3   it has the Bates numbers -- on the first page

4   HS2 02198. [EXH-159]

5     Sorry, Doug, I didn't mean --

6     MR. MORSEBURG:  That's okay.

7     THE REPORTER:  159; correct?

8     MR. DAILEY:  159, correct.

9     (Whereupon the document referred to is marked by

10   the reporter as Plaintiff Exhibit 159 for

11   identification.)

12     MR. DAILEY:

13     Q.  I'm going to ask you in particular to look at

14   the page with the highlighting on that you have.  Now,

15   with respect to the document which has been marked as

16   Exhibit 159, and in particular for Mr. Morse- --

17   Morseburg's assistance, the page that is marked

18   HS2 002205.

19     Have you seen that document before?

20     A.  I don't -- I don't remember.

21     Q.  Do you -- Do you know what NCPS is?

22     A.  NCPS?

23     Q.  Yes.

24     A.  No, I can't recall.

25     Q.  So you don't recognize that as a federal study

0128

1   agency that does healthcare research?

2      A.  No.

3      Q.  Okay.

4      I'd like to -- Are you aware that NCPS has

5   conducted various studies concerning the laundering of

6   hip protectors?

7      A.  I'm familiar with JCAH.

8      Q.  Oh, the joint commission --

9      A.  Right.

10     Q.  -- but I'm talking about this federal agency.

11  You're not familiar with this one?

12     A.  No, I'm not familiar.

13     Q.  And you're not familiar with the work that they

14  have done investigating laundering of hip protectors; is

15  that correct?

16     A.  You don't get involved with the textile.

17     Q.  I'm sorry?

18     A.  We do not get involved in evaluating textile

19  fabric, as far as their evaluations are concerned.

20     Q.  Okay.

21     So you -- you've had no association with this

22  federal agency at all --

23     A.  No, I do not.

24     Q.  -- and you're not aware with their work?

25     A.  I'm not associated with them, no.

**Minissian, Kevin 11/10/2006**                    **Page 128**

0129

1    Q.  Okay.  Fine.

2    I'd like you to look at the -- at the statement at

3    the bottom of page HS2 002205.  Do you see where it says

4    "Posey Laundry Notes"?

5    A.  Uh-huh.

6    Q.  And it says, "As a general rule, Posey hip

7    protectors should not be washed in the hospital laundry.

8    They degrade more quickly and pads crack or dissolve.

9    Bleach appears to accelerate this degrading process."

10    Did I read that correctly?

11    A.  Yeah.

12    Q.  And it then goes on to say, "However, if

13    necessary, small amounts of bleach should be used.  Hip

14    protectors should be dried in low heat and removed

15    promptly from the dryer," period.

16    Did I read that correctly?

17    A.  Uh-huh.

18    Q.  Okay.

19    Are you aware of this finding that, in fact, when

20    you use bleach, regardless of the temperature, that the

21    Posey hip protectors degrade because of the bleach?

22    A.  I'm not --

23    MR. MORSEBURG:  Objection to the

24    mischaracterization --

25    THE WITNESS:  I'm not aware of that and I didn't

**Minissian, Kevin 11/10/2006**                    **Page 129**

0130
1   see it.

2       MR. DAILEY:

3       Q.  Okay.

4       Did you do anything to investigate any degradation

5   in the pads that were washed 100 times?

6       A.  No, we did not do.

7       Q.  Okay.

8       So in other words, you didn't --

9       A.  We weren't asked to do that.

10      Q.  Okay.

11      And you did not do that?

12      A.  No.

13      Q.  So you have no opinion on that?

14      A.  No.

15      Q.  Okay.  Fine.

16      I'm going to ask you to refer to two other

17  exhibits.  The next one, which will be marked 160, is a

18  document which on the first page has a Bates number

19  PC 1951.  And it's titled at the top "Bacterial Quality

20  of Fabrics Washed at Lower-Than-Standard Temperatures in

21  a Hospital Laundry Facility" and the lead author is

22  Robert R. Christian. [EXH-160]

23      (Whereupon the document referred to is marked by

24  the reporter as Plaintiff Exhibit 160 for

25  identification.)

