# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____

THE HIPSAVER COMPANY, INC.,                    )
                                               )
    Plaintiff / Counterclaim Defendant,        )
                                               )
v                                              )    Civil Action No. 05-10917 PBS
                                               )
J.T. POSEY COMPANY,                            )
                                               )
    Defendant / Counterclaim Plaintiff.       )
                                               )
_____)

## HIPSAVER'S MEMORANDUM IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE OPINION TESTIMONY OF GARY REICH

The plaintiff, The HipSaver Company, Inc. ("HipSaver"), moves to exclude evidence of the opinions of Gary Reich as not based on sufficient facts or data, not based on reliable principles and methods, and unhelpful to the jury.

This case involves, in relevant part, HipSaver's claims for false advertising against Posey for advertising claims published and circulated through flyers, product catalogs, and video tapes. To resolve these disputes, the jury will interpret the disputed hip protector advertising's meaning, materiality, deceptiveness, and effect on HipSaver's business. Posey offers the expert testimony of Gary Reich to opine on the materiality and impact of the challenged statements on the consumer.

Through Gary Reich's opinions about the meaning of the disputed advertising, Posey improperly seeks to introduce expert opinion evidence that is conclusory and inadmissible because it is not based on sufficient facts or data and does not apply reliable principles and methods. Posey also improperly seeks to introduce opinion evidence

about the meaning of the disputed advertising that is not helpful because the jury can best evaluate the disputed advertising with its own common sense. Posey lists Gary Reich among the witnesses that it expects to call at trial.

## FACTS

HipSaver challenges the admissibility of Gary Reich's opinion testimony. Mr. Reich states his opinions in a report and a supplemental report. *See* **Exhibit A**, Expert Report of Gary Reich, submitted February 16, 2006, ¶ 5 ("Reich Report"); **Exhibit B**, Supplemental Report of Gary Reich, submitted October 17, 2006 ("Supplemental Reich Report"). Mr. Reich describes his experience in a resume. *See* **Exhibit C**, Resume of Gary Reich, submitted October 19, 2006 ("Reich Resume").

### A.     Mr. Reich's Experience

Mr. Reich's resume highlights his lack of relevant experience. Mr. Reich's experience is limited to business development and only tangential product marketing. *See* **Exh. C**, Reich Resume. His resume gives several examples of business development, such as planning sales strategy for MRI and PET scan centers and evaluating market opportunities for PET centers, outpatient surgery centers, and managed care facilities. *Id*. Mr. Reich's clients are hospitals and other health care service providers. *See Id*. Reich does not claim to have experience marketing products on behalf of medical product manufacturers like the parties in this case or creating medical product advertising like the disputed advertising in this case. **Exh. A**, Reich Report at ¶¶ 4-9.

Furthermore, Mr. Reich's resume does not explain when or in what role he marketed products that he claims to have marketed. *See* **Exh. C**, Reich Resume; **Exh. A**, Reich Report at ¶ 6. The products he claims to have marketed appear to be equipment

used by the health care service provider clients he has developed business for, not manufacturers of the products. He claims to have marketed expensive nuclear medicine equipment such as radioisotope dose calibrators, thyroid uptake systems, radioactive contamination wipe test counters, and radiation survey meters. **Exh. A**, Reich Report at ¶ 6. Such equipment would be used by the nuclear medicine service centers that he has consulted for. *See* **Exh. C**, Reich Resume. He also claims to have marketed living skin products and hyperbaric medicines for wound care. **Exh. A**, Reich Report at ¶ 6. Such products would be used by the wound healing service provider that he has consulted for. *See* **Exh. C**, Reich Resume.

Mr. Reich does not claim any experience marketing low cost, high volume preventive care products such as hip protectors. *See* **Exh. A**, Reich Report at ¶ 6. He claims to have marketed to the same "types of customers" in the past, by which he means health care facilities. *See Id*. at ¶¶ 8, 9. He does not explain whether the products he has marketed in the past are marketed in the same channels of trade as preventive care products such as hip protectors. *See Id*. at ¶ 6. He also does not explain whether purchasing decisions about the products he claims to have marketed in the past are made by the same people at a health care facility who make purchasing decisions about low cost, high volume preventive care products such as hip protectors. *See Id*. He does not claim to have experience marketing any redesigned products. *See Id*.

In the normal course of his consulting business, Mr. Reich says that he would "talk with customers and potential customers" about products. *See Id***. at ¶ 6. But Mr. Reich did not survey, interview, or otherwise talk to actual hip protector consumers in preparing his opinions. *See Id*. at ¶ 12.

### B.    Mr. Reich's Opinions

Mr. Reich offers many opinions about consumer perceptions, including what the disputed advertising would "suggest" to a consumer, what "a consumer would understand," what "a consumer assumes" and what "a consumer would not assume," what a consumer "would believe" and what "a consumer would not believe," and the "overall impression" of consumers. *See Id*. at ¶¶ 14–18, 31, 34, 37; *see* **Exh. B**, Supplemental Reich Report at II.  With regard to Posey advertisements, Mr. Reich states opinions about the effect of Garwood advertising statements on consumers or potential consumers in section V and VI of his report.  The specific terms and phrases addressed are:

- "independent study," **Exh. A**, Reich Report at ¶ 4;

- "An independent Laboratories[sic] study was conducted to determine the most effective impact absorbing material," *Id*.;

- "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material," *Id*.;

- "A weight was released in a guided drop to simulate a 120 lb subject falling from a height of 36"." *Id*. at ¶ 18;

- "Posey Hipsters help protect against injury from falls." **Exh. B**, Supplemental Supplemental Reich Report at II;

- "The Hipster's high energy-absorbing foam pads are positioned precisely over the hip bones, increasing the odds of surviving a fall uninjured." *Id.*;

- Sales patterns of medical products, **Exh. A**, Reich Report at ¶ 20;

- Market for hip protector products, *Id*. at ¶¶ 21, 22, 26, 27;

- Effect of placement and format of advertising, *Id*. at ¶¶ 24, 25.

With regard to HipSaver advertisements, Mr. Reich states opinions about the effect of specific terms and phrases on a consumer or potential consumer and the effect of the overall advertisement on consumers in section VII of his report. **Exh. A**, Reich Report at ¶¶ 29-37. The specific terms and phrases include:

- "Prevent devastating hip injury with the only scientifically validated soft hip protector," **Exh. A**, Reich Report at ¶¶ 30-32;

- "only proven, all-soft hip protector," *Id.*;

- "only soft hip protector that has clinical validation," *Id.*;

- "Only HipSaver hip protectors clearly meets the CDC guidelines for infection control in the laundry," *Id*. at ¶¶ 33-34;

- "Only HipSaver can be laundered according to CDC (Center for Disease Control) Guidelines for laundry." *Id.*;

- "HipSaver machine wash/dry up to 250ºF"; "HipSaver's wash and dry up to 250ºF," *Id*. at ¶ 35;

- HipSaver's Industry Comparisons chart, *Id*. at ¶¶ 36, 37.

