# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

—————————————————————————
                                                    )
THE HIPSAVER COMPANY, INC.,                         )
     Plaintiff / Counterclaim Defendant,          )
                                                    )
v.                                                  )    Civil Action No. 05-10917 PBS
                                                    )
J.T. POSEY COMPANY,                                 )
     Defendant / Counterclaim Plaintiff.          )
                                                    )
—————————————————————————)

## HIPSAVER'S OPPOSITION TO
## POSEY'S MOTION TO STRIKE SUPPLEMENTAL SUBMISSION OF HIPSAVER

### PRELIMINARY STATEMENT

The evidence in the record on summary judgment is more than sufficient to raise a genuine issue of material fact with respect to Posey's false advertising causing injury and damages to HipSaver. Posey's transparent attempt to have the Court reconsider its summary judgment rulings should be rejected. In addition, the Court should accept HipSaver's May 24, 2007 Supplemental Submission filed by HipSaver pursuant to the Court's Order on summary judgment dated May 15 because the submission relies on evidence, which, for the most part, was long ago produced to Posey (albeit updated) and Posey will suffer no prejudice because it has been provided the opportunity to take a second deposition of HipSaver's principal. Indeed, this Court even has given Posey the option of a continuance of the trial in the unlikely event that Posey decides it needs additional time to prepare for trial after having had the full opportunity to conduct supplemental discovery including depositions of HipSaver.

HipSaver, however, renews its Assented-to Motion to Withdraw the Supplemental Expert

Report of Roy J. Epstein, dated May 24, 2007.[1] Thus, all that remains of HipSaver's Supplemental Submission are certain summaries of data attached hereto (updated as described below), and a declaration of Edward Goodwin, dated May 24, 2007, attached as **Exhibit A**. *See* Declaration of Edward Goodwin, dated June 5, 2007 and exhibits thereto.[2]

## I.    HIPSAVER'S MATERIAL FACTS OF RECORD EVIDENCE CAUSATION AND DAMAGES

In its Memorandum and Order dated May 15, 2007, this Court summarized in part the evidence of record offered by HipSaver in support of causation and damages including:

(1) "Posey is a head-to-head competitor in a developing market that has disseminated literally false advertisements touting its products' superiority to that of the only other significant market player. Cf. *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994) (recognizing, in a discussion of standing under the Lanham Act, that where a plaintiff's products are in direct competition with a defendant's products, or where a defendant's advertisements draw a direct comparison between the two, a less definite showing of injury is required); see also Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 691 (6th Cir. 2000) (noting that consumer confusion, which is presumed in claims for literally false advertising, tends to show that "hard-to-prove" marketplace damages, like lost profits or lost sales, "probably exist"); and

(2) "[A]fter the settlement, Posey's monthly sales increased an average of 8.8% while HipSaver's sales increased only 4.2%."

Memorandum and Order [D.N. 228] at 31.

In addition, long before the summary judgment decision, HipSaver had filed the report of its economist expert, Roy J. Epstein, Ph.D., which sets out HipSaver's computation of damages. The report calculated damages based on a theory of lost profits for both (1) the entire period of advertising, August 2001 through December 2005 and (2) for the period following the settlement

---

[1]  HipSaver acknowledges that yesterday it had "withdrawn" its withdrawal of the assented to motion.  Nonetheless, HipSaver renews its assented-to motion the expert report of Roy J. Epstein.

[2]  Pursuant to this Court's order that all evidence relating to HipSaver sales after September 13, 2006, is not admissible, the attached exhibits are redacted to remove the sales data from after September 13, 2006.

of the prior HipSaver-Posey litigation, from September 2004 through December 2005.[3]  Posey's profits for the latter period are $756,828.  **Exhibit B**, September 25, 2006 Expert Report of Roy J. Epstein, PhD) at ¶¶ 5, 20, 25.  Thus, HipSaver has offered more than enough evidence to survive summary judgment on the issues of causation and damages.

Because the pretrial memorandum had been submitted by HipSaver without the benefit of this Court's summary judgment decision, the Court instructed HipSaver to "supplement its pre-trial memorandum within two weeks to make a proffer of evidence supporting causation and a theory of damages consistent with this ruling."  Memorandum and Order [D.N. 228] at 31.  HipSaver submits that the evidence outlined above is a sufficient proffer in that it comprises evidence of causation and of damages (as noted above, Dr. Epstein's original September 25, 2006 report includes a separate computation of post-settlement damages only).

In addition, as described below, HipSaver has filed a supplemental submission, which further supports causation and damages.

## II.    HIPSAVER'S SUPPLEMENTAL PRESENTATION OF THE FACTS OF RECORD

The Supplemental Submission filed by HipSaver in response to the Court's May 15 rulings, is cumulative of the material facts of record evidencing causation and damages and draws on documents, for the most part, previously produced to Posey (albeit necessarily updated because of the passage of time).  The key change effected by the Court's summary judgment rulings is that HipSaver is no longer entitled to damages for the period before August 2004.  HipSaver's Supplemental Submission comprises (1) a summary of HipSaver's previously produced 2006 domestic sales data (updated for the last quarter of 2006), which shows that HipSaver sales increased after Posey's false advertising was withdrawn; and (2) a summary of

---

[3]  Pursuant to this Court's summary judgment, HipSaver's damages are now limited to the post-settlement agreement period, September 2004 through December 2005.

the 2006 sales data focusing on a new HipSaver product sold under the trade name DermaSaver, which shows that the difference between HipSaver and Posey sales could not simply be a result of Posey's market power or exclusive relationship with large chains. Thus, HipSaver's Supplemental Submission does not rely on new theories but instead confirms that a focus on post August 2004 HipSaver sales data is consistent with HipSaver's previous assertions.

Posey's obsessive harping on the earlier statement of HipSaver's Mr. Goodwin that HipSaver 2006 sales were flat is an issue which goes to the credibility and not the admissibility of HipSaver's evidence. Indeed, Mr. Goodwin's characterization of 2006 sales spoke only to HipSaver's total revenue (U.S. and foreign). *See* **Exhibit C**, Declaration of Edward Goodwin in Support of HipSaver's Opposition to Posey's Motion for Summary Judgment [D.N. 183] at ¶ 2 ("Revenues from HipSaver were $1.5 million in 2005 and were flat for 2006"). Posey's incessant reference to this statement is a red herring given that full support for HipSaver's assertion that its 2006 U.S. sales increased is found in the <u>evidence</u>, *i.e.* the electronic database source of all of HipSaver sales data, the software, which runs the database and the copies of the invoices themselves, all of which have been produced to Posey.

