UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                     )
THE HIPSAVER COMPANY, INC.,          )
                                     )
          Plaintiff,                 )
                                     )
     v.                              )    CIVIL ACTION NO. 05-10917-PBS
                                     )
J.T. POSEY COMPANY,                  )
                                     )
          Defendant.                 )
_____  )
```

**MEMORANDUM AND ORDER**

July 19, 2007

Saris, U.S.D.J.

This hard-fought case involves allegations of literally false comparative advertising about hip protectors in a two-company market. Defendant J.T. Posey Company ("Posey") has requested discovery sanctions as a result of plaintiff HipSaver, Inc.'s ("HipSaver") failure to disclose key documents and information relating to causation until the week before the scheduled trial on June 11, 2007. Specifically, Posey urges the Court to preclude the introduction of this evidence at trial. Without this evidence, it argues, there is insufficient proof to support HipSaver's claim of injury caused by the advertising.

After multiple hearings, the Court holds that HipSaver is precluded from introducing this newly produced evidence under Fed. R. Civ. P. 37$^{©}$, and awards attorney's fees, as sanctions. However, while the issue is close, HipSaver has proffered evidence from which a reasonable inference of causation and

injury can be drawn with respect to its claim for disgorgement.

## I. Background

### A. Round I

In 2004, HipSaver brought its initial action against Posey, making allegations of false advertising under the Lanham Act, 15 U.S.C. §§ 1117 & 1125, and state law.[1]  HipSaver and Posey are direct competitors in a two-firm market.  That dispute centered on a series of UCLA advertisements (the "UCLA ads") which represented that testing had demonstrated that Posey's hip protector products, garments designed to prevent hip fractures in the elderly, were more effective than HipSaver's products at reducing the impact force associated with a fall.  The ads were disseminated beginning in late 2003 or early 2004.

Another series of Posey advertisements that relied on different testing (the "Garwood ads") had been distributed earlier to support claims of product superiority.  In these ads, Posey represented that testing had demonstrated that Posey's products were proven "<u>most effective</u>" and "reduced the impact force by 90%, the <u>best</u> results of any hip protector available." (emphasis added.)

The lawsuit settled in September 2004.  Under the settlement, Posey agreed to pay HipSaver $360,000 and, among

---

[1]For a more detailed introduction to this dispute, see <u>HipSaver Co. v. J.T. Posey Co.</u>, 2007 U.S. Dist. LEXIS 35364 (D. Mass. May 15, 2007).

other things, the parties mutually released each other from all "known and unknown" related claims which were or could have been asserted prior to the date of the settlement agreement. As part of the settlement, the parties also agreed not to press claims involving all known advertisements in existence at the time of the settlement that continued into the future.[2]

## B.  Round II

While the first litigation was proceeding, in 2004, Posey continued to run the Garwood ads. HipSaver's president, Edward Goodwin, states he believed that those ads had been abandoned when Posey began to publish the UCLA ads, and therefore did not press any claims about those ads in the first suit. The ads were in continuous use, throughout round one of the litigation, before, during, and after settlement negotiations. Posey disputes Goodwin's claims that he did not know about the ongoing Garwood ads.

HipSaver brought a second suit for false advertising under the Lanham Act and state law based on the Garwood ads, and Posey counterclaimed. The Garwood ads were terminated in 2005. On May 15, 2007 the Court issued an order allowing in part and denying in part Posey's motion for summary judgment on HipSaver's false advertising claims under the Lanham Act, 15 U.S.C. §§ 1117 &

---

[2]According to the parties' submissions, the parties do not dispute this interpretation of the agreement but it is not expressly included in the written settlement agreement.

1125, and related state law claims.  See HipSaver Co., 2007 U.S.
Dist. LEXIS 35364.  Among other things, I held that all claims
regarding advertisements run prior to September 2004 were barred
by the settlement agreement, regardless of whether Goodwin knew
about them, but permitted HipSaver to go forward with claims
based on alleged false advertisements which pre-dated the
agreement, but were unknown to Posey and continued to be run.
See id. at *22.  In addition, I concluded that there was
sufficient evidence from which a factfinder could reasonably
conclude that certain representations made by Posey in the
Garwood ads were both literally false and material.  Id. at *39.
I granted summary judgment for HipSaver on Posey's counterclaims
because those claims involved known pre-settlement advertisements
barred by the agreement and release.

    Posey argued that HipSaver's evidence with respect to the
remaining claims was insufficient to support a reasonable
inference of causation of injury, a required element for Lanham
Act claims seeking damages.  See, e.g., Cashmere & Camel Hair
Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 318 (1st Cir.