0131

1    MR. DAILEY:

2      Q.  And I'm going to ask you if you recognize this

3    document?

4      A.  I have a lot of documents regarding this so I

5    don't remember.

6      Q.  Okay.

7      Did you consult this document in making the

8    determination that the low-temperature formula that you

9    specified for washing the Posey hip protectors complied

10   with the CDC Guidelines?

11     A.  I did not use this report, no.

12     Q.  Okay.

13     And I'm going to ask you to look at one final

14   document, which will be Exhibit 161.  And that bears a

15   PC number on the first page -- I'm sorry, Bates number

16   on the first page PC 1933.  And that will be Exhibit

17   161, I think. [EXH-161]

18     (Whereupon the document referred to is marked by

19   the reporter as Plaintiff Exhibit 161 for

20   identification.)

21   MR. DAILEY:

22     Q.  And just for the record this document is titled

23   "Killing of Fabric-Associated Bacteria in Hospital

24   Laundry by Low-Temperature Washing," and the lead author

25   is Martin J. Blaser.

**Minissian, Kevin 11/10/2006**                    **Page 131**

0132

1     Do you recognize this?

2     A.  This is a copy I was talking about, Veterans

3  Administration, Colorado State, Denver, Colorado.  You

4  said you didn't have a copy.

5     Q.  No, no.  Mr. -- Mr. Minissian, please.  I asked

6  you to identify it.

7     A.  Yeah.  Yeah.

8     MR. MORSEBURG:  I think he just did.

9     MR. DAILEY:

10    Q.  Is this the document -- Is this the document

11  that says, "all VA Hospitals wash at 120 degrees"?  Is

12  that the document you're relying on?

13    A.  This is the -- Based on this document they

14  dropped their temperatures.

15    Q.  And -- And it says that in this document.  Is

16  that your testimony?

17    A.  This is one of the document that --

18    Q.  Okay.

19    A.  It was a determining factor for them to drop

20  the temperature.

21    Q.  Okay.

22    Do you know for a fact -- Do you know what hospital

23  conducted this experiment?

24    A.  Hospital conducted?

25    Q.  Yes.

**Minissian, Kevin 11/10/2006**              **Page 132**

0133

1       A.  Well, VA hospital laundries are located in the

2   hospital.

3       Q.  Let me ask you this.  Let's step back, and

4   we'll go through the whole thing.

5       Did you consult this article when you prepared the

6   formula for washing and drying the Posey hip protectors?

7       A.  This articles -- I provided this articles.

8   They were in my file.  I read this article 10 times.

9       Q.  Did you use this article in preparing the

10  formula?  That's my question.

11      A.  I used my -- this article as my knowledge to

12  write formulas, yes.

13      Q.  Okay.

14      Did you consult this article in preparing the

15  formula that you sent to Mr. Gastelum for washing and

16  drying the Posey hip protectors?

17      A.  I use the guideline for CDC for low

18  temperature, and I give him the recommendation usage

19  that he needs to supply the chemicals to the -- to the

20  wash formulas.

21      Q.  And did you use this as part of the CDC

22  Guideline?

23      A.  I don't understand why your -- What -- What

24  you're getting at.

25      Q.  I'm asking you if you read it before you --

0134

1       A.  I read it.

2       Q.  -- prepared the formula?

3       A.  I always read it.

4       Q.  When?  When?

5       A.  I read it.

6       Q.  When?

7       A.  I read this 10 years ago.

8       Q.  Did you -- Have you read it any more recently?

9       A.  I read briefly.  I didn't go through the

10   details.