In section VI of his report, Mr. Reich states opinions about the meaning and impact of these statements and opinions about the effect of the advertising format and organization, consumer opinion, sales trends, the hip protector market, and the use of hip protectors by consumers. *See Id*. at ¶¶ 19-27; **Exh. B**, Supplemental Reich Report at section II. Mr. Reich does not explain how his opinions are informed or supported by his experience. *See Id*. He did not conduct a survey and does not cite other data for support. *See* **Exh. A**, Reich Report at ¶ 12.

**ARGUMENT**

The Court should exclude Gary Reich's opinions as inadmissible under the Federal Rules of Evidence. Under the Rules, opinion evidence must be based on "sufficient facts or data" to be admissible. F.R.E. 702. Opinion evidence must come from "reliable principles and methods" to be admissible. *Id.* Futhermore, opinion evidence must be helpful to the jury to be admissible. *Id.* Under the Rules, "the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." F.R.E. 702 advisory committee's note. But Mr. Reich's opinions are conclusory and inadmissible because he does not base his opinions on sufficient facts or data and because he does not base his opinions on reliable principles and methods. His opinions are also inadmissible because they are not helpful to the jury; the jury can best interpret the normal meaning and appearance of an advertisement with its own common sense.

**A.    Mr. Reich Does Not Base His Opinions On Sufficient Facts or Data**

Mr. Reich states opinions about hip protector consumer perceptions, but the opinions are not based on sufficient facts or data. *See Polaino v. Bayer Corp.*, 122 F.Supp.2d 63, 69 (D. Mass. 2000) (Stearns, J.) (expert opinion based on speculation rather than investigation properly excluded). Mr. Reich did not survey actual hip protector consumers. *See* **Exh. A**, Reich Report at ¶ 12. He did not interview actual hip protector consumers. *See Id.* He did not talk to actual hip protector consumers. *See Id.* Mr. Reich has never marketed low cost, high volume preventive care products such as hip protectors in the past. *See Id.* at ¶ 6. Mr. Reich claims only that he has marketed to the same "types of customers" in the past, by which he means health care facilities. *See Id.*

at ¶¶ 8, 9.  But he does not explain whether the products he has marketed in the past are sold in the same channels of trade as preventive care products such as hip protectors, or whether purchasing decisions about the products he claims to have marketed in the past are made by the same people at a health facility who make purchasing decisions about preventive care products such as hip protectors.  *See Id.* at ¶ 6.

Mr. Reich does not base his opinions on any facts or data about actual hip protector consumers and their perceptions.  He offers many opinions about consumer perceptions, including what the disputed advertising would "suggest" to a consumer, what "a consumer would understand," what "a consumer assumes" and what "a consumer would not assume," what a consumer "would believe" and what "a consumer would not believe," and the "overall impression" of consumers. *See Id.* at ¶¶ 14–18, 31, 34, 37; *see* **Exh. B**, Supplemental Reich Report at II.  But Mr. Reich did not survey, interview, or even talk to any actual hip protector consumers to prepare these opinions about hip protector consumer perceptions.  And he has no past experience marketing low cost, high volume preventive care products such as hip protectors.

Because he did not base his opinions on surveys or interviews of any actual hip protector consumers, Mr. Reich's opinions about hip protector consumer perceptions are not based on sufficient facts or data and are not admissible.

### B.    Mr. Reich Does Not Base His Opinions On Reliable Principles And Methods

Under the Rules, opinion evidence must be based on "reliable principles and methods" to be admissible.  F.R.E. 702 advisory committee's note.  Furthermore, opinion evidence must be helpful to the jury to be admissible.  F.R.E. 702.  Under the Rules, "the proponent has the burden of establishing that the pertinent admissibility requirements are

met by a preponderance of the evidence." F.R.E. 702 advisory committee's note. Mr. Reich's opinions are conclusory and inadmissible because he does not base his opinions on reliable principles and methods

### 1. Mr. Reich Does Not Base His Opinions on the Principles and Methods that He Employs In the Normal Course of Business

Mr. Reich does not base his opinions on reliable principles and methods, because he does not base his opinions on the principles and methods he uses in the normal course of his business. An expert witness in a courtroom should employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). In the normal course of his consulting business, Mr. Reich admits that he would "talk with customers and potential customers" about products. *See* **Exh. A**, Reich Report at ¶ 6. He offers many opinions about consumer perceptions, including what the disputed advertising would "suggest" to a consumer, what "a consumer would understand," what "a consumer assumes" and what "a consumer would not assume," what a consumer "would believe" and what "a consumer would not believe," and the "overall impression" of consumers. *See* **Id**. at ¶¶ 14–18, 31, 34, 37; *see* **Exh. B**, Supplemental Reich Report at II.

But contrary to his normal practice, Mr. Reich does not base these opinions on having talked to or interviewed consumers and potential consumers. Mr. Reich claims only that he has marketed to the same "types of customers" in the past. *See* **Exh. A**, Reich Report at ¶ 9. By basing his opinions on past experience with non-hip protector products, rather than talking to actual hip protector consumers about the disputed advertising, Mr. Reich employs less intellectually rigorous principles and methods than

he admits employing in the normal course of his business.  Therefore his opinions are not based on reliable principles and methods.

> **2.    Mr. Reich's Opinion Is Inadmissible Because He Does Not Explain How His Experience Leads To His Opinion**

Mr. Reich bases his opinions about the effects of the Garwood ads on his deficient marketing experience, and not on scientific principles and methods such as economic analysis.  *See* **Exh. A**, Reich Report at ¶ 5.  In principal, opinion testimony based on experience alone can be admissible.  But when an opinion witness relies primarily or solely on experience, the witness "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  F.R.E.  702 advisory committee's note.  If the witness does not explain his experience, then the witness's testimony is not based on reliable principles and methods and is not admissible.  *See* **Id**.  In exercising its gate keeping authority, the trial court requires more than simply "taking the expert's word for it."  **Id**.  And the more subjective the expert's inquiry, "the more likely that the testimony should be excluded as unreliable."  **Id**.  Mr. Reich's opinions in this case are not admissible, because he does not explain how his experience leads to his opinions, he does not explain why his experience is a sufficient basis for his opinions, and he does not explain if or how he has applied his experience to the facts.

Even if Mr. Reich could explain how his opinions were based on his experience in a way that served as a reliable principal and method, it would be too late to explain.  The Federal Rules of Civil Procedure require expert witnesses to disclose a complete report of all opinions to be expressed "and the basis and reasons therefore."  F.R.C.P. 26(a)(2)(B).  The Court deadline for the submission of such expert reports was October 16, 2006.

Revised Scheduling Order [D.N. 136]. Opinions and the bases and reasons for opinions not disclosed as required by Rule 26(a)(2)(B) may not be offered later. *See* F.R.C.P. 37(c)(1).

An analysis of Mr. Reich's opinions show that these opinions are inadmissible because they are based on unreliable principles and methods and because they are not helpful to the jury. His principles and methods are unreliable because he does not explain how his experience leads to his opinions, he does not explain why his experience is a sufficient basis for his opinions, and he does not explain whether he has applied his experience to the facts, and if so, how his experience was applied. Without any proven basis in his experience, his opinions are instead unhelpful and unsubstantiated attempts to apply common sense.