A.    **HipSaver's Proffer of the 2006 Summary HipSaver Sales Data**

1.    **HipSaver's 2006 Summary Sales Data Shows a Marked Increase in HipSaver's Sales**

In its Supplemental Submission, HipSaver offered a summary of its 2006 U.S. sales data to show that HipSaver experienced a marked increase in sales in 2006, indicating that once the Garwood advertisement was discontinued, HipSaver sales rebounded. HipSaver's Supplemental Submission [D.N. 271] at 4. As Posey's own damages expert posited in his expert report, this marked increase in sales supports the inference of causation:

**[I]f the allegedly false Garwood references resulted in lower HipSaver sales,**

4

> **it would be expected that higher monthly sales would occur when the references were discontinued.**

Report of Creighton Hoffman, February 16, 2005, at p. 6. HipSaver's summary of its 2006 sales data shows precisely the response Mr. Hoffman predicted if injury had occurred: HipSaver sales rebounded after the Garwood Advertisement was discontinued and continued to grow in the following months. *See* Exhibits 1-3 to Declaration of Edward Goodwin, June 5, 2007.

Because this growth coincides with Posey's removal of the Garwood advertisement, the data supports a reasonable inference that HipSaver's growth rate would have been higher absent the marketplace disruption of false advertising and accordingly, that HipSaver was injured as a result of Posey's false Garwood advertising, conforming to Posey's own expert's economic analysis. This summary is admissible.

Posey's objection that this data is inconsistent with testimony of HipSaver's principal, Ed Goodwin, is contrived but in any event, is an issue of credibility to be tested at trial not an issue of admissibility. In his testimony, Mr. Goodwin characterizes as "flat" HipSaver's revenue in 2006. See Exhibit C, Declaration of Edward Goodwin in Support of HipSaver's Opposition to Posey's Motion for Summary Judgment [D.N. 183] at ¶ 2. Mr. Goodwin's statement spoke only to an estimation of HipSaver's overall revenue, not to HipSaver's U.S. sales. But, even if Mr. Goodwin were speaking to HipSaver's 2006 U.S. sales (he was not), Mr. Goodwin simply would've had it wrong. In May 2007 prior to the Court's May 15, 2007 Order, HipSaver completed summarizing its 2006 U.S. sales data and found that HipSaver's U.S. sales actually increased in 2006. (HipSaver then produced the summary to Posey). The 2006 U.S. sales data shows that HipSaver's sales markedly increased in 2006, as stated in HipSaver's Supplemental Submission. Posey has HipSaver's electronic invoice database, electronic invoices, printouts of

the invoices, and an Excel spreadsheet, which catalog ALL sales.  To the extent that Posey disagrees with HipSaver's 2006 U.S. sales data summary, Posey may cross exam on these points at trial.  The summary data is admissible.

### 2. HipSaver's Non-VHA 2006 Sales Show the Same Sales Trend Found in HipSaver's Total 2006 Sales[4]

After removing HipSaver's sales to the VHA from HipSaver's total sales, HipSaver's non-VHA sales data show an increase in 2006 after Posey withdrew its false advertising.  Posey keys to a statement made by Mr. Goodwin in his declaration that "the VHA has some immunity to Posey's false advertising because it conducts its own clinical studies of hip protector products" and argues that, if Mr. Goodwin's statement was correct, HipSaver's analysis of total U.S. sales data for 2006 ignores the possibility that the increase in total U.S. sales in 2006 could have reflected only an increase in VHA sales.  Again, the impact of VHA sales on the conclusion that HipSaver sales increased in 2006 is not in issue of admissibility but rather a matter of credibility for the jury to determine at trial.

Moreover, the upward trend in HipSaver's total sales is also found in HipSaver's non-VHA sales data:  HipSaver's non-VHA sales increased after the Garwood advertisements were removed from the marketplace.  Specifically, during the period of accused advertising, HipSaver's monthly non-VHA sales averaged $35,752 per month.  *See* Declaration of Edward Goodwin, June 5, 2006, Exhibit 3. For the six month period following removal of the advertising, from September 2005 through February 2006, HipSaver's non-VHA sales averaged $34,549 per month.  And, for the next 6 month period from March 2006 through August 2006, HipSaver's non-VHA sales averaged $40,189 per month, showing a 12% increase in sales over the advertising period.  If the data is parsed by 2005 and 2006 data, the data shows that from

---

[4]  In the June 4, 2007 hearing, this Court ruled that only sales data through September 13, 2006 will be admitted. Therefore, all 2006 data analyzed in this Opposition pertains only to data through August 2006.

September 2005 through December 2005, HipSaver's non-VHA sales averaged $32,448 per month, showing a decline at the end of 2005. And, in 2006, from January 2006 through August 2006, HipSaver's non-VHA sales averaged $39,830 per month, showing an 11% increase in sales over the advertising period. *Id.* The analysis of each of these data sets shows that sales immediately following the advertising did not immediately increase but that ultimately, HipSaver's sales increased after the advertising was removed.

HipSaver maintains that a marked increase in sales after the Garwood ad was withdrawn suggests that the Garwood ads depressed sales. Moreover, HipSaver's further analysis rules out Posey's suggestion that the marked increase in 2006 sales resulted only from an increase in VHA sales.

> ### 3. This Court has Already Ruled that HipSaver's Reliance on Sales Data Through September 13, 2006, is Permissible Because This Data Was Produced to Posey During Discovery

At the Final Pretrial Conference, the Court ruled that it would allow HipSaver sales data through the last quarter of 2006. Transcript of Final Pretrial Conference at 45-47. At the June 4, 2007, motion hearing, the Court revised this ruling to limit HipSaver's evidence to sales data up through September 13, 2006 because this data was produced to Posey during discovery. Posey's objection based on timeliness is moot.

### B. HipSaver's Proffer of Evidence Relating to Its 2006 DermaSaver Sales Data

In its Supplemental Submission, HipSaver also offered 2006 sales data for a new product designed and manufactured by HipSaver and sold under the trade name DermaSaver. This evidence is offered to rebut Posey's suggestion that Posey's increased sales were a result of Posey's market power, customer loyalty, or its exclusive agreements or "formularies."