2002).  I held:

> HipSaver's inability to identify specific lost
> opportunities or sales following [the settlement
> agreement] is not necessarily fatal at this point because
> it did not know the Court's ruling on this summary
> judgment motion. It contends it does not have the
> resources or record-keeping capacity to calculate its
> actual damages. HipSaver, however, must present
> admissible evidence of post-settlement damages and cannot
> invite jury speculation. Thus, HipSaver must supplement

its pre-trial memorandum within two weeks to make a
proffer of evidence supporting causation and a theory of
damages consistent with this ruling. HipSaver will not
be permitted to grab a pocketful of Posey's profits
without some evidence linking the false advertisements to
HipSaver's allegations of injury.

HipSaver, 2007 U.S. Dist. LEXIS 35364, at *42-43.

HipSaver's initial theory of causation was that it had lost
customers and been shut out of national "big chain" health care
facilities on account of Posey's false representations about its
hip protector products, at least some of which made implicit
false references to HipSaver's products. Edward Goodwin,
president of HipSaver, submitted a declaration stating that
HipSaver's sales in 2006 were "flat," and the sales data turned
over to Posey during discovery supported this contention. (See
Goodwin Decl. ¶¶ 2, 32 Docket No. 183-2.) Prior to the ruling on
summary judgment, HipSaver had identified certain customers and
opportunities which it alleged were lost as a result of Posey's
false advertising, but all of these pre-dated the 2004 settlement
agreement.

Posey argued in support of its motion for summary judgment
that HipSaver had failed to demonstrate causation and injury.
Posey's damages experts submitted reports concluding that
HipSaver had suffered no harm as a result of the advertisements,
and pointing out that one possible indication of harm would be a
measurable increase in sales following withdrawal of the ads.
(See Hoffman & Green at 6.) The flat sales data produced by

HipSaver did not reveal this "uptick."   (Id.)

**C.  HipSaver's Parry**

On May 24, 2007, HipSaver filed a supplemental report by its
damages expert, Dr. Epstein.  (Docket No. 271.)  HipSaver
identified: (1) new aggregate 2006 domestic sales data for its
hip protector products, which purportedly showed an increase in
sales following cessation of the Garwood ads; (2) a comparison of
the respective average monthly growth rates of HipSaver (4.2%)
and Posey (8.8%) in the 9 months following the 2004 settlement
agreement; and (3) 2006 sales data for a different HipSaver
product, the DermaSaver, which HipSaver was able to distribute to
large national chains.  DermaSaver is a sleeve-like garment worn
over the skin to protect against skin tears in the elderly.

According to HipSaver, this data, some of which it
characterized without explanation as "newly available,"
demonstrated that indeed HipSaver's sales rebounded after Posey's
false Garwood advertisements had been withdrawn, proving
causation, and countered Posey's suggestion that HipSaver's
exclusion from the "big chain" market was the result of factors
unrelated to the advertisements, such as brand loyalty.  HipSaver
has been unable to identify any specific lost customers,
opportunities, or diverted sales resulting from the Garwood
advertisements.

On May 29, 2007, at the final pre-trial conference, I

ordered HipSaver to produce all of the sales invoices supporting its new causation theory through the final quarter of 2006 to Posey in CD form within 24 hours.  HipSaver had represented that all sales data through September 13, 2006 had been previously handed over during discovery and had been available to Posey's experts when their reports were prepared.  (See, e.g, Tr. 5/29/07 45:7-17.)

On May 30, Posey moved to strike HipSaver's proffer and supplemental expert submission on various grounds, pointing out that the data included sales to the Department of Veterans Affairs ("VA"), which HipSaver had previously characterized as unaffected by Posey's false advertising.  (Referenced at Docket No. 276.)  Posey also moved to strike the proffer because it consisted of new 2006 sales data that hadn't been produced before the close of discovery on May 1, 2007 and, in any event, because the data didn't support a viable theory of causation.  The next day, on May 31, HipSaver voluntarily moved to withdraw its supplemental expert submission, conceding that inclusion of the VA sales was in error.  (Docket No. 280.)  HipSaver characterized the error as "inadvertent," and requested the opportunity to submit a revised expert report with the VA data excised.  On the same day, HipSaver produced an Excel spreadsheet listing summary data regarding 2006 hip protector sales.  Trial was slated to begin June 11.