11      Q.  Okay.

12          That's all you need to tell me.

13      A.  Okay.

14      Q.  Okay.

15          Why do you think that article is relevant to

16   your -- to the formula that you prepared and

17   Mr. Gastelum apparently undertook to wash and dry the

18   Hosey -- Posey hip protectors?

19      A.  Why is it important?

20      Q.  Yes.

21      A.  I don't know why it is important.  I mean,

22   who -- I'm not -- We're doing what you people asked us

23   to do to see what impact it will have, the low

24   temperature and the chemistry on the high-temperature

25   item and low-temperature item.

0135

1    Q. Okay.

2    A. So we were instructed to wash 100 time and

3    return item back to you for you to inspect.

4    Q. Okay. That's fine. That's fine. I

5    understand.

6    Let me ask you this: Is it your understanding that

7    this article by -- authored primarily or the lead

8    article -- author is Mr. Blaser, does this article

9    include a statement that VA Hospitals have adopted a

10    120-degree wash standard -- wash temperature standard?

11    A. Based on this article they adopted the 120

12    degrees wash temperature.

13    Q. You -- You say based on this article, but does

14    the article say that?

15    A. I don't know if the article says that --

16    Q. Okay.

17    A. -- but I know for a fact --

18    Q. Okay.

19    A. -- my relationship with the VA in the past --

20    Q. Yeah, and you're going to get me that

21    information; correct? That says the VA has adopted 120

22    degrees standard?

23    A. There's a gentleman by the name of Kent Tyler.

24    I would recommend you contact him, who -- who instigated

25    the 120-degree wash at the VA Hospitals.

0136

1       Q.  Okay.

2       And where is Mr. Tyler?

3       A.  Mr. Tyler is in -- either in Chicago or

4   in Washington D.C.  I can get his phone number, e-mail

5   it.

6       Q.  You can -- It will be most helpful if you would

7   get that and give it to Mr. Morseburg.

8       A.  He was instrumental doing the 120-degree wash

9   at the VA Hospitals.

10      Q.  Okay.

11      And is it your understanding that the hospital in

12  Denver where Mr. Blaser's experiment was conducted has

13  adopted a 120-degree wash temperature standard?

14      A.  It was countrywide.

15      Q.  Okay.

16      And it's your understanding that that continues; is

17  that correct?

18      A.  My understanding, yes.

19      Q.  Okay.

20      I have no further questions.  Thank you very much.

21      MR. MORSEBURG:  I have no questions.

22      THE VIDEOGRAPHER:  We're going off the record.  The

23  time is 12:15.  This is end of Tape 2 and concludes the

24  deposition of Kevin Minissian.

25      (The proceedings concluded at 12:15 p.m.)

0137

1                    ***

2

3       I declare under penalty of perjury under the laws

4    of the State of California that the foregoing is true

5    and correct.

6

7       Executed at _____, California,

8    on _____.

9

10

11    _____

           KEVIN G. MINISSIAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

0138

1  I, DIANE M. LYTLE, CSR 8606, do hereby declare:

2  That, prior to being examined, the witness named in
the foregoing deposition was by me duly sworn pursuant
3 to Section 30(f)(1) of the Federal Rules of Civil
Procedure and the deposition is a true record of the
4 testimony given by the witness.

5  That said deposition was taken down by me in
shorthand at the time and place therein named and
6 thereafter reduced to text under my direction.

7  _____ That the witness was requested to review the
transcript and make any changes to the
8  transcript as a result of that review
pursuant to Section 30(e) of the Federal
9  Rules of Civil Procedure.

10  _____ No changes have been provided by the witness
during the period allowed.
11

  _____ The changes made by the witness are appended
12  to the transcript.

13  _____ No request was made that the transcript be
reviewed pursuant to Section 30(e) of the
14  Federal Rules of Civil Procedure.

15  I further declare that I have no interest in the
event of the action.
16

  I declare under penalty of perjury under the laws
17 of the United States of America that the foregoing is
true and correct.
18

  WITNESS my hand this _____ day of
19

_____, _____.
20

21 _____
DIANE M. LYTLE, CSR 8606
22

23

24

25

**Minissian, Kevin 11/10/2006**    **Page 138**