In addition to Mr. Reich's general lack of knowledge relating to (1) advertising and sales in general; (2) advertising and sales of low cost, high volume, preventative care products in particular; and (3) advertising and sales of such products to long-term care facilities and hospitals, HipSaver calls out the following specific deficiencies in Mr. Reich's testimony with respect to the particular statements listed below and found in section VI of Mr. Reich's Expert Report. In each case, even if Mr. Reich has applicable experience, he does not explain how he applies his experience to the facts; we can only "take his word for it." See F.R.E. 702 advisory committee's note. Such subjective opinions are not admissible.

     a.    ***Mr. Reich characterizes the sales trends of HipSaver and Posey hip protectors as a "classic medical product sales trend."*** Exh. A, Reich Report at ¶ 20.

- Mr. Reich does not cite any basis for his characterization of HipSaver sales as a "classic medical product sales trend." He does not claim expertise in sales or sales

trends.  *See* **Exh. A**, Reich Report at ¶ 6.  Nor does he reference examples of any other advertising to support his opinion.

- With no experience marketing similar products, Mr. Reich does not explain how his experience leads to his opinion about sales trends for this product where his experience appears to be limited to large, expensive medical equipment.

> **b.** **"There is a limited market for this type of product. … There is a finite number of elderly or frail patients who would qualify or benefit…" and "After the majority of this market has been reached, the life cycle of the product begins to mature."  Exh. A, Reich Report at ¶ 21.**

- Mr. Reich does not explain how his marketing experience leads to the conclusion that the market's capacity has been reached, a conclusion which defies demographic reality.

- Mr. Reich does not provide the total number of elderly patients that make up the relevant market for hip protectors, and he does not explain how his experience could provide the number.  *See* **Exh. A**, Reich Report at ¶ 21.

- Mr. Reich does not cite any other authoritative reference as the basis for his opinion. *Id*.

- Mr. Reich does not explain what percentage of the market already benefits from hip protectors, nor does he explain how his experience could provide the percentage.  *See Id*.

> **c.** **"Nursing homes and care facilities often recycle the hip protectors, and thus, subsequent purchases of the product are not as frequent."  Exh. A, Reich Report at ¶ 22.**

- The assertion that healthcare facilities often recycle hip protectors is not an application of Mr. Reich's experience.  Mr. Reich does not claim to have experience marketing preventive care products such as hip protectors.  *See* **Exh. A**, Reich Report at ¶ 6.  This premise merely recites information that Posey told him.  *Id*. at ¶ 12 (c)(vii).

> **d.      Mr. Reich states an opinion about the expected sales growth of a "re-designed" hip protector product.  Exh. A, Reich Report at ¶ 23.**

- Mr. Reich does not claim to have experience marketing hip protectors that would let him compare the sales growth of an original and a redesigned hip protector; *Id*. at ¶ 6,

- Mr. Reich does not claim to have experience marketing any redesigned product that would let him compare the sales growth of an original and a redesigned product or even to know what constitutes a redesigned product.  *Id*. at ¶ 6.

> **e.      Mr. Reich states an opinion about the effect of package insert Garwood Ads on purchasing decisions, saying that they "had little, if any, influence on consumers' decisions . . ."  Exh. A, Reich Report at ¶ 24.**

- Mr. Reich did not conduct any survey to support this conclusion and does not offer any survey evidence at all.  *Id*. at ¶ 12.

- The opinion belies common sense.  If the package insert ads were not calculated to influence consumer decisions, Posey would not have paid to print and distribute the insert ads and would not have continued to print and distribute the insert ads over a number of advertising cycles.  Common sense suggests that the insert ads were calculated to influence consumers decisions in subsequent hip protector purchases.

- Mr. Reich does not explain how his experience leads to the opposite conclusion.  He does not disclose any experience with marketing products using package insert advertising and does not reference any experiences with such advertising that successfully (or unsuccessfully) influenced subsequent purchasing decision.  *See* **Exh. A**, Reich Report at ¶ 6.

- Finally, this opinion is not helpful to the jury.  Without any particular experience with package insert advertising, Mr. Reich merely misapplies common sense.  The jury can better apply its own common sense to the facts to reach its own conclusions.

> **f.** *Mr. Reich states an opinion about the placement and format of the Garwood Ads and states that the placement and format makes the ads ineffective. Exh. A, Reich Report at ¶ 25.*

- Statements relating to the effect of advertising on a consumer are proper subjects of survey evidence. Mr. Reich did not conduct any survey to support this conclusion and does not offer any survey evidence at all. *Id*. at ¶ 12.

- Mr. Reich does not explain how his experience is a sufficient basis for this opinion.

- Mr. Reich fails to explain how the placement and format of the Garwood Ads compares to his own experience in advertising.

- Finally, Mr. Reich's opinion about the placement and format of the Garwood Ads is inadmissible because it is not helpful to the jury. Mr. Reich states that the placement and format of the Garwood Ads "does not grab a buyer's attention." This observation is one that can best be made by the jury, relying on its own common sense.

> **g.** *Mr. Reich states an opinion that hip protector consumers will consider factors other than impact force reduction when choosing a hip protector. Exh. A, Reich Report at ¶ 26.*

- Again, Mr. Reich offers an opinion in lieu of survey evidence. Mr. Reich's opinions as to consumer decision making, without offering any basis for his opinion, are inadmissible.

- Where the purpose of the medical device is to reduce the impact force of a fall, common sense dictates that impact force reduction is an important factor to a consumer purchasing such device. Mr. Reich does not provide a sufficient basis for reaching an opinion contrary to common sense.

- This observation is one that can best be made by the jury, relying on its own common sense.

      **h.**     ***Mr. Reich states an opinion about marketplace factors such as "one-stop shopping" reducing the effect of the Garwood ads. Exh. A, Reich Report at ¶ 27.***

- With no experience marketing a similar product to similar consumers, Mr. Reich cannot have sufficient experience to form an opinion about the relative weight of marketplace factors that affect a hip protector consumer.

      **i.**     ***Mr. Reich's Inadmissible Ultimate Opinion About The Effect Of The Garwood Ads In Diverting Hip Protector Sales***

- Mr. Reich bases his ultimate opinion about the effect of the Garwood Ads on intermediate opinions noted above. But as discussed, his intermediate opinions are themselves inadmissible.

      In conclusion, because Mr. Reich does not base his opinions on the principles and methods he uses in the normal course of his business, and because he does not explain how his experience leads to his opinions, his opinions are not based on reliable principles and methods and are not admissible. Mr. Reich did not survey or even talk to consumers; he does not claim any experience marketing low cost, high volume preventive care products such as hip protectors; and he does not explain whether the products he has marketed in the past are marketed in the same channels of trade as preventive care products such as hip protectors. Without such experience and without explaining what other experience could lead to his opinions, the Court should exclude his opinion about the impact of the Garwood ads as not based on reliable principles and methods.

      **C.**     **Mr. Reich's Opinions Are Not Helpful To The Jury**

      As suggested above, Mr. Reich's opinions are conclusory, unsupported by facts or reliable methods, and are not helpful to the jury's understanding of the disputed advertising. The jury's common sense understanding can best decide the meaning of the disputed advertising or the effect of advertising placement or positioning. "There is no

more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." F.R.E. 702 advisory committee's note. The issues of the disputed advertising's meaning, materiality, and deceptiveness fall squarely within the common sense realm of the jury.