This data shows that, absent a marketplace disruption such as the Garwood advertising,

HipSaver would have had the ability to sell in large chains where Posey products were already sold and counters Posey's suggestion *(see e.g.* **Exhibit D**, Expert Report of Gary Reich, February 16, 2006 at ¶¶ 26-27) that it is formulary restrictions, brand loyalty, or Posey's market power, rather than false advertising, that kept HipSaver out of the healthcare chains and large distributors. This 2006 DermaSaver sales data 'but for' scenario shows HipSaver's access to healthcare institutions but for the marketplace disruption. Posey is not prejudiced by this proffer of evidence because Posey will have a full opportunity to question HipSaver's principal at the upcoming deposition.

## CONCLUSION

HipSaver's Supplemental Submission directly responds to this Court's instructions relating to a proffer of supplemental admissible evidence supporting causation and a theory of damages. The 2006 sales data shows that HipSaver's sales trended upward after Posey's false advertising was withdrawn. The same upward trend is evident in analysis of only non-VHA sales. Moreover, HipSaver's proffer of evidence relating to its DermaSaver product further supports HipSaver's causation and damages contentions.

Both the record of evidence offered by HipSaver in its summary judgment filings and HipSaver's Supplemental Submission, meet HipSaver's burden of proof with respect to raising a genuine issue of material fact with respect to causation and injury because a rational fact finder could reasonably infer that Garwood advertisements caused actual harm to HipSaver. *Cashmere & Camel Hair Mfgs. Inst. v. Saks Fifth Ave.,* 284 F.3d 302 (1st Cir. 2002); *see generally Vermont Pure Holdings Ltd. v. Nestle Waters North America Inc.,* No. Civ.A.03-11465 DPW, 2006 WL 839486 (D. Mass. March 28, 2006).

For the reasons stated above, HipSaver respectfully requests that this Court deny Posey's

Motion to Strike HipSaver's Supplemental Submission.

Dated:  June 5, 2007

Respectfully submitted,
The HipSaver Company, Inc.
By its Attorneys,


/s/  Courtney M. Quish
Lee Carl Bromberg, BBO No.:  058480
Edward J. Dailey, BBO No.:  112220
Courtney M. Quish, BBO No.:  662288
BROMBERG SUNSTEIN, LLP
125 Summer Street - 11th floor
Boston, Massachusetts 02110-1618
617.443.9292
617.443.0004  Fax
cquish@bromsun.com


## CERTIFICATE OF SERVICE

I certify that this document has been filed through the Electronic Case Filing System of the United States District Court for the District of Massachusetts and will be served electronically by the court to the Registered Participants identified in the Notice of Electronic filing.


/s/  Courtney M. Quish
Courtney M. Quish


02820/00502  680192.2

**EXHIBIT A**

**FILED UNDER SEAL**

**EXHIBIT B**

**FILED UNDER SEAL**

# EXHIBIT C

# Declaration of Edward L. Goodwin

January 8, 2007

I, **Edward L. Goodwin**, make this Declaration on the basis of personal knowledge and under penalty of perjury.

1.      I am president of the HipSaver Company.  In 1994, I informally surveyed a number of nursing homes and nursing home suppliers.  I found that none offered a hip protector to help prevent the 60,000 hip fractures that occurred from falls in the 17,000 nursing homes each year.

2.      In 1995, I invented the HipSaver® hip protector, a soft foam washable encapsulated protective pad sewn into a garment.  I hold a patent for technology related to soft hip protectors, and I have patents pending for related technology.  My company has been based in Canton and employs less than 10 people.  The HipSaver Company is a privately held company.  Revenues from HipSaver were $1.5 million in 2005 and were flat for 2006.

3.      Prior to developing HipSaver, I worked as an engineer in the rubber and textile industry for 20 years and thus had the requisite technical background to develop such a product, and I understood and was familiar with equipment and machinery necessary for manufacture.

4.      Additionally I had worked on new product teams and new product launches and saw the organizational challenges inherent in developing, testing, improving, manufacturing, and selling innovative, high quality products.

5.      In 1995, I met with Harvard researchers about hip protectors and discussed a variety of topics relating to epidemiology, etiology, hip protector construction, proper pad positioning and biomechanics. Since hip protectors were a new product category, there

was no American Society of Testing and Materials (ASTM) standard to test a hip

protector. Therefore, university researchers were constructing a biomechanical test that

included all of the known factors in the dynamic fall to the hip.  These included soft

tissue modeling, trochanteric anatomy modeling, pelvic rebound compliance and

literature established fall forces to the hip bone. Such a test could then reveal if a given

protective pad could lower the simulated fall force sufficiently to protect

the osteoporatic trochanter of an older person.  Beginning with testing initiated at

Harvard in 1996 through the Tampere testing conducted in 2000 and internal testing

conducted since 2004, HipSaver has tested and confirmed the ability of our original and

improved hip protector pads to reduce impact forces of a fall.  All of HipSaver's testing is

verifiable and scientifically simulates a dynamic fall impacting the hip.

6.     HipSaver is also the subject of a published clinical study directed by a physician

at the Fallon Clinic in Worcester.  And HipSaver was the subject of one of the first

published clinical studies to statistically confirm effectiveness against hip injury which

was directed by George Gross, PT, and colleagues at the Elder Service Plan of East

Boston.  Since 2001, I have invested some $350,000 in sophisticated manufacturing and

test equipment for HipSaver.

7.     Prior to 2001, HipSaver was practically the only hip protector in substantial

distribution to the United States nursing home and rehabilitation hospital market,

including the Veterans Administration.

8.     In 1999, the Posey Company introduced a hip protector product with removable

(non-washable) pads.  This product did not receive a significant response in the

marketplace and was not a competitive threat to HipSaver.

2

9.      Based on what I have learned in the present lawsuit with the Posey Company, it appears that the Posey Company embarked on an effort to develop a lower cost but inferior copy of our HipSaver product early in 2001.  Unknown to us at the time, this development effort included comparative testing of materials, secretive purchase of our products, false claims to our largest customer, the Veterans Administration about the superiority of Posey's new hip protector pad, and development of the 2001 version of the Garwood ads.