At a hearing on June 4,[3] the following Monday, the Court expressed concern that HipSaver was coming forward with a brand new theory and evidence of injury at such a late stage in the proceedings, but counsel for HipSaver responded: "I want to make very clear it's not a whole new theory.  It is the exact same theory, and it is the same data that they already had."  (6/4/07 Tr. 4:9-10.)  Nonetheless, HipSaver had not produced invoices for the last quarter of 2006 in a form accessible to Posey and had not, by the time of the hearing, submitted its proposed revised expert report.  Accordingly, with only a week until trial, I excluded all new sales data after September 13, 2006, and denied HipSaver's request to submit later a revised expert report. HipSaver agreed to stand on its supplemental expert submission, the underlying data through September 13, 2006, and the parties' differential growth rates in 2005.

Then, on June 5, HipSaver unexpectedly renewed its motion to withdraw its supplemental expert report on causation, which I allowed.  (Docket No. 293.)  HipSaver argued, nonetheless, that the 2006 sales data through September 13, 2006 (with VA sales now parsed out), the fact of DermaSaver "big chain" market

---

[3]Previously, on June 1, Posey had moved for discovery sanctions against HipSaver on account of its failure to produce the relevant sales data.  Posey also submitted an declaration from one of its damages experts stating that he was unable to reconcile the information contained in the initially-produced databases with the data contained in HipSaver's proffer, and identifying inconsistencies between the two sets of databases. (Docket No. 297-4.)

penetration, and the 2005 growth rate differential (including VA
sales) were sufficient to support a reasonable inference of
causation.  HipSaver also filed a declaration by Edward Goodwin
with attachments summarizing, among other things, HipSaver's 2006
aggregate hip protector sales (with foreign sales included),
total domestic sales, and domestic sales with VA sales excised.
(Docket No. 292.)

     The next day, June 6, I issued an order excluding any new
evidence of DermaSaver sales as untimely.  (Docket No. 298.)  The
same day, Posey filed a motion for sanctions alleging late
production of altered evidence in connection with HipSaver's
revised calculation of it 2006 average monthly sales.  (Docket
No. 296.)  There were, at this point, at least two motions by
Posey for discovery sanctions, as well as motions to strike
HipSaver's proffer and for summary judgment on the causation
issue.  HipSaver, meanwhile, had a theory of causation and
evidence of injury that were in flux.  The record had become
extremely messy, and the factual disputes regarding HipSaver's
disclosures to Posey were opaque and poorly vetted.  At a hearing
on June 7, Posey requested, with some reluctance, to continue the
trial.

     On June 11, I held a fourth hearing to resolve the
nettlesome claims of discovery abuses, and the overarching issue
of the insufficiency of the evidence to support a claim of
causation and damages.  To clarify the procedural position of the

case, I allowed Posey to renew its motions for summary judgment
and to strike data not produced prior to the close of discovery
on May 1 as a discovery sanction.  At the hearing, the parties
explained that HipSaver had produced two databases containing
information regarding its hip protector sales.  One was a 2006
FileMaker Pro database that contained summary information
regarding sales invoices.  The parties agree that Posey received
this database with information through September 13, 2006 during
discovery.  (It had never requested the invoices underpinning
this summary data and therefore, I do not regard HipSaver's
failure to produce these invoices as a discovery violation.)  The
other database was an Excel spreadsheet, which contained the same
summary data as the FileMaker Pro, but which also listed
additional information, breaking the numbers down into corporate
and individual charges.  Posey stated that while it had received
an Excel spreadsheet for other years, it had not received this
important and different database for 2006.

Posey vigorously contended that the sales data recently
produced by HipSaver differed substantially from that contained
in the 2006 database disclosed during discovery.  Posey submitted
an affidavit from its damages expert, C.P.A. Phillip Green, which
explained that total domestic sales for the eight months from
January 1, 2006 through August 31, 2006 amounted to approximately
$467,000 in the original FileMaker Pro Database produced during
discovery, while the sales summary recently produced as part of

its proffer listed sales of approximately $627,000 for the same
period.  (Green Decl. ¶ 4.)  In addition, he pointed out that the
total domestic sales listed in HipSaver's second FileMaker Pro
proffer ($627,000) differed from the total domestic sales listed
in Mr. Goodwin's June 5 Declaration by approximately $24,000, or
approximately 4% of the reported sales.  (Id. ¶ 6.)

HipSaver explained that the large $160,000 difference
between the original FileMaker Pro database and that submitted in
connection with the proffer was due to the inclusion of 2006
corporate charge data (i.e., corporate purchases on credit) and
"unequivocally" stated that this information had been available
to Posey prior before May 1, which Posey vigorously denied.[4]

HipSaver now concedes that the corporate data was not
produced until May 31, 2007, after discovery had closed and just
before trial.  (Docket No. 305.)  HipSaver, through inadvertence,
did not produce the excel spreadsheet listing all of the 2006
charge data.  This discrepancy between $627,000 and $467,000 is
the very uptick which HipSaver now claims proves its theory of
injury and causation sufficient to support its request for
disgorgement damages.