For example, Mr. Reich states that the placement and format of the Garwood Ads "[does] not grab a buyer's attention," but does not explain how his experience is a sufficient basis for this opinion. *See* **Exh. A**, Reich Report at ¶ 25. Because he offers no more experience than a jury possesses, the jury can best view the advertisement with its own common sense to decide whether the placement and format of the advertisement grab a viewer's attention.

Furthermore, Mr. Reich's Supplemental Report is flawed for the same reason. The Supplemental Report offers an unhelpful opinion about the effect of Posey advertising statements claiming that Posey hip protectors cover the hip bone and protect against falls. **Exh. B**, Supplemental Reich Report at section II. Common sense dictates that when advertising a hip protector, a device that is designed to cover the wearer's hip bone and protect the wearer's hip bone against injury from falls, advertising language claiming that the hip protector covers the hip bone and protects against falls must have an effect on consumers. But Mr. Reich vacillates and states that "It is difficult to determine how much the buying decision might be influenced . . ." by this advertising. *See Id*. This vacillation is not helpful to the jury and is not admissible; the jury can apply its own common sense understanding of the advertising claims and the product to determine

whether advertising about the coverage and protectiveness of hip protectors would have an effect on the purchasing decisions of hip protector consumers.

## CONCLUSION

Based on the forgoing reasons and authorities, HipSaver respectfully requests that this Court exclude the reports and testimony of Mr. Gary Reich, or alternatively, to selectively strike those portions of Mr. Reich's reports that the Court finds inadmissible under Rule 702 of the Federal Rules of Evidence.

Respectfully submitted
The HipSaver Company, Inc.
By its Attorneys,


/s/  Courtney M. Quish
Lee Carl Bromberg, BBO No.:  058480
Edward J. Dailey, BBO No.:  112220
Courtney M. Quish, BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004  Fax
cquish@bromsun.com
May 15, 2007


## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.


/s/  Courtney M. Quish
Courtney M. Quish


02820/00502  668532.1

16

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THE HIPSAVER COMPANY, INC., ) | Civil Action No. 05-10917 PBS |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| J.T. POSEY COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| AND RELATED COUNTERCLAIM. ) | |

## EXPERT DESIGNATION INCLUDING REPORT OF GARY REICH

*CONFIDENTIAL –ATTORNEYS' EYES ONLY*

## EXPERT REPORT AND DISCLOSURES OF GARY REICH

### I.    INTRODUCTORY STATEMENT

1.    I, Gary Reich, have been retained by Defendant/Counterclaimant J.T. Posey Company ("Posey") in this matter to provide expert testimony regarding certain advertising statements made by Posey and by Plaintiff/Counterdefendant The HipSaver Company, Inc. ("HipSaver") and regarding the impact of such advertising on customers and potential customers and on sales. I submit this report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

2.    This report contains a complete statement of all opinions that I have formed to date in connection with my assignment in this case. It also includes a complete statement of the basis and reasons for those opinions, and the information that I considered in forming the opinions. This report also contains a summary of my qualifications, and the rate that I am charging in this matter.

3.    My expert opinions regarding these subject areas are set forth below, and are based upon my expertise in marketing, including but not limited to health care consulting services, products sales, managed care, and long-term care, and upon my visual inspection and analysis of the advertisements and sales information of each company.

### II.    BACKGROUND AND QUALIFICATIONS

4.    My background, experience, and education are described in detail in my resume attached as Attachment A to this report.

5.    Briefly, I have extensive experience in the marketing of health care products and with the impact of advertising for medical products on customers and potential customers. I have acted as a marketing consultant for a variety of companies in the health care business, including

CIGNA, New York Presbyterian Health System, Prudential and Tenet. Presently, I am a marketing consultant for TriHealth, Florida Hospital Health System, and Watson Clinic. I have 20 years of experience in this field.

6.    In the normal course of my consulting activities in the health care industry, I evaluate different manufacturer's products, including product features, I talk with customers and potential customers regarding potential benefits to them. As a consequence of my extensive involvement in the industry, I am familiar with the buying habits of customers of healthcare-related products. In addition, I have developed marketing plans and advertisements for companies who market via the Internet, via brochures, product instruction sheets, trade shows, and catalogs. The products for which I have provided marketing assistance, including the development of advertising, include dose calibrators, thyroid up-take systems, work stations, wipe test counters, injection chairs, survey meters, living skin products for healing wounds, hyperbaric medicines for wound care, IV nutrition, and antibiotics.

7.    I graduated from George Washington University with a Bachelor of Arts in Economics degree in 1983, and from New York University with a Masters Degree in Economics in 1985.

8.    Based on the data and information I have reviewed in connection with my assignment in this case, the majority of both Posey's and HipSaver's customers consist of healthcare facilities, long-term care facilities homes, and acute care facilities. In the industry, these types of customers are considered sophisticated buyers. These types of buyers are experienced who buy a wide diversity of products, for example from food to pharmaceuticals to disposable products to capital goods. Thus, buyers of HipSaver's and Posey's products will consider and evaluate the

price, the quality, tests and studies, testimonials, compliance rates, reputation of the manufacturer, and weigh these factors prior to making a purchase.

9.    I have marketed to the types of consumers targeted by both Posey and HipSaver, and I have a strong understanding of the impact of advertising on these types of customers. Recently, I have focused on long-term care. In forming my opinions, I have taken into account the types of customers targeted by each company.

## III.    COMPENSATION

10.    In connection with the preparation of this report, I am being compensated at the flat rate of $3,500. I will be compensated at an hourly rate of $125 for any additional time spent in connection with this matter. My compensation is not contingent on the outcome of the trial nor upon the nature of my opinions.

11.    I have not previously testified as an expert in any litigation matters.

## IV.    DATA AND OTHER INFORMATION CONSIDERED

12.    In connection with the preparation of this report, I considered the following data and information:

    a.    The materials identified in Attachment B;

    b.    HipSaver's and Posey's websites, which I reviewed on or about February 6 through February 9, 2006;

    c.    Telephonic interview with Charleen McGrath and Victoria Walters of Posey, as a result of which I learned that:

        i.    Posey distributes its advertising in the form of brochures, catalogs, product inserts, and via its Internet website;

ii.     Posey has about 28 independent sales representatives who sell to both acute care facilities and long-term care facilities;

iii.     Posey has several contracts with nursing home chains, major distributors, and dealers in hip protectors;

iv.     Posey supplements its marketing by attending national and regional trade shows;

v.     Posey introduced its first hip protectors to the market in 1999-2000, and redesigned them in 2001;

vi.     Hip protectors are a voluntary product that are not prescribed by doctors, Medicare or insurance companies, therefore, the patient's family or nursing home must promote the hip protector;

vii.     Care facilities often recycle the hip protectors, and the hip protectors are replaced at a given facility when worn out;

viii.     Posey engaged Garwood Laboratories to conduct some testing of certain hip protector materials in or about 2001;

ix.     The results of the Garwood Laboratories tests were used to develop advertising for Posey (the "Garwood Laboratories Advertising"); and

x.     The first public dissemination of the Garwood Laboratories Advertising was in 2001.

## V.     ANALYSIS FOR POSEY'S GARWOOD LABORATORIES ADVERTISEMENT

13.     I was specifically requested to review Posey's Garwood Laboratories Advertising in the Posey materials identified in Attachment B. Each advertisement includes a bar graph and a paragraph about the study that was conducted.