10.      Late in 2001, the Posey Company launched its new hip protector product, known as Hipster III.  In essence, Posey created in 5 months the "appearance" of a hip protector offering the same benefits that HipSaver had worked on for the previous seven years. It was markedly distinct in appearance from Posey's earlier product, contained what was represented as a washable pad, and looked remarkably like our HipSaver.  If you place the two products side by side, it is difficult to distinguish the Posey copy from our HipSaver.  In fact, after Posey Hipsters began to fail routinely in health care facility laundries during 2002 and 2003, Posey's products were, on a number of occasions, mistakenly returned to our company – with complaints and demands for refunds.

11.      Although we learned that Posey had blatantly copied our product and were aware also of its initial Garwood advertising in 2002 and 2003, I dismissed the advertising as junk science.  I was not aware of the national scope of this advertising.  I was not aware that Posey had made comparison claims of superiority to the Veterans Administration in July 2001, and I was not aware of similar claims made in a Posey advertising video.  I was not alarmed by Posey's advertising until its "UCLA" advertising appeared in 2004.

3

12.     During 2002 and 2003, I was working to counter Posey's aggressive marketing to
the Veterans Administration and its false claims to the VA about the durability and
launderability of its hip protector product. Our company was also working very hard to
expand sales of HipSaver to nursing and rehab facilities and to obtain agreements with
major heath care product distributors and health care chains.

13.     From 2002 through 2005, our company made numerous efforts to advertise and
sell HipSaver to individual nursing and health care facilities, to national chains, and to
national distributors.

14.     HipSaver secured an agreement to be sold by Alimed, a large, Massachusetts
based multi-line supplier with national distribution to some 600 nursing and rehab
facilities in Massachusetts and about 15,000 across the country. This would have been
HipSaver's first opportunity to obtain a vehicle for widespread national distribution.
Working with John Bretz, the marketing manager, and his staff we supplied artwork and
photos in anticipation of a HipSaver catalog launch during 2002. Mr. Bretz told me that
although Alimed had reviewed an earlier Posey hip protector, they wanted to try
HipSaver because of its design and testing validation. We built inventory in anticipation
the large sales increase, only to be told at the last minute that HipSaver was dropped from
Alimed's catalog and replaced by the Posey copy.

15.     Since then, although we have tried repeatedly, we have been frozen out of all of
the major catalog distributors and resellers of hip protectors, including McKesson,
Cardinal Health, Medline, and Gulf South which have operations in Massachusetts.
Posey is sold by these distributors and resellers. In other cases, one major chain and
some facilities have refused to purchase HipSaver because of their experience with

4

Posey's product. The Posey Hipster failed at high rate in the laundry, customers believed that Posey's advertising misrepresented launderability, and we could not overcome the perception that all hip protector products would fail in the laundry. But, we still pursued the large chains.

16.     We tried to secure an agreement to supply Manor Care, a major nursing home chain, only to be told by its senior buyer, Bill Cusack, that he would not buy HipSaver because his company had entered into an exclusive arrangement with Posey. Similarly, we worked with Life Care, another national nursing home chain with facilities in Massachusetts, but were rejected by the company's corporate buyer for Posey. And again, in 2003 the corporate purchaser for Kindred, which has a number of health care facilities in Massachusetts, informed us that the company was under exclusive contract with Posey for hip protectors. Recently, we learned that LifeCare Corporation has largely abandoned hip protectors because of the poor quality of Posey's product. LifeCare refused to consider HipSaver as an alternative.

17.     Numerous individual facilities have also refused to purchase HipSaver. In a number of cases, these facilities have refused to purchase HipSaver hip protectors because of their experience with Posey's product and its repeated failures in the laundry. Included are Bangor Mental Health Institute, Bangor, ME; Truman Medical Center at Lakewood, Kansas City MO; Peaks Care Center, Longmont CO; Dunn County Health Care Center, Menomonie WI; VA Medical Center Bedford, Bedford MA; Resthaven York, York PA; Pleasant Meadows Christian Village, Chrisman IL; Friendship Village, Schaumburg IL; Pisgah Manor, Candler NC; Golden View, Meredith NH; Seneca Place, Verona PA; Phoebe Ministries, Allentown PA; Dow Rummel Village, Sioux Falls SD;

5

Eaglewood Care Center, Springfield OH; Baptist medical Center, Little Rock AR; Cedar

Wood Health Care, Colorado Springs CO; Park River States Care Center, Coon Rapids

MN; Regency at the Park, College Place WA; Kennedy Park Medical & Rehab,

Schofield WI; River Mede Health Care, Binghamton NY; and Sacred Heart Home,

Hyattsville MD.

18.     Between 2002 and the end of 2005, HipSaver spent almost $200,000 on

advertising primarily to the private market and yielded a total of only 20 nursing homes

as customers.  We have realized we don't have the capacity to counter Posey's false

advertising.  By the end of 2005 Posey had captured at least one half of the hip protector

market in the United States.

19.     By the end of 2005, it was clear also that HipSaver has been completely frozen

out of every private sector nursing and health care facility chain and every private

distribution chain.  Our rate of growth in the private marketplace has declined every year

since 2002, and we maintain our business largely on the basis of sales to the Veterans

Administration which accounts for more than 40% of our U.S. sales and almost all of our

growth offsetting other losses in the United States.

20.     Some of our lost business is due to the fact that the Posey Company's advertising

and sale of a defective product has led a number of health care facilities to abandon hip

protection products altogether.  Since at least the early spring of 2002, less than six

months from introduction of the Hipster III product, Posey has been aware that its

product is defective and has a high rate of failure.  In fact, notes from an internal Posey

meeting to evaluate its defective product in April 2003 indicate that Posey was concerned

that it "could lose the market" if it failed to resolve this issue.  Posey knew early on that

6

its hip protector failed in institutional laundries but continued to advertise that it could be laundered at high temperature.  Some health care facilities have not distinguished between Posey's defective product and our sound product.  So, a number of facilities have simply refused to buy any hip protection products.

21.     When Posey misrepresented the effectiveness and durability and launderability of its product in national campaigns year in and year out, our company simply didn't have the resources or ability to mount a counter campaign.  We have been able to maintain most of our business with the Veterans Administration because it is not as susceptible to Posey's advertising.  The VA system purchases independently, seeks the best value products, is open to new sources, and conducts its own product evaluation and testing – unlike the private sector.  Since at least late 2003, our company has spent most of its marketing resources dealing with the VA and fending off Posey's false claims about the superiority, launderability, and effectiveness of its hip protector copy in protecting patients from hip injury.