## II.  Discussion

---

[4]See 6/11/07 Tr. 56:23-25; 57:1-2) ("My representation, your
Honor, as clearly as I can state it and unequivocally, the
representation we are making is solely and exclusively based on
data that was provided to the other side during discovery.  It is
not on any more recent data.") (statement of counsel for Posey).

**A.  Rule 37**©

Federal Rule of Civil Procedure 37(c)(1) provides a
"self-executing sanction" for failure to make evidentiary
disclosures required by the Federal Rules.  Ortiz-Lopez v.
Sociedad Espanola de Auxilio Mutuo y Benefiencia de P.R., 248
F.3d 29, 33 (1st Cir. 2001).  The rule states:

> A party that without substantial justification fails to
> disclose information required by Rule 26(a) or 26(e)(1),
> or to amend a prior response to discovery as required by
> Rule 26(e)(2), is not, unless such failure is harmless,
> permitted to use as evidence at a trial, at a hearing, or
> on a motion any witness or information not so disclosed.

Thus a court may, in its discretion, preclude evidence if (1)
"the offending parties were not 'substantially justified' in
failing to disclose information required by Rule 26(a) or Rule
26(e)"[5] and (2) "the failure to disclose was not harmless."
Ortiz-Lopez, 248 F.3d at 33.  In this analysis, courts consider a
"multiplicity of pertinent factors," including

> the history of the litigation, the proponent's need for
> the challenged evidence, the justification (if any) for
> the late disclosure, and the opponent's ability to
> overcome its adverse effects.  Surprise and prejudice are
> important integers in this calculation.

Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197 (1st Cir.
2006).  Because the Rule contemplates strict adherence to

---

[5]Fed. R. Civ. P. 26(a) is an automatic disclosure provision,
which obligates the parties, within 14 days of the Rule 26(f)
conference, to disclose all information relevant to its claims or
defenses.  Fed. R. Civ. P. 26(e) imposes a general obligation to
supplement or correct disclosures or discovery responses to
reflect accurate information.

discovery rules and harsh sanctions for breaches, "the required
sanction in the ordinary case is mandatory preclusion." <u>Klonoski
v. Mahlab</u>, 156 F.3d 255, 269 (1st Cir. 1998).

**B.  HipSaver's Failure to Produce the 2006 Corporate Charge Data**

HipSaver argues that its late production of evidence was in
response to the Court's request, that it was inadvertent, and
that Posey has not been prejudiced because Posey was granted a
continuance.  These arguments are unavailing.

First, late production of the 2006 corporate charge data was
not "substantially justified" because the Court did not permit
HipSaver to produce new documents which should have been
disclosed during discovery in recasting its theory of injury
after the summary judgment ruling.[6]  The 2006 sales data,
including corporate charges, has always been relevant to issues
of causation, injury, and damages.  Mr. Goodwin cited "flat"
revenues in 2006 as an indication of the lasting effects of
Posey's false advertisements.  This statement was crucial to
HipSaver's theory that it had been -- and continued to be -- shut
out of big chain heath care facilities as a result of Posey's
false ads.  HipSaver maintains that the failure to disclose this

---

[6]At the initial hearing on the summary judgment motion, and
repeatedly throughout the hearings after May 15, I made clear
that HipSaver would be limited to evidence already in the record.
HipSaver, recognizing this, repeatedly averred that the 2006 data
had been disclosed.  <u>See, e.g.</u>, 6/11/07 Tr. 46: 1-4 (court: ". .
. I didn't want a whole new round of discovery so it had to be
based on what you had"; counsel for HipSaver, responding:
"Absolutely and I maintain that . . . .").

information was inadvertent.  HipSaver argues that it did not notice that it had turned over incomplete data because HipSaver's sales and revenue for 2006 had not been considered in the initial causation/injury analysis.  However, negligence is not substantial justification for non-production.

Second, HipSaver's omissions were not harmless.  Among other things, Posey prepared its export reports on the basis of incomplete data.  Likewise, Posey (whose lawyers are from California) was forced to prepare for trial and multiple pretrial hearings on the basis of a new theory of causation based on new data, and was put to significant expense attempting to reconcile the new data with the old.  HipSaver claims that Posey has not been prejudiced because the trial has been continued.  However, the delay and additional expense (not to mention stress) occasioned by HipSaver's failure to produce the 2006 data are precisely the sort of harm contemplated by the Rule.  See Gagnon, 437 F.3d at 197 (explaining that the Rule envisions "a fairly limited concept of 'harmless,'" (citing advisory committee's notes)).