## A.    STATEMENT OF OPINIONS

14.    After careful study of the documents and information given to me, I formed the following opinions:

a.    The words "independent study" do not suggest to a consumer that Posey did not pay Garwood Laboratories for the testing.

b.    The statements "[a]n independent Laboratories study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" indicate to a consumer that Posey tested materials to determine the "most effective" material at reducing the force of impact.

c.    The statements "[a]n independent Laboratories study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" do not indicate to a consumer that the Posey Hipster is the most effective product in the marketplace, or that all other products are inferior, either at reducing impact force or for comfortability.

d.    The Garwood Laboratories Advertising is not misleading to consumers as to the type of fall tested; a consumer would understand that a dropping type of fall was tested, and not a fall from a standing position.

## B.    STATEMENT OF BASIS/REASONS FOR OPINIONS

15.    A consumer assumes that a manufacturer pays a laboratory or other facility to test its products, and payment for a study or testing does not suggest that the study or testing was biased towards the manufacturer's product.  Typically, studies are funded.  For example, Underwriters'

Laboratories is paid to provide a "UL" certification for a manufacturer's product. A second example, it is well-known in hospitals and care facilities that companies pay for their facilities to be accredited by national bodies, such as JCAHO. Thus, the words "independent study" do not suggest that Posey did not pay Garwood for the study.

16.    The statements "[a]n independent Laboratories study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" indicate to the consumer that Posey tested materials for their effectiveness at reducing the force of an impact. Given that the bar graph and the paragraph describing the test are part of the advertising, a consumer would not be misled into thinking that "most effective" refers to anything other than the effectiveness at reducing the force. A consumer would not believe that Garwood Laboratories tested the comfortability of materials. The remainder of the study is directed to the methodology of the study of reducing impact force, not comfortability.

17.    The above statements do not indicate that the Posey Hipster is the most effective product in the marketplace, or that all other products are inferior because Posey makes no comparison with any other products in its advertisements and does not mention any other products in the Garwood Laboratories Advertising. A consumer would not believe that Posey's hip protector is necessarily more effective at reducing impact force, or more comfortable, than any or all other hip protectors.

18.    The Garwood Laboratories Advertising is not misleading as to the type of fall tested. The advertisement clearly states "a weight was released in a guided drop to simulate a 120lb subject falling from a height of 36"." A consumer would not assume that any other types of fall, were included in the testing.

## VI.    ANALYSIS OF POSEY'S GARWOOD LABORATORIES ADVERTISING EFFECT ON POSEY AND HIPSAVER SALES

### A.    STATEMENT OF OPINIONS

19.    There is no basis to conclude that the Garwood Laboratories advertising had any effect on HipSaver sales or Posey sales.  It would be total speculation to state otherwise.

### B.    STATEMENTS OF BASIS/REASONS FOR OPINIONS

20.    For both Posey and HipSaver, there is a consistent pattern of unit sales increases every year.  However, the rate of growth of unit sales declines for each company each year compared to the previous year.   For example, the rates of growth for the companies are converging, in that the percentage rate of growth declines each year in a similar amount for each company (i.e., HipSaver sales were 22% greater in 2004 compared to 2003, Posey sales were 21.7% greater in 2004 compared to 2003; HipSaver sales were 9% greater in 2005 compared to 2004, Posey sales were 10.5% greater in 2005 compared to 2004).   The sales patterns indicate that there is a classic medical product sales trend.  Initially, when products are launched, there are numerous sales for the product because there is initial excitement about the product, a large base of potential customers who have not used the product, and sales representatives tend to focus their time on the new product.  Thus, the sales growth is often highest when the product is first introduced or re-introduced to the market.  The biggest increase will usually be at the initial introduction of the product to the market because there are the greatest number of potential customers for the product.  For example, an increase of sales from 10 units to 20 units equals a 100% growth rate, however, going from 20 units to 30 units equals only a 50% growth rate, even though the increase in sales of 10 units is the same.

21.    There is a limited market for this type of product, and only certain consumers are targeted.  It is also a voluntary product that is not prescribed by Medicare or insurance

companies, and the family or nursing home of the patient must promote the hip protector.  There

is a finite number of elderly or frail patients who would qualify or benefit from this type of

product.  After the majority of this market has been reached, the life cycle of the product begins

to mature.

22.     Nursing homes and care facilities often recycle the hip protectors, and thus,

subsequent purchases of the product are not as frequent.  Once the pipeline is filled at a given

facility, only worn out units or units for new patients are needed.

23.     Posey's re-designed hip protector was introduced in 2001, and this year shows

Posey's strongest growth in sales, as expected for a re-designed product such as a hip protector.

Posey's sales growth actually declined in 2002 after the Garwood Laboratories Advertising was

disseminated in 2001.

24.     Posey's package inserts containing the Garwood Laboratories Advertising had little,

if any, influence on consumers' decisions to buy a Posey Hipster because the buyers would have

already purchased the product before they received the insert.

25.     The placement and format of the Garwood Laboratories Advertisements in the

material – on the second or third page in the corner or bottom of the page in small print - is not

very effective advertising because it does not grab a buyer's attention.

26.     Posey's target customers are typically sophisticated consumers who will consider

several factors other than the reduction of impact force when selecting a hip protector, such as

cost, comfortability, penetration of the market, quality, acceptance, and reputation of the

company.

27.     Other marketplace factors minimize the effect Posey's advertising will have had on

customers or prospective customers.  Posey has a strong awareness among potential buyers due

to the fact that Posey has been in the business for over 60 years, the fact that Posey has extended

contracts with certain customers, the fact that Posey has a sales force, the fact that Posey has an

established reputation, and the fact that Posey markets numerous products, as a result of which it

can offer customers "one-stop shopping."

## VII.    ANALYSIS OF HIPSAVER ADVERTISING

28.    I was requested to review several statements made on the HipSaver website attached

as Attachment B pertaining to HipSaver's validation and testing, laundering, and length on the

marketplace.

### A.    STATEMENT OF OPINIONS

29.    Customers would believe that:

a.    HipSaver's statements pertaining to validation and test results of hip

protectors pertain to HipSaver's hip protectors that are currently sold on the market.

b.    Reference to a "soft hip protector" means a hip protector with both soft and

hard components.

c.    HipSavers hip protectors can be washed at temperatures of up to 250°F.

d.    Posey hip protectors do not meet CDC Guidelines for infection control in the

laundry.

e.    HipSaver's chart on its website stating that Posey Hipsters have been offered

to the market since 2002, and that HipSaver's products has been offered to the market since

1995, indicate that these companies both first introduced hip protectors, of any type in 2002 and

1995, respectively.

### B.    STATEMENT OF BASIS/REASONS FOR OPINIONS

#### 1.    Validation & Testing

30. HipSaver makes several statements about the quality and testing success of its hip protectors on its website, including the following: (i) "Prevent devastating hip injury with the only scientifically validated soft hip protector"; (ii) HipSaver is the "only proven, all-soft hip protector"; and (iii) HipSaver is "the only soft pad hip protector that has clinical validation."