22.     HipSaver and Posey jointly participated in laundry testing conducted independently by the Veterans Health Administration.  Testing was initiated in September 2002 at the Mountain Home Veterans Medical Center.  Helen Brogna and I represented HipSaver.  Posey was represented by Victoria Lewis.  The Medical Center was represented by Randall Nentrup, its Risk Manager and the laundry manager.  The study coordinator was Eric Stalhanske, National Safety Center Manager.  Mr. Stalhanske outlined the study procedures which included laundering in accordance with the high temperature CDC Guideline with washing at 160-170°F, extraction cycle, and drying at 180°F.  Ms. Lewis stated that Posey's hip protector product would tolerate the study

7

procedures. HipSaver completed the study without failure. Posey's product had a high rate of failure. Subsequently, the Veterans Health Administration's National Center for Patient Safety issued guidelines for use of hip protectors in which it stated: "As a general rule, Posey™ hip protectors should not be washed in the hospital laundry. They degrade quickly and pads may crack or dissolve. Bleach appears to accelerate the degrading process". In the same guidelines, the Veterans Health Administration notes that HipSaver hip protectors can be washed in hospital laundry facilities without restriction .

23.     The Posey Company withdrew its first version of the Garwood advertising in the fall of 2003 and blanketed distributors, chains, and facilities with a new campaign, the false UCLA advertising which was distributed in catalogs, newsletters, and mailers, and on the Internet. The UCLA ads were based on a flawed testing protocol conducted by a UCLA graduate student and a white paper which was written or edited by Posey and misrepresented as a "UCLA" study. In this advertising, Posey claimed that its "UCLA" tests demonstrated the superiority of the Posey hip protector over HipSaver. In fact, even though the UCLA tests were flawed, they showed that HipSaver was superior. Nevertheless, Posey utterly misrepresented the tests and embarked on an 11 month campaign against HipSaver.

24.     In the spring of 2004, HipSaver filed a lawsuit in the federal court in Boston, seeking to halt Posey's false "UCLA" advertising. At the time, the false advertising consisted only of the UCLA ads; there was no Garwood advertising. So, of course, we challenged only what was being advertised at the time. When our company challenged the UCLA ads, we thought Posey had abandoned the Garwood ads for good and, instead, was trying to use the UCLA brand name to attack us.

8

25.     Posey filed a "tit for tat" countersuit to our lawsuit in 2004, challenging claims made by HipSaver in our website. After mediation, Posey agreed to a settlement which included withdrawal of all UCLA ads, a corrective advertising statement repudiating the false advertising, payment of attorney fees and associated costs, and dismissal of all claims with prejudice. In conjunction with the settlement, Posey did not request any changes to our website.

26.     Posey's corrective advertising statement explicitly admitted that UCLA did not sponsor, authorize, or endorse Posey's advertising, that our expert, Wilson C. Hayes, PhD is a recognized biomechanical engineering expert, and that he found that the "UCLA" tests were not reliable and could not sustain "any of the claims" in Posey's advertising. The corrective advertising statement noted Posey's regret at "comparisons with HipSaver products and confusion this may have caused in the marketplace".

27.     I agreed to the settlement because I thought that corrective advertising would put an end to Posey's false advertising. I understood that the settlement agreement barred any further claims by us against the UCLA ads in return for withdrawal of those ads and corrective advertising, and I understood also that Posey could not challenge our website – unless we made material new statements or claims in the website.

28.     Since the settlement in September 2004, HipSaver has not made any changes to the claims and statements in its website. We have updated several color product photos and added one garment to our HipSaver line, but not so much as a comma has changed in the statements and claims in our website.

29.     The Posey Company's regret for its false UCLA ads was short lived. I understand that less than a month after the settlement, Posey's president issued a marketing statement

to Manor Care, a 300 facility nursing home chain in which he undercut the corrective advertising settlement by suggesting that the "UCLA" testing was valid and that he had settled only because our lawsuit was a nuisance. More important, however, Mr. Posey revived the Garwood test advertising with a new version which included additional testing done on Posey's new PORON® based pad. This new advertising began sometime late in 2004.

30.     I became aware of the new Garwood ads in the late winter of 2005 after some correspondence with Mr. Posey. I was unaware until recently that in March 2005, Mr. Posey had ordered further testing of Posey's hip protector products in an effort to prepare for filing a lawsuit against HipSaver.

31.     In any case, once we reviewed the new Garwood ads, we instructed our lawyer to demand an immediate retraction. This lawsuit followed.

32.     While Posey finally withdrew the new Garwood advertising in the late summer of 2005, four years of false advertising by a company with the means to repeat its false claims again and again to customers has left HipSaver with little opportunity beyond the Veterans Administration. Our rate of growth is less than half Posey's. We are losing market share. Our revenue for 2006 was flat. We have no ability to access the private health care distribution and facility chains. The corrective advertising of 2004 might have reversed the trend against us, but it was undercut by Mr. Posey's marketing statement and the new Garwood ads. Posey's regret is meaningless. We remain frozen out, and we even face skeptical buyers who will no longer purchase from Posey because its product proved defective but will no longer consider us either.

33.     Since I began my work with soft hip protection garments, I have routinely conducted laundry and drying tests of numerous materials.  I have tested all of the pads used by HipSaver and all of the pads used by Posey.  And as noted above, I have participated in a large scale test by the Veterans Administration.  Based on my experience with institutional laundries operated by the VA and a number of private health care facilities and based on temperature readings I have taken at commercial laundries, the average wash temperature is 180°F and is frequently higher.  I understand that the American Institute of Architects industry standard for health care facility construction calls for laundry temperatures at 160°F.  The CDC high temperature wash guideline is for a minimum temperature of 160°F.  HipSaver hip protectors are labeled to be washed at 200°F while Posey labeled its product at a minimum temperature of 160°F until 2005.  And while I am aware of a low temperature CDC guideline, this guideline cannot be competently recommended for institutional settings because it requires use of bleach to offset the lower temperature. The hip protectors which are the subject of this lawsuit contain Lycra/Spandex stretch fibers and a urethane pad pouch covering. Bleach manufacturers recommend against bleach use on these components since routine use of bleach rapidly degrades the molecular structure of the base polymers.