Finally, the history of this litigation has been contentious, and HipSaver has twice already been sanctioned for failure to comply with discovery obligations.  Moreover, the summary sales data cited by Mr. Goodwin in his most recent submission to the court differs from the summary submitted just a few days earlier, which, as discussed, differs from that

submitted during discovery.  Hence, Posey reasonably has
questions about the reliability of the new data which would
necessitate additional depositions to resolve.  Posey would
suffer significant expense if it were required to crunch the 2006
sales data anew in order to determine the reliability of
HipSaver's figures.[7]

Accordingly, as a discovery sanction, I exclude the newly
produced 2006 sales data and order HipSaver to pay attorney's
fees and reasonable expenses resulting from the discovery
violations.

### III.  Causation and Injury

With the new 2006 sales data excluded, HipSaver now relies
on the following as evidence of causation and actual harm: (1) a
comparison of the respective average monthly growth rates of
HipSaver (4.2%) and Posey (8.8%) in the nine months following the
2004 settlement agreement; (2) DermaSaver market penetration;
and, finally, (3) a presumption of causation and consumer
confusion if the jury finds that Posey has willfully made
literally false comparative statements about a direct competitor
in a two-firm market.

---

[7]I decline to hold another hearing on this issue because the
parties have had ample opportunity to address the Court in the
hearings on May 29, June 4, June 7, and June 11.  Moreover, the
Court was forced to continue the long-scheduled trial at the last
minute because of the deep-seated uncertainty about the
reliability of the 2006 sales data and concerns about unfair
surprise to Posey.

**A.  Damage Claims**

**1.  Differential Growth Rates**

Posey argues that the parties' differential growth rates in 2005 do not support a reasonable inference that HipSaver has been injured as a result of Posey's post-settlement advertising. First, that growth rate includes sales to VA facilities, which the parties concede are unaffected by false advertising. HipSaver has not demonstrated a differential rate of growth with VA sales parsed out.  Thus, the 2005 growth rate differential using aggregated data cannot reasonably support an inference of causation with respect to non-VA sales.

Second, there are other independent variables that could equally explain these different growth rates which HipSaver and its expert have not addressed.  Most saliently, the parties' 2005 sales followed on a settlement agreement in which Posey agreed pay HipSaver $360,000 to dispose of the false advertising UCLA claims, which were dropped.  Moreover, the Garwood ads were running prior to the settlement.  As HipSaver concedes, the effects of false advertising linger, and HipSaver has offered no way to distinguish between the after-effects of the pre-settlement false UCLA and Garwood ads and the impact of the post-settlement Garwood ads now at issue.

In his June 8 deposition, HipSaver's expert Dr. Epstein could not conclude that HipSaver's 2005 growth rate was caused by

16

post-settlement advertisements; instead, he would only go so far as to say that the differential growth rates were "consistent with an effect of the ads."[8]  Further, Dr. Epstein concedes that other factors could potentially have impacted sales, such as (1) a company's allocation of marketing resources, (Epstein Dep. 59:22-24, 60:1-5 (6/8/07)); (2) customer buying habits, (id. 73:10-12); (3) changes in the selling price of the product, (id. 72:19-21); and (4) customer demand.  (Id. 73:13-15).  He did not consider these or any other potentially relevant variables in his analysis.  (Id. 74:5-25; 75: 8-13.).

Without an expert opinion that this growth rate differential was the result of the post-settlement false Garwood ads, the growth rates alone cannot support a reasonable inference of causation.  Compare EFCO Corp. v. Symons Corp., 219 F.3d 734, 740 (8th Cir. 2000) (actual injury may be proven by circumstantial evidence, where plaintiff "presented evidence of an erosion of its revenues during the period of misconduct.  During this same period, [defendant's] revenues increased at a nearly identical rate.  Further, [plaintiff] produced evidence that its sales

---

[8]
    Q: Can you conclude that HipSaver has suffered harm from
    Posey's accused ads from the analysis of sales trends
    alone?
    A: . . . At this point, the only opinion I'm prepared to
    offer was what was in my September report, which is . .
    . [that] the rates of growth between HipSaver and Posey
    were consistent with an effect of the ads, and that's as
    far as I can go right now.
Epstein Dep. 68: 8-17 (6/8/07).