31. A consumer seeing these statements would believe that they pertain to hip protectors currently sold on the marketplace. When a company touts the effectiveness and testing "validation" of its product, consumers likely believe that the company tested the product it is currently selling, and not an older product. It is misleading to tout a product that the company no longer sells.

32. On its website, HipSaver makes the distinction between "soft" and "all-soft," which indicates that "soft" hip protectors may be a combination of soft and rigid materials, whereas "all-soft" hip protectors are entirely constructed of soft materials. It would expect too much for the potential buyer to know the details of the construction and variety of hip protectors.

### 2. Launderability

33. In its advertising materials, HipSaver makes several statements about the launderability of its hip protectors, including the following: (i) "Only HipSaver hip protectors clearly meets the CDC Guidelines for infection control in the laundry"; and (ii) "Only HipSaver can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry."

34. The overall impression from Hipsaver's statements about launderability is that Posey's products do not meet CDC Guidelines. For example, the use of the word "only" indicates that HipSaver has tested the launderability of its product, that HipSaver has tested, or knows of launderability tests, for other products in the marketplace, and HipSaver can conclude that only HipSavers meet the CDC Guidelines. Also, HipSaver's comparison chart on its

website comparing its launderability to Posey and AliMed also indicates that HipSaver has tested or knows of launderability tests for other hip protectors in the marketplace. Further, according to HipSaver's statements, Posey's Hipster is machine wash up to 160°F at a maximum, and the CDC Guidelines recommended wash temperature is at least 180°F. Thus, a consumer would conclude that Posey does not meet the CDC Guidelines for washing.

35.    On its website, HipSaver also makes statements about the temperature at which its products may be washed. These include the following: (i) "HipSaver machine wash/dry up to 250°F"; and (ii) "HipSavers wash and dry up to 250°F." Thus, a consumer would likely assume that HipSavers can be washed at temperatures of up to 250°F, and then separately dried at temperatures of up to 250°F.

### 3.    Length of Time On the Market

36.    HipSaver's website includes an "Industry Comparisons" chart in which several statements are made to compare HipSaver's and Posey's products. HipSaver states that HipSaver hip protectors have been offered to the market since 1995 and Posey "Hipster" hip protectors have been offered to the market since 2002.

37.    These statements indicate to consumers that these companies first introduced hip protectors to the market, or alternatively, that these companies first introduced the hip protectors that the companies are currently selling, including any modifications that have been made in these respective years.

## VIII.  CONCLUSION AND POSSIBLE ADDITIONAL ANALYSIS AND INVESTIGATION

38.    In support of my opinions, I may rely on visual aids and other demonstrative exhibits which may include, among other things, the information from the materials listed in Attachment B, telephonic interviews, websites, deposition testimony, or other types of materials.

39.    The foregoing reflects my opinions and reasons therefore based on the materials I have reviewed to date.  I understand that the investigations are on-going, and that additional information may be discovered and provided to me after the submission of this report.  I reserve the right to supplement this report in the event that additional information is provided.  I may also rely on testimony given or to be given by various witnesses and on other reports and/or documents supplied to me in the future.


DATED:  February 12, 2006                    _____

                                                                    Gary Reich

## ATTACHMENT B

In preparation of my expert report, I considered the following data and information:

a.    "Posey EZ On Hipsters" package insert dated June 20, 2003 (Bates Nos. PC 0406-PC 0407);

b.    Posey brochure dated September 26, 2003 (Bates Nos. PC1810-PC1913);

c.    Posey brochure dated January 3, 2005 (Bates Nos. PC1743-PC1746);

d.    "Posey Hipsters" package insert dated April 28, 2005 (Bates Nos. PC0402-PC0403);

e.    Posey brochure dated May 9, 2005 (Bates Nos. PC0400-PC0401;

f.    Posey brochure dated August 5, 2005 (Bates Nos. PC1747-PC1750;

g.    "Posey Hipsters" dated January 24, 2005 (Bates Nos. PC0404-PC0405);

h.    HipSaver website at www.hipsaver.com (Bates Nos. PC0241-PC0290 and PC0291-PC0364);

i.    HipSaver 2003 catalog (Bates Nos. HS2 000014);

j.    HipSaver 2004 catalog (Bates Nos. HS2 000020);

k.    HipSaver "Open Bottom 3-Snap" flyer sheet (Bates Nos. HS2 000028);

l.    HipSaver catalog (Bates Nos. HS2 000014);

m.    Posey sales data (Bates Nos. PC2893-PC2904);

n.    HipSaver sales data (Bates Nos. HS2 000325-HS00326);

o.    Portions of the deposition testimony of Edward Goodwin of October 18, 2005 and November 30, 2005;

p.    Amended Complaint by HipSaver; and

q.    Answer and Counterclaim by Posey.

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic filing and USPS First Class mail today to Plaintiff's counsel of record, Edward J. Dailey, Esq., BROMBERG & SUNSTEIN, LLP, 125 Summer Street, 11th Floor, Boston, Massachusetts 02110-1618.

Dated: February 16, 2006

_____
Donald K. Piper

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE HIPSAVER COMPANY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.V. NO. 05-10917 PBS |
| ) | |
| J.T. POSEY COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

| | |
|---|---|
| J.T. POSEY COMPANY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| THE HIPSAVER COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

**SUPPLEMENTAL RULE 26(a) REPORT
PREPARED BY GARY REICH**

Subject to Protective Order: Attorneys' Eyes Only

## I.    **Preliminary Statement**

I have been asked to render a supplemental opinion with respect to the following: Assuming the advertisement attached as Exhibit 1 had been published for the entire period from 2001 through 2005, what portion of Posey's sales of hip protectors would have been due to the highlighted statements in the advertisement?

## II.    **Supplemental Opinions**

**Supplemental Opinion:**

In my prior report, I concluded that there is no basis to conclude that the Garwood Laboratories advertising had any effect on HipSavers sales or Posey sales, and that it would be total speculation to state otherwise. Posey's target customers are typically sophisticated consumers who will consider several factors, such as cost, comfortability, penetration of the market, quality, acceptance among the customer peers, and reputation of the company.

Since issuing that initial report, I have been provided with Posey Hipsters Advertisement PC0400 and PC 0401, a copy of which is attached. My initial opinion was limited to the effect of the Garwood portion of the attached advertisement that may have had upon Posey's sales. I have been asked to state a supplemental opinion as to the effect of the Garwood study in conjunction with the highlighted statements, "Posey Hipsters Help Protect Against Injury From Falls", and "The Hipsters high energy-absorbing foam pads are positioned precisely over the hip bones, increasing the odds of surviving a fall uninjured", in the advertisement that would have had an effect on Posey's sales of Hip Protectors.

For reasons as set forth in the original report and these supplements, my opinion is the same. It is difficult to estimate how much the buying decision might be influenced, if any, by this specific advertisement. Usually, with a product of this type, a company creates awareness about it through multiple channels; such as demonstrations at trade shows, distributors, direct mail, catalogs, and print advertising. The type of customer for this product, such as nurses, geriatric care case managers, or long-term care administrators would not buy only from seeing the advertisement. Instead, they might buy it, after becoming aware of the product from multiple sources, and confirming that their peers are also satisfied with the product.