34.     As noted above in paragraph 6, HipSaver has participated in two clinical studies. The purpose of the study conducted by Jeffry B. Burl, MD, a physician at the Fallon Clinic, was to determine the extent to which a high compliance rate can be achieved among an elder group at high risk of hip injury.  The compliance rate for patients who completed the study exceeded 93%.  Moreover, it is significant as a matter of fact that not a single high risk patient was injured while wearing a HipSaver hip protector – even

11

though patients experienced 126 falls during the course of the study. While the Fallon study did not evaluate the statistical significance of zero injury, this was demonstrated and confirmed in a related study by George Gross and his colleagues in the Elder Service Plan study. Gross' study of frail elders over the course of 26 months determined that a zero hip injury rate among HipSaver wearers was statistically significant.

35. The HipSaver pad used in the Gross Study was substantially a design equivalent of the current HipSaver pad. Both pads use the same basic technology of an encapsulated visco-elastic damping urethane pad which I invented. In 2002, two years after the study ended, the physical therapists who ran the Gross Study informed us that they now used HipSavers that use the current HipSaver pad and that they had an additional 200 falls on the current HipSavers with no fractures.

36. HipSavers were also tested at Tampere University in 2000. The pads in the hip protectors tested at Tampere use the same foam as the current HipSaver pad. The foam material is the determinant of the force absorption of a hip protector pad. To add an extra margin of safety, current hip protector pads are even thicker than the pads tested at Tampere.


**Edward L. Goodwin**

Dated: 1/8/07

02820/00502 596287.1

EXHIBIT D

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE HIPSAVER COMPANY, INC., | Civil Action No. 05-10917 PBS |
| Plaintiff, | |
| v. | |
| J.T. POSEY COMPANY, | |
| Defendant. | |
| AND RELATED COUNTERCLAIM. | |

## EXPERT DESIGNATION INCLUDING REPORT OF GARY REICH

### *CONFIDENTIAL –ATTORNEYS' EYES ONLY*

## EXPERT REPORT AND DISCLOSURES OF GARY REICH

### I.    INTRODUCTORY STATEMENT

1.    I, Gary Reich, have been retained by Defendant/Counterclaimant J.T. Posey Company ("Posey") in this matter to provide expert testimony regarding certain advertising statements made by Posey and by Plaintiff/Counterdefendant The HipSaver Company, Inc. ("HipSaver") and regarding the impact of such advertising on customers and potential customers and on sales.  I submit this report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.

2.    This report contains a complete statement of all opinions that I have formed to date in connection with my assignment in this case.  It also includes a complete statement of the basis and reasons for those opinions, and the information that I considered in forming the opinions. This report also contains a summary of my qualifications, and the rate that I am charging in this matter.

3.    My expert opinions regarding these subject areas are set forth below, and are based upon my expertise in marketing, including but not limited to health care consulting services, products sales, managed care, and long-term care, and upon my visual inspection and analysis of the advertisements and sales information of each company.

### II.    BACKGROUND AND QUALIFICATIONS

4.    My background, experience, and education are described in detail in my resume attached as Attachment A to this report.

5.    Briefly, I have extensive experience in the marketing of health care products and with the impact of advertising for medical products on customers and potential customers.  I have acted as a marketing consultant for a variety of companies in the health care business, including

CIGNA, New York Presbyterian Health System, Prudential and Tenet. Presently, I am a marketing consultant for TriHealth, Florida Hospital Health System, and Watson Clinic. I have 20 years of experience in this field.

6.     In the normal course of my consulting activities in the health care industry, I evaluate different manufacturer's products, including product features, I talk with customers and potential customers regarding potential benefits to them. As a consequence of my extensive involvement in the industry, I am familiar with the buying habits of customers of healthcare-related products. In addition, I have developed marketing plans and advertisements for companies who market via the Internet, via brochures, product instruction sheets, trade shows, and catalogs. The products for which I have provided marketing assistance, including the development of advertising, include dose calibrators, thyroid up-take systems, work stations, wipe test counters, injection chairs, survey meters, living skin products for healing wounds, hyperbaric medicines for wound care, IV nutrition, and antibiotics.

7.     I graduated from George Washington University with a Bachelor of Arts in Economics degree in 1983, and from New York University with a Masters Degree in Economics in 1985.

8.     Based on the data and information I have reviewed in connection with my assignment in this case, the majority of both Posey's and HipSaver's customers consist of healthcare facilities, long-term care facilities homes, and acute care facilities. In the industry, these types of customers are considered sophisticated buyers. These types of buyers are experienced who buy a wide diversity of products, for example from food to pharmaceuticals to disposable products to capital goods. Thus, buyers of HipSaver's and Posey's products will consider and evaluate the

price, the quality, tests and studies, testimonials, compliance rates, reputation of the manufacturer, and weigh these factors prior to making a purchase.

9.      I have marketed to the types of consumers targeted by both Posey and HipSaver, and I have a strong understanding of the impact of advertising on these types of customers. Recently, I have focused on long-term care. In forming my opinions, I have taken into account the types of customers targeted by each company.

## III.     COMPENSATION

10.     In connection with the preparation of this report, I am being compensated at the flat rate of $3,500. I will be compensated at an hourly rate of $125 for any additional time spent in connection with this matter. My compensation is not contingent on the outcome of the trial nor upon the nature of my opinions.

11.     I have not previously testified as an expert in any litigation matters.

## IV.     DATA AND OTHER INFORMATION CONSIDERED

12.     In connection with the preparation of this report, I considered the following data and information:

a.      The materials identified in Attachment B;

b.      HipSaver's and Posey's websites, which I reviewed on or about February 6 through February 9, 2006;

c.      Telephonic interview with Charleen McGrath and Victoria Walters of Posey, as a result of which I learned that:

i.      Posey distributes its advertising in the form of brochures, catalogs, product inserts, and via its Internet website;

       ii.     Posey has about 28 independent sales representatives who sell to both acute care facilities and long-term care facilities;

       iii.    Posey has several contracts with nursing home chains, major distributors, and dealers in hip protectors;

       iv.    Posey supplements its marketing by attending national and regional trade shows;

       v.     Posey introduced its first hip protectors to the market in 1999-2000, and redesigned them in 2001;

       vi.    Hip protectors are a voluntary product that are not prescribed by doctors, Medicare or insurance companies, therefore, the patient's family or nursing home must promote the hip protector;

       vii.   Care facilities often recycle the hip protectors, and the hip protectors are replaced at a given facility when worn out;

       viii.  Posey engaged Garwood Laboratories to conduct some testing of certain hip protector materials in or about 2001;

       ix.    The results of the Garwood Laboratories tests were used to develop advertising for Posey (the "Garwood Laboratories Advertising"); and

       x.     The first public dissemination of the Garwood Laboratories Advertising was in 2001.