force was losing clients to [defendant].  Taken together, this evidence supports an inference that the shift in the companies' market shares was due to [defendant's] misconduct"), <u>with</u> <u>Quabaug Rubber Co. v. Fabiano Shoe Co.</u>, 567 F.2d 154, 162 (1st Cir. 1977) (plaintiff company's speculative "belief" that his company had been injured by defendant's false ads not enough).

### 2. DermaSaver

Second, HipSaver argues that its DermaSaver product has penetrated the market, demonstrating that if there had not been false advertising, the HipSaver product would have been purchased by the big nursing home chains.  DermaSaver is not a hip protector garment, but a sleeve designed to protect fragile skin against tears and other causes of skin breakdown.  It is made with a fabric that Mr. Goodwin characterizes as "unique" and for which a patent is now pending.  (<u>See</u> Goodwin Dep. 22:2-24; 23:1-15 (6/8/06).)  No other sleeve product of this sort displays this feature.  Moreover, the market for sleeve products is estimated to be significantly larger than that for hip protectors.  <u>Id.</u> 22:2; 103:17-24; 104:23.)  While DermaSaver sales might be relevant in rebutting some of Posey's arguments that certain variables (like the size of its sales force) account for HipSaver's failure in the "big chain" hip protector market, the DermaSaver penetration does not establish that HipSaver's lack of marketing success in 2006 was due to the Garwood ads.  HipSaver

18

is not comparing apples with apples.

### 3. Presuming Damages

Finally, HipSaver contends that a factfinder could reasonable infer causation because Posey made willful and literally false statements comparing the effectiveness of its hip protectors to HipSaver's products, and because the parties are direct competitors in a two-firm market.  Accordingly, HipSaver argues that despite its inability to point to any specific evidence of injury, for example, diverted sales or lost customers, it is entitled to a presumption of causation and injury which is sufficient to support its claim of disgorgement of Posey's lost profits.

Section 1117(a) of the Lanham Act provides that a successful plaintiff shall be entitled "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).  In Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 316 (1st Cir. 2002), the First Circuit recognized that, where literally false advertisements are at issue, "if there is proof that a defendant intentionally set out to deceive or mislead consumers, a presumption arises that customers in fact have been deceived."  HipSaver contends that it is entitled to an additional presumption of causation and injury because Posey willfully made literally false statements comparing

19

the parties' directly competing products.  Posey argues that the
Garwood advertisements do not qualify as comparative
advertisements because they do not specifically identify HipSaver
or its products.  Nonetheless, in a two-firm market, where a
competitor makes assertions of relative product superiority
backed up by testing, a factfinder could reasonably conclude that
the representations qualify as comparative advertisements.  See 5
J. T. McCarthy, McCarthy on Trademarks and Unfair Competition §
27:62 at 27-130 (4th ed. 2006) (explaining that "comparative
advertising" includes a claim that "tests prove" a product's
superiority).

     The First Circuit has developed a quartet of rules to govern
Lanham Act claims seeking monetary relief:

> 1) a plaintiff seeking damages must prove actual harm,
> such as the diversion of sales to the defendant; 2) a
> plaintiff seeking an accounting of defendant's profits
> must show that the products directly compete, such that
> defendant's profits would have gone to plaintiff if there
> was no violation; 3) the general rule of direct
> competition is loosened if the defendant acted
> fraudulently or palmed off inferior goods, such that
> actual harm is presumed; and 4) where defendant's
> inequitable conduct warrants bypassing the usual rule of
> actual harm, damages may be assessed on an unjust
> enrichment or deterrence theory.

Aktiebolaget Electrolux v. Armatron Int'l Inc., 999 F.2d 1, 5
(1st Cir. 1999).  Thus, a plaintiff seeking disgorgement must
ordinarily prove "both actual harm and direct competition.  In
the absence of those elements, damages may be awarded upon one of
three conditions: the defendant acted fraudulently; to avoid

unjust enrichment of the defendant; or to deter further willful misconduct." Vt. Pure Holdings, Ltd. v. Nestle Waters N. Am., Inc., 2006 U.S. Dist. LEXIS 13683, at *36 (D. Mass. 2006) (citing Aktiebolaget Electrolux, 999 F.2d at 5); see also Nat'l Fire Prot. Ass'n v. Int'l Code Council, Inc., 2006 U.S. Dist. LEXIS 14360, at *91 (D. Mass. March 29, 2006) (noting that actual harm may be presumed in cases of willful and fraudulent violations of the Lanham Act).

In Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 35 (1st Cir. 2002), the First Circuit articulated three justifications for awarding an accounting of defendant's profits: "(1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement." Id. at 36. The Tamko court further stated that "[i]n cases of at least some direct competition and willfulness, some role may exist for deterrence in an award of an accounting of profits." Id. at 36. Willfulness is a question of fact, which must be submitted to a jury. Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 66 (1st Cir. 2000). Accordingly, if a plaintiff without specific evidence of injury proves direct competition and willfulness, an accounting may be available to the plaintiff "subject to the principles of equity." See Tamko, 282 F.3d at 35.

Prior to 1999 amendments to the Lanham Act, courts had held

21

that willful conduct was a prerequisite to an accounting of a defendant's profits. As the Third Circuit has explained,

> Prior to the amendment, [Section 35 of the Lanham Act] provided as follows:
>> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a) [15 U.S.C. § 1125(a)], shall have been established . . . the plaintiff shall be entitled . . ., subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.
>
> The 1999 amendment replaced "or a violation under section 43(a)" with "a violation under section 43(a), or a willful violation under section 43©[.]" The plain language of the amendment indicates that Congress intended to condition monetary awards for § 43© violations, but not § 43(a) violations, on a showing of willfulness.

Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 174 (3d Cir. 2005) (citations omitted). As a result of this change, several courts have concluded that willfulness is "an important -- but not indispensable -- factor in evaluating whether equity supports disgorging a defendant's profits." Id. at 175; see Quick Techs., Inc. v. Safe Group PLC, 313 F.3d 338, 349 (5th Cir. 2003); R&R Partners, Inc. v. Tovar, 2007 U.S. Dist. LEXIS 29819, at *4-5 (D. Nev. April 23, 2007). The First Circuit has stated that "when the rationale for an award of defendant's profits is to deter some egregious conduct, willfulness is required," Tamko, 282 F.3d at 36 n.11, though the continued force of that statement has been called into question by the reasoning of the Third and Fifth Circuits. In any event, in the absence of evidence of actual

22

harm, the better view of the evolving caselaw in this circuit is
that a plaintiff must prove willfulness.

Other circuits have permitted a plaintiff to recover in
Lanham Act cases, even in the absence of direct evidence of
actual harm, under a similar "totality of the circumstances"
approach.  See Southland Sod Farms v. Stover Seed Co., 108 F.3d
1134, 1146 (9th Cir. 1997) (explaining that "an inability to show
actual damages does not alone preclude a [monetary] recovery
under section 1117"; district court may fashion relief based on
"the totality of the circumstances"); Badger Meter, Inc. v.
Grinnell Corp., 13 F.3d 1145, 1157 (7th Cir. 1994) (stating that,
even if a plaintiff is unable to demonstrate damages resulting
from the defendant's Lanham Act violation, § 1117 allows the
district court to award the plaintiff any just monetary award so
long as it constitutes "compensation" for the plaintiff's losses
or the defendant's unjust enrichment and is not simply a
"penalty" for the defendant's conduct).  But see Seven-Up Co. v.
Coca-Cola Co., 86 F.3d 1379, 1389 (5th Cir. 1996) (no reasonable
inference of causation based on circumstantial evidence of
chronology of events where defendant Coca-Cola made material
false or misleading representations to bottling franchises
comparing Sprite with close competitor Seven-Up because there was
no direct evidence of any franchise switching to defendant's
products as a result of the false representations and evidence

established other explanations for franchises' switching over).

The Eighth and Sixth Circuits have expressly adopted a rebuttable presumption of causation for willfully false comparative advertisements.  The key case relied on by HipSaver is Porous Media Corp. v. Pall Corp., where the Eighth Circuit held that "in comparative advertising cases where money damages are sought and where there exists proof of willful deception," the plaintiff is entitled to a rebuttable presumption of causation and harm.  110 F.3d 1329, 1336 (8th Cir. 1997).  The court elaborated,

> A predicate finding of intentional deception, as a major part of the defendant's marketing efforts, contained in comparative advertising, encompasses sufficient harm to justify a rebuttable presumption of causation and injury in fact.

Id. (emphasis in original); see U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1040 (9th Cir. 1986) (approving a presumption of actual deception and reliance for deliberately false comparative claims); see also McNeilab, Inc. v. American Home Products Corp., 848 F.2d 34, 38 (2d Cir. 1988) (holding that injury may be presumed for false comparative advertising claims where injunctive relief is sought).

In Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 694-95 (6th Cir. 2000), the Sixth Circuit approved this rebuttable presumption of causation and injury for willful comparative advertisements.  However, the court held that an

24

award of marketplace damages was unavailable where the evidence
presented at trial rebutted the presumption by demonstrating that
the plaintiff's "business was not harmed" as a result of the
allegedly false representations.[9]  Id. at 694.  The court stated:

> The reasoning of Porous Media is applicable to the
> present case since [defendant] specifically targeted
> [plaintiff's] balancer, which was the only product of
> its kind in the market. However, . . . the evidence
> shows that [plaintiff] did not suffer marketplace
> injury as a result of [defendant's] advertisements.
> Therefore, even if the advertisements were found
> literally false and [plaintiff] presented evidence of
> willfulness or bad faith, the evidence defeats any
> presumption of damage to goodwill in the present case.

Id. at 694-95.  Further, the court cautioned that, even under a
deterrence theory, the principles of equity did not support an
award of defendant's profits "in the absence of harm to the
plaintiff or benefit to the defendant."  Id. at 695 n.6.

     Though the First Circuit has not addressed this presumption
head on, it has recognized in another context that "[i]n a
two-firm market, harm is sufficiently apparent whenever material
misrepresentations are made."  Elecs. Corp. of Am. v. Honeywell,
Inc., 428 F.2d 191, 194 (1st Cir. 1970) (reversing district
court's denial of a preliminary injunction where plaintiff
alleged that direct competitor engaged in unfair competition

---

[9]At trial, the evidence demonstrated plaintiff's sales
increased after the period in which the false representations
were disseminated; there was no decrease in the price of its
product; and, as plaintiff admitted, no customers had ever
informed it that it was losing a sale due to the defendant's
communications.  Balance Dynamics Corp., 204 F.3d at 694.

under state law by making false comparative statements about plaintiff's products in its brochures).  However, the court later clarified that when it "spoke of the inevitability of harm [the court was] not addressing the availability of damages but of relief."  487 F.2d 513 (1st Cir. 1973).  Indeed, with respect to Lanham Act claims, the First Circuit has emphasized that "section 1125(a) was not intended to provide a windfall."  Quabaug Rubber Co., 567 F.2d at 161 (despite deliberate literally false advertising and use of a mark deceptively similar to plaintiff's, no actual injury where plaintiff failed to adduce any specific evidence of lost sales or customer dissatisfaction relating to the infringing product).

Ultimately, while the law is not clear, Congress has stated that "the principles of equity" determine whether disgorgement is an appropriate remedy.  15 U.S.C. § 1117(a).  "Primary" factors that courts look to include:

> (a) the degree of certainty that the actor benefitted from the unlawful conduct;
>
> (b) the relative adequacy to the plaintiff of other remedies, including an award of damages;
>
> © the interests of the public in depriving the actor of unjust gains and discouraging unlawful conduct;
>
> (d) the role of the actor in bringing about the infringement or deceptive marketing;
>
> (e) any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights; and
>
> (f) any related misconduct on the part of the plaintiff.

Restatement (Third) of Unfair Competition § 37(2).  Courts have given great weight to "whether the defendant had the intent to confuse or deceive."  <u>Banjo Buddies</u>, 399 F.3d at 175 (citation omitted).  These equitable factors adequately guard against a "windfall" to the plaintiff in the form of a speculative damage award.

In sum, the weight of the caselaw in this circuit supports a rebuttable presumption of causation and injury for willful literally false advertising in a two firm market where a defendant makes comparative statements targeting a direct competitor's products.

**B.  Breach of Contract**

Posey also argues that summary judgment should be granted on Posey's breach of contract claim because HipSaver has failed to provide evidence of damages.  In the event of a breach of contract, a party may recover either damages or injunctive relief.  <u>See</u> Restatement (Second) of Contracts § 357 (1979). Here, HipSaver has alleged that Posey breached a provision of the settlement agreement requiring the parties to refrain from using the results of any "further" comparative testing of either's products without giving the other advanced (30 days) written notice.  Even if HipSaver is unable to prove that it suffered damages as a result of Posey's breach of the notice provision, it may still seek an injunction to enforce this notice provision.

27

See Restatement (Second) of Contracts, § 378 (Election Among Remedies).  Accordingly, Posey's motion for summary judgment on HipSaver's contract claim is **<u>DENIED</u>**.

**ORDER**

For the reasons stated, as a discovery sanction, HipSaver is precluded from introducing any evidence not produced to Posey prior to May 1, 2007, and ordered to pay attorney's fees.  Posey shall submit an affidavit supporting all attorney's fees and expenses resulting from the discovery violations.  Posey's renewed motion for summary judgment is **DENIED**.[10]

                                        S/PATTI B. SARIS

                                    United States District Judge

---

[10]I will address the Chapter 93A claim after trial.

29