## III    **Exhibits/Demonstratives**

I expect to use this report and my prior report and their attached exhibits in support of any testimony that may be offered at trial. However, a final determination of the documents and exhibits that may be used at trial has not been made. I may use additional demonstrative exhibits at trial and they will be provided in accordance with a schedule provided by the Court.

Subject to Protective Order: Attorneys' Eyes Only                2

Gary Reich

10/17/06

Date

Subject to Protective Order: Attorneys' Eyes Only

3

PC 0400

# FOR SOME RESIDENTS, EVERY FALL IS A BIG ONE





**Posey**®
FIRST IN FALL PREVENTION

## Clinical References Supporting the Use of Hip Protectors

Title: **External Hip Protectors to Prevent Osteoporotic Hip Fractures**
Author: A. Ekman, H. Mallmin, K. Michaelsson, S. Ljunghall
Publication: The Lancet, volume 350, August 23, 1997

Study Objectives: Ekman and colleagues conducted a controlled study on the use of hip protection to prevent hip fractures. One expectation was to either confirm or disprove the 1993 reported findings of J.B. Lauritzen and colleagues in "Effect of external hip protectors on hip fractures."

Results: The use of hip protectors as preventative treatment for hip fractures was validated. "Our study confirms a reduced risk for hip fractures of the same magnitude as the previous report."

Recommendations: "With improved compliance, external hip protectors should be an effective prophylactic against hip fractures."

Title: **Prevention Of Hip Fracture in Elderly People**
Author: Pekka Kannus, M.D., Ph.D., et al
Publication: The New England Journal of Medicine, Vol. 343, No. 21, November 21, 2000

Study Objectives: The purpose of this study was "to determine whether an external hip protector would be effective in preventing hip fractures among elderly adults." The study population was comprised of elderly adults from 22 community based health-care centers in Finland; a treatment group of 653 and a control group of 1,148 participants.

Results: The degree of compliance with the hip protector was $48 \pm 29\%$. The hip protector group suffered 13 hip fractures, 9 of which occurred while not wearing the hip protector, compared to 67 hip fractures in the control group.

Recommendations: "We conclude that the risk of hip fractures can be reduced in frail elderly adults through the use of an anatomically designed external hip protector. Only 41 persons need to use the hip protectors for one year (or 8 persons, for five years) in order for one fracture to be prevented."

Posey Hipsters can be washed according to CDC guidelines for soiled linen. Hipsters with high durability pads are designed to withstand laundering in large capacity machines at higher temperature hot (180°) washing and high temperature drying cycles.

Due to the random possibility of falls, the Posey Company makes no guarantee, express or implied, that the user is protected from hip trauma.

Please detach and fax to 1-626-443-5014, or call us at 1-800-44-POSEY to start your trial



### yes!

I want to take advantage of your 30-day trial offer. Please have a representative call me to discuss Posey Hipsters.

Fax or mail to:

Name _____
Title _____
Institution _____
Address _____
City _____ State ___ Zip ___
Telephone ( ) ___ Best time to call ___ am ___ pm

J.T. Posey Company
Attn: Marketing Dept.
5635 Peck Road
Arcadia, CA 91006-0020 USA
Fax 626-443-5014
www.posey.com

M8078 050905

PC 0401

## POSEY #6016 HIPSTERS STANDARD BRIEF

- *Easily fits over undergarments, or can be worn as underwear.*
- *Unisex sizing.*
- *#6016H Standard Brief with high durability pads.*

## POSEY #6017 INCONTINENT BRIEF

- *Snap front for easier application over diaper. Unisex sizing.*
- *#6017H Incontinent Brief with high durability pads.*

## POSEY #6018 MALE FLY BRIEF

- *Easily fits over undergarments, or can be worn as underwear.*
- *Front fly for improved compliance in male residents.*
- *#6018H Male Fly Brief with high durability pads.*

## POSEY #6019 EZ-ON BRIEF

- *Residents can wear their own undergarments.*
- *Can be worn in the shower.*
- *Hip pads can be removed for laundering or replacement.*
- *#6019H EZ-ON Brief with high durability pad.*

NEW! NEW! NEW! NEW!

### SIZING CHART

| Size | Waist Measurement | Hip Measurement |
|------|-------------------|-----------------|
| S | 26"- 30" or 71"- 76cm | 35"- 37" or 88"- 93cm |
| M | 30"- 34" or 76"- 86cm | 37"- 41" or 93"- 104cm |
| L | 34"- 38" or 86"- 96cm | 41"- 45" or 104"- 114cm |
| XL | 38"- 42" or 96"- 106cm | 45"- 49" or 114"- 124cm |
| XXL | 42"- 46" or 106"- 116cm | 49"- 53" or 124"- 134cm |

Posey High Durability Hipsters contain denser foam than the standard Hipsters. This increased density aids in its ability to withstand higher hot washing and drying cycles.

### LAUNDERING INSTRUCTIONS:

Hipsters

High Durability Hipsters

J T Posey Company
Arcadia, CA 91006 USA
Tel: 800-447-6739
www.posey.com








# POSEY HIPSTERS HELP PROTECT AGAINST INJURY FROM FALLS

It's a long way down for residents at risk of injury from falls. You can greatly reduce that risk with Posey Hipsters. The Hipsters' high energy-absorbing foam pads are positioned precisely over the hip bones, increasing the odds of surviving a fall uninjured. The Hipsters are comfortable and slim enough to be virtually undetectable under clothing. By offering increased protection, Hipsters relieve residents' anxiety about falling and enhance their quality of life.

- *High impact-absorbing viscoelastic pads protect hip bones against injury from falls*
- *Soft, comfortable pads improve compliance versus hard-shell products*
- *Washable to CDC standards for soiled linen without removing the pads*
- *100% latex-free*
- *Five sizes for correct fit*
- *Discreet, low-profile pads are virtually undetectable under clothing*



*Low Profile - All styles fit discreetly under men's and women's clothing.*

## Posey Hipsters Proven Effective in Laboratory Test

Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material. A test was created that would simulate a fall causing direct impact to the greater trochanter. In this study, a weight was released in a guided drop to simulate a 120 lb. subject falling from a height of 30", or the estimated height of the hip above the floor for a typical nursing home resident. The baseline measurement of impact force was determined to be a fall directly onto concrete. The G-Force of a fall under this scenario was 2,666N/S and, for purposes of comparison, is just slightly less impact force than that of a baseball being struck by a bat. In this extreme test, the low profile Posey Hipster reduced the impact force on average by 90% and showed excellent impact energy absorption.

Testing was conducted by Garwood Laboratories.
Data on file at J.T. Posey Company. *Source: www.medsci.org

### Special offer. 30-day no-risk free trial.
Test the Posey Hipsters for yourself with no obligation to buy.

# GARY L. REICH

151 North Nob Hill Road, #240                                                    Residence: (954) 474-2273
Plantation, Florida 33324                                                          Office: (954) 683-0484
E-Mail: g_reich@bellsouth.net      www.reichconsultingservices.com      Fax: (954) 424-8033

## BUSINESS DEVELOPMENT / MARKETING EXECUTIVE

Innovative, top performer with twenty year proven track record developing and marketing businesses, and managing people in both mature and growth industries. Strategic planner with solid experience in business-to-business applications and processes spanning Fortune 500 to mid-size companies.  Landed and managed multi-million dollar contracts in diverse aspects of the Health Care industry. Credited with exceptional vision in developing new products and creating industry acceptance and demand. Designed and established new health care software solutions, pioneered and led teams in successful national and regional marketing programs, and directed business development for major corporations. Prominent customers include CIGNA, New York Presbyterian Health System, Prudential, and Tenet. Articulate, well-informed communicator with talent for building trust and alliances with top executives to support staff. High-ranking New York University graduate with MA. in Economics. Excellent writing skills. Spanish fluency.