## V.    ANALYSIS FOR POSEY'S GARWOOD LABORATORIES ADVERTISEMENT

13.    I was specifically requested to review Posey's Garwood Laboratories Advertising in the Posey materials identified in Attachment B. Each advertisement includes a bar graph and a paragraph about the study that was conducted.

## A.    STATEMENT OF OPINIONS

14.    After careful study of the documents and information given to me, I formed the following opinions:

a.    The words "independent study" do not suggest to a consumer that Posey did not pay Garwood Laboratories for the testing.

b.    The statements "[a]n independent Laboratories study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" indicate to a consumer that Posey tested materials to determine the "most effective" material at reducing the force of impact.

c.    The statements "[a]n independent Laboratories study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" do not indicate to a consumer that the Posey Hipster is the most effective product in the marketplace, or that all other products are inferior, either at reducing impact force or for comfortability.

d.    The Garwood Laboratories Advertising is not misleading to consumers as to the type of fall tested; a consumer would understand that a dropping type of fall was tested, and not a fall from a standing position.

## B.    STATEMENT OF BASIS/REASONS FOR OPINIONS

15.    A consumer assumes that a manufacturer pays a laboratory or other facility to test its products, and payment for a study or testing does not suggest that the study or testing was biased towards the manufacturer's product.  Typically, studies are funded.  For example, Underwriters'

- 6 -

Laboratories is paid to provide a "UL" certification for a manufacturer's product. A second example, it is well-known in hospitals and care facilities that companies pay for their facilities to be accredited by national bodies, such as JCAHO. Thus, the words "independent study" do not suggest that Posey did not pay Garwood for the study.

16.     The statements "[a]n independent Laboratories study was conducted to determine the most effective impact absorbing material" and "Posey engaged Garwood Laboratories to conduct testing to select a comfortable and effective impact absorbing material" indicate to the consumer that Posey tested materials for their effectiveness at reducing the force of an impact. Given that the bar graph and the paragraph describing the test are part of the advertising, a consumer would not be misled into thinking that "most effective" refers to anything other than the effectiveness at reducing the force. A consumer would not believe that Garwood Laboratories tested the comfortability of materials. The remainder of the study is directed to the methodology of the study of reducing impact force, not comfortability.

17.     The above statements do not indicate that the Posey Hipster is the most effective product in the marketplace, or that all other products are inferior because Posey makes no comparison with any other products in its advertisements and does not mention any other products in the Garwood Laboratories Advertising. A consumer would not believe that Posey's hip protector is necessarily more effective at reducing impact force, or more comfortable, than any or all other hip protectors.

18.     The Garwood Laboratories Advertising is not misleading as to the type of fall tested. The advertisement clearly states "a weight was released in a guided drop to simulate a 120lb subject falling from a height of 36"." A consumer would not assume that any other types of fall, were included in the testing.

## VI.    ANALYSIS OF POSEY'S GARWOOD LABORATORIES ADVERTISING EFFECT ON POSEY AND HIPSAVER SALES

### A.    STATEMENT OF OPINIONS

19.    There is no basis to conclude that the Garwood Laboratories advertising had any effect on HipSaver sales or Posey sales.  It would be total speculation to state otherwise.

### B.    STATEMENTS OF BASIS/REASONS FOR OPINIONS

20.    For both Posey and HipSaver, there is a consistent pattern of unit sales increases every year.  However, the rate of growth of unit sales declines for each company each year compared to the previous year.  For example, the rates of growth for the companies are converging, in that the percentage rate of growth declines each year in a similar amount for each company (i.e., HipSaver sales were 22% greater in 2004 compared to 2003, Posey sales were 21.7% greater in 2004 compared to 2003; HipSaver sales were 9% greater in 2005 compared to 2004, Posey sales were 10.5% greater in 2005 compared to 2004).   The sales patterns indicate that there is a classic medical product sales trend.  Initially, when products are launched, there are numerous sales for the product because there is initial excitement about the product, a large base of potential customers who have not used the product, and sales representatives tend to focus their time on the new product.  Thus, the sales growth is often highest when the product is first introduced or re-introduced to the market.  The biggest increase will usually be at the initial introduction of the product to the market because there are the greatest number of potential customers for the product.  For example, an increase of sales from 10 units to 20 units equals a 100% growth rate, however, going from 20 units to 30 units equals only a 50% growth rate, even though the increase in sales of 10 units is the same.

21.    There is a limited market for this type of product, and only certain consumers are targeted.  It is also a voluntary product that is not prescribed by Medicare or insurance

companies, and the family or nursing home of the patient must promote the hip protector. There is a finite number of elderly or frail patients who would qualify or benefit from this type of product. After the majority of this market has been reached, the life cycle of the product begins to mature.

22.    Nursing homes and care facilities often recycle the hip protectors, and thus, subsequent purchases of the product are not as frequent. Once the pipeline is filled at a given facility, only worn out units or units for new patients are needed.

23.    Posey's re-designed hip protector was introduced in 2001, and this year shows Posey's strongest growth in sales, as expected for a re-designed product such as a hip protector. Posey's sales growth actually declined in 2002 after the Garwood Laboratories Advertising was disseminated in 2001.

24.    Posey's package inserts containing the Garwood Laboratories Advertising had little, if any, influence on consumers' decisions to buy a Posey Hipster because the buyers would have already purchased the product before they received the insert.

25.    The placement and format of the Garwood Laboratories Advertisements in the material – on the second or third page in the corner or bottom of the page in small print - is not very effective advertising because it does not grab a buyer's attention.

26.    Posey's target customers are typically sophisticated consumers who will consider several factors other than the reduction of impact force when selecting a hip protector, such as cost, comfortability, penetration of the market, quality, acceptance, and reputation of the company.

27.    Other marketplace factors minimize the effect Posey's advertising will have had on customers or prospective customers. Posey has a strong awareness among potential buyers due

to the fact that Posey has been in the business for over 60 years, the fact that Posey has extended

contracts with certain customers, the fact that Posey has a sales force, the fact that Posey has an

established reputation, and the fact that Posey markets numerous products, as a result of which it

can offer customers "one-stop shopping."

## VII.    ANALYSIS OF HIPSAVER ADVERTISING

28.    I was requested to review several statements made on the HipSaver website attached

as Attachment B pertaining to HipSaver's validation and testing, laundering, and length on the

marketplace.