**PRESIDENT**                                                                      **REICH CONSULTING SERVICES**
  January 2001 to Present                                                                      Ft. Lauderdale, FL

Successful health care consulting services, specializing in imaging, managed care, nuclear medicine, real estate, surgery, and wound care.
- Planned marketing and sales strategy for three MRI and Positron Emission Tomography (PET) centers, which increased revenue from zero to more than $3 million.  Created and supervised sales programs.
- Completed a market research project that identified PET center development opportunities nationwide with hospitals and radiology groups. Developed presentations and facilitated meetings among top executives.
- Provided market research for a feasibility study regarding the development of a new outpatient surgery center.
- Developed and implemented a marketing plan for Lakeside Executive Suites which increased occupancy from 80% to 100% within six months.
- Created and supervised a new marketing plan for the Weston Outpatient Surgical Center which increased average net revenue $34,000 per month and increased average profit $13,000 per month.
- Negotiated three new managed care contracts for an ancillary service provider to the long-term care industry. Results are better customer service and increased revenue of more than $500,000.
- Recommended managed care opportunities for a long-term care provider.
- Designed, wrote, and implemented case reports and a clinical newsletter for a national provider of wound healing centers to promote better clinical education tools to physicians at a national clinical meeting.
- Provided HIPAA compliance-training programs to four medical offices.
- Integrate off-the-shelf nuclear medicine and PET laboratory equipment with custom stainless steel laboratory cabinets to achieve optimal levels of radiation safety at 35 hospitals and imaging centers.
- Raised $3.3 million for Weston Pavilion Partners, LLLP, in order to purchase the Weston Medical Surgical Pavilion, a two-story 30,000-square foot medical building in Weston, Florida.
- Completed an offering of units in the ParkCreek Surgery Center, LLLP, which raised $10 million to construct a 21,400 square foot ambulatory surgery center in Coconut Creek, Florida.

**GENERAL MANAGER**                                                                      **CAREVIEW**
  1998 – December 2000                                                                      Pompano Beach, FL

Managed a $1 million budget for CareView, a subsidiary of Visual Data Corporation, an Internet content provider company, with $6 million annual revenues. CareView is a health care software application that helps hospitals locate and communicate discharge information with long-term care facilities.
- Reported to the Vice President, promoted in two years to General Manager from Director of Business Development.
- Analyzed hospital needs across the country for a more efficient discharge planning process, and created and implemented application solutions across multiple hospital departments and long-term care affiliates.
- Catapulted the number of hospital installations from zero to 346. Won the trust of top health care executives for this innovative product, and within two years established a database of more than 2,800 professional health care users. Customers include Columbia Presbyterian, Jackson Memorial, and New York Hospital.  Increased industry usage by 789% this year, representing over 28,200 page views versus 3,800 in 1999.

- Recruited, hired, and managed four Business Development Managers. Coordinated website design and application enhancements and supervised HTML programming. Led long-term care sales in South Florida.

**DIRECTOR, BUSINESS DEVELOPMENT**                     **PARKWAY REGIONAL HOSPITAL**
1996 – 1998                                                                                          Miami, FL

Led strategic planning for all hospital product lines at a 382-bed hospital. Parkway Regional is part of the Tenet Healthcare system, a $9 billion provider of health care services, with 112 hospitals nationwide. Hospital met and exceeded its revenue and profitability goals.

- Authored and coordinated the hospital's annual strategic plan with department directors and achieved new income records totaling $13 million from breakeven the prior year. Working on key executive team with the CEO, Regional, and Corporate Directors, increased total patient days by 9%, and outpatient visits by 11%. Credited with exceptional ability to evaluate existing business, coordinate information, and achieve results.
- Spearheaded development and implementation of product line programs in collaboration with hospital departments. Wrote business plan for the Healthy Heart Center, a community education service developed to reduce the incidence of heart disease. Designed workflow, recruited staff, marketed the program in the community, and expedited software implementation. Directly credited with increasing cardiac outpatient revenues by $300,000 per year, and reducing losses from inpatient admissions by $100,000 per year.
- Reorganized the Wound Care Center after the departure of its management company. Identified a new location, improved community marketing, added new hyperbaric services, and initiated a clinical trial agreement for Apligraf, a living skin product. The result was over $2 million in increased revenue.
- Recruited five key specialty physicians to increase annual maternity revenues by $500,000.
- Supervised a highly effective department of seven professionals and support staff.

**PRESIDENT**                                                               **REICH CONSULTING SERVICES**
1993 – 1995                                                                                  Ft. Lauderdale, FL

Founded and managed a successful health care consulting service. Major national customers included HIP, OrNda, and Sterling Healthcare.

- Identified opportunities to enhance managed care revenue and negotiated a $300,000 primary care physician agreement with a 70,000-member HMO, which provided a new source of business for this private practice.
- Created a home care traveling staffing program, which resulted in over $500,000 in new revenue the first year.
- Marketed the expertise of a South Florida physician specialty, utilization review, and claims processing service to Managed Care Companies in three states, so that the company could obtain $5 million in new sales.
- Managed a North Miami Beach community health center, evaluated its turn-around potential, and recommended its closure to save its owner, Sterling Healthcare, $250,000 per year.

**MANAGED CARE ACCOUNT EXECUTIVE**                          **MEDICAL CARE AMERICA**
1986 – 1993                                                                                          Miami, FL

Promoted five times in seven years to Account Executive from Marketing Specialist, catapulting annual sales to $650 million from $11 million for this national provider of home infusion and ambulatory surgery. Medical Care America employed 5,000 people in twenty states at more than 100 health care centers. Survived three mergers and acquisitions of this company, which originated as CarePlus, and was merged into New England Critical Care, Critical Care America, and Medical Care International.

- Pioneered major account sales to managed care companies in 16 states on behalf of 25 profit centers. Negotiated 16 contracts covering 1 million members, resulting in annual revenue of $21 million.
- Increased infusion therapy revenues by $2,000,000, in South Florida, by negotiating new contracts with three managed care companies. During second quarter 1993, achieved 112% of sales plan.
- Driving force in formulating and implementing sales and marketing strategies for physicians and hospitals within multi-state regions. Worked closely with field, regional, and corporate management. Instituted managed care reporting programs. Analyzed potential expansion markets and acquisitions. Managed investor relations, advertising, collateral materials, and promotions.
- Assisted in growing the number of CarePlus offices from 4 to 20, with gross margins of more than 25%, making the company a desirable potential acquisition.

**Education**

**M.A., ECONOMICS**                                                        **NEW YORK UNIVERSITY**
1985                                                                                             New York, NY
**B.A., ECONOMICS**                                             **GEORGE WASHINGTON UNIVERSITY**
1983                                                                                           Washington, DC