### A.    STATEMENT OF OPINIONS

29.    Customers would believe that:

      a.    HipSaver's statements pertaining to validation and test results of hip

protectors pertain to HipSaver's hip protectors that are currently sold on the market.

      b.    Reference to a "soft hip protector" means a hip protector with both soft and

hard components.

      c.    HipSavers hip protectors can be washed at temperatures of up to 250°F.

      d.    Posey hip protectors do not meet CDC Guidelines for infection control in the

laundry.

      e.    HipSaver's chart on its website stating that Posey Hipsters have been offered

to the market since 2002, and that HipSaver's products has been offered to the market since

1995, indicate that these companies both first introduced hip protectors, of any type in 2002 and

1995, respectively.

### B.    STATEMENT OF BASIS/REASONS FOR OPINIONS

#### 1.    Validation & Testing

30.    HipSaver makes several statements about the quality and testing success of its hip protectors on its website, including the following:  (i) "Prevent devastating hip injury with the only scientifically validated soft hip protector"; (ii) HipSaver is the "only proven, all-soft hip protector"; and (iii) HipSaver is "the only soft pad hip protector that has clinical validation."

31.    A consumer seeing these statements would believe that they pertain to hip protectors currently sold on the marketplace.  When a company touts the effectiveness and testing "validation" of its product, consumers likely believe that the company tested the product it is currently selling, and not an older product.  It is misleading to tout a product that the company no longer sells.

32.    On its website, HipSaver makes the distinction between "soft" and "all-soft," which indicates that "soft" hip protectors may be a combination of soft and rigid materials, whereas "all-soft" hip protectors are entirely constructed of soft materials.  It would expect too much for the potential buyer to know the details of the construction and variety of hip protectors.

### 2.    Launderability

33.    In its advertising materials, HipSaver makes several statements about the launderability of its hip protectors, including the following:  (i) "Only HipSaver hip protectors clearly meets the CDC Guidelines for infection control in the laundry"; and (ii) "Only HipSaver can be laundered according to the CDC (Center for Disease Control) Guidelines for laundry."

34.    The overall impression from Hipsaver's statements about launderability is that Posey's products do not meet CDC Guidelines.  For example, the use of the word "only" indicates that HipSaver has tested the launderability of its product, that HipSaver has tested, or knows of launderability tests, for other products in the marketplace, and HipSaver can conclude that only HipSavers meet the CDC Guidelines.  Also, HipSaver's comparison chart on its

website comparing its launderability to Posey and AliMed also indicates that HipSaver has tested or knows of launderability tests for other hip protectors in the marketplace. Further, according to HipSaver's statements, Posey's Hipster is machine wash up to 160°F at a maximum, and the CDC Guidelines recommended wash temperature is at least 180°F. Thus, a consumer would conclude that Posey does not meet the CDC Guidelines for washing.

35.    On its website, HipSaver also makes statements about the temperature at which its products may be washed. These include the following: (i) "HipSaver machine wash/dry up to 250°F"; and (ii) "HipSavers wash and dry up to 250°F." Thus, a consumer would likely assume that HipSavers can be washed at temperatures of up to 250°F, and then separately dried at temperatures of up to 250°F.

### 3.    Length of Time On the Market

36.    HipSaver's website includes an "Industry Comparisons" chart in which several statements are made to compare HipSaver's and Posey's products. HipSaver states that HipSaver hip protectors have been offered to the market since 1995 and Posey "Hipster" hip protectors have been offered to the market since 2002.

37.    These statements indicate to consumers that these companies first introduced hip protectors to the market, or alternatively, that these companies first introduced the hip protectors that the companies are currently selling, including any modifications that have been made in these respective years.

## VIII.  CONCLUSION AND POSSIBLE ADDITIONAL ANALYSIS AND INVESTIGATION

38.    In support of my opinions, I may rely on visual aids and other demonstrative exhibits which may include, among other things, the information from the materials listed in Attachment B, telephonic interviews, websites, deposition testimony, or other types of materials.

39.     The foregoing reflects my opinions and reasons therefore based on the materials I have reviewed to date.  I understand that the investigations are on-going, and that additional information may be discovered and provided to me after the submission of this report.  I reserve the right to supplement this report in the event that additional information is provided.  I may also rely on testimony given or to be given by various witnesses and on other reports and/or documents supplied to me in the future.

DATED:  February 12, 2006

_____

Gary Reich

- 13 -

## ATTACHMENT B

In preparation of my expert report, I considered the following data and information:

a.    "Posey EZ On Hipsters" package insert dated June 20, 2003 (Bates Nos. PC 0406-PC 0407);

b.    Posey brochure dated September 26, 2003 (Bates Nos. PC1810-PC1913);

c.    Posey brochure dated January 3, 2005 (Bates Nos. PC1743-PC1746);

d.    "Posey Hipsters" package insert dated April 28, 2005 (Bates Nos. PC0402-PC0403);

e.    Posey brochure dated May 9, 2005 (Bates Nos. PC0400-PC0401;

f.    Posey brochure dated August 5, 2005 (Bates Nos. PC1747-PC1750;

g.    "Posey Hipsters" dated January 24, 2005 (Bates Nos. PC0404-PC0405);

h.    HipSaver website at www.hipsaver.com (Bates Nos. PC0241-PC0290 and PC0291-PC0364);

i.    HipSaver 2003 catalog (Bates Nos. HS2 000014);

j.    HipSaver 2004 catalog (Bates Nos. HS2 000020);

k.    HipSaver "Open Bottom 3-Snap" flyer sheet (Bates Nos. HS2 000028);

l.    HipSaver catalog (Bates Nos. HS2 000014);

m.    Posey sales data (Bates Nos. PC2893-PC2904);

n.    HipSaver sales data (Bates Nos. HS2 000325-HS00326);

o.    Portions of the deposition testimony of Edward Goodwin of October 18, 2005 and November 30, 2005;

p.    Amended Complaint by HipSaver; and

q.    Answer and Counterclaim by Posey.

## CERTIFICATE OF SERVICE

I certify that a copy of this document has been forwarded by electronic filing and USPS First Class mail today to Plaintiff's counsel of record, Edward J. Dailey, Esq., BROMBERG & SUNSTEIN, LLP, 125 Summer Street, 11th Floor, Boston, Massachusetts 02110-1618.

Dated:  February 16, 2006

Donald K. Piper